proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this

(f) In the event Lenders or any holder of the Note shall assign the Note to any Lender or other entity to secure a loan from such Lender or other entity to Lender or such holder for an amount not in excess of the amount which will be due, from time to time, to Lenders under this Continuing Guaranty or the Note with interest not in excess of the rate of interest which is payable by Debtor to Lenders under the Note, Guarantor will accord full recognition thereto and agree that all rights and remedies of Lenders or such holder hereunder shall be enforceable against Guarantor by such Lender or other entity with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Indebtedness or any interest therein is not assigned or transferred.

(g) If: (i) this Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (ii) an attorney is retained to represent Lenders in any bankruptcy, reorganization, receivership, or other proceedings or claims involving, arising out of or related to any of the Loan Documents including this Continuing Guaranty; or (iii) an attorney is retained to represent Lenders in any proceedings whatsoever in connection with this Guaranty and any Lender prevails in any such proceedings, then Guarantor shall pay to Lenders all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "**Enforcement Costs**"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Continuing Guaranty as well as the other Loan Documents.

(h) The parties hereto intend and believe that each provision in this Continuing Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Continuing Guaranty is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Continuing Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Continuing Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Lenders or the holder of the Note under the remainder of this Continuing Guaranty shall continue in full force and effect.

(i) Any indebtedness of Debtor or any person to Guarantor now or hereafter existing is hereby subordinated to the payment of the Indebtedness. Guarantor agrees that, until the entire Indebtedness has been paid in full, Guarantor will not seek, accept, or retain for its own account, any payment from any Borrower on account of such subordinated debt. Any payments to Guarantor on account of such subordinated debt shall be collected and received by Guarantor in

trust for Lenders and shall be paid over to Lenders on account of the Indebtedness without impairing or releasing the obligations of Guarantor hereunder.

(j) Any amounts received by Lenders from any source on account of the Loan may be utilized by Lenders for the payment of the Indebtedness and any other obligations of Debtor or any person to Lenders in such order as Lenders may from time to time elect. Additionally, if the indebtedness guaranteed hereby is less than the full indebtedness evidenced by the Note, all rents, proceeds and avails, including proceeds of realization of Lenders' collateral, shall be deemed applied on the indebtedness of Debtor to Lenders that is not guaranteed by Guarantor until such unguaranteed indebtedness of Borrowers to Lender has been fully repaid before being applied upon the indebtedness guaranteed by Guarantor.

(k) In order to induce Lender to make the Loan and the Payments, Guarantor makes the following representations and warranties to Lenders set forth in this Section. Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan or the Payments.

A. Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

B. The execution, delivery, and performance by Guarantor of this Continuing Guaranty does not and will not contravene or conflict with (i) any Laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

C, This Continuing Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

D. Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his or its obligations under this Guaranty. There are no judgments or orders for the payment of money rendered against Guarantor which have been undischarged for a period of 30 or more consecutive days and the enforcement of which is not stayed by reason of a pending appeal or otherwise. Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

E. All statements set forth in the Recitals are true and correct.

F. Guarantor hereby agrees to indemnify and hold Lenders free and harmless from and against all loss, cost, liability, damage, and expense, including attorney's fees and

costs, which Lenders may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

(l) This Continuing Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor.

(m) Lender shall be entitled to honor any request for Payments made by any person and shall have no obligation to see to the proper disposition of such Payments. Guarantor agrees that his or its obligations hereunder shall not be released or affected by reason of any improper disposition by Debtor or any person of any Payment.

3. Counterparts. This Continuing Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each Guarantor has delivered this Continuing Guaranty to Lender as of the day, month and year first written above.

GUARANTORS:

______________________________
Jerrold S. Pressman

EPD INVESTMENT CO., LLC

By:___________________________
Jerrold S. Pressman

LENDER:

______________________________
John C. Kirkland

UNION BANK OF CALIFORNIA

# STATEMENT OF ACCOUNTS

UNION BANK OF CALIFORNIA
DIRECT BANKING CENTER 245
P. O. BOX 512380
LOS ANGELES CA 90051-0380



**Statement Number:** REDACTED **18457**
10/31/07 - 11/29/07

**Teleservices®**
For 24-hour Automated Direct Service
800-238-4486
800-826-7345(TDD)
Representatives are available
from 6 am to 11 pm

To open additional accounts,
or apply for loans, call your
banking office at 800-796-5656

Visit us at www.uboc.com

Thank you for banking with us
since 1995

**JOHN C KIRKLAND**
REDACTED

REDACTED

REDACTED
REDACTED
REDACTED

**Statement Number:** REDACTED **8457**

10/31/07 - 11/29/07

REDACTED

| | | | |
|---|---|---|---|
| 11/8 | WIRE TRANS TRN 1108019427 110807 | 93052288 | 150,000.00 |

REDACTED

REDACTED

REDACTED

UNION BANK OF CALIFORNIA

# STATEMENT OF ACCOUNTS



**Statement Number:** REDACTED **8457**
02/29/08 - 03/28/08

UNION BANK OF CALIFORNIA
DIRECT BANKING CENTER 245
P. O. BOX 512380
LOS ANGELES CA 90051-0380

**Teleservices®**
For 24-hour Automated Direct Service
800-238-4486
800-826-7345(TDD)
Representatives are available
from 6 am to 11 pm

To open additional accounts,
or apply for loans, call your
banking office at 800-796-5656

Visit us at www.uboc.com

**JOHN C KIRKLAND**
**754 SWARTHMORE AVE**
REDACTED

Thank you for banking with us
since 1995

- *Considering remodeling a kitchen, purchasing a vacation home or paying for your child's tuition? A Home Equity Loan from Union Bank can help make it possible. To apply, go to unionbank.com or visit a Union Bank branch today. Subject to credit and property approval for properties in California, Oregon, or Washington. Equal Housing Lender.*

REDACTED

**Checks**

| *Number* | *Date* | *Reference* | *Amount* | *Number* | *Date* | *Reference* | *Amount* |
|---|---|---|---|---|---|---|---|
| 1084 | 3/11 | 03326194 | 1,238.08 | 1085 | 3/27 | 12194362 | 150,000.00 |
| **Total** | | | | | | | **$ 151,238.08** |

REDACTED

REDACTED

REDACTED

# STATEMENT OF ACCOUNTS



**Statement Number:** REDACTED **457**
05/30/08 - 06/27/08

UNION BANK OF CALIFORNIA
DIRECT BANKING CENTER 245
P. O. BOX 512380
LOS ANGELES CA 90051-0380

**Teleservices®**
For 24-hour Automated Direct Service
800-238-4486
800-826-7345(TDD)
Representatives are available
from 6 am to 11 pm

To open additional accounts,
or apply for loans, call your
banking office at 800-796-5656

Visit us at www.uboc.com

**JOHN C KIRKLAND**
REDACTED

Thank you for banking with us

REDACTED

**Checks**

| Number | Date | Reference | Amount | Number | Date | Reference | Amount |
|---|---|---|---|---|---|---|---|
| 1052 | 6/20 | 12101847 | 100,000.00 | | | | |

REDACTED

# REDACTED

REDACTED

REDACTED

< < < Money Transfer System > > >

RCVD FROM COMERICA BANK SAN JOSE
SENDER'S DDA # REDACTED 01000

*** Message: NOT TESTED. ***

TRN REF #: 20080818-00001671

---

**** MESSAGE ENVELOPE **** ( Bank : CNB )

SRC:FED CALLER:
SND DATE: 08/08/18
EXT:

RPT# AMT:855,466.23 CUR:USD TRDR#
TEST: DUE: TYP:FTR/ FNDS:S CHG:DB:N CD:N COM:N CBL:N

---

| | |
|---|---|
| DBT A/121137522 | CDT D/112828184/ ADV:LTR |
| DEBIT VAL: 08/08/18 | CREDIT VAL: 08/08/18 |
| DEPT:098 | DEPT:001 |
| COMERICA BANK | EPD INVESTMENT CO., LLC |
| SAN JOSE | 520 BROADWAY SUITE 660 |
| CALIFORNIA | SANTA MONICA CA 90401 |
| SNDR REF NUM: REDACTED 003910 | ORIG TO BNF INFO: |
| ORIG:/1891461145 | JOHN C KIRKLAND ACCT NO JK6805 L BU |
| SOUTHLAND TITLE CORPORATION | 32963-JM ESCROW PROCEEDS |
| 7530 N GLENOAKS BLVD | |
| BURBANK, CA 91504 | |
| REF NUM:23100568 | |

**** MESSAGE TEXT ****

{1100} Message Disposition:

| | |
|---|---|
| Format Version: | 02 (New expanded format) |
| Test Production Code: | P (Production) |
| Msg Duplication Code: | (Original incoming msg) |
| Msg Status Indicator: | N (Incoming msg) |

{1110} Acceptance Timestamp:

| | |
|---|---|
| Date: | 08/18 |
| Time: | 13:03 |
| Application Id: | FT01 |

{1120} OMAD:

| | |
|---|---|
| Output cycle date: | 2008/08/18 |
| Output Destination Id: | L2LFCK1C |
| Output sequence number: | 000775 |
| Output date: | 08/18 |
| Output time: | 13:03 |
| Output application Id: | FT01 |

{1510} Type/Subtype Code:

| | |
|---|---|
| Type Code: | 10 (Transfer of funds) |
| Subtype Code: | 00 (Regular transfer) |

{1520} IMAD:

| | |
|---|---|
| Input Cycle date: | 2008/08/18 |
| Input Source id: | L1LF994C |
| Input Sequence number: | 000549 |

{2000} Amount: $855,466.23

{3100} Sending Bank:

| | |
|---|---|
| ABA number: | 121137522 |
| Short name: | COMERICA SCO VLY |

ABA lookup (REL): COMERICA BANK
SAN JOSE
CALIFORNIA

{3320} Sender Reference: REDACTED 3910

{3400} Receiving Bank:
ABA number: 122016066
Short name: CITY NATL BK BH
ABA lookup (AUX): CITY NATIONAL BANK
BEVERLY HILLS, CA

{3600} Business Function Code: CTR (Customer transfer)

{4200} Beneficiary: D/112828184
EPD INVESTMENTS LLC

{4320} Reference for Beneficiary: 23100568

{5000} Originator: D/1891461145
SOUTHLAND TITLE CORPORATION
7530 N GLENOAKS BLVD
BURBANK, CA 91504

{6000} Originator to Beneficiary Info: JOHN C KIRKLAND ACCT NO JK6805 L BU
32963-JM ESCROW PROCEEDS

MESSAGE HISTORY SEQUENCE

REDACTED 6

C

# GENERAL RELEASE

In consideration of $1,000.00, receipt of which is hereby acknowledged, Jerrold S. Pressman, on behalf of himself and his affiliates, estate, employees, representatives, agents, fiduciaries and creditors (collectively, "Pressman"), hereby fully, completely, absolutely and unconditionally waives, releases, discharges and holds harmless John C. Kirkland, all of his past, current and future affiliated law firms and companies, and all of their past, present and future officers, directors, managers, members, managing directors, partners, employees, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively, "Kirkland"), from any and all causes of action, rights, obligations, damages and claims of any kind or nature whatsoever, at law and in equity, including without limitation all claims of legal malpractice, breach of fiduciary duty, fraud, negligent misrepresentation, professional or ordinary negligence, and all claims in any way arising out of or relating to any prior or current representation of Pressman or his affiliates, and any transaction between the parties. Pressman shall defend, indemnify and hold Kirkland harmless from and against any and all claims asserted by Pressman's affiliates, estate, employees, representatives, agents, fiduciaries or creditors.

It is Pressman's intention to fully, finally and forever settle, release and resolve all claims, regardless of whether known or unknown, foreseen or unforeseen, suspected or unsuspected, vested or contingent, accrued or unaccrued. The releases given herein shall be and remain in effect to their full extent, notwithstanding the discovery or existence of any additional or different facts or damages. Pressman knowingly and voluntarily waives the provisions of California Civil Code section 1542, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Any dispute, controversy or claim arising out of or relating to this release will be resolved by binding arbitration before a retired judge at JAMS or its successor in Santa Monica, California. The prevailing party will be awarded its attorney fees, costs and expenses.

Pressman acknowledges and agrees that Kirkland does not represent Pressman or his interests in connection with this release. This release supersedes all prior and contemporaneous oral agreements, promises and understandings, and may not be modified except in writing signed by Kirkland.

________________________ Dated: February 9, 2009
Jerrold S. Pressman

# STATEMENT OF ACCOUNTS



**Statement Number:** REDACTED **8457**
03/31/09 - 04/29/09

UNION BANK OF CALIFORNIA
DIRECT BANKING CENTER 245
P. O. BOX 512380
LOS ANGELES CA 90051-0380

**Teleservices®**
For 24-hour Automated Direct Service
800-238-4486
800-826-7345(TDD)
Representatives are available
from 6 am to 11 pm

To open additional accounts,
or apply for loans, call your
banking office at 714-985-2105

Visit us at unionbank.com

Thank you for banking with us
since 1995

**JOHN C KIRKLAND**
REDACTED

- *Opening a new Union Bank account online has never been easier. It's secure, easy and takes just a few minutes. Go to unionbank.com/openaccount.*

REDACTED

**Checks**

| Number | Date | Reference | Amount | Number | Date | Reference | Amount |
|---|---|---|---|---|---|---|---|
| 1543 | 4/17 | 04071259 | 2,000.00 | 1568* | 4/14 | 03132286 | 100,000.00 |

REDACTED

**$ 105,637.50**
statement.

REDACTED

**Statement Number:** REDACTED **8457**
03/31/09 - 04/29/09

REDACTED

P

A

JOHN C. KIRKLAND
REDACTED 1554
REDACTED

16-49/245
1220
2451018457

1426

DATE 7-24-09

PAY TO THE ORDER OF EPD Investment Co. $ 100,000.00

One Hundred Thousand and no/100 DOLLARS

UNION BANK OF CALIFORNIA direct banking
(800) 238-4486

FOR

REDACTED 04961: REDACTED 3457II 1426

CITY NATIONAL BANK
REDACTED

For Deposit Only
City National Bank 122 REDACT
EPD Investment Co., LLC
Acct #1128 REDACTED

# FUNDING AGREEMENT

THIS FUNDING AGREEMENT ("**Agreement**") is entered into on July 24, 2009 (the "**Effective Date**"), between EPD INVESTMENT CO., LLC, a California limited liability company ("**EPD**"), and JERROLD S. PRESSMAN, an individual ("**Pressman**"), on the one hand, and JOHN C. KIRKLAND, an individual ("**Investor**"), on the other hand.

## Recitals

WHEREAS, the parties previously entered into that certain Secured Promissory Note dated as of November 8, 2007 (the "**Note**"), that certain Continuing Guarantee of even date therewith, and that certain Security Interest Agreement of even date therewith (collectively, together with any documents related thereto, the "**Transaction Documents**"); and

WHEREAS, Investor has invested an aggregate of approximately $2 million in EPD pursuant to the Transaction Documents, all of which is guaranteed and subject to repayment by EPD and Pressman; and

WHEREAS, EPD states that it has paid approximately $75,000 to Investor's mortgage lender for the benefit of Investor over the last year, in monthly payments of approximately $7,500, and will make additional monthly payments in accordance with this Agreement; and

WHEREAS, EPD has advised Investor that, due to temporary cash flow constraints, EPD has an immediate need for $100,000; and

WHEREAS, Investor has agreed to provide EPD with immediate funds subject to and in accordance with the terms hereof;

NOW THEREFORE, in consideration of the premises, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereby agree as follows:

## Agreement

1. **Additional Funds.** Pursuant to the Transaction Documents, which are hereby incorporated herein by reference as though each of the same were set forth in full herein, Investor will deliver $100,000.00 to EPD on the Effective Date, receipt of which is hereby acknowledged.

2. **Monthly Payments.** The funds delivered pursuant to Section 1 hereof shall be applied as follows: (a) first, to repayment of all funds previously paid by EPD on account of or for the benefit of Investor, to the extent actually paid, (b) second, to payment of any and all monies otherwise due to EPD from Investor, which have not previously been paid, (c) third, to be held in trust by EPD to make at least three consecutive additional monthly payments for the benefit of Investor, and (d) all funds paid by Investor, or previously paid by Investor, to or for the benefit of any EPD Parties or Pressman Entities (as defined below) shall be treated in accordance with the Transaction Documents and subject to guaranteed repayment by EPD and Pressman in accordance with the terms thereof.

3. **Investor Release.** Other than the duties and obligations provided for pursuant to or arising out of the Transaction Documents, including, but not limited to, repayment of the Obligations as defined in the Security Interest Agreement, Investor hereby fully, completely, absolutely and unconditionally waives, releases, remises, acquits, satisfies, and forever discharges and holds harmless EPD, Pressman, all of EPD's past and present officers, directors, managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with EPD and Pressman, the "**EPD Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which Investor ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of Investor hereafter can, shall or may have, against any of the EPD Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. Investor irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any EPD Parties in any capacity, whether brought by Investor or by others on Investor's behalf, based on or arising out of any or all matters provided for in the preceding sentence.

4. **EPD Release.** Notwithstanding any other provision, EPD, Pressman individually, and all entities owned or controlled by Pressman (collectively with EPD and Pressman, the "**Pressman Entities**"), hereby fully, completely, absolutely and unconditionally waive, release, remise, acquit, satisfy, and forever discharge and hold harmless Investor, all of Investor's past and present officers, directors, managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with Investor, the "**Investor Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which any of the Pressman Entities ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of any of the Pressman Entities hereafter can, shall or may have, against any of the Investor Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. Each of the Pressman Entities irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any of the Investor Parties in any capacity, whether brought by any Pressman Entities or by others on any Pressman Entities' behalf, based on or arising out of any or all matters provided for in the preceding sentence.

5. **1542 Release.** It is the parties' intention to fully, finally and forever settle, release and resolve all claims, regardless of whether known or unknown, foreseen or unforeseen, suspected or unsuspected, vested or contingent, accrued or unaccrued. The releases given herein shall be and remain in effect to their full extent, notwithstanding the discovery or existence of any additional or different facts or damages. Each of the parties knowingly and voluntarily waives the provisions of Civil Code Section 1542, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of

executing the release, which if known by him must have materially affected his settlement with the debtor."

6. **Contractual Statute of Repose.** Notwithstanding any other provision: Any action, arbitration, proceeding, claim or cause of action of any kind or nature whatsoever against EPD, Pressman, any of the EPD Parties or Pressman Entities, or Investor or any of the Investor Parties, brought by, on behalf of, or for the benefit of Investor or any of Investor Parties, or EPD, Pressman, any of the EPD Parties or any of the Pressman Entities, or any representative, fiduciary, trustee, creditor, successor, heir or assign of any of the foregoing, whether or not arising of, relating to, or in connection with this Agreement, the Transaction Documents or any relations between the parties, can only be brought and filed within one year (i.e., the day prior to the one-year anniversary) of the date of the earliest (a) occurrence, (b) wrongful act or omission, (c) breach, (d) damage, or (e) accrual of any claim or cause of action, whichever occurs first, with no tolling and regardless of discovery or continuing violation. This paragraph establishes an absolute bar to any ability to commence arbitration or bring suit on or after the one-year anniversary of the earliest of any of the foregoing, and in no event shall the time for the commencement of any action or proceeding exceed one year. The running and expiration of the one-year period cannot and shall not be tolled, extended, suspended, waived or revived for any reason whatsoever, including, but not limited to, the existence or lack of (i) knowledge or discovery, (ii) damage or actual injury, (iii) any continuing representation or ongoing relationship, fiduciary or otherwise, (iv) willful concealment, (v) actual fraud or collusion, (vi) mistake or duress, (vii) minority or disability, (viii) dependence on any future act or event, (ix) ongoing conduct or continuing violation, (x) subsequent acts or separable claims, (xi) exhaustion or pursuit of any remedies, actions or processes, (xii) waiver, failure to assert, or inconsistent action, (xiii) bankruptcy or receivership, (xiv) equity or fairness, or (xv) any other facts or circumstances. All rights, remedies, claims and causes of action shall expire and terminate within one year, and any action or proceeding not commenced prior to the one-year anniversary shall be permanently and forever barred, without regard to any waiver, tolling or limitations period provided for by statute, law, equity or fairness. The parties knowingly and permanently waive any tolling provision, rule or statute of limitations to the contrary. This paragraph is intended to limit the right to sue or arbitrate to a period shorter than that granted by statute, and shall be liberally construed and interpreted to accomplish that result. The protections of this paragraph cannot be waived. All provisions of this paragraph are severable.

7. **Interpretation.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their successors and assigns. This Agreement was drafted and prepared solely by EPD, and shall be interpreted and construed as an instrument drafted by EPD. Each of the EPD Parties acknowledges and agrees that Investor is not acting as an attorney or advisor to any of the EPD Parties, and will instead act solely in Investor's own interests, in connection with this Agreement.

8. **Arbitration.** Any and all disputes, controversies and claims in any way arising out of, relating to, or connected with this Agreement or any of the Transaction Documents, or involving any of the parties hereto, including, but not limited to, all issues of arbitrability, timeliness, existence of agreement to arbitrate, waiver of right to arbitrate, and all other preliminary issues, will be resolved by final and binding arbitration before a retired judge at JAMS or its successor in Santa Monica, California, in accordance with its most expedited and

streamlined rules and procedures, with depositions and discovery prohibited or limited to the maximum extent permissible, and the final offer (baseball) arbitration option. The prevailing party will be awarded all reasonable arbitration, attorney and expert fees, costs and expenses. Any arbitration award may be entered in any court of competent jurisdiction.

9. **Ratification.** This Agreement shall be interpreted in a manner that is harmonious and consistent with the intent and purpose of the Transaction Documents, but in the event of any conflict between the Loan Document and this Agreement, this Agreement shall control. Except as modified by this Agreement, the Transaction Documents are hereby ratified and confirmed in all respects, and shall be and remain fully effective and enforceable in accordance with their terms.

John C. Kirkland

Jerrold S. Pressman

EPD INVESTMENT CO., LLC

By:________________________
Jerrold S. Pressman

The Kirklands
[redacted]

September 11, 2009

Mr. Jerrold S. Pressman
EPD Investment Co., LLC
520 Broadway, Suite 660
Santa Monica, CA 90401

Re: Bright Conscience Trust

Dear Jerry:

I am very happy that you and your family are doing well. Thank you and Kate again for the lovely baby presents. Hunter sleeps with his new blanket all the time. And thank you and Keith again for visiting our growing family in the hospital. Hunter is doing so much better now. He is the joy of my life. Your thoughts and prayers helped more than you know.

Of course I accept your apology for not filing the U.C.C. statement that was supposed to be done for the trust. We trust you and know our son's money is in good hands. I understand you can get busy and distracted and things get missed. (I guess now that I'm a mom we'll see what I miss!) As agreed, the U.C.C. will be filed today. In consideration, the trust will release any claims against you and EPD, and also agree to extend the loans for at least another year as you asked. Glad to be able to help.

Thanks again for everything, and please let us know if you need anything else. Kisses and hugs for all.

Sincerely,

Poshow Ann Kirkland,
Trustee of the Bright Conscience Trust
Dated September 9, 2009

Accepted and Agreed:

Jerrold S. Pressman
Chairman of EPD Investment Co., LLC

# FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "**Agreement**") is entered into on October 15, 2009 (the "**Effective Date**"), between EPD INVESTMENT CO., LLC, a California limited liability company ("**EPD**"), and JERROLD S. PRESSMAN, an individual ("**Pressman**"), on the one hand, and POSHOW ANN KIRKLAND, TRUSTEE OF THE BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009 (the "**Trust**"), on the other hand.

## Recitals

WHEREAS, the Trust is the assignee and holder of all right, title and interest under that certain Secured Promissory Note dated as of November 8, 2007 (the "**Note**"), that certain Continuing Guarantee of even date therewith, and that certain Security Interest Agreement of even date therewith (collectively, together with any documents related thereto, the "**Transaction Documents**"); and

WHEREAS, EPD and Pressman desire a forbearance from the Trust, and an extension of the Maturity Date provided for in the Note to at least one year from the Effective Date; and

WHEREAS, EPD and Pressman may have failed to live up to all promises, representations, covenants and agreements made by them in connection with the Transaction Documents, including, but not necessarily limited to, the representation that they would promptly file a first priority UCC-1 Financing Statement to fully perfect the security interests granted pursuant to the Security Interest Agreement;

NOW THEREFORE, in consideration of the premises, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereby agree as follows:

## Agreement

1. **Acknowledgement.** Each of the parties acknowledges, confirms and agrees that the Trust is the valid and bona fide assignee of, and sole and exclusive holder of all right, title and interest under, each of the Transaction Documents.

2. **Forbearance.** Notwithstanding any other provision, the Trust hereby agrees that it will not make written demand pursuant to Section 1 of the Note to cause the Maturity Date (as defined in the Note) to be sooner than the one-year anniversary of the Effective Date of this Agreement.

3. **Trust Release.** Other than the duties and obligations provided for pursuant to or arising out of the Transaction Documents, including, but not limited to, repayment of the Obligations as defined in the Security Interest Agreement, the Trust hereby fully, completely, absolutely and unconditionally waives, releases, remises, acquits, satisfies, and forever discharges and holds harmless EPD, Pressman, all of EPD's past and present officers, directors, managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with EPD and Pressman,

the "**EPD Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which the Trust ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of the Trust hereafter can, shall or may have, against any of the EPD Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. The Trust irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any EPD Parties in any capacity, whether brought by the Trust or by others on the Trust's behalf, based on or arising out of any or all matters provided for in the preceding sentence.

4. **EPD Release.** Notwithstanding any other provision, EPD, Pressman individually, and all entities owned or controlled by Pressman (collectively with EPD and Pressman, the "**Pressman Entities**"), hereby fully, completely, absolutely and unconditionally waive, release, remise, acquit, satisfy, and forever discharge and hold harmless the Trust, all of the Trust's past and present officers, directors, managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with the Trust, the "**Trust Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which any of the Pressman Entities ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of any of the Pressman Entities hereafter can, shall or may have, against any of the Trust Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. Each of the Pressman Entities irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any of the Trust Parties in any capacity, whether brought by any Pressman Entities or by others on any Pressman Entities' behalf, based on or arising out of any or all matters provided for in the preceding sentence.

5. **1542 Release.** It is the parties' intention to fully, finally and forever settle, release and resolve all claims, regardless of whether known or unknown, foreseen or unforeseen, suspected or unsuspected, vested or contingent, accrued or unaccrued. The releases given herein shall be and remain in effect to their full extent, notwithstanding the discovery or existence of any additional or different facts or damages. Each of the parties knowingly and voluntarily waives the provisions of Civil Code Section 1542, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

6. **Contractual Statute of Repose.** Notwithstanding any other provision: Any action, arbitration, proceeding, claim or cause of action of any kind or nature whatsoever against EPD, Pressman, any of the EPD Parties or Pressman Entities, or the Trust or any of the Trust Parties, brought by, on behalf of, or for the benefit of the Trust or any of Trust Parties, or EPD, Pressman, any of the EPD Parties or any of the Pressman Entities, or any representative,

fiduciary, trustee, creditor, successor, heir or assign of any of the foregoing, whether or not arising of, relating to, or in connection with this Agreement, the Transaction Documents or any relations between the parties, can only be brought and filed within one year (i.e., the day prior to the one-year anniversary) of the date of the earliest (a) occurrence, (b) wrongful act or omission, (c) breach, (d) damage, or (e) accrual of any claim or cause of action, whichever occurs first, with no tolling and regardless of discovery or continuing violation. This paragraph establishes an absolute bar to any ability to commence arbitration or bring suit on or after the one-year anniversary of the earliest of any of the foregoing, and in no event shall the time for the commencement of any action or proceeding exceed one year. The running and expiration of the one-year period cannot and shall not be tolled, extended, suspended, waived or revived for any reason whatsoever, including, but not limited to, the existence or lack of (i) knowledge or discovery, (ii) damage or actual injury, (iii) any continuing representation or ongoing relationship, fiduciary or otherwise, (iv) willful concealment, (v) actual fraud or collusion, (vi) mistake or duress, (vii) minority or disability, (viii) dependence on any future act or event, (ix) ongoing conduct or continuing violation, (x) subsequent acts or separable claims, (xi) exhaustion or pursuit of any remedies, actions or processes, (xii) waiver, failure to assert, or inconsistent action, (xiii) bankruptcy or receivership, (xiv) equity or fairness, or (xv) any other facts or circumstances. All rights, remedies, claims and causes of action shall expire and terminate within one year, and any action or proceeding not commenced prior to the one-year anniversary shall be permanently and forever barred, without regard to any waiver, tolling or limitations period provided for by statute, law, equity or fairness. The parties knowingly and permanently waive any tolling provision, rule or statute of limitations to the contrary. This paragraph is intended to limit the right to sue or arbitrate to a period shorter than that granted by statute, and shall be liberally construed and interpreted to accomplish that result. The protections of this paragraph cannot be waived. All provisions of this paragraph are severable.

7. **Interpretation.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their successors and assigns. This Agreement was drafted and prepared solely by EPD, and shall be interpreted and construed as an instrument drafted by EPD. Each of the EPD Parties acknowledges and agrees that neither the Trust nor any party in any way affiliated with the Trust is acting as an attorney or advisor to any of the EPD Parties, and will instead act solely in the Trust's interests, in connection with this Agreement.

8. **Arbitration.** Any and all disputes, controversies and claims in any way arising out of, relating to, or connected with this Agreement or any of the Transaction Documents, or involving any of the parties hereto, including, but not limited to, all issues of arbitrability, timeliness, existence of agreement to arbitrate, waiver of right to arbitrate, and all other preliminary issues, will be resolved by final and binding arbitration before a retired judge at JAMS or its successor in Santa Monica, California, in accordance with its most expedited and streamlined rules and procedures, with depositions and discovery prohibited or limited to the maximum extent permissible, and the final offer (baseball) arbitration option. The prevailing party will be awarded all reasonable arbitration, attorney and expert fees, costs and expenses. Any arbitration award may be entered in any court of competent jurisdiction.

9. **Ratification.** This Agreement shall be interpreted in a manner that is harmonious and consistent with the intent and purpose of the Transaction Documents, but in the event of any conflict between the Loan Document and this Agreement, this Agreement shall control. Except as modified by this Agreement, the Transaction Documents are hereby ratified and confirmed in all respects, and shall be and remain fully effective and enforceable in accordance with their terms.

______________________________
Poshow Ann Kirkland, Trustee
of the Bright Conscience Trust
Dated September 9, 2009

______________________________
Jerrold S. Pressman

EPD INVESTMENT CO., LLC

By:____________________________
Jerrold S. Pressman

# ADDITIONAL FORBEARANCE AGREEMENT

THIS ADDITIONAL FORBEARANCE AGREEMENT (this "**Agreement**") is entered into on September 3, 2010 (the "**Effective Date**"), between EPD INVESTMENT CO., LLC, a California limited liability company ("**EPD**"), and JERROLD S. PRESSMAN, an individual ("**Pressman**"), on the one hand, and POSHOW ANN KIRKLAND, TRUSTEE OF THE BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009 (the "**Trust**"), on the other hand.

## Recitals

WHEREAS, the Trust is the holder of all right, title and interest under that certain Secured Promissory Note dated as of November 8, 2007 (the "**Note**"), that certain Continuing Guarantee of even date therewith, and that certain Security Interest Agreement of even date therewith, that certain Funding Agreement dated July 24, 2009, and that certain Forbearance Agreement dated October 14, 2009 (collectively, together with any and all documents related thereto, the "**Transaction Documents**"); and

WHEREAS, there is more than two million dollars ($2,000,000) due to the Trust from EPD and Pressman pursuant to the Transaction Documents, payable on demand, the exact amount of which shall be set forth in an accounting to be prepared by EPD within thirty (30) days; and

WHEREAS, the Trust has previously agreed to forbear from calling the loan to October 14, 2010, and previously gave notice that the Maturity Date provided for in the Note would be November 29, 2010, but has stated its desire to exercise its right to move up the Maturity Date to October 14, 2010; and

WHEREAS, EPD and Pressman desire a further forbearance from the Trust, and a binding extension of the Maturity Date provided for in the Note to three (3) months from the Effective Date of this Agreement;

NOW THEREFORE, in consideration of the premises, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereby agree as follows:

## Agreement

1. **Forbearance.** Notwithstanding any other provision, the parties hereby agree that the Maturity Date for any and all funds due under the Note and the full and complete satisfaction of all Obligations under the Transaction Documents shall be three (3) months from the Effective Date of this Agreement.

2. **Trust Release.** Other than the duties and obligations provided for pursuant to or arising out of the Transaction Documents, including, but not limited to, full and timely repayment of the Note and all funds advanced thereunder, and full and timely satisfaction of all Obligations as defined in the Security Interest Agreement, the Trust hereby fully, completely, absolutely and unconditionally waives, releases, remises, acquits, satisfies, and forever discharges and holds harmless EPD, Pressman, all of EPD's past and present officers, directors,

managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with EPD and Pressman, the "**EPD Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which the Trust ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of the Trust hereafter can, shall or may have, against any of the EPD Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. The Trust irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any EPD Parties in any capacity, whether brought by the Trust or by others on the Trust's behalf, based on or arising out of any or all matters provided for in the preceding sentence.

3. **EPD Release.** Notwithstanding any other provision, EPD, Pressman individually, and all entities owned or controlled by Pressman (collectively with EPD and Pressman, the "**Pressman Entities**"), hereby fully, completely, absolutely and unconditionally waive, release, remise, acquit, satisfy, and forever discharge and hold harmless the Trust, all of the Trust's past and present officers, directors, managers, members, managing directors, partners, employees, trusts, settlors, trustees, beneficiaries, fiduciaries, relatives, representatives, agents, attorneys and assigns, whether acting in their representative, individual or any other capacities (collectively with the Trust, the "**Trust Parties**"), from any and all liabilities, duties, causes of action, rights, obligations, damages, suits, debts, sums of money, accounts, reckonings, bonds, bills, demands, agreements, covenants, contracts, controversies, costs, expenses, offsets, and claims of any kind or nature whatsoever, at law and in equity, whether known or unknown, which any of the Pressman Entities ever had, now has, or which any representative, fiduciary, trustee, creditor, successor, heir or assign of any of the Pressman Entities hereafter can, shall or may have, against any of the Trust Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time to the Effective Date. Each of the Pressman Entities irrevocably agrees to forever refrain and forbear from commencing, instituting or participating, either as a named party or otherwise, in any lawsuit, action or other proceeding against any of the Trust Parties in any capacity, whether brought by any Pressman Entities or by others on any Pressman Entities' behalf, based on or arising out of any or all matters provided for in the preceding sentence.

4. **1542 Release.** It is the parties' intention to fully, finally and forever settle, release and resolve all claims, regardless of whether known or unknown, foreseen or unforeseen, suspected or unsuspected, vested or contingent, accrued or unaccrued. The releases given herein shall be and remain in effect to their full extent, notwithstanding the discovery or existence of any additional or different facts or damages. Each of the parties knowingly and voluntarily waives the provisions of Civil Code Section 1542, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

5. **Interpretation.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their successors and assigns. This Agreement was drafted and prepared

solely by EPD, and shall be interpreted and construed as an instrument drafted by EPD. Each of the EPD Parties acknowledges and agrees that neither the Trust nor any party in any way affiliated with the Trust is acting as an attorney or advisor to any of the EPD Parties, and will instead act solely in the Trust's interests, in connection with this Agreement.

6. **Arbitration.** Any and all disputes, controversies and claims in any way arising out of, relating to, or connected with this Agreement or any of the Transaction Documents, or involving any of the parties hereto, including, but not limited to, all issues of arbitrability, timeliness, existence of agreement to arbitrate, waiver of right to arbitrate, and all other preliminary issues, will be resolved by final and binding arbitration before a retired judge at JAMS or its successor in Santa Monica, California, in accordance with its most expedited and streamlined rules and procedures, with depositions and discovery prohibited or limited to the maximum extent permissible, and the final offer (baseball) arbitration option. The prevailing party will be awarded all reasonable arbitration, attorney and expert fees, costs and expenses. Any arbitration award may be entered in any court of competent jurisdiction.

7. **Ratification.** This Agreement shall be interpreted in a manner that is harmonious and consistent with the intent and purpose of the Transaction Documents, but in the event of any conflict between the Loan Document and this Agreement, this Agreement shall control. Except as modified by this Agreement, the Transaction Documents are hereby ratified and confirmed in all respects, and shall be and remain fully effective and enforceable in accordance with their terms.

______________________________
Poshow Ann Kirkland, Trustee
of the Bright Conscience Trust
Dated September 9, 2009

______________________________
Jerrold S. Pressman

EPD INVESTMENT CO., LLC

By:___________________________
Jerrold S. Pressman

# CERTIFICATION OF TRUST

The undersigned, trustee of the Bright Conscience Trust, confirms the following facts:

(1) The above trust is in existence, and the trust instrument was executed September 9, 2009.

(2) The settlor of the trust was John C. Kirkland.

(3) The trustee of the trust is Poshow Ann Kirkland.

(4) The trustee has all powers enumerated in the California Trust Law.

(5) The trust is irrevocable.

(6) Attached hereto are excerpts from the original trust documents which confer upon the trustee the power to act.

(7) The trust has not been revoked, modified, or amended in any manner which would cause the representations contained in the certification of trust to be incorrect.

(8) This Certification is being signed by all of the currently acting trustees of the trust.

Dated: April 2, 2013

Poshow Ann Kirkland

## ACKNOWLEDGMENT

State of California
County of LOS ANGELES )

On APRIL 02 2013 before me, RANDOLPH EDELMAN NOTARY PUBLIC
(insert name and title of the officer)

personally appeared PO SHOU ANN KIRKLAND,
who proved to me on the basis of satisfactory evidence to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(~~ies~~), and that by ~~his~~/her/~~their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

RANDOLPH EDELMAN
Commission # 1863472
Notary Public - California
Los Angeles County
My Comm. Expires Sep 30, 2013

Signature Randolph Edelman (Seal)

## OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

CERTIFICATION OF TRUST
(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages 1 Document Date 04-02-2013

(Additional information)

# BRIGHT CONSCIENCE TRUST

This trust agreement is made between John C. Kirkland (called the "settlor") and Poshow Ann Kirkland, as trustee.

## I. Creation of Trust

A. Transfer to Trust. The settlor hereby transfers and delivers to the trustee, the property described in Schedule A, attached to this trust. This property, together with any other property subsequently becoming part of the trust, constitutes the trust estate and will be held, administered, and distributed by the trustee as provided in this agreement. The trustee hereby acknowledges receipt of the trust property and agrees to hold the trust property in trust, according to this agreement.

B. Name of Trust. This trust may be referred to as the Bright Conscience Trust dated September 9, 2009.

REDACTED

REDACTED

III. Office of Trustee

REDACTED

REDACTED

F. Trustee Powers. The trustee of each trust established under this instrument is authorized to exercise the following powers for purposes of discharging the trustee duties imposed by this document and by law:

(1) Each and every power enumerated in any part of the California Trust Law, and any successor statutes as amended from time to time.

REDACTED

REDACTED

(12) The power to institute or defend legal actions concerning this trust or any trust created by this instrument.

G. Scope of Powers. The trustee may freely act under all or any of the powers by this agreement given to them in all matters concerning this trust and the trusts created by this instrument, after forming their judgment based upon all the circumstances of any particular situation as to the wisest and best course to pursue in the interest of the trusts and the beneficiaries, without the necessity of obtaining the consent or permission of any interested person, or the consent or approval of any court. The powers granted to the trustee may be exercised in whole or in part, from time to time, and shall be deemed to be supplementary to and not exclusive of the general powers of trustees pursuant to law, and shall include all powers necessary to carry them into effect.

REDACTED

REDACTED

Executed at Pacific Palisades, California, as of September 9, 2009.

John C. Kirkland, Settlor

Poshow Ann Kirkland, as Trustee

**Spousal Consent**

I, Poshow Ann Kirkland, the settlor's spouse, hereby consent to transfer of the property described in Schedule A, attached to this trust.

Poshow Ann Kirkland

JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** **CV 13-08910 SJO** **DATE:** **March 17, 2014**

**TITLE:** **In re: EPD Investment Company and Jerrold S. Pressman**
Bankruptcy Court case number: BK 10-62208 ER

========================================================================

**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz — Courtroom Clerk
Not Present — Court Reporter

**COUNSEL PRESENT FOR APPELLANT:** Not Present

**COUNSEL PRESENT FOR APPELLEES:** Not Present

========================================================================

**PROCEEDINGS (in chambers): ORDER DISMISSING APPEAL FOR LACK OF STANDING**

This matter is before the Court on Appellant Poshow Ann Kirkland's ("Appellant"), individually and as Trustee of the Bright Conscience Trust, Dated September 9, 2009 (the "BC Trust"), appeal of the United States Bankruptcy Court for the Central District of California's (the "Bankruptcy Court") Order (the "Bankruptcy Order") Approving Chapter 7 Trustee Jason Rund's (the "Trustee") Motion for Approval of Compromise with Greenberg Traurig LLP and Greenberg Traurig P.A. (together, "GT") (collectively with the Trustee, "Appellees"). Appellant filed her opening brief ("Brief") on February 7, 2014, Trustee filed a reply brief ("Trustee Opp'n") on February 21, 2014, and GT filed one ("GT Opp'n") on the same day. Appellant responded to both the Trustee and GT ("GT Reply") on March 7, 2014. For the following reasons, the Court **DISMISSES** the appeal for lack of standing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Trustee makes the following allegations in the Second Amended Complaint ("SAC") to his adversary proceeding against John C. Kirkland ("Kirkland"), Appellant, and the BC Trust.[1] (*See generally* Trustee Opp'n, Ex. A ("Trustee R.") 110-37 (SAC), ECF No. 13.) From 1970 to 2003, EPD Investment Company ("EPD") operated as an unincorporated sole proprietorship run by Jerrold S. Pressman ("Pressman") (collectively with EPD, the "Debtors"). (SAC ¶ 12.) In 2003, EPD became a California limited liability company, and the sole proprietorship's assets and liabilities were transferred from Pressman to EPD. (SAC ¶ 12.) EPD operated as a Ponzi scheme, using funds from investors either to pay obligations due to other investors or to invest in other business entities partially owned and controlled by Pressman. (SAC ¶ 24.) Beginning in 2009, EPD had insufficient operating cash flow to pay its obligations. (SAC ¶ 25.)

John C. Kirkland ("Kirkland"), the husband of Appellant, served as outside counsel for Pressman, EPD, and other business entities partially owned and controlled by Pressman, both in Kirkland's

---

[1] Bankruptcy Case number AP 12-02424 ER.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

**CASE NO.: CV 13-08910 SJO DATE: March 17, 2014**

individual capacity and through the various law firms at which he was employed. (SAC ¶ 28.) From 2001 until 2006, Kirkland was a partner at GT. (Appellant's Excerpts of R. ("Appellant R.") 25, ECF Nos. 9-1, 9-2, 9-3.) Between January 1, 2004, and December 5, 2006, EPD transferred over $3.12 million into GT's client trust account. (Appellant R. 138.) Of that sum, $255,110 "appears to have been for legal fees . . . and over $2.8 million was . . . for the benefit of other business entities." (Appellant R. 138.) Kirkland was also the Debtors' agent for service of process while he was a partner at GT. (Trustee's R. 36.)

In July 2009, although Kirkland was aware of the alleged Ponzi scheme and the Debtors' insolvency, he entered into a Funding Agreement wherein he invested $100,000 in EPD "due to [EPD's] temporary cash flow constraints." (SAC ¶ 30.c.) In September 2009, Kirkland assigned his interest in EPD to the BC Trust, over which Appellant presided as trustee. (SAC ¶ 29.)

On December 7, 2010, an involuntary bankruptcy petition was filed against EPD by several creditors. (SAC ¶ 8.) On February 1, 2012, Pressman filed a voluntary Chapter 7 petition. (SAC ¶ 9.) The EPD bankruptcy estate and the Pressman bankruptcy estate were consolidated on June 4, 2012. (SAC ¶ 10.) On May 24, 2013, Plaintiff filed the SAC against Kirkland and Appellant, individually and as trustee of the BC Trust, seeking to avoid and recover, for the benefit of the estate, property transferred by the Debtors to Kirkland. The SAC seeks (1) disallowance or subordination of the BC Trust's proofs of claim pursuant to 11 U.S.C. §§ 502 and 510(c); (2) avoidance of fraudulent transfers made with actual intent pursuant to 11 U.S.C. § 544 and California Civil Code ("Civil Code") sections 3439.04(a) and 3439.07; (3) avoidance of fraudulent transfers made with actual intent pursuant to 11 U.S.C. § 548(a)(1)(A); (4) avoidance of fraudulent transfers of constructive fraud pursuant to 11 U.S.C. § 544 and Civil Code sections 3439.04(b), 3439.05, and 3439.07; (5) avoidance of fraudulent transfers of constructive fraud pursuant to 11 U.S.C. § 548(a)(1)(B); and (6) recovery of avoided transfers pursuant to various provisions of Title 11 and the Civil Code. (*See generally* SAC.)

On September 10, 2013, the Trustee filed a Motion for Approval of Compromise with GT (the "Motion"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. (*See generally* Trustee R. 11-62.) In exchange for GT paying $500,000 to the estate, the settlement purported to release GT from any potential claims arising from its interactions with the Debtors during Kirkland's tenure as partner. (Trustee R. 47-48.) In the Motion, the Trustee argued that the estate has viable claims against GT for (1) fraudulent transfer; (2) breach of fiduciary duty; (3) corporate waste; (4) conversion; and (5) civil conspiracy. (Trustee R. 36-37, 47.) The Trustee also requested that the Bankruptcy Court make a finding that the settlement was entered into in good faith within the meaning of California Code of Civil Procedure section 877.6. (Trustee R. 34-38.) That statute precludes third parties from seeking indemnification or contribution from the settling releasee based on comparative fault or contractual liability in the event that the settling claimant subsequently wins a judgment against those third parties. Cal. Civ. Proc. Code § 877.6(c).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 13-08910 SJO DATE: March 17, 2014

Appellant did not object to the settlement in principal, only to the Trustee's request for a good faith finding. (Trustee R. 168-69.) On October 16, 2013, after a hearing, the Bankruptcy Court granted the Motion and found that the settlement between the Trustee and GT was made in good faith under section 877.6. (Trustee R. 1-2, 8-9.) Appellant filed a notice of appeal on October 30, 2013. (Am. Notice of Appeal, ECF No. 2.)

II. DISCUSSION

Appellant contends that the Bankruptcy Court erred by inquiring into the good-faith nature of the settlement under section 877.6. (Brief 2-3.) Appellant makes two arguments in this regard. First, she argues that section 877.6 cannot apply to the settlement, as a matter of law, because there was no "action" pending between GT and the Trustee at the time of settlement. (Brief 7-15.) Alternatively, Appellant contends that the Bankruptcy Order cannot preclude future indemnity or contribution actions based on the state-law claims against GT released by the Trustee. (Brief 15-17.)[2] Appellees dispute both contentions, and GT further argues that Appellant lacks standing to appeal the Bankruptcy Order. (Trustee Opp'n 15-21; GT Opp'n 6-15.) The Court turns its attention first to the threshold issue of standing.

"To prevent unreasonable delay, courts have created an additional prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999). This consists of more than the injury in fact required by Article III of the United States Constitution. "Only those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court have been held to have standing to appeal that order." *Matter of Fondiller*, 707 F.2d 441, 442 (9th Cir. 1983). "[I]n other words, the [bankruptcy court's] order must diminish the appellant's property, increase its burdens, or detrimentally affect its rights." *P.R.T.C.*, 177 F.3d at 777. The determination of whether the appellant is "aggrieved" in this manner is a question of fact. *In re Thorpe Insulation Co.*, 393 Fed. App'x 467, 469 (9th Cir. 2010) (citing *In re Parker*, 139 F.3d 668, 670 (9th Cir.1998)). Appellant bears the burden of demonstrating that she is a "person aggrieved." *Fondiller*, 707 F.2d at 443; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

GT first argues that Appellant is not a "person aggrieved" because she "was [not] a party to the Settlement Agreement." (GT Opp'n 9.) This argument misses the mark. The reason the settling parties sought a good-faith finding under section 877.6 was to immunize GT from indemnity and contribution suits by third parties such as Appellant. *See* Cal. Civ. Proc. Code §§ 877(b), 877.6(c). The Ninth Circuit has held that provisions barring third parties from seeking indemnity or contribution in judicially approved settlements constitute an actual injury. *Smith v. Arthur*

[2] Appellant expressly disavows any argument that the Bankruptcy Court abused its discretion in weighing the factors for a good-faith finding outlined by the California Supreme Court in *Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488 (1985). (Brief 7-8.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 13-08910 SJO** **DATE: March 17, 2014**

*Andersen LLP*, 421 F.3d 989, 998-1001 (9th Cir. 2005). The dispute in *Smith* arose from a settlement agreement between a bankruptcy trustee and certain defendants in an adversary proceeding. *Id.* at 995-96. The non-settling defendants in the adversary complaint challenged the agreement because it contained an injunction barring them from suing the settling defendants for contribution or indemnity should the bankruptcy trustee prevail on his claims against them. *Id.* at 996. The *Smith* court held that the non-settling defendants had standing because the agreement purported to strip them of "a legal claim or cause of action." *Id.* at 999.

Although the legal question addressed by *Smith* was constitutional rather than prudential standing, the principle articulated in that case is applicable to instant action. *See In re Johns-Manville Corp.*, 340 B.R. 49, 56-58 (S.D.N.Y. 2006) (citing *Smith*, 421 F.3d 989), *vacated on other grounds*, 517 F.3d 52 (2d Cir. 2008). The loss of indemnity and contribution claims would detrimentally affect Appellant's rights. Her interest also has a pecuniary dimension because the type of claims barred by the settlement are modes of properly apportioning money damages among jointly liable parties. Appellant does not seek to avoid having to defend herself or the BC Trust against valid adversary proceedings; she is already defending the BC Trust against the Trustee in one. *See, e.g.*, *In re Abbott*, 183 B.R. 198, 200 (BAP 9th Cir. 1995); *Travelers Ins. Co. v. H.K. Porter Co., Inc.*, 45 F.3d 737, 742 (3d Cir. 1995).[3] Instead, Appellant seeks to preserve her legal right to sue GT in the event that she or the BC Trust is held jointly liable for one of Trustees released claims against GT. Her rights would be detrimentally affected within the meaning of *P.R.T.C.* should the Bankruptcy Order bar her from asserting a potential indemnity or contribution claim against GT.

All this begs the question of whether the settlement could, in fact, bar Appellant from bringing a potential indemnity or contribution claim against GT. (*See* GT Opp'n 9-10.) The Trustee must possess a claim against Appellant which could give rise to an indemnity or contribution action against GT should Appellant be found liable. The actual possibility of an indemnity claim is necessary to satisfy the "aggrieved person" test's demand that Appellant be "directly and adversely affected" by the Bankruptcy Order. *See Smith*, 421 F.3d at 1001 (holding that, under a "more searching inquiry," a party's failure to articulate "the precise nature of the indemnity" claim would prove fatal to standing); *Fondiller*, 707 F.2d at 442 (requiring direct impact). Appellant concedes that she lacks standing "if the Court determines that the Appellant is not a 'joint tortfeasor' or 'co-obligor' as those terms are used in [section] 877.6." (GT Reply 3.) The determination of whether Appellant is a "person aggrieved" is, at root, a factual finding. *Parker*, 139 F.3d at 670. To find that Appellant has standing based on untested hypotheticals would frustrate the prudential standing doctrine's *raison d'être*: the prevention of unreasonable delay in bankruptcy proceedings. *See P.R.T.C.*, 177 F.3d at 777; *Fondiller*, 707 F.2d at 443.

---

[3] GT is mistaken that *In re Eisen*, Nos. CC 06-01385 PAM; SA 06-10372 ES, 2007 WL 7540959 (BAP 9th Cir. 2007), offers any guidance. (*See* GT Opp'n 8-9.) That case dealt with a settling party's interest in property, not the abrogation of third parties' legal rights. *Id.* at *6-7.

Case 2:13-cv-08910-SJO Document 18 Filed 03/17/14 Page 5 of 6 Page ID #:592


**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 13-08910 SJO DATE: March 17, 2014**

Appellant first argues that "[b]ased on . . . Appellees' failure to set forth the claims allegedly settled in a complaint, it is unclear whether . . . Appellant is 'aggrieved.'" (GT Reply 4.) The Court cannot accept this argument for two reasons. First, ruling thus would impermissibly shift the burden of proof. *See Fondiller*, 707 F.2d at 443. Appellant would have Appellees prove her lack of standing, either in a complaint or in Appellees' briefings on appeal, rather adduce evidence and argument herself proving that she is a "person aggrieved." Second, the argument is unpersuasive on the facts. The Trustee listed several specific causes of action the estate could bring against GT in the Motion and in the Trustee Opposition. (Trustee R. 28, 36-37.) Likewise, the Trustee's claims against Appellant can be gleaned from the SAC in the adversary proceeding. (*See generally* SAC.) Appellant would scarcely possess more information to determine the existence of overlapping claims had the Trustee instituted a *pro forma* adversary proceeding against GT and filed a complaint.

Appellant alternatively contends that "if the Trustee succeeds in subordinating or disallowing the [BC] Trust's multi-million dollar secured claim[s] due to Kirkland's misconduct while employed by [GT], the [BC] Trust may be entitled to indemnification due to, *inter alia*, [GT]'s negligent supervision of Kirkland." (GT Reply 5.) This argument fails to demonstrate that Appellant is a "person aggrieved." First, disallowance and subordination do not sound in contract or tort; they are remedies created by the Bankruptcy Code. 11 U.S.C. §§ 502, 510. Section 877.6 explicitly limits immunity to joint tortfeasors and co-obligors. Cal. Civ. Proc. Code § 877.6(c). As such, the Trustee's claim for disallowance and subordination does not create tort or contract liability that can be apportioned through contribution or indemnity. *In re Richmond Produce Co., Inc.*, No. C 93-00390 EFL, 1993 WL 470434, at *2 & n.4 (N.D. Cal. Nov. 10, 1993) (citing *Elliot v. Glushon*, 390 F.2d 514, 516 (9th Cir.1967)) ("[T]here are no contribution or indemnification rights in the bankruptcy context."); *see also In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 595-98 (Bankr. N.D. Cal. 1994) ("[E]ven intentionally fraudulent transfers are valid between the participants, who are presumed to act *in pari delicto*."). Appellant would have to sue for contribution or indemnity on some basis other than an adverse ruling on the Trustee's bankruptcy claims.

Additionally, Appellant is not a "joint tortfeasor" with GT on any of the claims released by the settlement. The Trustee's non-bankruptcy claims against GT sound in tort. (Trustee Opp'n 11; Trustee R. 28.) The Trustee has alleged tortious misconduct by neither Appellant nor the BC Trust, only Kirkland. (*See* SAC ¶¶ 29, 39-40, 42-44; Trustee R. 6-8, 194-95.) As Appellant acknowledges, "[t]he Trustee . . . seeks to utilize [Kirkland's] misconduct to disallow or subordinate the [BC] Trust's claims." (GT Reply 5.) If the Trustee does not allege any tort claims against Appellant or the BC Trust, neither party qualifies as GT's "joint tortfeasor" under section 877.6. *Gackstetter v. Frawley*, 135 Cal. App. 4th 1257, 1272-73 (2006) ("'Joint tortfeasors' have been referred to as 'two or more persons who are liable to the same person for the same harm.'" (quoting Restatement (Second) of Torts § 886A cmt. b (1979))); *see also* Cal. Civ. Proc. Code § 875(a).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 13-08910 SJO** **DATE: March 17, 2014**

Appellant indicates that she may have a claim against GT for negligent supervision. However, Appellant's hypothetical indemnity claim based on negligent supervision—if it is even valid—would not be barred by the settlement agreement. Appellant's claim for negligent supervision would not be an indemnity action at all unless GT had a contractual obligation to cover the BC Trust's potential loss resulting from Kirkland's assignment or breached a duty owed to Appellant. *See Watson v. Dep't of Transp.*, 68 Cal. App. 4th 885, 890-91 (1998). No party asserts that any such relationship existed. Rather, Appellant's hypothetical claim would be a tort action against GT directly (for negligence) or a vicarious liability action based on torts committed by Kirkland while he was in GT's employ. The factual basis for such an action would not be GT's failure to properly supervise Kirkland while he was fraudulently transferring money from the Debtors. Only the Trustee, not a creditor like Appellant, would have standing to challenge Kirkland and GT's tortious conduct toward the Debtors. *Estate of Spirtos v. One San Bernardino Cnty. Superior Court Case*, 443 F.3d 1172, 1176 (9th Cir. 2006). Appellant's claim would instead be based on some alleged fraud or breach of contract that occurred during Kirkland's assignment of his inequitably obtained shares in EPD. Because the factual circumstances surrounding such a fraud or breach of contract would not concern the Trustee—who would have already secured the funds for the estate through disallowance or avoidance—the Trustee's release in the settlement agreement would not encompass claims like the one posited by Appellant.

The Bankruptcy Court, moreover, specifically found "Kirkland provide[d] no evidence that the acts giving rise to his potential liability [to Appellant and the BC Trust] were done in his capacity as a lawyer for GT." (Trustee R. 8.) Since the Bankruptcy Court found no evidence that Kirkland's liability to the BC Trust accrued during his employment at GT—and since this Court finds no evidence that the Bankruptcy Court's conclusion is clearly erroneous, Appellant appears to have no factual justification for seeking to hold GT vicariously liable for any wrong committed by Kirkland in relation to the assignment. Given that Plaintiff has failed to present a legal or factual basis that would give rise to a contribution or indemnity claim precluded by the Bankruptcy Court's good-faith finding, she has failed establish that she is a "person aggrieved" by the Bankruptcy Order.

III. RULING

For the foregoing reasons, the Court **DISMISSES** the appeal because Appellant lacks standing.

IT IS SO ORDERED.

# EXHIBIT 11

**From:** Lewis R. Landau [mailto:lew@landaunet.com]
**Sent:** Friday, May 05, 2017 11:59 AM
**To:** Corey R. Weber
**Cc:** Michael Davis
**Subject:** Kirkland Discovery Negotiations

Corey:

After our call yesterday, I came away with the following list of open items you wanted addressed:

1. Discovery stip Issue 1: semantics over "deposit" and "investment" etc.
2. Discovery stip Issue 2: JCK RFA #236. You requested confirmation that JCK is a PMK for the trust.
3. Discovery stip Issue 4: Individual tax agency letter authentication versus generalized authentication.
4. Overarching confirmation that other than docs identified on the privilege log (including groups of docs), defendants searched for all docs and produced all, other than as already in the Trustee's possession.
5. Disclosure of content of redacted parts of certificate of trust.
6. 2006-2010 tax returns or later if relate to investments in debtors.

If there are other issues aside from these 6, please identify them so we have a complete working set of items needing resolution.

On the six items, here are comments:

1. The request to characterize the nature of the transfer other than their factual history is problematic. I previously provided you with the list of transfers and the bank docs relating to them. We are willing to establish the facts as we know them, but will object to characterizing the transfers. You suggested a qualified RFA response that would resolve this dispute and we'll consider it. Please specify the text.
2. On the PMK issue, I assume you are referring to the attached highlighted portion of the JCK 2004 transcript. If so, we'll restate this in discovery response format if necessary. But your discovery request as that we characterize JCK as a "PMK" and the concept of "PMKs" is not applicable to a trust entity under the rules. Since that characterization may be used in a different context, we object to the characterization.
3. We will authenticate the individual letters. Please specify the exhibit numbers you want us to reference.
4. We will make the overarching document production confirmation you requested. Do you want to suggest text?
5. On the certificate of trust, I noted that there are no redactions. The redactions are in the trust instrument itself, which is the whole point of the certificate. If you would identify and establish the relevancy of a specific trust provision that may be needed, we will evaluate disclosing the same.
6. On the tax returns, the issue is similar to the trust. If there are specific entries within the return that you deem necessary, please identify it and establish the relevance. We can then evaluate disclosure.

Other than the foregoing as a subset of the issues in the draft discovery stipulation, here are comments on other discovery issues:

1. Attached find the additional documents for production based on the Pressman waiver.
2. We agreed to consensually work toward setting the Jerry Pressman and Keith Pressman depositions. For my purposes, I need to see those set in mid-June after I have your side's written discovery responses, with Jerry Pressman's deposition first, about a week before Keith's deposition.
3. I'll also get back to you once I have estimated dates for the Kirklands to consensually appear in Los Angeles for deposition, assuming the other issues are likewise consensually resolved.

Let me know where we stand after you consider this additional information.

Thank you,

Lew

Lewis R. Landau
Attorney at Law
22287 Mulholland Hwy., # 318
Calabasas, CA 91302
Voice & Fax: (888)822-4340

Gmail **John C. Kirkland [redacted]@gmail.com>**

# doc

**Ruben Moreno** [redacted]@broadwayentertainment.com> Fri, Dec 9, 2011 at 7:04 PM
To: [redacted]@gmail.com

**DOCUMENTATION IN SUPPORT OF PROOF OF CLAIM.docx**
14K

# DOCUMENTATION IN SUPPORT OF PROOF OF CLAIM

The documentation in support of ______________ proof of claim ("the Claim"), as it pertains to account number _________ filed in the bankruptcy case of EPD Investment Co., LLC (bearing case number 2:10-bl-62208-ER) is not attached hereto because such documentation is voluminous and may be protected from disclosure because of the attorney-client privilege and/or work-product doctrine.

In the event that a real party in interest seeks production of the documentation in support of this proof of claim, the documentation shall only be produced in such a manner, including, but not limited to, the documents being redacted, to maintain & insure the attorney-client privilege and/or work product doctrine.

On behalf of ___________, all rights and remedies are hereby reserved.

**Loan #1 $**

Gmail - Pulling her hair?

Gmail **John C. Kirkland <[redacted]@gmail.com>**

# Pulling her hair?

1 message

**John Kirkland** [redacted]@gmail.com> Fri, May 25, 2012 at 9:16 PM
To: keith@theepdgroup.com

http://losangeles.cbslocal.com/2012/05/25/party-of-five-star-jeremy-london-pleads-guilty-to-hitting-wife/

Gmail **John C. Kirkland [redacted]@gmail.com>**

# Re: Karma

1 message

**Keith Pressman** [redacted]@theepdgroup.com> Wed, Feb 22, 2012 at 12:50 AM
To: John Kirkland [redacted]@gmail.com>

Total Karma!!

> -----Original Message-----
> From: John Kirkland [redacted]@gmail.com>
> To: [redacted]@theepdgroup.com
> Date: Tue, 21 Feb 2012 09:42:13 -0800
> Subject: Karma
>
> Jeremy LondonCharged with Domestic Battery,Officially Described as Homeless
> http://www.tmz.com/2012/01/24/jeremy-london-domestic-battery-homeless

Gmail **John C. Kirkland <[redacted]@gmail.com>**

---

# Karma

1 message

---

**John Kirkland** [redacted]@gmail.com> Tue, Feb 21, 2012 at 1:42 PM
[redacted]theepdgroup.com

Jeremy LondonCharged with Domestic Battery,Officially Described as Homeless
http://www.tmz.com/2012/01/24/jeremy-london-domestic-battery-homeless

Gmail John C. Kirkland [redacted]@gmail.com>

# Re: Who knew the guy had a temper?

1 message

**Keith Pressman** [redacted]@theepdgroup.com> Fri, Dec 30, 2011 at 12:40 PM
To: John Kirkland [redacted]@gmail.com>

He probably beat her up because she wouldn't let him in to use the bathroom
-----Original Message-----
From: John Kirkland [redacted]@gmail.com>
[redacted]@theepdgroup.com
Date: Thu, 29 Dec 2011 20:33:21 -0800
Subject: Who knew the guy had a temper?

> http://today.msnbc.msn.com/id/45820290/ns/today-entertainment

Gmail - Who knew the guy had a temper?

Gmail **John C. Kirkland [redacted]d@gmail.com>**

# Who knew the guy had a temper?

1 message

**John Kirkland** [redacted]@gmail.com> Fri, Dec 30, 2011 at 12:33 AM
[redacted]theepdgroup.com

http://today.msnbc.msn.com/id/45820290/ns/today-entertainment

Gmail

John C. Kirkland [redacted]@gmail.com>

# More scrutiny for Romney: Overseeing Marriott during years of kickback charges

1 message

**John Kirkland** [redacted]@gmail.com> Thu, Jan 19, 2012 at 4:54 PM
To:[redacted]@theepdgroup.com

http://100r.org/2012/01/romney-on-board/

WOODLAND HILLS, CALIFORNIA;
MAY 27, 2011; 10:15 A.M.

JOHN KIRKLAND,
HAVING BEEN DULY ADMINISTERED AN AFFIRMATION BY THE REPORTER, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

EXAMINATION

BY MR. WEBER:
**Q.** Could you please state your name for the record.
**A.** John Kirkland.
**Q.** Mr. Kirkland, my name is Corey Weber. I'm with Ezra, Brutzkus, Gubner, LLP, special litigation counsel for Jason Rund, Chapter 7 Trustee, who's also present. To my right is Michael Davis, also with Ezra, Brutzkus, Gubner, and Larry Gabriel, also with Ezra, Brutzkus, Gubner. To the right of Mr. Gabriel is Jason Rund, the Chapter 7 trustee. To his right is Robert Hessling, Danning, Gill, Diamond, & Kollitz, general counsel for the Trustee.
Could we have appearances by everyone else.
MR. SLOAN: Paul Sloan.
MR. MOE: Joe Moe of Luce, Forward, Hamilton &



Scripps.
MR. SAHN: Victor Sahn, Sulmeyer Kupetz, counsel for the witness.
MR. WEBER: I'd like to mark as exhibit number 1 a Rule 2004 Motion that was filed on this case. And I apologize, on this one, we only have a few of the copies because they're so large, but it's the document that was filed in the bankruptcy case.

(Whereupon Exhibit 1 was marked for identification and is attached hereto.)

BY MR. WEBER:
**Q.** Mr. Kirkland, have you seen this document before?
**A.** Yes.
**Q.** And are you here as a result of the Motion For Rule 2004 examination?
**A.** Apparently so.
**Q.** And in the Motion For Rule 2004 examination, you were requested as a witness or an examinee in your individual capacity or as counsel for the debtor; there's also a request for the Bright Conscience Trust, person most knowledgeable of that entity, to appear on a later date. Are you here today on behalf of that entity



as well?
**A.** Yes.
**Q.** And your counsel, Mr. Sahn, does he represent you individually here today?
**A.** Yes.
**Q.** And does he also represent you as former counsel for the debtor?
**A.** I have no idea what that means.
**Q.** It says he represents you in your capacity as person most qualified for the Bright Conscience Trust.
**A.** I would assume so.
**Q.** Mr. Kirkland, are you a practicing attorney?
**A.** I guess, yes.
**Q.** What do you mean by "I guess"?
**A.** Well, I switched from being a lawyer to being on -- on the investment side, but I remain of counsel to Luce, Forward so I guess still am, at least in that capacity, a practicing attorney.
**Q.** Are you licensed with the State Bar of California?
**A.** Yes.
**Q.** What year did you become a California attorney?
**A.** 1990.
**Q.** And you're still in good standing?
**A.** Yes.



**Q.** Have you ever had your deposition taken before?
**A.** Yes.
**Q.** Have you ever had a rule 2004 examination taken before, of you?
**A.** Not that I recall.
**Q.** Let me remind you of some of the ground rules. A rule 2004 examination is similar to a deposition in its structure, but the ground rules are the same. Are you familiar with the ground rules for depositions?
**A.** Yes.
**Q.** And I'll ask you to put down your BlackBerry while the deposition is proceeding.
**A.** I can multi-task.
**Q.** I'll ask you again to put down your BlackBerry while the examination is proceeding.
**A.** I'm fine, thanks.
**Q.** I'll remind you that you're here today under oath, that we're going to be asking a series of questions, and we're entitled to your responses and to your undivided attention.
Do you understand that?
**A.** I understand what the rules are.
MR. WEBER: Why don't we go off the record for a minute.
///

**Michael Davis**

| | |
|---|---|
| **From:** | Lewis R. Landau <lew@landaunet.com> |
| **Sent:** | Wednesday, May 10, 2017 4:12 PM |
| **To:** | Corey R. Weber |
| **Cc:** | Michael Davis |
| **Subject:** | Additional Document for Production; Defendants Depositions |
| **Attachments:** | Kirkland Schedules 2007 to 2010.pdf |

Corey:

The attached was just received by JCK from Reuben reflecting the account status. Perhaps we can use this to help focus the first set of issues on characterization. For now, it is being produced as it is relevant and only just came into the client's possession.

Also, although we've been discussing alternate arrangements, I want to make it clear that we have expressly offered to produce JCK and PAK for deposition in St. Thomas on any week day over the next month on reasonable notice.

Let's address the issues further tomorrow.

Thanks,

Lew

Lewis R. Landau
Attorney at Law
22287 Mulholland Hwy., # 318
Calabasas, CA 91302
Voice & Fax: (888)822-4340
Lew@Landaunet.com

| | BEGINNING BALANCE AS OF 01/01/2007 | | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING PRINCIPAL | PREVIOUS INTEREST | BEGINNING BALANCE | DATE | DEPOSITS | MONTHLY INTEREST | DATE | WITHDRAWAL FROM PRINCIPAL | WITHDRAWAL FROM INTEREST | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
| ACCOUNT NO: [redacted] | | | | | | | | | | | | | | |
| | 12.00% | 0.00 | 0.00 | 0.00 | | | | | | | | - | - | - |
| John Kirkland | | | | | 1/1/2007 | | - | 1/1/2007 | - | - | | - | - | - |
| | | | | | 2/1/2007 | | - | 2/1/2007 | - | - | | - | - | - |
| | | | | | 3/1/2007 | | - | 3/1/2007 | - | - | | - | - | - |
| | | | | | 4/1/2007 | | - | 4/1/2007 | - | - | | - | - | - |
| | | | | | 5/1/2007 | | - | 5/1/2007 | - | - | | - | - | - |
| | | | | | 6/1/2007 | | - | 6/1/2007 | - | - | | - | - | - |
| | | KEP Deposit 1029 | | | 9/27/2007 | 200,000.00 | - | 9/27/2007 | - | - | | 200,000.00 | - | 200,000.00 |
| | | BEM Deposit ck 1030 | | | 9/27/2007 | 400,000.00 | - | 9/27/2007 | - | - | | 600,000.00 | - | 600,000.00 |
| | | | | | 10/1/2007 | | 600.00 | 10/1/2007 | - | - | | 600,000.00 | 600.00 | 600,600.00 |
| | | | | | 11/1/2007 | | 6,006.00 | 11/1/2007 | - | - | | 600,000.00 | 6,606.00 | 606,606.00 |
| | | Opening Deposit Via Bank Wire | | | 11/8/2007 | 150,000.00 | 1,617.62 | 11/8/2007 | - | - | | 750,000.00 | 8,223.62 | 758,223.62 |
| | | Wire to Neah Power Systems, Inc. | | | 11/14/2007 | | 1,516.45 | 11/14/2007 | 500,000.00 | - | 500,000.00 | 250,000.00 | 9,740.06 | 259,740.06 |
| | | Transfer to start Lease L071201-JK | | | 12/1/2007 | | 1,385.28 | 12/1/2007 | 200,000.00 | - | 200,000.00 | 50,000.00 | 11,125.34 | 61,125.34 |
| | | | | | | 750,000.00 | 11,125.34 | | 700,000.00 | - | 700,000.00 | 50,000.00 | 11,125.34 | 61,125.34 |

| | BEGINNING BALANCE AS OF 01/01/2008 | | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING PRINCIPAL | PREVIOUS INTEREST | BEGINNING BALANCE | DATE | DEPOSITS | MONTHLY INTEREST | DATE | WITHDRAWAL FROM PRINCIPAL | WITHDRAWAL FROM INTEREST | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
| ACCOUNT NO: [redacted] | | | | | | | | | | | | | | |
| | 12.00% | 50,000.00 | 11,125.34 | 61,125.34 | | | | | | | | 50,000.00 | 11,125.34 | 61,125.34 |
| John Kirkland | | Transfer from L071201-JK | | | 1/1/2008 | 3,530.55 | 611.25 | 1/1/2008 | - | - | | 53,530.55 | 11,736.60 | 65,267.15 |
| | | Transfer from L071201-JK | | | 2/1/2008 | 3,530.55 | 652.67 | 2/1/2008 | - | - | | 57,061.10 | 12,389.27 | 69,450.37 |
| | | Wire Deposit RBC | | | 2/11/2008 | 32,300.00 | 254.65 | 2/11/2008 | - | - | | 89,361.10 | 12,643.92 | 102,005.02 |
| | | Wire Deposit RBC | | | 2/20/2008 | 31,400.00 | 306.02 | 2/20/2008 | - | - | | 120,761.10 | 12,949.93 | 133,711.03 |
| | | Transfer from L071201-JK | | | 3/1/2008 | 3,530.55 | 445.70 | 3/1/2008 | - | - | | 124,291.65 | 13,395.64 | 137,687.29 |
| | | Wire Deposit RBC | | | 3/5/2008 | 19,492.48 | 229.48 | 3/5/2008 | - | - | | 143,784.13 | 13,625.12 | 157,409.25 |
| | | Wire Deposit RBC | | | 3/13/2008 | 10,516.47 | 419.76 | 3/13/2008 | - | - | | 154,300.60 | 14,044.88 | 168,345.48 |
| | | Wire Deposit RBC | | | 3/20/2008 | 21,550.00 | 392.81 | 3/20/2008 | - | - | | 175,850.60 | 14,437.68 | 190,288.28 |
| | | BEM Deposit Check # 1085 | | | 3/26/2008 | 150,000.00 | 380.58 | 3/26/2008 | - | - | | 325,850.60 | 14,818.26 | 340,668.86 |
| | | Transfer from L071201-JK | | | 4/1/2008 | 3,530.55 | 454.23 | 4/1/2008 | - | - | | 329,381.15 | 15,272.48 | 344,653.63 |
| | | Wire to RBC Risk Management | | | 4/1/2008 | | - | 4/1/2008 | 87,578.43 | - | 87,578.43 | 241,802.72 | 15,272.48 | 257,075.20 |
| | | Wire Deposit RBC | | | 4/15/2008 | 48,086.70 | 1,285.38 | 4/15/2008 | - | - | | 289,889.42 | 16,557.86 | 306,447.28 |
| | | Deposit Neah Power Systems via Bank Wire | | | 4/18/2008 | 175,000.00 | 308.45 | 4/18/2008 | - | - | | 464,889.42 | 16,864.31 | 481,753.73 |
| | | Wire Deposit RBC | | | 4/29/2008 | 126,810.95 | 1,766.43 | 4/29/2008 | - | - | | 591,700.37 | 18,630.74 | 610,331.11 |
| | | Transfer from L071201-JK | | | 5/1/2008 | 3,530.55 | 203.44 | 5/1/2008 | - | - | | 595,230.92 | 18,834.18 | 614,065.10 |
| | | Transfer from L071201-JK | | | 6/1/2008 | 3,530.55 | 6,140.65 | 6/1/2008 | - | - | | 598,761.47 | 24,974.83 | 623,736.30 |
| | | KEP CNB Deposit Check # 1052 | | | 6/19/2008 | 100,000.00 | 3,950.33 | 6/19/2008 | - | - | | 698,761.47 | 28,925.16 | 727,686.63 |
| | | Transfer from L071201-JK | | | 7/1/2008 | 3,530.55 | 2,668.18 | 7/1/2008 | - | - | | 702,292.02 | 31,593.35 | 733,885.37 |
| | | Wire Deposit Neah | | | 7/30/2008 | 50,000.00 | 7,338.85 | 7/30/2008 | - | - | | 752,292.02 | 38,932.20 | 791,224.22 |
| | | Transfer from L071201-JK | | | 8/1/2008 | 3,530.55 | 263.74 | 8/1/2008 | - | - | | 755,822.57 | 39,195.94 | 795,018.51 |
| | | Wire Deposit Neah | | | 8/18/2008 | 30,000.00 | 4,505.10 | 8/18/2008 | - | - | | 785,822.57 | 43,701.05 | 829,523.62 |
| | | Wire Deposit Neah | | | 8/25/2008 | 5,000.00 | 1,935.56 | 8/25/2008 | - | - | | 790,822.57 | 45,636.60 | 836,459.17 |
| | | Wire Deposit Neah | | | 8/27/2008 | 5,000.00 | 557.64 | 8/27/2008 | - | - | | 795,822.57 | 46,194.24 | 842,016.81 |
| | | Transfer from L071201-JK | | | 9/1/2008 | 3,530.55 | 1,122.69 | 9/1/2008 | - | - | | 799,353.12 | 47,316.93 | 846,670.05 |
| | | Wire Deposit Neah | | | 9/2/2008 | 200,000.00 | 282.22 | 9/2/2008 | - | - | | 999,353.12 | 47,599.15 | 1,046,952.27 |
| | | Transfer from L071201-JK | | | 10/5/2008 | 3,530.55 | 11,516.47 | 10/5/2008 | - | - | | 1,002,883.67 | 59,115.63 | 1,061,999.30 |
| | | Check # 67333 Union Bank | | | 10/5/2008 | | - | 10/5/2008 | 7,437.50 | - | 7,437.50 | 995,446.17 | 59,115.63 | 1,054,561.80 |
| | | Transfer from L071201-JK | | | 11/5/2008 | 3,530.55 | 10,545.62 | 11/5/2008 | - | - | | 998,976.72 | 69,661.25 | 1,068,637.97 |
| | | Check # 67548 Union Bank | | | 11/5/2008 | | - | 11/5/2008 | 7,437.50 | - | 7,437.50 | 991,539.22 | 69,661.25 | 1,061,200.47 |
| | | Transfer from L071201-JK | | | 12/5/2008 | 3,530.55 | 10,612.00 | 12/5/2008 | - | - | | 995,069.77 | 80,273.25 | 1,075,343.02 |
| | | Check # 67779 Union Bank | | | 12/5/2008 | | - | 12/5/2008 | 7,437.50 | - | 7,437.50 | 987,632.27 | 80,273.25 | 1,067,905.52 |
| | | | | | | 1,047,523.20 | 69,147.91 | | 109,890.93 | - | 109,890.93 | 987,632.27 | 80,273.25 | 1,067,905.52 |

| | BEGINNING BALANCE AS OF 01/01/2009 | | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING PRINCIPAL | PREVIOUS INTEREST | BEGINNING BALANCE | DATE | DEPOSITS | MONTHLY INTEREST | DATE | WITHDRAWAL FROM PRINCIPAL | WITHDRAWAL FROM INTEREST | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
| ACCOUNT NO: [redacted] | 12.00% | 987,632.27 | 80,273.25 | 1,067,905.52 | | | | | | | | 987,632.27 | 80,273.25 | 1,067,905.52 |
| John Kirkland | | | | | 1/5/2009 | | 10,679.06 | 1/5/2009 | - | - | | 987,632.27 | 90,952.31 | 1,078,584.58 |
| Check 68014 Union Bank of CA | | | | | 1/5/2009 | | - | 1/5/2009 | 7,437.50 | - | 7,437.50 | 980,194.77 | 90,952.31 | 1,071,147.08 |
| | | | | | 2/5/2009 | | 10,711.47 | 2/5/2009 | - | - | | 980,194.77 | 101,663.78 | 1,081,858.55 |
| Check 68253 Union Bank of CA | | | | | 2/5/2009 | | - | 2/5/2009 | 7,437.50 | - | 7,437.50 | 972,757.27 | 101,663.78 | 1,074,421.05 |
| | | | | | 3/5/2009 | | 10,744.21 | 3/5/2009 | - | - | | 972,757.27 | 112,407.99 | 1,085,165.26 |
| Check 68507 Union Bank of CA | | | | | 3/5/2009 | | - | 3/5/2009 | 7,809.38 | - | 7,809.38 | 964,947.89 | 112,407.99 | 1,077,355.88 |
| | | | | | 4/5/2009 | | 10,773.56 | 4/5/2009 | - | - | | 964,947.89 | 123,181.55 | 1,088,129.44 |
| Check 68869 Union Bank of CA | | | | | 4/5/2009 | | - | 4/5/2009 | 7,435.52 | - | 7,435.52 | 957,512.37 | 123,181.55 | 1,080,693.92 |
| Deposit Check # 1568 | | | | | 4/15/2009 | 100,000.00 | 3,602.31 | 4/15/2009 | - | - | | 1,057,512.37 | 126,783.86 | 1,184,296.23 |
| | | | | | 5/5/2009 | | 7,895.31 | 5/5/2009 | - | - | | 1,057,512.37 | 134,679.17 | 1,192,191.54 |
| Check 69002 Union Bank of CA | | | | | 5/5/2009 | | - | 5/5/2009 | 7,435.52 | - | 7,435.52 | 1,050,076.85 | 134,679.17 | 1,184,756.02 |
| | | | | | 6/5/2009 | | 11,847.56 | 6/5/2009 | - | - | | 1,050,076.85 | 146,526.73 | 1,196,603.58 |
| Check 69245 Union Bank of CA | | | | | 6/5/2009 | | - | 6/5/2009 | 7,435.52 | - | 7,435.52 | 1,042,641.33 | 146,526.73 | 1,189,168.06 |
| | | | | | 7/5/2009 | | 11,891.68 | 7/5/2009 | - | - | | 1,042,641.33 | 158,418.41 | 1,201,059.74 |
| Check # 69491 Union Bank of CA | | | | | 7/5/2009 | | - | 7/5/2009 | 7,435.52 | - | 7,435.52 | 1,035,205.81 | 158,418.41 | 1,193,624.22 |
| Deposit Neah Power | | | | | 7/7/2009 | 22,068.04 | 795.75 | 7/7/2009 | - | - | | 1,057,273.85 | 159,214.16 | 1,216,488.01 |
| Deposit Check # 1426 | | | | | 7/24/2009 | 100,000.00 | 6,893.43 | 7/24/2009 | - | - | | 1,157,273.85 | 166,107.59 | 1,323,381.44 |
| | | | | | 8/5/2009 | | 4,852.40 | 8/5/2009 | - | - | | 1,157,273.85 | 170,959.99 | 1,328,233.84 |
| Check # 69720 Union Bank of CA | | | | | 8/5/2009 | | 885.49 | 8/5/2009 | 7,435.52 | - | 7,435.52 | 1,149,838.33 | 171,845.48 | 1,321,683.81 |
| | | | | | 9/5/2009 | | 13,216.84 | 9/5/2009 | - | - | | 1,149,838.33 | 185,062.31 | 1,334,900.64 |
| Check # 69855 Union Bank of CA | | | | | 9/5/2009 | | - | 9/5/2009 | 7,435.52 | - | 7,435.52 | 1,142,402.81 | 185,062.31 | 1,327,465.12 |
| | | | | | 10/5/2009 | | 13,274.65 | 10/5/2009 | - | - | | 1,142,402.81 | 198,336.97 | 1,340,739.78 |
| Check # 69984 Union Bank of CA | | | | | 10/5/2009 | | - | 10/5/2009 | 7,435.52 | - | 7,435.52 | 1,134,967.29 | 198,336.97 | 1,333,304.26 |
| Deposit Check # 1127 | | | | | 10/14/2009 | 16,142.00 | 3,999.91 | 10/14/2009 | - | - | | 1,151,109.29 | 202,336.88 | 1,353,446.17 |
| | | | | | 11/5/2009 | | 9,474.12 | 11/5/2009 | - | - | | 1,151,109.29 | 211,811.00 | 1,362,920.29 |
| | | | | | 12/5/2009 | | 13,629.20 | 12/5/2009 | - | - | | 1,151,109.29 | 225,440.20 | 1,376,549.49 |
| Check # 70192 Union Bank of CA | | | | | 12/14/2009 | | 6,423.90 | 12/14/2009 | 7,807.30 | - | 7,807.30 | 1,143,301.99 | 231,864.10 | 1,375,166.09 |
| | | | | | | 238,210.04 | 151,590.85 | | 82,540.32 | - | 82,540.32 | 1,143,301.99 | 231,864.10 | 1,375,166.09 |

0669

| BEGINNING BALANCE AS OF 01/01/2010 | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING BALANCE | DATE | DEPOSITS | UNRECOGNIZED INCOME | DATE | RETURN OF WITHDRAWL | INCOME PAID O OUT | TOTAL WITHDRAWALS | BALANCE | UNRECOGNZIED INCOME TO DATE | ENDING BALANCE |
| ACCOUNT NO: [redacted] | 12.00% | 1,375,166.09 | | | | | | | | 1,143,301.99 | 231,864.10 | 1,375,166.09 |
| John Kirkland | | | 1/5/2010 | | 13,751.66 | 1/5/2010 | - | - | | 1,143,301.99 | 245,615.76 | 1,388,917.75 |
| | | | 2/5/2010 | | 13,889.18 | 2/5/2010 | - | - | | 1,143,301.99 | 259,504.94 | 1,402,806.93 |
| | | | 3/5/2010 | | 14,028.07 | 3/5/2010 | - | - | | 1,143,301.99 | 273,533.01 | 1,416,835.00 |
| | | | 4/5/2010 | | 14,168.35 | 4/5/2010 | - | - | | 1,143,301.99 | 287,701.36 | 1,431,003.35 |
| | | | 5/5/2010 | | 14,310.03 | 5/5/2010 | - | - | | 1,143,301.99 | 302,011.39 | 1,445,313.38 |
| | | | 6/5/2010 | | 14,453.13 | 6/5/2010 | - | - | | 1,143,301.99 | 316,464.53 | 1,459,766.52 |
| | | | 7/5/2010 | | 14,597.67 | 7/5/2010 | - | - | | 1,143,301.99 | 331,062.19 | 1,474,364.18 |
| | | | 8/5/2010 | | 14,743.64 | 8/5/2010 | - | - | | 1,143,301.99 | 345,805.83 | 1,489,107.82 |
| | | | 9/5/2010 | | 14,891.08 | 9/5/2010 | - | - | | 1,143,301.99 | 360,696.91 | 1,503,998.90 |
| | | | 10/5/2010 | | 15,039.99 | 10/5/2010 | - | - | | 1,143,301.99 | 375,736.90 | 1,519,038.89 |
| | | | 11/5/2010 | | 15,190.39 | 11/5/2010 | - | - | | 1,143,301.99 | 390,927.29 | 1,534,229.28 |
| | | | 12/5/2010 | | 15,342.29 | 12/5/2010 | - | - | | 1,143,301.99 | 406,269.58 | 1,549,571.57 |
| | | | | - | 174,405.48 | | - | - | - | 1,143,301.99 | 406,269.58 | 1,549,571.57 |

0670

| NAME | INTEREST RATE | 3INN REVIOL INCIFITERES | | BEGINNING BALANCE | DATE | DEPOSITS | MONTHLY INTEREST | DATE | WITHDRAWAL FROM PRINCIPAL | WITHDRAWAL FROM INTEREST | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BEGINNING BALANCE AS OF 01/01/2008 | | | | | DEPOSITS | | | WITHDRAWALS | | | ENDING BALANCES | | |
| ACCOUNT NO: [redacted] | | | | | | | | | | | | | | |
| | 12.00% | 0.00 | 0.00 | 0.00 | | | | | | | | - | - | - |
| John Kirkland | | | | | 1/1/2008 | | - | 1/1/2008 | - | - | | - | - | - |
| | | | | | 2/1/2008 | | - | 2/1/2008 | - | - | | - | - | - |
| | | | | | 3/1/2008 | | - | 3/1/2008 | - | - | | - | - | - |
| | | | | | 4/1/2008 | | - | 4/1/2008 | - | - | | - | - | - |
| | | | | | 5/1/2008 | | - | 5/1/2008 | - | - | | - | - | - |
| | | | | | 6/1/2008 | | - | 6/1/2008 | - | - | | - | - | - |
| | | | | | 7/1/2008 | | - | 7/1/2008 | - | - | | - | - | - |
| | | | | | 8/1/2008 | | - | 8/1/2008 | - | - | | - | - | - |
| | | Deposit Via Bank Wire | | | 8/18/2008 | 855,466.23 | - | 8/18/2008 | - | - | | 855,466.23 | - | 855,466.23 |
| | | | | | 9/1/2008 | | 3,421.86 | 9/1/2008 | - | - | | 855,466.23 | 3,421.86 | 858,888.09 |
| | | | | | 10/1/2008 | | 8,588.88 | 10/1/2008 | - | - | | 855,466.23 | 12,010.75 | 867,476.98 |
| | | | | | 11/1/2008 | | 8,674.77 | 11/1/2008 | - | - | | 855,466.23 | 20,685.52 | 876,151.75 |
| | | | | | 12/1/2008 | | 8,761.52 | 12/1/2008 | - | - | | 855,466.23 | 29,447.03 | 884,913.26 |
| | | | | | | 855,466.23 | 29,447.03 | | - | - | - | 855,466.23 | 29,447.03 | 884,913.26 |

| | BEGINNING BALANCE AS OF 01/01/2009 | | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING PRINCIPAL | PREVIOUS INTEREST | BEGINNING BALANCE | DATE | DEPOSITS | MONTHLY INTEREST | DATE | WITHDRAWAL FROM PRINCIPAL | WITHDRAWAL FROM INTEREST | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
| ACCOUNT NO: [redacted] | 12.00% | 855,466.23 | 29,447.03 | 884,913.26 | | | | | | | | 855,466.23 | 29,447.03 | 884,913.26 |
| John Kirkland | | | | | 1/1/2009 | | 8,849.13 | 1/1/2009 | - | - | | 855,466.23 | 38,296.17 | 893,762.40 |
| | | | | | 2/1/2009 | | 8,937.62 | 2/1/2009 | - | - | | 855,466.23 | 47,233.79 | 902,700.02 |
| | | | | | 3/1/2009 | | 9,027.00 | 3/1/2009 | - | - | | 855,466.23 | 56,260.79 | 911,727.02 |
| | | | | | 4/1/2009 | | 9,117.27 | 4/1/2009 | - | - | | 855,466.23 | 65,378.06 | 920,844.29 |
| | | | | | 5/1/2009 | | 9,208.44 | 5/1/2009 | - | - | | 855,466.23 | 74,586.50 | 930,052.73 |
| | | | | | 6/1/2009 | | 9,300.53 | 6/1/2009 | - | - | | 855,466.23 | 83,887.03 | 939,353.26 |
| | | | | | 7/1/2009 | | 9,393.53 | 7/1/2009 | - | - | | 855,466.23 | 93,280.56 | 948,746.79 |
| | | | | | 8/1/2009 | | 9,487.47 | 8/1/2009 | - | - | | 855,466.23 | 102,768.03 | 958,234.26 |
| | | | | | 9/1/2009 | | 9,582.34 | 9/1/2009 | - | - | | 855,466.23 | 112,350.37 | 967,816.60 |
| | | | | | 10/1/2009 | | 9,678.17 | 10/1/2009 | - | - | | 855,466.23 | 122,028.54 | 977,494.77 |
| | | | | | 11/1/2009 | | 9,774.95 | 11/1/2009 | - | - | | 855,466.23 | 131,803.49 | 987,269.72 |
| | | | | | 12/1/2009 | | 9,872.70 | 12/1/2009 | - | - | | 855,466.23 | 141,676.18 | 997,142.41 |
| | | | | | | - | 112,229.15 | | - | - | - | 855,466.23 | 141,676.18 | 997,142.41 |

| BEGINNING BALANCE AS OF 01/01/2010 | | | DEPOSITS | | | WITHDRAWALS | | | | ENDING BALANCES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | INTEREST RATE | BEGINNING BALANCE | DATE | DEPOSITS | UNRECOGNZIED INCOME TO DATE | DATE | WITHDRAWAL | INCOME PAYOUT | TOTAL WITHDRAWALS | PRINCIPAL BALANCE | TO DATE ACCRD. INT. | ENDING BALANCE |
| ACCOUNT NO: [redacted] | 12.00% | 997,142.41 | | | | | | | | 855,466.23 | 141,676.18 | 997,142.41 |
| John Kirkland | | | 1/1/2010 | | 9,971.42 | 1/1/2010 | - | - | | 855,466.23 | 151,647.61 | 1,007,113.84 |
| | | | 2/1/2010 | | 10,071.14 | 2/1/2010 | - | - | | 855,466.23 | 161,718.75 | 1,017,184.98 |
| | | | 3/1/2010 | | 10,171.85 | 3/1/2010 | - | - | | 855,466.23 | 171,890.60 | 1,027,356.83 |
| | | | 4/1/2010 | | 10,273.57 | 4/1/2010 | - | - | | 855,466.23 | 182,164.16 | 1,037,630.39 |
| | | | 5/1/2010 | | 10,376.30 | 5/1/2010 | - | - | | 855,466.23 | 192,540.47 | 1,048,006.70 |
| | | | 6/1/2010 | | 10,480.07 | 6/1/2010 | - | - | | 855,466.23 | 203,020.54 | 1,058,486.77 |
| | | | 7/1/2010 | | 10,584.87 | 7/1/2010 | - | - | | 855,466.23 | 213,605.40 | 1,069,071.63 |
| | | | 8/1/2010 | | 10,690.72 | 8/1/2010 | - | - | | 855,466.23 | 224,296.12 | 1,079,762.35 |
| | | | 9/1/2010 | | 10,797.62 | 9/1/2010 | - | - | | 855,466.23 | 235,093.74 | 1,090,559.97 |
| | | | 10/1/2010 | | 10,905.60 | 10/1/2010 | - | - | | 855,466.23 | 245,999.34 | 1,101,465.57 |
| | | | 11/1/2010 | | 11,014.66 | 11/1/2010 | - | - | | 855,466.23 | 257,014.00 | 1,112,480.23 |
| | | | 12/1/2010 | | 11,124.80 | 12/1/2010 | - | - | | 855,466.23 | 268,138.80 | 1,123,605.03 |
| | | | | - | 126,462.62 | | - | - | - | 855,466.23 | 268,138.80 | 1,123,605.03 |

# EXHIBIT 12

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re )
)
EPD INVESTMENT COMPANY, LLC, )
and JERROLD S. PRESSMAN, )
)
Debtors, )
)
)
JASON M. RUND, CHAPTER 7 ) No. 2:10-bk-62208-ER
TRUSTEE, )
)
Plaintiff, )
)
vs. )
)
JOHN C. KIRKLAND, an individual )
and POSHOW ANN KIRKLAND, as )
TRUSTEE of the BRIGHT )
CONSCIENCE TRUST DATED )
SEPTEMBER 9, 2009, )
)
Defendants. )
)

DEPOSITION OF POSHOW ANN KIRKLAND

June 28, 2017

Mitch Genser, CSR No. 4239.
425072

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles (415) 433-5777 San Francisco (949) 955-0400 Irvine (858) 455-5444 San Diego
(310) 207-8000 Century City (408) 885-0550 San Jose (760) 322-2240 Palm Springs (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento (800) 222-1231 Martinez (702) 366-0500 Las Vegas (800) 222-1231 Monterey
(951) 686-0606 Riverside (818) 702-0202 Woodland Hills (702) 366-0500 Henderson (516) 277-9494 Garden City
(212) 808-8500 New York City (347) 821-4611 Brooklyn (518) 490-1910 Albany (914) 510-9110 White Plains
(312) 379-5566 Chicago 00+1+800 222 1231 Paris 00+1+800 222 1231 Dubai 001+1+800 222 1231 Hong Kong

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re )
)
EPD INVESTMENT COMPANY, LLC, )
and JERROLD S. PRESSMAN, )
)
Debtors, )
________________________________)
)
JASON M. RUND, CHAPTER 7 ) No. 2:10-bk-62208-ER
TRUSTEE, )
)
Plaintiff, )
)
vs. )
)
JOHN C. KIRKLAND, an individual )
and POSHOW ANN KIRKLAND, as )
TRUSTEE of the BRIGHT )
CONSCIENCE TRUST DATED )
SEPTEMBER 9, 2009, )
)
Defendants. )
________________________________)

DEPOSITION OF POSHOW ANN KIRKLAND,

taken on behalf of Chapter 7 Trustee, at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367, commencing at 10:13 a.m., Wednesday, June 28, 2017, before Mitch Genser, CSR No. 4239.

PERSONS PRESENT:

| | |
|---|---|
| For Plaintiff: JASON RUND, CHAPTER 7 TRUSTEE | BRUTZKUS GUBNER ROZANSKY SEROR WEBER, LLP<br>BY COREY R. WEBER, ESQ.<br>21650 Oxnard Street<br>Suite 500<br>Woodland Hills, California 91367<br>(818) 827-9000<br>cweber@bg.law |
| For Defendants: JOHN KIRKLAND, POSHOW ANN KIRKLAND | LEWIS R. LANDAU, ESQ.<br>22287 Mulholland Highway<br>Calabasas, California 91302<br>(888) 822-4340<br>lew@landaunet.com |
| Also Present: | John Hank<br>Videographer |

10:24 THE DEPONENT: (In English) Can I get my pen?
10:25 MR. WEBER: Sure.
10:25 Q When did you get married to John Kirkland?
10:25 A (In English) February 17, 2009.
10:25 Q February 17, 2009?
10:25 A (In English) Yes.
10:25 Q And where did you get married?
10:25 A (In English) Here, in Santa Monica beach.
10:25 Q Did you have additional marriage ceremonies later on?
10:25 A (In English) Yes, we have a ceremony in Taiwan.
10:25 Q And when was that?
10:26 A (In English) I don't remember the date. We went back to Taiwan to have a very, very great ceremony, great traditional Taiwanese ceremony.
10:26 Q Was that at a later point?
10:26 A (In English) Right, it was later time.
10:26 MR. LANDAU: Just one second.
(Deponent conferring with attorney.)
10:26 Q BY MR. WEBER: But you were legally married to John Kirkland as of February 17, 2009?
10:26 A (In English) I remember the date we were at the beach. I don't recall what day we went to the


BARKLEY Court Reporters

clerk to register; I have to look at the certificate.

10:27 Q At some point in February 2009 you were legally married to John Kirkland?

10:27 A (In English) Uh-huh. That's correct.

10:27 Q And have you been married to John Kirkland since February 2009?

10:27 A (In English) Yes.

10:27 Q And you're still married to him today?

10:27 A (In English) Yes.

10:27 Q And do you and Mr. Kirkland have kids?

10:27 A (In English) Yes, we have two children.

10:27 Q And what years were they born?

10:27 A (In English) Hunter is [redacted], and Sienna is [redacted].

10:28 Q Now, the trust that you referred to previously, is that the Bright Conscience Trust dated September 9, 2009?

10:28 THE INTERPRETER: What's the name of the trust?

10:28 MR. WEBER: Bright Conscience Trust dated September 9, 2009.

10:28 THE DEPONENT: (In English) Yes.

10:28 Q BY MR. WEBER: And that's your family trust?

10:28 THE DEPONENT: Mr. Landau, when he says


BARKLEY Court Reporters

"family" do you mean --

10:29 MR. LANDAU: You can ask him to clarify. Better that he clarifies than I clarify.

10:29 THE DEPONENT: (In English) Mr. Weber, when you say "family trust," I want to make sure you understand. This formed trust is -- I am the sole trustee. I am in charge of this trust, the money for my kids. And I make the sole decisions. When you say "family," John and I, we are family. But he work. After I married him, I haven't. If anything happen to him, then he just want to make sure his children, our kids, will be provided for.

10:30 Q BY MR. WEBER: So is it okay if I refer to it as the "Bright Conscience Trust"?

10:30 A (In English) Yes.

10:30 Q Was the Bright Conscience Trust formed for the benefit of your children with John Kirkland?

10:30 MR. LANDAU: You're hesitating. So if you don't understand --

10:30 THE DEPONENT: Yes. Can you rephrase the question?

10:30 MR. LANDAU: Repeat, rephrase?

10:30 THE DEPONENT: (Through the interpreter) Can you repeat the question, please. (In English) Rephrase it.

10:31 MR. WEBER: Let me rephrase it.
10:31 Q You previously testified you had two children with John Kirkland named Hunter and Sienna; is that correct?
10:31 A (In English) Yes.
10:31 Q And was the Bright Conscience Trust set up for the benefit of Hunter and Sienna?
10:31 A (In English) Yes.
10:31 Q And are they the sole beneficiaries under the trust?
10:31 MR. LANDAU: "They" being the kids?
10:32 MR. WEBER: Right.
10:32 MR. LANDAU: Okay.
10:32 THE DEPONENT: (In English) They all are. Yes, they are. Yes, this trust is formed for them. So yes, it is for them.
10:32 Q BY MR. WEBER: Are there any other beneficiaries under the Bright Conscience Trust?
10:32 A (In English) No.
10:32 Q And you're the sole trustee of the Bright Conscience Trust?
10:32 A (In English) Right.
10:32 Q And have you been the sole trustee of the Bright Conscience Trust since it was formed?
10:33 A (In English) Yes.

if my husband know or not, so I don't know.
11:04 Q Have you seen any documents in regard to the Bright Conscience Trust that discussed cash flow issues at EPD?
11:04 A (In English) You mean do I aware John contribute his loan into the Bright Conscience Trust?
11:04 Q No.
11:05 MR. WEBER: Can you repeat the question.
(At this time, the following record was read by the Deposition Officer:
"Q Have you seen any documents in regard to the Bright Conscience Trust that discussed cash flow issues at EPD?")
11:05 THE DEPONENT: (In English) I never haven't seen it. I don't recall I see any of those cash flow documents.
11:05 Q BY MR. WEBER: Do you know if any of the loans or investments that John Kirkland made with EPD were based on EPD's cash flow issues?
11:06 A (In English) I don't know. I don't know.
11:06 Q When your husband assigned the loan or investments with EPD to the Bright Conscience Trust, did your husband -- did you or the Bright Conscience Trust pay anything in exchange for that?

11:06 A (In English) No. The certificate said it's irrevocable. There is no that kind of thing. I don't know.

11:06 Q Did you pay any amount to your husband in exchange for the assignment of the loans or investments regarding EPD?

11:07 A (In English) No. Oh, I see your question. Now I get it.

Of course not.

11:07 Q And did the Bright Conscience Trust pay anything or give any property to your husband in exchange for the assignment of the EPD loans or investments?

11:07 A (In English) I need a break.

11:07 Q I'd like your response first and then you can take a break.

11:07 A (In English) There is -- we didn't do that things you said. No, we don't. I don't...

11:08 Q The Bright Conscience Trust --

11:08 A (In English) Bright Conscience Trust didn't pay John Kirkland to put his loan into the Bright Conscience Trust. Actually, this is John's love to his children, pure conscience that he want to make sure our children will be provided for. So he formed the trust and then we both sign it. He formed

the trust with me and he -- and I am the sole trustee.
Q Do you want to take a break?
A Yes.
Q Okay.
THE VIDEOGRAPHER: We're off the record at 11:08.
(Recess held.)
THE VIDEOGRAPHER: We're back on the record at 11:22.
Q BY MR. WEBER: Mrs. Kirkland, at the time the Bright Conscience Trust was formed, what was your understanding as to when EPD would repay the amounts to your husband, you, or the Bright Conscience Trust?
A (In English) I don't aware too much of it. I don't know.
Q Did you have any understanding?
A (In English) I trust John. And I didn't ask him. I don't know.
Q Did you know any of the terms of the loans or investments?
A (In English) No, I don't know.
Q Did you look at any documents regarding the loans or investments?
A (In English) I don't recall.
Q At any later point did you come to find

11:33 Q You don't remember the firm name?
11:33 A (In English) No, I don't recall.
11:33 Q And you don't remember her last name?
11:33 A (In English) Many years; I don't recall.
11:33 Q I'd like to introduce Exhibit 2.
(Chapter 7 Trustee's Exhibit 2 was marked for identification by the Deposition Officer and is attached hereto.)
11:34 Q BY MR. WEBER: Have you seen this document before?
11:34 A (In English) Yes. I wrote this form and I signed it. I saw this one.
11:34 Q That's your signature at the bottom?
11:34 A (In English) Yes.
11:34 Q And is that your handwriting --
11:34 A (In English) Yes.
11:34 Q -- in Sections 1 through 7?
11:34 A (In English) Yes.
11:34 Q How did you arrive at the amount $2,672,000?
11:35 A (In English) I find out from Jerry's office; someone told me.
11:35 Q You called up and someone gave you that amount?

11:35 A (In English) I don't recall. I just -- someone tell me to write this number, Jerry's office, somebody there.
11:35 Q You don't recall who?
11:35 A I don't recall who.
11:35 Q And did you base that amount off of anything else?
11:36 A (In English) No. I know I have to file at that time. So I just find out the number and I wrote it there. Somebody from EPD's office tell me that's the amount that they owed us, owed my kids' trust.
11:36 Q In Section 2, it says, "Basis for claim," and you wrote in "Money." Do you see that?
11:36 A (In English) Yes.
11:36 Q What's that referring to?
11:36 A (In English) This money is the Notice of Assignment, the money that John contribute to my kids' trust.
11:36 Q And in Item Number 3 it has four digits listed there, [redacted] it looks like. Do you know what that refers to?
11:37 A (In English) It's identification debtors. I don't recall how I got that number.
11:37 Q If you look in item number 4, you wrote in

11:39 A Based on the filing, the public record Jerry filed. We agreed that he will do it and he did.
11:39 Q Do you know what a UCC-1 is?
11:39 A (In English) I don't know what is UCC-1, I know UCC filing.
11:39 Q And what's your understanding of a UCC filing?
11:40 A (In English) That's public record, that Jerry show the public that he granted the security interest over his assets.
11:40 Q When was the first time you've ever heard of a UCC filing?
11:40 A (In English) On September, around that time that we formed, John and I, we formed the trust, and find out Jerry didn't put the money John Kirkland that invested in him, he didn't file it. John was very angry. And he very angry at Jerry. And that's the time that Jerry called me, telling me that he was very sorry. That time we discussed, so I heard. So that's -- I know it's a very important document.
11:41 Q That was the first time you had ever heard of a UCC filing?
11:41 A (In English) Yes, from John and then from Jerry.
11:41 Q If you look below that, it says, "Amount

of secured claim," and then it looks like you wrote in $2,672,000; is that right?

11:41 A (In English) Yes.

11:41 Q And how did you know that the Bright Conscience Trust had a secured claim for two million six hundred 72 thousand dollars?

11:41 A (In English) This is money plus interest. And from Jerry's office, someone told me.

11:42 Q So you called up and someone gave you that number to fill in there?

11:42 A (In English) I don't recall how I find out, phone call or in person. I don't recall how I get that specific number.

11:42 Q So once you filled out and signed this, what did you do to file it with the court?

11:42 A (In English) I don't recall.

11:42 Q Do you recall mailing it or handing it to anyone?

11:42 A (In English) Long time ago. I don't recall.

11:43 Q Did Mr. Kirkland help you fill out this form?

11:43 A (In English) No.

11:43 Q Did you talk about the form with Mr. Kirkland?

11:45 Q I'd like to introduce Exhibit 4.
(Chapter 7 Trustee's Exhibit 4 was marked for identification by the Deposition Officer and is attached hereto.)
11:45 Q BY MR. WEBER: Have you seen this form before?
11:46 A (In English) Yes.
11:46 Q And is that your signature at the bottom?
11:46 A (In English) Yes.
11:46 Q Is this also a duplicate of Exhibits 2 and 3?
11:46 A (In English) Yes.
11:46 Q And so the same claim was filed three times?
11:46 A (In English) It looks like it.
11:46 Q Are Exhibits 2, 3 and 4 all based on the same thing?
11:46 A (Through the interpreter) The same form I fill up and it was filed three times.
11:47 Q Do you know why?
11:47 A (In English) I don't recall the reason. I don't recall how that happened.
11:47 Q I'd like to introduce Exhibit 5.
///

(Chapter 7 Trustee's Exhibit 5 was marked for identification by the Deposition Officer and is attached hereto.)

11:47 Q BY MR. WEBER: Have you seen this form before?
11:47 A (In English) Yes.
11:48 Q Is that your signature on the second page?
11:48 A (In English) Yes.
11:48 Q Did you fill out this form?
11:48 A (In English) No. I don't recall.
11:48 Q Do you recall who filled it out?
11:48 A (In English) I think attorney does this, (through the interpreter) my attorney.
11:48 Q Do you recall who that attorney was?
11:48 A (In English) I don't recall.
11:48 Q If you look in Section 1, it lists an amount $3,529,000. Do you see that?
11:48 A (Through the interpreter) Yes, I saw that.
11:49 Q And how did you come up with that amount?
11:49 A (In English) Money plus interest.
11:49 Q What interest rate?
11:49 A (In English) 24 percent.
11:49 Q And why 24 percent?

investor's mortgage lender for the benefit of investor over the last year in monthly payments of approximately $7,500 and will make additional monthly payments in accordance with this Agreement"?

A (In English) What's your question?

Q Do you see that there?

A (In English) Yes.

Q Were you aware that EPD was making mortgage payments on your house?

A (In English) I don't know.

Q In 2009, you and Mr. Kirkland lived at the same home; is that correct?

A (In English) After I married him, yes.

Q After February 2009?

A (In English) Yes.

Q Did you make the mortgage payments on the house after that?

A (In English) Not me, no.

Q Do you know who made the mortgage payments on the house after that?

A (In English) I don't know.

Q Do you know why EPD would be paying the mortgage payments on your house with Mr. Kirkland?

A (Through the interpreter) I don't know.

Q If you look in the next paragraph, it

12:48 A (Through the interpreter) That's correct, I don't know that. I didn't know that previously. That was my answer.

12:49 Q If it was a loan, do you know if it was one loan or multiple loans?

12:49 A (In English) I don't know.

12:49 Q And if it was an investment, do you know if it was one investment or multiple investments?

12:49 A (In English) I don't know.

12:49 Q Do you know how much money your husband received back from EPD or Jerry Pressman?

12:49 A (In English) I don't know.

12:49 Q Have you ever seen any documents as to how much Mr. Kirkland received back from EPD or Jerry Pressman?

12:50 A (In English) I don't recall. I don't recall I see any statement.

12:50 Q Do you know how much Mr. Kirkland, your husband, received back from other businesses with which Mr. Pressman was affiliated?

12:50 A (Through the interpreter) I don't know.

12:50 Q Has the Bright Conscience Trust ever done business with Keith Pressman?

12:50 A (In English) You mean the business, Bright Conscience Trust?

12:51 Q Correct.
12:51 A Of course not. I'm in charge of it. Anything like that, I should know.
12:51 Q Has the Bright Conscience Trust ever loaned money to Keith Pressman?
12:51 A (In English) I don't recall I signing loan documents under the Bright Conscience Trust.
12:51 Q And --
12:51 A (In English) Let me rephrase it.
12:51 I don't recall I sign any loan document for BCT to Keith Pressman.
12:52 Q Do you recall investing any -- the Bright Conscience Trust investing any money with Keith Pressman?
12:52 A (In English) I don't recall.
12:52 Q Do you recall giving any money to Keith Pressman on behalf of the Bright Conscience Trust?
12:52 A (In English) I don't know. No, I don't recall.
12:53 Q Can you think of any reason why the Bright Conscience Trust would file a UCC Financing Statement against Keith Pressman's assets?
12:53 A (In English) Really? I don't know anything about it.

12:53 Q Can you think of any reason why the Bright Conscience Trust would have filed a UCC Financing Statement against Keith Pressman's assets?

12:53 A (In English) No. Why we will do that? Keith didn't owe Bright Conscience the money. That was -- when John invest Jerry Pressman and EPD and that loan Note assigned it to Bright Conscience Trust and that's the only one, that UCC paper that I want Jerry file. But I don't know anything about Keith Pressman.

12:54 Q I'd like to introduce Exhibit 12.

(Chapter 7 Trustee's Exhibit 12 was marked for identification by the Deposition Officer and is attached hereto.)

12:55 Q BY MR. WEBER: Have you seen this document before?

12:55 A (In English) This is -- I haven't seen this one.

12:55 Q Did you instruct that a UCC-1 be filed against Keith Pressman's assets?

12:55 A (In English) No. No. I don't know -- I don't know anything about this.

12:55 Q And after you became the trustee of the Bright Conscience Trust in September 2009, were you

the only person authorized to act on behalf of the trust?
12:56 A (Through the interpreter) Yes.
12:56 Q So can you explain how this got filed?
12:56 A (In English) No, I cannot explain. No, this is not the one I would be expecting. The other one that with Jerry, that one I know about it. And that one is very important. But this one, I don't see how will this be filed and covered and grant the Bright Conscience Trust the security interest.
12:57 Q Have you heard of a company called EPD Investment Leasing Co., LLC?
12:57 A (In English) No.
12:57 Q You're not familiar with that company?
12:57 A (In English) Not very -- not familiar.
12:57 Q Did the Bright Conscience Trust ever loan money to EPD Investment Leasing Company, LLC?
12:57 A (In English) I don't -- I don't recall.
12:57 Q Did the Bright Conscience Trust ever invest money with EPD Investment Leasing Company, LLC?
12:58 A (In English) No, I don't think so.
12:58 Q Did Bright Conscience Trust ever give money of any kind to EPD Investment Leasing Company, LLC?
12:58 A (In English) No. I don't recall.

12:58 Q Did you ever file a UCC-1 Financing Statement on behalf of the Bright Conscience Trust against the assets of EPD Investment Leasing Company, LLC?

12:58 A (Through the interpreter) No.

12:59 Q Did you ever authorize to file a UCC-1 Financing Statement on behalf of the Bright Conscience Trust against the assets of EPD Investment Leasing Co., LLC?

12:59 A (In English) No. Formally, no.

12:59 Q Was your husband, John Kirkland, authorized on behalf of the Bright Conscience Trust to instruct that UCC Financing Statements be filed?

12:59 A (In English) I'm very clear on that. I am the sole trustee of Bright Conscience Trust. I can make decision; no one else can do that for me.

01:00 Q And Mr. Kirkland wasn't authorized to file UCC Financing Statements on behalf of the trust?

01:00 A (In English) Correct. He has no authority to authorize me to do that. (Through the interpreter) He has no -- I have never authorized him to do that. And he also has no power to ask me to do that.

01:00 Q I'd like to introduce Exhibit 13.

///

///

(Chapter 7 Trustee's Exhibit 13 was marked for identification by the Deposition Officer and is attached hereto.)

01:01 Q BY MR. WEBER: Have you seen this e-mail before?
01:01 A (Through the interpreter) No, I never seen it.
01:01 Q Do you know who Amy Brown is?
01:01 A (Through the interpreter) I don't.
01:01 Q Are you familiar with a company called National Corporate Research?
01:02 A (Through the interpreter) No.
01:02 Q Do you know why Mr. Kirkland instructed Ms. Brown to file a UCC-1 with the California Secretary of State in favor of the Bright Conscience Trust and against the assets of EPD Investment Leasing Company, LLC on April 29th, 2011?
01:02 A (In English) I don't know.
01:02 Q Was he authorized to do this?
01:02 A (In English) No.
01:02 Q And you weren't aware of this?
01:03 A (In English) Yeah, I don't know about this filing.
01:03 Q I'd like to introduce Exhibit 14.

attorneys prepare. I've got one general set of questions in regard to this.
01:08 If you look at page 10, do you see a chart of dates and dollar amounts?
01:08 A (In English) I don't recall if I seen or not. What your question about this?
01:08 Q Do you know if your husband deposited, loaned or invested $200,000 in EPD or with Jerrold Pressman on September 28, 2007?
01:08 A (Through the interpreter) I don't know.
01:08 Q Do you know if your husband deposited, loaned or invested $400,000 with EPD or Jerrold Pressman on September 28, 2007?
01:09 A (Through the interpreter) I don't.
01:09 Q Do you know if your husband loaned, invested or deposited $150,000 with EPD or Jerrold Pressman on November 8, 2007?
01:09 A (In English) That I don't know.
01:09 Q Do you know if your husband loaned, deposited or invested $150,000 with EPD or Jerrold Pressman on March 27, 2008?
01:09 A (In English) I don't know.
01:09 Q Do you know if your husband loaned, invested or deposited $100,000 with EPD or Jerrold Pressman on June 20th, 2008?

01:10 A (In English) 100,000 three times. I don't know which date of that. I do deliver a personal check from John to Jerry's house.
01:10 Q One personal check for $100,000?
01:10 A (In English) Uh-huh. I personally bring it to him. But I don't know which date, if it's June 20th or April 14th, 2009, or if it was July 24, 2009; I don't know which one time. And I don't know if that check is in here or not. But I can tell you, I personally delivered the check, but I don't know the purpose of the check.
01:11 Q Do you know if your husband, John Kirkland, loaned, invested or deposited $855,466.23 on August 18th, 2008?
01:11 A (In English) No, I don't know.
01:11 Q And do you know whether your husband loaned, deposited or invested $100,000 with Jerry Pressman on April 14th, 2009?
01:11 A (In English) I don't recall.
01:11 Q Do you know if your husband loaned, deposited or invested $100,000 with EPD or Jerrold Pressman on July 24th, 2009?
01:12 A (In English) I don't know. I don't recall. I don't know if that -- which time will be the time of that check and if the check is for his --

for this or not; he didn't tell me.
01:12 Q Other than that $100,000 check, have you seen copies of any other checks or wire transfers from your husband to EPD or to Jerrold Pressman?
01:12 A (In English) No.
01:12 Q I'd like to introduce Exhibit 16.
(Chapter 7 Trustee's Exhibit 16 was marked for identification by the Deposition Officer and is attached hereto.)
01:13 THE DEPONENT: (In English) The last question is I don't know.
01:13 Q BY MR. WEBER: Have you seen this letter before?
01:13 A (In English) I don't recall. I don't recall if I seen it or not.
01:13 Q In regard to the two checks totaling $600,000 and the additional $150,000 referenced in the letter, do you know whether those amounts were paid to EPD or Jerrold Pressman or someone else?
01:14 A (In English) No, I don't recall.
01:14 Q Have you ever seen copies of those checks?
01:14 A (In English) This is September 28, 2007. Of course I never seen it. I don't know. I don't recall I seen it.

01:14 Q I'd like to introduce Exhibit 17.
(Chapter 7 Trustee's Exhibit 17 was marked for identification by the Deposition Officer and is attached hereto.)
01:15 Q BY MR. WEBER: Have you seen this Continuing Guaranty before?
01:15 A (In English) I think this is the document John put into the trust.
01:15 Q And is that your husband's signature on the last page?
01:15 A (In English) Uh-huh, yes.
01:15 Q If you look on the top of page -- starting at the bottom of page 1 and continuing on the top of page 2, at Recital E.
01:16 Do you see the reference on the top of the second page about payments to the debtor for consulting fees, advisory fees and professional service fees?
01:16 A (In English) Okay.
01:16 Q Can you think of any reason why if your husband paid EPD or Jerrold Pressman consulting fees, advisory fees or professional service fees, why that would be something that EPD or Jerrold Pressman would have to repay?

01:17 A (In English) I don't know.
01:17 Q Have you ever heard of a company called Broadway Entertainment Marketing, Inc.?
01:17 A (In English) I don't recall.
01:17 Q Can you think of any reason why if your husband, John Kirkland, paid consulting fees, advisory fees or professional service fees to Broadway Entertainment Marketing, Inc. that would be something that EPD or Jerry Pressman would have to repay?
01:17 A (In English) I don't recall. I don't know. I don't know.
01:18 Q Can you think of any reason why if your husband, John Kirkland, paid money to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees those would be amounts that EPD or Jerry Pressman would have to repay?
01:18 A (In English) I don't know why.
01:18 Q You can't think of any reason why?
01:18 A (In English) No, that's correct.
01:18 Q I'd like to introduce Exhibit 18.
(Chapter 7 Trustee's Exhibit 18 was marked for identification by the Deposition Officer and is attached hereto.)
01:19 Q BY MR. WEBER: Have you seen this document

UCC-1 for the Bright Conscience Trust?
02:27 A (In English) It is Jerry Pressman promise me he will file it for the Bright Conscience Trust.
02:28 Q Can you think of any reason why your husband would have filed it rather than Jerry Pressman?
02:28 A (In English) This is beyond. I don't know. I mean, I don't recall the reason.
02:28 Q Did you authorize your husband to file a UCC-1 for the Bright Conscience Trust?
02:28 A (In English) How the UCC finally got filed, all I care is it did.
02:28 Q But my question is, did you authorize your husband, John Kirkland, to file a UCC-1 for the Bright Conscience Trust?
02:29 A (In English) I asked Jerry to do it.
02:29 Q My question is, did you authorize your husband to do it?
02:29 A (In English) I don't recall if I have a conversation with John about that.
02:29 Q So you're not sure if you authorized him?
02:29 A (In English) I don't recall.
02:29 Q I'd like to introduce Exhibit 21.
///
///

(Chapter 7 Trustee's Exhibit 21 was marked for identification by the Deposition Officer and is attached hereto.)

02:30 Q BY MR. WEBER: Have you seen this e-mail chain before?

02:30 A (In English) I haven't seen this one. I haven't seen this e-mail.

02:30 Q Did you authorize your husband, John Kirkland, to send National Corporate Research a UCC-1 for filing in favor of the Bright Conscience Trust?

02:31 MR. LANDAU: Objection; asked and answered.

02:31 THE DEPONENT: What was that?

02:31 MR. LANDAU: I objected to the question as being asked and answered already.

02:31 Q BY MR. WEBER: You can answer.

02:31 A (In English) This is Jerry promise me he will file.

02:31 Q Did you authorize your husband to send this e-mail chain?

02:31 A (In English) I didn't ask John Kirkland to do it.

02:32 Q I'd like to introduce Exhibit 22.

(Chapter 7 Trustee's Exhibit 23 was marked for identification by the Deposition Officer and is attached hereto.)

02:41 Q BY MR. WEBER: Have you seen this e-mail before?
02:41 A (In English) No.
02:41 Q Do you know why a secretary working for Mr. Kirkland would be corresponding with National Corporate Research regarding a UCC-3 Financing Statement regarding The Bright Conscience Trust?
02:42 A (In English) I don't recall.
02:42 Q Were Mr. Kirkland or his secretary authorized to file UCC-3 amendments regarding the Bright Conscience Trust?
02:42 A (In English) I don't know about this. I don't know.
02:42 Q You're not sure whether you authorized Mr. Kirkland to file amendments to UCC Financing Statements?
02:42 A (In English) I don't recall.
02:42 Q Were you aware at the beginning of the bankruptcy case that your husband, Mr. Kirkland, appeared on behalf of the Bright Conscience Trust at an examination?

02:43 A (In English) I don't recall.
02:43 Q Do you recall authorizing your husband, Mr. Kirkland, to appear on behalf of the Bright Conscience Trust to give testimony in the bankruptcy case?
02:43 A (In English) I don't recall.
02:43 Q Is the only person that's authorized to speak on behalf of the Bright Conscience Trust you?
02:44 A (In English) Uh-huh. Sorry. Yes. I am the sole trustee, I make the decision.
02:44 Q And have you been the only authorized person to speak on behalf of the Bright Conscience Trust since it was formed?
02:44 A (Through the interpreter) Yes.
02:44 Q And would John Kirkland need your permission to appear on behalf of the Bright Conscience Trust to give testimony?
02:44 MR. LANDAU: Objection; calls for a legal conclusion.
02:45 THE DEPONENT: (In English) I refuse to answer.
02:45 Q BY MR. WEBER: On what basis?
02:45 A Marriage privilege.
02:45 Q I'm not asking what Mr. Kirkland told you.
02:45 MR. WEBER: Can you read back the

question back? I don't remember the question.

02:47 THE DEPONENT: I don't know how to answer.

02:48 MR. WEBER: Mitch, could you read back the question.

(At this time, the following record was read by the Deposition Officer:

"THE DEPONENT: (Through the interpreter) Did you ask me whether my husband needs my authorization in order to appear in court?

"Q BY MR. WEBER: In order to provide testimony on behalf of the Bright Conscience Trust.

"MR. LANDAU: Same objection.

"THE DEPONENT: What?

"MR. LANDAU: I objected to the question as calling for a legal conclusion.

"Q BY MR. WEBER: You can answer.

"A No, I can't.

"THE DEPONENT: Can I say that?

MR. LANDAU: You can say whatever you want.

"Q BY MR. WEBER: No answer isn't an answer.

"A (In English) Then strike it.

"Q BY MR. WEBER: Mrs. Kirkland, do

you have an answer?")
02:51 THE DEPONENT: When John and I formed this trust, he just only thinking of Hunter Kirkland, his future and wanting to protect him for to make sure he will be provide for. That's from a father's love. And if anything about the trust, when we formed it, there is not -- the EPD loan is not fulfilled. We didn't release the claim. And then until it's too late, we have to file the proof of claim. So John do the testimony. I am not surprised he will do that. And I don't recall how our conversation about it.
02:52 Q BY MR. WEBER: Do you recall authorizing John Kirkland to testify on behalf of the Bright Conscience Trust?
02:52 A (In English) It was several years ago; I don't recall.
02:52 Q Have you ever authorized anyone to testify on behalf of the Bright Conscience Trust?
02:52 A Have I? Does "testify" mean having attorneys to represent me, representing our trust?
02:52 Q Provide testimony under oath similar to today.
02:53 A (Through the interpreter) What's your question, then?
02:53 Q Have you ever authorized anyone to testify

under oath on behalf of the Bright Conscience Trust?
02:53 A (In English) I don't recall.
02:53 Q And you don't recall authorizing Mr. Kirkland to testify on behalf of the Bright Conscience Trust under oath?
02:53 MR. LANDAU: Asked and answered.
02:53 THE DEPONENT: (In English) I don't recall.
02:53 Q BY MR. WEBER: Have you ever been a lender licensed by the State of California?
02:54 A (Through the interpreter) I don't understand.
02:54 Q Have you ever received a license from the State of California to loan money?
02:54 A (In English) I don't know anything about it.
02:54 Q Have you ever made loans to people or businesses?
02:54 A (In English) Let me think. I don't recall.
02:54 Q Are you familiar with the maximum permissible interest rate in the state of California?
02:55 A (Through the interpreter) I don't know.
02:55 Q Do you know if 12 percent is a permissible interest rate in the state of California?

# EXHIBIT 13

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,<br><br>Debtors, | |
| JASON M. RUND, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,<br><br>Defendants. | No. 2:10-bk-62208-ER |

DEPOSITION OF JOHN KIRKLAND

June 26, 2017

Mitch Genser, CSR No. 4239.
425069

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles
(310) 207-8000 Century City
(916) 922-5777 Sacramento
(951) 686-0606 Riverside
(212) 808-8500 New York City
(312) 379-5566 Chicago
(415) 433-5777 San Francisco
(408) 885-0550 San Jose
(800) 222-1231 Martinez
(818) 702-0202 Woodland Hills
(347) 821-4611 Brooklyn
00+1+800 222 1231 Paris
(949) 955-0400 Irvine
(760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas
(702) 366-0500 Henderson
(518) 490-1910 Albany
00+1+800 222 1231 Dubai
(858) 455-5444 San Diego
(800) 222-1231 Carlsbad
(800) 222-1231 Monterey
(516) 277-9494 Garden City
(914) 510-9110 White Plains
001+1+800 222 1231 Hong Kong

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,<br><br>Debtors, | |
| JASON M. RUND, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,<br><br>Defendants. | No. 2:10-bk-62208-ER |

Deposition of JOHN KIRKLAND,

taken on behalf of Chapter 7 Trustee, at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367, commencing at 10:02 a.m., Monday, June 26, 2017, before Mitch Genser, CSR No. 4239.


BARKLEY Court Reporters

PERSONS PRESENT:

| | |
|---|---|
| For Plaintiff: JASON RUND, CHAPTER 7 TRUSTEE | BRUTZKUS GUBNER ROZANSKY SEROR WEBER, LLP<br>BY COREY R. WEBER, ESQ.<br>MICHAEL W. DAVIS, ESQ.<br>LAWRENCE GABRIEL, ESQ.<br>21650 Oxnard Street<br>Suite 500<br>Woodland Hills, California 91367<br>(818) 827-9000<br>cweber@bg.law<br>mdavis@bg.law<br>lgabriel@bg.law |
| For Defendants: JOHN KIRKLAND, POSHOW ANN KIRKLAND | LEWIS R. LANDAU, ESQ.<br>22287 Mulholland Highway<br>Calabasas, California 91302<br>(888) 822-4340<br>lew@landaunet.com |
| Also Present: | Alex Loverde<br>Videographer |

10:09 A I went to UCLA. We were roommates in a house in Santa Monica.
10:09 Q Did you also go to school with Keith Pressman at Pepperdine prior to transferring to UCLA Law School?
10:09 A Yes, for one year.
10:09 Q And was it then when you started being roommates with Keith Pressman for the law school time period?
10:09 A We stayed roommates. And when I went to UCLA, we got a house, I guess not roommates but housemates, and with several other law students.
10:09 Q How long were you a roommate of Keith Pressman for?
10:10 A I guess, two years.
10:10 Q After law school, did you keep in touch with Keith Pressman?
10:10 A On and off, yes.
10:10 Q Were you friends?
10:10 A I think we were certainly friends in law school and kind of drifted apart over time.
10:10 Q During law school, is that also when you met Jerrold Pressman?
10:10 A Yes.
10:10 Q And that's because that was Keith's dad?

10:10 A Correct.
10:10 Q And did you get to know him fairly well during that time period?
10:10 A No.
10:10 Q More of just a dad of a roommate?
10:10 A Correct.
10:11 Q Now, after you graduated law school, at some point did you or firms that you were part of start representing Jerrold Pressman or any entities that he was involved in?
10:11 A I became involved in representing Master Protection Corporation, which was not an entity he was involved with but was an entity that he had previously been involved with and sold, and they asked him for an attorney recommendation and he recommended me, I think.
10:11 Q And about what year was that?
10:11 A It must have been sometime in the '90s.
10:11 Q And what did you do for Master Protection?
10:11 A Litigation.
10:12 Q How about other entities?
10:12 A At some point, he became involved with a company called Billboard Live. And they were in a franchise dispute or licensing dispute, and I represented Billboard.

10:18 Q Did you also represent Jerrold Pressman in regard to issues with the California Franchise Tax Board?
10:18 A I think Greenberg Traurig did.
10:18 Q And was that while you were at Greenberg Traurig as an attorney?
10:18 A Yes, and maybe after I left; I don't know.
10:18 Q Do you know what the nature was of the representation in regard to the Franchise Tax Board?
10:18 A It was handled by Carol Perrin and two tax associates in her department. I believe it arose out of Mr. Pressman's sale of Stretto, which I think was involved with Master Protection, and some kind of tax bill relating to that sale.
10:19 Q And did you send letters to the Franchise Tax Board in regard to whatever the issue was with the Franchise Tax Board?
10:19 A The firm did.
10:19 Q Did you sign any letters and send them to the Franchise Tax Board?
10:19 A I would not have sent them; it's possible I signed letters. I was one of the attorneys at Greenberg.
10:19 Q Now, earlier you mentioned that EPD was in the investment business and you mentioned some


BARKLEY Court Reporters

other businesses. Do you know what type of investments EPD made?

10:19 A I'm not sure I understand the question.

10:19 Q EPD as a company, you thought it was an investment company; is that right?

10:19 A Well, I infer that from the name, so yes.

10:20 Q Do you know specifically what kind of investments they made?

10:20 A No.

10:20 Q Do you know if it solicited investors?

10:20 A I'm not aware of them ever soliciting investors.

10:20 Q Do you know if it accepted investors?

10:20 A I don't know what that means.

10:20 Q Did EPD have investors?

10:20 A I don't believe so. I believe they had the equity owners and they had lenders, creditors.

10:20 Q And how was it set up? Some person or entity would loan money to EPD and then EPD would go ahead and use those funds?

10:20 A I don't know. I would assume so.

10:20 Q Not sure as to the specifics?

10:20 A I was never involved in the specifics.

10:21 Q At some point did you become an investor in or a lender to EPD?

court reporter.
10:25 A I think at that time, it was spelled P-o-s-h-o-w, but she changed it to a "B," kind of like Peiking and Bejing.
10:25 Q And the handwriting above the signature, do you recognize that handwriting?
10:25 A No.
10:25 Q You don't know whose it is?
10:26 A No.
10:26 Q It's not yours or your wife's?
10:26 A It's definitely not mine. It might be my wife's, but I don't think so.
10:26 Q Now, this lists a claim in the amount of $2.672 million; is that right?
10:26 A That's what it says.
10:26 Q Do you know what that's based on?
10:26 A I assume it's based on the EPD records and they calculated what the amount was that was due.
10:26 Q How much do you believe you loaned to EPD?
10:26 A Somewhere right around $2 million.
10:26 Q And that's to EPD itself?
10:26 A Yes.
10:26 Q That's not amounts that you paid to other entities?
10:26 A It would include anything, everything.


BARKLEY Court Reporters

10:27 Q And what do you mean by "everything"?
10:27 A Any money that I paid to EPD or to related entities or anyone at its request would be included as part of the loan.
10:27 Q So if you paid money to Broadway Entertainment Marketing, Inc., that's included in here?
10:27 A Yes.
10:27 Q And in the two million you mentioned?
10:27 A Yes.
10:27 Q And how about if you paid money to Keith Pressman?
10:27 A Yes.
10:27 Q That's included?
10:27 A Yes.
10:27 Q And if you paid money to S.C. Club, L.P.?
10:27 A I don't think I ever did, but yes, that would be included.
10:28 Q And how about to Plush Lounge Las Vegas, LLC?
10:28 A I don't know the ownership structure of Plush Lounge; I would be guessing. In fact, I'm guessing about S.C. Club, L.P., too. I would assume so, but I don't know for those two entities. It was any sister companies.

10:34 Q That was claim 171.
10:34 A Yeah, it's hard to read. This looks like a fax or a scan. 3 is more readable. It says, "12% annual interest rate."
10:34 Q And that's the interest rate you agreed on with EPD?
10:34 A I believe so.
10:34 Q Was there any issue in regard to that interest rate being potentially usurious under California law?
10:34 A No.
10:34 Q And why is that?
10:34 A The agreement had a standard usury savings clause. And the amount of original loan was over $300,000, so it was exempt from usury.
10:34 Q And were you concerned about any requirement to comply with the California Finance Lenders Law?
10:35 A No.
10:35 Q And why is that?
10:35 A It was only one loan; it wouldn't apply.
10:35 Q Did you loan all the amounts at the same time?
10:35 A No.
10:35 Q And over what period of time did you loan

the amounts?

10:35 A I don't recall. Two or three years, probably.

10:35 Q And you believe they are all part of the same loan notwithstanding the lapse in time?

10:35 A I believe they were all part of the single loan, yes.

10:35 Q Did you agree on the total amount at the beginning?

10:36 A No, we agreed on a minimum amount.

10:36 Q And why did you loan additional amounts after that?

10:36 A He asked.

10:36 Q "He" meaning Jerrold Pressman?

10:36 A Yes.

10:36 Q Did he say why he needed it?

10:36 A I don't recall.

10:36 Q So when was the first loan?

10:36 A Probably somewhere fall of 2007.

10:36 Q And how about when was the next time after that?

10:36 A I don't recall.

10:36 Q Do you recall the approximate time period when you made the last loan?

10:36 A 2009, I think.

A Some I have.

Q Are those generally letters prepared for your signature to send to the California Franchise Tax Board?

A No.

Q They're not generally those?

A No.

Q Let's look at the pages starting with Bates stamped GT002172.

A I'm sorry. Say that again.

Q The page starting GT002172, and it goes through 002178.

A Okay.

Q Now, is that a letter that's set up for your signature to send to the California Franchise Tax Board?

A It's a draft of a letter that someone has set up for my signature, yes.

Q Dated July 8, 2005?

A Yes.

Q Have you seen this letter before?

A I recall seeing some letters that Carol Perrin and Grace Chung and Michelle Ferrera did in connection with a tax issue, but I don't recall this one specifically.

10:57 Q If you look at the second page of that letter at the top, it's 002173. It says, "Mr. Pressman is a 70-year old retiree deeply in debt with virtually no current income or unemcumbered assets."
Do you see that?
10:57 A I see that's what this piece of paper says, yes.
10:57 Q Was that your understanding at the time?
10:57 A No.
10:57 Q What was your understanding at the time?
10:57 A That Jerrold Pressman was a wealthy and successful businessman.
10:57 Q So why would a draft letter to the Franchise Tax Board say that Mr. Pressman is deeply in debt with virtually no current income or unencumbered assets?
10:58 A You would have to ask Carol Perrin that question or Grace Chung or Michelle Ferrera.
10:58 Q Do you recall signing the final version of this letter?
10:58 A I don't recall either way.
10:58 Q You may have, but you don't recall?
10:58 A Correct.
10:58 Q If you look down below three paragraphs

11:04 A I see that the piece of paper says, yes.
11:04 Q Was that accurate as of July 2005?
11:04 A Well, that's a whole lot of different statements, so I'm not sure what you mean by that. And I assume whatever was included in the final letter was true or we wouldn't have sent it.
But there is a lot of different statements made here, so you would have to go one at a time, but I'm not sure I would have any recollection.
11:04 Q Well, was Mr. Pressman heavily in debt?
11:04 A I assume if we said he was, then he was.
11:04 Q Was he subject to financial distress?
11:04 A That's a wiggle word; it doesn't have any meaning.
11:04 Q It doesn't have any meaning whatsoever?
11:05 A It doesn't have any legal meaning, it's what we would call "fluff." It's just -- it sounds impressive to say to somebody, but it doesn't have any specific meaning.
11:05 Q What does "financial distress" mean to you?
11:05 A Nothing.
11:05 Q Do you know if at that point EPD and Pressman had borrowed tens of millions of dollars through EPD?

11:05 A I believe that's correct.
11:05 Q And that was your understanding at the time?
11:05 A I believe so.
11:05 Q And that those amounts were all personally guaranteed by Mr. Pressman and secured by a lien on his home and a blanket UCC-1 on his assets?
11:05 A I believe that I saw a UCC-1 filed in favor of EPD from Mr. Pressman personally. I probably was aware of it at that time. And this mortgage, I'm not sure if I've ever seen it, but I assume I was aware of it. I think there was a blanket lien from Mr. Pressman individually in favor of EPD Investment Company, LLC. That was my understanding at the time, I think.
11:06 Q If you look at the letter that starts with GT002227.
11:06 A Yes.
11:06 Q And that one goes through 2229.
11:06 A Yes.
11:06 Q Is that another letter that is set up for your signature to send to the Franchise Tax Board?
11:06 A Well, it looks like from the little codes here beneath my name that it was actually written by Michelle Ferrera. You see it says "JCK:GMF:mb."

of Mr. Pressman's assets, then a tax lien would be behind a prior perfected UCC loan. That's just the law. That's the legal argument this appears to be making. If it is factually accurate that there was a UCC-1 filed, then I believe that would, in fact, be the case.

11:10 Q And do you recall having seen that UCC-1?

11:10 A I recall being aware of it; I'm not sure I've ever seen it.

11:10 Q If you look at the letter that starts with GT002632.

11:10 A Again, none of these are letters, these are all drafts.

11:10 Q Looking at 002632 through 2636?

11:10 A Yes.

11:10 Q Is that another letter set up for your signature to send to the California Franchise Tax Board?

11:10 A It appears to be another draft. This one looks like it's undated.

11:10 Q Do you recall having seen this letter before?

11:10 A No.

11:11 Q Do you recall if it was sent?

11:11 A No.

out what's really going on.

So they're making an argument in this letter, picking and choosing specific numbers and figures and making an argument based on that that he should get a discount on his taxes.

Q And by "they" --

A And without seeing the underlying data, I don't know what the real numbers are. But in general, I'm sure any argument that they ended up making was true. But technically accurate and presenting a true picture of financial reality are two different things, which is the point I made to Carol Perrin. But this is the way they wanted to make the argument.

Q And by "they," are you referring to Greenberg Traurig, which was your law firm at the time?

A Greenberg Traurig, generally, and Carol Perrin, Grace Chung and Michelle Fererra specifically.

Q What years were you an attorney at Greenberg Traurig?

A 2000-ish to 2008-ish.

Q And were you an equity partner there?

A Yes. A "shareholder" is how they

structure it, but equity partner, same thing.
11:16 Q Were you a shareholder there the entire time?
11:16 A Yes.
11:16 Q If you look at the next sentence it says, "The company received approximately $9 million in 2004 mostly through third-party loans, including approximately $1.5 million from IRA accounts."
Do you see that?
11:17 A That's what it says.
11:17 Q Was that your understanding?
11:17 A Again, I have absolutely no recollection whatsoever of any of these specific numbers. Whatever number was included in the final letter I assume was based on the enclosures. And if you check the enclosures against the letter, you can see if the math is right.
11:17 Q If you look at the next sentence, it says, "Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow."
Do you see that?
11:17 A I do. I don't see any date on this draft.
11:17 Q Was that your understanding in the

11:22 A But that wasn't in the context of this letter.
11:22 Q I'm starting piece by piece.
11:22 A Okay.
11:22 Q Do you recall having mentioned those entities?
11:22 A Yes.
11:22 Q And you represented those entities?
11:22 A At some point in time I did, yes.
11:22 Q Did you have any understanding as to whether Mr. Pressman owned a controlling interest in any of those entities?
11:22 A No.
11:22 Q At any point?
11:23 A I don't recall. This draft has a list of specific entities, I assume those are the entities you're referring to.
11:23 Q Where did all the information in these letters come from?
11:23 A I don't know.
11:23 Q Were you the person with the relationship with Mr. Pressman at Greenberg Traurig?
11:23 A I would have been probably listed as the origination partner.
11:23 Q Were you also the person that had the

primary relationship with Mr. Pressman?
11:23 A I don't tend to work that way. When I hand something off, I tend to hand it off completely and try to stay hands off and let the person with the expertise handle it.
So with regard to tax matters, the person with the primary relationship would have been Carol or probably more likely Grace or maybe Michelle or maybe different people over different periods of time. But I would not have collected information in this level of detail; an associate would have done that, probably Grace or Michelle.
11:24 Q As to the final version of any of these letters sent to the Franchise Tax Board, would you have read them prior to signing them?
11:24 A I don't recall.
11:24 Q Do you generally read letters before signing them?
11:24 A If they're written by somebody I trust, I may or may not. If they're not written by somebody I trust, I don't sign them.
11:24 Q Have you heard of someone named Sherry Anne Lear?
11:24 A Yes.
11:25 Q Who is that?

11:25 A She's a lawyer.
11:25 Q And did you also go to law school with her?
11:25 A Yes.
11:25 Q How long have you known Ms. Lear?
11:25 A Since law school.
11:25 Q Do you refer matters to her?
11:25 A Sometimes.
11:25 Q Did you refer a matter to her titled in the -- strike that.
Did you refer a matter to her whereby she would represent EPD against Plush?
11:25 A No.
11:25 Q You didn't?
11:25 A No.
11:25 Q You didn't write her and suggest that she represent EPD?
11:26 A I don't believe so.
11:26 Q The litigation that you mentioned earlier, Plush against Marriott, is that titled Plush vs. Hotspur?
11:26 A Sounds right, et al.
11:26 Q I'd like to introduce Exhibit 16.
///
///

11:29 A I don't recall. I don't recall ever having represented EPD until the Hansel lawsuit.
11:29 Q Did Greenberg Traurig represent EPD in 2006?
11:29 A I don't recall them. Again, I don't recall anyone representing EPD until the Hansel lawsuit. If it did -- if someone did on some specific matter, I just don't recall it.
11:29 Q I'd like to introduce Exhibit 17.
(Chapter 7 Trustee's Exhibit 17 was marked for identification by the Deposition Officer and is attached hereto.)
11:30 Q BY MR. WEBER: Is this an e-mail you received from Christopher Austin on March 21, 2006?
11:30 A Yes.
11:30 Q What is Mr. Austin referring to in this e-mail?
11:30 A "I note that EPD Investment Company, LLC is the secured party on the UCC-1 filing for the inventory of Plush Lounge. I assume EPD is another company owned/controlled by Jerry and that we are counsel for EPD. Can you confirm the relationship?
"I'm in the process of preparing the letter demanding the delivery/return of the remaining items identified on the UCC-1 that we were unable to

recover because Marriott kicked us out, and it seems to me that the demand should come from the secured party EPD as well as (or perhaps exclusive of) Plush Lounge Las Vegas LLC (the identified debtor). Your thoughts?"

11:31 Q Do you know what he was referring to?

11:31 A It sounds like he's talking about items left in the space where the Plush Lounge nightclub was located at the Marriott Hotel.

11:31 Q And he thought EPD should make a demand for those assets?

11:31 A Well, I know everything that you do, I'm just reading what the e-mail says. It says, "It seems to me that demand should come from the secured party EPD as well as (or perhaps exclusive of) Plush (the identified Debtor). Your thoughts?"

11:31 Q Do you know if you instructed Mr. Austin to make a demand on behalf of Plush?

11:31 A It's not my nature to instruct people to do things. He's asking for my thoughts, so I assume we exchanged thoughts and did something.

11:31 Q Do you recall if you had a different attorney make a demand for EPD?

11:32 A I do not recall.

11:32 Q I'd like to introduce Exhibit 18.



BARKLEY Court Reporters

tell them the situation and see what they wanted to do.

11:33 Q If you didn't represent EPD at the time, why would you care one way or the other?

11:33 A Well, they were related to Plush in some way. Mr. Pressman was involved with both and we wanted the equipment out of the hotel. It doesn't do anybody any good to have equipment sitting in a hotel. So whoever owns it, we can figure that out later. The important thing is to get it out of there so that it's not wasted value.

I think we were focused on -- it looks like Marriott threw people out of the facility while they were trying to remove their items. And having them sit in a locked room in Marriott wasn't going to do anybody any good. So that was the important thing to get done.

But it looks like we did not represent EPD, a different lawyer did. And we would have to contact that lawyer and find out about EPD, is what I infer from this e-mail.

11:34 Q I'd like to introduce Exhibit 19.

(Chapter 7 Trustee's Exhibit 19 was marked for identification by the Deposition Officer and is attached hereto.)

11:39 Q And in 2006, were you general outside counsel for Plush?
11:39 A Yes.
11:39 Q Had you represented the principals of Plush for more than a decade?
11:39 A Yes.
11:39 Q And the principals of Plush were the Pressmans?
11:39 A I think the principals of Plush or the principal of Plush was S.C. Club, L.P., S.C., Inc. and Jerrold Pressman, according to this.
11:39 Q And do you recall who controlled S.C. Club, L.P. and S.C. Club, Inc.?
11:39 A I don't know about controlled. This says the sole limited partner of S.C. Club, L.P. is Jerrold Pressman. It doesn't identify -- the general partner would be S.C., Inc. So the question is who were the officers of S.C., Inc., and I don't recall that. I assume Jerrold Pressman was probably chairman, but that's an assumption.
11:40 Q In Paragraph 2 of this Declaration, when you say, "I have represented the principals of Plush for more than a decade," who are you referring to?
11:40 A I think I must be referring to S.C. Club, L.P. and S.C., Inc.

11:40 Q And is that accurate?
11:40 A I think so. I assume -- well, the answer is, I don't recall who I was referring to. But whoever it was, I'm sure it was accurate at the time or I wouldn't have signed the Declaration.
11:40 Q At that point, had you been representing the Pressmans or entities they were involved with for more than a decade?
11:40 A I don't recall whether I ever represented either or both of the Pressmans individually. I certainly had represented various entities that Mr. Pressman had some involvement with for more than a decade.
11:41 Q And you were the registered agent for service of process of Plush at that point?
11:41 A Yes.
11:41 Q You drafted the company's Operating Agreement?
11:41 A On May 9th, 2003, that's what it says.
11:41 Q Is it accurate?
11:41 A Yes.
11:41 Q In 2006, you said you don't recall having ever represented EPD?
11:41 A I don't recall either way.
11:41 Q Do you know if EPD had any relation to


BARKLEY Court Reporters

Plush?

11:41 A I think it loaned Plush money. I don't think it had any ownership relationship, based on this explanation. It says here that the sole member of Plush Lounge is S.C. Club, L.P., which is also the manager. And the general partner of S.C. Club, L.P. is S.C. Inc. And the sole limited partner of S.C. Club, L.P. is Jerrold Pressman.

So unless EPD is a shareholder of S.C. Club, Inc., then there would be no equity relationship. But I believe that EPD loaned Plush money. And there was an interrelated ownership or relationship or control due to Mr. Pressman's involvement or possibly both Pressmans' involvement.

11:42 Q Are you aware that at some point EPD filed a lawsuit against Plush?

11:42 A Yes.

11:42 Q And do you know why the lawsuit was filed?

11:42 A To perfect the claim in a manner that would enable it to file a judgment lien.

11:43 Q And file a judgment lien that would be in relation to the Hotspur litigation?

11:43 A Yes.

11:43 Q And why was that done?

11:43 A I don't recall.

11:44 A I don't recall.
11:44 Q Do you recall if the Pressmans had decision-making authority with regard to Plush?
11:44 A I would assume that they did, but I don't recall.
11:44 Q Why would a state court case be filed by EPD vs. Plush to obtain a judgment lien rather than just entering into some type of agreement?
11:45 A You can't do it by agreement, it has to be a judgment.
11:45 Q Do you recall who decided to file the Complaint in state court?
11:45 A I think Sherry Lear did.
11:45 Q Did you provide any instructions to her to file a Complaint in state court?
11:45 A No.
11:45 Q Did you suggest that she file a Complaint in state court?
11:45 A Yes.
11:45 Q And did you suggest that she go ahead and file it and get a Stipulated Judgment with Plush?
11:45 A Yes.
11:45 Q And did you also suggest that after getting a judgment that she obtain a Judgment Lien?
11:46 A Yes.

11:46 Q And did you also suggest to her that after obtaining a Judgment Lien, that she take some sort of action to file a Notice of Judgment Lien in the Plush vs. Hotspur litigation?
11:46 A Yes. And suggest, I don't know about suggest, but we -- I discussed that with her and with the client, with my client and with the court, and ultimately that's what we did.
11:46 Q What do you mean you discussed it with the court?
11:46 A Well, we had to explain to the judge what was going on here and why.
11:46 Q Who do you mean by "we"?
11:46 A Me and/or Sherry and/or the individual people that were involved.
11:46 Q At that point, you represented Plush; is that right?
11:47 A Yes.
11:47 Q And did you represent EPD?
11:47 A No, Sherry represented EPD.
11:47 Q Do you know if you had a conflict of interest at that point in being involved or giving direction regarding litigation between EPD and Plush?
11:47 A Well, I couldn't give direction to opposing counsel. I wouldn't have any conflict of

being involved in representing my client, which was Plush. So I'm not sure -- I guess the short answer is no, I'm not aware of any conflict.

11:47 Q And you didn't represent EPD at that point?

11:47 A I don't recall.

11:47 Q I'd like to introduce Exhibit 23.

(Chapter 7 Trustee's Exhibit 23 was marked for identification by the Deposition Officer and is attached hereto.)

11:48 Q BY MR. WEBER: Is this an e-mail you sent to Sherry Anne Lear on August 13, 2006?

11:48 A Yes.

11:48 Q And you tell her, "I would like you to please represent Keith Pressman's company, EPD, Investment Co., LLC, a California limited liability company"; is that right?

11:48 A Yes. Keith had chosen Sherry to represent EPD, so I was sending her this information.

11:48 Q And you say, "And file a standard Judicial Council form breach of contract action in LASC against Plush Lounge Las Vegas, LLC, a California limited liability company."

11:48 A Yes.

11:48 Q You're suggesting that she file the suit?

11:50 A Yes.
11:50 Q Is that accurate?
11:50 A I don't have any recollection of what that means.
11:50 Q Then it says, "We want the investors to be protected, but due to the obvious conflict, I cannot represent both sides in the same lawsuit."
Do you see that?
11:50 A Yes.
11:50 Q And what are you referring to there?
11:50 A You can't represent both sides on the same lawsuit.
11:50 Q Then you say, "EPD needs to get a judgment, and file an abstract of judgment in L.A. County, perfect the foreign judgment in Nevada, and file a notice of judgment lien in a pending federal court action in which I represent Plush, Plush Lounge Las Vegas, LLC vs. Hotspur Resorts Nevada, Inc.," and then the case number.
Do you see that?
11:52 A Yes.
11:52 Q So you're telling her to then get a judgment, file the abstract, and perfect the judgment and file a Notice of Judgment Lien?
11:52 A Well, I'm giving my view of what I think

should be done.
11:52 Q And that's to obtain a judgment against your client?
11:52 A Yes.
11:52 Q And file a Notice of Judgment Lien as to your client?
11:52 A Yes.
11:53 Q I'd like to introduce Exhibit 24.
(Chapter 7 Trustee's Exhibit 24 was marked for identification by the Deposition Officer and is attached hereto.)
11:53 Q BY MR. WEBER: Have you ever seen this Complaint that was filed in the EPD vs. Plush litigation?
11:53 A Yes.
11:53 Q There is a Multiple Advance Promissory Note attached as an exhibit. Do you see that?
11:53 A Yes.
11:53 Q Have you seen this Promissory Note before?
11:53 A I assume I'm -- I don't recall.
11:53 Q Do you recognize the signature for Plush?
11:53 A Yes.
11:53 Q And who is that?
11:53 A I take it back. I'm not sure.
11:53 Q Do you recognize the signature for EPD?

record at 12:06 p.m.

12:06 MR. WEBER: I'd like to introduce Exhibits 27 and 28.

(Chapter 7 Trustee's Exhibit 27 and Exhibit 28 were marked for identification by the Deposition Officer and are attached hereto.)

12:06 Q BY MR. WEBER: Mr. Kirkland, is it your understanding that a Judgment and then a Final Judgment were entered in the EPD vs. Plush case in early 2007?

12:06 A Yes.

12:06 Q Are these the judgments?

12:06 A They appear to be.

12:06 Q Have you seen them before?

12:06 A I don't recall.

12:06 Q I'd like to introduce Exhibit 29.

(Chapter 7 Trustee's Exhibit 29 was marked for identification by the Deposition Officer and is attached hereto.)

12:06 Q BY MR. WEBER: Who is Ann Loeb?

12:07 A Apparently somebody at Dreier, Stein & Kahan.

12:07 Q Were you an attorney at Dreier, Stein & Kahan?

12:13 Q BY MR. WEBER: Did that e-mail that you sent Ms. Lear suggest that she obtain a judgment and file a Notice of Lien in the Plush vs. Hotspur litigation?
12:13 A I said that EPD needed to get a judgment and file an abstract of judgment in L.A. County and perfect the foreign judgment in Nevada and file a Notice of Judgment Lien in the pending federal court action.
12:13 Q Didn't you suggest that she obtain a Judgment Lien and then file a Judgment Lien in the Plush vs. Hotspur litigation?
12:13 A I said EPD needed to get a judgment and file an abstract of judgment in L.A. County, perfect the foreign judgment in Nevada and file a Notice of Judgment Lien in the pending federal court action.
12:13 Q And what was the pending federal court action titled?
12:14 A Plush Lounge Las Vegas, LLC vs. Hotspur Resorts Nevada, Inc. et al.; U.S. District Court Case CV 06-2626 FM (CTLx).
12:14 Q So did you consider the EPD vs. Plush case related or having any relevance to the Plush vs. Hotspur case?
12:14 A No.

12:14 Q None whatsoever?
12:14 A I don't know what that means.
12:14 Q You didn't think that the cases were in any way related?
12:14 A Correct.
12:14 Q You didn't think that filing a litigation to get a Judgment Lien to file in the other made them in any way related?
12:14 A No.
12:14 Q And did you think that the EPD vs. Plush litigation was in any way relevant to the Plush vs. Hotspur litigation?
12:14 A I don't recall ever thinking about that. I did say, "It did not appear that the issues in the EPD lawsuit are relevant to the claims or defenses in this litigation" to my associate at Dreier, Stein.
(Deponent conferring with attorney.)
12:15 Q BY MR. WEBER: I'd like to introduce Exhibit 32.
(Chapter 7 Trustee's Exhibit 32 was marked for identification by the Deposition Officer and is attached hereto.)
12:15 THE DEPONENT: These look like Maribeth Annaguey's thoughts to me. So my prior testimony was wrong. I assumed I had written this, I didn't, she wrote

Lien in the other litigation marginally relevant?
12:21 A I don't think so, no. The standard in Wyeth that we cite, is "critical to resolving the issues before the court." It seems like a pretty good argument to me. I don't know what the court ruled, but it seems like we should have won that one.
12:21 Q Is this right around the time period when you first invested or loaned money to EPD?
12:21 A I don't recall.
12:21 Q Do you recall if it was in 2007?
12:21 A I think this must have been later, but I'm not sure.
12:21 Q I'd like to introduce Exhibit 33.
(Chapter 7 Trustee's Exhibit 33 was marked for identification by the Deposition Officer and is attached hereto.)
12:22 Q BY MR. WEBER: Is this a letter that you wrote to Mr. Pressman and sent on or about September 28, 2007?
12:22 A Yes.
12:22 Q Is that your signature?
12:22 A Yes.
12:22 Q You refer to an initial investment in EPD. Do you see that?
12:22 A Yes.

12:22 Q Why do you refer to it as an investment rather than a loan?
12:22 A Vernacular.
12:22 Q Are they different?
12:22 A "Investment" is a broad term that is used kind of generically, like res judicata. So in the business sense, they're not different. This is a colloquially written letter. There is a legal distinction between an equity investor and a lender or creditor. An investor would have a risk of loss, a lender or creditor would not. So I'm using "investment" in the generic sense.
12:23 Q And then in the second paragraph you state that Keith Pressman would prepare loan documents; is that right?
12:23 A "As agreed, Keith will prepare standard form, multiple advance, secured loan documents, including a Secured Promissory Note, Continuing Guaranty, Security Interest Agreement, conflict waivers, etc. in due course."
12:23 Q Do you know if you prepared those or if Keith prepared those?
12:23 A I didn't prepare them except for maybe the conflict waiver. I don't know whether Keith did or not, but it wasn't me.

to invest or loan money to EPD or Pressman that your interest would be to ensure repayment of debt owed to you?
12:29 A I don't recall.
12:29 Q Is it your understanding that if you were to invest or loan money to EPD or Pressman, that your interest would be preservation of assets for your benefit and not to protect the interests of EPD or Pressman?
12:29 A I don't recall.
12:29 Q If you look at Paragraph 6, it says, "EPD and Pressman understand that, if the loans are not repaid when required, Kirkland's interests will become directly adverse to the interests of EPD and Pressman, and their property."
Do you see that?
12:29 A Yes.
12:30 Q Was it your understanding that if the loans were not timely repaid, that your interests would become directly adverse to EPD and Pressman?
12:30 A No.
12:30 Q Why is that?
12:30 A I don't think I gave any thought at all to not being repaid.
12:30 Q But if the amounts weren't repaid, would

that make your interests directly adverse to EPD and Pressman?

A I never thought about it.

Q I'm not asking what you thought about, I'm asking now whether it's the case.

A I don't think so, no.

Q So if you weren't being timely repaid on a loan, you don't believe that would make your interests adverse to EPD and Pressman?

A You're asking me a hypothetical question?

Q It's not hypothetical.

A I don't know. I've never thought about it.

Q Do you recall reviewing this document before it was signed?

A I'm sure I did not.

Q And your testimony is you didn't draft this?

A I don't recall drafting it.

Q But you do recall drafting the Conflict Waiver; correct?

A I have a recollection of drafting some kind of a Conflict Waiver. Maybe it was a Conflict Waiver within an engagement letter for one or more of the firms and that's what I'm thinking of. I do not

recall drafting this document.
12:31 Q Do you know who would have drafted it?
12:31 A Someone at EPD. It says the documents were prepared by EPD and Pressman in writing. So I assume somebody at EPD. I would guess Keith, but that's a guess. It's pretty boilerplate for the most part.
12:32 Q Did you pay any consulting fees to Broadway Entertainment Marketing, Inc.?
12:32 A I don't recall.
12:32 Q Did you pay any advisory fees to Broadway Entertainment Marketing, Inc.?
12:32 A I don't recall.
12:32 Q Did you pay any professional service fees to Broadway Entertainment Marketing, Inc.?
12:32 A I don't recall.
12:32 Q Did you pay any kind of fees to Broadway?
12:32 A I don't recall.
12:32 Q Can you think of any reason why you would pay fees to Broadway?
12:32 A Because Jerry Pressman asked me to make a check payable to Broadway and I would have said okay.
12:32 Q For any purpose?
12:32 A Correct.
12:33 Q Do you recall whether you paid any amounts


BARKLEY Court Reporters

12:33 to Keith Pressman for consulting fees?
12:33 A I don't recall.
12:33 Q Do you recall making any payments to Keith Pressman for advisory fees?
12:33 A I don't recall.
12:33 Q Do you recall making any payments to Keith Pressman for professional service fees?
12:33 A I don't recall.
12:33 Q Do you recall paying any amounts to Keith Pressman for legal feas?
12:33 A I don't recall. I think I paid Broadway $400,000 and Keith $200,000.
12:33 Q For what?
12:33 A Because Jerry told me that's what he wanted the checks written to.
12:33 Q And what was your understanding as to why the money was going to Broadway?
12:33 A I don't recall.
12:34 Q You didn't ask why?
12:34 A If I did, I don't remember the answer or the question.
12:34 Q That's a lot of money. You didn't inquire further?
12:34 A It's enough money to warrant papering. But I don't recall, as I said, whether or not I

asked what it was for or whether or not he told me. I assume he probably volunteered it. My recollection is he was looking for me to write checks and I think those were the first checks. So my guess is this letter refers to $600,000, and my recollection is there was $400,000 to Broadway and $200,000 to Keith, and that the documents -- probably these documents prepared in due course reflect those amounts. And I'm sure at the time Jerry gave me a full presentation of what the money was for and what goes where, but I don't remember it now; that was 10 years ago.

12:35 Q Can you think of any reason why if you paid fees of any kind to Broadway that that would be an obligation owed by EPD?

12:35 A The pitch that Jerry gave me, the explanation he gave me is, "You are investing in this enterprise, Jerry Pressman, Inc., for lack of a better vernacular. And the money goes wherever it goes and you pay whoever you pay. And at the end of the day, I and EPD will guarantee that you will get back your money, plus interest."

So I said, "Make sure the documents reflect that."

12:35 Q Aside from that pitch, can you think of any reason why EPD would be liable for fees that you

paid Broadway?
12:35 A Yes. I assume that the money was going there because Jerry wanted it to go there. I assume Broadway provided something to EPD of value. I assumed Keith Pressman provided something to EPD of value, services, money, what have you. They were all related entities. And whether I paid a check to Jerry individually, to EPD, to Broadway, to Keith, to Plush, to whoever, I didn't think about it, which is why I wanted to be sure that the documents reflected that I didn't have to think about it. Any money that went to that enterprise would all be guaranteed unconditionally by EPD.
12:36 Q And you didn't ask any questions about why two separate businesses or multiple separate businesses were part of one enterprise?
12:36 A I don't think they were separate businesses. It's very, very, very common for companies to have separate and related entities. I don't think I've ever had a client that didn't, with the sole exception of Warner Bros., which is one single entity for everything and everything is a dba. But aside from that, all companies have related entities; wholly owned subs, partially owned subs, sister companies, parent companies, that's very

typical.

12:37 Q Were EPD and Broadway parents or subsidiary companies?

12:37 A I don't recall.

12:37 Q Do you recall if Broadway owed substantial amounts to EPD during 2007?

12:37 A I don't recall.

12:37 Q Can you think of any reason why payments by you to Keith Pressman of fees of any kind would be an obligation of EPD?

12:37 A Well, if Jerry Pressman asked me to pay it in connection with money that EPD owed Pressman, Keith Pressman, or services that he was providing or what have you, then if I'm writing the check, the money is coming out of my pocket to benefit EPD. EPD is promising it's going to put the money back in my pocket. So if he wanted checks written to different people, I wanted it to be crystal clear that EPD was on the hook to pay me back, which it was.

12:38 Q So why would you categorize something like a fee instead of a loan if it was being paid to Broadway?

12:38 A I don't recall characterizing it as anything. I recall asking Jerry, "Who do you want the checks payable to," and he told me and I wrote the

checks.

12:38 Q I'd like to introduce Exhibit 35.

(Chapter 7 Trustee's Exhibit 35 was marked for identification by the Deposition Officer and is attached hereto.)

12:38 Q BY MR. WEBER: Is that your signature on the last page where it says, "Lender, John C. Kirkland?

12:38 A Yes.

12:38 Q Did you prepare this Continuing Guaranty?

12:38 A I don't recall preparing it. I think someone at EPD prepared it. This is one of the loan documents. I think there was a Guaranty, a Security Interest Agreement and a Note.

12:39 Q Did you review this before you signed it?

12:39 A No.

12:39 Q You never reviewed it?

12:39 A I have since reviewed it. At the time, Jerry handed me this stack of documents, and I signed them and handed them back. I probably flipped through them like this (indicating). I signed them and handed them back to him across the table.

12:39 Q As a longstanding practicing attorney, is it your practice to just sign legal documents handed to you?

at either Guarantor's direction or recommendation, including without limitation all loans directly to Debtor pursuant to the Note or Loan Documents, all additional funds loaned to Debtor from time to time, all payments to the Debtor for consulting fees, advisory fees, and professional service fees, all payments to BEM for consulting fees, advisory fees, and professional service fees, and all payments to Keith Pressman for consulting fees, advisory fees, professional fees, and legal fees, and all payments to any other sister company of EPD, (any and all such loans and payments, collectively, the 'Payments')."

Do you see that?

12:44 A Yes.

12:44 Q Was that your understanding?

12:44 A Yes. Although it would also include loans -- oh, this says loans. Yes.

12:44 Q And you never questioned as to why consulting fees, advisory fees or professional service fees paid to BEM, Broadway Entertainment, or to Keith Pressman would be an obligation of either EPD or Jerrold Pressman?

12:44 A I don't recall ever having any conversation using those terms.

12:44 Q Do you ever recall thinking about why

those could possibly be obligations of EPD or Jerrold Pressman?

12:45 A It wasn't a mystery. It was very clear to me from what Mr. Pressman said. He said, "You're investing in an overall enterprise. And from time to time, I may have you write checks to whoever for whatever. Whoever or whatever the check is for, if you loan $200,000 to Keith Pressman, I'm going to make sure that you get that money back, plus interest. And you don't have to worry about what he's going to do with the money, trust me, I know what I'm doing. I've been doing this for 30 years. You don't have to know in each instance exactly what's going on. I'll just ask you to give me money, you'll give it to me and I'm guaranteeing and EPD is guaranteeing you'll get paid back."

And I said, "Fine."

12:45 Q You never inquired further or asked questions about it?

12:45 A I think he explained it at the time, I just don't remember.

12:46 Q By the time you entered into this Continuing Guaranty on November 8, 2007, how many years had you been a practicing attorney?

12:46 A 17, 16 1/2.

01:04 Q Without any authorization?
01:04 A Yes.
01:04 Q You don't recall providing that information to EPD?
01:05 A I don't recall either way.
01:05 Q And you don't recall telling EPD to make your monthly mortgage payments?
01:05 A I don't recall either way.
01:05 Q Do you recall during mid 2009, EPD or Pressman telling you that they had cash flow issues?
01:05 A Yes.
01:05 Q And do you recall when exactly that was?
01:05 A Mid to fall, somewhere around there.
01:05 Q Somewhere in the May to September time period?
01:05 A Somewhere in there, maybe.
01:05 Q And what did they say or how did you find out?
01:05 A I think Jerry said, "I need a hundred grand; there is some short-term issues."
And I said, "Fine."
01:05 Q Did he say what the issues were?
01:05 A He probably did. Jerry tends to be an over explainer. So he tends to give detailed explanations about everything, which I carefully

(Chapter 7 Trustee's Exhibit 40 was marked for identification by the Deposition Officer and is attached hereto.)

MR. WEBER: These are the Initial Disclosures that your counsel served in this case.

If you look at page 10 of your Initial Disclosures, it states, "Based on the Bright Conscience Trust's current information, as shown in detail in the chart below, Bright Conscience Trust seeks to recover from the Debtors and their assets and combined estate a first position secured claim in the principal amount of $2,055,466.23, plus interest at the maximum legal rates, plus any amounts received by Debtors, or transferred to third parties for the benefit of Debtors, or an amount according to proof at trial, plus interest at the maximum legal rates, including but not limited to the following:"

And then it lists several dates and dollar amounts.

Q Do you see that?

A Yes.

Q As to the amount on September 28, 2007, for $200,000, do you know if that amount was put into EPD, Jerrold Pressman, or some other person or entity?

A I don't know what Jerry did with the check

01:46 when I handed it to him. I handed the check to Jerry.
01:46 Q Do you know who you wrote that check to?
01:46 A I think Keith Pressman.
01:46 Q Made payable to Keith Pressman?
01:46 A I think so, but I'm not sure.
01:46 Q As to the second item, September 28, 2007, for $400,000, do you know who you paid that amount to?
01:46 A I handed that check to Jerry Pressman.
01:46 Q And do you know who it was payable to?
01:46 A Whoever he said to make it payable to; I think BEM, but, I'm not sure.
01:47 Q Broadway?
01:47 A Yes.
01:47 Q As to the --
01:47 A I assume. I assumed, I guess. I don't recall.
01:47 Q As to the November 8, 2007, amount for $150,000 do you know who you made that payable to?
01:47 A I think it was payable to EPD.
01:47 Q And how about the March 27th, 2008, payment for $150,000?
01:47 A I don't recall.
01:47 Q How about June 20th, 2008, payment for $100,000?
01:47 A I don't recall. I know for all of them I

made them payable to whoever Jerry asked me to make them payable to and gave them to Jerry.

01:47 Q How about for the August 18, 2008, payment for $855,466.23?

01:47 A EPD.

01:48 Q And why the not round number?

01:48 A It was taken directly out of closing from a refinance of my house.

01:48 Q And April 19th, 2009, for $100,000?

01:48 A I don't recall.

01:48 Q How about July 24th, 2009, for $100,000?

01:48 A I think that was EPD, but I'm not sure.

01:48 Q And is it your contention that these were all part of a single loan?

01:48 A Yes.

01:48 Q One single loan from you to EPD and Jerrold Pressman?

01:48 A From me to EPD; correct.

01:48 Q Over the course of approximately two years?

01:48 A The first check is 9-28-07 and the last check is 7-24-09.

01:48 Q And you believe that's all part of one loan?

01:48 A Yes, I do.


BARKLEY Court Reporters

01:49 Q And why is that?
01:49 A Because it was.
01:49 Q Other than just saying it was, what are you relying on?
01:49 A I don't have any idea what you're asking me.
01:49 Q Why do you think that all of those amounts payable to EPD or to other entities or people over the course of almost two years are part of a single loan transaction?
01:49 A Because they were a single loan from me to EPD.
01:49 Q But other than just saying that as a fact, what are you basing that on?
01:49 A I'm basing it on that's what it was. I don't know what you -- I don't know what more you're looking for. That's what occurred. That's what it was. That's the answer.
01:49 Q Are you relying on a piece of paper or the way you think about it? What are you basing it on?
01:50 A What's the "it" in your question?
01:50 Q Your contention that that's all part of a single loan transaction.
01:50 A I'm not making any contention, I'm just answering your question. You asked me whether it was

part of a single loan transaction and I said, "Yes, it was." That's what occurred.

01:50 Q And I'm asking what you're basing that on.

01:50 A Because that's what happened.

01:50 Q Anything other than that?

01:50 A I don't know what else there could be.

01:50 Q I'd like introduce Exhibit 41.

(Chapter 7 Trustee's Exhibit 41 was marked for identification by the Deposition Officer and is attached hereto.)

01:50 Q BY MR. WEBER: Is this a check you wrote to Broadway on or about March 16, 2008?

01:50 A It is a check to BEM as one of the documents. It also looks like there is a deposit slip and the back of a check.

01:51 Q Is that your signature on that check?

01:51 A Yes.

01:51 Q And that's an amount payable to Broadway?

01:51 A Yes.

01:51 Q And if you look in the line at the lower left, it says "For fees."

Do you see that?

01:51 A Yes.

01:51 Q Do you know what you're referring to?

01:51 A No.

01:51 Q Do you know why you would write "For fees"?
01:51 A I did whatever Jerry asked me to do, so I assume that's what he said to put.
01:51 Q Do you know if you were paying fees to Broadway Entertainment?
01:51 A I have no recollection.
01:51 Q I'd like to introduce Exhibit 42.
(Chapter 7 Trustee's Exhibit 42 was marked for identification by the Deposition Officer and is attached hereto.)
01:52 THE DEPONENT: I think I have two of the same thing.
01:52 MR. WEBER: I think this one is marked 41. This isn't a marked copy, it must have been a duplicate.
01:52 Q Exhibit 42 appears to be another check to Broadway, this one dated September 28, 2007; is that right?
01:52 A One of four documents is a check payable to the order of BEM. Both of the checks are payable to BEM.
01:52 Q Is that your signature on the check for $400,000 to Broadway?
01:52 A To BEM, yes.

01:52 Q And is "BEM" Broadway?
01:52 A I don't know.
01:52 Q Can you think of what else it would be?
01:52 A No.
01:52 Q It's not EPD, is it?
01:53 A I don't know.
01:53 Q Looking back on your Initial Disclosures, Exhibit Number 40. On page 10, the list of dates and deposit or transfer amounts that we were looking at a moment ago, are these two checks listed on that chart?
01:53 A Which two checks?
01:53 Q Exhibit 41 and Exhibit 42, the two checks to BEM, are those listed on your chart on page 10 of your Initial Disclosures?
01:53 A It appears that the one dated 3-14-08 for 150,000, it looks like this check was deposited on 3-26-08, based on this. I assume that's what that stamp means. And it looks like the 400,000 is dated 9-26-07 and deposited 9-27-07 or 9-28-07. So I assume that's the same thing.
01:53 Q Is it your understanding that these two checks to BEM, Exhibits 41 and 42, are included in the chart that you included with your Initial Disclosures?
01:53 A Yes.
01:53 Q And is it your understanding that those


BARKLEY Court Reporters

two checks are also included in the amounts in the Proofs of Claim filed by the Bright Conscience Trust?

01:54 A Yes.

01:54 Q And as to amounts you paid to Keith Pressman, it's your understanding that those are also included in the amounts sought by the Bright Conscience Trust in their Proofs of Claim?

01:54 A I don't recall.

01:54 Q What is the Bright Conscience Trust?

01:54 A It's a family trust that was created after the birth of my son for estate planning purposes.

01:54 Q For estate planning purposes?

01:54 A Correct.

01:54 Q When was the Bright Conscience Trust formed?

01:54 A September 9th, 2009.

01:54 Q You said it was after the birth of your son?

01:54 A Yes.

01:54 Q When was your son born?

01:55 A August 2009.

01:55 Q Is it okay if I just refer to it as the "Bright Conscience Trust"?

01:55 A Yes.

01:55 Q Was it formed for any other purpose than

estate planning purposes?
01:55 A No.
01:55 Q What was transferred into the trust?
01:55 A The EPD documents and some other assets.
01:55 Q Other personal assets?
01:55 A Yes.
01:55 Q And who formed it as a trust?
01:55 A My wife and I.
01:55 Q Anyone else?
01:55 A No.
01:55 Q And when it was formed, was your wife the sole trustee?
01:55 A Yes.
01:55 Q You've never been a co-trustee of it?
01:55 A Correct.
01:56 Q Were you the settlor?
01:56 A I believe that's correct.
01:56 Q Any other settlors?
01:56 A No.
01:56 Q Who are the beneficiaries under the trust?
01:56 A My kids.
01:56 Q Anyone else?
01:56 A I don't believe so. Maybe their kids.
01:56 Q Your kids are still minors?
01:56 A Yes.


BARKLEY Court Reporters

01:56 Q Who prepared the paperwork for the formation of the Bright Conscience Trust?
01:56 A I don't recall.
01:56 Q Was it you?
01:56 A It might have been.
01:56 Q Were whatever interests you had in EPD assigned to the Bright Conscience Trust?
01:56 A Yes.
01:56 Q And do you recall when that occurred?
01:56 A No.
01:57 Q Did the Bright Conscience Trust pay you any amount for that assignment?
01:57 A Yes. I had a support obligation to the kids. So it was to fulfill my obligation to my children under the law.
01:57 Q When did you get married to Mrs. Kirkland, Poshow Ann Kirkland?
01:57 A February 2009.
01:57 Q And are you still married today?
01:57 A Yes.
01:57 Q And your kids are kids of you and Poshow Ann Kirkland?
01:57 A Yes.
01:57 Q So what are you referring to in terms of support obligation?

01:57 A If you have a child, under the law, you're obligated to support that child.
01:57 Q But you're supporting your children anyway, aren't you?
01:57 A You're obligated to.
01:58 Q So how is that relevant to payment to you in regard to formation of the trust?
01:58 A Because the trust was formed in order to fulfill that legal obligation; pay for their college and their education and their support.
01:58 Q Is any amount currently being paid by the trust to your kids?
01:58 A No.
01:58 Q Or for their benefit?
01:58 A No.
01:58 Q Has any amount been paid for their benefit?
01:58 A No.
01:58 Q Has any amount been paid to them?
01:58 A No. You have all their money.
01:58 Q So it's just a -- it's a future purported obligation for college?
01:58 A No, it's -- it was, and is, an obligation that I have to support my kids, and to fulfill that obligation, I created the trust.

01:59 Q What amount did the Bright Conscience Trust pay you in return for the assignment of your interests in regard to EPD?
01:59 A Whatever amount I put in is the amount that went to their support.
01:59 Q But I'm asking you, did the Bright Conscience Trust pay you any money or give you any property when you assigned your interest to the Bright Conscience Trust?
01:59 A It did not pay me any money, it gave me an equal -- any amount I put in fulfilled that exact amount of my legal obligation to my kids by definition.
01:59 Q Other than fulfillment of the obligation that you contend occurred, is there anything else that the Bright Conscience Trust or Poshow Ann Kirkland or your kids provided to you in exchange for the assignment?
01:59 A I don't recall.
01:59 Q You don't recall any?
02:00 A I don't recall either way.
02:00 Q What is HMB Holdings Company, LLC?
02:00 A It was an LLC that Thom Ferro formed.
02:00 Q And who is Thom Ferro?
02:00 A Somebody who worked with Jerry Pressman,

02:05 Q Do you recall if Ms. Werner had a felony conviction against her?
02:05 A I think that's why she was disbarred.
02:05 Q And did you know she had been suspended or disbarred? Strike that.
Did you introduce Ms. Werner to Jerrold Pressman?
02:05 A No, I think he met her when she was at Weissmann Wolfe.
02:05 Q Did you recommend Ms. Werner for a position with EPD or Broadway?
02:05 A I think when he said he needed a secretary, I think I said -- he knew Katy and I think I said she was looking for a job.
02:05 Q Was that after she had been suspended or disbarred?
02:05 A I think so.
02:05 Q And after her criminal conviction?
02:05 A I think so.
02:05 Q Did you know that she had been suspended or disbarred at that point?
02:06 A Yes.
02:06 Q And did you know she had a felony conviction against her?
02:06 A I don't recall.

02:06 Q Why did you recommend someone who had been suspended or disbarred to go work for EPD or Broadway?
02:06 A That had nothing to do with it. I thought she would be a good secretary.
02:06 Q Do you hire people that have been suspended or disbarred?
02:06 A Not as a lawyer. It would depend on the person.
02:06 Q EPD was involved in making investments; is that right?
02:06 A I infer that from the name, yes.
02:06 Q Didn't you see any problem with someone who had been suspended or disbarred based on a felony conviction going to work for an investment company?
02:06 A No.
02:07 Q Why not?
02:07 A Why would I?
02:07 Q I'm asking you.
02:07 A The question doesn't make any sense to me.
02:07 Q Does it make any sense as to why there may be an issue with having someone who had a felony conviction go work for an investment company?
02:07 A Correct.
02:07 Q You didn't see any issue with that?
02:07 A She was a secretary. I didn't see any


BARKLEY Court Reporters

issue.
02:07 Q Did you tell Mr. Pressman about her suspension or disbarment?
02:07 A I did or she did, I don't recall; I think she probably did.
02:07 Q Did you tell Mr. Pressman about her felony conviction?
02:07 A I did or she did. I think she probably did.
02:07 Q Mr. Pressman didn't see an issue with that either?
02:08 A I don't know; you would have to ask him.
02:08 Q Not that you're aware of?
02:08 A Not that I'm aware of.
02:08 Q Did you ever have Ms. Werner perform legal work for you?
02:08 A Yes.
02:08 Q What kind of work?
02:08 A Drafting pleadings, appearing in court, taking depositions, drafting motions, probably drafting agreements, letters, speaking with opposing counsel.
02:08 Q Was that all while she was working for EPD or Broadway?
02:08 A No, none of that while she was working


BARKLEY Court Reporters

02:27 A That's just not something I would do. She would have her friend do that. The English is pretty good, so she may have had somebody help her; I don't recall. Her English is pretty good, especially if she spends time on it.

02:27 Q Do you recall right around September 11, 2009, instructing someone to file a UCC-1 in favor of the Bright Conscience Trust and against the assets of EPD and Pressman?

02:27 A Yes.

02:28 Q And do you recall who you instructed to do that?

02:28 A Some filing service.

02:28 Q Do you recall if it was National Corporate Research?

02:28 A I do not.

02:28 Q I'd like to introduce Exhibit 47.

(Chapter 7 Trustee's Exhibit 47 was marked for identification by the Deposition Officer and is attached hereto.)

02:28 Q BY MR. WEBER: Is this an e-mail chain that starts with an e-mail from someone at National Corporate Research to you dated September 11, 2009?

02:28 A Yes.

02:28 Q And down below there is an e-mail from

you to National Corporate Research dated September 10, 2009?

02:28 A Two e-mails, actually.

02:28 Q Did you send the e-mail at the bottom of the first page to National Corporate Research on September 10, 2009?

02:29 A Yes.

02:29 Q And were you asking them to file a UCC-1 in favor of the Bright Conscience Trust and against the assets of EPD and Pressman?

02:29 A I was just asking them to file the attached document. "Please file the attached in California."

02:29 Q And what is "the attached"?

02:29 A The UCC-1.

02:29 Q In favor of the Bright Conscience Trust?

02:29 A Yes.

02:29 Q And against the assets of EPD and Pressman?

02:29 A Yes, Jerrold Pressman.

02:29 Q Who drafted the UCC-1?

02:29 A I don't recall.

02:29 Q Was it you?

02:29 A I don't recall.

02:29 Q And you received the e-mail at the top

02:31 Q I'd like to introduce Exhibit 49.
(Chapter 7 Trustee's Exhibit 49 was marked for identification by the Deposition Officer and is attached hereto.)
02:31 MR. WEBER: This Limited Liability Company Certificate of Formation with the State of Delaware for HMB lists you as an authorized person.
02:31 Q Do you see that?
02:31 A Yes.
02:31 Q Were you an authorized person for HMB?
02:31 A I don't recall.
02:31 Q Did you cause HMB to be formed as a limited liability company?
02:31 A I don't recall. As I said, either I -- it looks like it's National Corporate Research. Either I asked them to do it or Thom Ferro asked them to do it. And he said, "I'm calling because John Kirkland referred me," and they assumed it was me who would be incorporator, and that's why they inserted my name; I just don't remember either way.
02:32 Q I'd like to introduce Exhibit 50.
(Chapter 7 Trustee's Exhibit 50 was marked for identification by the Deposition Officer and is attached hereto.)
02:32 Q BY MR. WEBER: Do you know if HMB was,

in fact, formed as a limited liability company at that time?
02:32 A This indicates that it was.
02:32 Q After September 14th, 2009, did you have any further involvement with regard to HMB?
02:32 A None that I recall.
02:32 Q Did you assist in filing a UCC Financing Statement in favor of HMB and against the assets of EPD and Pressman?
02:32 A I don't recall.
02:33 Q I'd like to introduce Exhibit 51.
(Chapter 7 Trustee's Exhibit 51 was marked for identification by the Deposition Officer and is attached hereto.)
02:33 Q BY MR. WEBER: Did you receive this e-mail from National Corporate Research on September 14th, 2009?
02:33 A Yes.
02:33 Q Did you assist in filing the paperwork for -- I'm sorry. This is in regard to Bright Conscience Trust.
I'd like to introduce Exhibit 52.
(Chapter 7 Trustee's Exhibit 52 was marked for identification by the Deposition Officer and is attached hereto.)

02:33 MR. WEBER: And I'll note for the record that there is an attachment to this document that my colleague said was produced in this fashion. But if you look at the cover of this document, it doesn't list an attachment. So I'll just note it for the record. I think that's the way it was produced.

02:34 Q On September 14th, 2009, did you cause an additional UCC to be filed in favor of HMB Holdings, LLC and against the assets of Jerrold Pressman?

02:34 A I don't recall.

02:34 Q How about against the assets of EPD?

02:34 A I don't recall.

02:34 Q Are these e-mails on the first page e-mails you sent or received?

02:34 A The first page is an e-mail from Alexis Cassidy to me and an e-mail from me to her and an e-mail from her to me. There is no indication of any attachments or other pages.

02:34 Q I'd like to introduce Exhibit 53.

(Chapter 7 Trustee's Exhibit 53 was marked for identification by the Deposition Officer and is attached hereto.)

02:34 Q BY MR. WEBER: Is this an e-mail you received from National Corporate Research on or about

September 16, 2009?
02:35 A Yes.
02:35 Q And did you receive the filed UCC-1 in favor of HMB and against EPD?
02:35 A I don't recall.
02:35 Q But it's attached to this e-mail; correct?
02:35 A It's attached to this piece of paper you handed me.
02:35 Q Was that an e-mail that you received?
02:35 A The first page is.
02:35 Q But it notes that there is an attachment; correct?
02:35 A It does note that there is an attachment.
02:35 Q And it says, "John, attached is the filed UCC-1 from California for EPD Investment Co. LLC."
02:35 A That's what it says.
02:35 Q So did you receive this?
02:35 A I received the first page; I don't know about anything else.
02:35 Q Are you familiar with HMB having obtained a lien against EPD's assets?
02:36 A I believe we listed them on the bankruptcy schedules.
02:36 Q Do you know if you caused them to have the UCC-1 listed on the bankruptcy schedules?


BARKLEY Court Reporters

02:36 A I don't understand your question.
02:36 Q Did you submit the UCC-1 with the California Secretary of State directly or indirectly?
02:36 A I don't recall.
02:36 MR. WEBER: We've got to go off the record so the videographer can switch the tape, which I think takes approximately 4 1/2 minutes.
02:36 THE VIDEOGRAPHER: We're off the record at 2:36 p.m.
(Recess held.)
02:42 THE VIDEOGRAPHER: We're back on the record at 2:42 p.m.
02:42 MR. WEBER: I'd like to introduce Exhibit 54.
(Chapter 7 Trustee's Exhibit 54 was marked for identification by the Deposition Officer and is attached hereto.)
02:42 Q BY MR. WEBER: Have you ever seen this Security Interest Agreement between HMB and EPD?
02:42 A I think so.
02:42 Q Did you draft it?
02:42 A No.
02:42 Q Did someone who worked for you draft it?
02:42 A No.
02:42 Q When did you first see it?


BARKLEY Court Reporters

there was no UCC-1.

So I called up Jerry and asked him why. And he said he screwed up and it wasn't ever filed. And I got pretty upset about that.

And then I calmed down and said, "You better work this out with Ann and figure it out. And I told him to call her. He then called me back and said he had worked it out with her and he instructed me to file a UCC-1, which I did.

02:45 Q Did you yell at Mr. Pressman during that phone call?

02:45 A I believe I raised my voice, yes. I was very upset.

02:45 Q Did you threaten legal action against him or EPD?

02:45 A No.

02:45 Q None whatsoever?

02:45 A No. I would guess that he inferred that I did, but I think he was hearing his own head, because I think he felt very guilty for what he had done. I take him at his word that he did it accidentally, but it was a pretty major screw-up.

02:45 Q Have you ever threatened legal action against Jerrold Pressman or EPD?

02:45 A No.

time I found out about that, it wasn't me, it was the trust.

02:47 Q I'd like to introduce Exhibit 56.

(Chapter 7 Trustee's Exhibit 56 was marked for identification by the Deposition Officer and is attached hereto.)

02:47 Q BY MR. WEBER: Are these e-mails you sent to or received from Katy Werner on February 25th, 2010?

02:48 A Yes.

02:48 Q Is this Ms. Werner reaching out to you to represent EPD and Jerrold Pressman in a suit brought by an investor?

02:48 A It's Katy saying that Jerry would like me to substitute into a case and handle it ex parte.

02:48 Q Do you know what case that was?

02:48 A I assume it's Hansel, but that's a guess.

02:48 Q I'd like to introduce Exhibit 57.

(Chapter 7 Trustee's Exhibit 57 was marked for identification by the Deposition Officer and is attached hereto.)

02:48 Q BY MR. WEBER: Is this an e-mail you received from Katy Werner also on February 25th, 2010?

02:48 A Yes.

02:48 Q This attaches a letter, it looks like it's

02:50 Q Do you recall any financial issues during 2009?
02:50 A No, other than I think Jerry asked for the $100,000 in 2009, whenever that was. I don't remember when that was.
02:50 Q And that was due to financial constraints; correct?
02:50 A That was in July of 2009, due to temporary cash flow constraints.
02:50 Q So you were aware that there were some cash flow constraints at least beginning in July 2009?
02:51 A I was aware on July 24th, 2009, that EPD had temporary cash flow constraints and needed $100,000.
02:51 Q I'd like to introduce Exhibit 58.
(Chapter 7 Trustee's Exhibit 58 was marked for identification by the Deposition Officer and is attached hereto.)
02:51 Q BY MR. WEBER: Are these also e-mails between you and Katy Werner, with the exception of the last one?
02:51 A There is an e-mail from Regina Yeh at the Doniger law firm that Ms. Werner forwards to me. I respond to her and she responds back to me.
02:51 Q You see at the top, at the last sentence,

change in the future."
Do you see that?
02:58 A I do.
02:58 Q Is that also boilerplate?
02:59 A No. Well, the "EPD" reference -- no, this is not boilerplate because I -- no, it's not boilerplate.
02:59 Q Did you draft that?
02:59 A I don't recall.
02:59 Q What was your view as to whether or not there was a conflict of interest between you and EPD at that point?
02:59 A There was no conflict.
02:59 Q You didn't believe that even though you had loaned money or invested money with EPD, that that presented a conflict in representing EPD against a suit brought by another investor or lender?
02:59 A Well, I did not, no. And the loan was at that point held by my family trust. But even if it weren't, I still don't believe there is any conflict. My recollection is that her loan was materially different than my loan.
03:00 Q How so?
03:00 A I don't recall. But I don't know that I would make any -- my recollection is that I did not

believe there was any conflict and that's still my belief.

03:00 Q Did you enter into any equipment leases that were facilitated by EPD for Jerrold Pressman?

03:00 A I don't recall.

03:00 Q Do you recall discussing equipment leases with Jerrold Pressman or EPD?

03:00 A I don't recall either way.

03:00 Q Did you know that EPD was engaged in some type of business with equipment leases?

03:00 A Yes.

03:00 Q And what was your understanding of it?

03:00 A That was it.

03:01 Q Just that they were involved in equipment leases?

03:01 A Yes.

03:01 Q Did you know if EPD was a lessor or lessee?

03:01 A No.

03:01 Q Do you know if Jerrold Pressman was?

03:01 A I guess the answer is I don't recall.

03:01 Q Do you know if EPD or Pressman -- I'm sorry.

Do you know if Jerrold Pressman himself was a lessor or a lessee?



BARKLEY Court Reporters

due next Wednesday as well."
Do you see that?
03:06 A Yes.
03:06 Q And you received that e-mail?
03:06 A Yes.
03:06 Q Your response that same day was, "Have Katy do it. Send her the last one we did."
Do you see that?
03:06 A Yes.
03:06 Q Were you saying that Katy Werner should do it?
03:06 A Yes. She would take the prior pleading and, you know, change the names, et cetera. The substantive work was already done, so she was doing secretarial work. I didn't want Lisa to have to do it, so I wanted Katy to do it.
03:07 Q Why didn't you have an attorney at Luce Forward do it?
03:07 A That would be idiotic. It was secretarial work. I would never have a lawyer do secretarial work.
03:07 Q So drafting an opposition is secretarial work?
03:07 A That's not what is happening here, it's clear. The opposition had already been done in a

similar case, and all she was doing is taking the prior pleading and rechanging it to be filed in this case. That's a secretary's job, not a lawyer's job.

03:07 Q So that's a secretary's job to take a pleading from a similar case and turn it into a pleading for whatever case you're working on?

03:07 A To do the first round of it, yes, absolutely. And then Theona or I would revise it and file it. But saying, "Here's a pleading for an identical motion in an identical case, all you've got to do is change the names and the case numbers and the dates and then hand it back to me," no question, that's secretarial work.

03:08 Q It's not legal work?

03:08 A It's not legal work.

03:08 Q I'd like to introduce Exhibit 63.

(Chapter 7 Trustee's Exhibit 63 was marked for identification by the Deposition Officer and is attached hereto.)

03:08 Q BY MR. WEBER: Is this an e-mail you sent to Katy Werner and Lisa Underkoffler on May 3rd, 2010?

03:08 A Yes.

03:08 Q And are you asking that Katy Werner prepare an opposition to an attachment motion?

03:08 A Yes.

03:31 Q Do you recall making the argument that Hansel was subject to the California Finance Lenders Law?
03:32 A I don't recall.
03:32 Q I'd like to introduce Exhibit 76.
(Chapter 7 Trustee's Exhibit 76 was marked for identification by the Deposition Officer and is attached hereto.)
03:32 THE DEPONENT: I assume we did based on this pleading. It seems to be arguing the contra position.
03:32 Q BY MR. WEBER: Is that your signature on Exhibit 76, the General Denial in the Hansel case?
03:32 A Yes.
03:32 Q The defenses listed here are 1, "The stated interest rate is usurious," and 2, "The funds were an investment rather than a loan that required repayment."
Is that right?
03:33 A Those are separate affirmative defenses to plaintiff's Complaint.
03:33 Q Who came up with those affirmative defenses?
03:33 A I don't recall.
03:33 Q Was it you?

03:40 A Yes.
03:41 Q Is that her commenting that the argument is a stretch or Jerrold Pressman commenting?
03:41 A I assume it's Jerry. That doesn't seem like an argument Katy would make, that seems like a "Jerry" argument. And he's on this e-mail, so I assume that's Jerry conveying it to me.
03:41 Q Why did either Katy Werner or Jerrold Pressman think that argument was a stretch?
03:41 A It was a pretty weak argument. It wasn't quite frivolous, but it was a pretty weak argument.
03:41 Q But you still made it?
03:41 A Yes. Our obligation as lawyers is to aggressively make every argument we can on behalf of our clients and that's what we did. That one I think we lost -- well, I know we lost, but we gave it the "old college try."
03:42 Q Do you know who drafted the Declaration of Ruben Moreno attached to this e-mail?
03:42 A Me, Jerry, Ruben and probably others.
03:42 Q It doesn't look like Ruben Moreno is on this e-mail chain. Is there a reason for that?
03:42 A I almost never -- well, you would have to ask Katy that. Katy sent the e-mail.
03:42 Q It's Ruben Moreno's Declaration; correct?

A Yes.
Q Did he provide any input into the Declaration?
A Yes.
Q Did he verify its contents?
A Yes.
Q Did you talk with him about the contents of the Declaration?
A Yes.
Q And he believed all the contents of the Declaration were true and correct once it was finalized?
A Yes.
Q Did Mr. Moreno sign the Declaration before it was filed?
A I don't recall. I think for at least one declaration he did. He was out of the office and had somebody sign for him. But I don't think I was aware of that until later.
Q Someone signed a Declaration under penalty of perjury for him?
A Yes. He asked somebody, maybe Sherry or someone in the office to sign for him.
Q Someone in whose office?
A His office.

03:44 Q And when did you become aware of that?
03:44 A Sometime later. I wasn't aware at the time, but I found out later, I don't recall when.
03:44 Q Did you ever comment to Katy Werner that her work in preparing pleadings wasn't what you had expected it to be?
03:44 A Yes.
03:44 Q What was the issue?
03:44 A I don't recall. I think in general she felt like she wanted to be more substantive in her contributions and didn't like just doing secretarial work; she wanted to do something more substantive. But that's only a general recollection.
03:44 Q I'd like to introduce Exhibit 80.
(Chapter 7 Trustee's Exhibit 80 was marked for identification by the Deposition Officer and is attached hereto.)
03:45 Q BY MR. WEBER: Is the e-mail at the bottom the same as the e-mail we just looked at?
03:45 A Excuse me?
03:45 Q Is the e-mail at the bottom of Exhibit 80 the e-mail that we just looked at, Exhibit 79?
03:45 A Yes.
03:45 Q And then above it, is that an e-mail you sent to Katy Werner on June 7, 2010, responding?

to know how we should address the 12% interest as a legal matter," on 81. And back on 78, she was saying, "We need to talk about the issue, especially the 12% interest rate, etc." So this makes it pretty clear that by "we" she meant me and Jerry.

03:49 Q BY MR. WEBER: Is this e-mail at the top an e-mail that you received from Katy Werner on June 8, 2010?

03:49 A There is an e-mail from Katy to Jerry saying, "OK here it is. The good news is reconstruction often makes things better. I'll talk to John."

And then an e-mail from Katy to me copying Lisa. It says the attachment in Moreno Decl.

"Please review this revised version and call me. Jerry wants to know how we should address the 12% interest -- as a legal matter. Any ideas?"

03:49 Q Do you recall discussing the 12 percent interest issue with Jerrold Pressman and Katy Werner?

03:49 A I do generally with Jerry, I don't think with Katy.

03:50 Q What did you discuss?

03:50 A I don't recall specifically. I know the 12 percent issue. 12 percent is higher than 10 percent. But I think Jerry's view was, he paid

12 percent and he agreed to pay 12 percent interest, he was going to pay 12 percent interest and that's the way it was.

03:50 Q Did he discuss the issue of --

03:50 A He didn't want to argue some legal technicality to get him out of his obligation. He felt he agreed to pay 12 percent and that's what he wanted to pay. Whether it was usury or not, he didn't care.

03:50 Q Did you discuss the usury issue with Jerrold Pressman?

03:51 A Only in the context of Jerry said, "Look, John, my business in the last 50 years is based on my reputation and based on who I am as a human being. I always tell the truth, I always treat everybody right. I never screw anybody. I don't try to get out of anything on a technicality.

"This woman loaned me money and I promised to pay her back and I promised to pay her 12 percent; therefore, I'm going to pay her back and I'm going to pay her 12 percent. And I don't care that you have legal defenses, that's what I'm going to do, because that's the right thing to do and that's who I am. That's what my business is based on and that's what my life is based on; get used to it."

Declaration?
03:57 A There is an e-mail from Katy to Jerry and Ruben attaching, I assume -- it says, "Here's Rubin's Declaration again. Please review and discuss. Thanks."
And then there is an e-mail from Katy to me two minutes later forwarding that prior e-mail and saying, "Don't know what's going on with the brief or declaration or even whether I was supposed to keep working on either of them. Anyway, here's a revised version of the declaration."
03:58 Q So she was continuing to revise the Declaration during that time period?
03:58 A I don't know. Someone was. It looks to me like probably Jerry and Ruben were, and Katy was making the changes they told her to make and she was sending it to them.
03:58 Q I'd like to introduce Exhibit 85.
(Chapter 7 Trustee's Exhibit 85 was marked for identification by the Deposition Officer and is attached hereto.)
03:59 Q BY MR. WEBER: At the bottom --
03:59 A This Exhibit 84 refreshes -- indicates that Ruben was obviously in the drafting of this Declaration because he's copied on that e-mail.

It's actually sent to him.

03:59 Q If you look at the bottom of page 85, is that an e-mail you received from Katy Werner on June 10, 2010?

03:59 A There is an e-mail from Katy to me and Lisa saying, "Jerry wants to know if the declaration is okay."

And then an e-mail from me to Katy saying, "Flip the order, start with the first sentence of par 10, and go through Hansel's decl using words like false, untrue, misleading, incorrect, etc."

And then an e-mail from Katy to me saying "Jerry would like to have a conference call."

04:00 Q Did you have a conference call?

04:00 A I don't recall.

04:00 Q You sent and received those e-mails?

04:00 A Yes.

04:00 Q Why was your instruction to go through and use words like "false," "untrue," "misleading" and "incorrect"?

04:00 A I don't recall. I assume because Hansel's Declaration was false, untrue, misleading and incorrect.

04:00 Q Do you recall looking at it first?

04:00 A Looking at what first?

04:00 Q The Declaration.
04:00 A I'm sure I did. I don't recall it, but I'm sure I read her Declaration in order to prepare a Declaration in response.
04:00 Q Did Katy Werner also prepare discovery responses?
04:01 A I would assume so.
04:01 Q At your instruction?
04:01 A I don't recall.
04:01 Q I'd like to introduce Exhibit 86.
(Chapter 7 Trustee's Exhibit 86 was marked for identification by the Deposition Officer and is attached hereto.)
04:01 Q BY MR. WEBER: Is this an e-mail you received from Katy Werner on June 11, 2010?
04:01 A Yes.
04:01 Q And did you have Ms. Werner prepare and draft discovery responses?
04:01 A Yeah. I think I said, "Here's the responses. Here's what questions you're responding to; plug it in." That's typically how I do discovery responses. I tend to be very repetitive. So I have some pretty standard responses. And then I say, "Okay, for Number 1, object on A, B and C, Number 2, C, D and E, Number 3, A, B and D." And then I have

my secretary do that, or in this case, Jerry's secretary. It looks like in this case it was mostly objections. So it would have been me saying, "Here's my standard objections, plug them in as follows."

04:02 Q I'd like to introduce Exhibit 87.

(Chapter 7 Trustee's Exhibit 87 was marked for identification by the Deposition Officer and is attached hereto.)

04:02 Q BY MR. WEBER: Is that an e-mail you received from Katy Werner on June 11, 2010, with draft discovery responses?

04:02 A Yes.

04:02 Q And who prepared the content, the substantive contents or dictated the substantive contents in the responses?

04:03 A Jerry and I.

04:03 Q So if you look at page --

04:03 A And Ruben.

04:03 Q If you look at page 4 of the attachment, on number 3.

04:03 A The fourth page?

04:03 Q Yes. If you look at the bottom, there is --

04:03 A Page number 4?

04:03 Q Item number 3.

04:03 A The fifth page of Exhibit 87?
04:03 Q Correct.
04:03 A Okay.
04:03 Q Item number 3, "Any purported 'loan' from Plaintiff to EPD was usurious."
Do you see that?
04:04 A Yes.
04:04 Q Who came up with that argument?
04:04 A I don't recall.
04:04 Q And Sub a. on that says, "Plaintiff was not a state-licensed California finance lender and 12% interest rate was higher than allowed by the California Constitution and the California Finance Lenders Law."
Do you see that?
04:04 A Yes.
04:04 Q Who came up with that argument?
04:04 A I don't recall.
04:04 Q I'd like to introduce Exhibit 88.
(Chapter 7 Trustee's Exhibit 88 was marked for identification by the Deposition Officer and is attached hereto.)
04:04 Q BY MR. WEBER: Is this an e-mail you sent to Jerrold Pressman and Keith Pressman on June 22nd, 2010?

A Yes.
Q And it attaches a revised draft of the Ruben Moreno Declaration?
A Yes.
Q I'd like to introduce Exhibit 89.
(Chapter 7 Trustee's Exhibit 89 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: Is this the final filed version of the Ruben Moreno Declaration?
A I don't know if it's the same one that we've been talking about or if there were more than one, but this is a filed Declaration of Ruben Moreno.
Q Do you know if that's Mr. Moreno's signature on the Declaration?
A I don't know. I wouldn't recognize his signature. I wouldn't know one way or the other.
Q Mr. Moreno testified at his deposition in this case that that wasn't his signature and that he didn't authorize it.
MR. LANDAU: Is that a question?
Q BY MR. WEBER: Can you provide any further details?
A I don't understand what you're asking me.
Q Did you have Mr. Moreno's permission to


BARKLEY Court Reporters

file this Declaration?

04:06 A I don't think I needed his permission to file a Declaration.

04:06 Q Did you obtain his signature on the Declaration?

04:06 A I didn't, someone in his office signed it at his request, I think Sherry. Her name is on one of the exhibits.

04:07 Q How do you know it was pursuant to his request?

04:07 A That's what he told me. He said, "I'm out of the office, I asked somebody to sign it for me."

04:07 Q Ruben Moreno told that to you by phone call?

04:07 A I don't recall whether it was in person or by phone. It was after the fact. I don't think I knew at the time, but I found out later. He told me he was out of the office and asked someone else to sign it for him.

04:07 Q Did Mr. Moreno have personal knowledge as to the items discussed in this Declaration?

04:07 A I think some of them are things that need personal knowledge, and as to those, he was the only one who did. And some of them are more sort of generic arguments and anybody could have attested to

those.

04:08 Q Do you know if, for instance, looking at Paragraph 9, if Mr. Moreno had ever looked at IRS publication 525 or had any knowledge as to what that was?

04:08 A I know he had because I discussed it with him. I discussed Hansel's Form 1040 with him in the context of 525.

04:08 Q If you look at Paragraph 10, there is a reference to Form 6198. Do you know if Mr. Moreno had any knowledge as to that form?

04:08 A Again, I discussed it with him. So I know that he did because we reviewed both those in the context of preparing this Declaration.

04:08 Q I liked to introduce Exhibit 90.

(Chapter 7 Trustee's Exhibit 90 was marked for identification by the Deposition Officer and is attached hereto.)

04:09 Q BY MR. WEBER: Is that your signature on the last page of this Opposition?

04:09 A Yes.

04:09 Q If you look on the second to last page, where you begin to make the argument that Ms. Hansel wasn't a lender pursuant to the California Finance Lenders Law.

04:09 A Is that a question?
04:09 Q Yes.
04:09 A What's the question?
04:09 MR. WEBER: Can you read it back.
"Q If you look on the second to last page, where you begin to make the argument that Ms. Hansel wasn't a lender pursuant to the California Finance Lenders Law.")
04:10 THE DEPONENT: That's not a question.
04:10 MR. WEBER: I'll rephrase it.
04:10 Q Were you arguing that Ms. Hansel was not a qualified lender pursuant to the California Finance Lenders Law?
04:10 A The argument we were making on behalf of the defendants was that, "Plaintiff has failed to comply with the California Finance Lenders Law. Plaintiff is trying to eat her cake and have it to, arguing on the one hand that the funds paid to EPD Investment Co. were investments, and therefore she is not subject to the California Finance Lenders Law -- while at the same time asserting that they were loans that had to be repaid, which clearly would subject her to the law. In truth, Plaintiff is caught squarely between a rock and a hard place. If the funds were

investments, then they were at risk, and not subject to an unconditional repayment obligation. If they were promissory notes, then she is a lender, and subject to the California Finance Lenders Law.

04:11 "The only exception under California law, as found by any California court, is for making less than one loan per year. See Cal. Fin. Code 22050(e). If the notes were loans, not investments, then Plaintiff made multiple loans, and does not fall within the safe harbor. She cannot claim that this was merely a personal accommodation between friends, and then seek collection like a bank. Her position is entirely self-defeating. The internal inconsistency within her own position precludes a finding of probable validity, and the court cannot find that plaintiff will likely obtain a judgment on such claims. See Bank Nederland.

04:11 "Lastly, Plaintiff argues that there should be no consequence at all for her failure to be properly licensed. But the law does not give a right without a remedy. At a bare minimum, Plaintiff must become a properly licensed lender before bringing a collection action to enforce a series of loans made in violation of the law. Like a corporation that has been suspended, she cannot come before the Court

seeking legal relief until she has complied with the mandatory licensing provisions of the law. As such, the motion should be denied."

04:12 Q Is this the argument that you were saying was a -- and I don't think your words were a stretch, but something to that effect?

04:12 A Somebody said it was a stretch and I can't disagree with that characterization. It's a pretty weak argument. It's not quite a frivolous argument, but it's a pretty weak argument.

04:12 Q Were you or your wife ever licensed lenders pursuant to the California Finance Lenders Law?

04:13 A No.

04:13 Q Did you think there was any type of conflict issue in making this argument when the same thing could apply potentially to you or your wife or your family trust?

04:13 A No.

04:13 Q Why is that?

04:13 A Because I don't.

04:13 Q When someone serves a Request for Production of Documents on your clients, do you normally have them look for all responsive documents or just ones that would help your position?

04:13 A Well, it depends on whether I've objected or not, whether there is privileged issues or not. So I would do whatever is appropriate in response to a particular request. That may vary depending on what the request is and what the response is.
04:13 Q I'll introduce Exhibit 91.
(Chapter 7 Trustee's Exhibit 91 was marked for identification by the Deposition Officer and is attached hereto.)
04:13 Q BY MR. WEBER: At the bottom of the first page, is that an e-mail that Lisa Underkoffler sent to you on July 1, 2010?
04:14 A Yes.
04:14 Q And she asks, "Are we producing doc? I've prepared Verifications for Jerry to sign."
04:14 A Yes.
04:14 Q And your response is, "Yes, but only helpful ones."
04:14 A Yes.
04:14 Q What did you mean by that?
04:14 A I assume I meant we were objecting to production of some documents and we were only producing ones we thought were helpful.
04:14 Q You weren't producing any documents that would potentially harm your client's case?

04:14 A I don't know. I'm inferring from what I say. I say, "Yes, but only helpful ones." So I assume that means we've objected. I think earlier there was an indication we objected to a lot of these requests. So now we've said, "We've objected. You're not entitled to these, but we're going to produce some notwithstanding objections, but the ones we're going to produce are helpful. And we're still objecting to producing the ones we don't think are helpful."

But again, that's a guess based on what I'm reading. I don't have any recollection specifically.

04:15 Q Who is Matt Gruenberg?

04:15 A A lawyer.

04:15 Q How do you know Matt Gruenberg?

04:15 A He apparently worked at Dreier, Stein & Kahan at the same time I did, or at Dreier, Stein, Kahan, Browne, Woods & George at the same time I did, but I don't really recall him when he worked there. He later did some work for Jerry, and I do recall he worked in the Hansel matter.

04:16 Q So Mr. Gruenberg at some point started performing legal work for EPD or Jerrold Pressman?

04:16 A Or some of their entities.

04:16 Q And did you oversee that work?

04:29 Q Do you know why you told Matt Gruenberg, "No, you want to use your least knowledgeable people for Declarations. Provides less to potentially impeach them with down the line at trial or depo"?
04:29 A I just told you that's protected attorney work product.
04:29 Q Do you believe that Declarations should be signed by people with less knowledge?
04:29 A I won't answer that question.
04:29 Q And why is that?
04:29 A Because you're basing it on attorney work product after I told you it was work product.
04:29 Q I'm asking you as a general matter. Do you generally have people sign Declarations that have the least knowledge?
04:29 A I won't answer the question, because you're basing it on attorney work product after being advised it was work product.
04:29 Q Work product, performing work on behalf of whom?
04:30 A I don't recall. It doesn't matter, I hold the privilege.
04:30 Q As to EPD you don't hold any privilege. The Trustee has waived the privilege.
04:30 A The attorney holds the work product

read by the Deposition Officer:
"Q BY MR. WEBER: Is the e-mail at the very top of the page an e-mail you sent to Mr. Pressman and Matt Gruenberg on October 15, 2010?")

04:45 THE DEPONENT: Yes.

04:45 MR. WEBER: You say, "If we can't show anything, and rely on 'money as fungible,' she would get it all."

04:45 Q Do you see that?
04:45 A Yes.
04:45 Q What are you referring to?
04:45 A I don't recall.
04:45 Q You don't recall having any discussion or communication on that issue?
04:45 A I don't recall what I'm referring to in this sentence.
04:45 Q I'd like to introduce Exhibit 103.

(Chapter 7 Trustee's Exhibit 103 was marked for identification by the Deposition Officer and is attached hereto.)

04:46 Q BY MR. WEBER: Is that an e-mail you received from Jerry Pressman on January 19, 2011?
04:46 A Yes.

signature on the last page of this document?
04:47 A (Deponent pauses.)
04:47 Q Again, I'm just asking if that's your
electronic signature on the last page of the document.
04:47 A It appears to be.
04:47 Q Are the arguments made in this objection
accurate?
04:48 A They're arguments. I don't know that an
argument can be accurate; they're arguments.
04:48 Q On the first page, on lines 25 through 26,
it says, "The alleged Debtor is generally paying its
debts as such debts become due, unless such debts are
the subject of a bonifide dispute."
Do you see that?
04:48 A Yes.
04:48 Q Was that accurate?
04:48 A As far as I know.
04:48 Q Well, was EPD paying its debts as they
became due to you or the Bright Conscience Trust at
that point?
04:48 A I don't think they were due.
04:48 Q Is that because you or your wife had
to enter into Forbearance Agreements?
04:49 A I don't think she or I had to do
submission. If you enter into an agreement, it's

because you choose to.

04:49 Q Is that because amounts were due that couldn't be paid?

04:49 A I don't know why that would make you do it. That might be a reason someone would ask for it.

04:49 Q Were Forbearance Agreements entered into between your wife and EPD because amounts couldn't be paid by EPD in a timely fashion?

04:49 A I don't think they couldn't be paid. I think Mr. Pressman was anticipating that he wanted to solidify the -- eliminate cash flow issues, and he asked for the extension before it was a problem.

04:49 Q If you look on the second page, lines 7 through 9, it says, "Though their cash flow problems are unfortunate, they are hardly unique in today's economy. That is the nature of investing."

04:50 A Yes.

04:50 Q And then it says, "Moving parties have no one to blame but themselves for their own investment decisions. Their funds were fully at risk, and EPD owes them nothing."

Do you see that?

04:50 A Yes.

04:50 Q Accurate?

04:50 A It's an argument.

04:50 Q Is it accurate?
04:50 A It's an argument.
04:50 Q Nothing more than an argument?
04:50 A I don't know. It's an argument.
04:50 Q Were your funds fully at risk?
04:50 A No.
04:50 Q Were your wife and your family trust's investments or loans fully at risk?
04:51 A No.
04:51 Q And why is that?
04:51 A They were documented loans. The loan documents speak for themselves.
04:51 Q And at the time they were documented, you were an attorney for Jerrold Pressman or his various entities?
04:51 A No, I think the documents that you showed me earlier showed I was not.
04:51 Q Were you an attorney for Plush at the time?
04:51 A I don't recall.
04:51 Q Were you an attorney for Broadway at the time?
04:51 A I don't recall.
04:51 Q Were you an attorney for EPD at the time?
04:52 A I think the documents you showed me said I

was not.

04:52 Q Were you an attorney for EPD at the time that the UCC-1 was filed in favor of the Bright Conscience Trust?

04:52 A Yes. I filed it at the request of EPD, on their behalf as their attorney.

04:52 Q So you were an attorney filing a UCC-1 when you were also the party that would benefit from the UCC-1?

04:52 A No, it was my family trust, it was not me.

04:52 Q Your family trust for which your wife is the trustee and your kids or the kids of your kids are beneficiaries?

04:52 A Correct. I don't know if I filed it as attorney for EPD, I filed it because Jerry asked me to file it.

04:53 Q For the benefit of your family?

04:53 A No, to fulfill EPD's obligation to file it. EPD was obligated to file it and they breached that obligation. And they entered into an agreement with the trust that they would waive the claim for the breach if it was filed. And so he asked me to file it so that he was sure it would get filed. Because last time it didn't. So he wanted to make sure he had someone file it who would and that someone was me.

04:53 Q Did any other lenders to EPD that didn't have the benefit of also being counsel to EPD also get UCC-1s?
04:53 A I don't know. You would have to check the UCC filings to see that.
04:53 Q You prepared EPD's statements and schedules, did you not?
04:53 A No.
04:54 Q Did you file them?
04:54 A No, I think Lisa filed them.
04:54 Q Was it filed under your signature?
04:54 A I don't recall.
04:54 Q If you look toward the bottom of page 2, starting on line 23, it says, "Conversely, if the instant application were somehow granted, it would trigger the standard bankruptcy default provisions in virtually every contract, loan and other agreement to which EPD is a party, destroy its credit, and effectively put the company out of the business. The loss would be catastrophic."
Do you see that?
04:54 A Yes.
04:54 Q Is that accurate?
04:54 A I was psychic. That's exactly what happened. Yes.

04:55 Q It's accurate?
04:55 A Yes. It's not accurate, it's an argument. But that is exactly what happened. The bankruptcy was filed. And was confirmed as a 7, and you wiped out the estate.
04:55 Q What business was EPD conducting in January 2011?
04:55 A I don't know. I don't recall. They owned a number of properties in Tennessee and Missouri or Mississippi or somebody did. There was the Key Club, there was the Radio Music Awards, a radio station, real estate in North Hills. There were all kinds of businesss and assets and all kinds of entities that EPD was involved with, all of which had enormous value, which was all wiped out by you.
04:55 Q And did EPD or Jerrold Pressman directly own any of what you just mentioned?
04:56 A I was never involved in that; I don't know.
04:56 Q If you look on page 6 starting at line 23, it says, "This is not surprising given that, with the exception of the claims described above and claims of similar ilk which are subject to bona fide disputes, EPD does not have a single past due bill or late payment. In other words, EPD is generally paying

its debts as they become due, unless such debts are subject to a bona fide dispute."

Do you see that?

04:56 A I see that.

04:56 Q Is that accurate?

04:56 A Well, it says "claims described above," so I've got to read the claims described above to see.

04:56 Q Are you aware of EPD having any past due bills or late payments in January 2011?

04:57 A I don't recall.

04:57 Q Do you recall if EPD was generally paying its debts as they became due in January 2011?

04:57 A I believe with the exception of these things that are in litigation, they were, but I don't recall.

04:57 Q I'd like to introduce Exhibit 105.

(Chapter 7 Trustee's Exhibit 105 was marked for identification by the Deposition Officer and is attached hereto.)

04:57 Q BY MR. WEBER: Is that your electronic signature on this Declaration on page 2?

04:57 A Yes.

04:57 Q On Paragraph 3, starting at line 11, it says, "If not immediately set aside, the entry of an

Order for Relief would have devastating consequences on an Alleged Debtor. Because it would effectively cause an Alleged Debtor to cease its ability to operate as a going concern, the damage caused by such an order could not be undone and would effectively result in the destruction of the company's business or diminution in value of the estate to the detriment of all creditors. Accordingly, immediate relief is necessary."

Do you see that?

04:58 A Yes.

04:58 Q Accurate?

04:58 A It's an argument.

04:58 Q This is a Declaration, not a pleading.

04:58 A Correct.

04:58 Q Is it accurate?

04:58 A It's an argument. It is, in fact, exactly what happened to this particular alleged debtor. So obviously, my psychic abilities were dead on. You destroyed the business, you wiped it out, you caused devastating consequences, so the destruction of the business, diminution in the value of its assets. So all of the things I said could happen to an alleged debtor did, in fact, happen to this particular debtor because of the Chapter 7

bankruptcy. So it was a pretty good psychic prediction, sadly.

04:59 Q When you're referring to an "alleged debtor," are you referring to EPD?

04:59 A No.

04:59 Q Just the generic debtor?

04:59 A Yes.

04:59 Q And Paragraph 1 says that you have personal knowledge of the facts set forth in the Declaration. Is that right?

05:00 A Yes.

05:00 Q And did you have personal knowledge of the facts set forth in Paragraph 3?

05:00 A Yes. It's an argument. I'm making the argument; I have personal knowledge of it.

05:00 Q Personal knowledge of an argument?

05:00 A Yes. It's my prediction of the future and my prediction unfortunately came true; I was dead on.

05:00 Q Have you produced all documents showing your loans to or investments in EPD?

05:00 A I produced whatever I had.

05:00 Q I'd like to introduce Exhibits 106 and 107.

///

///



BARKLEY Court Reporters

(Chapter 7 Trustee's Exhibit 106 and Exhibit 107 were marked for identification by the Deposition Officer and are attached hereto.)

05:01 Q BY MR. WEBER: Have you seen these Substitution of Attorney forms before?
05:01 A Yes.
05:01 Q Are those your electronic signatures on both documents?
05:01 A Yes.
05:01 Q Did you obtain Matthew Gruenberg's permission to attach his electronic signature on these documents?
05:01 A I believe my secretary did.
05:01 Q Did you discuss that with Mr. Gruenberg?
05:01 A Yes.
05:01 Q What did he say?
05:01 A I think he said he would substitute in for all pending litigation in place of Luce.
05:02 Q Did Mr. Gruenberg authorize you or Ms. Underkoffler to file these substitutions with his electronic signature?
05:02 A Yes.
05:02 Q He did?
05:02 A Yes.

05:02 Q In writing?
05:02 A I don't recall.
05:02 Q Did he ever give you a handwritten signature on these documents?
05:02 A I doubt it.
05:02 Q Did he ever send one to you or Ms. Underkoffler?
05:02 A I don't think I've ever gotten a handwritten signature from anybody with an electronic conformed signature; I don't recall that ever having been done. So I think I would remember if that happened here because I've never seen it.
05:03 Q After you filed these or caused them to be filed, did Mr. Gruenberg notify you that he did not authorize his electronic signature on these documents?
05:03 A I think he called and said he was not admitted in the bankruptcy court or somebody said that.
05:03 Q Did he tell you he didn't authorize his electronic signature?
05:03 A I don't recall.
05:03 Q I'd like to introduce Exhibit 108.
///
///
///

05:08 A I assume that was probably the broker for the Neah stock. Because it looks like you've got RBC and Neah. So I assume they got some stock, deposited it, sold it and got some money. But that's just an assumption based on the document.
05:08 Q Do you know if this chart, Exhibit 108, is accurate?
05:08 A I was told by Ruben Moreno that he prepared it and did it contemporaneously at the time of each of these entries as part of his job function. And Ruben is a pretty sharp guy, so I have to assume it is accurate, but I have not reviewed it line by line.
05:08 Q Who makes the decisions on behalf of the Bright Conscience Trust?
05:09 A My wife.
05:09 Q Has she made every decision for the Bright Conscience Trust since its formation?
05:09 A Yes.
05:09 Q Do you have any input into the decisions?
05:09 A I'm not sure I understand the question.
05:09 Q Do you discuss the decisions with your wife before she makes them?
05:09 A I won't answer that.
05:09 Q And why is that?

05:09 A It's privileged.
05:09 Q And which privilege?
05:09 A Marital communication.
05:09 Q In her capacity as trustee of the trust?
05:09 A I don't think you have -- I don't think it's a capacity question. Any type of communication between husband and wife that doesn't involve third parties is privileged.
05:10 Q Including any in regard to the Bright Conscience Trust and its actions in regard to EPD?
05:10 A I don't think there is any subject matter limitation. If it's a confidential communication between husband and wife, it's privileged under federal law.
05:10 Q Who made the decision to form the Bright Conscience Trust?
05:10 A My wife and I.
05:10 Q Collectively?
05:10 A Yes.
05:10 Q Who decided that whatever interests you have in relation to EPD would be assigned to the Bright Conscience Trust?
05:10 A I don't recall.
05:11 Q Did you previously appear in a Rule 2004 examination in this case, in the bankruptcy case on

behalf of the Bright Conscience Trust?
05:11 A No.
05:11 Q You didn't appear as the designated person most knowledgeable or person most qualified on behalf of the Bright Conscience Trust?
05:11 A No.
05:11 Q Who represented the Bright Conscience Trust during the Rule 2004 examination?
05:11 A I don't have any idea what you're talking about.
05:11 Q So your testimony is you did not -- you were not the designated person most knowledgeable or person most qualified on behalf of the Bright Conscience Trust at the Rule 2004 examination.
Is that right?
05:12 A Correct.
05:12 Q Do you know if the Bright Conscience Trust designated a person most knowledgeable or person most qualified for the Rule 2004 examination?
05:12 A The trust isn't an entity, so it couldn't.
05:12 Q Did your wife designate you as a person most knowledgeable or person most qualified for the Rule 2004 examination?
05:12 A The trust is not an entity. It can't have a person most knowledgeable. Only an entity can have

a person most knowledgeable. The trust is not an entity; therefore, it cannot have such a thing.

05:12 Q Did your wife ask you to testify at the Rule 2004 examination in this case, in the bankruptcy case, in regard to the Bright Conscience Trust?

05:12 A I won't answer that.

05:12 Q Because of marital privilege?

05:13 A Correct.

05:13 Q How did your wife know what amounts to put on the Proofs of Claim filed in the bankruptcy case on behalf of the Bright Conscience Trust?

05:13 A I think somebody from EPD gave her the numbers. Someone from EPD gave everybody the numbers.

05:13 Q Did you provide her any information with regard to the Proofs of Claim?

05:13 A Not that I recall.

(Deponent conferring with attorney.)

05:13 Q BY MR. WEBER: Do you know what letters you actually signed and sent to the Franchise Tax Board on behalf of EPD or Pressman during 2004 and 2005?

05:13 A I'm sure I didn't send any. I don't recall which, if any, I signed.

05:13 Q You don't recall sending any letters to the Franchise Tax Board on behalf of Pressman or EPD?

05:14 A I'm sure I did not. I'm sure it would have been whoever wrote the letter or their secretary or my secretary, but I certainly wouldn't do it.

05:14 Q I like to introduce Exhibit 109.

(Chapter 7 Trustee's Exhibit 109 was marked for identification by the Deposition Officer and is attached hereto.)

05:14 Q BY MR. WEBER: Is that your signature on the Verification on the very last page?

05:14 A Yes.

05:14 Q Did you review the Supplemental Responses to Requests for Admissions before you signed that Verification?

05:14 A Yes.

05:14 Q If you look on page 3, Request for Admission 17 says, "Admit you sent letters to the FTB on Pressman's behalf in 2004 while you were an attorney at Greenberg Traurig, LLP."

And if you look down at the Supplemental Response on lines 11 and 12, it says "Admit."

Do you see that?

05:15 A Yes.

05:15 Q Is that accurate?

05:15 A Well, I guess it depends on what you

mean by "sent." My firm sent letters to the FTB on Pressman's behalf. I certainly wouldn't be the one to have sent those letters; the associate did it or the secretary did it. I may or may not have signed some of them; I don't recall. I know that letters were sent. So I'm admitting that letters were sent by Greenberg Traurig to the FTB on behalf of Pressman. I didn't for a moment mean I'm the one who put them in the mailbox; I would never do that.

Q If you look at Request for Admission 21, "Admit you sent letters to the FTB on Pressman's behalf in 2005 while you were an attorney at Greenberg Traurig, LLP."

And if you look at the next page, where it says, "Supplemental Response" on lines 5 and 6, it says, "Admit."

Do you see that?

A Yes.

Q And you're admitting that you sent letters on Pressman's behalf to the FTB during 2005?

A Certainly letters were sent from Greenberg Traurig to the FTB on Pressman's behalf; I personally didn't send them. If you think that by this I meant I personally sent them, then I apologize for admitting, I should not have. I did not personally



BARKLEY Court Reporters

send anything to the FTB.
So I guess I should amend these and say "Denied" if that's how you interpret that. That's not how I interpreted it when I answered.
05:17 Q Either you or Greenberg Traurig also sent letters to the IRS on Pressman's behalf during 2004 and 2005?
05:17 A Greenberg Traurig did.
05:17 Q And were those letters set up for your signature?
05:17 A I don't recall.
05:17 Q And were the letters to the Franchise Tax Board set up for your signature?
05:17 A I don't recall. I don't recall what letters were actually sent. I know that letters were actually sent to the FTB and the IRS. This doesn't specify any specific letters. So I don't recall what was actually sent. I know that something was sent, but I don't know what it was, but it certainly wasn't sent by me.
It says here, "Greenberg Traurig sent letters to the FTB and the IRS on behalf of their client, Pressman."
05:18 Q When you started investing in EPD or lending funds to EPD, were you aware that there were

client either way.

05:22 Q Something less than millions of dollars?

05:23 A I don't recall. I just remember thinking of them as a nominal client, not a very important client in the scope of things. I don't mean to say it that way. In terms of the economics, the dollar amount that they represented in terms of billables was not material to my book of business based on my recollection. That's not to say they weren't important; all clients are important.

05:23 Q Did you ever discuss with Jerrold Pressman or EPD as to whether an actual conflict came up at some point in your representing EPD in relation to either suits by investors against EPD or in relation to the bankruptcy case for EPD?

05:23 A I don't recall anyone ever suggesting there was an actual conflict.

05:23 Q Did you ever bring up that issue?

05:23 A I don't recall.

05:24 Q Do you believe as you're sitting here today that there was any actual conflict at any point?

05:24 A No.

05:24 Q Do you think that -- so you don't think that the Bright Conscience Trust or you being a lender to EPD presented any type of conflict?

05:24 A No.
05:24 Q And you don't believe that the Bright Conscience Trust obtaining a UCC-1 financing statement as to EPD and Pressman's assets presented a conflict?
05:24 A No.
05:24 Q And you don't believe that making arguments as to usurious interest or California finance lenders law as to those investors or lenders present a conflict?
05:24 A No.
05:24 Q At any point?
05:25 A Correct.
05:25 Q When you were defending the suits on behalf of EPD and Pressman brought by lenders or investors, were you representing EPD's interests or your or your family trust's interests?
05:25 A I don't understand the question.
05:25 Q Well, when you were defending suits brought by investors, wasn't it in your interest and your family trust's interest to defeat those suits?
05:25 A The only suit I can think of is Hansel. I think there was only one, and maybe there were related suits. The only one that's occurring to me right now that I ever represented EPD and Pressman was Hansel.

05:25 Q You also stated that you were working with Matt Gruenberg in relation to at least the Jenny Lee Bridal suit; right?

05:26 A That doesn't mean I was representing any party in the action, it means I was a lawyer representing EPD in the Hansel case. And there was another related case that he was a lawyer, and we were working together because they were similar. I wasn't counsel for anybody in the Jenny Lee case, I was simply giving him my thoughts in my capacity as counsel in the other case because they involved similar allegations.

05:26 Q Was it in the interest of you and your family trust to defeat the suits brought by Hansel and Jenny Lee Bridal?

05:26 A I never considered that question. I don't think it made any difference.

05:26 Q And why is that?

05:26 A Because they had a secured UCC. So whether EPD won or lost wouldn't affect the trust.

05:27 Q So you were okay either way because the Bright Conscience Trust had filed a UCC-1; is that correct?

05:27 A I never considered the question. I was not okay either way. If I'm representing a client,



BARKLEY Court Reporters

I'm trying really hard to win. And if I win, that's very good, and if I lose, that's very bad. So no, I was not okay either way; I wanted to win for my client.

05:27 Q But the Bright Conscience Trust was protected because you had caused a UCC-1 to be filed; is that right?

05:27 A I never considered that question.

05:27 Q But I'm asking you now.

05:27 A I don't know. I'd have to think about it.

05:27 Q And when you represented EPD in defending against the involuntary bankruptcy filing, wasn't it in your family trust's interest that the involuntary not have an order for relief entered?

05:28 A I never considered the question at the time. It was in everyone's best interests, Hansel's, EPD's, Pressman's and everyone else on planet other than your firm that the order for relief be denied. It was disastrous for every human being on the planet who doesn't work here.

05:28 Q Was it in the interest of you and your family trust and your family that the order for relief not be entered?

05:28 A It was in the interests of everybody on planet earth other than your firm, and that would

kids and your family trust?

05:30 A I think it was in everyone's best interests. I never considered any question beyond that. It was obviously a horrific thing, it was horrible. I believed it would be a horrible result, it was a horrible result. It destroyed millions of dollars in value for EPD and all of its creditors and lenders and investors; it was awful.

05:30 Q And when you were defending against the involuntary bankruptcy filing, were you representing your interests and your family's interests or EPD's interests?

05:30 A EPD's interests.

05:31 Q Did you disclose any type of an actual conflict at that point?

05:31 A I'm not aware of any actual conflict at any point.

05:31 Q Did you believe it was a potential conflict?

05:31 A There is always a potential conflict. The only way not to have a potential conflict, as an ethics lawyer who did a presentation at one of my firms said, "Is to sit alone in a dark room with the door locked and the phone unplugged."

05:31 Q Did you also work with Matt Gruenberg in

06:04 A In regard to the Note, Continuing Guaranty, Security Interest and whatever else was defined as "transaction documents" in the assignment.
06:04 Q And are the Bright Conscience Trust Proof of Claims solely based on whatever those interests are?
06:05 A It would be the Secured Promissory Note, Continuing Guaranty and Security Interest Agreement dated November 8, 2007, between me, EPD and Jerrold Pressman, and all other loan documents currently or subsequently entered into among the parties.
06:05 Q Bright Conscience Trust or your wife never separately invested funds in EPD or loaned funds to EPD, did they?
06:05 A Not to my knowledge.
06:05 Q So whatever interests they have are based on your interests?
06:05 A Whatever interests they have are based on the assignment.
06:05 Q The assignment from you?
06:05 A From me, correct.
06:06 Q And the amounts in the Proofs of Claim are solely based on amounts that you loaned or invested with EPD, Jerrold Pressman, Broadway Entertainment,

# EXHIBIT 14

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,<br><br>Debtors, | |
| JASON M. RUND, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,<br><br>Defendants. | No. 2:10-bk-62208-ER |

Deposition of KEITH E. PRESSMAN

June 23, 2017

Mitch Genser, CSR No. 4239.
424421

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles
(310) 207-8000 Century City
(916) 922-5777 Sacramento
(951) 686-0606 Riverside
(212) 808-8500 New York City
(312) 379-5566 Chicago
(415) 433-5777 San Francisco
(408) 885-0550 San Jose
(800) 222-1231 Martinez
(818) 702-0202 Woodland Hills
(347) 821-4611 Brooklyn
00+1+800 222 1231 Paris
(949) 955-0400 Irvine
(760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas
(702) 366-0500 Henderson
(518) 490-1910 Albany
00+1+800 222 1231 Dubai
(858) 455-5444 San Diego
(800) 222-1231 Carlsbad
(800) 222-1231 Monterey
(516) 277-9494 Garden City
(914) 510-9110 White Plains
001+1+800 222 1231 Hong Kong

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

In re )
)
EPD INVESTMENT COMPANY, LLC, )
and JERROLD S. PRESSMAN, )
)
Debtors, )
_______________________________)
)
JASON M. RUND, CHAPTER 7 ) No. 2:10-bk-62208-ER
TRUSTEE, )
)
Plaintiff, )
)
vs. )
)
JOHN C. KIRKLAND, an individual )
and POSHOW ANN KIRKLAND, as )
TRUSTEE of the BRIGHT )
CONSCIENCE TRUST DATED )
SEPTEMBER 9, 2009, )
)
Defendants. )
_______________________________)

Deposition of KEITH E. PRESSMAN, taken on behalf of Chapter 7 Trustee, at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367, commencing at 10:09 a.m., Friday, June 23, 2017, before Mitch Genser, CSR No. 4239.

PERSONS PRESENT:

| | |
|---|---|
| For Plaintiff: JASON RUND, CHAPTER 7 TRUSTEE | BRUTZKUS GUBNER ROZANSKY SEROR WEBER, LLP<br>BY COREY R. WEBER, ESQ.<br>21650 Oxnard Street<br>Suite 500<br>Woodland Hills, California 91367<br>(818) 827-9000<br>cweber@bg.law |
| Also Present: | John Hank<br>Videographer |

10:24 A Yes.
10:24 Q And is it okay if I just refer to that as "Plush"?
10:25 A Yes.
10:25 Q So for those entities, Broadway, Plush, Key Club and the ice rinks, you had managerial positions?
10:25 A There were managers. So I don't know if I would call it "managerial." I was just kind of involved in whatever capacity needed to be handled.
10:25 Q Were you an officer or director or manager of any of those entities?
10:25 A I'm pretty sure I was an officer of Key Club and probably Broadway.
10:25 Q And how about Plush?
10:25 A I would think so. I don't remember specifically. I didn't have much of a direct involvement in that as the others, but I may have.
10:26 Q And how about EPD?
10:26 A EPD, I was on there as -- I don't remember what my capacity was, but I was partial owner. And I think I was an officer if I remember correctly.
10:26 Q I think I already stated this on the record, but just in case, when I refer to "EPD,"

I'm referring to EPD Investment Company, LLC.
10:26 A Yes.
10:26 Q When did you start doing things for all those entities, Broadway, Key Club, Plush, the ice rinks, EPD?
10:26 A Sometime in the '90s.
10:26 Q So sometime in the '90s for all those entities through 2010 or so?
10:26 A Yes, that sounds right.
10:26 Q Now, during that time, did you also maintain a separate legal practice called the Law Offices of Keith Pressman?
10:27 A Yes.
10:27 Q And did you practice law during that time?
10:27 A Here and there. That was maybe more of a catch-all if there was something I would do. That wasn't my main emphasis, but maybe here and there I would do something.
10:27 Q Does the Law Offices of Keith Pressman still exist?
10:27 A I don't know if I ever shut it down. I don't do any business in that capacity, but I don't know if the firm officially is gone.
10:27 Q Do you know when you formed it?
10:27 A No.

10:30 Q How about Luce Forward?
10:30 A It sounds familiar, but I don't remember in what capacity or why it sounds familiar.
10:30 Q How long have you known Mr. Kirkland?
10:30 A I've known him since law school, the first year of law school.
10:30 Q You were classmates?
10:30 A For one year.
10:30 Q What year was that?
10:30 A '87.
10:31 Q Were you also roommates during that time period?
10:31 A Yes.
10:31 Q Were you friends as well?
10:31 A Yes.
10:31 Q And was that at Pepperdine Law School?
10:31 A Correct.
10:31 Q And then after that one-year period, did Mr. Kirkland transfer to UCLA?
10:31 A Yes.
10:31 Q And did you remain roommates after that time period?
10:31 A Yes.
10:31 Q For how long?
10:31 A I don't remember, but maybe a few years.

10:31 Q And then after you finished being roommates, did you remain friends with Mr. Kirkland?
10:31 A Yes.
10:31 Q Are you still a friend of Mr. Kirkland?
10:32 A I consider him a friend.
10:32 Q You've known each other for a very long time?
10:32 A Yes. I don't see him a lot, but he's always going to be my friend.
10:32 Q Were you invited to his weddings?
10:32 A Yes.
10:32 Q Did you attend?
10:32 A No.
10:32 Q Sent a gift?
10:32 A I'm sure I did.
10:32 Q Do you still talk with Mr. Kirkland once in a while?
10:32 A Yes.
10:32 Q Normal chitchat or conversation, that type of thing?
10:33 A Yes.
10:33 Q So you keep up with each other's lives?
10:33 A Yes.
10:33 Q Is that how Mr. Kirkland became an attorney for EPD or Plush or Broadway or the other

entities?
10:33 A I'm sure it was.
10:33 Q So your father would have known him back when he was in law school, too; is that right?
10:33 A Yes.
10:33 Q And your father is Jerrold Pressman?
10:33 A Yes.
10:33 Q So when you and Mr. Kirkland were roommates, your father would sometimes visit and get to know Mr. Kirkland?
10:33 A Yes.
10:33 Q Do you know how long after Mr. Kirkland graduated from law school he began doing legal work for any of the entities that you referenced before?
10:34 A I don't remember the timing.
10:34 Q Do you remember if it was fairly shortly after graduating?
10:34 A I really don't remember.
10:34 Q Do you recall when EPD -- and I'm referring to the limited liability company -- was formed as a limited liability company?
10:34 A No.
10:34 Q I'd like to introduce Exhibit 3.
///
///

EPD?
10:35 A I know I was at some point, I think, but I don't know if I was the original. I don't know from memory. But I'm looking on here and it says I am, so yes.
10:36 Q If you flip to the second page in this document, it's a Statement of Information filed on May 24th, 2004; is that right?
10:36 A Correct.
10:36 Q And you're listed as the president of EPD; is that right?
10:36 A Yes.
10:36 Q In 2004, were you the president of EPD?
10:36 A I would assume so.
10:36 Q Were you the president of EPD during 2003 as well?
10:36 A You know, I don't have a memory of it. I don't know. Maybe. I mean, it seems like I would be.
10:37 Q How about 2005 through 2010, were you also the president of EPD?
10:37 A I don't know. I would guess so.
10:37 Q Were you some type of an officer for EPD between 2003 and 2010?
10:37 A I don't know from memory, but I believe

I probably was.
10:37 Q During 2003 through 2010, did you communicate with Mr. Kirkland about EPD?
10:37 A I don't think so.
10:37 Q No recollection?
10:37 A No recollection. I may have; I don't remember.
10:37 Q I'd like to introduce Exhibit 4.
(Chapter 7 Trustee's Exhibit 4 was marked for identification by the Deposition Officer and is attached hereto.)
10:37 MR. WEBER: For the record, it's an Operating Agreement of EPD.
10:38 Q Mr. Pressman, have you seen this document before?
10:38 A Since I signed it, I assume I did.
10:38 Q On the second to last page, there are signature blocks for "Manager" and two members.
Do you see that
10:38 A Yes.
10:38 Q Is the third signature block, which is "Member," your signature?
10:38 A Yes.
10:38 Q And are the above two signatures Jerrold Pressman's signature?

10:38 A It looks like it, yes.
10:38 Q And if you flip to the last page, it lists Jerrold Pressman as a 49% member and you as a 51% member.
Do you see that?
10:38 A Yes.
10:39 Q Is that accurate?
10:39 A I believe so.
10:39 Q How much did you pay for your membership interests?
10:39 A I don't remember the mechanics of it. I mean, I know my father -- what I do remember is he had put me on for estate purposes, whatever that means. But I don't know how he -- what the mechanics were regarding how I got the interest, I just don't know.
10:39 Q What does that mean, "for estate purposes"?
10:39 A I just think he trusted me and so he wanted me, if something happened to him, to be in a position where I would have owned more of the company.
10:39 Q And if you look on the first page of this document that you signed, on Number 4, Registered Agent, it says that Mr. Kirkland at Greenberg Traurig is the registered agent for EPD.

10:44 A Yes. I think that's right, yes.
10:44 Q If you look at the next document in this Exhibit 5, there is a fax cover sheet and an Operating Agreement for Plush Lounge or Plush.
Do you see that?
10:44 A I'm sorry?
10:44 Q If you look at the next document in Exhibit 5, there is a fax cover sheet with an Operating Agreement of Plush.
Do you see that?
10:44 A Yes.
10:44 Q And as to the Operating Agreement for Plush, if you look to the second to last page, there are two signature blocks.
Do you see that?
10:45 A Yes.
10:45 Q And are those your signatures?
10:45 A Yes.
10:45 Q It lists you as being the president of S.C., Inc. Do you see that?
10:45 A Yes.
10:45 Q Were you the president of S.C., Inc.?
10:45 A Yes.
10:45 Q And was S.C., Inc. the general partner of S.C. Club, L.P.?

10:45 A Yes.
10:45 Q And S.C. Club, L.P. was the member and manager of Plush; is that right?
10:45 A Yes.
10:45 Q And if you look at the last page of this document, at the end of the Operating Agreement, it also lists S.C. Club, L.P. as having 100 percent interest in Plush; is that right?
10:45 A Yes.
10:45 Q And is that accurate?
10:46 A That sounds right.
10:46 Q And the Operating Agreement is also dated May 9th, 2003. Do you see that on the first page?
10:46 A Yes.
10:46 Q And is that approximately when it started operating?
10:46 A Yes, I believe.
10:46 Q At some point, did EPD sue Plush Lounge or Plush?
10:46 A I don't remember offhand.
10:46 Q Can you think of a reason why EPD would have sued Plush?
10:46 A It's not ringing a bell.
10:46 Q Both companies were effectively operated by entities that you and your dad, Jerrold Pressman,

controlled; right?
10:46 A Correct.
10:46 Q Can you think of any reason why EPD would have sued Plush?
10:46 A Not offhand.
10:47 Q I'd like to introduce Exhibit 6.
(Chapter 7 Trustee's Exhibit 6 was marked for identification by the Deposition Officer and is attached hereto.)
10:47 Q BY MR. WEBER: Have you seen this document before?
10:47 A I don't know.
10:47 Q For the record, this is a Complaint filed in the matter of EPD vs. Plush that was pending before the Superior Court for the County of Los Angeles, with a conformed copy stamp on September 8, 2006.
You don't recall ever having seen this Complaint before?
10:47 A Not offhand.
10:47 Q Do you know who Sherry Anne Lear is?
10:47 A It sounds kind of familiar. I don't know if I -- I just don't remember who she is specifically.
10:47 Q Do you remember ever retaining her as counsel on behalf of EPD?
10:47 A Not offhand. I just don't happen to

remember offhand. I'm seeing that she was, but it's just not ringing a bell personally.

10:47 Q If you look at the last two pages, there is a Multiple Advance Promissory Note for $2.5 million.

Do you see that?

10:48 A Yes.

10:48 Q And it looks like it states that Plushed owed EPD $2.5 million.

Do you see that?

10:48 A Yes.

10:48 Q Do you know if that's accurate?

10:48 A I would assume from the document. I mean, I don't remember the circumstances. I don't have a memory of it specifically.

10:48 Q On the first page of that Promissory Note it states that it's dated April 15, 2003.

Do you see that?

10:48 A Yes.

10:48 Q And on the second page, on the two signature blocks, there is writing next to the signatures with a date that also lists April 15, 2003.

Do you see that?

10:48 A Yes.

10:48 Q Now, there is a signature block for Plush.

Do you see that?
10:49 A Yes.
10:49 Q Is that your signature?
10:49 A Yes.
10:49 Q And do you recognize the signature for EPD?
10:49 A Ruben Moreno.
10:49 Q Who is Ruben Moreno?
10:49 A He's been the bookkeeper for the entities.
10:49 Q For EPD and the other entities?
10:49 A Yes.
10:49 Q Is he also the bookkeeper for Plush?
10:49 A Probably.
10:49 Q Did Mr. Moreno work for you and your dad, Jerrold Pressman?
10:49 A I don't remember what specific entity he worked for. I know he did work for all the entities; I don't know who specifically was the entity that he was hired by.
10:49 Q And what people did he report to?
10:50 A He reported to Jerry.
10:50 Q Your dad?
10:50 A My dad.
10:50 Q Anyone else?
10:50 A I don't think so.

10:50 Q Now, you signed this on April 15, 2003; is that right?
10:50 A Yes.
10:50 Q Isn't that before EPD was formed as a limited -- I'm sorry.
Isn't that before Plush was formed as a limited liability company?
10:50 A When was Plush formed again?
10:50 Q If you look back at Exhibit 5, it states that it was formed as of May 9, 2003.
10:50 A Okay. I don't know. I don't know what -- I don't remember the circumstances.
10:50 Q Can you think of any explanation as to how Plush Lounge Las Vegas, LLC could sign a Promissory Note before it's formed as a limited liability company?
10:51 A I have no idea.
10:51 Q Do you know if this Promissory Note was back dated?
10:51 A I have no idea.
10:51 Q Have you ever back dated agreements and signed them?
10:51 A No.
10:51 Q Now, Mr. Moreno also signed on behalf of EPD on April 15, 2003; is that right?

10:51 A Yes.
10:51 Q Isn't that before EPD was formed as a limited liability company?
10:51 A Yes, it looks like it.
10:51 Q And if you look at Exhibits 3 and 4, it looks like EPD was formed as an LLC on June 27, 2003, which is a couple months after this Promissory Note was executed; is that right?
10:51 A Correct.
10:51 Q Do you know how Mr. Moreno could sign a Promissory Note on behalf of EPD a couple months before it was formed as an LLC?
10:52 A I have no idea.
10:52 Q You can't think of any explanation?
10:52 A No.
10:52 Q Do you know if this is a real Promissory Note based on actual funds lent?
10:52 A I assume so.
10:52 Q Do you base that on anything?
10:52 A I couldn't tell you off of personal knowledge what the situation was. I just don't remember at all, I would be guessing.
10:52 Q Have you signed more than one Promissory Note before?
10:52 A Yes.

10:52 Q On behalf of entities?
10:52 A Yes.
10:52 Q And do you do any due diligence or review of documents regarding amounts owed before you sign them?
10:53 A Usually my father is running the businesses. And he may explain it to me at the time, but I just trust him and I trust his judgment. So a lot of times I'm not 100 percent up to speed and I just go on what he tells me.
10:53 Q And sign?
10:53 A Sure.
10:53 Q And in addition to Promissory Notes, is that true of other documents?
10:53 A Yes.
10:53 Q So anything that your father, Jerrold Pressman, would hand to you in terms of a legal document to sign, if he told you to sign it, you would sign it?
10:53 A Yes. Usually there is some discussion and he explains it. But I trust what he says, so I feel comfortable.
10:53 Q And you wouldn't generally look into the circumstances behind it, you would just take what he said at face value?

10:54 A I take what he says at face value. I might look into the circumstances, maybe, but usually I take what he tells me at face value.

10:54 Q I'd like to introduce Exhibit 7.

(Chapter 7 Trustee's Exhibit 7 was marked for identification by the Deposition Officer and is attached hereto.)

10:54 MR. WEBER: For the record, this is an e-mail from John Kirkland to Sherry Anne Lear and copied on, it looks like, you and someone else at Greenberg Traurig.

10:54 Q Do you see that?

10:54 A Yes.

10:54 Q Do you recall receiving this e-mail on or about August 13, 2006?

10:54 A Not offhand.

10:54 Q It's from Mr. Kirkland to Ms. Lear. And it says at the top, "I would like you to please represent Keith Pressman's company EPD Investment Co, LLC, a California limited liability company, and file a standard Judicial Council form breach of contract action in LASC against Plush Lounge Las Vegas, LLC, a California limited liability Company."

Do you see that?

10:55 A Yes.

Q And EPD was your company?
A Technically, but I had no day-to-day involvement.
Q Now, as of 2006, did Mr. Kirkland represent both EPD and Plush at that point?
A I don't know who he officially represented.
Q He had represented both in the past?
A I mean, from my knowledge, I don't remember specifically who he represented.
Q He was an agent for service of process for EPD?
A Yes.
Q And he also assisted in the formation of Plush?
A Yes.
Q And he was also a family friend?
A Yes.
Q Do you know why he sent this e-mail to Ms. Lear?
A No.
Q Skipping over the -- well, let's not skip over it.
The next sentence says, "Keith or Jerry can give you the dollar amounts of the claim."

10:57 Q Why?
10:57 A He probably would have dealt with my dad.
10:57 Q He wouldn't deal with you on issues like that?
10:57 A Usually not.
10:58 Q Do you know if there was a conflict, how he could communicate on behalf of EPD that Ms. Lear should go ahead and file a Complaint, and that the parties should just stipulate to a judgment?
10:58 A Again, I wouldn't be talking to you out of any knowledge or memory. I could look at the document, but it wouldn't be from anything other than what I'm looking at here.
10:58 Q You're an attorney, too; right?
10:58 A Yes.
10:58 Q Isn't that a conflict of interest, to represent both sides and then give instructions to one party as to how to proceed?
10:58 A I just don't know all the circumstances. I don't want to make a judgment on that without knowing everything.
10:58 Q You were an officer of both EPD and Plush at that time?
10:58 A Yes.
10:58 Q The next paragraph says, "EPD needs to

11:00 Q Was that the litigation that's referenced here?
11:00 A It looks like it.
11:00 Q Do you know if this was done to get a protective lien in place in that or some other pending litigation?
11:00 A I don't know.
11:00 Q The paragraph below that, after it talks about being on safari, the next sentence says, "I am the registered agent for service of process for Plush, so just serve me at my office." And it goes on.
Do you see that?
11:00 A Yes.
11:00 Q So at that point, Mr. Kirkland was the agent for service of process for both EPD and Plush?
11:01 A Correct.
11:01 Q And you were an officer for both EPD and Plush?
11:01 A Yes.
11:01 Q And EPD filed a suit in state court against Plush; is that right?
11:01 A That's right.
11:01 Q Why would two companies that are controlled by the same people file a lawsuit against each other?

11:01 A You know, again, I would be guessing. I don't remember anything about it; I don't think I was involved.
11:01 Q Do you remember approving it?
11:01 A No.
11:01 Q Logically thinking, can you think of any reason as to why two related companies would sue each other when they were both under control of the exact same people?
11:01 A Again, I'm not going to guess.
11:02 Q You never discussed that with Mr. Kirkland?
11:02 A I don't believe so.
11:02 Q How about with your dad?
11:02 A Probably not. I mean, I don't remember offhand; I don't think so.
11:02 Q I'd like to introduce Exhibit 8.
(Chapter 7 Trustee's Exhibit 8 was marked for identification by the Deposition Officer and is attached hereto.)
11:02 MR. WEBER: For the record, this is two consecutive copies of a Stipulation for Entry of Judgment in the EPD vs. Plush case. The first one has a conformed stamp and the second one has a "Received" stamp.

11:09 A I believe so.
11:09 Q And how about Plush?
11:09 A I'm sure she did.
11:09 Q Do you recall what her title was?
11:09 A No, but I'm looking here and it says "Business Affairs Director."
11:10 Q And did she have that title for EPD as well?
11:10 A I don't know.
11:10 Q Do you recall how she found the job with the various entities?
11:10 A I think she came from John Kirkland.
11:10 Q Mr. Kirkland referred her?
11:10 A I believe so.
11:10 Q Did he recommend her?
11:10 A I assume so. I don't remember how it happened, I just remember that she did come through him.
11:10 Q Do you recall if Ms. Werner previously worked with Mr. Kirkland?
11:10 A I don't remember how he knew her.
11:10 Q Now, when you or your dad first got contacted in regard to Ms. Werner being a potential employee, did Mr. Kirkland discuss with you her suspension or her potential disbarment?

11:10 A I don't remember how it came about. I think he was mostly dealing with my dad on it, so I don't remember the timing.
11:10 Q Do you know if Ms. Werner was previously a practicing attorney?
11:11 A Yes.
11:11 Q And are you aware that she was suspended and then got disbarred?
11:11 A Yes.
11:11 Q When did you become aware of that?
11:11 A I don't remember.
11:11 Q Was it around the time she got hired?
11:11 A I don't remember.
11:11 Q And was your dad aware of that as well?
11:11 A I don't remember.
11:11 Q Were you also aware that she had a felony conviction against her?
11:11 A Yes.
11:11 Q And do you recall when you became aware of that?
11:11 A I don't remember.
11:11 Q Was it sometime while she was working for the various entities?
11:11 A Yes, I think so.
11:11 Q And did that cause any concern for you or

your dad?

11:12 A No. He dealt with it. I don't remember the circumstances. I just don't remember how it all happened or came down.

11:12 Q Do you recall what the felony conviction was for?

11:12 A Not offhand.

11:12 Q Do you recall if it involved forgery?

11:12 A Actually, I don't even remember.

11:12 Q Do you recall if it involved grand theft?

11:12 A I don't remember what it was.

11:12 Q You don't recall whether Mr. Kirkland communicated the conviction when he introduced Ms. Werner to you or your dad?

11:12 A I don't remember.

11:12 Q You don't recall whether he discussed the suspension or potential disbarrment with you or your dad when he introduced Ms. Werner?

11:12 A I don't remember how it happened.

11:12 Q What kind of a business is EPD?

11:13 A I don't know how it would be technically classified.

11:13 Q What's your understanding of what EPD did?

11:13 A It makes investments. People put their money in, I guess as a loan, and investments are made.

And it just invests in different businesses.
11:13 Q Do you know how many investors in EPD there were?
11:13 A No, not offhand.
11:13 Q More than 100?
11:13 A I don't think so.
11:13 Q More than 50?
11:13 A I don't know.
11:13 Q Do you know how much the total investments were in round dollars?
11:13 A I knew at one point, but I just don't remember anything about it at this point.
11:13 Q Can you give a ballpark amount?
11:13 A I don't even remember.
11:13 Q More than 10 million?
11:14 A Yes.
11:14 Q More than 50 million?
11:14 A You know, it's been so long since I've even thought about it. I did know at one point, but I don't remember anything at this point.
11:14 Q So people would put money into EPD as an investment or as a loan?
11:14 A You know, I don't even remember how it specifically happened. Like I said, I wasn't involved in the day to day. So I don't know how everything was

structured, necessarily; I never really got involved in that end. So I don't know exactly how the business model worked.

11:14 Q You don't know if funds put in were investments as compared with loans?

11:14 A You know, I knew at one point. But again, it's been so long, and it's been out of my mind for many, many years. I don't remember specifically how my father structured it. I think they were loans.

11:14 Q And your dad structured how the money came in and whether it was an investment or a loan?

11:15 A I don't remember how he structured it. I mean, I think it was -- if I remember correctly, I think they were loans. I don't remember if there was different forms of the money coming in. I don't remember how he set it up. I just never had any involvement in that end.

11:15 Q Once the money came into EPD, what did EPD do with it?

11:15 A You know, I know he made investments, but I don't know -- again, structurally, I don't know how that was done. I don't know how it was classified and how specifically things happened. I just -- I don't remember the specifics of the business.

11:15 Q Let's take a step back.

When the money came in, do you know where EPD deposited the money, when they got a check or a wire transfer?

11:15 A No.

11:15 Q Did EPD have a bank account?

11:16 A I'm sure it did.

11:16 Q You don't know offhand, though?

11:16 A I mean, of course. I would think that, you know, the money goes somewhere, but I don't remember specifically what bank. I just had no involvement in that end of it.

11:16 Q Do you know if there was one bank account or segregated bank accounts for each investor or lender?

11:16 A I don't know.

11:16 Q You said after the funds came in, EPD made investments after that, but you weren't sure of the general nature of the investments; is that right?

11:16 A You know, the way my father had everything set up in different entities, I never -- you know, I may have had a better knowledge at the time of how it all kind of worked, but now it's just all -- I can't really distinguish how it was done, what was EPD, how it was structured; I would be kind of just guessing at this point. I wouldn't be able to give you an

accurate assessment.
11:17 Q Why did EPD seek investors or lenders?
11:17 A I don't know.
11:17 Q Did EPD have some type of an operating business that needed cash flow?
11:17 A I mean, that doesn't sound right. I really don't know what -- I can't really speak for what the whole setup was.
11:17 Q Other than taking in money and investing it in something, did EPD do anything else as a business?
11:17 A Again, I don't know what was done as EPD or maybe as another business. I know people's -- it handled some people's -- paid some people's bills. I don't know if that's specifically EPD as an entity that did it or if that was an offshot, but I know that that was one thing is that bills would be paid on people's behalfs.
11:17 Q So someone would deposit money, and then EPD would pay credit card bills or mortgage payments or utility payments, something like that?
11:18 A Yes.
11:18 Q Why wouldn't people just put it in a bank?
11:18 A I don't know. Just for convenience, to have someone kind of manage your money and kind of

make your payments for you.
11:18 Q Do you know if EPD was offering a high interest rate to investors or lenders?
11:18 A It was offering a good interest rate.
11:18 Q Do you remember if it was 12 percent?
11:18 A That sounds right.
11:18 Q How could EPD afford to pay investors or lenders 12 percent?
11:18 A Again, I know the company made investments, so off of the investmens, I would assume.
11:18 Q So EPD was generating a profit in excess of 12 percent a year that could allow it to repay investors 12 percent on their money?
11:18 A That sounds right.
11:18 Q And how did it do that?
11:19 A Again, I know that investments were made, but I don't remember in what capacity. But I just -- again, my father had it all set up. I really didn't have any involvement in that end of it, so I'm just kind of giving you my knowledge from the outside.
11:19 Q Can you remember seeing any financial document from EPD showing that EPD was generating more than 12 percent per year in profits?
11:19 A I don't think I've ever seen the documents directly.

Q Do you know if EPD was operating at a net loss year after year?
A I don't believe so.
Q What's your understanding?
A Just, you know, all my information is through my father. I never heard of anything like that, so I would assume not.
Q You never saw the financial documents for EPD at any time?
A No.
Q How about the tax returns?
A No.
Q Ms. Werner was hired to work partly for EPD; is that right?
A Yes.
Q Was there any concern with having someone who had a felony conviction being brought in to work for a company that handled people's investments or money?
A You know, I don't remember the -- I mean, I know she was at a pretty low level. I don't think she handled the money. I mean, I don't remember the exact conversations, but I don't remember her having much control of anything.
Q But she worked at the company?

11:20 A I don't remember what entity she worked for technically, but I know she did work for, if I recall, all the entities.

11:20 Q Do you know if she answered calls from investors or lenders and communicated information?

11:21 A She was the one who answered the phone, yes.

11:21 Q You don't recall any concern with having someone who had been convicted of a felony interacting with lenders or investors regarding their money?

11:21 A No. My dad made the decision. And I don't remember the -- you know I'm sure we had a discussion and it came up. And I know he pretty much made the decision. I don't remember the discussion.

11:21 Q Do you know why Mr. Kirkland would bring a person who had been suspended from the State Bar and convicted of a felony and introduce them to work for EPD or the other entities?

11:21 A I don't remember the specifics.

11:21 Q If you look behind -- still in Exhibit 12, there is a series of communications between you and Ms. Lear, both e-mails and letters or faxes.

Do you see that?

11:22 A Yes.

11:22 Q Do you recall receiving any of those?

letters with invoices?
11:24 A No.
11:24 Q You said previously that S.C. Club, L.P. was the manager of Plush; is that right?
11:24 A Yes, I believe so.
11:25 Q Let's take a look back on that.
If you look at Exhibit 5, on the second page of Exhibit 5, the Limited-Liability Company Articles of Organization for Plush, it lists S.C. Club, L.P. as the manager of Plush; is that right?
11:25 A Yes.
11:25 Q So if you look back at Exhibit 13, the exhibit we just introduced.
11:25 A Yes.
11:25 Q On the final page there is a check from S.C. Club, L.P. to Ms. Lear with a memo "Retainer fee Plush Lounge."
Do you see that?
11:25 A Yes.
11:25 Q And is that your signature on that check?
11:25 A Yes.
11:25 Q Do you recall signing that?
11:25 A No.
11:25 Q So it looks like S.C. Club, L.P. paid Ms. Lear's retainer check; right?

11:26 A Yes.
11:26 Q And S.C. Club is the manager of Plush; is that right?
11:26 A Yes.
11:26 Q So Ms. Lear was effectively retained using money from the defendant in the suit where she was being retained by the plaintiff in the suit?
11:26 A Yeah. I don't remember the situation, the circumstances.
11:26 Q But is that right?
11:26 A That sounds right.
11:26 Q I'd like to introduce Exhibit 14.
(Chapter 7 Trustee's Exhibit 14 was marked for identification by the Deposition Officer and is attached hereto.)
11:26 MR. WEBER: This is another series of documents that Ms. Lear produced. For instance, on the first page, it's an e-mail from Sherry Lear to Guy Nicholson and copied on you on December 11, 2006.
11:26 Q Do you see that?
11:27 A Yes.
11:27 Q And it refers to a stipulation, which appears to be the Stipulation for Entry of Judgment in that EPD vs. Plush case; is that right?
11:27 A Yes.

11:29 Q And Mr. Kirkland responds, "They make jelly beans? 'EPD Investment Co. is not an investment co' is not a very powerful argument. Give me a few minutes."
Do you see that?
11:30 A Yes.
11:30 Q Do you recall discussing that with Mr. Kirkland?
11:30 A No.
11:30 Q You don't recall what you were communicating about in terms of the type of company EPD was?
11:30 A Again, he may have made a mention to me to tell John something and maybe at the time I knew, but right now, looking at this, I don't remember what went behind it.
11:30 Q Do you know if EPD was also involved in equipment leases?
11:30 A I know there were equipment leases. I don't know specifically if it was EPD, but I think it was.
11:30 Q Do you recall any details as to the way the equipment leases worked?
11:30 A No.
11:30 Q Did EPD act as a lessor or a lessee in

regard to any equipment leases?
A I don't remember.
Q Did EPD have its investors or lenders become lessors in equipment leases?
A I think so.
Q Do you know why?
A I don't know the mechanics of why, but that sounds right.
Q Some sort of tax benefit?
A I don't remember the situation.
Q Do you know what the equipment was?
A I don't know offhand.
Q Do you know where the equipment was located?
A I just don't remember.
Q Did you ever see any of the equipment that was subject to the leases?
A I don't remember if -- I just don't remember how that was all structured or what it was that was leased.
Q Did you ever prepare any equipment leases?
A I may have. I mean, I think it would have been more boilerplate kind of thing. I don't know if I specifically prepared leases.
Q Did you ever sign equipment leases?

11:32 A I'm sure I must have.
11:32 Q Why?
11:32 A I don't remember why. I mean, again, it goes down to if my father said, "This is something we need to do," I would have taken him at his word that that's a good way to go and I would have -- I don't remember the circumstances.
11:32 Q Do you recall who you would have signed equipment leases on behalf of?
11:32 A No.
11:32 Q Are you familiar with the terms of any of the equipment leases?
11:32 A No.
11:32 Q Are you familiar with what entities entered into equipment leases?
11:33 A Not offhand.
11:33 Q Do you know someone named Allen Sumian?
11:33 A Yes.
11:33 Q Who is Allen Sumian?
11:33 A Allen is a friend, and he has the business, True Position.
11:33 Q True Position Technologies, Inc.
11:33 A Correct.
11:33 Q What kind of a company is that?
11:33 A It's an aerospace manufacturing.

11:35 Q Do you ever recall signing equipment lease agreements on behalf of True Position?
11:35 A I don't know offhand.
11:35 Q Did you have authority to enter into equipment leases on behalf of True Position?
11:36 A I don't remember if I did; I don't remember.
11:36 Q Do you know, is Mr. Sumian the head of True Position?
11:36 A Yes.
11:36 Q So he would know whether someone had authority to enter into contracts or equipment leases on behalf of True Position; is that right?
11:36 A Yes.
11:36 Q I'd like to introduce Exhibit 16.
(Chapter 7 Trustee's Exhibit 16 was marked for identification by the Deposition Officer and is attached hereto.)
11:36 MR. WEBER: I'd like you to take a few minutes to look through the Declaration of Allen Sumian and the attachments. And after you've done that, I'll ask some questions.
11:36 THE DEPONENT: Okay.
11:36 Q BY MR. WEBER: Do you know if what Mr. Sumian is saying here is accurate?

11:37 A It seems like it is.
11:37 Q In Paragraph 6 it says, "In connection with the loan from EPD Investment Co. to TPT," which is defined earlier as True Position Technologies, Inc., "Keith Pressman was appointed as the Secretary for TPT at its formation, but was never a director, employee or agent. Keith Pressman remained as secretary during the 1990s for TPT. Keith Pressman had no role at TPT as an officer, director, employee or agent at any point after the 1990s."
Do you see that?
11:37 A Yes.
11:37 Q Is that accurate?
11:37 A I assume so.
11:37 Q If you look at Paragraph 7, it says, "The only people that have been authorized to take actions on behalf of TPT at any point since its incorporation, including but not limited to entering into contracts or agreements of any kind on behalf of TPT, are me and Tim Meade."
Do you see that?
11:38 A Yes.
11:38 Q Is that accurate?
11:38 A Again, I don't remember personally. I don't know. It sounds right. I don't think he

would say something that wasn't true.

11:38 Q Paragraph 8 says, "At no point did Keith Pressman have any authority or responsibilities with respect to TPT."

Is that accurate?

11:38 A No, I didn't have any responsibilities. And again, I don't remember if at some point -- if at any point -- I don't remember. I don't remember. I know he dealt with my father on stuff. So again, if I technically was able to do something or not, I wouldn't remember if I did.

11:38 Q Continuing on in the paragraph, it says, "Keith Pressman's appointment as secretary of TPT was nominal only. Keith Pressman never performed any work or services for TPT, didn't have an office at TPT, and had no management duties or any duties or authority whatsoever. Keith Pressman and Jerrold Pressman never received salary or other income or distributions from TPT. Keith Pressman and Jerrold Pressman were never employees or agents of TPT. Keith Pressman and Jerrold Pressman never had any authority to take any actions on behalf of TPT or to enter into contracts or other written agreements on behalf of TPT."

Do you see that?

11:39 A Yes.

11:39 Q Is that accurate?
11:39 A Again, he dealt with my dad on what the capacity was. So I mean, I don't have personal knowledge, but again, I have no reason to doubt what Allen would say.
11:39 Q It references some early equipment leases in relation to EPD in Paragraph 9 and Paragraph 10.
Do you see that?
11:39 A Correct.
11:39 Q And then it says in Paragraph 10, "From 2000 forward, all equipment located at, and used by, TPT was either (a) owned by TPT; or (b) leased by TPT directly from the manufacturer of the equipment. After the late 1990s, TPT never leased equipment from any person or entity other than the manufacturer of the equipment."
Do you see that?
11:40 A Yes.
11:40 Q Do you know if that's accurate?
11:40 A Not of my own knowledge.
11:40 Q If you look at Paragraph 14, it says, "I have reviewed a number of documents over the past few months which purport to be equipment leases between various parties as the lessor(s) and TPT as the lessee. True and correct copies of those

documents that I reviewed are attached hereto as Exhibits 1-8 (collectively, the 'Purported Leases'). Prior to my review of the Purported Leases during the last few months, I had never seen the Purported Leases before. I did not authorize the Purported Leases. The Purported Leases that appear to be signed on behalf of TPT were signed without any authorization by TPT, and were signed by a person who was not an officer, director, employee or agent of TPT as of the dates of the Purported Leases and who had no authority to enter into any agreement, contract, lease or other document on behalf of TPT."

Do you see that?

11:41 A Yes.

11:41 Q Do you know if it's accurate?

11:41 A Not from my own personal knowledge.

11:41 Q Let's look one by one.

The first one, Exhibit 1, is unsigned, so why don't we start with Exhibit 2. I'm looking at Paragraph 16.

It says, "Exhibit 2 is a purported lease between TPT and an entity named Deushane Leasing Company ('DLC'), as of September 27, 2000. The document identifies the lease as 'Lease # 000927-DL.' TPT never had any discussions with DLC regarding the

lease of equipment, TPT never leased any equipment from DLC, and TPT never prepared, reviewed or entered into an agreement with DLC regarding the lease of equipment. TPT never leased any equipment from DLC. TPT never agreed to pay, nor did it ever make payments to DLC (or to EPD for the benefit of DLC) on the account of this or any other purported equipment lease. Attached to Exhibit 2 is a document titled 'Financing Statement,' which appears to be connected to this purported lease. TPT never agreed to the filing of a financial statement of any sort for the benefit of DLC. To the extent that any purported leases or other contracts or agreements reflect that equipment was leased by DLC to TPT, those purported leases are fraudulent as TPT did not enter into any equipment leases or any other contract or agreement with DLC."

Do you see that?

11:42 A Yes.

11:42 Q Do you know if that's accurate?

11:43 A Again, not to my personal knowledge.

11:43 Q Let's take a look at Exhibit 2. And this starts on page T-PR 060648 and continues on to 060652. This is the same document.

11:43 A So where am I going?



BARKLEY Court Reporters

11:43 Q We're looking at Exhibit 2 to this document.
11:43 A Okay.
11:43 Q Actually, why don't we start with Exhibit 1.
11:43 A Okay.
11:43 Q It looks like Exhibit 1 and Exhibit 2 are unsigned. But take a look and let me know if you've ever seen those equipment leases before.
11:43 A I don't know.
11:43 Q You don't recall seeing them before?
11:43 A Not offhand.
11:43 Q How about Exhibit 3?
11:43 A Exhibit 3 is entitled "Equipment Lease Agreement" between Grand Canyon Leasing and True Position Technologies.
11:44 A I don't remember it offhand.
11:44 Q If you look at the signature page for Exhibit 3, which is located on Bates stamped page number TP-R 060658, there is a signature block for True Position.
Do you see that?
11:44 A Yes.
11:44 Q Is that your signature?
11:44 A Yes.

11:44 Q And under "Title," it says, "VP"?
11:44 A Yes.
11:44 Q Vice president?
11:44 A Right.
11:44 Q Were you the vice president of True Position?
11:44 A I don't believe so.
11:44 Q And it's dated December 22nd, 2000; is that right?
11:44 A Yes.
11:45 Q Were you the vice president of True Position in December 2000?
11:45 A Not from what it says in the Declaration, it doesn't appear that I was.
11:45 Q Do you recall signing this Equipment Lease Agreement?
11:45 A I don't recall offhand.
11:45 Q Do you ever recall signing Equipment Lease Agreements on behalf of True Position?
11:45 A I don't remember offhand. I mean, probably. Again, I'm just assuming. If it happened -- I mean, it obviously did -- then my dad would have had me sign it. But I don't have the specific memory of it.
11:45 Q As to that Exhibit 3, if you look back

at Mr. Sumian's Declaration in Paragraph 17, it says, starting at line nine, "I am familiar with Keith Pressman's signature and the purported lease appears to be signed by Keith Pressman as Vice President on behalf of TPT."
Do you see that?
11:46 A Yes.
11:46 Q And he is correct as to that; that's your signature?
11:46 A Yes, it looks like it, definitely.
11:46 Q And then it says, "The date of the signature is December 22nd, 2000. Keith Pressman was not a vice president or an officer of TPT as of December 22nd, 2000."
Is that correct?
11:46 A Yes.
11:46 Q And then it says, "Keith Pressman never had any authority at any point to enter into contracts or agreements, including but not limited to leases on behalf of TPT. I was the only person authorized on behalf of TPT to enter into contracts or agreements on behalf of TPT as of December 22nd, 2000."
Do you see that?
11:46 A Yes.
11:46 Q Is that accurate?

11:47 A I'm assuming -- you know, I wouldn't doubt what he said.

11:47 Q And then it continues, "I was not aware of any agreement between TPT and GCL and did not authorize Keith Pressman or any other person to enter into an agreement or equipment lease with GCL. TPT never leased the equipment referenced in Exhibit A to the equipment lease from GCL. TPT never leased any equipment from GCL. TPT never agreed to pay, nor did it make any payments to GCL (or to EPD for the benefit of GCL) on the account of this or any other purported equipment lease."

Is that accurate?

11:47 A Again, I don't have any personal knowledge one way or another.

11:47 Q Do you know you came to sign this Equipment Lease Agreement, Exhibit 3?

11:47 A No. It was 17 years ago. And I know typically, on these kinds of things, it was at my father's direction, usually. I don't remember if he discussed it with me or if he just had me sign it, I just don't remember.

11:48 Q How could you sign an agreement as vice president of a company when you weren't vice president of the company?

Declaration, looking at Paragraph 21, which refers to Exhibits 7 and 8, it states, starting on line 3, "I am familiar with Keith Pressman's signature and the purported lease appears to be signed by Keith Pressman as vice president of TPT and dated as of November 17, 2004. Keith Pressman was not a vice president or an officer of TPT at any point between August 8, 2004, and November 17, 2004." And then it goes on to state that you weren't authorized to enter into contracts or agreements on behalf of True Position.

Do you see that?

11:55 A Yes.

11:55 Q And is that your understanding as well?

11:55 A Again, I have no information other than what I see on the document.

11:55 Q Other than you preparing an Equipment Lease Agreement, where else would you get an Equipment Lease Agreement to sign?

11:55 A I'm sorry?

11:55 Q How did you come to sign these Equipment Lease Agreements? Who gave them to you?

11:55 A I don't remember any of the specifics, but I would have guessed my father.

11:55 Q Did you ever discuss them with him?

11:55 A I don't have any direct knowledge or

memory of these specific leases. And I don't know if I discussed it with him or if he just told me to sign them.

11:55 Q Do you know if all the equipment leases that EPD or your father was involved in were sham or fake leases?

11:56 A I would guess not.

11:56 Q And why is that?

11:56 A Because I know my father, and I don't think he would do something like that.

11:56 Q Well, you just reviewed several leases that are signed by you as an officer of a company that you weren't an officer of; isn't that right?

11:56 A Correct.

11:56 Q Aren't those sham leases?

11:56 A Well, without not having all the information, I can't tell you. I only see what's here and I don't know all the circumstances.

11:56 Q You're an attorney. You can't sign an agreement on behalf of an entity that you're not an officer of as an officer; is that right?

11:56 A Correct.

11:56 Q But that's exactly what you did here, isn't it?

11:56 A Again, I have no knowledge of what the

situation was; I would only be speculating.
11:57 Q In all your time working for EPD and the other entities, have you ever seen any of the equipment that's subject to these equipment leases?
11:57 A I don't know. I don't remember.
11:57 Q Do you recall signing equipment leases on behalf of other entities, too?
11:57 A Not offhand, but I would imagine I probably did.
11:57 Q I'd like to introduce Exhibit 17.
(Chapter 7 Trustee's Exhibit 17 was marked for identification by the Deposition Officer and is attached hereto.)
11:57 MR. WEBER: If you look on the last page of this Equipment Lease Agreement, there is a signature block for Ice Skating Enterprises, Inc.
11:57 Q Do you see that?
11:57 A Yes.
11:57 Q Is that your signature?
11:57 A Yes.
11:58 Q And were you an officer or director of Ice Skating Enterprises, Inc. in 2004?
11:58 A I assume so.
11:58 Q Were you authorized to sign equipment leases on behalf of Ice Skating Enterprises, Inc.?

11:58 A I would think so.
11:58 Q What makes you think that?
11:58 A I don't remember at that time what the ownership was or what position I had, so I guess I don't know.
11:58 Q Ice Skating Enterprises, Inc. is an entity that was under control by you and your father; is that right?
11:58 A Again, there are so many ice skating companies, I don't even remember which one this is.
11:58 Q On the first page it lists equipment costs. Do you see that?
11:58 A Yes.
11:58 Q So following entering into this Equipment Lease Agreement, do you recall EPD or your father or you purchasing equipment?
11:59 A Not offhand.
11:59 Q I'd like to introduce Exhibit 18.
(Chapter 7 Trustee's Exhibit 18 was marked for identification by the Deposition Officer and is attached hereto.)
11:59 MR. WEBER: This appears to be an e-mail at the bottom from Allen Sumian to you dated October 19th, 2010, and then it looks like you forwarded it to your dad; is that correct?

11:59 A Yes.
11:59 Q Why was Mr. Sumian sending you a draft Declaration of himself in 2010?
11:59 A I don't remember.
11:59 Q No recollection whatsoever?
11:59 A No.
11:59 MR. WEBER: I've been informed by the videographer that we have to switch tapes, so why don't we take a 5-minute or a 10-minute break.
11:59 THE VIDEOGRAPHER: We're off the record at 11:59. This is the end of Disk Number 1.
(Lunch recess held.)
12:39 THE VIDEOGRAPHER: We're back on the record at 12:39. This is the start of Disk Number 2.
12:39 Q BY MR. WEBER: Mr. Pressman, do you know if EPD ever acted as a venture capital company?
12:39 A I don't know.
12:39 Q Did you and your dad have accounts at EPD?
12:39 A I did.
12:39 Q And what was the nature of the account?
12:39 A My money went into the account.
12:39 Q And was it an investment? Was it a loan?
12:39 A I don't know how it was characterized.
12:39 Q Who put in the funds, you personally?
12:39 A It was my funds, but my father handled all

my business and my money, so he just did everything for me.

12:39 Q So he put money into your EPD account?

12:39 A Correct.

12:39 Q And then would that money be used in the EPD account to pay your bills?

12:40 A Yes.

12:40 Q And credit cards?

12:40 A Yes.

12:40 Q Lease payments for cars?

12:40 A Yes.

12:40 Q Rent for your apartments?

12:40 A Yes.

12:40 Q Utilities?

12:40 A Yes.

12:40 Q Between 2003 and 2010, was that all true?

12:40 A Yes.

12:40 Q And do you know where your dad got the money from during that time period to put into your account?

12:40 A I don't remember the specifics. I knew I had some ownership interests in some companies. And just whatever monies would come to me would go into the account.

12:40 Q The ownership interests that you had in

companies, did you pay for them?
12:41 A I don't remember.
12:41 Q Do you ever remember writing a check for an ownership interest in a company?
12:41 A I don't remember how I got them.
12:41 Q Do you know roughly how much money EPD paid on your behalf in credit cards, lease payments, rent, utilities, all those types of things, between 2003 and 2010?
12:41 A No.
12:41 Q Who would write the checks for those items?
12:41 A I'm not sure.
12:41 Q It wasn't you, though; right?
12:41 A I don't think so.
12:41 Q Do you know if EPD has obtained ownership in more than 150 companies over the years?
12:41 A I don't know.
12:41 Q Do you know if EPD ever provided on-site management, personnel, hiring, marketing or strategic planning to companies?
12:42 A Not offhand.
12:42 Q Do you know if EPD acquired interests in companies?
12:42 A I don't remember structurally how things

residents, as the case may be, that at one time or another either performed services in California on an independent contractor basis with EPD or entered into lease transactions with plaintiffs in California."

Do you see that?

12:50 A Yes.

12:50 Q Do you know if it's accurate?

12:50 A Not from my knowledge; I don't know.

12:50 Q What part don't you think is accurate?

12:50 A I'm not saying I don't think it's accurate, I'm just saying I don't have personal knowledge of it; I mean, it looks right.

12:50 Q Did EPD Group perform independent contractor services with EPD?

12:50 A I'm sorry?

12:51 Q Do you know what EPD Group is?

12:51 A I don't remember which entity that is.

12:51 Q It's listed here. Do you know what EPD Group is?

12:51 A Not offhand.

12:51 Q Do you know what EPD Investment Leasing Co., LLC is?

12:51 A I get them all mixed up. I don't remember which one is which.

12:51 Q At some point in 2008 or 2009, did EPD

begin experiencing cash flow issues?

12:51 A Yes, I believe so.

12:51 Q Do you recall what the circumstances were?

12:51 A No.

12:51 Q There was some type of a cash crunch?

12:51 A Yes.

12:51 Q Do you recall approximately when that happened?

12:51 A Not offhand. I guess around -- I mean, I don't remember specifically.

12:52 Q Somewhere in the 2008/2009 time frame?

12:52 A Yes.

12:52 Q And did EPD start getting a lot of calls from investors or lenders asking the status of their money on deposit with EPD?

12:52 A I know there were calls.

12:52 Q A lot of calls?

12:52 A Yes.

12:52 Q And e-mails?

12:52 A I'm sure there were.

12:52 Q Was the general nature that the investors or lenders were wondering if their money was safe or whether they could get it back, that type of inquiry?

12:52 A Yes.

12:52 Q And what was the response by EPD?

12:52 A I don't remember.
12:52 Q Who responded to the investors or lenders during that time period?
12:53 A I think mostly my dad.
12:53 Q And do you know why EPD wasn't able to repay lenders or investors at that point?
12:53 A I don't know the specifics.
12:53 Q Just that there wasn't an ability to repay at that point?
12:53 A There wasn't an ability. I think I remember some cash, some credit lines being cut, but I don't remember the specifics.
12:53 Q Was your dad trying to arrange a credit line during that time period?
12:53 A I think so.
12:53 Q Do you know why a credit line would be needed to refund amounts that were on deposit by investors or lenders?
12:53 A I really don't remember the specifics.
12:53 Q Do you remember if at some point in 2009 and 2010 if investors or lenders began to file lawsuits against EPD?
12:54 A I know there were lawsuits.
12:54 Q By several investors or lenders?
12:54 A I don't remember how many, but I know

01:12 A Correct. I mean, I think at one point -- and I keep getting the dates wrong, but I think I had a controlling ownership.
01:13 Q Do you know as of 2005 if your dad had borrowed substantially and was heavily in debt?
01:13 A I don't know.
01:13 Q Did your dad ever discuss his finances with you?
01:13 A No.
01:13 Q Or the finances of EPD or any of the other companies?
01:13 A No.
01:13 Q He was the only one who knew what was going on financially?
01:13 A Yes.
01:13 Q How about Ruben Moreno, did he know?
01:13 A I'm sure he did.
01:13 Q Anyone else?
01:13 A I don't know.
01:13 Q Did EPD or the other entities ever have outside auditing firms come in and audit the books and records?
01:14 A I don't know offhand.
01:14 Q Were the tax returns done by someone named Ted Jonavic?


BARKLEY Court Reporters

no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not).

"As non-controlling interests in private companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not).

"Finally, as noted above, all of Mr. Pressman's assets -- including his equity interests in all of the above entities, and all of the proceeds thereof -- are subject to over $36 million in secured loans to third parties. Accordingly, he would not be able to use any such funds to pay the tax liability even if they existed (which they do not)."

Do you see that?

01:29 A Yes.

01:29 Q Do you know if it's accurate?

01:29 A I don't know.

01:29 Q As an officer of EPD, didn't you have fiduciary duties to EPD to generally monitor what was

going on in the business?

01:30 A I don't know. I don't believe so. Again, I can't answer that. I don't know if that's an issue. But I can definitely tell you I didn't...

01:30 Q You're an attorney. And you're aware of the concept of fiduciary duty; right?

01:30 A Correct.

01:30 Q And officers and directors owe fiduciary duties to companies that they're officers and directors of, do they not?

01:30 A Correct. But I really can't comment on it; it's not my area of expertise. I can just tell you I didn't have any day-to-day knowledge.

01:30 Q And is that because you were more affiliated with these entities for estate planning purposes for your dad?

01:30 A Yes.

01:30 Q You didn't actually have a management or supervisory or any other type of role in the companies?

01:31 A Correct.

01:31 Q Including EPD?

01:31 A Correct.

01:31 Q Do you know why, for estate planning purposes, why your dad didn't just put you on as

investor?
02:26 A I don't know.
02:26 Q Do you know if your dad or you authorized a security interest in favor of Mr. Kirkland or his family trust against EPD's assets?
02:26 A I don't know.
02:26 Q You don't recall that?
02:26 A No.
02:26 Q Do you know why Mr. Kirkland, as an investor or lender, would be entitled to some type of security interest in EPD's assets different from any other investor or lender in EPD?
02:26 A I don't know.
02:27 Q Are you aware of any reason?
02:27 A No.
02:27 Q You're not aware of any reason why he would be entitled to that?
02:27 A No.
02:27 Q Or why his family trust would be entitled to that?
02:27 A No.
02:27 Q Or why his wife would be entitled to that?
02:27 A No.
02:27 Q I'd like to introduce Exhibit 61.
///

(Chapter 7 Trustee's Exhibit 61 was marked for identification by the Deposition Officer and is attached hereto.)

02:27 MR. WEBER: This is a document entitled "Security Interest Agreement" between Mr. Kirkland and EPD, dated November 8, 2007.

02:27 Q Do you see that?
02:27 A Yes.
02:27 Q On the last page, there is a signature block that says, "Agreed and approved as to form and content, Law Offices of Keith E. Pressman," and the signature block below says, "Keith E. Pressman, attorney for debtor."
02:28 Q Do you see that?
02:28 A Yes.
02:28 Q Is that your signature?
02:28 A Yes, it is.
02:28 Q Do you recall reviewing this agreement?
02:28 A I don't recall offhand.
02:28 Q Do you recall approving it as to form and content?
02:28 A I don't remember.
02:28 Q Do you know who prepared it?
02:28 A No.
02:28 Q Did you prepare it?

02:28 A No.
02:28 Q You're not a transactional or corporate attorney, are you?
02:28 A I am not.
02:28 Q You wouldn't prepare this type of document; is that right?
02:29 A Correct.
02:29 Q Do you know if Mr. Kirkland prepared it?
02:29 A I don't know.
02:29 Q Do you know why you signed this document?
02:29 A I don't remember.
02:29 Q I'd like to introduce Exhibit 62.
(Chapter 7 Trustee's Exhibit 62 was marked for identification by the Deposition Officer and is attached hereto.)
02:29 MR. WEBER: This document is titled "Security Promissory Note" between Mr. Kirkland and EPD, also dated November 8, 2007.
02:29 Q Do you see that?
02:29 A Yes.
02:29 Q For $150,000?
02:29 A Yes.
02:29 Q And on the last page, there is a slot that says, "Acknowledged and Agreed." And it has a signature block and it says, "Keith E. Pressman,

member."
Do you see that?
02:30 A Yes.
02:30 Q Is that your signature?
02:30 A Yes.
02:30 Q And is that your dad's signature?
02:30 A Yes.
02:30 Q Do you recall reviewing this agreement?
02:30 A I don't recall.
02:30 Q Or Note?
02:30 A I don't recall.
02:30 Q Do you recall approving this Secured Promissory Note?
02:30 A I don't recall.
02:30 Q Did you draft it?
02:30 A No.
02:30 Q Again, this isn't the type of document you would draft; right?
02:30 A Correct.
02:30 Q Do you know why Mr. Kirkland would be entitled to a Secured Promissory Note as to the assets of EPD or a Security Interest Agreement as to the assets of EPD?
02:31 A No.
Q I'd like to introduce Exhibit 63.

(Chapter 7 Trustee's Exhibit 63 was marked for identification by the Deposition Officer and is attached hereto.)

02:31 MR. WEBER: This document is titled "Continuing Guaranty" between Mr. Kirkland and your father, and it looks like EPD, dated November 8, 2007.

02:31 Q Do you see that?

02:31 A Yes.

02:31 Q And this one doesn't look like it's set up for your signature. Do you recall ever receiving or reviewing this Continuing Guaranty?

02:31 A I don't remember.

02:31 Q Do you know why Mr. Kirkland would be entitled to a Continuing Guaranty from EPD?

02:31 A No.

02:31 MR. WEBER: Why don't we take a short break, because the videographer has to switch tapes. And then we can go through the remaining documents and hopefully bring this to a conclusion.

02:31 THE VIDEOGRAPHER: We're off the record at 2:31. This is the end of Disk Number 2.

(Recess held.)

02:40 THE VIDEOGRAPHER: We're back on the record at 2:40. This is the start of Disk Number 3.

02:40 MR. WEBER: I'd like to introduce

Exhibit 64.

(Chapter 7 Trustee's Exhibit 64 was marked for identification by the Deposition Officer and is attached hereto.)

02:40 MR. WEBER: This is titled, "Conflict Waiver and Consent" between EPD and Mr. Kirkland, dated November 7, 2007.

02:40 Q This looks like it was set up for your dad's signature rather than you; is that right?

02:40 A Correct.

02:40 Q And those are his signatures on the last page?

02:40 A Yes.

02:41 Q On the third page of this document, on Number 5 it says, "EPD and Pressman understand that if Kirkland invests or loans money to EPD or Pressman or obtains a security interest in the property or assets of EPD or Pressman, Kirkland's interest as an investor or lender may be adverse to the interests of EPD and Pressman, and their property, in that Kirkland's interests will be to ensure repayment of his debt, and preservation of the assets for his benefit, not to protect the interests of EPD or Pressman."

02:41 Do you see that?

02:41 A Yes.
02:41 Q Did you ever discuss that with your dad or with Mr. Kirkland?
02:41 A No.
02:42 Q The following paragraph, Paragraph 6, says, "EPD and Pressman understand that, if the loans are not repaid when required, Kirkland's interests will become directly adverse to the interests of EPD and Pressman and their property."
02:42 Do you see that?
02:42 A Yes.
02:42 Q Did you ever discuss that with Mr. Kirkland or your dad?
02:42 A No.
02:42 Q Do you know how Mr. Kirkland could represent EPD against one or more investors that had filed suit against EPD when Mr. Kirkland had disclosed this actual conflict of interest?
02:42 A I don't know.
02:42 Q Do you know how Mr. Kirkland or his law firm could represent EPD in trying to prevent the involuntary bankruptcy filing when he had that type of a conflict?
02:43 A I don't know.
02:43 Q Did Mr. Kirkland ever discuss or disclose

that conflict to you?
02:43 A No.
02:43 Q I'd like to introduce Exhibit 65.
(Chapter 7 Trustee's Exhibit 65 was marked for identification by the Deposition Officer and is attached hereto.)
02:43 MR. WEBER: This is a document titled "General Release," dated February 9, 2009.
02:43 Q Is that your signature at the bottom where it says "Acknowledged and agreed"?
02:43 A Yes.
02:44 Q Did you draft this General Release?
02:44 A I don't believe so.
02:44 Q It's not the type of document you would draft?
02:44 A Correct.
02:44 Q Do you recall reading it?
02:44 A I don't remember.
02:44 Q The first paragraph has EPD purporting to release things, including claims of legal malpractice, breach of fiduciary duty and fraud against Mr. Kirkland.
Do you see that?
02:44 A Yes.
02:44 Q Can you think of any reason why EPD would

or your dad failing to live up to agreements with Mr. Kirkland?
02:49 A No.
02:49 Q Can you think of any reason why Mr. Kirkland, his wife or his family trust would be entitled to a first priority UCC-1 Financing Statement as to EPD's assets or your dad's assets?
02:50 A No.
02:50 Q I'd like to introduce Exhibit 68.
(Chapter 7 Trustee's Exhibit 68 was marked for identification by the Deposition Officer and is attached hereto.)
02:50 MR. WEBER: This is a document entitled "Additional Forebearance Agreement," and it's between EPD, Jerrold Pressman and Poshow Ann Kirkland, Trustee of the Bright Conscience Trust dated September 9, 2009. And it appears to have been entered into on September 3rd, 2010.
02:50 Q Do you see that?
02:50 A Yes.
02:50 Q And this again doesn't look like it has your signature on it; is that right?
02:50 A Correct.
02:51 Q On the second "Whereas" paragraph, it says, "Whereas, there is more than $2 million due

pursuant to the Note or Loan Documents, all additional funds loaned to Debtor from time to time, all payments to the Debtor for consulting fees, advisory fees, and professional service fees, and all payments to BEM" -- which is defined above as Broadway -- "for consulting fees, advisory fees and professional service fees, and all payments to Keith Pressman for consulting fees, advisory fees, professional service fees, and legal fees, and all payments to any other sister company of EPD, (any and all such loans and payments, collectively the 'Payments')."

Do you see that?

02:55 A Yes.

02:55 Q Can you think of any reason why, if Mr. Kirkland made a payment to EPD for consulting fees, as to why that would be a loan subject to repayment?

02:55 A I don't know.

02:55 Q You're not aware of any?

02:55 A I'm not.

02:55 Q Can you think of any reason why, if Mr. Kirkland paid EPD some amount for advisory fees, that that would be a loan subject to repayment?

02:55 A I don't know.

02:55 Q Can you think of any reason why, if


BARKLEY Court Reporters

Mr. Kirkland paid EPD for professional service fees, why that would be a loan subject to repayment?

02:55 A I don't know.

02:56 Q Can you think of any reason why, if Mr. Kirkland gave any amount whatsoever to Broadway, why that would be something that EPD would have to repay?

02:56 A I don't know.

02:56 Q You can't think of any reason?

02:56 A No.

02:56 Q Can you think of any reason why, if Mr. Kirkland wrote a check to Broadway or sent a wire to Broadway for consulting fees paid to Broadway, why that would be a loan to be repaid by EPD?

02:56 A I don't know.

02:56 Q Can you think of any reason why, if Mr. Kirkland paid Broadway for advisory fees or professional service fees, why that would be a loan that would be subject to repayment by EPD?

02:57 A I don't know.

02:57 Q How about, can you think of any reason why, if Mr. Kirkland paid an amount to you, Keith Pressman, for consulting fees, advisory fees, professional service fees or legal fees, why that would be a liability or a loan that EPD would have to

repay?
02:57 A I don't know.
02:57 Q Can you think of any reason?
02:57 A No.
02:57 Q Did Mr. Kirkland ever pay you for consulting fees?
02:57 A I don't know.
02:57 Q Did Mr. Kirkland ever pay you advisory fees?
02:57 A I don't know.
02:58 Q Did Mr. Kirkland ever pay you professional service fees?
02:58 A I don't know.
02:58 Q Did Mr. Kirkland ever retain you as a lawyer and pay you legal fees?
02:58 A No, I don't think so.
02:58 Q Can you recall ever providing any services whatsoever to Mr. Kirkland?
02:58 A I don't recall offhand.
02:58 Q I'd like to introduce Exhibit 69.
(Chapter 7 Trustee's Exhibit 69 was marked for identification by the Deposition Officer and is attached hereto.)
02:58 Q BY MR. WEBER: Have you ever seen this document before?

03:00 A I don't know.
03:00 Q Can you think of any reason why Mr. Kirkland would deposit funds with you?
03:00 A I don't know offhand.
03:00 Q Or deposit funds into your account at EPD?
03:00 A I don't know offhand.
03:00 Q Can you think of any reason why Broadway would deposit funds on behalf of Mr. Kirkland?
03:01 A I don't know.
03:01 Q And can you think of any reason why you or Broadway would pay amounts to Mr. Kirkland?
03:01 A I don't know.
03:01 Q You're not familiar with Neah Power Systems, Inc.?
03:01 A No.
03:01 Q How about RBC?
03:01 A Not offhand.
03:01 Q Are you aware that EPD was paying Mr. Kirkland's mortgage payments?
03:01 A I wasn't aware of that offhand.
03:01 Q Can you think of any reason why EPD would be paying Mr. Kirkland's mortgage payments?
03:01 A I don't know.
03:01 Q I'd like to introduce Exhibit 70.
///

(Chapter 7 Trustee's Exhibit 70 was marked for identification by the Deposition Officer and is attached hereto.)

03:02 MR. WEBER: This is an e-mail between Mr. Kirkland and National Corporate Research, Ltd., with the e-mails dated September 11, 2009, and September 10, 2009.

03:02 Q Do you see that?

03:02 A Yes.

03:02 Q It looks like Mr. Kirkland sent in a UCC-1 filing statement to be filed with the Secretary of State whereby Bright Conscience Trust dated September 9th, 2009, would have a lien against EPD's assets and your dad's assets; is that right?

03:02 A Yes.

03:02 Q Can you think of any reason why Mr. Kirkland or the Bright Conscience Trust would be entitled to that?

03:03 A No.

03:03 Q I'd like to introduce Exhibit 71.

(Chapter 7 Trustee's Exhibit 71 was marked for identification by the Deposition Officer and is attached hereto.)

03:03 MR. WEBER: This appears to be a filed stamped version filed with the California Secretary of

State of that UCC-1 by the Bright Conscience Trust as to EPD and Mr. Pressman's assets.

03:03 Q Do you see that?

03:03 A Yes.

03:03 Q Can you think of any reason as to why Mr. Kirkland, Mrs. Kirkland or the Bright Conscience Trust would be entitled to a UCC-1 against your dad or EPD's assets?

03:04 A I don't know.

03:04 Q You're not aware of any?

03:04 A I'm not aware of any.

03:04 Q I'd like to introduce Exhibit 72.

(Chapter 7 Trustee's Exhibit 72 was marked for identification by the Deposition Officer and is attached hereto.)

03:04 MR. WEBER: This is a Privilege Log provided by Mr. Kirkland's counsel in this case.

This Privilege Log, on the sixth entry, lists an e-mail dated February 21, 2012, from Mr. Kirkland to you, and it's listed as attorney-client privilege S.C. Club.

03:04 Q Do you see that?

03:04 A Yes.

03:05 Q Did Mr. Kirkland continue to have an attorney-client relationship with S.C. Club or you

A No.
Q And how about the income and expenses?
A No.
Q Did you ever know the assets, liabilities, income or expenses of Broadway, Plush, S.C. Club, Inc. or S.C. Club, L.P.?
A I don't remember offhand. I might have known it here or there, but it would have been -- I mean more than likely, probably not.
Q How about for the other entities?
A I usually didn't get involved in that end of it, it was Jerry, my father.
Q As of January 2011, do you know if EPD was operating as a company?
A I don't think so.
Q Do you know if it was engaged in any business?
A I don't believe so.
Q Other than fielding calls or e-mails from investors trying to find out what was going on with their money?
A Not to my knowledge.
Q In January 2011, do you know if EPD was paying its debts as they became due?
A I don't know.

Q As of January 2011, wasn't EPD getting a lot of calls from investors asking where their money was?

A Correct. Yeah, so they weren't.

Q So EPD was not paying its debts as they became due in January 2011; is that right?

A Correct.

Q And was EPD paying debts as they became due during 2010?

A I don't remember the timing.

Q EPD started getting calls from investors based on the cash flow issues in the 2008/2009 time period, didn't it?

A Again, that sounds right. If that's the case, then that's correct. I always get the years mixed up.

Q Do you know if EPD was paying its debts as they became due in 2009?

A I mean, if you were just saying that we were getting calls in 2008 and 2009, then probably not.

Q Well, I'm not telling you, I'm asking.

A Again, I hate to go back to it, but it's just kind of all one big blur. I don't remember the dates. And if I jumped in on something, I might have

jumped in and just -- I don't remember what I was doing; there was just so much chaos.

03:22 Q You testified earlier somewhere in the 2008/2009 time frame, that's generally when the cash crunch hit EPD?

03:22 A I think that's about right.

03:22 Q In January 2011, did EPD have past due bills or payments?

03:22 A I believe so.

03:22 Q Do you know if EPD was insolvent in January 2011?

03:23 A I don't know what the legal status would have been; I just wasn't involved in that end of it.

03:23 Q Do you know if it had more liabilities than assets?

03:23 A I mean, I've never heard of anything like that; I don't think so.

03:23 Q Have you ever looked at EPD's bankruptcy Schedules?

03:23 A No.

03:23 Q Did you ever discuss the bankruptcy Schedules with anyone?

03:23 A No.

03:23 Q I'd like to introduce Exhibit 78 and also Exhibit 79.

those lines.

03:28 Q You don't recall discussing that issue with your dad or Mr. Kirkland?

03:28 A No.

03:28 Q In terms of the amount of money that you had in your EPD account, other than monies that your dad put in, was there money that came to that account from anywhere else?

03:29 A Well, the money he would put in would have been money that was coming to me. So like, for instance, an ice rink was making a distribution or something, then he would coordinate that to put that into the account.

03:29 Q But aside from your dad putting money in, did you put any money in of your own funds you were earning while you were working as an attorney or for a business or anything of that sort?

03:29 A I don't remember.

03:29 Q If you did, was it much?

03:29 A Probably not.

03:29 Q Would you ever have had occasion to deposit anything more than like 50- or $100,000 a year?

03:30 A I don't remember. I just don't remember how everything was structured or where it came from;

I just don't remember.
03:30 Q Can you think of any reason why you would have an account that was over a million dollars with EPD?
03:30 A Just that it was any money that I made from all the investments. And any money coming to me would go into the account.
03:30 Q From what investments?
03:30 A Well, like the ice risks. I know there was a lot of money coming from that.
03:30 Q Based on your membership interest?
03:30 A You know, I don't remember what percentages, but I just know that I had some ownership, but I don't remember how. Again, my dad took care of all my business dealings, so I don't remember in what capacity.
03:31 Q And you don't remember paying for any of the membership interests; right?
03:31 A I don't remember how it was declared; it was a long time ago.
03:31 Q You don't remember writing a check?
03:31 A I don't remember offhand, no.
03:31 Q Did your dad ever discuss with you the issue as to whether EPD was operating as a Ponzi scheme?

A I mean, at some point we probably had the discussion that it wasn't a Ponzi scheme.

Q Do you recall why he said it wasn't?

A I mean, I don't remember the conversation. But again, he didn't have to get into too much detail. I know he's not a dishonest guy. And if he tells me it's not, I believe him.

Q You don't know how EPD could afford to theoretically pay investors or lenders 12 percent interest per year?

A No, I don't know how exactly. But I know he structured deals and was a good businessman. And he said there was assets to back everything up and, again, I believed him. He might have gone into some detail with me many years ago, but I don't remember the specifics, but I was satisfied.

Q Can you think of any plausible explanation as to those equipment leases you looked at where you signed on behalf of True Position?

A I don't know.

Q You can't think of any plausible explanation as to why those occurred?

A Not offhand, no.

MR. WEBER: I don't have anything further.

Q What I'd propose on the record is a

# EXHIBIT 15

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC,<br>and JERROLD S. PRESSMAN,<br><br>Debtors, | |
| JASON M. RUND, CHAPTER 7<br>TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual<br>and POSHOW ANN KIRKLAND, as<br>TRUSTEE of the BRIGHT<br>CONSCIENCE TRUST DATED<br>SEPTEMBER 9, 2009,<br><br>Defendants. | No. 2:10-bk-62208-ER |

DEPOSITION OF JERROLD PRESSMAN

June 21, 2017

Mitch Genser, CSR No. 4239.
424419

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles
(310) 207-8000 Century City
(916) 922-5777 Sacramento
(951) 686-0606 Riverside
(212) 808-8500 New York City
(312) 379-5566 Chicago
(415) 433-5777 San Francisco
(408) 885-0550 San Jose
(800) 222-1231 Martinez
(818) 702-0202 Woodland Hills
(347) 821-4611 Brooklyn
00+1+800 222 1231 Paris
(949) 955-0400 Irvine
(760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas
(702) 366-0500 Henderson
(518) 490-1910 Albany
00+1+800 222 1231 Dubai
(858) 455-5444 San Diego
(800) 222-1231 Carlsbad
(800) 222-1231 Monterey
(516) 277-9494 Garden City
(914) 510-9110 White Plains
001+1+800 222 1231 Hong Kong

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,<br><br>Debtors, | ) |
| JASON M. RUND, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,<br><br>Defendants. | ) No. 2:10-bk-62208-ER |

Deposition of JERROLD PRESSMAN, taken on behalf of Chapter 7 Trustee, at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367, commencing at 10:04 a.m., Wednesday, June 21, 2017, before Mitch Genser, CSR No. 4239.



BARKLEY Court Reporters

PERSONS PRESENT:

| | |
|---|---|
| For Plaintiff:<br>JASON RUND, CHAPTER 7 TRUSTEE | BRUTZKUS GUBNER ROZANSKY SEROR WEBER, LLP<br>BY COREY R. WEBER, ESQ.<br>MICHAEL W. DAVIS, ESQ.<br>21650 Oxnard Street<br>Suite 500<br>Woodland Hills, California 91367<br>(818) 827-9000<br>cweber@bg.law<br>mdavis@bg.law |
| For Defendants:<br>JOHN KIRKLAND,<br>POSHOW ANN KIRKLAND | LEWIS R. LANDAU, ESQ.<br>22287 Mulholland Highway<br>Calabasas, California 91302<br>(888) 822-4340<br>lew@landaunet.com |

assets did it sell?

10:22 A Properties, real estate properties.

10:22 Q Did EPD own real estate properties?

10:22 A Yes.

10:22 Q Which ones?

10:22 A I don't recall offhand.

10:22 Q You mentioned you received loans from people investing or lending money in EPD?

10:22 A Lending money to EPD.

10:22 Q And did you generally refer to them as investors?

10:22 A I don't know, maybe. It's a loose word. I don't want to deal in semantics. They loaned money to the company. If you want to call them investors for the purpose of this conversation, I'll be glad to designate that.

10:22 Q Do you know how much in loans or investments in EPD were present at any given time from 2003 onward?

10:23 A Not offhand.

10:23 Q Was it in the millions?

10:23 A Yes.

10:23 Q Tens of millions?

10:23 A I'm not sure whether it was post- or pre-2003 that it would have been tens of millions,

but after 2003, it was certainly substantial, certainly over 10 million.

10:23 Q And those were loans by the investors or lenders to EPD?

10:23 A That's correct.

10:23 Q When the people invested or loaned money, did they know what the money was going to be used for?

10:23 A No.

10:23 Q You didn't tell them?

10:23 A I didn't know.

10:23 Q Did you provide any updates to the investors or lenders at any time as to what their funds were being used for?

10:24 A I know that we've had this discussion before, Corey. The dollars are fungible. We don't say, "This is your dollars going into this thing." All the money was put into one place. And just like any bank, the bank loans money out. And it's not your money or their money or their money, it's just money.

10:24 So some people from time to time might have asked what some of our investments were in, but as to any specific person with any specific investment, the answer would be no.

10:24 Q When someone put money into EPD as an investment or a loan, they were given an account

number by EPD; is that right?
10:24 A That's correct.
10:24 Q And then they received monthly or quarterly or some sort of periodic statement detailing what their investment or loan was and what interest had accrued and what deposits and withdrawals had been made; is that right?
10:25 A Yes, it is.
10:25 Q And if someone, for instance, received a statement saying that they had a million dollars in an EPD account, did EPD actually have those funds on hand?
10:25 A Of course not.
10:25 Q So if someone were to deposit a million dollars, one of the investors or lenders, that money would -- the check or wire transfer would go into EPD's general checking account?
10:25 A Yes, it would.
10:25 Q And were there segregated accounts within EPD's bank accounts for each investor or lender?
10:25 A No different than any bank. You make your deposit and it goes into one fund. The purpose for the people putting the money in is for EPD's use. And it's just a loan. It's no different than getting a second mortgage and putting the money into your

account.
10:26 Q So all the investor or lender funds all went into one general bank account for EPD and were commingled together; is that right?
10:26 A Yes.
10:26 Q And that's what you're referring to by saying that the money is "fungible," that the dollars were all sort of aggregated together and could be used for anything?
10:26 A That's correct.
10:26 Q When an investor lender was depositing money, do you know if they could request those funds back on demand or 30 days after demand?
10:26 A They are all demand notes, to the best of my recollection.
10:26 Q So they could theoretically demand the money at any point?
10:26 A That's correct.
10:26 Q And if the investors or lenders demanded the money -- and if it's okay with you, I'll just refer to them as "investors."
10:27 A Yes.
10:27 Q And I'm not trying to state one way or the other whether they're investors or lenders, but --
10:27 A I'll accept that.

(Chapter 7 Trustee's Exhibit 2 was marked for identification by the Deposition Officer and is attached hereto.)

10:31 Q BY MR. WEBER: Mr. Pressman, do you recognize these documents?

10:31 A Yes. Well, I recognize what they are; I don't necessarily recognize the specific documents.

10:31 Q Was EPD formed as a limited liability company on or about June 27th, 2003?

10:31 A Yes.

10:31 Q And was John Kirkland the agent for service of process upon its formation?

10:31 A Yes, his firm, Greenberg Traurig.

10:31 Q If you look on the page I was just looking at, and for the record, it's the Limited Liability Company Articles of Organization for EPD. The second page, starting with the second page, are Statements of Information that appear to have been filed with the California Secretary of State. The first one on May 24th, 2004, references Keith Pressman as the president. Is that right?

10:32 A Yes.

10:32 Q He was the president of EPD at that point?

10:32 A That's what it says.

10:32 Q Is it correct?

10:33 Q And who had check signing authority on behalf of EPD?
10:33 A I don't recall.
10:34 Q Would it have been anyone other than you and maybe Keith Pressman?
10:34 A It might have been.
10:34 Q Can you think of anyone else?
10:34 A Well, it could have been -- well, again, this was years and years. It could have been anybody working in the office; I don't recall.
10:34 Q But no one could write a check without your approval?
10:34 A Well, you know, there is basically an accounting procedure. Somebody has to initial the bill or whatever. But the pragmatic bills for utilities and rent and things like certainly wouldn't require my approval; it would just be a bookkeeping function of the bookkeeping department.
10:34 Q I'd like to introduce Exhibit 3.
(Chapter 7 Trustee's Exhibit 3 was marked for identification by the Deposition Officer and is attached hereto.)
10:35 Q BY MR. WEBER: Mr. Pressman, is this the Operating Agreement for EPD?
10:35 A Yes, it is.

10:35 Q And if you look on the second to last page, is that your signature where it says "Manager"?
10:35 A Yes, it is.
10:35 Q And is that your signature below where it says "Member"?
10:35 A Yes, it is.
10:35 Q And whose signature is it below yours where it also says "Member"?
10:35 A Keith Pressman.
10:35 Q On the first page of this document, on Number 4, it states that John Kirkland is the registered agent for EPD; is that right?
10:35 A Yes.
10:35 Q And this Operating Agreement was entered into on June 27, 2003?
10:35 A Yes.
10:36 Q Was Mr. Kirkland your attorney at that point?
10:36 A His firm was.
10:36 Q Was he the attorney for both you and EPD?
10:36 A I didn't have a personal attorney.
10:36 Q So he was just EPD's attorney?
10:36 A Again, his firm was. He was in so many firms, I don't recall which firm that might have been. It was Greenberg Traurig, they were the attorneys of

record, and he worked for them. I dealt with several attorneys at the firm.
10:36 Q When did Mr. Kirkland -- strike that.
10:36 Did Mr. Kirkland, his firms, also represent other entities you're affiliated with?
10:36 A His firms have, yes.
10:36 Q And which entities?
10:36 A I can't guarantee I'm going to remember them all, but certainly the Plush Lounge in Las Vegas, the Key Club or S.C. Club, L.P., Stretto. You're talking about pre- and post-2003; right?
10:37 Q 2003 or after.
10:37 A Then it wasn't Stretto, it was before. I'm not sure if there were other ones after 2003; it's a possibility. EPD in the bankruptcy.
10:37 Q And by "Plush," are you referring to Plush Lounge Las Vegas, LLC?
10:37 A Yes.
10:37 Q I'll just refer to it as "Plush," if that's okay.
10:37 A Certainly.
10:37 Q And he represented S.C. Club, L.P.?
10:37 A Yes.
10:37 Q And that's also known as the Key Club?
10:37 A Yes.

10:37 Q How about S.C. Club, Inc.?
10:37 A That was the general partner. So it's possible.
10:37 Q And how about Broadway Entertainment Marketing, Inc.?
10:38 MR. LANDAU: Objection on the line of questioning on the use of the pronoun "he."
10:38 I think the testimony was that Greenberg Traurig represented these entities.
10:38 MR. WEBER: I asked John Kirkland at various firms that he was affiliated with.
10:38 MR. LANDAU: If that's clear to the witness, it's good by me.
10:38 THE DEPONENT: If there was any litigation with Broadway, his firm would have represented us, but I don't recall specifically if there was any.
10:38 Q BY MR. WEBER: Do you know when Mr. Kirkland started representing Plush?
10:38 MR. LANDAU: Again, is this him or the firm?
10:38 MR. WEBER: It's the same. It's Mr. Kirkland at whatever firm he was affiliated with at that point.
10:39 THE DEPONENT: I have a feeling that it was after 2005 or '06, because Plush was represented

by a Las Vegas firm during its inception throughout its operation. It was only related to the litigation that he became involved. So whenever that litigation took place, it was 2005 or '06 is when his firm became involved.

10:39 Q BY MR. WEBER: And how about S.C. Club?

10:39 A What about it?

10:39 Q When did Mr. Kirkland, at his various firms, start representing S.C. Club, L.P.?

10:39 A I would say -- again, you want everything after 2003; right?

10:39 Q Correct.

10:39 A Again, the Key Club was operating in the '90s. So there were slip-and-falls and, you know, various frivolous litigations that his firms handled, but I can't remember which side of 2003.

10:39 Q Mr. Kirkland was representing S.C. Club, L.P. probably before and after 2003?

10:40 A You keep on saying "Mr. Kirkland." It's Mr. Kirkland's firm. I dealt with various people in Mr. Kirkland's firm. He was the guy I looked to. But most of the things we dealt with had specialty requirements, and he would refer us to the specialist at those firms.

10:40 Q But he had the relationship with you when

you were dealing with those firms?
10:40 A Absolutely.
10:40 Q Did Mr. Kirkland or his firms represent S.C. Club both before and after 2003?
10:40 A Yes.
10:40 Q And how about Broadway Entertainment Marketing, Inc.?
10:40 A If there was litigation, they would have.
10:40 Q Do you recall what year?
10:40 A No, I don't.
10:40 Q Now, at some point in 2009, was there a cash flow issue that EPD started to encounter?
10:41 A There certainly was. It's called the economic crisis of America.
10:41 Q And do you recall approximately when that was?
10:41 A I believe my credit line, or the credit line I was always dependent on, in 2008 was cancelled by the bank, along with all of their customers that had real estate securing those loans. And as the effect of the economic crisis, all of the customers of -- the major customers of Broadway Entertainment, which were the movie studios, ran out of money and couldn't pay their bills.
10:41 So I would say that we ran into some

serious cash flows. Once the credit line was gone, I had no source -- I couldn't sell property any longer because we required those funds to post the bonds to sell the properties.

10:41 Q Do you recall when in 2008 or 2009 EPD didn't have money to -- strike that.

10:42 Do you recall when in 2008 or 2009 EPD started encountering severe cash flow issues?

10:42 A It's interesting. I should remember that because it was over 50 years that we never did. And so the first time in 50 years, I should have that date pressed into my brain. But, no, I can't give you a specific date, it was just sometime in 2009. And I explained to you the reasons for it, our cash flow disappeared.

10:42 Q Do you recall if it was around the summer of 2009?

10:42 A I don't recall.

10:42 Q And at that point, did EPD stop making regular payments to investors?

10:42 A Yes, it did.

10:42 Q And did EPD make continuing interest payments to creditors?

10:42 A I don't know if it was all through 2009, but it might have partially done so. But at some

point in time, it ceased doing so.
10:43 Q So if someone -- after the cash flow crunch happened sometime in 2009, if an investor was to request or demand some or all of their funds back, was EPD able to repay those funds?
10:43 A EPD was on the crest of receiving a $4 million -- I was on the crest of receiving a $4 million loan against the North Hills property. And I had the paperwork in place by the end of 2009, both the approval of the lender and the tentative approval of Wells Fargo, who was the second mortgager, who had to approve that loan.
10:43 And so all the way from 2009 until the last letter that I received from Wells Fargo approving the loan, which was August of 2010, giving us 90 days to finish the legal transactions, I was expecting an input of $4 million, which would have easily allowed me to continue paying those loans and the funds available to put up the bonds so I could begin to sell the properties and become whole.
10:44 Q But when an investor requested their funds in 2009, after the credit crunch happened, if they requested their funds, was EPD able to repay them at that point?
10:44 A Not at the time they requested it. But I

did tell them if they could just hang on. And I showed them the documents from the bank, that it would just hopefully be a short period of time and I would have the funds to pay them.

10:44 Q Did EPD start receiving a heavy volume of calls and e-mails from investors during 2009 as to the status of their funds?

10:44 A Yes.

10:44 Q On a daily basis?

10:44 A Probably.

10:44 Q Do you recall how many calls came in a day from investors at that point?

10:45 A No.

10:45 Q And someone at EPD communicated with the investors that EPD just didn't have the funds on hand at that point, but that a credit line was being worked on?

10:45 MR. LANDAU: Objection; leading.

10:45 THE DEPONENT: As I said, even to the extent of sending them confirmation of the loan agreements, showing that they were truly approved and in place.

10:45 Q BY MR. WEBER: Now, at some point in 2009, did any creditors or investors start threatening suits against EPD or you?

10:45 A Yes.
10:45 Q Do you recall how many?
10:45 A No, not the exact number, but certainly more than 20.
10:45 Q And did any of those investors also threaten an involuntary bankruptcy case against EPD?
10:46 A Yes.
10:46 Q And are you familiar with an entity called HMB Holdings, LLC?
10:46 A Yes.
10:46 Q What's HMB?
10:46 A I don't remember what it stood for. It was a group of investors that had gotten together and agreed to defer legal action if I would give them a security interest in EPD to the extent of -- I can't recall exactly, but I think about 15- to $16 million, that group.
10:46 Q And did they also, in addition to -- strike that.
10:46 So they threatened legal action against EPD or you?
10:46 A Yes.
10:46 Q Did that group of people, HMB, also threaten an involuntary bankruptcy case against EPD?
10:46 A Yes, some of them did.

aside, I just read this previous exhibit, it says, "The undersigned have executed this Certificate of Formation."

10:53 So he's the authorized person to execute it, not necessarily the authorized person of the company. But again, I can't comment on it.

10:53 Q BY MR. WEBER: Have you seen Exhibit 6 before?

10:53 A I don't know; I may have.

10:53 Q And for the record, it's a document from the Delaware Secretary of State in regard to the formation of HMB.

10:53 Mr. Pressman, is it your understanding that HMB was formed on or about September 14, 2009?

10:54 A I don't recall.

10:54 Q Sometime in 2009?

10:54 A Yes.

10:54 Q Do you recall when HMB, or the group of people that made up HMB, threatened legal action against EPD or you?

10:54 A Well, certainly within the six months previous from the point that payments stopped being made. I can't tell you when that date was, but it was between three and six months prior to the forming of HMB or my agreement to do so.

10:54 Q Was that the same time that they threatened an involuntary bankruptcy case?
10:54 A Yes.
10:54 Q I'd like to introduce Exhibit 7.
(Chapter 7 Trustee's Exhibit 7 was marked for identification by the Deposition Officer and is attached hereto.)
10:54 MR. WEBER: For the record, this is a document entitled "Security Interest Agreement."
10:55 Q Mr. Pressman, have you seen this document before?
10:55 A I'm sure I have, but I don't recall it specifically.
10:55 Q On the last page, is that your signature where it says, "Debtor: EPD Investment Co., LLC"?
10:55 A Yes.
10:55 Q And below it there is a signature block for Law Offices of Keith E. Pressman.
10:55 Do you see that?
10:55 A Yes.
10:55 Q And is that Keith Pressman's signature?
10:55 A Yes.
10:55 Q And is that Mr. Ferro's signature on behalf of HMB?
10:55 A I don't know.

of the banks were charging 12 and 15 percent. Because this was land development and that commands a very high interest rate. But that's what EPD and I and all of our companies were literally paying nationally syndicated banks.

11:04 Q So Mr. Kirkland wanted to start earning 12 percent interest?

11:04 A Well, he had some excess cash, and that's what he said he wanted, yes.

11:04 Q Now, prior to investing funds in EPD, did Mr. Kirkland have any knowledge as to your financial status or EPD's financial status?

11:04 MR. LANDAU: Objection; calls for speculation.

11:04 THE DEPONENT: Not before or after; ever.

11:04 Q BY MR. WEBER: He never had any information in regard to your or EPD's financial status?

11:04 A No, he didn't.

11:04 Q Did Mr. Kirkland ever represent you in dealings with the California Franchise Tax Board?

11:04 A His firm did.

11:04 Q And did Mr. Kirkland have any involvement in that?

11:05 A Only signing the letters. They had two

tax experts in their firm that I dealt with all the time.

11:05 Q And what information did the letters Mr. Kirkland signed provide?

11:05 A Just the comments of what I and the two female individuals in his firm developed to fight the FTB on the taxes that they were attempting to go against, not EPD but against Stretto.

11:05 Q I'd like to introduce Exhibit 10.

(Chapter 7 Trustee's Exhibit 10 was marked for identification by the Deposition Officer and is attached hereto.)

11:05 MR. WEBER: For the record, this is a Declaration by the custodian of records for Greenberg Traurig LLP attaching various documents.

11:05 Q Mr. Pressman, I'm going to ask you to turn to the page that's Bates stamped in the lower right-hand corner 082995.

11:06 A Okay.

11:06 Q And that should be a letter dated October 4th, 2004.

11:06 A Right.

11:06 MR. WEBER: Lew, do you have that?

11:06 MR. LANDAU: I'm working my way to it.

11:06 Q BY MR. WEBER: And if you look at this

page and the following page, 082996, this appears to be an unsigned letter from Mr. Kirkland to the California Franchise Tax Board dated October 4th, 2004; is that right?

11:06 A That's correct.

11:06 Q In 2004, were you 69 years old?

11:06 A Probably.

11:06 Q How old are you today?

11:06 A I'm going to be 82 in a couple months.

11:06 Q If you look at the bottom of that first page, it says, "Please note that Mr. Pressman is 69 years old and his only current income is from Social Security. He has incurred more than $10 million in business losses in the last five years, and has received no personal income from his business at that time. His total debt exceeds $48 million. All of his real property is mortgaged and virtually all of his other assets are subject to security interests substantially in excess of their ready market value."

11:07 Do you see that?

11:07 A Yes, I do.

11:07 Q Did you provide Mr. Kirkland, or other people at his firm, with that information?

11:07 A I supplied the other people,

Carol Perrin and Grace Chung.
11:07 Q At Mr. Kirkland's firm?
11:07 A Yes.
11:07 Q And then Mr. Kirkland was to be the signatory on this letter?
11:08 A Well, obviously out of courtesy, I guess, since he's the lead person or my contact, he signed the letter. But I only dealt with the girls, the women at that firm.
11:08 Q And are those statements accurate?
11:08 A Well, they're accurate, but they're misleading.
11:08 Q How so?
11:08 A Well, when you talk about business losses, we're talking about book losses. We're not talking about real -- we're talking about losses for tax purposes. It is true that I only lived on Social Security and that I had no personal income. And while my debt exceeded $48 million, much of that debt was secured by real property in the ordinary course of business. And all the property is mortgaged, that is correct, or subject to security interest.
11:08 And substantially in excess of their ready market value, that I would defer and that's their terminology. But at the time we were dealing with

11:11 A Yes.
11:11 Q Did you provide Mr. Kirkland, or people at his firm, with that information?
11:11 A Yes.
11:11 Q Is it accurate?
11:11 A Yes.
11:12 Q If you skip down four paragraphs to the paragraph that starts "Wynton Marsalis."
11:12 A Okay.
11:12 Q It says, "Wynton Marsalis has said the best way to make a small fortune as a jazz musician is to start with a large fortune. Mr. Pressman's experience has, unfortunately, applied an extreme version of that maxim to real estate investing. During his ownership of JSP Properties, Westover Hills and North Hills, he has lost millions, gone substantially deeper into debt, and never received a penny in salary or distribution."
11:12 Do you see that?
11:12 A Yes.
11:12 Q And did you provide Mr. Kirkland or someone at his firm with that information?
11:12 A I did.
11:12 Q And is it accurate?
11:12 A No. Well, it's accurate, but, again, with


BARKLEY Court Reporters

mitigating circumstances.

11:13 As an example, North Hills never did make a distribution to me; however, as a result of its K-1 earnings, I had K-1 earnings of $648,000, which again, is in that package that I brought today; not cash, just my K-1 portion. And another year, $450,000 of K-1 earnings which I never got to keep.

11:13 So I never got distributions, but that didn't mean the companies didn't make the money. I didn't, but that doesn't mean that they didn't.

11:13 Q The next paragraph says, "Since he has no source of current income and no ability to borrow more, Mr. Pressman has effectively been living off his credit cards. He charges the business expenses of companies managed by his son to his American Express card and obtains cash reimbursement from companies essentially using his credit card as a line of credit."

11:13 Do you see that?

11:14 A Yes.

11:14 Q And did you provide that information to Mr. Kirkland or someone at his firm?

11:14 A I did.

11:14 Q Is it accurate?

11:14 A Yes. And they reimbursed me for what I

spent and what I charged on the card. And I lived off the credit cards and my Social Security.

11:14 Q If you skip to page 6 of this document, which is TP-R 083013, the last page of this particular letter.

11:14 A Got it.

11:14 Q The second paragraph says, "To the contrary, Mr. Pressman has borrowed substantially and is heavily in debt. The enclosed sampling of promissory notes give an indication of the depth of his financial distress. His borrowings over the years through EPD Investment Co." and then "(originally operated by Mr. Pressman as a sole proprietorship for thirty years, and now operated as an LLC managed and controlled by his son, attorney Keith Pressman, on behalf of the investors) are now tens of millions of dollars, which are personally guaranteed by Mr. Pressman, and secured by a lien on his home and a blanket UCC-1 on all his assets. As shown from the enclosed documentation, all the funds are owed to third parties, many of a fiduciary nature such as banks and IRA accounts. These creditors preclude Mr. Pressman from choosing to apply their funds towards his personal taxes. He simply does not have the actual or legal ability to do so."

11:15 Do you see that?
11:15 A Yes.
11:15 Q Did you provide that information to Mr. Kirkland or someone at his firm?
11:15 A Yes, I did.
11:15 Q And is it accurate?
11:15 A Yes.
11:16 Q And Mr. Kirkland is on the final version of this letter?
11:16 A Yes.
11:16 Q If you look at the next letter, which starts on T-PR 083015 and goes through 083017. This appears to be a letter dated December 23rd, 2005, from Mr. Kirkland to the Franchise Tax Board.
11:16 Do you see that?
11:16 A Yes.
11:16 Q If you look at the second page in that document, 083016, in the second paragraph, starting at the second sentence, it says, "Mr. Pressman has provided extensive data showing that his living expenses have been paid for for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of

$3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of $3.8 million, all of which were connected to poor investments from the past. His income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his Social Security payment of $1,400 per month. The Offer for $250,000 was in line with his Social Security payment, assuming he lived to be over 85 years old."

11:17 Did you see that?

11:17 A Yes.

11:17 Q And did you provide that information to Mr. Kirkland or someone at his firm?

11:17 A Yes, to Diana Perrin.

11:17 Q And is it accurate?

11:17 A It is accurate, but again with mitigating circumstances. Those losses are paper losses on my tax return. Those are tax losses, not actual losses. These are K-1s that were generated by some of the outside companies due to depreciation.

11:18 Q And if you go down two paragraphs, it says, "Indeed, if the FTB were to file a lien against Mr. Pressman, he may be forced to file for bankruptcy. Mr. Pressman currently finds himself with over $48 million of debt, all of which is being managed

through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would be erased, which will place him in default with his secured creditors. Any lien filed by the FTB now would put the FTB behind roughly $48 million in secured debt, including multiple mortgages on all of his real estate, and multiple blanket security interests in all his other assets, which would mean the FTB would collect nothing. Mr. Pressman's assets come to no where near the amount of the multiple liens upon them, as his Offer in Compromise showed."

11:18 Do you see that?

11:18 A Yes.

11:19 Q Did you provide that information to Mr. Kirkland or someone at his firm?

11:19 A Well, there is a good deal of hyperbole there, but yes.

11:19 Q Is it accurate?

11:19 A Not really. I mean, it's accurate, yes, but with mitigating circumstances.

11:19 Q And what are the mitigating circumstances?

11:19 A Well, I have the debt; I have no requirement to repay it. The debt was being repaid by the other companies. So of the $48 million of debt,







BARKLEY Court Reporters

11:22 Q So this was a letter from Mr. Kirkland to Ms. Perrin?

11:22 MR. LANDAU: Objection; assumes facts not in evidence.

11:22 THE DEPONENT: Yes.

11:22 Q BY MR. WEBER: And did Mr. Kirkland sign the final version of that letter?

11:22 A I have no idea.

11:22 Q If you look at the next document, which starts at T-PR 083023 and goes through 083027, it appears to be an undated letter from Mr. Kirkland to the California Franchise Tax Board.

11:22 Do you see that?

11:22 A Yes.

11:22 Q If you look on the second page, there is a section that says "EPD Investment Co., LLC."

11:23 Do you see that?

11:23 MR. LANDAU: I need a page reference, please.

11:23 MR. WEBER: T-PR 083024.

11:23 MR. LANDAU: Got it.

11:23 MR. WEBER: That section says, "EPD has total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally

guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets."

11:23 Q Do you see that?

11:23 A Yes.

11:23 Q Is that information that you provided to Mr. Kirkland or someone at his firm?

11:23 A I don't know.

11:24 Q Is it accurate?

11:24 A I don't know.

11:24 Q Do you know where else they would have gotten that information?

11:24 A No. I just don't recall the numbers.

11:24 Q You don't know if it's accurate?

11:24 A No. I'm trying to look at it myself, and I can't figure it out at the moment.

11:24 Q But your personal repayment obligations were secured by a UCC-1?

11:24 A That's correct.

11:24 Q In favor of EPD?

11:24 A Yes.

11:24 Q And the next paragraph says, "EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004,

most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow."

11:25 Do you see that?

11:25 A Yes.

11:25 Q Did you provide that information to Mr. Kirkland or someone at his firm?

11:25 A Yes.

11:25 Q And is it accurate?

11:25 A Yes, it is, on its face.

11:25 Q If you look at the next paragraph that starts on that page and continues on to the next page, it says, "Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise. In order to stave off default, Mr. Pressman refinanced his home twice during 2004, and deposited the full proceeds from the financing into EPD, to fund some of the interest and principal demands of the existing note holders which he has

personally guaranteed."
Do you see that?
A Yes.
Q Did you provide that information to Mr. Kirkland or someone at his firm?
A Yes.
Q And is it accurate?
A Again, it is accurate, but it is a requirement on an accrual basis, not on a cash basis. So while it's possible the 3 million a year would have been paid in interest and 1.5 in principal, which would have been accrued during that period of time, that doesn't necessarily mean, and it didn't mean, that they took that amount of money. In fact, in 2004 -- well, I actually have the number in that stuff that I gave you in 2004 what the actual number was, but it was considerably less. Like the combined numbers were close to a 1.3 or 1.4 million.
Q Forgetting about the specific numbers for a minute -- we'll come back to the specific numbers -- did EPD require new investments or loans each year to meet its current obligations?
A No. As I indicated to you, it was getting $10 million a year in cash flow, which was not income. It was getting $4.1 million a year average over the

out. So it probably usually only paid out less than half of that.

11:28 Q So those funds could come from repayments from like S.C. Club or Broadway or they could come from new investments or loans?

11:29 A Yeah, but it also came from sales of assets, it also came from actual income. As I indicated, it averaged $3 million a year alone on income, that it reported on its tax return as income for EPD. So between just the income and the outside investors, that's almost $7 1/2 million of cash flow.

11:29 Q When an investor put money into EPD, I know you said that the funds became fungible at that time; is that right?

11:29 A Yes.

11:29 Q So if another investor asked for money, either as interest or principal repayment the next day, the funds that the other investor had just put into EPD the prior day could have been used to pay the other investor; is that right?

11:29 MR. LANDAU: Objection; incomplete hypothetical.

11:29 THE DEPONENT: Well, what you're saying is, if we had a million dollars in the bank account and someone requested $10 and someone requested $10,

that they would get the $10 from the guy that puts the $10 in or would they get it from the 1 million that was already in the bank account. The bank account was there. So obviously, there was never a point in time, until the total crisis of 2009, where there wasn't more than enough cash flow to handle every single payment without one investor. Never did we require one investor's dollar to make payments to people.

11:30 Q BY MR. WEBER: The money that was used to repay investors wasn't any type of segregated funds, it was just funds in the general EPD bank account or a loan; is that right?

11:30 A You have to think of it like a bank. People put money into one account, and when people take their money out, it comes from one account.

11:30 Q So it was someone's funds that was used to repay them. It may have been their funds, it may have been someone else's funds, but it was just funds in that bank account?

11:31 MR. LANDAU: Objection; vague and ambiguous.

11:31 THE DEPONENT: Correct, it was just funds in that bank account.

11:31 Q BY MR. WEBER: Which was everyone's collective funds?



BARKLEY Reporters

11:31 A That's true.

11:31 MR. LANDAU: Objection. That's not a question.

11:31 THE DEPONENT: But we also paid bills on behalf of those investors with those same funds. So it didn't come out of their specific funds, it came out of the general account.

11:31 Q BY MR. WEBER: So EPD would pay, for instance, credit card payments for investors; is that right?

11:31 A That's correct.

11:32 Q And how about mortgage payments?

11:32 A Mortgage payments, utility bills, doctor bills. They would buy houses for them with their money, where they would put a million dollars in because they were going to be gone and they needed someone to put the money into escrow on their behalf.

11:32 Q Continuing on the same page of the document we were just on, two paragraphs down -- and this, again, is on 083025.

11:32 A Okay.

11:32 Q It says in the third paragraph on that page, "Mr. Pressman cannot misappropriate EPD funds to pay off a personal obligation. The equity interest in EPD is obviously unsaleable due to its massive debt

load and negative net worth. The $36 million in security debt -- which encumbers all of Mr. Pressman's other assets -- effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation."

11:33 Do you see that?

11:33 A Yes.

11:33 Q And did you provide that information to Mr. Kirkland or someone at his firm?

11:33 A Yes.

11:33 Q And is it accurate?

11:33 A It is. But again, with everything else, I was personally putting money into EPD on a daily and monthly basis. My average over the previous five years, I was putting in $1,430,000. So any money that I took out was from the same funds that I put in like any other investor.

11:33 Q The next section on JSP Properties, Inc., was that in relation to land in Tennessee?

11:33 A Yes.

11:33 Q The second sentence says, "The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land."

11:33 Do you see that?

11:34 A That's correct.

11:34 Q And did you provide that information to Mr. Kirkland or someone at his firm?
11:34 A I did.
11:34 Q Is it accurate?
11:34 A From a cost standpoint, yes.
11:34 Q What do you mean, "from a cost standpoint?"
11:34 A Well, the undeveloped land is worth what was paid for it, which may be a million dollars. In the meantime, we were able to borrow $9 million against it, so obviously, it had a higher value than $1 million.
11:34 But that's true, on undeveloped land and at cost, that's absolutely true. But during that period of time, the lots on that property were being sold at the current market value and this doesn't discuss that.
11:34 Q Do you know, do you still have an ownership interest in JSP Properties, Inc.?
11:35 A No, I don't.
11:35 Q Do you know what the ownership interest was eventually sold for?
11:35 A I don't even know that it was sold.
11:35 Q Do you know who owns that land now?
11:35 A No.

sheet or financial statement, and one of the things that the FTB complained about, pointing that out.

11:36 Q Below that, Broadway Entertainment Marketing, Inc. The last sentence in that section says, "It has virtually no other assets other than unsaleable book value good will, is subject to approximately $1.1 million in liabilities, and has an approximate $450,000 negative net worth."

11:37 Do you see that?

11:37 A I do.

11:37 Q And did you provide that information to Mr. Kirkland or someone at his firm?

11:37 A I did.

11:37 Q Is it accurate?

11:37 A No. Well, it's accurate at the time, but I've since today furnished you information from an outside auditor that indicated that by 2006, that company, combining with Key Club, had earned revenues of $10 million and made a profit of over $5 million a year; $10 million a year and 5 million a year. It shows that in the first -- it was a four-year study, that in the first year it lost $1.1 million and then it went up to, as I say, $10 million in revenue and $5 million in profit by the end of 2006.

11:37 So while this is accurate, it had a

even if they had a positive value (which they do not).

11:43 "Finally, as noted above, all of Mr. Pressman's assets -- including his equity interests in all of the above entities, and all of the proceeds thereof -- are subject to over $36 million in secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not)."

11:43 Do you see that?

11:43 A Yes.

11:43 Q Did you provide that information to Mr. Kirkland or someone at his firm?

11:43 A Yes.

11:43 Q And is it accurate?

11:44 A Yes.

11:44 Q Did Mr. Kirkland sign the final version of that letter?

11:44 A I don't know.

11:44 Q Did you ever see a final version of that letter?

11:44 A Did I what?

11:44 Q Ever see a final version of that letter.

11:44 A I don't know; I may have.

11:44 Q So Mr. Kirkland, in signing these letters or having them for his signature, did have information

regarding your financial status; correct?

11:44 A Not particularly.

11:44 MR. LANDAU: Objection.

11:44 THE DEPONENT: I don't know whether he read the information or not, he just signed it. Obviously, I never dealt with him at his firm on these issues. So he could have looked at it. I doubt if he did, but he could have. But I have no information whether he did or not.

11:45 Q BY MR. WEBER: Why do you doubt he looked at letters that he signed?

11:45 A Because this was not his expertise, this was tax issues. This had nothing to do with the thing that I normally hire Mr. Kirkland to do as an attorney. These were the tax experts for his company. So he wasn't even in the meetings when I attended them.

11:45 Q But the letters were set up for his signature?

11:45 A By them, not by me. So I can't speak to what he did or what he looked at or what he saw.

11:45 Q And he was the person that you interacted with at the firm primarily?

11:45 A Not on the taxes; and frankly, not on many of the things.

11:45 Q But he had the relationship with you?
11:45 A That's exactly right.
11:46 Q Did EPD hire a person at some point named Katy Werner?
11:46 A Yes.
11:46 Q Who is Katy Werner?
11:46 A She was just a secretary.
11:46 Q And who introduced you to Ms. Werner?
11:46 A She came in either by -- either John Kirkland personally called me and told me about her or she told me that John Kirkland recommended her; I don't remember.
11:46 Q So Mr. Kirkland recommended Katy Werner?
11:46 A Well, yeah.
11:46 Q She was hired as a secretary?
11:46 A Yes.
11:46 Q Anything else?
11:46 A She just had a cubicle and answered the phone and typed. She was a great typist. And I, as you're aware, have no computer skills, so I dictated everything, and she typed off of a dictating machine like back in the 1970s.
11:47 Q Did Ms. Werner ever prepare any legal pleadings for EPD?
11:47 A I don't know; I don't think so.

11:47 Q When you hired Ms. Werner, were you aware that at one point she was a practicing attorney in California?
11:47 A A practicing attorney?
11:47 Q Correct.
11:47 A At one time, yes.
11:47 Q You were aware of that when you hired her?
11:47 A Yes.
11:47 Q And were you also aware that she had been suspended or disbarred?
11:47 A Yes.
11:47 Q And were you aware of that when you hired her?
11:47 A I'm pretty sure I was, or I would have known it very soon thereafter.
11:48 Q Were you aware that Ms. Werner had a felony conviction against her?
11:48 A I did find that out, but I don't remember when, whether it was before or after. I knew that she had been in jail. But to the extent of it, I wasn't aware of the details.
11:48 Q When you found out that she had a felony conviction, did you inquire as to what the conviction was for?
11:48 A I asked her.

(Chapter 7 Trustee's Exhibit 15 was marked for identification by the Deposition Officer and is attached hereto.)

12:03 Q BY MR. WEBER: This is an e-mail dated June 22nd, 2010. It appears to be from Mr. Kirkland to you and Keith Pressman also regarding the Ruben Moreno Declaration; is that right?

12:03 A Yes.

12:03 Q Is this an e-mail you received?

12:03 A I don't remember it. But my name is on there, so I probably did.

12:03 Q Was Mr. Kirkland involved in the drafting of the Ruben Moreno Declaration?

12:03 A Well, it looks like it went back and forth. I don't know who did it. Perhaps he just got tired of the back-and-forth and ultimately did it himself. His name is on the top of this, so the answer is yes.

12:04 Q I'd like to introduce Exhibit 16.

(Chapter 7 Trustee's Exhibit 16 was marked for identification by the Deposition Officer and is attached hereto.)

12:04 Q BY MR. WEBER: Mr. Pressman, have you seen the filed version of this Declaration before?

12:04 A No, I haven't.

12:10 Q Did EPD at some point sue Plush Lounge or Plush?
12:10 A They did, but I don't remember all the details of it, but, yeah, I think they did.
12:10 Q Do you know why?
12:10 A To protect its interest.
12:10 Q Protect whose interest, EPD's?
12:10 A Yes. Well, since we were both parties, basically, we were just trying to protect it from outside creditors, if there were any.
12:10 Q So at the time the suit was filed, were EPD and Plush both controlled by you?
12:10 A Yes.
12:10 Q But EPD sued Plush?
12:10 A Yes. Plush owed EPD over $2 million. EPD had loaned Plush over $2 million.
12:10 Q And did you select counsel for EPD and Plush for that lawsuit?
12:10 A Yes.
12:10 Q And do you remember who you selected?
12:11 A Mr. Kirkland's firm.
12:11 Q Do you know if he ultimately represented EPD or Plush in that matter?
12:11 A Yes, he did.
12:11 Q Do you know who he represented?

12:12 A I don't recall.
12:12 But you have to recall there was this big lawsuit going on from Plush to this Hotspur that was the landlord of the Marriott Hotel. And that -- if that lawsuit had prevailed, there may have been many millions of dollars available to pay back EPD. So it wasn't just some frivolous little thing we were doing, it had a main purpose, to protect that $2 million.
12:12 Q Was the purpose of the lawsuit to obtain a judgment and a lien in favor of EPD against Plush's assets?
12:13 A That's correct.
12:13 Q And was the idea to file the lien in that pending Plush vs. Hotspur litigation?
12:13 A Probably, yeah.
12:13 Q Or related litigation?
12:13 A Something like that, yeah.
12:13 Q I'd like to introduce Exhibit 18.
(Chapter 7 Trustee's Exhibit 18 was marked for identification by the Deposition Officer and is attached hereto.)
12:13 Q BY MR. WEBER: Do you recognize this Complaint?
12:13 A Yes.
12:13 Q And do you know if this is the Complaint

that EPD ended up filing against Plush?
12:13 A I assume so.
12:13 Q Do you know someone named Sherry Anne Lear?
12:13 A Yes.
12:14 Q And she was the attorney for EPD?
12:14 A Yes.
12:14 Q Do you know who recommended her?
12:14 A Well, I had used her before. I had used her in family -- there was an adoption in my family so I've used her before. So I don't remember who originally recommended her, but I've used her in the past.
12:14 Q If you look at Exhibit A to this Complaint, it's a Multiple Advance Promissory Note from Plush to EPD.
12:14 Do you see that?
12:14 A Yes.
12:14 Q And it's dated April 15, 2003.
12:14 Do you see that?
12:14 A Yes.
12:14 Q And on the last page of that document, there is a signature on behalf of Plush.
12:14 Do you see that?
12:14 A Yes.

12:15 Q And do you recognize that signature?
12:15 A Yes.
12:15 Q And whose signature is that?
12:15 A Keith's, Keith Pressman.
12:15 Q And below there is a signature on behalf of EPD. Do you recognize that?
12:15 A Yes.
12:15 Q And whose signature is that?
12:15 A Ruben Moreno.
12:15 Q Ruben Moreno worked for you?
12:15 A Worked for EPD. I assume he did at that time, yes.
12:15 Q And Keith Pressman is your son; correct?
12:15 A Yes.
12:15 Q Now, it says that EPD -- Ruben Moreno signed this on behalf of EPD on April 15th, 2003.
12:15 Do you see that on the signature page?
12:15 A Yes.
12:15 Q Had EPD been formed as a limited liability company at that point?
12:16 A If I'm not mistaken, EPD wasn't formed until June of that year. I may be wrong.
12:16 Q And if you look back --
12:16 A I've had to say it a number of times; I remember that date.

12:26 So after they would put the money in, they would, "Direct my funds to buy this equipment for a lease." And once it left EPD, it was their judgment, it had nothing to do with EPD, any more than buying a house for an investor with their money.
12:26 Q Do you know who came up with these affirmative defenses?
12:26 A Of course not.
12:26 Q Was it you?
12:26 A No.
12:26 Q Was it an attorney?
12:26 A I have no idea. I'm sure it was an attorney; it sure wasn't me.
12:26 Q But it wasn't you?
12:26 A No, it wasn't me.
12:26 Q I'd like to introduce Exhibit 23.
(Chapter 7 Trustee's Exhibit 23 was marked for identification by the Deposition Officer and is attached hereto.)
12:26 MR. WEBER: This is another General Denial in the Dittmar case that is on Matt Gruenberg's pleading caption.
12:27 Q Do you see that?
12:27 A Yes.
12:27 Q And did Matt Gruenberg represent you or

EPD in some of these cases?
12:27 A I guess he did.
12:27 Q If you look, the affirmative defenses listed appear to be identical to the last ones we looked at for the Hansel case; is that right?
12:27 A Yes.
12:27 Q Did you come up with these affirmative defenses?
12:27 A No.
12:27 Q Was it an attorney?
12:27 A I'm sure it was.
12:27 Q Do you know, was Matt Gruenberg working with Mr. Kirkland on these cases?
12:27 A He was an independent attorney.
12:27 Q Do you know who introduced you to Mr. Gruenberg?
12:28 A Actually, Mr. Kirkland's secretary.
12:28 Q I'd like to introduce Exhibit 24.
(Chapter 7 Trustee's Exhibit 24 was marked for identification by the Deposition Officer and is attached hereto.)
12:28 MR. WEBER: This is another General Denial in the Jenny Lee Bridal vs. EPD case, also set up for Mr. Gruenberg's caption.
12:28 The first two affirmative defenses appear

influence or representation."
12:31 Do you see that?
12:31 A Yes.
12:31 Q Do you know what that means?
12:31 A Well, obviously, in the lawsuit they probably alleged that I influenced and represented them, forgetting about the fact that the money was put in 30 years before by her husband.
12:31 Q This General Denial also includes that same affirmative defense, that the funds were an investment rather than a loan that required repayment.
12:31 Do you see that?
12:31 A Yes.
12:31 Q Is that because Druckman was involved in leases?
12:31 A I can't remember whether they were or whether they weren't; I just don't remember.
12:31 Q Did you come up with these affirmative defenses?
12:31 A Again, I'm not an attorney, no.
12:32 Q I'd like to introduce Exhibit 26.
(Chapter 7 Trustee's Exhibit 26 was marked for identification by the Deposition Officer and is attached hereto.)
12:32 MR. WEBER: The good news is, I think this

12:33 A No.

12:33 Q Now, at the time that these General Denials were filed, was Mr. Kirkland or his family trust an investor in EPD?

12:33 A Well, I don't remember when that -- what date that transferred. I mean, he formed a trust and he just notified to change everything to his trust. I don't know what date that was offhand, so I can't tell you.

12:33 How did you word the question?

12:33 Q As of when these General Denials were filed in 2010, was either Mr. Kirkland or his family trust an investor in EPD?

12:34 A Yes. Prior to 2010, yes.

12:34 Q And do you know if the interest rates being provided to Mr. Kirkland, were they the same as the interest rates being provided to these EPD investors?

12:34 A Well, to the best of my recollection, some of these people were really older, so they may have had a lesser interest rate, you know, reflected 10 years ago or 15 years before.

12:34 Q So if anything, Mr. Kirkland's interest rate would have been higher?

12:34 A Not higher than 12 percent I don't think.

No, I'm sure not higher than 12 percent.
Q If anything, it may be higher than the interest rate provided to these investors?
A Yes.
Q The other investors didn't get an interest rate above 12 percent; right?
A No.
Q Did Mr. Kirkland get 12 percent?
A Yes.
Q On the Hansel Complaint, do you know why Mr. Kirkland would assert that the interest rate is usurious if he was getting the same interest rate?
MR. LANDAU: Objection; argumentative.
THE DEPONENT: I have been admonished in the past on this issue by somebody and I have no idea what I'm saying now if it's factual or how I remember it correctly. But someone said that over $500,000 it's not -- there is no usury rate, but I may be totally wrong on that. Or maybe this was 10 years ago; maybe life has changed since then.
But at one point in time, I know, in my 50-year history, there was a time where if you invested on over a half million dollars or some big number, you weren't affected by usury rates.
But again, that wouldn't be what you're

because I'm the one that would have prepared the documents and have him sign the documents.

12:57 Q If you look at Exhibits 8 and 9, there are signature blocks also for True Position on those two leases. Do you recognize the signatures on those two for True Position?

12:57 A Those are Keith Pressman's.

12:57 Q Now, as to all of those exhibits, those leases, Mr. Sumian declares under penalty of perjury in this Declaration that your son, Keith Pressman, didn't have authority to enter into those on behalf of True Position Technologies.

12:58 MR. LANDAU: Objection. Not a question, it's a statement.

12:58 THE DEPONENT: What's the statement?

12:58 MR. WEBER: Well, you didn't let me finish.

12:58 Q Do you know why Keith Pressman is on those?

12:58 A Because I told him to.

12:58 Q Do you know under what authority he signed them?

12:58 A I believe that he had authority to do so.

12:58 Q And what did you base that on?

12:58 A Based on our relationship with True


BARKLEY Court Reporters

Position. It was our money. You know, everything was ours. They didn't invest one penny in that company.

12:58 Q Anything else?

12:58 MR. LANDAU: Counsel, do you have the rest of the document? This is partial from some other document.

12:58 MR. WEBER: Which document?

12:58 MR. LANDAU: Exhibit 28.

12:59 MR. WEBER: There should be a full copy.

12:59 MR. LANDAU: This is the whole document?

12:59 MR. WEBER: It shouldn't --

12:59 MR. LANDAU: It's not a pleading filed in court?

12:59 MR. WEBER: No, it hasn't been filed. But it has been produced to you.

12:59 MR. LANDAU: I understand. I'm looking for the rest of the document. This is complete, you're saying?

12:59 MR. WEBER: It should go through 060683.

12:59 MR. LANDAU: There is nothing in front of the Declararion, I'm asking.

12:59 MR. WEBER: Correct.

12:59 I'd like to introduce Exhibit 29.

///

///

(Chapter 7 Trustee's Exhibit 29 was marked for identification by the Deposition Officer and is attached hereto.)

12:59 Q BY MR. WEBER: Do you recognize this letter?

01:00 A I don't recognize -- I know what it is, but I had nothing to do with it.

01:00 Q Do you recall if Mr. Kirkland began investing in EPD around November of 2007?

01:00 A That's what this appears to be.

01:00 Q And he got 12 percent interest?

01:00 A Yes.

01:00 Q This says, "We would like to take this opportunity to welcome you as an investor to EPD Investment Company, LLC."

01:00 A Yes.

01:00 Q Was it your understanding that Mr. Kirkland was an investor?

01:00 MR. LANDAU: I'll object to that question as vague and ambiguous.

01:00 You defined the term "investor" at the beginning of the examination. Is this something different now?

01:00 MR. WEBER: I'm asking about the specific language in this document.

01:01 THE DEPONENT: Well, I actually don't believe they were investors as such, but it's irrelevant. I consider them just lenders. But it's just a play on words.

01:01 Q BY MR. WEBER: Was Mr. Kirkland, along with the other people that put money in for things other than leases, all lenders in your view?

01:01 A Yes. This was a stock letter. This was not a personal letter. This was a letter that just came off the computer.

01:01 Q Anyone that put money into EPD, if it wasn't for leases, it would have been as a loan?

01:01 A A loan or a designated deposit for a designated purpose, like buying a house for them.

01:01 Q And Mr. Kirkland wouldn't have been any different in that regard from the other people that put in money for things other than leases; is that right?

01:01 A That's correct.

01:01 Q I'd like to introduce Exhibit Number 30.

(Chapter 7 Trustee's Exhibit 30 was marked for identification by the Deposition Officer and is attached hereto.)

01:02 MR. LANDAU: Counsel, I just want to remind you that you said you were going to break at

1:00.

01:02 MR. WEBER: Okay. Do you want to take a -- let me just ask a couple questions on this document and then we can break, if that's okay.

01:02 Q Mr. Pressman, if you look to the last page of this document, is that your signature where it says "Debtor, Jerrold S. Pressman"?

01:02 A Yes.

01:02 Q Do you recognize the other signatures on that page?

01:02 A Well, I'm not that familiar with Mr. Kirkland's signature, but I assume that's his signature, and it's definitely Keith's signature.

01:02 Q Do you know who prepared this agreement?

01:02 A I'm sure Mr. Kirkland did.

01:03 Q Do you know the purpose of the agreement?

01:03 A Exactly what it says, a Security Interest Agreement.

01:03 Q Did the other people loaning or investing money in EPD get this type of agreement?

01:03 A Not one like this. But yes, from time to time, everybody would come in with their attorneys or their accountants and wanted different types of documentation or a different kind of note or different kind of language, but not like this.

01:03 Q Do you know why Mr. Kirkland got that kind of document and other people that loaned money didn't?
01:03 A I say this facetiously, but he's smarter than most. It's not a bad idea. But to me, I've never seen a security agreement this thick.
01:03 Q Was he also your attorney or EPD's attorney at that time?
01:03 A I don't believe he was, no.
01:03 Q Was he the attorney for entities that you controlled or owned at that time?
01:04 A Yes.
01:04 Q So he had a preexisting relationship with you as an attorney for either you or entities you were affiliated with; is that right?
01:04 A That's right.
01:04 Q Did he demand this document?
01:04 A Yes.
01:04 Q And he drafted it?
01:04 A Yes.
01:04 Q And did he know that other people that loaned money to EPD weren't given this kind of document?
01:04 A I didn't ask.
01:04 Q He just told you this is what he needed?
01:04 A That's what he said.

01:04 Q And you agreed?
01:04 A Absolutely.
01:04 MR. WEBER: Why don't we take a short lunch break.
01:04 THE VIDEOGRAPHER: We're off the record at 1:04.
(Lunch recess held.)
01:41 THE VIDEOGRAPHER: We're back on the record at 1:41.
01:41 MR. WEBER: I'd like to introduce Exhibit 31.
(Chapter 7 Trustee's Exhibit 31 was marked for identification by the Deposition Officer and is attached hereto.)
01:41 MR. WEBER: For the record, it's a document entitled "Security Promissory Note."
01:41 MR. WEBER: Mr. Pressman, have you seen this document before?
01:41 A Yes.
01:41 Q And on the last page, is that your signature on behalf of EPD?
01:41 A Yes.
01:41 Q And is that Keith Pressman's signature?
01:41 A Yes.
01:41 Q This is a Secured Promissory Note dated

November 8, 2007, for $150,000; is that right?
01:41 A That's correct.
01:41 Q Do you know if this was entered into before or after Mr. Kirkland put 150,000 into EPD?
01:41 A I'm sure it was after -- I mean, it was simultaneous. I really don't know.
01:41 Q If you look on page 9, subparagraph g, which defines "interest rate." It says that Mr. Kirkland would receive 12 percent interest per annum; is that right?
01:42 A That's correct.
01:42 Q And that was the same as other people lending money to EPD?
01:42 A Mostly.
01:42 Q And this, again, like the last document, is this a note that most investors or lenders to EPD got?
01:42 A No.
01:42 Q Were there any others that got this kind of a note?
01:42 A Not like this, but some of them definitely did have their attorneys look over and change the language to a different kind of Promissory Note or a different type of document, but not like this.
01:42 Q Did Mr. Kirkland get this document because

he demanded it?
01:42 A Yes.
01:42 Q And he was also an attorney for you or entities that you were affiliated with at that point?
01:42 A That I was related to, yes.
01:42 Q I'd like to introduce Exhibit 32.
(Chapter 7 Trustee's Exhibit 32 was marked for identification by the Deposition Officer and is attached hereto.)
01:43 MR. WEBER: This is a document titled "General Release," dated February 9th, 2009.
01:43 Q Is that your signature?
01:43 A Yes.
01:43 Q And is that Keith Pressman's signature?
01:43 A Yes.
01:43 Q Was John Kirkland an attorney for EPD as of February 9th, 2009?
01:43 A I don't think so.
01:43 Q Why was EPD giving Mr. Kirkland a General Release?
01:43 A Because he asked for it, and he was investing money. People who invest money have a right to ask for what they want. If you've ever mortgaged a house, you'd understand.
01:43 Q In the first paragraph, among the other

since then. Or I think she might have been at a party or event that I was at, but never a business.

01:47 Q I'd like to introduce Exhibit 35.

(Chapter 7 Trustee's Exhibit 35 was marked for identification by the Deposition Officer and is attached hereto.)

01:47 MR. WEBER: This is a document that I think the Kirklands produced that I don't believe was in the books and records turned over. It's a document entitled "Continuing Guaranty," dated November 8, 2007.

01:48 Q Have you seen this document before?

01:48 A Yes.

01:48 Q If you look at the last page, is that your signature for yourself and EPD?

01:48 A Yes.

01:48 Q And is this another document that Mr. Kirkland demanded of you?

01:48 A Yes.

01:48 Q When did he sign this document?

01:48 A I don't know. Is it dated?

01:48 Q November 8, 2007.

01:48 A That's what it looks like.

01:48 Q Do you remember signing it on or about that date?

01:48 A I remember just signing a whole bunch of documents kind of at the same time, but I can't tell you for sure what day I signed it or if it was exactly that date.

01:48 Q Has Mr. Kirkland or his attorneys requested that you sign documents for them after the bankruptcy filing other than the statements and schedules?

01:49 A No.

01:49 Q If you look at Paragraph D on the first page and continuing on to the second page -- I'm sorry, Paragraph D, which is just on the first page. The second sentence says, "Pressman is Chairman of EPD and holds a membership interest in EPD, as does Pressman's son, attorney Keith Pressman. EPD owes substantial sums to Pressman. In addition, Pressman has an outstanding note to EPD, and has granted a lien to EPD. Broadway Entertainment Marketing ('BEM') owes substantial debts to EPD. BEM and Keith Pressman pay substantial fees to Debtor's sister companies. The execution and delivery of this Continuing Guaranty by both Guarantors is a condition precedent to the making of the payments by lender."

01:49 Do you see that?

01:49 A Yes.

01:49 Q So at the point that this was entered into, Broadway Entertainment Marketing owed substantial amounts to EPD?
01:49 A Right.
01:49 Q Is that accurate?
01:49 A Yes.
01:49 Q Do you know how much?
01:49 A Not at that point.
01:50 Q Did Mr. Kirkland perform legal services for Broadway?
01:50 A I don't know; he may have.
01:50 Q At the point that this was signed, did Mr. Kirkland perform legal work for S.C. Club, L.P.?
01:50 A Yes.
01:50 Q And did S.C. Club, L.P. owe substantial sums to EPD at that point?
01:50 A Yes.
01:50 Q And who was Mr. Kirkland paid by?
01:50 A I don't know.
01:50 Q S.C. Club?
01:50 A I don't know.
01:50 Q Or EPD?
01:50 A Well, he wasn't paid, it was his firm that would have been paid. So I really don't have any idea who paid the bill. Because even traditionally, the

way things work, EPD may pay the bills, but it charges the company for it and it's repaid. Because as the accountant handling all the money, it does that. But that doesn't mean he could have got paid direct; it could have gone either way.

01:50 Q And at the point that this was entered into, did Plush owe substantial amounts to EPD?

01:50 A I don't think she had any loans with EPD.

01:51 Q Plush?

01:51 A Anything.

01:51 Q Plush didn't owe any amounts to EPD?

01:51 A I don't think she had anything to do with anything.

01:51 Q Plush Lounge?

01:51 A Not to my knowledge, not to my recollection.

01:51 Q Didn't you say that EPD --

01:51 A You're saying "Poshow"?

01:51 Q Plush Lounge.

01:51 A Did you say Poshow had something to do with Plush Lounge?

01:51 Q No.

01:51 A I'm sorry. I misunderstood you.

01:51 Q At the point this was entered into, did Plush Lounge owe substantial amounts to EPD?

A Yes.

Q And did Mr. Kirkland perform legal work for Plush?

A Yes.

Q In that Hotspur litigation?

A Yes.

Q Do you recall how much he or his firm received in payment for that case?

A No.

Q Do you know where the money came from?

A One of the entities, but I don't know for sure.

Q One of your entities?

A Yes. Again, if it came from EPD, it would have been charged to Plush Lounge.

Q But at that point, Plush owed money to EPD?

A Yes.

Q If you look at Paragraph E, it says, "Each of the Guarantors has advised, represented, warranted and guaranteed to lender that he will receive a bottom line, cumulative net return on investment of at least 12% per annum (24% on default) from Debtor for any and all payments made by or on behalf of lender, from time to time prior to, on and after the date of this

Continuing Guaranty, whether to Debtor, on Debtor's behalf, for Debtor's benefit, or at either Guarantor's direction or recommendation, including without limitation all loans directly to Debtor pursuant to the Note or Loan Documents, all additional funds loaned to Debtor from time to time, all payments to the Debtor for consulting fees, advisory fees, and professional service fees, all payments to BEM for consulting fees, advisory fees, and professional service fees, and all payments to Keith Pressman for consulting fees, advisory fees, professional service fees, and all payments to any other sister company of EPD, (any and all such loans and payments, collectively, the 'Payments')."

01:53 Do you see that?

01:53 A Yes.

01:53 Q Why would EPD be responsible for repaying amounts that Mr. Kirkland paid to Broadway for consulting fees, advisory fees or professional service fees?

01:53 A Because that was our deal.

01:53 Q But if a fee is paid to that company for consulting, why would EPD, or even Broadway, be subject to repaying an amount that's a fee and not a loan or an investment?

A Well, that's just the way it was arranged.

I want to go back to "D" for a moment.

I'm the one that insisted on that clause in there for transparency that he talked about the money that was loaned to EPD from the Security Agreement. I don't want you to think I just let this thing go off without trying to protect myself.

But in terms of the other one, that was our arrangement. Because I designated it. I'd say he was willing to give all the money to EPD. And I had the option to put it wherever I wanted to put it. He didn't care. So I just said, "Instead of me giving it to EPD and then going the other direction, wherever -- I'll designate where you put the money. And as far as I'm concerned, it's just like you're putting it all into EPD."

Q But if it's a consulting fee, how is that a loan?

A Well, I, frankly -- and I don't know at this point -- I don't remember the reason for that. And I don't know if he did do that, whether he paid a consulting fee to Broadway; I don't think he did. I know he paid a fee to Keith, but I don't think he paid one to the other companies, so I don't know if that's relevant.

01:54 Q How is payments of an advisory fee or a professional service fee a loan?
01:54 A Well, that was his deal. That was the deal.
01:54 Q How are payments to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees a loan?
01:54 A Well, to be honest, here's the way that one works, because I do know that one on both sides of the story.
01:55 Keith hadn't collected any monies from the company for any salaries for years, and we were getting ready to pay him some money.
01:55 And I just said, "John, instead of" -- I don't know if I told John this, but from my standpoint, instead of me taking the money from EPD and giving it to Keith or Broadway, I'll just have John give it to EPD. Now, Keith recorded it as income, reported it on his income tax. What John did with it, I don't know.
01:55 But again, John had the option originally saying to me, "I'll just put it all in EPD and you can pay Keith or do anything you want."
01:55 But that was the deal that we arranged. I honestly don't remember all the fine points of it,

but I remember specifically saying to John, "As long as you don't care, give Keith the 200 grand and he'll report it as income." Because he would have reported it as income whether he got it from me or from John.

01:55 Q How would income received by Keith Pressman from John Kirkland as a legal fee or a consulting fee, or whatever else, how would that be a loan that EPD would owe?

01:56 A Because that's what the documents say. That's what the deal was.

01:56 Q And who came up with that?

01:56 A Me or him; I don't know.

01:56 Q And how --

01:56 A I agree with you. In retrospect, I agree with you, it looks kind of weird. I don't remember all the things that were happening at that date, so there may have been a compelling reason for me to have done it.

01:56 Q I'd like to introduce Exhibit 36.

(Chapter 7 Trustee's Exhibit 36 was marked for identification by the Deposition Officer and is attached hereto.)

01:56 MR. WEBER: This is a document entitled "Funding Agreement" dated July 24th, 2009.

01:56 Q Is that your signature in the signature

blocks on the last page?
01:56 A Yes.
01:56 Q Is this another document that Mr. Kirkland demanded?
01:56 A That he what?
01:56 Q Demanded.
01:56 A Yes.
01:56 Q And was it entered into on or about July 24th, 2009?
01:57 A Yes.
01:57 Q The third "Whereas" paragraph references that EPD --
01:57 A Excuse me. Where are we at, what paragraph?
01:57 Q The first page, the third "Whereas" paragraph.
01:57 A Okay.
01:57 Q It says that EPD paid approximately $75,000 to Mr. Kirkland's mortgage lender; is that right?
01:57 A Yes.
01:57 Q And the next "Whereas" paragraph says, "Whereas, EPD has advised investor that, due to temporary cash flow constraints, EPD has an immediate need for $100,000."

it was very embarrassing. And he knows a lot of people that I knew. And I was just -- I was almost destroyed by it. We screwed up. Somebody in my office didn't file it. And that's what that's in reference to. She's very nice, but he was not nice when he talked to me about it.

01:59 Q Did Mr. Kirkland yell at you?

01:59 A Yes, he did.

02:00 Q Did he demand that the UCC-1 be filed immediately in favor of the Bright Conscience Trust?

02:00 A Well, I'm trying to think. I don't remember whether we did it or whether he then took it on himself to do it, which he had the right to do. And that was my position, "Well, you have the right to do it anyways, you don't have to wait for me to do it."

02:00 But I think the document said we would do it or we told him we would do it. Anyway, it was a bad situation. We really screwed up.

02:00 Q Did he threaten litigation against EPD or you?

02:00 A He actually did; I don't think he meant it.

02:00 Q What did he say?

02:00 A You know, "We can sue you for that."

If some creditor came forward in between -- because we didn't know the damage at that time, whether there was any. And I don't think it turned out there was any damage. It all happened before the lawsuit, before anyone got a lien against us, so I don't think he was harmed by it. But I think that was his position. If he was harmed by it, he might sue me. And I would have to hire him to defend me, by the way.

02:01 Q Did any other lenders or investors get financing statements, UCC Financing Statements?

02:01 A Again, in a case like that, we wouldn't file them; those were things filed by the other party. Some of them did get Security Agreements. And it's up to you to file a UCC-1 to perfect the security agreement.

02:01 Q Other than HMB Holdings and the Bright Conscience Trust, can you think of any other lenders to EPD that had UCC-1s filed?

02:01 A I remember discussing it with two different people. I can't remember the names. Whether they did it or not, I don't know.

02:01 Q Was that after Mr. Kirkland yelled at you or --

02:01 A No, this was before.

02:01 Q I'm asking a different question.

We'll address it. We have an extra half hour.
02:03 MR. WEBER: Let's keep going and address it as it comes up.
02:03 MR. LANDAU: It will come up shortly.
02:03 MR. WEBER: Then we can discuss it.
02:03 MR. LANDAU: Okay.
02:03 MR. WEBER: I'd like to introduce Exhibit 38.
(Chapter 7 Trustee's Exhibit 38 was marked for identification by the Deposition Officer and is attached hereto.)
02:04 MR. WEBER: This purports to be another Engagement Agreement between EPD and Luce Forward dated February 26, 2010.
02:04 Q If you look at the signature page, which is page 12, is that your signature?
02:04 A Yes.
02:04 Q And did you enter into this agreement with Mr. Kirkland and Luce Forward in regard to the Hansel case?
02:04 A I must have. My signature is on it. The answer is yes.
02:04 Q If you look on the top of page 4, it says, "As you know, I personally have represented you, your family and your afilliated persons on various legal

matters. In addition, I have longstanding personal and professional relationships with you and EPD."

02:04 Do you see that?
02:04 A Yes.
02:04 Q Is that accurate?
02:04 A Yes.
02:04 Q And it says, "The above-described matter may present potential or actual conflicts of interest between EPD and you personally, because although currently aligned, it is possible that your interests may in the future diverge. In addition, the matter may present potential or actual conflicts of interest between EPD and me personally because my family trust is an investor with EPD, although those personal interests may currently be aligned with representing you and EPD in the present dispute, it is possible that this may change in the future."
02:05 Do you see that?
02:05 A Yes.
02:05 Q Did you think it was an issue having an investor in EPD represent EPD in a suit brought by a different investor?
02:05 A Perhaps he was highly motivated to protect his own funds. I don't find any problem with that.
02:05 Q Was he representing his own interests or

EPD's interests?
02:05 A When he was defending us -- when his firm defended me against Hansel?
02:05 Q Yes.
02:05 A I can't speak for what he thinks or what was in his mind.
02:05 Q To your knowledge.
02:05 A Even to my knowledge. I hired that firm to represent me. I can't explain what they were thinking.
02:06 Q When Mr. Kirkland was representing EPD in the EPD bankruptcy case, do you know if he was representing his or his family trust's interest or EPD's interest?
02:06 A Certainly EPD's interest. Mr. Moe took over that internally there. So I'm not sure to what extent Mr. Kirkland was actually involved, if maybe that's why he transferred it to Mr. Moe, who was their bankruptcy expert.
02:06 Q I'd like to introduce Exhibit 39.
(Chapter 7 Trustee's Exhibit 39 was marked for identification by the Deposition Officer and is attached hereto.)
02:06 Q BY MR. WEBER: Have you seen this Declaration before?

02:15 Q And how about "Wire Neah Power Systems"?
02:15 A I'm not sure whether that means he wired it or we wired it.
02:15 Q Do you know if Mr. Kirkland was an attorney for Neah Power Systems?
02:15 A No, I didn't. Wait. He probably did tell me. He might have told me; yes, he did.
02:15 Q Below it says, "Transfer to start lease," and then it has a number. Do you see that?
02:16 A Right.
02:16 Q Did Mr. Kirkland participate in leases through EPD?
02:16 A Yes, he had one lease.
02:16 Q And you said leases are not loans; right?
02:16 A Right.
02:16 Q On the next page it mentions "Wire Deposit RBC." Do you know what that is?
02:16 A Yeah. I know you're not asking me, but I guess I might as well clarify this so we don't take 40 minutes to explain it.
02:16 At the time, EPD didn't need the money and didn't want to start paying interest. And so I asked -- I actually was going to temporarily return the funds. And he said, "Well, why don't you invest in this company, Neah, for me temporarily. And then when you


BARKLEY Court Reporters

02:20 Do you see that?
02:20 A Yes.
02:20 Q Do you know how much Mr. Kirkland actually invested in EPD less the amounts he took out of EPD?
02:20 A No, I don't.
02:20 Q Do you know if it's any more than those two amounts?
02:20 A I think it is, yes.
02:21 Q Are you talking about amounts put into EPD or a different entity?
02:21 A Well, eventually, everything was put into EPD. So I assume -- I can't even begin to guess without getting all the information, but I'm sure it was more than that.
02:21 Q But you don't know how much?
02:21 A No, I don't. I probably never did.
02:21 Q I'd like to introduce Exhibit 44.
(Chapter 7 Trustee's Exhibit 44 was marked for identification by the Deposition Officer and is attached hereto.)
02:21 MR. WEBER: If you look at the second page, it's a letter from you to Theodore Jonavic dated December 10, 2004.
02:21 Q Do you see that?
02:21 A Yes, I do.

02:33 A Yes.
02:33 Q Is it your understanding that the Bright Conscience Trust filed a UCC-1 against EPD's assets and your assets in or about September 2009?
02:33 A Yes.
02:33 Q And as of September 2009, were creditors or investors, lenders in EPD contacting EPD about cash flow issues?
02:33 A Probably, yes.
02:33 Q And was EPD experiencing cash flow issues during September 2009?
02:33 A Yes; it was awaiting a loan.
02:33 Q So at that point, were any other lenders or investors getting Security Agreements or UCC Financing Statements?
02:34 A No.
02:34 Q Just Mr. Kirkland?
02:34 A Yes.
02:34 Q Or his family trust?
02:34 A Yes.
02:34 Q And HMB?
02:34 A Yes.
02:34 Q No one else?
02:34 A That's correct.
02:34 Q And after that point, was EPD still making

02:48 A Well, again, I don't know what the time frame is. At some point in time he was; I think it was in 2009. I mean, I don't know the date of 2009 between when he talked to Mr. Huerth and -- because I don't think -- I'm not sure he was at that time. It's possible you would know that better than I what the dates were.

02:48 Q You don't think he was what?

02:48 A I don't know if HMB had already filed their UCC-1 before the conversation with Mr. Huerth, they may have; I have no idea. It would be unrelated and I wouldn't have been involved.

02:48 Q Did you ever tell investors or lenders that you had given Mr. Kirkland or his family trust a Security Agreement and let them file a UCC-1 that put them higher in priority, theoretically, to other creditors?

02:49 A No, because I personally guaranteed most of those people. And he didn't have a Security Agreement against me.

02:49 Q Other than Mr. Kirkland and HMB, other lenders or investors weren't given a UCC Financing Statement, right, or a Security Agreement in 2009; right?

02:49 A Remember, most of these investors go back

15 or 20 years. HMB didn't even occur until, what, 2009. So obviously, there was never an issue for the previous 30 or 40 years.

02:49 Q But among those, EPD and Kirkland or Bright Conscience Trust, they got it because they demanded it?

02:49 A Because I didn't want to get sued. Just like there is a whole group of people. And if that whole group of people, which are very strong people -- one of them was a bankruptcy attorney -- I was dead. I would have never got the loan. So I did it with my arm being twisted. But again, nobody loaned money to EPD after 2009. I mean if they did, it was just nickels and dimes. I'll bet you I didn't get 10- or $15,000 after that, so there was no one to notify; this was all after the fact.

02:50 Q Have you spoken with Mr. Kirkland since 2011?

02:50 A I'm sure I have, yes.

02:50 Q How often do you speak with Mr. Kirkland?

02:50 A Like once a year. He would call me once a year or something or every other year. I don't know.

02:51 Q Do you discuss anything in relation to the bankruptcy case?

02:51 A No. He always admonishes me, "I don't

investment."
02:54 Do you see that?
02:54 A That's correct.
02:54 Q Is that what you were referring to earlier in regard to "fungible"?
02:54 A Yes.
02:54 Q I'd like to introduce Exhibit 59.
(Chapter 7 Trustee's Exhibit 59 was marked for identification by the Deposition Officer and is attached hereto.)
02:54 Q BY MR. WEBER: Is this an e-mail you sent to Mr. Kirkland on or about March 20, 2011?
02:55 A Yes.
02:55 Q Is it accurate?
02:55 A Generally.
02:55 Q And is the description of EPD accurate?
02:55 A Again, it's all a blur to me, but yes, it looks right. I'd have to go over every single word, but it looks right.
02:55 Q I'd like to introduce Exhibit 60.
(Chapter 7 Trustee's Exhibit 60 was marked for identification by the Deposition Officer and is attached hereto.)
02:55 Q BY MR. WEBER: Is this an e-mail chain between you and Mr. Kirkland dated March 21, 2011?

02:55 A Yes.
02:55 Q Did you send or receive these e-mails?
02:56 A What was the question?
02:56 Q Did you send or receive these e-mails?
02:56 A I don't remember. But in essence, it's correct, so...
02:56 Q If you look at the bottom e-mail on the first page describing EPD, it says, "It was only an accounting entity that acted as a conduit to flow funds to entities held by me."
02:56 Do you see that?
02:56 A Yes.
02:56 Q Is that accurate?
02:56 A Well, to the extent except for unusual transactions where it sold some properties or charged consulting fees, but it is accurate.
02:56 Q I'd like to introduce Exhibit 61.
(Chapter 7 Trustee's Exhibit 61 was marked for identification by the Deposition Officer and is attached hereto.)
02:57 Q BY MR. WEBER: Is this an e-mail you sent to Mr. Kirkland on or about April 22nd, 2011?
02:57 A Yes.
02:57 Q Is it accurate?
02:57 A Pretty much so, yes.

03:13 Q Can you think of any specific real property?
03:13 A No, I can't give you the name or the date. I know we had some.
03:13 Q Did EPD ever request a Security Agreement or a UCC-1 from Broadway or S.C. Club, L.P. or Plush?
03:14 A I don't think so.
03:14 Q Any reason why not?
03:14 A We were all the same people. I wouldn't have thought to do it. Perhaps it would have been prudent, but I hadn't thought to do it.
03:14 Q Didn't you give a Security Agreement and UCC-1 in favor of EPD and against your assets?
03:14 A That's because I wanted the investors, as we call them, to know that there was a lot of assets I couldn't transfer directly because I was a shareholder in those companies. And I wanted them to know that I wasn't just using the LLC to get out of an obligation. And I took 100 percent of my assets to secure that company for the benefit of the shareholders -- for the benefit of those investors.
03:15 Q You filed the EPD vs. Plush suit to protect EPD's assets; right?
03:15 A To protect EPD's assets, yes.
03:15 Q So why didn't you also obtain Security

Agreements and file UCC-1s on behalf of EPD, as to S.C. Club, Plush, and Broadway?

03:15 A In hindsight, I probably should have.

03:15 Q When Mr. Kirkland yelled at you and it sounded like he threatened a lawsuit, potentially, at some point in 2009; is that right?

03:15 A Yes.

03:15 Q Did you ever think that the issue of him or his family trust potentially having litigation against EPD created an actual conflict between him representing EPD?

03:16 A As I indicated to you, I don't think he really meant it, based on the relationship. I mean, I screwed up. We screwed up, no question. He had a right to be really mad. And you know when people are mad, they say things that -- I mean, I honestly didn't think he would do that.

03:16 Q Did you think that he or his family trust having a security interest or purported security interest in a UCC-1 put him in a conflict situation with EPD where he may be looking out for his own interests or his family trust's interests rather than EPD's interests?

03:16 MR. LANDAU: Objection; extremely compound.


BARKLEY Court Reporters

03:17 THE DEPONENT: I would have signed a waiver to that effect. I don't think I would have been concerned about that. I never suspected that of him and I never thought of that, but again, maybe I should have.

03:17 Q BY MR. WEBER: But he did threaten you; right?

03:17 MR. LANDAU: Asked and answered.

03:17 THE DEPONENT: It wasn't something I would have to call the police about. You know, he was mad at me.

03:17 Q BY MR. WEBER: You mentioned during your 2004 exam, one of them, I think, that you thought Mr. Kirkland was a very powerful individual?

03:17 A Yes.

03:18 Q Something to the effect that you didn't want to get on his bad side?

03:18 A I meant from a business standpoint, that he knew a lot of people that I knew, not from a physical standpoint.

03:18 Q So to clear up the record, I wasn't inferring that he was threatening you physically.

03:18 A Okay.

03:18 Q But you thought that if you didn't comply with what Mr. Kirkland requested, that it might


BARKLEY Court Reporters

03:25 Q The one on the Andrews case was a deposition; the Rule 2004 examinations in the main bankruptcy were separate.
03:25 A There was one thing in there that I said that was wrong, but it's to my benefit. I kept on alluding to $5 million a year in cash flow without investors and it turns out it's $10 million a year in cash flow, I just misspoke. I had the same documents, but I just didn't read it correctly.
03:25 Q Is everything else that you stated in your prior 2004 examinations and depositions accurate?
03:26 A To the best of my knowledge, yes.
03:26 Q Did you discuss with Mr. or Mrs. Kirkland them filing proofs of claim in the bankruptcy case?
03:26 A No.
03:26 Q Did you know they were going to file proofs of claim in the bankruptcy case?
03:26 A No.
03:26 Q Have you discussed the proofs of claim filed by the BC Trust or communicated with the Kirklands regarding the proofs of claim filed by the Bright Conscience Trust?
03:26 A No. I'm frankly not even aware of what the status is.
03:26 Q Is there a reason why you think that the

Kirklands are entitled to monies from the bankruptcy estate or from EPD before other lenders or investors get money?

03:27 A The truth is, no, I don't think he should be entitled to it, but that's the deal I made. At the time I made it, I didn't expect that it would be coming down to a "Sophie's Choice" between him and everybody else. At the time I made it, with that $4 million loan coming in, I had total confidence that everybody would be treated equal.

03:27 Had I known the situation, I would agree, I don't think one creditor should get it. But that's the document, that's the contract. That's what I agreed to do. And as a man of my word, that's what's got to happen. I don't even like what's happening, but that's what it is.

03:28 Q And that's because he was in the position where he demanded it and --

03:28 A It's a two-way street. I was in a position and I needed the money. He was in a position like any lender, to command what he needed to give me the money. He did it in good faith, so I've got to do what I've got to do.

03:28 Q And while he was an attorney for you or other entities that you had control over; is that



BARKLEY Court Reporters

03:53 Q Exhibit C is a document called "Conflict Waiver and Consent." I would appreciate you taking a moment to page through the four pages and confirm when you're ready that, in fact, you've signed the document on the last page.
03:53 A Yes, I did.
03:54 Q Those are your signatures?
03:54 A Yes.
03:54 Q Is the document a true, accurate, complete and genuine copy of a Conflict Waiver and Consent between EPD, Kirkland and Pressman?
03:54 A Are we on Exhibit C?
03:54 Q Yes, the one you just confirmed you signed. I'm just asking you to confirm that it's a genuine and complete document.
03:54 A Yes.
03:54 Q It is, sir?
03:54 A Yes.
03:54 Q And that's the routine for the rest of the documents.
03:54 Exhibit D is a document entitled "Secured Promissory Note," dated November 8, 2007. I ask you to take a moment to page through that document to the end.
03:55 A Yes.

generated. And even going back to 2004, Broadway paid $2.4 million in a reduction of a loan, in addition to which these companies were charged for services that EPD rendered to them. And those costs were 6- or $700,000 a year.

04:17 Q BY MR. LANDAU: And those services are included within the revenue numbers?

04:17 A No, they go down under EPD income.

04:17 Q I see.

04:17 A So this absolutely proves, I think it was $10 million of cash flow, almost any one of these line items could pay off the annual investors without taking one penny from another investor. And some of them are, you know, really big.

04:18 Q So you just gave us Broadway and Key Club. On the ISE entities, just a quick description, a synopsis of how it generated those revenues.

04:18 A The ISE were ice rinks. And so some of these were self-owned ice rinks and some of these were managerial ice rinks for the City of Oakland and the City of Vacaville. And this generated -- and for Escondido. And this generated, you know, tremendous cash flow where each one of them paid EPD or somebody a salary, a fee for doing it, and in addition, repaid loans of $1.7 over those -- $2.075 over the same

five-year period.

04:18 The Plush Lounge was the nightclub in Las Vegas that operated. It would have been very successful. And Mr. Neches' report will tell the reason why it failed is because the Marriott -- we sued them. Because the Marriott Hotel refused to let us put a sign up, contrary to the contract of the lease, and it refused to let us advertise on the radio or even use our address as being in the Marriott Hotel, and it refused to let us walk into the hotel, any part of the hotel, except where the club was. That's why we sued them.

04:19 Mississippi.

04:19 Q Westover, if you could, please.

04:19 A Westover Hills. Westover Hills was 800 acres in San Antonio, Texas. It was originally purchased for about $1.7 or $1.8 for 800 acres, and it was sold -- as I told you, the last several acres were sold for more than was paid for all the land put together, and so it generated enormous cash.

04:19 But by 2005, almost all the land was sold. Most of these properties go back to the '90s, '80s and '90s, so they were all captured and reflected on their Balance Sheet at cost.

04:20 And the object, which I will explain with

# EXHIBIT 16

CONFIDENTIAL

I, Michael Alvarez, declare:

1. I am a Risk Management Paralegal and duly authorized custodian of records for Greenberg Traurig LLP ("Greenberg) and have the authority to certify the records attached hereto.

2. Attached hereto are copies of the following documents (hereafter, "Documents")

A. Document January 27, 2004, bates stamped GT001389-1391.

B. Document dated January 30, 2004, bates stamped GT001392-1393.

C. Document dated August 18, 2004, bates stamped GT001993.

D. Document dated October 4, 2004, bates stamped GT002119-2127

E. Document dated January 28, 2005, bates stamped GT002146-2148.

F. Document undated, bates stamped GT002171.

G. Document July 8, 2005, bates stamped GT002172-2178.

H. Document December 23, 2005, bates stamped GT002227-2229.

I. Document December 23, 2005, bates stamped GT002230-2232.

J. Document January 28, 2005, bates stamped GT002630-2631.

K. Document undated, bates stamped GT002632-2636.

L. Document undated, bates stamped GT002637-2641

M. Document July 8, 2005, bates stamped GT002642-2648.

N. Document January 28, 2005, bates stamped GT002886-2887.

O. Document undated, bates stamped GT002888-2892.

P. Document undated, bates stamped GT002893-2897.

Q. Document July 8, 2005, bates stamped GT002898-2904

R. Document dated December 19, 2005, bates stamped GT004180-4182.

S. Document April 6, 2006, bates stamped GT004183.

T. Document April 10, 2006, bates stamped GT004184.

U. Document dated April 11, 2006, bates stamped GT004185.

V. Document December 23, 2005, bates stamped GT004207-4209.

W. Document February 17, 2006, bates stamped GT005162-5164.

3. The Documents were produced by Greenberg to counsel for Jason Rund, Chapter 7 Trustee for the bankruptcy estate of consolidated debtors EPD Investment Company, LLC and Jerrold S. Pressmen pursuant to the: (a) Stipulation for: (1) Withdrawal of Motion for Order Pursuant to F.R.B.P. 2004 [Docket No. 256], and (2) Production of Documents by Greenberg Traurig LLP (the "Stipulation"); and, (b) the Bankruptcy Court's Order approving the Stipulation.

4. The Documents are true and correct copies of records maintained by Greenberg in the course of its regularly conducted business and were prepared as part of regular practice.

5. The Documents were prepared by Greenberg personnel in the ordinary course of Greenberg's business at or near the time of the act, condition, or event by persons with knowledge of those matters.

I declare, under penalty of perjury, under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on May 8, 2017, in Miami, Florida.

[signature]

Michael Alvarez

CONFIDENTIAL

310-586-77__
____________@gtlaw.com January __, 2004

**PERSONAL AND CONFIDENTIAL**
**SUBJECT TO ATTORNEY CLIENT PRIVILEGE**

Stretto Enterprises
c/o Jerold Pressman
[redacted]

Re: Offer in Compromise

Dear Mr. Pressman:

We have obtained from Rhonda Bianco of the complex collections division of the Franchise Tax Board (the "FTB") a 30-day suspension on collection activity for Stretto Enterprises (the "Company"), which expires on February 20, 2004. At that time, we will need to provide reasons for further extension.

To enable us to represent the Company before both divisions, please sign and return the enclosed FTB 3520, *Power of Attorney Declaration for the Franchise Tax Board*. I have also enclosed, in blank, FTB 4905, *Bank and Corporation Taxes Offer in Compromise*, which we should complete as soon as possible. Collection activity is generally, although not always, suspended pending the resolution of an offer.

Because the Company itself dissolved many years ago and has no assets, we need to review the Company's historical records to help us evaluate potential arguments that the FTB might have for making future assessments against transferees who received the Company's assets at the time of its liquidation. We also should confirm how much time, if any, remains in the applicable statute of limitations for the FTB to make such additional transferee assessments. These considerations will affect our strategy in submitting an offer amount.

**Transferee Liability**

To date, I understand that no transferee has been assessed, only the Company. The FTB cannot automatically assert transferee liability without first showing (1) voluntary assumption of

corporate tax liabilities, as, for instance, might very likely have been stated on a tax clearance certificate upon dissolution, (2) involuntary assumption by a transferee who has accepted corporate assets after a tax liability has accrued, without leaving sufficient assets to pay such tax liability, or (3) alter ego between the Company and another party who commingled funds or otherwise shared an identity with the Company.[1] If the FTB can show any one of the these, it may assess the transferee and pursue collections directly against the transferee, without ever pursuing the dissolved corporation itself. ***The transferee would generally be liable for the lesser of the Company's unsatisfied primary liability, or the value of assets received by the transferee.*** To prepare to protest any future transferee assessment, we need the following information, as well as any additional information that may be available regarding the Company's assets at the time of its liquidation:

- date and manner of dissolution;
  - description of the Company's assets and their value immediately prior to its dissolution and liquidation;
  - description of the Company's liabilities, if any, immediately prior to its dissolution and liquidation;
  - full name of each party, if any, who or which assumed the Company's liabilities immediately prior to its dissolution and liquidation (i.e., the tax clearance certificate);
- full name of each stockholder;
  - description and value of the Company's cash and other assets received by stockholders upon liquidation;
  - full name of any other party who or which received the Company's cash and other assets upon liquidation, and description and value of same.

Helpful documents would include corporate minutes immediately preceding the Company's dissolution, any certificates or statements filed with the California Secretary of State and the Franchise Tax Board at that time, and contemporaneous state and federal income tax returns and financial statements.

**Statute of Limitations**

The statute of limitations on assessment against an initial transferee of a taxpayer is within one year after the expiration of the statute of limitations against the taxpayer. Generally,

[1] An alter ego theory would rest upon substantial control by one party, lack of corporate records, commingling of assets, and undercapitalization.

CONFIDENTIAL



taxes may be assessed against a taxpayer up to 4 years (or 5 years against a transferee) after the return required by the taxpayer is filed. If a taxpayer's return omits gross income in excess of 25% of the gross income stated in the return, the limitation date is 6 years (or 7 years against a transferee) after the return is filed. The taxpayer may also agree to an extension of the limitations period, as long as the FTB has provided the taxpayer with the proper notification of rights.[2] The running of the statute of limitations against the taxpayer or a transferee is suspended while the taxpayer is exercising an administrative remedy, such as a tax protest, appeal or petition for rehearing. We will prepare a chronology to determine the expiration date for the statute of limitations for transferee assessment.

Please provide the information requested in this letter as soon as possible, so that we may begin to frame our arguments for an offer in compromise, and for cessation of collections activity.

Very truly yours,

GC/

2 California Revenue and Taxation Code §19074.

CONFIDENTIAL

Grace Chung, Esq.
310-586-7718
chungg@gtlaw.com

January 30, 2004

**PERSONAL AND CONFIDENTIAL**
**SUBJECT TO ATTORNEY CLIENT PRIVILEGE**

Stretto Enterprises
c/o Jerold Pressman
[redacted]

Re: Offer in Compromise

Dear Mr. Pressman:

We have obtained from Rhonda Bianco of the complex collections division of the Franchise Tax Board (the "FTB") a 30-day suspension on collection activity for Stretto Enterprises (the "Company"), which expires on February 20, 2004. At that time, we will need to provide reasons for further extension.

To enable us to represent the Company before the collections division and with respect to its offer in compromise, please sign and return the enclosed *Power of Attorney*. I have also enclosed, in blank, a *Bank and Corporation Taxes Offer in Compromise*, and an *Offer in Compromise for Individual Taxpayers*, for you to complete as soon as possible with the information that you have available.

The FTB cannot act against you personally until it assesses you personally, but we need to be prepared for this. In particular, we need a copy of the tax clearance certificate or any other document you have signed in which you, personally, assumed the Company's tax liabilities. Any such personal liability would be limited to the lesser of the Company's unsatisfied primary tax liability, or the value of the assets that you received. We therefore need to know exactly how much the Company distributed to you (or to any other party) during the year of its liquidation. If you received any assets other than cash, we need a description of such assets, their fair market value, and the value of any security interests held by the Company's creditors at that time. These considerations will affect our strategy in submitting an offer amount.

CONFIDENTIAL



Please also advise if you, personally, have signed any forms waiving any statutes of limitations in this matter. Absent such a written waiver, and subject to suspension while the Company was administratively contesting its tax liability, taxes may be assessed against a transferee no more than 5 years from the date that the Company filed its return (or 7 years if the return omitted gross income in excess of 25% of the gross income stated in the return). We are preparing a chronology to determine when would be the expiration date for the FTB to make a transferee assessment in your case.

Please provide the information requested in this letter as soon as possible, so that we may begin to frame our arguments for an offer in compromise, and for cessation of collections activity.

Very truly yours,

GREENBERG TRAURIG, LLP

By: GRACE CHUNG

cc: John Kirkland
Carol Perrin

CONFIDENTIAL

August 18, 2004

VIA FACSIMILE (916) 855-5733

Rhonda Bianco
California Franchise Tax Board
PO Box 942857
Sacramento, CA 94257

Re: Stretto Enterprises
Entity ID CORP [redacted]

Dear Ms. Bianco:

Further to our telephone conversation yesterday, I am writing to confirm that you will not initiate any collection process against the assumer without first giving us advance written notice.

As we discussed, our client is preparing an Offer and Compromise. I understand that you are anxious to move the matter forward, and will be touching base with me next month regarding our progress with the Offer and Compromise.

Please do not hesitate to call with any questions.

Yours truly,

Grace Chung

cc: Mr. Jerrold S. Pressman
John C. Kirkland, Esq.
Carol Perrin, Esq.

CONFIDENTIAL

October 4, 2004

BY U.S. EXPRESS MAIL

Ms. Rhonda Bianco
California Franchise Tax Board
P.O. Box 942857
Sacramento, CA 94257

Re: Stretto Enterprises
Entity ID CORP [redacted]

Dear Ms. Bianco:

Per your instructions, we are submitting to you the enclosed Form 4905, Offer in Compromise, for our client Jerrold Pressman on behalf of Stretto Enterprises.

Also enclosed is the following supporting documentation:

1. Verification of Income (Loss): Personal tax returns on Form 1040 for 2000, 2001, 2002, and 2003 extension
2. Verification of Expenses: Billing statements for the last three months
3. Bank statements
4. Auto lease statements
5. Mortgage statements
6. Power of attorney

Please note that Mr. Pressman is 69 years old and his only current income is from social security. He has incurred more than $10 million in business losses in the last five years, and has received no personal income from his business in that time. His total debt exceeds $48,000,000. All of his real property is mortgaged and virtually all of his other assets are subject to security interests substantially in excess of their ready market value.

CONFIDENTIAL

Ms. Rhonda Bianco

Page 2

After you have had the opportunity to review the Offer in Compromise, please let us know whether you need any further documents or information.

It continues to be our understanding that you will not proceed with involuntary collection against Mr. Pressman without first providing us with written notice. As you and Ms. Chung have discussed, any collection actions would trigger defaults on his loans and result in bankruptcy or total financial collapse.

Thank you for your assistance in this matter.

Very truly yours,

John C. Kirkland

JCK:mb
Enclosures
cc: Carol Perrin, Esq.
Grace Chung, Esq.

CONFIDENTIAL



Bcc: Mr. Jerrold S. Pressman

LA-FS1\301031v01

CONFIDENTIAL

**ATTACHMENT TO FTB FORM 4905**
**JERROLD S. PRESSMAN**
**SSN: [redacted]**

**Section 4. Asset and Liability Analysis**

Other assets.

| | | |
|---|---|---|
| 21. | Westover Hills | $150,000 |
| 22. | BCM | $100,000 |
| 23. | SC | $400,000 |
| Total: | | $650,000 |

LA-FS1\301249v01\47727.010900

CONFIDENTIAL

**ATTACHMENT TO FTB FORM 4905**
**JERROLD S. PRESSMAN**
**SSN:** [redacted]

**Section 4. Asset and Liability Analysis**

17. Other assets. $0

Equity interest in following entities:
- Westover Hills
- Broadway Entertainment Marketing
- S.C. Club
- Iceoplex
- North Hills
- USP Prop.
- Easy Street

Promissory Notes payable from entities in which I have an interest.

Since these interests are not readily marketable, I have valued them at zero.

**CONFIDENTIAL**

# CHECK REQUEST

## TRUST ACCOUNT

| | FILE NUMBER | CLIENT-FILE NAME | PAYMENT DESCRIPTION** | AMOUNT | CODE* | ACCOUNTING ONLY |
|---|---|---|---|---|---|---|
| 1 | 47727.010000 | Key Club: EPD Investment | Wire transfer from client trust account | $250,000.00 | 18 | (1) |
| 2 | | | | | | (2) |
| 3 | | | | | | (3) |
| 4 | | | | | | (4) |
| 5 | | | | | | (5) |
| | **This description will print on client invoice when using Code 18 | | TOTAL | $250,000.00 | | |

**Note: By requesting a disbursement from any escrow maintained or created by the law firm, the shareholder signing below is representing and confirming to Greenberg Traurig, P.A., Greenberg Traurig, LLP and any entity owned by either of them that neither the shareholder nor any member of the shareholder's immediate family have any legal or beneficial ownership interest (held either directly or indirectly through corporations, partnerships, or other entities) in any entity that is a party to the subject escrow agreement or arrangement. Excluded from this representation is any indirect ownership interest existing as a result of ownership of publicly traded mutual funds.**

**Payee:** EPD Investment Company

Account No. [redacted]

ABA No. [redacted]

Bank Name: City National Bank

Attn: Staci Ridley

400 N. Roxbury Dr., 2nd Floor

Beverly Hills, CA 90210

310.888-6109

310.888-6113 - Fax

(Fill in address if window envelope will be used)

**Mail to Payee:** Yes ☐ No ☒

**Special Instructions and/or Remarks:** Must be wire transferred today. Thank you.

**Return to:** JCK

Attorney's/Secretary's Initials

**Signature:**

**Printed Name:** John C. Kirkland

***DISBURSEMENT CODES**

**ACCOUNTING ONLY**

**GT002124**

**T-PR 083026**

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| (1) Telephone charges | (8) Court Fees\Filing fees | (15) Publication charges | (22) Transcript charges | (29) Federal Express | Payee Code: _______ |
| (2) Messenger | (9) Recording charges | (16) Legal expert & professional | (23) Subpoena Fees | (30) Local Counsel | Ck#: _______ |
| (3) Reproduction charges | (10) Minute books, seal & stock cert | (17) Special Clerical Services | (24) Govt. Agency reports | (31) Arbitrator/Mediators | Date: _______ |
| (4) Word Processing | (11) Travel & Lodging-Out of Town | (18) Other Disbursements | (25) Business Meals | (32) Private Investigators | |
| (5) Witness fees | (12) Printing charges | (19) Certified Copies | (26) Copies from Courthouse | (33) Exhibits | |
| (6) Info & Research | (13) Transportation-Local Travel | (20) Service Company changes | (27) Abstract, title & survey chg | (34) Lit Sup Vendors | |
| (7) Title policies | (14) Postage | (21) Court reporter/Depo | (28) Facsimile | | |

GT002125

**CONFIDENTIAL**

# CHECK REQUEST

## TRUST ACCOUNT

| | FILE NUMBER | CLIENT-FILE NAME | PAYMENT DESCRIPTION** | AMOUNT | CODE* | ACCOUNTING ONLY |
|---|---|---|---|---|---|---|
| 1 | [redacted] | Key Club: EPD Investment | Wire transfer from client trust account | $250,000.00 | 18 | (1) |
| 2 | | | | | | (2) |
| 3 | | | | | | (3) |
| 4 | | | | | | (4) |
| 5 | | | | | | (5) |
| | **This description will print on client invoice when using Code 18 | | TOTAL | $250,000.00 | | |

**Note: By requesting a disbursement from any escrow maintained or created by the law firm, the shareholder signing below is representing and confirming to Greenberg Traurig, P.A., Greenberg Traurig, LLP and any entity owned by either of them that neither the shareholder nor any member of the shareholder's immediate family have any legal or beneficial ownership interest (held either directly or indirectly through corporations, partnerships, or other entities) in any entity that is a party to the subject escrow agreement or arrangement. Excluded from this representation is any indirect ownership interest existing as a result of ownership of publicly traded mutual funds.**

**Payee:** EPD Investment Company

Account No. [redacted]

ABA No. [redacted]

Bank Name: City National Bank

Attn: Staci Ridley

400 N. Roxbury Dr., 2nd Floor

Beverly Hills, CA 90210

310.888-6109

310.888-6113 - Fax

(Fill in address if window envelope will be used)

**Mail to Payee:** Yes ☐ No ☒

**Special Instructions and/or Remarks:** Must be wire transferred today. Thank you.

**Return to:** JCK

Attorney's/Secretary's Initials

**Signature:**

**Printed Name:** John C. Kirkland

*DISBURSEMENT CODES

**ACCOUNTING ONLY**

GT002126

**T-PR 083002**

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| (1) Telephone charges | (8) Court Fees\Filing fees | (15) Publication charges | (22) Transcript charges | (29) Federal Express |
| (2) Messenger | (9) Recording charges | (16) Legal expert & professional | (23) Subpoena Fees | (30) Local Counsel |
| (3) Reproduction charges | (10) Minute books, seal & stock cert | (17) Special Clerical Services | (24) Govt. Agency reports | (31) Arbitrator/Mediators |
| (4) Word Processing | (11) Travel & Lodging-Out of Town | (18) Other Disbursements | (25) Business Meals | (32) Private Investigators |
| (5) Witness fees | (12) Printing charges | (19) Certified Copies | (26) Copies from Courthouse | (33) Exhibits |
| (6) Info & Research | (13) Transportation-Local Travel | (20) Service Company changes | (27) Abstract, title & survey chg | (34) Lit Sup Vendors |
| (7) Title policies | (14) Postage | (21) Court reporter/Depo | (28) Facsimile | |

Payee Code: _______
Ck#: __________
Date: __________

GT002127

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

As requested in your letter of December 14, 2004, a copy of which is enclosed for your reference, enclosed please find the following documents:

A. Independent appraisals for each of the following properties, which we are advised have the following approximate mortgage balances:

1. 705 Palisades Beach Road, Santa Monica, CA
   Appraisal: $4,800,000
   Mortgage: $5,040,000

2. 1808 Wilson Pike, Brentwood, TN
   Appraisal: $1,000,000
   Mortgage: $1,117,000

3. 4507 West 131st Street, Hawthorne, CA
   Appraisal: $520,000
   Mortgage: $464,000

B. Balance Sheets and Profit and Loss Statements for the last two years for the following investments. Although there is obviously significant detail and explanation necessary to fully understand each of the individual investments, we are advised that the basic summary responses to your inquiries with regard to these investmenets are as follows:

CONFIDENTIAL



1. JSP Properties, Inc.
   A. Date acquired: April 7, 1999
   B. Amount invested:
   C. Percent ownership:

2. North Hills Industrial Park, Inc.
   A. Date acquired: May 21, 1998
   B. Amount invested:
   C. Percent ownership:

3. EPD Investment Co., LLC
   A. Date acquired: June 27, 2003 (sole proprietorship since 19_____)
   B. Amount invested:
   C. Percent ownership:

4. Broadway Entertainment Marketing, Inc.
   A. Date acquired: June 10, 1992
   B. Amount invested:
   C. Percent ownership:

5. S.C. Club, L.P.
   A. Date acquired: May 1, 1996
   B. Amount invested:
   C. Percent ownership:

6. Ice Skating Enterprises, Inc.
   A. Date acquired: November 25, 2002
   B. Amount invested:
   C. Percent ownership:

**[JERRY – CAN'T FIND SECRETARY OF STATE RECORDS FOR THESE TWO ENTITIES]**

7. Iceoplex Panorama City, Escondido
   A. Date acquired:
   B. Amount invested:
   C. Percent ownership:

8. West Hills Properties, L.P.
   A. Date acquired:
   B. Amount invested:

CONFIDENTIAL

Mr. Terence K. Tanner
January 28, 2005
Page 3

C. Percent ownership:

**[JERRY - FOUND THESE THREE ENTITIES LISTED WITH SECRETARY OF STATE]**

9. Iceoplex Oakland, Inc.
   A. Date acquired: May 31, 1995
   B. Amount invested:
   C. Percent ownership:

10. Iceoplex Fremont, L.P.
    A. Date acquired: July 7, 1993
    B. Amount invested:
    C. Percent ownership:

11. Iceoplex, L.P.
    A. Date acquired: September 13, 1991
    B. Amount invested:
    C. Percent ownership:

After you have had the opportunity to review the enclosed, please let me know if you need any further documents or information.

It continues to be our understanding that the Franchise Tax Board will not proceed with involuntary collection against Mr. Pressman without first providing us with written notice. As we have discussed, any collection actions would trigger defaults on his loans and result in bankruptcy or total financial collapse.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb
Enclosures

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By Facsimile and U.S. Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Subject: Offer in Compromise
Taxpayer: Stretto Enterprises
Account No.: [redacted]
Tax Year: 1992

Dear Mr. Tanner:

Thank you for your letter dated May 9, 2005, which we received on May 16, 2005. We are in the process of preparing detailed factual responses to each of the issues raised in your letter, but doing so requires extensive documentation. Accordingly, as previously advised, we hereby request a 30-day extension of time to Friday, July 8, 2005 to respond.

Thank you again for your ongoing courtesy and professionalism in this matter.

Sincerely,

John C. Kirkland

JCK:mb
cc: Mr. Jerrold S. Pressman

LA-FS1\343533v01

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

July 8, 2005

By U.S. Express Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

| | |
|---|---|
| Subject: | Offer in Compromise |
| Taxpayer: | Stretto Enterprises |
| Account No.: | [redacted] |
| Tax Year: | 1992 |
| Liability: | $456,443 plus interest |
| Offer: | $250,000 |

Dear Mr. Tanner:

Our client, Jerrold Pressman, hereby requests reevaluation of his Offer in Compromise.

In addition, because he was able to obtain a $250,000 line of credit on his residence, Mr. Pressman hereby increases his offer to $250,000. (The original offer he submitted in October 2004 noted that Mr. Pressman intended to seek a second mortgage on his residence to obtain the funds to pay the offer. Due to an increase in the property value, he was able to refinance his home in February 2005.)

The following discussion specifically addresses all reasons for denial, and explains the significant documentation which is enclosed to overcome the reasons for denial. As explained below, the denial is based on misapprehensions of Mr. Pressman's actual finances, and incorrect assumptions regarding apparent inferences from the documentation previously provided.

Mr. Pressman also requests an in-person meeting with an OIC Specialist, to explain his complicated financial circumstances, the reasons he does not have the ability to pay his outstanding liability in full, and why the amount offered is more than the Franchise Tax Board can expect to collect within a reasonable period of time.

CONFIDENTIAL



---

### 1. Mr. Pressman's Background

Mr. Pressman is a 70-year old retiree, deeply in dept, with virtually no current income or unencumbered assets.

Many years ago, he began driving around in a pick-up truck, servicing fire extinguishers for small business owners. Over the course of some 35 years, he was able to gradually build up his own small business, by joining together with other fire extinguisher servicemen.

Over this same period of time he built up substantial debt, primarily for equipment and acquisition costs. He would pay the interest on the debt from the income he generated from his business. In 1992, he sold the business and retired. It was that sale which gave rise to the assessment against his company, Stretto Enterprises, that has led to this offer in compromise.

Mr. Pressman used the proceeds of the sale to pay accrued interest on his debt, and to become a passive investor in real estate projects, almost all of which have been disastrous. Throughout the course of his business life, Mr. Pressman never had any personal experience or connection with real estate ownership, developments or management of properties. So, naturally, he invested all his money in real estate.

Wynton Marsalis has said that the best way to make a small fortune as a jazz musician is to start with a large fortune. Mr. Pressman's experience has, unfortunately, applied an extreme version of that maxim to real estate investing. During his ownership of JSP Properties, Westover Hills and North Hills, he has lost millions, gone substantially deeper into debt, and never received a penny in salary or distribution.

### 2. American Express Card Statements

[Since he has no source of current income and no ability to borrow more, Mr. Pressman has effectively been living off his credit cards. He charges the business expenses of companies managed by his son to his American Express card, and obtains cash reimbursement from the companies, essentially using his credit card as a line of credit.]

Enclosed is backup data showing that Mr. Pressman's American Express card was used to pay the expenses of S.C. Club, Inc. (Key Club and the Plush Lounge it is the manager of), where the vendors required cash or would not extend credit. By using his credit card, S.C. Club was able to gain an extra 30 days to pay their bills. Enclosed are detailed statements for July, August and September 2004, indicating that these companies were billed back and reimbursed him for those AMEX charges.

---

Additionally, enclosed is a copy of a check from Specialty Merchandise Corporation (an unrelated company) reimbursing Mr. Pressman for the Laker tickets referenced in the July 2004 American Express bill, which he was required to sell after owning them for 20 years, since he is unable to afford them.

You will note that, once the company business expenses are deducted, Mr. Pressman's monthly personal expenses were actually only $1,370.00, $659.95 and $1,942.00 for July, August and September 2004, respectively. This does not suggest that Mr. Pressman could enter into an installment agreement to resolve his liability, but rather shows that he cannot.

The monthly expenses of S.C. Club are also no indication that Mr. Pressman has a monthly income. As noted in our letter of March 7, 2005, Mr. Pressman owns a one-third interest in S.C. Club, which has a substantial negative net worth and net loss. (The fact that S.C. Club is asking a minority shareholder to help "float" their monthly expenses is an indication of their financial difficulty.)

Mr. Pressman's credit cards are not paid in full each month, but rather have a steadily increasing outstanding balance. The remaining outstanding balance on Mr. Pressman's AMEX card after making his last monthly payment is approximately $__________.

**3. Two "Personal" Properties**

Mr. Pressman's daughter and her family live in the Hawthorne, CA home. A copy of the lease is enclosed. No rent is shown because there is no cash flow. The monthly rent is $1,700 per month, and the mortgage payment is $1,591.15. As shown by the appraisal and mortgage statement previously provided, the home could not be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs.

The Brentwood, TN property is not a home that anyone could live in. The house was built in 1858, and has stood empty for the past 10 years. No rent is shown because there is no tenant. The property is a contiguous parcel of the undeveloped land owned by JSP Properties (as explained below), that Mr. Pressman was required to purchase out of bankruptcy. However, because it contained a single family residence, Mr. Pressman was able to finance this portion of the land with a residential mortgage with more favorable treatment than a commercial loan. Since it would be cost prohibitive to make the house livable, presumably it will be torn down for development if JSP Properties is ever able to develop or sell the adjacent parcels. As noted by the appraisal and mortgage statement previously provided, this property cannot be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs. Mr. Pressman has had the property aggressively on the market to sell for the last four years, and has never received any offer sufficient to generate any cash.

CONFIDENTIAL

Mr. Terence K. Tanner
July 8, 2005
Page 4

---

**4. JSP Properties, Inc.**

A decade ago, Mr. Pressman became a limited partner in Inglehame Farm, L.P., a real estate limited partnership in Tennessee. In order to "get in with no money down" he was induced to guarantee the financing for the purchase of the original properties.

When that group went into bankruptcy, Mr. Pressman was personally on the line for between $7 and $8 million of debt, so to protect his interests he was forced to have JSP Properties purchase the property out of bankruptcy by financing the purchase through Beal Bank, which allowed him to pay off the accelerated debt that he was facing. The hope was that the new loan would give enough time to sell off the property to earn enough to ultimately cover the new borrowed funds of close to $11 million. Mr. Pressman was also required to cross collateralize the loan with his ownership in Westover and North Hills. His expectation was only to preserve his estate, and while he would have liked to have made a profit, it was very clear this could probably not be done. The enclosed bankruptcy court documents clarify Mr. Pressman's transition from passive investor to his involvement in the ultimate purchase of the property.

A group experienced in real estate development manages the company and is in charge of developing and selling the properties. All monies received by JSP Properties are deposited into their business account and are used only to repay the lenders, pay for required bonding and the contractors related to that preparation of the land for sale. The borrowed funds are specifically tied to the development of each lot with the requirement of paying back the borrower a specific portion of the proceeds upon sale or using the funds specifically for construction, bonding, taxes, etc.

As previously stated, Mr. Pressman has never been able to distribute one penny to himself or his family, and any future prospect of doing so is subordinated to the group operating the business on a contingency if and when a profit is ever generated. The business plan contemplated was designed only to pay off the guaranteed debt and hopefully to buy some time and break even at the end. As of this date, some of the property taxes have not been paid and, as of this month, Mr. Pressman is advised that the bank account of JSP Properties, Inc. was overdrawn $4,800.

[Mr. Pressman feels he was defrauded in the complex financial dealings relating to the Tennessee properties which he was unable to understand and appreciate, given his complete lack of experience with real estate development. He was able to find a trial lawyer in Tennessee to take his case on contingency. Unfortunately, he lost. A copy of the Court of Appeals decision is enclosed for your reference.]

The intertwining of financial interests in JSP Properties does not suggest that Mr. Pressman has the ability to pay more than the amount offered in the OIC, but rather shows that he does not.

LA-FS1\343533v02

CONFIDENTIAL



**5. North Hills Industrial Park, Inc.**

Unfortunately, North Hills Industrial Property came to me under duress and stressful conditions, but the bottom line was clear, that while I have attempted over the years to sell my ownership in the property, the property has no economic value since up to now and in the foreseeable future all of its income only repays creditors, maintenance and interest and there does not seem to be any potential for profit distribution until the year 2008, at which time if and when a distribution can be made, I will, as a minority owner, receive only my portion. The existing majority owners also have no cash flow, so they have no interest in purchasing my ownership especially with covenants contained in the loan agreement that will not allow me to sell it to a third party, but even if I could, no third party would ever buy a minority interest knowing that they could never sell the property unless the other partners agreed and there was no cash flow in the foreseeable future. Not only can't I sell my interest or leverage it, I have absolutely zero leverage since the leverage rests with the majority owners.

**6. Borrowing on Personal Residence**

As noted above, due to the increasing property values in Southern California, Mr. Pressman has been able to refinance a second mortgage on his home, making available $250,000 in equity which he can use to pay the OIC.

However, the $1.5 million and $600,000 liens recently placed on Mr. Pressman's personal residence do not represent any money received by Mr. Pressman. Rather, they are liens placed on the home as additional security for prior loans.

The $1.5 million lien against his residence was additional security for a refinancing required to release the North Hills as cross collateral from the Beal Bank loan on JSP Properties. If Mr. Pressman was unable to pay off that loan on the North Hills property, he would have been in default and lost his entire interest, and so was only able to borrow the money in North Hills by reposting it as collateral for the loan, and was further required to place a fourth mortgage on his home in order to secure that loan.

The $600,000 mortgage was not given in exchange for a new loan, but rather as additional security for a 1991 loan. The note became due and the creditor required as a condition of not calling the million dollar note, to place third mortgage on Mr. Pressman's personal home and obtain second UCC-1 on all of Mr. Pressman's other assets (including any possible future distributions from JSP Properties or North Hills), which he was forced to do to keep from going into default on their note.

Mr. Pressman did not receive either $1.5 million or $600,000, and did not have the opportunity to apply these funds towards his taxes.

7. **Future Earning Potential**

For the last 10 years after Mr. Pressman sold his business of 35 years, he has had no earning history. Unfortunately, Mr. Pressman does not have the ability to raise money and generate income. If he could, he would.

To the contrary, Mr. Pressman has borrowed substantially and is heavily in debt. The enclosed sampling of promissory notes give an indication of the depth of his financial distress. His borrowings over the years through EPD Investment Co. (originally operated by Mr. Pressman as a sole proprietorship for thirty years, and now operated as an LLC managed and controlled by his son, attorney Keith Pressman, on behalf of the investors) are now tens of millions of dollars, which are personally guaranteed by Mr. Pressman and secured by a lien on his home and a blanket UCC-1 on all his assets. As shown from the enclosed documentation, all of the funds are owed to third parties, many of a fiduciary nature such as banks and IRA accounts. These creditors preclude Mr. Pressman from choosing to apply their funds towards his personal taxes. He simply does not have the actual or legal ability to do so.

Mr. Pressman does not lead an expensive or extravagant lifestyle. Aside from his personal residence (which, fortunately, he has been able to live off the equity of, using it as a source of positive cash flow, rather than a drain), Mr. Pressman has very low monthly personal expenditures. He is unmarried. All of his children are grown. He drives a leased Jeep, as he has for the last 10 years. He is not a member of any club, does not play golf, and does not take vacations. Mr. Pressman is reimbursed for monies that he lays out on behalf of third parties through his credit cards giving him a wash, not a profit.

Because Mr. Pressman has offered to pay towards his taxes all of the money that he has been able to raise, and because of his other creditors and the liens on all his assets the amount offered is more that the Franchise Tax Board can expect to collect within a reasonable period of time, Mr. Pressman requests that his offer in compromise be accepted.

Thank you again for your assistance in this matter. Please feel free to contact me with any questions, or if there is any further information we can provide.

Sincerely,

John C. Kirkland

JCK:mb

LA-FS1\343533v02

---

cc: Mr. Jerrold S. Pressman

LA-FS1\343533v02

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By Fax and Mail

Ms. Diana Perrin
Offer in Compromise Unit
Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise for Stretto Enterprises
Account No. [redacted]
Tax Year: 1992
Liability: $456,443 plus interest

Dear Ms. Perrin:

This letter is in response to your letter dated November 19, 2005 regarding the above-referenced Offer in Compromise. My colleague, Michelle Ferreira, and I have tried to call you to discuss options for resolving this account. Ms. Ferreira is a tax attorney in Greenberg Traurig's Silicon Valley office who solely specializes in tax controversy matters. You are authorized to speak to her directly about this account.

Our attempts to contact you were to discuss the resolution of this matter. The FTB should consider accepting the previous offer to resolve this liability for $250,000. I cannot stress that the FTB will not collect the full liability owing from Mr. Pressman, given his age (he is 70 years old) and that he does not have future earning potential the FTB claims he has (he is retired). Mr. Pressman has offered to pay $250,000, which represents the line of credit he has on his personal residence. If the FTB would prefer that Mr. Pressman turn over the title to both rental properties subject to its existing liens, one of which has been in and out of sale escrow three times and remains unoccupied, in satisfaction of this liability, he would gladly do that, however, please understand that the value of these homes has reduced substantially since the date Mr. Pressman made his Offer. Indeed, the value of these two homes is less than the $250,000 Mr. Pressman is offering to satisfy this liability.

Ms. Ferreira has spoken to Charlyn Moore, of the Business Entities Collections Unit, regarding this account. Ms. Moore suggested we speak with you, as the Offer in Compromise Unit apparently has the authority to resolve this matter. Ms. Ferreira offered to

CONFIDENTIAL



---

place Mr. Pressman in an installment agreement payment plan, of $10,000 per month, and Ms. Moore indicated that request would not be acceptable, as the "liability would not be paid, given Mr. Pressman's age." We understand this as well, and this is why the taxpayer offered to pay the $250,000 lump sum payment via the Offer in Compromise.

If the FTB believes this taxpayer will have "future earning potential," as your November 19, 2005 letter states, the FTB is mistaken. Mr. Pressman has provided extensive data showing that his living expenses have been paid for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of $3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of $3.8 million, all of which were connected to poor investments from the past. His income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his social security payment of $1,400 per month. The Offer for $250,000 was in line with his social security payment, assuming he lived to be over 85 years old.

Either way, Mr. Pressman's offer to pay either $250,000, in a lump sum amount, or $10,000 per month (for the rest of his life), are fair resolutions to this matter. It seems the FTB would prefer to receive some payment now, rather than nothing at all.

Indeed, if the FTB were to file a lien against Mr. Pressman, he may be forced to file for bankruptcy. Mr. Pressman currently finds himself with over $48 million of debt, all which is being managed through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would be erased, which will place him in default with his secured creditors. Any lien filed by the FTB now would put the FTB behind roughly $48 million in secured debt, including multiple mortgages on all of his real estate, and multiple blanket security interests in all his other assets, which would mean the FTB would collect nothing. Mr. Pressman's assets come no where near the amount of the multiple liens upon them, as his Offer in Compromise showed.

An Offer in Compromise is a business decision by the FTB. If the FTB will collect nothing from an individual taxpayer in the future, and if the offered amount will guarantee some form of collection today, it seems to me that the FTB should take the payment for the state to resolve the liability. However, given the multiple loans, liens and other secured debt (which comes before any FTB lien), the FTB will collect nothing from a 70 year old, unemployed taxpayer who will never have a paying income stream in the future.

This matter is placing immense stress on our elderly client, particularly during the holiday season, and he is desperate to resolve it. We seriously hope you will reconsider your blanket refusal to resolve this matter. If there is an alternative payment option you propose, we welcome a proposal from you.

LA-FS1\379965v01

CONFIDENTIAL



---

If you have any questions, please contact me at the number listed above.

Sincerely,

John C. Kirkland

JCK:GMF:mb

cc: Ms. Charlyn Moore
Mr. Jerrold S. Pressman
G. Michelle Ferreira, Esq.

LA-FS1\379965v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By Fax and Mail

Ms. Diana Perrin
Offer in Compromise Unit
Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise for Stretto Enterprises
Account No. [redacted]
Tax Year: 1992
Liability: $456,443 plus interest

Dear Ms. Perrin:

This letter is in response to your letter dated November 19, 2005 regarding the above-referenced Offer in Compromise. My colleague, Michelle Ferreira, and I have tried to call you to discuss options for resolving this account. Ms. Ferreira is a tax attorney in Greenberg Traurig's Silicon Valley office who solely specializes in tax controversy matters. You are authorized to speak to her directly about this account.

Our attempts to contact you were to discuss the resolution of this matter. The FTB should consider accepting the previous offer to resolve this liability for $250,000. I cannot stress that the FTB will not collect the full liability owing from Mr. Pressman, given his age (he is 70 years old) and that he does not have future earning potential the FTB claims he has (he is retired). Mr. Pressman has offered to pay $250,000, which represents the line of credit he has on his personal residence. If the FTB would prefer that Mr. Pressman turn over the title to both rental properties subject to its existing liens, one of which has been in and out of sale escrow three times and remains unoccupied, in satisfaction of this liability, he would gladly do that, however, please understand that the value of these homes has reduced substantially since the date Mr. Pressman made his Offer. Indeed, the value of these two homes is less than the $250,000 Mr. Pressman is offering to satisfy this liability.

Ms. Ferreira has spoken to Charlyn Moore, of the Business Entities Collections Unit, regarding this account. Ms. Moore suggested we speak with you, as the Offer in Compromise Unit apparently has the authority to resolve this matter. Ms. Ferreira offered to