CONFIDENTIAL



---

place Mr. Pressman in an installment agreement payment plan, of $10,000 per month, and Ms. Moore indicated that request would not be acceptable, as the "liability would not be paid, given Mr. Pressman's age." We understand this as well, and this is why the taxpayer offered to pay the $250,000 lump sum payment via the Offer in Compromise.

If the FTB believes this taxpayer will have "future earning potential," as your November 19, 2005 letter states, the FTB is mistaken. Mr. Pressman has provided extensive data showing that his living expenses have been paid for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of $3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of $3.8 million, all of which were connected to poor investments from the past. His income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his social security payment of $1,400 per month. The Offer for $250,000 was in line with his social security payment, assuming he lived to be over 85 years old.

Either way, Mr. Pressman's offer to pay either $250,000, in a lump sum amount, or $10,000 per month (for the rest of his life), are fair resolutions to this matter. It seems the FTB would prefer to receive some payment now, rather than nothing at all.

Indeed, if the FTB were to file a lien against Mr. Pressman, he may be forced to file for bankruptcy. Mr. Pressman currently finds himself with over $48 million of debt, all which is being managed through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would be erased, which will place him in default with his secured creditors. Any lien filed by the FTB now would put the FTB behind roughly $48 million in secured debt, including multiple mortgages on all of his real estate, and multiple blanket security interests in all his other assets, which would mean the FTB would collect nothing. Mr. Pressman's assets come no where near the amount of the multiple liens upon them, as his Offer in Compromise showed.

An Offer in Compromise is a business decision by the FTB. If the FTB will collect nothing from an individual taxpayer in the future, and if the offered amount will guarantee some form of collection today, it seems to me that the FTB should take the payment for the state to resolve the liability. However, given the multiple loans, liens and other secured debt (which comes before any FTB lien), the FTB will collect nothing from a 70 year old, unemployed taxpayer who will never have a paying income stream in the future.

This matter is placing immense stress on our elderly client, particularly during the holiday season, and he is desperate to resolve it. We seriously hope you will reconsider your blanket refusal to resolve this matter. If there is an alternative payment option you propose, we welcome a proposal from you.

LA-FS1\379965v01

CONFIDENTIAL

Ms. Diana Perrin
December 23, 2005
Page 3

---

If you have any questions, please contact me at the number listed above.

Sincerely,

John C. Kirkland

JCK:GMF:mb

cc: Ms. Charlyn Moore
Mr. Jerrold S. Pressman
G. Michelle Ferreira, Esq.

LA-FS1\379965v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

As requested in your letter of December 14, 2004, a copy of which is enclosed for your reference, enclosed please find the following documents:

A. Independent appraisals for each of the following properties, which we are advised have the following approximate mortgage balances:

1. 705 Palisades Beach Road, Santa Monica, CA
2. 1808 Wilson Pike, Brentwood, TN
3. 4507 West 131st Street, Hawthorne, CA

B. Balance Sheets and Profit and Loss Statements for the last two years for the following entities:

1. JSP Properties, Inc.
2. North Hills Industrial Park, Inc.
3. EPD Investment Co., LLC
4. Broadway Entertainment Marketing, Inc.
5. S.C. Club, L.P.
6. Ice Skating Enterprises, Inc.
7. Ice Group Escondido, Inc.
8. West Hills Properties, L.P.

After you have had the opportunity to review the enclosed, please let me know if you need any further documents or information.

LA-FS1\320601v01

CONFIDENTIAL

Mr. Terence K. Tanner
January 28, 2005
Page 2

It continues to be our understanding that the Franchise Tax Board will not proceed with involuntary collection against Mr. Pressman without first providing us with written notice. As we have discussed, any collection actions would trigger defaults on his loans and result in bankruptcy or total financial collapse.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb
Enclosures

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By U.S. Express Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

The purpose of this letter is to respond to your requests for additional information with regard to the previously-submitted OIC. In particular, you have asked us to provide:

1. The percentage interest that Jerrold Pressman owns and controls of each of the entities listed in his tax returns, and the date he first acquired an interest.
2. An explanation of why Mr. Pressman cannot sell the assets owned by one or more of the entities to pay the tax liability.
3. An explanation of why Mr. Pressman cannot sell his interest in one or more of the entities, and use the proceeds to pay the tax liability.

Although there is obviously significant detail and explanation necessary to fully understand each of the individual investments, we are advised that the basic summary responses are as follows:

1. EPD Investment Co., LLC
   Date Acquired: June 27, 2003
   Percent Ownership: 49%

2. JSP Properties, Inc.
   Date acquired: April 7, 1999
   Percent Ownership: 50%

LA-FS1\320601v01

CONFIDENTIAL



3. West Hills Properties, L.P.
   Date Acquired: June 22, 1995
   Percent Ownership: 50%

4. North Hills Industrial Park, Inc.
   Date Acquired: May 21, 1998
   Percent Ownership: 10%

5. Broadway Entertainment Marketing, Inc.
   Date Acquired: June 10, 1992
   Percent Ownership: 98.2%

6. S.C. Club, Inc.
   Date Acquired: June 9, 1993
   Percent Ownership: 33.33%

7. Ice Skating Enterprises, Inc.
   Date Acquired: November 25, 2002
   Percent Ownership: 49%

8. Ice Group Escondido, Inc.
   Date Acquired: August 15, 1994
   Percent Ownership: 48.5%

**1. EPD Investment Co., LLC**

EPD has a total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets.

EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004, most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow.

Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise.

In order to stave off default, Mr. Pressman refinanced his home twice during 2004, and deposited the full proceeds from the financing into EPD, to fund some of the interest and principal demands of the existing note holders which he has personally guaranteed.

On a monthly basis, to the extent funds are available, EPD doles out to Mr. Pressman, as a return of the principal from the funds acquired by him through refinancing, enough to meet the interest on the refinancing and his other living expenses. All of these funds come back to him as a return of his principal, not as income or other compensation.

Mr. Pressman cannot misappropriate EPD funds to pay off a personal obligation. The equity interest in EPD is obviously unsaleable due to its massive debt load and negative net worth. The $36 million in secured debt—which encumbers all of Mr. Pressman's other assets—effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation.

**2. JSP Properties, Inc.**

JSP Properties' assets consist of undeveloped land in Tennessee. The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land. Mr. Pressman executed approximately $7 million of personal guarantees to the banks.

Additional funding would be required to develop the project to make it saleable for an amount in excess of the encumbrances. Mr. Pressman would be unable to sell the property without approval from the other 50% shareholder, who has refused.

Mr. Pressman is subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the other shareholder, who has refused.

**3. West Hills Properties, L.P.**

West Hills Properties' assets consist of undeveloped land in Texas. There have been periodic sales of portions of the property. The cash flow generated by those sales was used to pay the interest and taxes on the underlying mortgage and debt which is approximately $3.9 million. Mr. Pressman is subject to a personal guaranty on the note.

Additional funds would be required in order to entitle the land and prepare it for sale. If the company could sell the property today, the money would go to repaying the two major debts and other creditors of the company. Mr. Pressman would be unable to sell the property without approval from the other 50% partner, who has refused.

CONFIDENTIAL



Mr. Pressman's shares in the company have been placed as collateral securing a $2,307,000 promissory note.

**4. North Hills Industrial Park, Inc.**

North Hills Industrial Park's assets are an industrial park in North Hills, California. The property is subject to $24,740,000 in mortgages, and has a negative cash flow. Mr. Pressman is subject to a personal guarantee.

Mr. Pressman is a 10% shareholder. He is subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the majority shareholders, who have refused.

**5. Broadway Entertainment Marketing, Inc.**

Broadway Entertainment Marketing (BEM) was originally formed in 1992 as Billboard Entertainment Marketing, to purchase a license from the music magazine Billboard, to produce the Billboard Awards television award show. The company lost the Billboard license in 1997, and changed its name to Broadway Entertainment. It has virtually no assets other than unsaleable book value good will, is subject to approximately $1.1 million in liabilities, and has an approximate $450,000 negative net worth.

**6. S.C. Club**

S.C. Club, Inc. is the general partner of S.C. Club, L.P., which operates the Key Club nightclub in leased premises on Sunset Blvd. Mr. Pressman is the sole limited partner, and is a one-third shareholder of the general partner. It was originally Billboard Live, as part of an extension of the above license. Upon losing the Billboard name, the venue was converted to the Key Club. It currently carries a negative net worth in excess of $10 million, and to date has a net loss this year of close to $900,000.

**7. Ice Skating Enterprises, Inc. (Easy Street)**

Ice Skating Enterprises is a management company that operates an ice skating rink located in Simi Valley, California. It has shareholder equity of $31,000, of which over $450,000 consists of good will. Mr. Pressman is a minority shareholder.

**8. Ice Group Escondido, Inc.**

Ice Group Escondido is a management company that manages ice rinks in Panorama City, Escondido, and Simi Valley, California. It currently has a negative $235,000 shareholder's

Mr. Terence K. Tanner

Page 5

equity and is operating at a loss for the year. It does not own any assets. Mr. Pressman is a minority shareholder.

Mr. Pressman's business has generated heavy losses and has had no income for more than five years. None of the entities have any saleable assets with equity in excess of secured liens and other debts. With the exception of BEM, which has no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not).

As non-controlling interests in private companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not).

Finally, as noted above, all of Mr. Pressman's assets—including his equity interests in all of the above entities, and all of the proceeds thereof—are subject to over $36 million is secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not).

After you have had the opportunity to review the enclosed, please let me know your thoughts.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By U.S. Express Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

The purpose of this letter is to respond to your requests for additional information with regard to the previously-submitted OIC. In particular, you have asked us to provide:

1. The percentage interest that Jerrold Pressman owns and controls of each of the entities listed in his tax returns, and the date he first acquired an interest.
2. An explanation of why Mr. Pressman cannot sell the assets owned by one or more of the entities to pay the tax liability.
3. An explanation of why Mr. Pressman cannot sell his interest in one or more of the entities, and use the proceeds to pay the tax liability.

Although there is obviously significant detail and explanation necessary to fully understand each of the individual investments, we are advised that the basic summary responses are as follows:

1. EPD Investment Co., LLC
   Date Acquired: June 27, 2003
   Percent Ownership: 49%

2. JSP Properties, Inc.
   Date acquired: April 7, 1999
   Percent Ownership: 50%

CONFIDENTIAL

Mr. Terence K. Tanner

Page 2

3. West Hills Properties, L.P.
   Date Acquired: June 22, 1995
   Percent Ownership: 49.5%

4. North Hills Industrial Park, Inc.
   Date Acquired: May 21, 1998
   Percent Ownership: 10%

5. Broadway Entertainment Marketing, Inc.
   Date Acquired: June 10, 1992
   Percent Ownership: 48.2%

6. S.C. Club, Inc.
   Date Acquired: June 9, 1993
   Percent Ownership: 33.33%

7. Ice Skating Enterprises, Inc.
   Date Acquired: November 25, 2002
   Percent Ownership: 49%

8. Ice Group Escondido, Inc.
   Date Acquired: August 15, 1994
   Percent Ownership: 48.5%

**1. EPD Investment Co., LLC**

EPD has a total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets.

EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004, most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow.

Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise.

In order to stave off default, Mr. Pressman refinanced his home twice during 2004, and deposited the full proceeds from the financing into EPD, to fund some of the interest and principal demands of the existing note holders which he has personally guaranteed.

On a monthly basis, to the extent funds are available, EPD doles out to Mr. Pressman, as a return of the principal from the funds acquired by him through refinancing, enough to meet the interest on the refinancing and his other living expenses. All of these funds come back to him as a return of his principal, not as income or other compensation. He intends to use the remainder of these funds to pay the OIC.

Mr. Pressman cannot misappropriate EPD funds to pay off a personal obligation. The equity interest in EPD is obviously unsaleable due to its massive debt load and negative net worth. The $36 million in secured debt—which encumbers all of Mr. Pressman's other assets—effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation.

**2. JSP Properties, Inc.**

JSP Properties' assets consist of undeveloped land in Tennessee. The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land. Mr. Pressman executed approximately $7 million of personal guarantees to the banks.

Additional funding would be required to develop the project to make it saleable for an amount in excess of the encumbrances. Mr. Pressman would be unable to sell the property without approval from the other 50% shareholder, who has refused.

Mr. Pressman is also subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the other shareholder.

**3. West Hills Properties, L.P.**

West Hills Properties' assets consist of undeveloped land in Texas. There have been periodic sales of portions of the property. The cash flow generated by those sales was used to pay the interest and taxes on the underlying mortgage and debt which is approximately $3.9 million. Mr. Pressman is subject to a personal guaranty on the note.

Additional funds would be required in order to entitle the land and prepare it for sale. If the company could sell the property today, the money would go to repaying the two major debts and other creditors of the company. Mr. Pressman would be unable to sell the property without approval from the other 50% partner, who has refused.

Mr. Pressman's shares in the company have been used as collateral to secure a $2,307,000 promissory note.

**4. North Hills Industrial Park, Inc.**

North Hills Industrial Park's assets are an industrial park in North Hills, California. The property is subject to $24,740,000 in mortgages, and has a negative cash flow. Mr. Pressman is subject to a personal guarantee.

There is no market for Mr. Pressman's 10% interest in the company. He is also subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the majority shareholders.

**5. Broadway Entertainment Marketing, Inc.**

Broadway Entertainment Marketing (BEM) was originally formed in 1992 as Billboard Entertainment Marketing, to purchase a license from the music magazine Billboard, to produce the Billboard Awards television award show. The company lost the Billboard license in 1997, and changed its name to Broadway Entertainment. It has virtually no saleable hard assets other than unsaleable book value good will, is subject to approximately $1.1 million in liabilities, and has an approximate $450,000 negative net worth.

**6. S.C. Club**

S.C. Club, Inc. is the general partner of S.C. Club, L.P., which operates the Key Club nightclub in leased premises on Sunset Blvd. Mr. Pressman is the sole limited partner, and is a one-third shareholder of the general partner. It was originally Billboard Live, as part of an extension of the above license. Upon losing the Billboard name, the venue was converted to the Key Club. It currently carries a negative net worth in excess of $10 million, and to date has a net loss this year of close to $900,000.

**7. Ice Skating Enterprises, Inc. (Easy Street)**

Ice Skating Enterprises operates an ice skating rink on leased property in Simi Valley, California. It is subject to a promissory note with a remaining balance of over $600,000, which is personally guaranteed by Mr. Pressman.

**8. Ice Group Escondido, Inc.**

CONFIDENTIAL



---

Ice Group Escondido is a management company that manages ice rinks in Panorama City, Escondido, and Simi Valley, California. It does not own any assets, and is operating at a loss. Mr. Pressman's business has generated heavy losses and has had no income for more than five years. None of the entities have any saleable assets with equity in excess of secured liens and other debts. With the exception of BEM, which has no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not).

As non-controlling interests in private companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not).

Finally, as noted above, all of Mr. Pressman's assets—including his equity interests in all of the above entities, and all of the proceeds thereof—are subject to over $36 million is secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not).

After you have had the opportunity to review the above, please let me know your thoughts.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

July 8, 2005

By U.S. Express Mail

Offer in Compromise Unit
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

| | |
|---|---|
| Subject: | Offer in Compromise |
| Taxpayer: | Stretto Enterprises |
| Account No.: | [redacted] |
| Tax Year: | 1992 |
| Liability: | $456,443 plus interest |
| Offer: | $250,000 |

Dear Offer in Compromise Specialist:

Our client, Jerrold Pressman, hereby requests reevaluation of his Offer in Compromise.

In addition, because he was able to obtain a $250,000 line of credit on his residence, Mr. Pressman hereby increases his offer to $250,000. (The original offer he submitted in October 2004 noted that Mr. Pressman intended to seek a second mortgage on his residence to obtain the funds to pay the offer. Due to an increase in the property value, he was able to refinance his home in February 2005.)

The following discussion specifically addresses all reasons for denial, and explains the significant documentation which is enclosed to overcome the reasons for denial. As explained below, the denial is based on misapprehensions of Mr. Pressman's actual finances, and incorrect assumptions regarding apparent inferences from the documentation previously provided.

Mr. Pressman also requests an in-person meeting with an OIC Specialist, to explain his complicated financial circumstances, the reasons he does not have the ability to pay his outstanding liability in full, and why the amount offered is more than the Franchise Tax Board can expect to collect within a reasonable period of time.

CONFIDENTIAL



---

**1. Mr. Pressman's Background**

Mr. Pressman is a 70-year old retiree, deeply in dept, with virtually no unencumbered assets or current income.

Many years ago, he began driving around in a pick-up truck, servicing fire extinguishers for small business owners. Over the course of some 35 years, he was able to gradually build up his own small business, by joining together with other fire extinguisher servicemen.

Over this same period of time he built up substantial debt, primarily for equipment and acquisition costs. He would pay the interest on the debt from the income he generated from his business. In 1992, he sold the business and retired. It was that sale which gave rise to the assessment against his company, Stretto Enterprises, that has led to this offer in compromise.

Mr. Pressman used the proceeds of the sale to purchase a home, pay accrued interest on his debt, and become a passive investor in real estate projects, almost all of which have been disastrous. Throughout the course of his business life, Mr. Pressman never had any personal experience or connection with the stock market, real estate ownership, developments or management of properties. So, naturally, he invested all his money in stocks and real estate.

Wynton Marsalis has said that the best way to make a small fortune as a jazz musician is to start with a large fortune. Mr. Pressman's experience has, unfortunately, applied an extreme version of that maxim to investing. During his ownership of JSP Properties and North Hills, he has lost millions, gone substantially deeper into debt, and never received a penny in salary or distribution.

**2. American Express Card Statements**

Since he has no source of current income and no ability to borrow more, Mr. Pressman has effectively been living off his credit cards. He charges the business expenses of S.C. Club, Inc. (Key Club and the Plush Lounge it is the manager of) to his American Express card, and obtains cash reimbursement from the company, essentially using his credit card as a line of credit.

Enclosed is backup data showing that Mr. Pressman's American Express card was used to pay the expenses of S.C. Club where the vendors required cash or would not extend credit. By using his credit card, S.C. Club was able to gain an extra 30 days to pay their bills. Enclosed are detailed statements for July, August and September 2004, indicating that these companies were billed back and reimbursed him for those AMEX charges. (Tabs 1-6.)

Additionally, enclosed is a copy of a check from Specialty Merchandise Corporation (an unrelated company) reimbursing Mr. Pressman for the Laker tickets referenced in the July 2004

CONFIDENTIAL



American Express bill, which he was required to sell after owning them for 20 years, since he is unable to afford them. (Tab 7.)

You will note that, once the company business expenses are deducted, Mr. Pressman's monthly personal expenses were actually only $1,370.00, $659.95 and $1,942.00 for July, August and September 2004, respectively. This does not suggest that Mr. Pressman could enter into an installment agreement to resolve his liability, but rather shows that he cannot.

The monthly expenses of S.C. Club are also no indication that Mr. Pressman has a monthly income. As noted in our letter of March 7, 2005, Mr. Pressman owns a one-third interest in S.C. Club, which has a substantial negative net worth and net loss. (That S.C. Club is asking a minority shareholder to help "float" its monthly expenses is an indication of its own financial difficulties.)

Mr. Pressman's credit cards are not paid in full each month, but rather have a steadily increasing outstanding balance. The remaining outstanding balance on Mr. Pressman's AMEX card after making his last monthly payment is over $99,000, bearing interest at high credit card rates.

**3. Two "Personal" Properties**

Mr. Pressman's daughter and her family live in the Hawthorne, CA home. The monthly rent is $1,700 per month, and the mortgage payment is $1,591.15. Accordingly, there is no cash flow. As shown by the appraisal and mortgage statement previously provided, the home could not be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs.

The Brentwood, TN property is not a home that anyone could live in. The house was built in 1858, and has stood empty for the past 10 years. No rent is shown because there is no tenant. The property is a contiguous parcel of the undeveloped land owned by JSP Properties (as explained below), that Mr. Pressman was required to purchase out of bankruptcy. However, because it contained a single family residence, Mr. Pressman was able to finance this portion of the land with a residential mortgage with more favorable treatment than a commercial loan. Since it would be cost prohibitive to make the house livable, presumably it will be torn down for development if JSP Properties is ever able to develop or sell the adjacent parcels. As noted by the appraisal and mortgage statement previously provided, this property cannot be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs. Mr. Pressman has had the property aggressively on the market to sell for the last four years, but to date has been unable to sell it for an amount sufficient to generate any cash at closing.

**4. JSP Properties, Inc.**

A decade ago, Mr. Pressman became a limited partner in Inglehame Farm, L.P., a real estate limited partnership in Tennessee. He was induced to guarantee the financing for the purchase of the original properties.

The development failed and the L.P. went into bankruptcy. Mr. Pressman was personally on the line for over $7 million of debt, so to protect his interests he was forced to have JSP Properties, Inc. purchase the property out of bankruptcy. This allowed him to pay off the accelerated debt that he was facing, with the hope that the new loans would allow enough time to sell off the property and ultimately earn enough to cover the new borrowed funds. JSP Properties obtained financing for the purchase through Beal Bank, but Mr. Pressman was also required to obtain additional loans from individual investors through EPD, personally guarantee the debt, and cross collateralize the loan with his ownership interest in North Hills. By that point, his hope was only to preserve his estate, and while he would have liked to have made a profit, it was apparent after the bankruptcy filing that this could probably not be done. The enclosed bankruptcy court plan clarifies Mr. Pressman's transition from passive investor to his involvement in the ultimate purchase of the property. (Tab 8.)

A group experienced in real estate development manages JSP Properties and is in charge of developing and selling the properties. All monies received by the company are deposited into their business account and are used only to repay the lenders, pay for required bonding and the contractors related to that preparation of the land for sale. The borrowed funds are specifically tied to the development of each lot with the requirement of paying back the borrower a specific portion of the proceeds upon sale or using the funds specifically for construction, bonding, taxes, etc.

As previously stated, Mr. Pressman has never been able to have one penny distributed to himself or his family, and any future prospect of doing so is subordinated to the lenders and the group operating the business on contingency if and when a profit is ever generated. The business plan contemplated was designed to pay off the guaranteed debt and hopefully to buy some time and break even at the end. To date enough of the property has been sold to at least meet the debt service. However, as of this date, some of the property taxes have not been paid and, as of this month, Mr. Pressman is advised that the bank account of JSP Properties, Inc. was overdrawn.

Mr. Pressman believes he was fraudulently induced into the complex financial dealings relating to the Tennessee properties, which he was unable to fully understand and appreciate given his complete lack of experience with real estate development. He was able to find a trial lawyer in Tennessee to take his case on contingency. Had he prevailed, he may have recovered enough money to pay his tax liability. Unfortunately, he lost. He appealed, and lost again. A copy of the final Court of Appeals decision is enclosed for your reference. (Tab 9.)

CONFIDENTIAL



As described in detail above, the intertwining of financial interests in JSP Properties does not suggest that Mr. Pressman has the ability to pay more than the amount offered in the OIC, but rather shows that he does not.

**5. North Hills Industrial Park, Inc.**

Despite speculation that the property could be sold for more than the total encumbrances against it, the economic reality is that it cannot. In addition to a $25 million mortgage which exceeds the value of the property, the property cannot be sold (or even refinanced at a lower interest rate) without payment of a $3 million defeasance penalty to the insurance company who provided the financing.

Mr. Pressman's non-controlling interest in North Hills Industrial Park, Inc. is unsaleable since all of the income from the property only repays creditors, maintenance and interest. The tenant (Federal Express) was given long-term rent concessions in exchange for completing the required build out, and there does not seem to be any potential for profit distribution for the foreseeable future. Any positive cash flow would first be used to pay bridge financing and other lenders who have an interest in the proceeds.

The controlling majority owners have no interest in selling the property (particularly at a loss), or in purchasing Mr. Pressman's stock, especially with a shareholder agreement that will not allow Mr. Pressman to sell it to a third party, even in the unlikely event such a purchaser could be found for a minority share of a single-asset company with no cash flow.

**6. Borrowing on Personal Residence**

As noted above, due to the increasing property values in Southern California, Mr. Pressman has been able to refinance a second mortgage on his home, making available $250,000 in equity which he can use to pay the OIC.

However, the $1.5 million and $600,000 liens recently placed on Mr. Pressman's personal residence do not represent any money received by Mr. Pressman. Rather, they are liens placed on the home as additional security for prior loans.

The $1.5 million lien against his residence was additional security for a refinancing required to release the North Hills as cross collateral from the Beal Bank loan of JSP Properties. If the loan on the North Hills property was not paid off, Mr. Pressman would have been in default and lost everything, and so he was required to place a fourth mortgage on his home in order to secure that loan.

CONFIDENTIAL



The $600,000 mortgage was not given in exchange for a new loan, but rather as additional security for a 1991 loan from Stanton Greene. The note became due and the creditor required as a condition of not calling the million dollar note, to place third mortgage on Mr. Pressman's personal home and obtain second UCC-1 on all of Mr. Pressman's other assets (including any possible future distributions from JSP Properties or North Hills), which he was forced to do to keep from going into default on the note. (Tab 11, S.)

Mr. Pressman did not receive either $1.5 million or $600,000, and did not have the opportunity to apply these funds towards his taxes.

**7. Future Earning Potential**

For the last 10 years after Mr. Pressman sold his business of 35 years, he has had no earning history. Unfortunately, Mr. Pressman does not have the ability to raise money and generate income. If he could, he would.

To the contrary, Mr. Pressman following the sale of his business he has continued to borrow substantially to finance debt service and living expenses, and is now heavily in debt. The enclosed sampling of promissory notes give an indication of the depth of his financial distress. (Tab 11, A-Z.) His borrowings over the years through EPD Investment Co. (originally operated by Mr. Pressman as a sole proprietorship for thirty years, and now operated as an LLC managed and controlled by his son, attorney Keith Pressman, on behalf of the investors) are now tens of millions of dollars, which are personally guaranteed by Jerrold Pressman and secured by a lien on his home and a blanket UCC-1 on all his assets. (Tab 10.)

As shown from the enclosed documentation, all of the funds are owed to third parties, many of a fiduciary nature such as financial institutions and IRA accounts. Keith Pressman receives no salary or distribution for managing the LLC, but acts to ensure that funds are applied as designated and required. Jerrold Pressman is unable to borrow money to pay his taxes, and the existing creditors preclude him from choosing to apply their funds towards his personal taxes. He simply does not have the actual or legal ability to do so.

Mr. Pressman does not lead an expensive or extravagant lifestyle. Aside from his personal residence (which, fortunately, he has been able to live off the equity of, using it as a source of positive cash flow, rather than a drain), Mr. Pressman has very low monthly personal expenditures. He is unmarried. All of his children are grown. He drives a leased Jeep, as he has for the last 10 years. He is not a member of any club, does not play golf, and does not take vacations. Mr. Pressman is reimbursed for monies that he lays out on behalf of third parties through his credit cards giving him a wash, not a profit.

CONFIDENTIAL



---

Because Mr. Pressman has offered to pay towards his taxes all of the money that he has been able to raise, and because of his other creditors and the liens on all his assets the amount offered is more that the Franchise Tax Board can expect to collect within a reasonable period of time, Mr. Pressman requests that his offer in compromise be accepted.

Thank you again for your assistance in this matter. Please feel free to contact me with any questions, or if there is any further information we can provide.

Sincerely,

John C. Kirkland

JCK:mb
cc: Mr. Jerrold S. Pressman

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

As requested in your letter of December 14, 2004, a copy of which is enclosed for your reference, enclosed please find the following documents:

A. Independent appraisals for each of the following properties, which we are advised have the following approximate mortgage balances:

1. 705 Palisades Beach Road, Santa Monica, CA
2. 1808 Wilson Pike, Brentwood, TN
3. 4507 West 131st Street, Hawthorne, CA

B. Balance Sheets and Profit and Loss Statements for the last two years for the following entities:

1. JSP Properties, Inc.
2. North Hills Industrial Park, Inc.
3. EPD Investment Co., LLC
4. Broadway Entertainment Marketing, Inc.
5. S.C. Club, L.P.
6. Ice Skating Enterprises, Inc.
7. Ice Group Escondido, Inc.
8. West Hills Properties, L.P.

After you have had the opportunity to review the enclosed, please let me know if you need any further documents or information.

LA-FS1\320601v01

CONFIDENTIAL

Mr. Terence K. Tanner
January 28, 2005
Page 2

It continues to be our understanding that the Franchise Tax Board will not proceed with involuntary collection against Mr. Pressman without first providing us with written notice. As we have discussed, any collection actions would trigger defaults on his loans and result in bankruptcy or total financial collapse.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb
Enclosures

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By U.S. Express Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

The purpose of this letter is to respond to your requests for additional information with regard to the previously-submitted OIC. In particular, you have asked us to provide:

1. The percentage interest that Jerrold Pressman owns and controls of each of the entities listed in his tax returns, and the date he first acquired an interest.

2. An explanation of why Mr. Pressman cannot sell the assets owned by one or more of the entities to pay the tax liability.

3. An explanation of why Mr. Pressman cannot sell his interest in one or more of the entities, and use the proceeds to pay the tax liability.

Although there is obviously significant detail and explanation necessary to fully understand each of the individual investments, we are advised that the basic summary responses are as follows:

1. EPD Investment Co., LLC
Date Acquired: June 27, 2003
Percent Ownership: 49%

2. JSP Properties, Inc.
Date acquired: April 7, 1999
Percent Ownership: 50%

CONFIDENTIAL

Mr. Terence K. Tanner

Page 2

3. West Hills Properties, L.P.
   Date Acquired: June 22, 1995
   Percent Ownership: 50%

4. North Hills Industrial Park, Inc.
   Date Acquired: May 21, 1998
   Percent Ownership: 10%

5. Broadway Entertainment Marketing, Inc.
   Date Acquired: June 10, 1992
   Percent Ownership: 98.2%

6. S.C. Club, Inc.
   Date Acquired: June 9, 1993
   Percent Ownership: 33.33%

7. Ice Skating Enterprises, Inc.
   Date Acquired: November 25, 2002
   Percent Ownership: 49%

8. Ice Group Escondido, Inc.
   Date Acquired: August 15, 1994
   Percent Ownership: 48.5%

**1. EPD Investment Co., LLC**

EPD has a total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets.

EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004, most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow.

Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise.

CONFIDENTIAL



In order to stave off default, Mr. Pressman refinanced his home twice during 2004, and deposited the full proceeds from the financing into EPD, to fund some of the interest and principal demands of the existing note holders which he has personally guaranteed.

On a monthly basis, to the extent funds are available, EPD doles out to Mr. Pressman, as a return of the principal from the funds acquired by him through refinancing, enough to meet the interest on the refinancing and his other living expenses. All of these funds come back to him as a return of his principal, not as income or other compensation.

Mr. Pressman cannot misappropriate EPD funds to pay off a personal obligation. The equity interest in EPD is obviously unsaleable due to its massive debt load and negative net worth. The $36 million in secured debt—which encumbers all of Mr. Pressman's other assets—effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation.

**2. JSP Properties, Inc.**

JSP Properties' assets consist of undeveloped land in Tennessee. The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land. Mr. Pressman executed approximately $7 million of personal guarantees to the banks.

Additional funding would be required to develop the project to make it saleable for an amount in excess of the encumbrances. Mr. Pressman would be unable to sell the property without approval from the other 50% shareholder, who has refused.

Mr. Pressman is subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the other shareholder, who has refused.

**3. West Hills Properties, L.P.**

West Hills Properties' assets consist of undeveloped land in Texas. There have been periodic sales of portions of the property. The cash flow generated by those sales was used to pay the interest and taxes on the underlying mortgage and debt which is approximately $3.9 million. Mr. Pressman is subject to a personal guaranty on the note.

Additional funds would be required in order to entitle the land and prepare it for sale. If the company could sell the property today, the money would go to repaying the two major debts and other creditors of the company. Mr. Pressman would be unable to sell the property without approval from the other 50% partner, who has refused.

---

Mr. Pressman's shares in the company have been placed as collateral securing a $2,307,000 promissory note.

**4. North Hills Industrial Park, Inc.**

North Hills Industrial Park's assets are an industrial park in North Hills, California. The property is subject to $24,740,000 in mortgages, and has a negative cash flow. Mr. Pressman is subject to a personal guarantee.

Mr. Pressman is a 10% shareholder. He is subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the majority shareholders, who have refused.

**5. Broadway Entertainment Marketing, Inc.**

Broadway Entertainment Marketing (BEM) was originally formed in 1992 as Billboard Entertainment Marketing, to purchase a license from the music magazine Billboard, to produce the Billboard Awards television award show. The company lost the Billboard license in 1997, and changed its name to Broadway Entertainment. It has virtually no assets other than unsaleable book value good will, is subject to approximately $1.1 million in liabilities, and has an approximate $450,000 negative net worth.

**6. S.C. Club**

S.C. Club, Inc. is the general partner of S.C. Club, L.P., which operates the Key Club nightclub in leased premises on Sunset Blvd. Mr. Pressman is the sole limited partner, and is a one-third shareholder of the general partner. It was originally Billboard Live, as part of an extension of the above license. Upon losing the Billboard name, the venue was converted to the Key Club. It currently carries a negative net worth in excess of $10 million, and to date has a net loss this year of close to $900,000.

**7. Ice Skating Enterprises, Inc. (Easy Street)**

Ice Skating Enterprises is a management company that operates an ice skating rink located in Simi Valley, California. It has shareholder equity of $31,000, of which over $450,000 consists of good will. Mr. Pressman is a minority shareholder.

**8. Ice Group Escondido, Inc.**

Ice Group Escondido is a management company that manages ice rinks in Panorama City, Escondido, and Simi Valley, California. It currently has a negative $235,000 shareholder's

equity and is operating at a loss for the year. It does not own any assets. Mr. Pressman is a minority shareholder.

Mr. Pressman's business has generated heavy losses and has had no income for more than five years. None of the entities have any saleable assets with equity in excess of secured liens and other debts. With the exception of BEM, which has no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not).

As non-controlling interests in private companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not).

Finally, as noted above, all of Mr. Pressman's assets—including his equity interests in all of the above entities, and all of the proceeds thereof—are subject to over $36 million is secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not).

After you have had the opportunity to review the enclosed, please let me know your thoughts.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

By U.S. Express Mail

Mr. Terence K. Tanner
Offer in Compromise Specialist
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise

Dear Mr. Tanner:

The purpose of this letter is to respond to your requests for additional information with regard to the previously-submitted OIC. In particular, you have asked us to provide:

1. The percentage interest that Jerrold Pressman owns and controls of each of the entities listed in his tax returns, and the date he first acquired an interest.

2. An explanation of why Mr. Pressman cannot sell the assets owned by one or more of the entities to pay the tax liability.

3. An explanation of why Mr. Pressman cannot sell his interest in one or more of the entities, and use the proceeds to pay the tax liability.

Although there is obviously significant detail and explanation necessary to fully understand each of the individual investments, we are advised that the basic summary responses are as follows:

1. EPD Investment Co., LLC
   Date Acquired: June 27, 2003
   Percent Ownership: 49%

2. JSP Properties, Inc.
   Date acquired: April 7, 1999
   Percent Ownership: 50%

Mr. Terence K. Tanner

Page 2

3. West Hills Properties, L.P.
   Date Acquired: June 22, 1995
   Percent Ownership: 49.5%

4. North Hills Industrial Park, Inc.
   Date Acquired: May 21, 1998
   Percent Ownership: 10%

5. Broadway Entertainment Marketing, Inc.
   Date Acquired: June 10, 1992
   Percent Ownership: 48.2%

6. S.C. Club, Inc.
   Date Acquired: June 9, 1993
   Percent Ownership: 33.33%

7. Ice Skating Enterprises, Inc.
   Date Acquired: November 25, 2002
   Percent Ownership: 49%

8. Ice Group Escondido, Inc.
   Date Acquired: August 15, 1994
   Percent Ownership: 48.5%

**1. EPD Investment Co., LLC**

EPD has a total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets.

EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004, most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow.

Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise.

CONFIDENTIAL



In order to stave off default, Mr. Pressman refinanced his home twice during 2004, and deposited the full proceeds from the financing into EPD, to fund some of the interest and principal demands of the existing note holders which he has personally guaranteed.

On a monthly basis, to the extent funds are available, EPD doles out to Mr. Pressman, as a return of the principal from the funds acquired by him through refinancing, enough to meet the interest on the refinancing and his other living expenses. All of these funds come back to him as a return of his principal, not as income or other compensation. He intends to use the remainder of these funds to pay the OIC.

Mr. Pressman cannot misappropriate EPD funds to pay off a personal obligation. The equity interest in EPD is obviously unsaleable due to its massive debt load and negative net worth. The $36 million in secured debt—which encumbers all of Mr. Pressman's other assets—effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation.

**2. JSP Properties, Inc.**

JSP Properties' assets consist of undeveloped land in Tennessee. The underlying debt is in excess of $9 million, which is more than two times the value of the undeveloped land. Mr. Pressman executed approximately $7 million of personal guarantees to the banks.

Additional funding would be required to develop the project to make it saleable for an amount in excess of the encumbrances. Mr. Pressman would be unable to sell the property without approval from the other 50% shareholder, who has refused.

Mr. Pressman is also subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the other shareholder.

**3. West Hills Properties, L.P.**

West Hills Properties' assets consist of undeveloped land in Texas. There have been periodic sales of portions of the property. The cash flow generated by those sales was used to pay the interest and taxes on the underlying mortgage and debt which is approximately $3.9 million. Mr. Pressman is subject to a personal guaranty on the note.

Additional funds would be required in order to entitle the land and prepare it for sale. If the company could sell the property today, the money would go to repaying the two major debts and other creditors of the company. Mr. Pressman would be unable to sell the property without approval from the other 50% partner, who has refused.

Mr. Pressman's shares in the company have been used as collateral to secure a $2,307,000 promissory note.

**4. North Hills Industrial Park, Inc.**

North Hills Industrial Park's assets are an industrial park in North Hills, California. The property is subject to $24,740,000 in mortgages, and has a negative cash flow. Mr. Pressman is subject to a personal guarantee.

There is no market for Mr. Pressman's 10% interest in the company. He is also subject to a shareholder agreement, prohibiting him from selling his shares in the corporation to a third party without the consent of the majority shareholders.

**5. Broadway Entertainment Marketing, Inc.**

Broadway Entertainment Marketing (BEM) was originally formed in 1992 as Billboard Entertainment Marketing, to purchase a license from the music magazine Billboard, to produce the Billboard Awards television award show. The company lost the Billboard license in 1997, and changed its name to Broadway Entertainment. It has virtually no saleable hard assets other than unsaleable book value good will, is subject to approximately $1.1 million in liabilities, and has an approximate $450,000 negative net worth.

**6. S.C. Club**

S.C. Club, Inc. is the general partner of S.C. Club, L.P., which operates the Key Club nightclub in leased premises on Sunset Blvd. Mr. Pressman is the sole limited partner, and is a one-third shareholder of the general partner. It was originally Billboard Live, as part of an extension of the above license. Upon losing the Billboard name, the venue was converted to the Key Club. It currently carries a negative net worth in excess of $10 million, and to date has a net loss this year of close to $900,000.

**7. Ice Skating Enterprises, Inc. (Easy Street)**

Ice Skating Enterprises operates an ice skating rink on leased property in Simi Valley, California. It is subject to a promissory note with a remaining balance of over $600,000, which is personally guaranteed by Mr. Pressman.

**8. Ice Group Escondido, Inc.**

CONFIDENTIAL

Mr. Terence K. Tanner

Page 5

Ice Group Escondido is a management company that manages ice rinks in Panorama City, Escondido, and Simi Valley, California. It does not own any assets, and is operating at a loss. Mr. Pressman's business has generated heavy losses and has had no income for more than five years. None of the entities have any saleable assets with equity in excess of secured liens and other debts. With the exception of BEM, which has no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not).

As non-controlling interests in private companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not).

Finally, as noted above, all of Mr. Pressman's assets—including his equity interests in all of the above entities, and all of the proceeds thereof—are subject to over $36 million is secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not).

After you have had the opportunity to review the above, please let me know your thoughts.

Thank you again for your assistance in this matter.

Sincerely,

John C. Kirkland
JCK:mb

cc: Mr. Jerrold S. Pressman

LA-FS1\320601v01

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7786
Fax 310.586.0286
KirklandJ@gtlaw.com

July 8, 2005

By U.S. Express Mail

Offer in Compromise Unit
State of California Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

| | |
|---|---|
| Subject: | Offer in Compromise |
| Taxpayer: | Stretto Enterprises |
| Account No.: | [redacted] |
| Tax Year: | 1992 |
| Liability: | $456,443 plus interest |
| Offer: | $250,000 |

Dear Offer in Compromise Specialist:

Our client, Jerrold Pressman, hereby requests reevaluation of his Offer in Compromise.

In addition, because he was able to obtain a $250,000 line of credit on his residence, Mr. Pressman hereby increases his offer to $250,000. (The original offer he submitted in October 2004 noted that Mr. Pressman intended to seek a second mortgage on his residence to obtain the funds to pay the offer. Due to an increase in the property value, he was able to refinance his home in February 2005.)

The following discussion specifically addresses all reasons for denial, and explains the significant documentation which is enclosed to overcome the reasons for denial. As explained below, the denial is based on misapprehensions of Mr. Pressman's actual finances, and incorrect assumptions regarding apparent inferences from the documentation previously provided.

Mr. Pressman also requests an in-person meeting with an OIC Specialist, to explain his complicated financial circumstances, the reasons he does not have the ability to pay his outstanding liability in full, and why the amount offered is more than the Franchise Tax Board can expect to collect within a reasonable period of time.

CONFIDENTIAL



**1. Mr. Pressman's Background**

Mr. Pressman is a 70-year old retiree, deeply in dept, with virtually no unencumbered assets or current income.

Many years ago, he began driving around in a pick-up truck, servicing fire extinguishers for small business owners. Over the course of some 35 years, he was able to gradually build up his own small business, by joining together with other fire extinguisher servicemen.

Over this same period of time he built up substantial debt, primarily for equipment and acquisition costs. He would pay the interest on the debt from the income he generated from his business. In 1992, he sold the business and retired. It was that sale which gave rise to the assessment against his company, Stretto Enterprises, that has led to this offer in compromise.

Mr. Pressman used the proceeds of the sale to purchase a home, pay accrued interest on his debt, and become a passive investor in real estate projects, almost all of which have been disastrous. Throughout the course of his business life, Mr. Pressman never had any personal experience or connection with the stock market, real estate ownership, developments or management of properties. So, naturally, he invested all his money in stocks and real estate.

Wynton Marsalis has said that the best way to make a small fortune as a jazz musician is to start with a large fortune. Mr. Pressman's experience has, unfortunately, applied an extreme version of that maxim to investing. During his ownership of JSP Properties and North Hills, he has lost millions, gone substantially deeper into debt, and never received a penny in salary or distribution.

**2. American Express Card Statements**

Since he has no source of current income and no ability to borrow more, Mr. Pressman has effectively been living off his credit cards. He charges the business expenses of S.C. Club, Inc. (Key Club and the Plush Lounge it is the manager of) to his American Express card, and obtains cash reimbursement from the company, essentially using his credit card as a line of credit.

Enclosed is backup data showing that Mr. Pressman's American Express card was used to pay the expenses of S.C. Club where the vendors required cash or would not extend credit. By using his credit card, S.C. Club was able to gain an extra 30 days to pay their bills. Enclosed are detailed statements for July, August and September 2004, indicating that these companies were billed back and reimbursed him for those AMEX charges. (Tabs 1-6.)

Additionally, enclosed is a copy of a check from Specialty Merchandise Corporation (an unrelated company) reimbursing Mr. Pressman for the Laker tickets referenced in the July 2004

CONFIDENTIAL



American Express bill, which he was required to sell after owning them for 20 years, since he is unable to afford them. (Tab 7.)

You will note that, once the company business expenses are deducted, Mr. Pressman's monthly personal expenses were actually only $1,370.00, $659.95 and $1,942.00 for July, August and September 2004, respectively. This does not suggest that Mr. Pressman could enter into an installment agreement to resolve his liability, but rather shows that he cannot.

The monthly expenses of S.C. Club are also no indication that Mr. Pressman has a monthly income. As noted in our letter of March 7, 2005, Mr. Pressman owns a one-third interest in S.C. Club, which has a substantial negative net worth and net loss. (That S.C. Club is asking a minority shareholder to help "float" its monthly expenses is an indication of its own financial difficulties.)

Mr. Pressman's credit cards are not paid in full each month, but rather have a steadily increasing outstanding balance. The remaining outstanding balance on Mr. Pressman's AMEX card after making his last monthly payment is over $99,000, bearing interest at high credit card rates.

**3. Two "Personal" Properties**

Mr. Pressman's daughter and her family live in the Hawthorne, CA home. The monthly rent is $1,700 per month, and the mortgage payment is $1,591.15. Accordingly, there is no cash flow. As shown by the appraisal and mortgage statement previously provided, the home could not be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs.

The Brentwood, TN property is not a home that anyone could live in. The house was built in 1858, and has stood empty for the past 10 years. No rent is shown because there is no tenant. The property is a contiguous parcel of the undeveloped land owned by JSP Properties (as explained below), that Mr. Pressman was required to purchase out of bankruptcy. However, because it contained a single family residence, Mr. Pressman was able to finance this portion of the land with a residential mortgage with more favorable treatment than a commercial loan. Since it would be cost prohibitive to make the house livable, presumably it will be torn down for development if JSP Properties is ever able to develop or sell the adjacent parcels. As noted by the appraisal and mortgage statement previously provided, this property cannot be sold for an amount sufficient to pay off the outstanding mortgage balance, realtor fee and closing costs. Mr. Pressman has had the property aggressively on the market to sell for the last four years, but to date has been unable to sell it for an amount sufficient to generate any cash at closing.

CONFIDENTIAL

State of California Franchise Tax Board
July 8, 2005
Page 4

**4. JSP Properties, Inc.**

A decade ago, Mr. Pressman became a limited partner in Inglehame Farm, L.P., a real estate limited partnership in Tennessee. He was induced to guarantee the financing for the purchase of the original properties.

The development failed and the L.P. went into bankruptcy. Mr. Pressman was personally on the line for over $7 million of debt, so to protect his interests he was forced to have JSP Properties, Inc. purchase the property out of bankruptcy. This allowed him to pay off the accelerated debt that he was facing, with the hope that the new loans would allow enough time to sell off the property and ultimately earn enough to cover the new borrowed funds. JSP Properties obtained financing for the purchase through Beal Bank, but Mr. Pressman was also required to obtain additional loans from individual investors through EPD, personally guarantee the debt, and cross collateralize the loan with his ownership interest in North Hills. By that point, his hope was only to preserve his estate, and while he would have liked to have made a profit, it was apparent after the bankruptcy filing that this could probably not be done. The enclosed bankruptcy court plan clarifies Mr. Pressman's transition from passive investor to his involvement in the ultimate purchase of the property. (Tab 8.)

A group experienced in real estate development manages JSP Properties and is in charge of developing and selling the properties. All monies received by the company are deposited into their business account and are used only to repay the lenders, pay for required bonding and the contractors related to that preparation of the land for sale. The borrowed funds are specifically tied to the development of each lot with the requirement of paying back the borrower a specific portion of the proceeds upon sale or using the funds specifically for construction, bonding, taxes, etc.

As previously stated, Mr. Pressman has never been able to have one penny distributed to himself or his family, and any future prospect of doing so is subordinated to the lenders and the group operating the business on contingency if and when a profit is ever generated. The business plan contemplated was designed to pay off the guaranteed debt and hopefully to buy some time and break even at the end. To date enough of the property has been sold to at least meet the debt service. However, as of this date, some of the property taxes have not been paid and, as of this month, Mr. Pressman is advised that the bank account of JSP Properties, Inc. was overdrawn.

Mr. Pressman believes he was fraudulently induced into the complex financial dealings relating to the Tennessee properties, which he was unable to fully understand and appreciate given his complete lack of experience with real estate development. He was able to find a trial lawyer in Tennessee to take his case on contingency. Had he prevailed, he may have recovered enough money to pay his tax liability. Unfortunately, he lost. He appealed, and lost again. A copy of the final Court of Appeals decision is enclosed for your reference. (Tab 9.)

LA-FS1\343533v02

CONFIDENTIAL



As described in detail above, the intertwining of financial interests in JSP Properties does not suggest that Mr. Pressman has the ability to pay more than the amount offered in the OIC, but rather shows that he does not.

**5. North Hills Industrial Park, Inc.**

Despite speculation that the property could be sold for more than the total encumbrances against it, the economic reality is that it cannot. In addition to a $25 million mortgage which exceeds the value of the property, the property cannot be sold (or even refinanced at a lower interest rate) without payment of a $3 million defeasance penalty to the insurance company who provided the financing.

Mr. Pressman's non-controlling interest in North Hills Industrial Park, Inc. is unsaleable since all of the income from the property only repays creditors, maintenance and interest. The tenant (Federal Express) was given long-term rent concessions in exchange for completing the required build out, and there does not seem to be any potential for profit distribution for the foreseeable future. Any positive cash flow would first be used to pay bridge financing and other lenders who have an interest in the proceeds.

The controlling majority owners have no interest in selling the property (particularly at a loss), or in purchasing Mr. Pressman's stock, especially with a shareholder agreement that will not allow Mr. Pressman to sell it to a third party, even in the unlikely event such a purchaser could be found for a minority share of a single-asset company with no cash flow.

**6. Borrowing on Personal Residence**

As noted above, due to the increasing property values in Southern California, Mr. Pressman has been able to refinance a second mortgage on his home, making available $250,000 in equity which he can use to pay the OIC.

However, the $1.5 million and $600,000 liens recently placed on Mr. Pressman's personal residence do not represent any money received by Mr. Pressman. Rather, they are liens placed on the home as additional security for prior loans.

The $1.5 million lien against his residence was additional security for a refinancing required to release the North Hills as cross collateral from the Beal Bank loan of JSP Properties. If the loan on the North Hills property was not paid off, Mr. Pressman would have been in default and lost everything, and so he was required to place a fourth mortgage on his home in order to secure that loan.

State of California Franchise Tax Board
July 8, 2005
Page 6

---

The $600,000 mortgage was not given in exchange for a new loan, but rather as additional security for a 1991 loan from Stanton Greene. The note became due and the creditor required as a condition of not calling the million dollar note, to place third mortgage on Mr. Pressman's personal home and obtain second UCC-1 on all of Mr. Pressman's other assets (including any possible future distributions from JSP Properties or North Hills), which he was forced to do to keep from going into default on the note. (Tab 11, S.)

Mr. Pressman did not receive either $1.5 million or $600,000, and did not have the opportunity to apply these funds towards his taxes.

**7. Future Earning Potential**

For the last 10 years after Mr. Pressman sold his business of 35 years, he has had no earning history. Unfortunately, Mr. Pressman does not have the ability to raise money and generate income. If he could, he would.

To the contrary, Mr. Pressman following the sale of his business he has continued to borrow substantially to finance debt service and living expenses, and is now heavily in debt. The enclosed sampling of promissory notes give an indication of the depth of his financial distress. (Tab 11, A-Z.) His borrowings over the years through EPD Investment Co. (originally operated by Mr. Pressman as a sole proprietorship for thirty years, and now operated as an LLC managed and controlled by his son, attorney Keith Pressman, on behalf of the investors) are now tens of millions of dollars, which are personally guaranteed by Jerrold Pressman and secured by a lien on his home and a blanket UCC-1 on all his assets. (Tab 10.)

As shown from the enclosed documentation, all of the funds are owed to third parties, many of a fiduciary nature such as financial institutions and IRA accounts. Keith Pressman receives no salary or distribution for managing the LLC, but acts to ensure that funds are applied as designated and required. Jerrold Pressman is unable to borrow money to pay his taxes, and the existing creditors preclude him from choosing to apply their funds towards his personal taxes. He simply does not have the actual or legal ability to do so.

Mr. Pressman does not lead an expensive or extravagant lifestyle. Aside from his personal residence (which, fortunately, he has been able to live off the equity of, using it as a source of positive cash flow, rather than a drain), Mr. Pressman has very low monthly personal expenditures. He is unmarried. All of his children are grown. He drives a leased Jeep, as he has for the last 10 years. He is not a member of any club, does not play golf, and does not take vacations. Mr. Pressman is reimbursed for monies that he lays out on behalf of third parties through his credit cards giving him a wash, not a profit.

CONFIDENTIAL

State of California Franchise Tax Board
July 8, 2005
Page 7

---

Because Mr. Pressman has offered to pay towards his taxes all of the money that he has been able to raise, and because of his other creditors and the liens on all his assets the amount offered is more that the Franchise Tax Board can expect to collect within a reasonable period of time, Mr. Pressman requests that his offer in compromise be accepted.

Thank you again for your assistance in this matter. Please feel free to contact me with any questions, or if there is any further information we can provide.

Sincerely,

John C. Kirkland

JCK:mb
cc: Mr. Jerrold S. Pressman

LA-FS1\343533v02

CONFIDENTIAL

John C. Kirkland
Tel: 310.586.7788
Fax: 310.586.0288
KirklandJ@gtlaw.com

December 19, 2005

Diana Perrin
Offer in Compromise Unit
Franchise Tax Board
P. O. Box 2952
Sacramento, CA 95812-2952

Re: *Offer in Compromise for Jerrold Pressman (Stretto Enterprises)*
*Account No.* [redacted]
*SSN#:* [redacted]
*Tax Year: 1992*
*Liability: $1,492,857.45*

Dear Ms. Perrin:

This letter is in response to your letter dated November 19, 2005 regarding the above-referenced Offer in Compromise. My colleague, Michelle Ferreira, and I have tried to call you to discuss options for resolving this account. Michelle Ferreira is a tax attorney in Greenberg Traurig's Silicon Valley office who solely specializes in tax controversy matters. You are authorized to speak to Michelle Ferreira directly about this account.

Our attempts to contact you were to discuss the resolution of this matter. The FTB should consider accepting the previous offer to resolve this liability for $250,000. I cannot stress that the FTB will not collect the full liability owing from Mr. Pressman, given his age (he is 70 years old) and that he does not have future earning potential the FTB claims he has (he is retired). Mr. Pressman has offered to pay $250,000, which represents the equity he has in a line of credit on his personal residence. If the FTB would prefer that Mr. Pressman turn over the title to both rental properties in satisfaction of this liability, he would gladly do that, however, please understand that the value of these homes has reduced substantially since the date Mr. Pressman made his Offer. Indeed, the value of these two homes is less than the $250,000 Mr. Pressman is offering to satisfy this liability.

Michelle Ferreira has spoken to Charlyn Moore, of the Business Entities Collections Unit, regarding this account last week. Ms. Moore suggested we speak with you, as the Offer in Compromise Unit apparently has the authority to resolve this matter. Michelle offered to place Mr. Pressman in an installment agreement payment plan, of $10,000 per month, and Ms. Moore denied that

CONFIDENTIAL

request, as the "liability would not be paid, given Mr. Pressman's age." We understand this as well, and this is why the taxpayer offered to pay the $250,000 lump sum payment via the Offer in Compromise.

If the FTB believes this taxpayer will have "future earning potential," as your November 19, 2005 letter states, the FTB is mistaken. Mr. Pressman has provided clear data showing that his living expenses have been paid for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of $3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of **{John, how much?}.** Clearly his income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his social security payment of $1,400 per month. The Offer for $250,000 was in line with his social security payment, assuming he lived to be 85 years old.

Either way, Mr. Pressman's offer to pay either $250,000, in a lump sum amount, or $10,000 per month (for the rest of his life), are fair resolutions to this matter. It seems the FTB would prefer to receive some payment now, rather than nothing at all.

Indeed, if the FTB were to file a lien against Mr. Pressman, he would have to file for bankruptcy. Mr. Pressman currently finds himself in over $48 million of debt, all which is being managed through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would seriously decrease, which will place him in default with his secured creditors. Any lien filed by the FTB now would put the FTB behind roughly $48 million in secured debt, which would mean the FTB would collect nothing. Mr. Pressman's assets do not exceed this amount, and his Offer in Compromise clearly showed this.

An Offer in Compromise is a business decision by the FTB. If the FTB will collect nothing from an individual taxpayer in the future, and if the offered amount will guarantee some form of collection today, it seems to me that the FTB would take the payment for the state to resolve the liability. However, given the multiple loans, liens and other secured debt (which come before any FTB lien), the FTB will collect nothing from a 70 year old taxpayer who will never have a paying income stream in the future. We seriously hope you will reconsider your blanket refusal to resolve this matter now. If there is an alternative payment option you propose, we welcome a proposal from you.

If you have any questions, please contact me at the number listed above.

Sincerely yours,

CONFIDENTIAL

John C. Kirkland

Cc: Jerrold Pressman
G. Michelle Ferreira

sv-fs1\20866v01

CONFIDENTIAL

G. Michelle Ferreira
(650) 289-7855
ferreiram@gtlaw.com

April 6, 2006

**VIA FACSIMILE AND CERTIFIED MAIL**

Terrence Tanner
OIC Specialist
California Franchise Tax Board
Offer in Compromise Unit MS HA- 453-081:726
P. O. Box 2952
Sacramento, CA 95812-2952

Re: *Stretto Enterprises and Jerrold S. Pressman*
*Acct. #* [redacted]
*SSN#* [redacted]
*Original Liability: $1,502,673.15*
*Offer in Compromise for $456,443.00*

Dear Mr. Tanner:

The above-listed taxpayer is hereby responding to your letter dated March 9, 2006. In your letter, you have requested a cashier's check in the amount of $456,443.00 and a copy of Mr. Pressman's 2004 California state income tax return. We are enclosing a copy of the taxpayer's Form 1040 U.S. Individual Income Tax Return, and his Form 540 California Resident Income Tax Return for 2004 for your reference. Both returns for 2004 have been filed and Mr. Pressman had no tax liability for 2004 at the Federal or state level. The funds will be sent to you in a separate cover.

If you have any questions, please do not hesitate to call me.

Sincerely yours,

G. Michelle Ferreira

Enclosures

Cc: Jerrold Pressman
John Kirkland

CONFIDENTIAL

G. Michelle Ferreira
(650) 289-7855
ferreiram@gtlaw.com

April 10, 2006

**VIA EXPRESS MAIL**

Terrence Tanner
OIC Specialist
California Franchise Tax Board
Offer in Compromise Unit MS HA- 453-081:726
P. O. Box 2952
Sacramento, CA 95812-2952

Re: *Stretto Enterprises and Jerrold S. Pressman*
*Acct. #* [redacted]
*SSN#* [redacted]
*Original Liability: $1,502,673.15*
*Offer in Compromise for $456,443.00*

Dear Mr. Tanner:

The above-listed taxpayer is hereby remitting a cashier's check, in the amount of $456,443 to the Franchise Tax Board in connection with the Offer in Compromise for the account listed above. Per your letter of March 9, 2006, if Mr. Pressman's OIC is not accepted by the FTB, the FTB has agreed to return the check to Mr. Pressman. ***In other words, all funds will be refunded to the taxpayer, in the amount of $456,443.00, if the Offer in Compromise is not accepted.***

If you have any questions, please do not hesitate to call me.

Sincerely yours,

G. Michelle Ferreira

Enclosures

Cc: Jerrold Pressman
John Kirkland

CONFIDENTIAL

G. Michelle Ferreira
(650) 289-7855
ferreiram@gtlaw.com

April 10, 2006

**VIA EXPRESS MAIL**

Terrence Tanner
OIC Specialist
California Franchise Tax Board
Offer in Compromise Unit MS HA- 453-081:726
P. O. Box 2952
Sacramento, CA 95812-2952

Re: *Stretto Enterprises and Jerrold S. Pressman*
*Acct. #*[redacted]
*SSN#* [redacted]
*Original Liability: $1,502,673.15*
*Offer in Compromise for $456,443.00*

Dear Mr. Tanner:

The above-listed taxpayer is hereby remitting a cashier's check, in the amount of $456,443 to the Franchise Tax Board in connection with the Offer in Compromise for the account listed above. Per your letter of March 9, 2006, if Mr. Pressman's OIC is not accepted by the FTB, the FTB has agreed to return the check to Mr. Pressman. ***In other words, all funds will be refunded to the taxpayer, in the amount of $456,443.00, if the Offer in Compromise is not accepted.***

If you have any questions, please do not hesitate to call me.

Sincerely yours,

G. Michelle Ferreira

Enclosures

Cc: Jerrold Pressman
John Kirkland

CONFIDENTIAL

**Greenberg Traurig**

**Transmittal Cover Sheet**

**From:** G. Michelle Ferreira
**Tel:** 650.289.7855
**E-Mail:** FerreiraM@gtlaw.com

| To: | Fax No: | Company: | Phone No.: |
|---|---|---|---|
| Terrence Tanner | 916.855.5692 | CA Franchise Tax Board-OIC | |

**Re:** Stretto Enterprises and J. Pressman

**Date:** April 11, 2006 03:49 PM

**No. Pages:** Including Cover Sheet 3

If you do not receive all pages properly, please call the Sender.

**Notes:** Terrence,

Please find attached a copy of the check that was sent to your attention yesterday from our LA office via Express Mail. Please let me know if you do not receive in a timely manner, so that I may track its delivery.

Sincerely,

Naomi Takenaka
Secretary to Michelle Ferreira

**Also sent via:** ☐ US Mail ☐ Overnight ☐ Messenger ☐ Email ☒ No Other

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

1900 University Avenue, 5th Floor, East Palo Alto, California 94303 Phone: 650.328.8500 Fax: 650.328.8508

CONFIDENTIAL

John C. Kirkland
Tel. 310.586.7788
Fax 310.586.0286
KirklandJ@gtlaw.com

By Fax and Mail

Ms. Diana Perrin
Offer in Compromise Unit
Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Re: Offer in Compromise for Stretto Enterprises
Account No. [redacted]
Tax Year: 1992
Liability: $456,443 plus interest

Dear Ms. Perrin:

This letter is in response to your letter dated November 19, 2005 regarding the above-referenced Offer in Compromise. My colleague, Michelle Ferreira, and I have tried to call you to discuss options for resolving this account. Ms. Ferreira is a tax attorney in Greenberg Traurig's Silicon Valley office who solely specializes in tax controversy matters. You are authorized to speak to her directly about this account.

Our attempts to contact you were to discuss the resolution of this matter. The FTB should consider accepting the previous offer to resolve this liability for $250,000. I cannot stress that the FTB will not collect the full liability owing from Mr. Pressman, given his age (he is 70 years old) and that he does not have future earning potential the FTB claims he has (he is retired). Mr. Pressman has offered to pay $250,000, which represents the line of credit he has on his personal residence. If the FTB would prefer that Mr. Pressman turn over the title to both rental properties subject to its existing liens, one of which has been in and out of sale escrow three times and remains unoccupied, in satisfaction of this liability, he would gladly do that, however, please understand that the value of these homes has reduced substantially since the date Mr. Pressman made his Offer. Indeed, the value of these two homes is less than the $250,000 Mr. Pressman is offering to satisfy this liability.

Ms. Ferreira has spoken to Charlyn Moore, of the Business Entities Collections Unit, regarding this account. Ms. Moore suggested we speak with you, as the Offer in Compromise Unit apparently has the authority to resolve this matter. Ms. Ferreira offered to

CONFIDENTIAL



place Mr. Pressman in an installment agreement payment plan, of $10,000 per month, and Ms. Moore indicated that request would not be acceptable, as the "liability would not be paid, given Mr. Pressman's age." We understand this as well, and this is why the taxpayer offered to pay the $250,000 lump sum payment via the Offer in Compromise.

If the FTB believes this taxpayer will have "future earning potential," as your November 19, 2005 letter states, the FTB is mistaken. Mr. Pressman has provided extensive data showing that his living expenses have been paid for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of $3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of $3.8 million, all of which were connected to poor investments from the past. His income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his social security payment of $1,400 per month. The Offer for $250,000 was in line with his social security payment, assuming he lived to be over 85 years old.

Either way, Mr. Pressman's offer to pay either $250,000, in a lump sum amount, or $10,000 per month (for the rest of his life), are fair resolutions to this matter. It seems the FTB would prefer to receive some payment now, rather than nothing at all.

Indeed, if the FTB were to file a lien against Mr. Pressman, he may be forced to file for bankruptcy. Mr. Pressman currently finds himself with over $48 million of debt, all which is being managed through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would be erased, which will place him in default with his secured creditors. Any lien filed by the FTB now would put the FTB behind roughly $48 million in secured debt, including multiple mortgages on all of his real estate, and multiple blanket security interests in all his other assets, which would mean the FTB would collect nothing. Mr. Pressman's assets come no where near the amount of the multiple liens upon them, as his Offer in Compromise showed.

An Offer in Compromise is a business decision by the FTB. If the FTB will collect nothing from an individual taxpayer in the future, and if the offered amount will guarantee some form of collection today, it seems to me that the FTB should take the payment for the state to resolve the liability. However, given the multiple loans, liens and other secured debt (which comes before any FTB lien), the FTB will collect nothing from a 70 year old, unemployed taxpayer who will never have a paying income stream in the future.

This matter is placing immense stress on our elderly client, particularly during the holiday season, and he is desperate to resolve it. We seriously hope you will reconsider your blanket refusal to resolve this matter. If there is an alternative payment option you propose, we welcome a proposal from you.

LA-FS1\379965v01

CONFIDENTIAL



If you have any questions, please contact me at the number listed above.

Sincerely,

John C. Kirkland

JCK:GMF:mb

cc: Ms. Charlyn Moore
Mr. Jerrold S. Pressman
G. Michelle Ferreira, Esq.

CONFIDENTIAL

G. Michelle Ferreira
(650) 289-7855
ferreiram@gtlaw.com

February 17, 2006

**VIA FEDERAL EXPRESS**

D. Perrin
Principal OIC Specialist
California State Franchise Tax Board
ITCB- OIC Group
P. O. Box 2952
Sacramento, CA 95812-2952

Re: *Offer in Compromise for Jerrold Pressman*
*a.k.a. Stetto Enterprises*
*Account #* [redacted]
*Tax Year: 1992*
*Offer: $456,443.00*

Dear Ms. Perrin:

Pursuant to your letter dated January 18, 2006, we are hereby responding to the requested information. Specifically, you have requested that the following be addressed by February 18, 2006:

1. The source of the $456,443.00 of funds offered to resolve this matter with the FTB;

2. A copy of the JSP Notes Payable of $1,808,083.94 to Jerrold Pressman; and

3. A copy of the note payable of $1,425,000.00 to Jerrold Pressman for the sale of the 2672 Lacey Street, Los Angeles, CA property.

We will provide the information you have requested in the order presented in your January 18, 2006 letter.

**1. Source of the $456,443.00 offer in compromise:**

Jerry Pressman has confirmed that he will have the funds by the due date required by the Franchise Tax Board from borrowed funds, as follows:

- $250,000 home equity loan on the home located at 705 Palisades Beach Road, Santa Monica, CA from Wells Fargo Bank;

- $56,000 in unsecured loans from American Express and Visa;
- $150,000 in personal loans from immediate family members (Sven Reckeweg, Robert Pressman, Gary Pressman and Keith Pressman).

**2. JSP Properties note payable:**

A copy of the JSP Properties note payable is attached as the "Inglehame Farms" note in the amount of $2,000,000 to Jerrold Pressman, dated February 10, 1994. (See Exhibit A). Jerrold Pressman had originally invested in Inglehame Farms in the early 1990's to the extent of approximately $8 million on funds he borrowed from various lenders. Inglehame Farms went into bankruptcy in {when?} and a successor company JSP Properties carried the note to Jerrold Pressman from Inglehame Farms. Because the debt is unsecured, and because JSP Properties owns assets worth less than other secured debt, the unsecured promissory note from Inglehame Farms (a bankrupt and defunct company), is essentially worthless and Mr. Pressman has no expectation of repayment on this note. Moreover, the funds he invested in Inglehame Farms were borrowed and he is currently personally liable on that debt.

**3. The Lacey Street note of $1,425,000:**

The Lacey Street property was sold in and the note was paid in April, 2001. The funds Mr. Pressman received from the payment of this note were used to pay various creditors and he no longer has these funds.

Jerrold Pressman had sold the property located at 2684 Lacey Street, Los Angeles on October 16, 2000 and he took back a note from Haven Properties LLC, in the amount of $1,425,000, which encumbered the real property. See Seller's Closing Statement, dated October 12, 2000, which is marked Exhibit B. A copy of the promissory note on the Lacey Street property, in the amount of $1,425,000.00, dated October 12, 2000 is attached hereto and marked Exhibit C

On April 3, 2001, Haven Properties sold the Lacey Street property which required the promissory note to Jerrold Pressman to become due immediately. Attached hereto and marked Exhibit D is a copy of the Request for Beneficiary's Payoff Demand to Commerce Escrow Company for Mr. Pressman's secured note on the property. Exhibit E is a copy of the payoff calculation for the sale of this property, which indicates a net payoff amount to Jerrold Pressman of $1,112,410.25[1].

Mr. Pressman no longer holds an interest in the Lacey Street note.

[1] This amount was the net payoff amount to Mr. Pressman, after payment to Bar-K of principal and interest of $312,971.20 and $2,399.59, respectively. See Exhibit F for a copy of the Bar-K demand for payment on the $312,971.20 loan to Jerrold Pressman.

I hope this clarifies the questions you had in your January 18, 2006 letter. If you need further information from me, please do not hesitate to call. Mr. Pressman would like to resolve this matter with the FTB as quickly as possible, so please contact me as soon as possible to discuss resolution of this account.

Sincerely yours,

G. Michelle Ferreira

Enclosures

Cc: Jerrold Pressman
John Kirkland, Esq.

# EXHIBIT 17

CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

In re

EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,

Debtors,

JASON M. RUND, CHAPTER 7 TRUSTEE,

Plaintiff,

vs.

JOHN C. KIRKLAND, an individual and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,

Defendants.

No. 2:10-bk-62208-ER

DEPOSITION of RUBEN MORENO

June 19, 2017

Reported by: Mitch Genser, CSR No. 4239
424631

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles
(310) 207-8000 Century City
(916) 922-5777 Sacramento
(951) 686-0606 Riverside
(212) 808-8500 New York City
(312) 379-5566 Chicago
(415) 433-5777 San Francisco
(408) 885-0550 San Jose
(800) 222-1231 Martinez
(818) 702-0202 Woodland Hills
(347) 821-4611 Brooklyn
00+1+800 222 1231 Paris
(949) 955-0400 Irvine
(760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas
(702) 366-0500 Henderson
(518) 490-1910 Albany
00+1+800 222 1231 Dubai
(858) 455-5444 San Diego
(800) 222-1231 Carlsbad
(800) 222-1231 Monterey
(516) 277-9494 Garden City
(914) 510-9110 White Plains
001+1+800 222 1231 Hong Kong

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC,<br>and JERROLD S. PRESSMAN,<br><br>Debtors,<br>______________________________<br><br>JASON M. RUND, CHAPTER 7<br>TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN C. KIRKLAND, an individual<br>and POSHOW ANN KIRKLAND, as<br>TRUSTEE of the BRIGHT<br>CONSCIENCE TRUST DATED<br>SEPTEMBER 9, 2009,<br><br>Defendants.<br>______________________________ | No. 2:10-bk-62208-ER |

Deposition of RUBEN MORENO,

taken on behalf of Chapter 7 Trustee, at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367, commencing at 10:20 a.m., Monday, June 19, 2017, before Mitch Genser, CSR No. 4239.

PERSONS PRESENT:

| | |
|---|---|
| For Plaintiff: JASON RUND, CHAPTER 7 TRUSTEE | BRUTZKUS GUBNER ROZANSKY SEROR WEBER, LLP<br>BY COREY R. WEBER, ESQ.<br>21650 Oxnard Street<br>Suite 500<br>Woodland Hills, California 91367<br>(818) 827-9000<br>cweber@bg.law |
| For Defendants: JOHN KIRKLAND, POSHOW ANN KIRKLAND | LEWIS R. LANDAU, ESQ.<br>22287 Mulholland Highway<br>Calabasas, California 91302<br>(888) 822-4340<br>lew@landaunet.com |

A It could have been. I don't know the name of the other entity.

Q What kind of company was EPD? What did it do?

A The main thing that I worked with it is, we paid people's bills; it was personal cards, mortgages.

Q And by "personal cards," do you mean credit cards?

A Yes.

Q And anything else?

A I was just involved with that. There was so many other entities that I was working on. EPD was just paying bills for people.

Q Do you know if EPD had any sort of an ongoing business at any point?

A What do you mean?

Q Did it actually do anything as a company other than pay people's bills?

A I'm not sure. I'm not completely -- you know, I only knew that part of it.

Q You worked for EPD for 10 years; right?

A Yes.

Q And was that starting before EPD was formed as a limited liability company?

A I don't know.
Q During that roughly 10-year time period, are you aware of any ongoing business activities that EPD had other than paying people's bills?
A No. I wasn't really -- Jerry was the main EPD guy. My role was just to take care of the bills; and not just me, it was several staff.
Q How many people worked for EPD during the time that you were there?
A I would say about 10.
Q At any given time?
A Yes. It wasn't a lot. There were a lot of different aspects in the office, but I guess everybody worked on everything.
Q What did the other people who worked there do?
A It was ice rinks. We had a radio station there, movie premieres, like book advertising, and Key Club, Plush Lounge.
Q When you say "ice rinks," is that something EPD did or something a different entity did?
A Well, we all worked -- it wasn't like -- how do I say it? We all worked together on everything.
Q All the companies?

A All the companies, yes. And then I had my own gigs that had nothing to do with EPD that I also worked on.

Q Do you know which entity did things regarding ice rinks?

A What do you mean?

Q Did EPD as a company do anything relating to ice rinks?

A Because we all were under the EPD thing, so we all did everything. Do you know what I mean? We all worked under the whole umbrella of different companies there. It wasn't like this is EPD and they don't do this, or this is Broadway and they don't do that. We all worked on everything.

Q Did you input transactions into some sort of a finance software for EPD?

A Yes.

Q And did you use QuickBooks or something else?

A QuickBooks.

Q And when you booked entries into QuickBooks for revenue for EPD, what constituted the revenue coming in to EPD?

A What do you mean?

Q How did EPD make money?

"them," the investors in EPD. So that's how they -- but I was never privy to, "This is what I did to get that." It was just, "Here's a check and it's income from this."

Q You mentioned EPD had investors?

A Yes. We called them investors. People we paid their bills for, we just called them investors.

Q And did those people put money into EPD?

A Yes.

Q And do you know why they put money into EPD?

A No.

Q Were the investors able to take money out of EPD at any time?

A Yes.

Q And what would they do? Would they just contact you or Jerry Pressman?

A Jerry. I would take direction from Jerry, me or whoever the staff was. I wasn't dealing with them.

Q And upon request they could take money out?

A Yes.

Q So effectively, it was like using EPD like

a bank account?
A Yes.
Q And could the investors also ask you to pay a mortgage payment or a credit card payment?
A Yes.
Q And did they do that?
A Yes. Not me directly, it would always come from -- I took direction from Jerry. I wasn't on the bank account; I couldn't sign the checks.
Q So they would reach out to Jerry Pressman and say, "Pay my credit card," and it would go ahead and get paid?
A Yes. He would approve everything.
Q When investors put money into EPD, do you know were the money went?
A What do you mean?
Q Where was it deposited?
A City National Bank.
Q Into EPD's bank account?
A Yes.
Q Did EPD have a separate bank account for each of the investors who invested money?
A No.
Q Was it all just deposited into one general bank account?

A Yes.
Q And that was just a general EPD bank account?
A Yes.
Q So the funds were commingled together?
A Yes.
Q Did the investors receive regular account statements as to how much money they had in EPD?
A Yes.
Q And who generated those account statements?
A There was a variety of us, you know; there was like five or six of us.
Q Did you generate some of the account statements?
A Some of them, yes.
Q So if an account statement said that there was $100,000 in that person's EPD account, was $100,000 physically in EPD's bank account?
A It could have been. I mean, you know, it fluctuated.
Q Was there enough in EPD's bank account at any given time to pay the investors what they had deposited in EPD?
A I don't think so, no.

Q Where would the money go if it wasn't in the bank account?

A It would pay people's bills. That was it pretty much.

Q If an investor deposited funds into EPD, were those funds sometimes used to pay amounts to other investors?

A I would imagine so, because it was all the same bank account.

Q And were funds deposited by one investor used to pay credit card or mortgage payments for other investors?

A I'm not sure. I mean, it was just all in one account. It was one account coming in and one account -- everything was coming in and out of one account.

Q Did EPD take any steps to make sure that there were sufficient funds in the bank account to repay investors the amounts they had deposited?

A I'm sure, you know, Jerry had it. That was not something I did.

Q You're not aware of any measures that EPD took to make sure there was enough in the bank account to be able to repay investors the amounts they had deposited?

A Yeah, I was not in charge of that. It was just a bookkeeping function for me.
Q Are you aware of any measures, though?
A No, I'm not aware.
Q At some point in 2009, did investors start demanding amounts that EPD wasn't able to pay?
A Yes.
Q Do you recall when that was?
A No, I don't.
Q Was it some point in 2009?
A Yes.
Q Was it in the summertime?
A I don't remember.
Q What generally happened? Investors contacted EPD asking for money and EPD just didn't have the money to pay it?
A Yeah, basically. That's what ended up happening.
Q So what did EPD tell the investors at that point?
A From what I recall, Jerry was working on some kind of loan to get everybody the cash they needed.
Q And was he successful in getting that loan?

A I don't think it ever came through, no.
Q When you booked entries into the QuickBooks account for EPD, were those entries that you just did automatically as part of your job or did someone instruct you to input them?
A Both.
Q So for instance, if a deposit came in from an investor, would you just automatically book that?
A What do you mean?
Q If an investor wrote a check to EPD for, say, $100,000, and it came to the office, is that something that you would automatically book in QuickBooks?
A Yes, I would book it.
Q And if EPD wrote a check to an investor, is that something you would automatically book in QuickBooks?
A Yeah, it's automatically booked.
Q What are the transactions that people asked you to book that were sort of not part of the things that you would automatically book?
A Ask me again. I'm not sure what you're asking.
Q Did Jerry Pressman ever ask you to book specific transactions in relation to EPD?


BARKLEY Court Reporters

A Yes.
Q Did you prepare Balance Sheets?
A Yes.
Q How about income statements or profit and loss statements?
A Yes. It was generally automatically from the QuickBooks.
Q On the profit and loss statements for EPD, do you ever recall there being a net profit for EPD in any given year?
A No, I don't recall. I don't recall the net.
Q You don't recall one way or the other?
A Yeah.
Q And on the Balance Sheets, do you recall if there were assets in excess of liabilities in any given year?
A I don't recall.
Q You don't recall one way or the other?
A No.
Q Did EPD own any assets?
A I don't know.
Q Do you know if it owned any real property?
A I don't know the structure; I don't know that.

Q Do you know if it owned any physical assets?
A No, I don't know.
Q Was EPD involved in leasing transactions?
A I believe so, yes.
Q What were the leasing transactions?
A It was usually equipment at the ice rinks.
Q So how did the leasing transactions work?
A People would buy equipment and they would prepare the paperwork and then give it to accounting and tell them how to pay it out.
Q So who would buy the equipment?
A Whatever investor or, you know...
Q So was that equipment that was already at the ice rink?
A I don't know where the location of the equipment was. I just got paperwork of, you know, "Here, you're going to pay this lease on a monthly basis." That's pretty much how it came down the pipeline.
Q The ice rinks you're referring to, were those ice rinks that Jerry Pressman was affiliated with?
A Yes.
Q So an investor would buy equipment that

would be located at one of the ice rinks?
A I believe that's how it worked.
Q And then would they lease that equipment to someone?
A No, I'm not sure how it worked on that. Like I said, I just got the bookkeeping directions and did it.
Q Who gave you the bookkeeping directions?
A Jerry.
Q Jerry Pressman?
A Yes.
Q And do you know if EPD was the lessor or lessee in any of those lease transactions?
A I always confused that. I wouldn't know if I was looking at one of them.
Q Do you know if EPD ever leased equipment?
A I don't know. I don't know the answer to that.
Q Do you know if EPD had any involvement in those transactions?
A They generated a check to the investor for the lease payment.
Q EPD did?
A Yes.
Q So EPD would pay the investor lease

payments on a regular basis?
A Yes.
Q And would EPD receive funds from anyone in exchange for that?
A Yes.
Q From whom?
A From the investor who purchased the equipment.
Q So EPD would get a check from an investor for some amount to purchase equipment?
A Yes.
Q And then EPD would pay the investor lease payments?
A Yes.
Q But you don't know if EPD was a lessor or a lessee under the leases?
A I always confused them, but if I'm looking at one, it will say.
Q Do you know why EPD did leasing transactions?
A No.
Q Do you know why the investors did leasing transactions?
A No.
Q Did it show up as revenue on EPD's income

with Jerry on something.

Q Do you know approximately when he started working with Jerry Pressman?

A I have no idea.

Q Has it been a long time?

A Yes, it's been a long time, I'm sure; I don't know, 10 years ago, maybe. I'm just guessing. I don't talk to him too much.

Q Was Mr. Kirkland an investor in EPD?

A I think so, yes.

Q Do you know how much he invested?

A Not off the top of my head, no.

Q And have you ever heard of an entity called the Bright Conscience Trust?

A No.

Q Have you ever heard of someone named Poshow Ann Kirkland?

A No. Is that John Kirkland?

Q No.

A That's why I'm saying. Because I've heard of John Kirkland.

Q Have you ever communicated with John Kirkland?

A Yes.

Q About what?


BARKLEY Court Reporters

A He called me about a month ago to ask me for some information.
Q What kind of information?
A He wanted a listing of what he had deposited into EPD, I believe.
Q Anything else?
A That was it pretty much. It was pretty quick.
Q Did you speak with him by phone?
A Yes, only by phone.
Q And when you received that call, you didn't still work for EPD or Mr. Pressman, did you?
A No, I did not.
Q What did you tell him?
A I told him he would have to talk to Jerrold Pressman.
Q Did you provide anything to Mr. Kirkland?
A And then Jerrold asked me to provide him with the information.
Q Did you send information to Mr. Kirkland?
A I believe I did.
Q By e-mail?
A I think so. I don't remember or I could have faxed it over. Whatever he asked me to do after he talked to Jerry.

Q So your understanding is Kirkland then talked to Jerry Pressman and Jerry Pressman instructed you to send something to Mr. Kirkland?

A Yes.

Q So whatever it was, you didn't generate it, it was something Mr. Pressman gave to you?

A Yes.

Q Do you know what it was?

A It was a list of deposits.

Q And that came from Mr. Pressman?

A Yes.

Q Do you know how Mr. Pressman got it?

A Probably on the computer. It was probably on the computer somewhere. I might have given him the list on the computer, now that I'm thinking about it because I don't know where he would have got it at.

Q Other than that one call and e-mail or fax to Mr. Kirkland, have you communicated with Mr. Kirkland any other time since the bankruptcy case started?

A No.

Q Could you provide a copy of whatever e-mail or fax you sent to Mr. Kirkland and any responses?

A I think so. I can go back and look, yes.

Q And how about 2005 through 2010?
A I don't know when it ended, but 2005 to when it ended.
Q You reported to Jerrold Pressman?
A Yes.
Q Did you prepare the Statements of Information in Exhibit 2?
A Not necessarily; I don't know.
Q You don't recall preparing them?
A No.
Q Do you know who would have prepared them?
A No.
Q You've never heard of an entity called the Bright Conscience Trust?
A No, off the top of my head, no.
Q How about a company called HMB Holdings, LLC?
A I've heard of it.
Q Do you know what it is?
A No.
Q Do you know if the Bright Conscience Trust ever invested funds with EPD?
A Not off the top of my head.
Q Do you know if Bright Conscience Trust ever loaned funds to EPD?

A I don't know.
Q Do you know if Mr. Kirkland loaned funds to EPD?
A I don't know the nature of the deal, if it was a loan or whatever it was, but he had written checks to EPD, yes.
Q Do you know if HMB Holdings, LLC invested funds in EPD?
A I'm not sure. I don't know.
Q Do you know if they loaned funds to EPD?
A I'm not sure.
Q Have you ever served as controller of EPD?
A Yes, that may have been the title. Sometimes controller, sometimes accounting.
Q Do you know what you did as controller?
A Mainly bookkeeping.
Q Anything else?
A No, it was just bookkeeping and accounting work.
Q With regard to any of the funds put into EPD by investors, do you know if they were investments or loans?
A No, I didn't ever get into the nature of that.
Q Do you know if there were funds put into

EPD that were loans rather than investments?
A Yes, possibly.
Q Do you know what the distinction was between the ones that were loans versus the ones that were investments?
A What was the first part?
Q For the funds put into EPD that you think were loans, what makes you think they were loans rather than investments?
A Because we paid them back.
Q And you didn't pay the investors back?
A No, we would pay -- like if there was a loan, we would pay the loan back.
Q So how did you know it was a loan rather than an investment that was getting repaid?
A I don't think we distinguished that, that this is a loan and this is an investement.
Q Do you know if the funds that were put into EPD were subject to risk of loss?
A I don't know what that means.
Q I'd like to introduce Exhibit 3.
(Chapter 7 Trustee's Exhibit 3 was marked for identification by the Deposition Officer and is attached hereto.)
Q BY MR. WEBER: Mr. Moreno, have you seen


BARKLEY Court Reporters

this document before?
A Not that I remember.
Q For the record, this document titled "Declaration of Ruben Moreno in Opposition to Plaintiff's Application for Right to Attach Order and Order for Issuance of Writ of Attachment" was previously introduced during Mr. Moreno's Rule 2004 Examination.
Mr. Moreno, if you flip to what's stamped at the top, it's page 7 of 12. Do you see that there is a signature?
A Yes.
Q And do you see the signature block where it says "Ruben Moreno" printed?
A Yes.
Q Is that your signature?
A No.
Q Do you recognize whose signature it is?
A No.
Q Do you recall authorizing your signature to be signed by someone else on this document?
A I don't remember that, no.
Q Do you recall reviewing this Declaration before it was filed with the court?
A I don't recall, no.

controller since 2003?
A No, I believe it was 2000.
Q In the next sentence it mentions that you were the custodian of books, records and files relating to some of EPD's transactions.
Do you see that?
A Yes.
Q Is that accurate?
A I don't believe so. Any books and records would have to go through Jerrold Pressman. I was not in charge of that.
Q If you look at Paragraph 4, it quotes a definition from the financial dictionary.
Do you see that?
A Okay.
Q Then it says, "The distinguishing feature of an investment, as opposed to a loan, is that an investment is characterized by risk of loss."
Do you see that?
A Yes.
Q Do you remember writing that?
A No, I do not.
Q Have you ever looked at the financial dictionary before?
A No.

Q Do you know the difference between a loan and an investment?
A Yes.
Q Could you characterize any of the amounts put into EPD as loans as compared to investments?
A Yes, we would.
Q Do you know, for instance on this one, whether the investment it's talking about here was a loan or an investment?
A No, I don't recall the details of this.
Q If you look on Paragraph 9, there is a reference to IRS Publication 525.
Do you see that?
A Yes.
Q Have you ever heard of IRS Publication 525?
A No.
Q Have you ever read it?
A No.
Q Do you know what it is?
A No.
Q If you look at Paragraph 10, there is a reference to IRS instructions to Form 6198.
Do you see that?
A Yes.

Q Do you know what Form 6198 is?
A No.
Q Have you ever seen it before?
A No.
Q There is a reference to a Tax Code specifically requiring that amounts be at risk in relation to that paragraph.
Do you see that, Paragraph 10?
A Yes.
Q Do you know what that means?
A No.
Q In Paragraph 11 it says that EPD -- strike that.
In Paragraph 11 it says, "It must also be noted that EPD Investment Co. acted merely as a conduit, EPD Investment Co. made no profit on the transaction and did not benefit financially in any way from her temporary deposit of the funds. It was really just a personal favor because Ms. Hansel is a family friend of EPD Investment Co.'s chairman."
Do you see that?
A Yes.
Q Do you know what that's talking about?
A No.
Q Do you know if EPD acted as a conduit?

A No.
Q Paragraph 13 references you generating Promissory Notes.
Do you see that?
A Yes.
Q Did you ever generate Promissory Notes for EPD?
A No.
Q Never?
A No, I didn't generate those.
Q So that's not accurate?
A No.
Q Paragraph 17 says, "For the initial three years of the investments, EPD Investment Co. received monthly payments from the lessors and sent them to Ms. Hansel at her request.
Do you see that?
A Yes.
Q Is that something you wrote?
A No.
Q Do you have any knowledge of EPD receiving monthly payments from lessors?
A No.
Q Or paying --
A I don't remember any of that.

A Yes, I see that.
Q Is that accurate?
A I don't remember.
Q Do you recall ever discussing this Declaration with anyone?
A I believe you asked me about it last time I was here.
Q Anyone else?
A No.
Q This appears to have been filed by Mr. Kirkland with the Superior Court, based on the cover page. Do you recall ever talking with Mr. Kirkland about a Declaration of yours that he was going to file in a pending case?
A I don't remember that.
Q And it's not your signature and you don't recall authorizing it?
A Yes, that's not my signature.
Q And you didn't authorize your signature on this document?
A I don't recall that.
Q I'd like to introduce Exhibit 4.
(Chapter 7 Trustee's Exhibit 4 was marked for identification by the Deposition Officer and is attached hereto.)

A Yes.
Q Did you review it before it getting filed?
A Yes.
Q If you look at the first page, the last paragraph. The second sentence in that paragraph says, "EPD acts as an intermediary, investment placement company for private investors seeking to invest funds in third-party equipment leases in California."
Do you see that?
A Yes.
Q Is that accurate?
A Yes.
Q Then it says, "Said equipment leases purport to provide investors monthly lease payment income from third parties and certain tax deductions that are made available by the IRS to purchasers of equipment that is leased for use in a trade or business."
Do you see that?
A Yes.
Q Is that accurate?
A Yes.
Q How do you know those statements are accurate?

A That's what EPD did. They would pay out investors on monthly lease payment income.
Q Other than that and paying the investors' bills, do you have any other understanding as to what EPD did?
A No.
Q If you look on page 4, at the bottom. The last paragraph, the second sentence says, "EPD's investors are independent businesses and individuals, who are nothing more than prospective lessors of equipment to third parties. EPD exercises no control over them. Investors have no authority to negotiate equipment leases on behalf of EPD. They are under no obligation to purchase any of the equipment being leased, or to sell it downstream upon termination of the lease."
Do you see that?
A Yes.
Q Is that accurate?
A I'm not sure what that means.
Q Do you know who came up with that language?
A No, I do not.
Q I'd like to introduce Exhibit 6.
///

(Chapter 7 Trustee's Exhibit 6 was marked for identification by the Deposition Officer and is attached hereto.)

MR. WEBER: For the record, this is an e-mail from Mr. Landau that attaches printouts. And this is dated May 10, 2017. The only part in the e-mail that I was interested in says, "The attached was just received by JCK from Ruben reflecting the account status," and then it attaches printouts.

Q Is this what you were referring to when you said you sent printouts regarding the deposits to Mr. Kirkland?

A Yes.

Q Do you know where this information came from?

A The schedule?

Q Yes.

A From the old EPD files.

Q Electronic files or print files?

A Electronic files.

Q QuickBooks?

A No, this is Excel.

Q Do you know who inputted these transactions that are reflected here?

A No, I wouldn't know.

Q Was it you?
A Possibly, but not entirely. There was about about five or six of us that worked on it.
Q Do you know if they're accurate?
A I'm going to -- yes, they've got to be accurate.
Q And what do you base that on?
A Because this was tied to the bank statement.
Q If you look at the first page of the printout, on the left-hand side in bold it says, "KEP deposit 1029."
Do you see that?
A Yes.
Q Is "KEP" Keith Pressman?
A Yes.
Q Why would a deposit by Keith Pressman be reflected on Mr. Kirkland's account?
A Because it went into Keith's account.
Q Into whose account?
A Keith Pressman's account.
Q But isn't this a printout in regard to Mr. Kirkland?
A Yes. He wrote the check to -- it's just telling you where the check went.

Q So Keith Pressman wrote a check to John Kirkland?
A No, John Kirkland wrote a check to Keith Pressman.
Q And do you know why?
A I don't recall, no.
Q So that's there because John Kirkland wrote a check to Keith Pressman?
A Yes.
Q Why would a check to Keith Pressman show up on an EPD account?
A What do you mean?
Q Aren't these schedules in regard to EPD?
A Everything. They're everything deposited into all the entities. You'll see Broadway Entertainment on there.
Q Why would a payment to Keith Pressman be reflected in an account statement for EPD?
A It's just a listing of all monies John Kirkland ever gave to any entity.
Q So not necessarily EPD?
A Not necessarily EPD only.
Q Just any entity or person that had any relation to Jerrold Pressman?
A Yes, basically his companies or Keith's.

Q But why would that be reflected on an EPD account statement?
A I don't know. Because he deposited 200,000 into Keith's account. So this is -- these schedules are every single deposit put into any of the accounts. That's how we were instructed to prepare the schedules.
Q Any entity?
A Not any, the Pressman entities.
Q And any payments directly to Keith Pressman?
A Yes.
Q But you don't know why John Kirkland paid Keith Pressman $200,000?
A No, I wouldn't know what they paid Broadway Entertainment for. I wasn't privy to any of that information.
Q So the next entry says "BEM Deposit ck 1030."
Do you see that?
A Yes.
Q "BEM," is that Broadway?
A Yes.
Q And does that transaction reflect that Mr. Kirkland deposited $400,000 into Broadway?

A Yes.
Q Do you know why Mr. Kirkland deposited $400,000 into Broadway?
A No.
Q If you look below that on the left, it says, "Wire to Neah Power Systems, Inc."
Do you see that?
A Yes.
Q Do you know what Neah Power Systems, Inc. is?
A No. I've heard of the name, but I don't know what they do.
Q Do you know why that entry is there?
A No. I mean, I'm assuming they wired some money to Neah Power for John Kirkland. But I couldn't order that. I don't know why they did it.
Q And below it, it says, "Transfer to start Lease L0712-1-JK."
Do you see that?
A Yes.
Q And do you know what that's in relation to?
A It looks like he started a lease.
Q John Kirkland started a lease?
A Yes.

Q If you look at the next page, there are quite a few entries that say "Wire Deposit RBC." Do you see that?

A Yes.

Q Do you know what those are?

A They were deposits, but I don't know what the RBC was for.

Q You don't know what those relate to?

A No.

Q And below those there is a BEM deposit, "Check # 1085." Do you know what that's in relation to?

A No.

Q How about the "Wire to RBC Risk Management"?

A I don't know what that was for.

Q How about "KEP CNB Deposit Check # 1052"?

A What about it? What are you asking?

Q Do you know what that's in relation to?

A No, not from looking at this.

Q And how about the wire deposit Neah entries?

A No.

Q Who asked you to input all these, you or whoever inputted the entries into here -- strike that.

Do you know who provided instructions to input these entries?
A Off the top of my head, no, but I'm going to assume it was Jerrold Pressman.
Q Could it have been anyone else?
A No, it would have been Jerrold Pressman.
Q However Jerrold Pressman wanted something booked on the records, that's how it got booked?
A Yes.
Q Did EPD have any independent auditors?
A What do you mean, in-house?
Q No, independent auditors, an accounting firm.
A Did we use like a CPA, yes.
Q Is that Ted Jonavic?
A Yes.
Q Did he ever audit the books and records of EPD?
A I don't know.
Q Did he prepare tax returns for EPD?
A I'm going to assume yes, it was him.
Q Did he also prepare tax returns for any investors in EPD?
A Yes.
Q As to any of the entries on this sheet,

can you independently verify that they're accurate?
A What do you mean?
Q Can you verify that the entries on --
A There is a way to verify, yes.
Q But as you sit here today, can you verify that any of these entries are accurate?
A Yes.
Q And how is that?
A Because if I look on the bank statement on 8/18/2008, for example, I can see that there is a bank wire for $855,000.
Q But without going back and checking against the bank statements, you couldn't verify that this is accurate?
A No.
Q I'd like to introduce Exhibit 7.
(Chapter 7 Trustee's Exhibit 7 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: And for the record, this is a register that was previously marked as part of Mr. Moreno's Rule 2004 Examination.
Q Mr. Moreno, have you seen this document before?
A Not that I recall.

Q Do you know what type of an interest rate EPD promised investors?
A I'm sorry?
Q Strike that.
Did EPD promise investors some type of an interest rate on their investments?
A Yes.
Q Do you know what it was?
A I think it was between 8 and 12 percent.
Q Do you know how EPD could afford to pay that interest rate?
A No.
Q You don't recall any sort of an on-going business for EPD, do you?
A Just all the enties that I'm telling you; the ice rinks, nightclubs, the radio stations. You know, we managed nightclubs in Palm Springs, Las Vegas.
Q Do you recall EPD generating profits in excess of 8 to 12 percent a year on whatever it did?
A I don't recall that, no.
Q Do you know how EPD could afford to pay investors 8 or 12 percent return on their investments?
A No, I never got involved in that.
Q Did you ever question how EPD could

promise those types of interest rates?

A No.

Q I'd like to introduce Exhibit 10.

(Chapter 7 Trustee's Exhibit 10 was marked for identification by the Deposition Officer and is attached hereto.)

MR. WEBER: Again, this is a previously marked exhibit from the Rule 2004 Examination.

Q Mr. Moreno, did you send this e-mail dated March 18, 2011, to Jerry Pressman?

A Yes.

Q And it attaches EPD's Balance Sheet as of December 31, 2010?

A Yes.

Q Did you generate this Balance Sheet?

A Yes. I'm going to assume, yes.

Q Is it from QuickBooks?

A Yes.

Q If you look at the third page of this document, which is the second page of the printout following the e-mail, it lists total current assets of approximately $16 million.

Do you see that?

A Third page where?

Q The third page of the document, but the

Sheet?
A I'm assuming that there was a loan out to that company.
Q You're not sure one way or another?
A No, I'm not sure.
Q If you look on the last page of this document, it lists "Total Liabilities."
Do you see that?
A Yes.
Q And it lists an amount in excess of 51 million.
A Yes.
Q So as of December 31, 2010, EPD's liabilities were over 51 million and its assets were approximately 16 million; is that correct?
A Yes.
Q If you look on page 7 of this Balance Sheet -- it says "Page 7" in the lower right-hand corner.
A Yes.
Q Toward the top, there is an amount listed for John Kirkland with an account that's L071201-JK.
Do you see that?
A Yes.
Q It says "$200,000."


BARKLEY Court Reporters

A Yes.
Q If you look on page 19, again, stamped in the lower right-hand corner.
A Okay.
Q Toward the middle of the page, there is another entry for John Kirkland, one that says "Lease Payments," and then one with an account that says "080818-JK" and one that says "071108-JK."
Do you see that?
A Yes.
Q That one lists three other amounts for Mr. Kirkland that make up $370,122.01.
Do you see that?
A Yes.
Q And that previous entry on page 7 listed $200,000.
A Yes.
Q Other than those, are there any other amounts that relate to Mr. Kirkland or his family trust?
A What do you mean?
Q On this Balance Sheet.
A Not that I see, no.
Q So if Mr. Kirkland or his family trust had monies owing to them as of this date, wouldn't those

show up on EPD's Balance Sheet as a liability?
A They should, yes.
Q Can you point me to any other entries other than those ones that I just mentioned that reference Mr. Kirkland or his family or his family trust?
A No.
MR. WEBER: Why don't we take a break.
(Lunch recess held.)
MR. WEBER: Back on the record.
Q Mr. Moreno, I'll remind you you're still under oath.
A Okay.
Q I'd like to introduce Exhibit 11.
(Chapter 7 Trustee's Exhibit 11 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: And you'll note that this is similar to Exhibit 10. This is another e-mail that looks like it's from you to Jerrold Pressman, but Exhibit 11 is dated March 30, 2011, whereas Exhibit 10 is dated March 18, 2011. And it says that there are two attachments, "EPD Yellow Sced" and "EPD Other Sced."
Q Do you see that?

A Yes.
Q And is this an e-mail that you sent to Mr. Pressman on March 30, 2011?
A Yes.
Q Did he request that you send it to him?
A Yes.
Q This also attaches an EPD Balance Sheet dated December 31, 2010.
A Yes.
Q If you look on page 3 of 25, with the numbering in the lower right-hand corner.
A Okay.
Q There is an entry on the Balance Sheet John Kirkland, account number L071201-JK for $200,000.
Do you see that?
A Yes.
Q And then if you look at the second page from the end of this document, which is page 6 of 7 of that second document attached.
A Yes.
Q There is another entry that's titled "K,J," which may be John Kirkland, but I'm not sure.
Do you know if it is or not?
A Where is that?
Q Page 6 of 7, but it's the second page from

the end of the document. There is an entry toward the bottom, "K,J."

A Okay.

Q Do you know if that's an entry related to John Kirkland?

A I'm thinking it is only because I saw it on the other one, the same exact numbers.

Q You saw the same numbers in Exhibit 10?

A Yes.

Q Now, other than the entry on page 3 of 25 attached to this Exhibit 11 that has an entry for $200,000, and the entry, the second page from the end for $370,122.01, are there any other entries on the Balance Sheet relating to Mr. Kirkland?

A Not that I'm aware of.

Q Do you see any?

A No.

Q And again, if there was a liability from EPD to Mr. Kirkland or his family or his family trust, that should be reflected as a liability on the Balance Sheet, shouldn't it?

A Yes.

Q Do you know if Mr. Pressman provided personal guarantees to investors or lenders?

A He could have, yes.

Q Do you know one way or the other?
A Yes, he did.
Q Did he provide it to all investors?
A No.
Q How did he decide who he gave a personal guarantee to?
A I have no idea.
Q Do you know if the people he provided guarantees to werr investors or lenders or both?
A Both.
Q Do you know if Mr. Pressman or EPD gave Promissory Notes to investors?
A Yes.
Q And how about Security Agreements?
A I'm not sure.
Q Do you know if he gave Promissory Notes also to lenders?
A Yes.
Q And how about Security Agreements?
A I don't know about that.
Q Do you know if Mr. Pressman or EPD permitted the filing of UCC financing statements in favor of investors?
A No, I don't know what that means.
Q Do you know what the difference between

Exhibits 10 and 11 is?
A It looks like one of them is only a listing of the loans, only the loan part of the Balance Sheet or the liabilities, it looks like, and then the other one is the entire Balance Sheet.
Q Which one is the entire Balance Sheet?
A Number 10.
Q And neither 10 nor 11 list any entries regarding the Kirklands other than the ones that we just went through?
A Yes.
Q That's correct?
A Yes.
Q I'd like to introduce Exhibit 12.
(Chapter 7 Trustee's Exhibit 12 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: This is another e-mail and attached documents previously marked during your Rule 2004 Examination. The first page is an e-mail that states that it's from you to Jerrold Pressman on April 11, 2011.
Q Do you see that?
A Yes.
Q And is that an e-mail you sent to

Mr. Pressman?
A Yes.
Q And it attaches an EPD Balance Sheet with "latest changes"?
A Yes.
Q Do you know what the changes were?
A No.
Q Do you know who made the changes?
A He would have asked me to make changes, but I don't know what the changes were.
Q "He" being Jerrold Pressman?
A Yes.
Q The Balance Sheet, is that something that you generated from QuickBooks?
A Yes.
Q If you look on page 5 of 29 stamped in the lower right-hand corner.
A Yes.
Q There is a section toward the bottom that's called "Notes Payable." Do you see that?
A Yes.
Q There is an entry on HMB Holdings, 11.25 million. Do you see that?
A Yes.
Q Do you know what that's for?

A No.
Q Are those three entries, HMB Holdings, Ice Group Escondido and Easy Street the only notes payable listed on this Balance Sheet?
A It looks like.
Q Do you see any other notes payable?
A All the other pages. The total is 55 million at the very end.
Q Are those notes payable or are they long-term liabilities?
A Those are long term.
Q So if you look on page 5 of 29, below where it says "Notes Payable," two lines down, it looks like it says "Total Current Liabilities," and then it looks like it starts "Long Term Liabilities."
Do you see that?
A Yes.
Q So starting from that point and going down through the pages, are those all long-term liabilities rather than notes payable?
A Yes.
Q And if you look on page 16 of 29 stamped in the lower right-hand corner.
A Okay.
Q In the middle there is an entry that says

"Bright Con."
Do you see that?
A Yes.
Q And it says "JK," and then there is a dollar amount. And then there is an entry that says "080818-JK," and another amount and an entry that says "071108-JK" and another amount. And then it says Total Bright Con, $370,122.01.
Do you see that?
A Yes.
Q Is that the same amount that was listed for Mr. Kirkland in Exhibits 10 and 11?
A Yes.
Q But you don't recall an entity with the name Bright Con or Bright Conscience Trust?
A Just on here; that's probably the first time I saw that.
Q Other than that one entry, can you tell me if there are any other entries related to Mr. Kirkland or Bright Con or the Bright Conscience Trust on this Balance Sheet that's attached to Exhibit 12?
A No.
Q There aren't any?
A There aren't any.
Q And if there was a liability owed to

Mr. Kirkland or the Bright Conscience Trust or to his wife, that should be reflected on the Balance Sheet; correct?
A Yes.
Q Did you ever discuss the Balance Sheets with Mr. Kirkland as part of the EPD bankruptcy case?
A No.
Q Do you know what kind of a business Key Club or S.C. Club was?
A A live music venue.
Q Anything else?
A And a restaurant.
Q Was that the Key Club on the Sunset Strip?
A Yes.
Q And Plush Lounge, is that a nightclub in Las Vegas?
A Yes.
Q And how about what was Broadway Entertainment?
A It was an entertainment entity that did movie premieres, and we ran a radio station in our office.
Q Do you know if EPD transferred monies to those entities?
A Yes.

Q Do you know for what purpose?
A Just intercompany funding.
Q Short-term funding or loans?
A Yes.
Q And then at some point some of the amounts got repaid to EPD?
A Yes.
Q Do you know if at the time of the bankruptcy those entities owed monies to EPD?
A I'd have to look at the Balance Sheet.
Q Could you take a look at Exhibits 10 through 12 and let me know if Broadway, S.C. Club/Key Club and Plush Lounge owed money to EPD.
A Yes.
Q Did Broadway owe money to EPD?
A Yes.
Q How much?
A It looks like $4.7 million.
Q Did Plush owe money to EPD?
A Yes.
Q How much?
A $45,406.
Q Did S.C. Club or Key Club owe money to EPD?
A Yes.

Q How much?
A $6,000,723.
MR. LANDAU: Can I confirm what exhibit you're reading from, please.
THE DEPONENT: This is Exhibit 12.
MR. LANDAU: Thank you.
Q BY MR. WEBER: And are the amounts the same as being owed in Exhibits 10 and 11?
A Exhibit 11 doesn't have that part.
Q And how about Exhibit 10?
A No, they're not the same amounts.
Q And what does Exhibit 10 reflect as the amounts owed from those entities to EPD?
A $4,412,000.
Q For which entity?
A Broadway Entertainment.
Q That's the amount that Broadway owed EPD?
A Yes.
Q And how about the other ones?
A The other ones. Plush Lounge is the same. And Key Club is a different amount.
Q And what does Exhibit 10 say about Key Club?
A Exhibit 10 says, $12,567,253.
Q Did Mr. Pressman individually also owe

amounts to EPD?
A I don't know.
Q Is that reflected on the Balance Sheet?
A I don't see it.
Q And you're looking at Exhibit 10?
A Yes.
Q How about Exhibits 11 or 12, do they reflect amounts owed from Mr. Pressman to EPD?
A Yes.
Q How much?
A It says here, 24 million. It's a receivable, though.
Q Mr. Pressman owed 24 million to EPD?
A Yes.
A Yes, according to this Exhibit 12.
Q Did Jerrold Pressman take funds out of EPD?
A Yes.
Q Do you know what he did with them?
A No.
Q Could Mr. Pressman --
A I mean, we paid the mortgage out of EPD and some of the credit cards for the businesses out of EPD.
Q How about did you pay Mr. Pressman's

credit cards?
A Yes.
Q And Mr. Pressman's mortgage?
A Yes.
Q Mr. Pressman's car payments?
A Yes.
Q And when I say "you," I meant EPD for all those.
A Okay.
Q And is the answer still the same?
A Yes.
Q Did EPD also pay Keith Pressman's mortgage payments?
A No, he didn't have one.
Q Did EPD pay Keith Pressman's rent?
A Yes. Actually, I'm not sure. He could have paid it out of his own account.
Q Did EPD pay Keith Pressman's car payments?
A Possibly, yes.
Q Did EPD pay Keith Pressman's utility payments?
A Maybe.
Q Did EPD pay Keith Pressman's credit card payments?
A Yes.

did anyone see the EPD bank statements on a monthly basis?

A Yes, some of the other accounting staff may have.

Q Anyone else?

A Not that I'm aware of, no.

Q Were those account statements ever provided to investors?

A No.

Q Were investors ever provided any listings of assets and liabilities of EPD?

A Not that I'm aware of.

Q Were they provided any statements of income and expenses of EPD?

A No, not that I am aware of.

Q On the amounts that were listed on Exhibits 10 through 12 relating to Mr. Kirkland or Bright Conscience Trust, there was a reference to lease payments; is that correct?

A Yes.

Q Was Mr. Kirkland involved in a lease transaction with EPD?

A Yes.

Q Do you know the nature of it?

A No.

Q Do you know what equipment was leased?
A No.
Q Do you know the lessor or lessee?
A No.
Q Other than one or more lease transactions, do you know if Mr. Kirkland had any other type of transactions with EPD?
A Other than the ones you've mentioned?
Q Other than the lease transactions.
A Yes.
Q What other type of transactions?
A It looks like a loan due to him is listed on here, that $300,000.
Q Do you know what the nature of that loan was?
A No.
Q Do you know if that was a loan versus an investment?
A No.
Q It could have been either?
A It could have been, yes.
Q At the time that Mr. Kirkland made investments or loans in EPD, do you know if he was an attorney for EPD or Mr. Pressman?
A No, I don't know if he was.

Q And are those in relation to the funding ability of EPD to pay back investors?
A Yes.
Q Was EPD having money issues and liquidity issues going back to October 15, 2009?
A It looks like it, yes.
Q If you turn to Document 37-7, page 2 of 56.
A Yes.
Q There is an e-mail from you to Mr. Huerth dated October 12, 2009.
Do you see that?
A Yes.
Q And below it there is an e-mail from Mr. Huerth to you the same day?
A Yes.
Q And those are e-mails you sent or received?
A Yes.
Q And are those e-mails in relation to the ability of EPD to pay back investors?
A Yes.
Q And EPD was having money or liquidity issues as of October 12, 2009?
A Yes.

Q And If you flip to the next page, page 3 of 56, also on Document 37-7.
A Yes.
Q There is an e-mail from you to Mr. Huerth dated September 30, 2009.
Do you see that?
A Yes.
Q And below it there is an e-mail from Mr. Huerth to you of the same date?
A Yes.
Q And those are e-mails you sent or received?
A Yes.
Q And are those in relation to the ability of EPD to pay back investors?
A Yes.
Q And was having EPD cash flow liquidity issues as of September 30, 2009?
A Yes.
Q And on the second e-mail on that page, the one from Mr. Huerth to you, Mr. Huerth, in the second paragraph says, "Needless to say, we are very scared with the EPD situation. We have run out of money and are leaving for Florida tomorrow. The plan is to put everything up for sale that we can. I doubt the

house will sell we have too big a mortgage. The boat and cars may sell. I know Jerry is trying his best. I think you have all of your savings in EPD as well. Do you think Jerry can pull us out of this in the next 30 days? Your thoughts would be most helpful."

Do you see that?

A Yes.

Q Had this issue, in regard to the ability of EPD to pay investors, started far before September 30, 2009?

A I'm going to assume, yes.

MR. LANDAU: Page number, please.

MR. WEBER: Page 3 of 56.

MR. LANDAU: Thank you.

Q BY MR. WEBER: In September of 2009, were you getting a lot of e-mails or calls similar to this?

A I'm not sure, but like I said, Art Huerth called or e-mailed regularly.

Q If you look at page 18 of 56. It's an e-mail from Art Huerth to you dated June 30, 2009.

Do you see that?

A Yes.

Q Is that an e-mail you received from Mr. Huerth?

A Yes.

A Yes.
Q And the third sentence says, "I am most concerned that I can't get an answer from anyone and the only one with the answers is you. Is EPD in trouble, should we set up a meeting? Our checks used to come like clock work, I know something is wrong."
Do you see that?
A Yes.
Q Is that in relation to the ability of EPD to pay money to investors?
A Yes.
Q Was EPD having money and liquidity problems back in May 2009?
A I'm going to assume, yes, from this e-mail.
Q If you look on page 30 of 56.
A Yes.
Q At the top there is an e-mail from Art Huerth to you dated February 17, 2010, with the subject matter "RE: Late check."
Do you see that?
A Yes.
Q And there is other e-mails in the string. Were those all e-mails you sent or received?
A Yes.

below is an e-mail from Katy Werner to Jerry Pressman dated June 8, 2010, in relation to your Declaration, according to the attachment.

Q Do you see that?

A Yes.

Q It looks like there is a draft form of that Declaration that we looked at earlier; is that right?

A Yes.

Q Do you know why Katy Werner would have been corresponding with Jerry Pressman or John Kirkland about your Declaration?

A No.

Q Do you know why Katy Werner would be drafting your Declaration?

A No.

Q Were you aware of that?

A No.

Q Did Ms. Werner or Mr. Kirkland discuss this Declaration with you?

A Not that I remember, no.

Q I'd like to introduce Exhibit 15.

(Chapter 7 Trustee's Exhibit 15 was marked for identification by the Deposition Officer and is attached hereto.)

MR. WEBER: Again, this is another e-mail between Ms. Werner and Mr. Kirkland. The bottom one has some other recipients, dated June 9, 2010.

At the bottom there is an e-mail from Katy Werner to Jerry Pressman, and it looks like to you, dated June 9, 2010.

Q Do you see that?

A Yes.

Q And Katy Werner says, "Here's Ruben's Declaration. Again, please review and discuss. Thanks."

Do you see that?

A Yes.

Q Do you recall receiving that e-mail?

A No.

Q Do you recall discussing the draft Declaration with Katy Werner or Jerry Pressman or John Kirkland?

A No.

Q Do you recall anyone providing you an opportunity to provide comments or changes to this Declaration before it was filed?

A I don't recall.

Q And someone else signed it representing that they were you?

A Yes.
Q I'd like to introduce Exhibit 16.
(Chapter 7 Trustee's Exhibit 16 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: This is another e-mail that doesn't look like you're a sender or recipient on, but it's an e-mail from John Kirkland to Jerry Pressman and Keith Pressman dated June 22nd, 2010; "Subject: Moreno Declaration."
Q Do you see that?
A Yes.
Q And it looks like this has yet another version of the Declaration that was ultimately filed; is that correct?
A Yes.
Q And did Mr. Kirkland or either of the Pressmans or Ms. Werner share this with you?
A Not that I remember, no.
Q They didn't provide any opportunity for you to review or comment or make changes to the Declaration?
A No.
Q And the final version that was filed by Mr. Kirkland isn't your signature?

$24,100,000 and "reduce SC obligation" and it looks like "note payable by the same amount."

Do you see that?

A Yes.

Q Do you know why Mr. Pressman was asking you to make those changes?

A No.

Q Do you know the reason why the changes were being made?

A No.

Q So any entry on the Balance Sheet could be changed by someone if Mr. Pressman instructed that it be done?

A Yes.

Q And Mr. Pressman didn't provide any reasoning for the changes, he just said, "Do it"?

A Yes.

Q And you or whoever else was implementing the changes would just do it?

Q I'd like to introduce Exhibit 19.

(Chapter 7 Trustee's Exhibit 19 was marked for identification by the Deposition Officer and is attached hereto.)

MR. WEBER: And this is another previously marked exhibit from your Rule 2004 Examination. It's

to investors as to what EPD did with funds?
A Not that I'm aware of, no.
Q The account statements that were sent out to investors, were those done on a monthly basis or a quarterly basis?
A Every six months.
Q And were those just generated through Excel?
A Yes.
Q And who generated those?
A Me and the rest of the accounting staff, and the receptionist would help.
Q And the amounts on those account statements didn't necessarily reflect the amounts that were in EPD's bank accounts; is that right?
A Yes, that's correct.
Q The account statements reflected the amounts that the investors put in and took out and interest or lease payments?
A Yes.
Q Whether or not EPD actually still had those funds?
A Yes.
Q So if EPD had transferred the funds somewhere else, those funds would still be reflected

on the account statements sent to the investors?
A Yes.
Q Did Mr. Pressman ever express concern to you during 2009 or 2010 about the inability to pay back investors?
A Yes, he was concerned. He was trying to take care of it.
Q Do you know what he was concerned about?
A Just concerned that there was a shortage of cash.
Q Did he ever express concern about EPD being found out as a Ponzi scheme?
A No, I never heard that.
Q He never used that term?
A He never used that term.
Q Did you hear anyone else use that term?
A Yes, investors would call and ask me.
Q And what would you say?
A I would say whatever he had told me and that he was working on the loan, and I would just relay that information.
Q Did you become concerned when you heard investors ask you if it was a Ponzi scheme?
A Yes, of course.
Q Did you do anything?

A In terms of -- no, I mean, I always had faith that he was going to come through. I worked for him for a very long time. There was a trust there. I didn't think that. I thought he was going to get the loan and we'll be on our way. Because they were all legitimate businesses. There were rinks, there was nightclubs. It's not like there were no businesses. There was a ton of businesses that we worked for.

Q You said based on the Balance Sheet that the nightclubs, S.C. Club and Key Club owed EPD money; right?

A Yes.

Q And Broadway owed EPD money; right?

A Yes.

Q And Plush owed EPD money; right?

A Yes.

MR. WEBER: I don't have anything further. Lew?

MR. LANDAU: Give me a moment.

EXAMINATION

BY MR. LANDAU:

Q Mr. Moreno, I introduced myself earlier; I'm the Kirkland's attorney.

A Yes.
Q So when you were testifying before on the amounts due the Kirklands, Mr. Weber asked you a lot of questions about those. Do you recall that?
A Yes.
Q Your testimony related to those transactions was strictly based on what you were reading from the exhibits that he put in front of you; correct?
A Yes.
Q You don't have any independent knowledge or recollection of the balance due the Kirklands, do you?
A No, not other than that schedule that you provided.
Q Yes. Let's go to that schedule.
MR. WEBER: Are you referring to Exhibits 10 through 12?
MR. LANDAU: No, it's the schedule that was sent to me. There it is. It's Number 6.
Q Mr. Moreno, the question is, do you know what date this schedule is current as of?
A The end of 2010.
Q Would that be December 31st, 2010?
A That would be September 1st, 2010.

They're all different. Actually, no, December 1st, 2010.

Q And how do you come to that date?

A If you go to the very last page, you see under "Date," the very last date on there is December 1st, 2010?

Q Yes.

A That's the period it goes through.

Q I see. So on the very last page of Exhibit 6, the last transaction is December 1st, 2010?

A Yes.

Q And you're basing your answer on that entry?

A Yes.

Q And do you know how this schedule, this Exhibit 6, fits with, let's say, Exhibit 12, which is the Balance Sheet?

A This schedule reflects every deposit Kirkland made with one of Jerry Pressman's entities. And the reason, for example, if you look on 9-27-2007.

Q Yes.

A There is a $400,000 deposit that went to Broadway Entertainment. That's not going to be reflected on this schedule because this schedule only reflects the amounts that went directly into the EPD

books.

MR. LANDAU: Okay. That's all I have.

MR. WEBER: Why don't we go off the record for a minute just to talk about the stipulation.

(Discussion held off the record.)

MR. WEBER: Back on the record.

While we were off the record, we discussed the stipulation as follows: And Mr. Moreno or Mr. Laundau can provide any corrections if they have any.

The court reporter will be relieved of his duties. He'll prepare a transcript of today's proceedings and send it to Mr. Moreno at an address that he will provide in a moment on the record; that Mr. Moreno will have two weeks upon receipt to review it, make any corrections to it, sign it and return it to me at my office; that if the original transcript is lost, stolen, destroyed, not returned or anything else becomes of it, that a certified copy may be used in lieu of the original agreed.

THE DEPONENT: Agreed.

MR. WEBER: And Mr. Moreno, could you provide the address to the court reporter to send the transcript to.

THE DEPONENT: 7266 Franklin Avenue,

# EXHIBIT 18

**AFFIDAVIT OF**
**NATIONAL CORPORATE RESEARCH, LTD.**

1. I, Andrew A. Lundgren, Esquire, state the following in relation to the *Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding)* (the "Subpoena"), dated March 22, 2017 (attached hereto as Exhibit A), issued by the Chapter 7 Trustee in that certain matter styled *Rund v. Kirkland, et al.*, Adv. Proc. No. 2:12-ap-02424-ER (Bankr. C.D. Cal.) (the "Proceedings") and directed to National Corporate Research, Ltd. (the "Company"), requesting the Company's records in connection with certain entities named in the subpoena during the period January 1, 2003, to present.

2. I am Vice President and Manager of Registered Agent Services for the Company.

3. The Company performs corporate services and serves as registered agent for corporations and other business entities nationwide.

4. The Company maintains an office located at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

5. Attached are true and correct copies of all non-privileged documents responsive to the Subpoena that are in the Company's possession, custody, and/or control (the "Documents") (attached hereto as Exhibit B). Certain privileged documents created by or at the direction of the Company's inside counsel have been withheld. All such privileged documents relate solely to the Company's search for records responsive to the Subpoena and post-date the issuance of the Subpoena.

6. The Company objects to the Subpoena to the extent that it requests the production of Documents that reveal information related to current and/or former Company clients that are not the subject of the Subpoena.

7. The Documents are produced without waiving the attorney-client privilege, the work-product immunity doctrine, or any other privilege or immunity held by the Company. The Company reserves all rights in connection with inadvertently produced Documents.

8. The Company reserves all rights to object to any supplement to this Subpoena or any additional request on any and all grounds, including, but not limited to, on the grounds that it is burdensome, oppressive, repetitious, or seeks information or documentation that is already in the possession, custody, and/or control of a party to the Proceedings.

9. The Company reserves all rights to object to any supplement to this Subpoena or any additional request to the extent it requires production of documents or information not in the Company's possession, custody, or control, or that is otherwise publicly available.

10. By producing the Documents, the Company makes no representation as to whether the information, documents, or other materials sought in the Subpoena are relevant or material to the subject matter of the Proceedings, admissible in evidence, or reasonably calculated to lead to the discovery of admissible evidence.

11. The Documents are produced pursuant to the Company's interpretation of the language in the Subpoena. The Company reserves the right to supplement its response should the issuer assert a different interpretation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2017

Andrew A. Lundgren, Esquire
National Corporate Research, Ltd.
850 New Burton Road, Suite 201
Dover, Delaware 19904
(212) 379-1969

**EXHIBIT A**

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re EPD INVESTMENT COMPANY, LLC,and JERROLD S. PRESSMAN
Debtor

*(Complete if issued in an adversary proceeding)*

Case No. 2:10-bk-62208-ER

Chapter 7

Jason M. Rund, Chapter 7 Trustee
Plaintiff
v.
John C. Kirkland, et. al.
Defendant

Adv. Proc. No. 2:12-ap-02424-ER

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: National Corporate Research, Ltd., care of Erin Upchurch, its agent for service of process in California
*(Name of person to whom the subpoena is directed)*

[X] *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit "A" attached hereto and incorporated herein by this reference

| PLACE | DATE AND TIME |
|---|---|
| Brutzkus Gubner, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367 | April 6, 2017 at 10:00 a.m. |

[ ] *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 3/22/17

CLERK OF COURT

OR

*Signature of Clerk or Deputy Clerk*

*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Jason M. Rund, Chapter 7 Trustee, who issues or requests this subpoena, are:
Michael W. Davis, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367, mdavis@bg.law, (818) 827-9000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: ______________________________
on *(date)* __________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ______________________
__________________________________________________________________________
______________________________ on (*date*) ________________ ; or

☐ I returned the subpoena unexecuted because: ________________________________________
__________________________________________________________________________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ ____________________ .

My fees are $ ________ for travel and $________ for services, for a total of $________ .

I declare under penalty of perjury that this information is true and correct.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

**EXHIBIT "A"**

**DOCUMENTS REQUESTED PURSUANT TO SUBPOENA**

**(INCLUDING COPIES OF ELECTRONIC DOCUMENTS)**

**I.**

**DEFINITIONS**

The following definitions are to be used in connection with the documents demanded:

1. "DOCUMENT(S)" shall have the broadest meaning permitted under Rule 34 of the *Federal Rules of Civil Procedure*, and shall include all tangible sources of information, including but not limited to: all paper, film, tape, computer drive or other medium upon which any electronic, computer stored, verbal, graphic, or pictorial information or image can be recorded, stored, written, printed, typed, drawn, produced, or reproduced in any fashion including all correspondence, memoranda, interoffice and intra-office communications, handwritten and other notes, analyses, agreements, contracts, books, files, charts, quotations, accounting records, audit work papers, worksheets, costs sheets, rate sheets, ledgers, price quotations, proposals, bids, receipts, manuals, lists, tables, financial analyses, spreadsheets, diagrams, studies, outlines, records, reports, agendas, minutes, photographs, drawings, sketches, brochures, schedules, calendars (paper and electronic), diaries, electronic mail ("email"), instant messages (and the equivalent), text messages, computer hard drives, computer servers, discs, CDs, DVDs, tapes, computer back-up tapes, video or audio tape recordings, voicemail messages, photocopies, computer-sorted or computer-retrievable information, information from hand-held electronic devices (including Blackberries, iPhones, mobile phones, pagers and other electronic mechanisms) and computer print-outs and programs or other data compilations from which information can be obtained or translated into usable form. The definition of "document" encompasses not only the original but also any copy reflecting or containing, or having attached thereto, any alterations, notes, comments, or other writing or material not appearing on the original, and shall also include drafts, revisions of drafts and other preliminary or preparatory material, from whatever source, underlying, supporting, or used in the preparation of any "document." The term "DOCUMENT"

also includes any removal "post-it" notes, tape flags, or other attachments or exhibits affixed to any of the foregoing.

2. The term "COMMUNICATION" shall mean any transmittal of information (in the form of facts, ideas, inquiries, photographs, drawings or otherwise), and a request for all documents concerning "communications" includes correspondence, all documents contained on any computer or server, facsimile transmissions, telecopies, electronic mail, all attachments and enclosures thereto, recordings in any medium of oral communications, voicemails, telephone logs, message logs and notes and/or memoranda concerning written or oral communications, and any translations thereof and any other documents concerning any of the foregoing.

3. "REGARDING" shall mean, pertaining to, mentioning, discussing, including, summarizing, describing, reflecting, containing, referring to, relating to, depicting, connected with, embodying, evidencing, constituting, concerning, reporting, purporting or involving an act occurrence, event, transaction, fact, thing or course of dealing.

4. "ADVERSARY PROCEEDING" shall mean and refer to the adversary proceeding pending in the Central District of California, Los Angeles Division, styled *Jason M. Rund, Chapter 7 Trustee, Plaintiff, vs. JOHN C. KIRKLAND, an individual, and POSHOW ANN KIRKLAND, as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009*, Adversary Case No. 2:12-ap-02424-ER.

5. "BANKRUPTCY CASE" means and refers to the consolidated bankruptcy case, styled *In re EPD Investment Company, LLC, and Jerrold S. Pressman*, Case No. 2:10-bk-62208-ER, currently pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

6. "DEBTORS" means and refers collectively to the consolidated debtors in the BANKRUPTCY CASE: EPD Investment Company, LLC and Jerrold S. Pressman.

7. "KIRKLAND" means and refers to John C. Kirkland, an individual.

8. The terms "NCR," "YOU", "YOUR", or "RESPONDING PARTY" means and refers to National Corporate Research, Ltd., a Delaware corporation, or any of its present or former

agents, employees or independent contractors, and all others acting or purporting to act on its behalf.

## II.

## GENERAL INSTRUCTIONS

For the purposes of responding to the requests, the following instructions shall apply:

1. This request seeks production of all documents and things described in the request which are in YOUR possession, custody or control, whether prepared by YOU or anyone else. and in any location they may exist including documents and writings in the possession. custody or control of any of YOUR representatives, attorneys, accountants or other agents.

2. This demand applies to the original of each document demanded (or copy if the original is unavailable) and any non-identical copy (for example, any copy with a handwritten notation).

3. If any demanded document cannot be produced in full, YOU are instructed to produce the demanded document to the extent possible and to specify in YOUR response each reason for your inability to produce the remainder of the items requested, stating whether it:

(a) is missing or lost;

(b) has been destroyed;

(c) has been transferred to others, voluntarily or involuntarily; or

(d) has been otherwise disposed of in some other manner.

4. In the event the RESPONDING PARTY seeks to withhold any document or information related to it on the basis that it is privileged or otherwise protected from disclosure, the RESPONDING PARTY is to set forth in the written response, as to each document for which any such privilege or limitation of discovery is claimed, the following:

(a) The name of each author or sender of each such document or thing, if any;

(b) The name of each recipient, addressee or other party for whom each such document or thing was intended, if any;

(c) The date or estimated date of each such document;

(d) The general subject matter as described on each such document or, if no

such description appears, then such other description sufficient to identify it; and

(e) The grounds for any such limitation on discovery (for example, attorney client privilege).

5. Unless otherwise specified, the time period covered by the requests is January 1, 2003, through the present.

III.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from, KIRKLAND REGARDING the filing of any UCC Financing Statements, amendments, or terminations REGARDING either of the DEBTORS.

**REQUEST FOR PRODUCTION NO. 2):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from, Lisa Underkoffler REGARDING the filing of any UCC Financing Statements, amendments, or terminations REGARDING either of the DEBTORS.

**REQUEST FOR PRODUCTION NO. 3):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from, Katherine (Katy) Werner REGARDING the filing of any UCC Financing Statements, amendments, or terminations REGARDING either of the DEBTORS.

**REQUEST FOR PRODUCTION NO. 4):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from, Dreier Stein & Kahan LLP REGARDING the filing of any UCC Financing Statements, amendments, or terminations REGARDING either of the DEBTORS.

**REQUEST FOR PRODUCTION NO. 5):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from, Greenberg Traurig LLP REGARDING the filing of any UCC Financing Statements, amendments, or terminations REGARDING either of the DEBTORS.

///

**REQUEST FOR PRODUCTION NO. 6):**

All DOCUMENTS and COMMUNICATIONS RESPONDING PARTY sent to, or received from. Luce. Forward. Hamilton & Scripps LLP REGARDING the filing of any UCC Financing Statements. amendments. or terminations REGARDING either of the DEBTORS.

**REQUEST FOR PRODUCTION NO. 7):**

All DOCUMENTS and COMMUNICATIONS REGARDING any UCC Financing Statements. amendments. or terminations filed on behalf of HMB Holdings, LLC.

**REQUEST FOR PRODUCTION NO. 8):**

All DOCUMENTS and COMMUNICATIONS REGARDING any UCC Financing Statements. amendments. or terminations filed on behalf of the Bright Conscience Trust Dated September 9, 2009.

**EXHIBIT B**

| OrderNo | TrackingNo | JurisState | Juris | Entity | PC | PcDesc | Qty | ServiceCharge | Disb | EntityRID | FilingRID | FilingDate | FilingNumber | ServiceStatus | RejectedReason | ItemRID | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M045544 | M045544-136071 | CA | Secretary of State | EPD INVESTMENT CO. | 152 | UCC, STL/FTL, & Judgments - Prelin | 1 | 37.00 | 0.00 | M000074272 | M000015078 | | | | | M000134713 | |