Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $50,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

TRUE POSITION TECHNOLOGIES shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

Lessee: ____
Lessor: ____

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised be written notice only to MONGILLO LEASING COMPANY, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to MONGILLO LEASING COMPANY and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by MONGILLO LEASING COMPANY, to reimburse MONGILLO LEASING COMPANY for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. **Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

Lessee: _____
Lessor: _____

13. General

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you" refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | "Lessee" |
|---|---|
| MONGILLO LEASING COMPANY | TRUE POSITION TECHNOLOGIES |
| By: ____________ | By: ____________ |
| Print: ____________ | Print: ____________ |
| Title: ____________ | Title: ____________ |
| Date: ____________ | Date: ____________ |

Lessee: ____
Lessor: ____

JMP 0057

This FINANCING STATEMENT is presented for filing pursuant to the California Uniform Commercial Code.

| | | | |
|---|---|---|---|
| 1. DEBTOR (LAST NAME FIRST—IF AN INDIVIDUAL) TRUE POSITION TECHNOLOGIES | | 1A. SOCIAL SECURITY OR FEDERAL TAX NO. [redacted] | |
| 1B. MAILING ADDRESS 24711 Avenue Rockefeller | 1C. CITY, STATE Valencia, CA | | 1D. ZIP CODE 91355 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST—IF AN INDIVIDUAL) | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO. | |
| 2B. MAILING ADDRESS | 2C. CITY, STATE | | 2D. ZIP CODE |
| 3. DEBTOR'S TRADE NAMES OR STYLES (IF ANY) | | 3A. FEDERAL TAX NUMBER | |
| 4. SECURED PARTY NAME MONGILLO LEASING COMPANY MAILING ADDRESS 3221 San Fernando Road CITY Los Angeles STATE CA | ZIP CODE 90065 | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. | |
| 5. ASSIGNEE OF SECURED PARTY (IF ANY) NAME MAILING ADDRESS CITY STATE | ZIP CODE | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. | |

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by Instruction 4).

HAAS VERTICAL - Model No. VF-6

7. CHECK IF APPLICABLE ☒ | 7A. ☒ PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(a) ITEM: ☐ (1) ☐ (2) ☐ (3) ☐ (4)

8. CHECK IF APPLICABLE ☒ | ☐ DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC § 9105 (1) (n)

9. ► SIGNATURE(S) OF DEBTOR(S) DATE:

TRUE POSITION TECHNOLOGIES
TYPE OR PRINT NAME(S) OF DEBTOR(S)

►
SIGNATURE(S) OF SECURED PARTY(IES)

MONGILLO LEASING COMPANY
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

CODE 1 2 3 4 5 6 7 8 9 0

10. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, FILE NUMBER AND FILING OFFICER)

11. Return copy to:

NAME
ADDRESS EPD INVESTMENT COMPANY
CITY 520 Broadway, Suite 660
STATE Santa Monica, CA 90401
ZIP CODE

(1) FILING OFFICER COPY

FORM UCC-1—FILING FEE $3.00
*Approved by the Secretary of State*

JMP 0058

# EXHIBIT 2

Lease # 000927-DL

# EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 27th day of September, 2000 by and between DEUSHANE LEASING COMPANY, whose principal address is 3221 San Fernando Road, Los Angeles, CA, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, whose address is 24711 Avenue Rockefeller, Valencia, CA, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

Miyano Lathe #4 - Model No. BNC-34S
Chevalier Mill - Model No. FM-32HP

2. Term:

The term of this lease is forty-two (42) months, beginning October 27, 2000 and ending April 27, 2004.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $ 200,000.00 |
| Monthly Payment (a) | $ 3,530.56 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 148,283.52 |
| Buyout @ | N/A |

MD
SEPT 2000

200K

During the term of this Lease, I agree to pay to DEUSHANE LEASING COMPANY monthly, the monthly payments set forth above. If the monthly payment is not paid by the 27th of the month, I agree to pay a $50.00 late fee.

4. Equipment Warranties:

DEUSHANE LEASING COMPANY does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to TRUE POSITION TECHNOLOGIES' place of business in proper working order, less normal wear an tear.

Lessee: ____
Lessor: ____

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $50,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor <u>as additional named insured and loss payee</u>. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

TRUE POSITION TECHNOLOGIES shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

Lessee: ____
Lessor: ____

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised be written notice only to DEUSHANE LEASING COMPANY, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to DEUSHANE LEASING COMPANY and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by DEUSHANE LEASING COMPANY, to reimburse DEUSHANE LEASING COMPANY for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. **Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

Lessee: _____
Lessor: _____

JMP 0068

13. General

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you" refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | "Lessee" |
|---|---|
| DEUSHANE LEASING COMPANY | TRUE POSITION TECHNOLOGIES |
| By: ____________ | By: ____________ |
| Print: ____________ | Print: ____________ |
| Title: ____________ | Title: ____________ |
| Date: ____________ | Date: ____________ |

Lessee: ____
Lessor: ____

JMP 0069

This FINANCING STATEMENT is presented for filing pursuant to the California Uniform Commercial Code.

1. DEBTOR (LAST NAME FIRST—IF AN INDIVIDUAL): TRUE POSITION TECHNOLOGIES
1A. SOCIAL SECURITY OR FEDERAL TAX NO.: [redacted]
1B. MAILING ADDRESS: 24711 Avenue Rockefeller
1C. CITY, STATE: Valencia, CA
1D. ZIP CODE: 91355

2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST—IF AN INDIVIDUAL)
2A. SOCIAL SECURITY OR FEDERAL TAX NO.
2B. MAILING ADDRESS
2C. CITY, STATE
2D. ZIP CODE

3. DEBTOR'S TRADE NAMES OR STYLES (IF ANY)
3A. FEDERAL TAX NUMBER

4. SECURED PARTY
NAME: DEUSHANE LEASING COMPANY
MAILING ADDRESS: 3221 San Fernando Road
CITY: Los Angeles STATE: CA ZIP CODE: 90065
4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO.

5. ASSIGNEE OF SECURED PARTY (IF ANY)
NAME
MAILING ADDRESS
CITY STATE ZIP CODE
5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO.

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4).

MIYANO LATHE #4 - Model No. BNC-34S
CHEVALIER MILL - Model No. FM-32HP

7. CHECK IF APPLICABLE [X] 7A. [X] PRODUCTS OF COLLATERAL ARE ALSO COVERED
7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(a) ITEM: [ ] (1) [ ] (2) [ ] (3) [ ] (4)

8. CHECK IF APPLICABLE [X] [ ] DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC § 9105 (1) (n)

9. DATE:
SIGNATURE(S) OF DEBTOR(S)

TRUE POSITION TECHNOLOGIES
TYPE OR PRINT NAME(S) OF DEBTOR(S)

SIGNATURE(S) OF SECURED PARTY(IES)

DEUSHANE LEASING COMPANY
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

CODE 1 2 3 4 5 6 7 8 9 0

10. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, FILE NUMBER AND FILING OFFICER)

11. Return copy to:
NAME
ADDRESS
CITY
STATE
ZIP CODE

EPD INVESTMENT COMPANY
520 Broadway, Suite 660
Santa Monica, CA 90401

(1) FILING OFFICER COPY

FORM UCC-1—FILING FEE $3.00
Approved by the Secretary of State

JMP 0070

# EXHIBIT 3

Article 'D'

Lease # 001222-GCL

## EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into at Santa Monica, State of California, on this 22nd day of December, 2000 by and between GRANDE CANYON LEASING, whose principal address is 31 West Robertson Street, Palatine, IL 60067, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

Lessor will lease to me and I agree to lease from Lessor the following equipment:

2. Term:

The term of this lease is forty-two (42) months, beginning December 22, 2000 and ending December 22, 2007.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $ 200,000.00 |
| Monthly Payment (a) | $ 3,530.55 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 148,283.10 |
| Buyout @ | N/A |

During the term of this Lease, I agree to pay to GRANDE CANYON LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 22nd of the month, I agree to pay a $50.00 late fee.

4. Equipment Warranties:

GRANDE CANYON LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to TRUE POSITION TECHNOLOGIES' place of business in proper working order, less normal wear an tear.

Lessee: ____
Lessor: ____

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $50,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

TRUE POSITION TECHNOLOGIES shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

Lessee:
Lessor:

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have the option to purchase the equipment. This option shall be exercised be written notice to GRANDE CANYON LEASING, within three (3) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to GRANDE CANYON LEASING and I have paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but no the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid buy GRANDE CANYON LEASING, to reimburse GRANDE CANYON LEASING for all fees and taxes relating to the equipment and this Lease.

12. Warranty:

The equipment is subject to a separate written warranty. **Under this Lease, however, there is not warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** This means that there is no promise that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment I used. NO substitution of equipment is allowed, unless agreed to in writing by you.

Lessee:
Lessor:

13. General

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay in, requiring me to keep my promises, or in enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights afterwards.

c. No changes in any of the terms or conditions of this Lease will be valid unless made in writing and signed by you and me. If any part of this Lease turns out to be prohibited by law, that will not make the rest of the Lease ineffective.

d. You have no obligation to provide replacement equipment for any reason.

e. California law govern the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you " refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filed in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

| "Lessor" | Lessee" |
|---|---|
| **GRANDE CANYON LEASING** | **TRUE POSITION TECHNOLOGIES** |
| By: [signature] | By: [signature] |
| Print: RAlph GRANDE | Print: |
| Title: President | Title: VP |
| Date: | Date: 12-22-00 |

Lessee: [initials]
Lessor: [initials]

**EXHIBIT "A"**

(3) 73007 Yamaha Machine Centers with Monitor - Model # PM3506M-53
#PM3506M-54
#PM3514L-50

Fadal VMC-4020 Vertical Machining Center, Miyano CNC Lathe-Model #JNC-45-S, Mcl CNC Control 4" Kitagawa Chuck, S-20 & S-16 Collets, Tool Holders & Bushings

# EXHIBIT 4

Lease # 010228-GCL

# EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 28th day of February, 2001 by and between GRANDE CANYON LEASING, whose principal address is 31 West Robertson Street, Palatine, IL 60067, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

Please See Exhibit "A" Attached.

2. Term:

The term of this lease is forty-two (42) months, beginning February 28, 2001 and ending August 28, 2004.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $ 48,000.00 |
| Monthly Payment (a) | $ 847.33 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 35,587.86 |
| Buyout @ | $ N/A |

During the term of this Lease, I agree to pay to GRANDE CANYON LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 28th of the month, I agree to pay a $25 late fee.

4. Equipment Warranties:

GRANDE CANYON LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to TRUE POSITION TECHNOLOGIES' place of business in proper working order, less normal wear an tear.

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where

Lessee: [signature]
Lessor: [signature]

it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $50,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

TRUE POSITION TECHNOLOGIES shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

Lessee: 14
Lessor: [signature]

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you " refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | Lessee" |
|---|---|
| GRANDE CANYON LEASING | TRUE POSITION TECHNOLOGIES |
| By: [signature] | By: [signature] |
| Print: RALPH GRANDE | Print: |
| Title: President | Title: VP |
| Date: | Date: 2-28-01 |

Lessee: [initials]
Lessor: [initials]

**EXHIBIT "A"**

(1) Miyano LTCC Lathe, Fadal VMC-4020 Vertical Machining Center, Miyano CNC Lathe - Model #JNC-45-T, McL CNC Control 4" Kitagawa Chuck, S-20 & S-16 Collets, Tool Holders & Bushings

# EXHIBIT 5

Lease # 020115-GCL

## EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 15th day of January, 2002 by and between GRANDE CANYON LEASING, whose principal address is 31 West Robertson Street, Palatine, IL 60067, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

See Attached Schedule "A"

2. Term:

The term of this lease is forty-two (42) months, beginning February 15, 2002 and ending August 15, 2005.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $ 200,000.00 |
| Monthly Payment (a) | $ 3,530.55 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 148,283.10 |
| Buyout @ | $__N/A____ |

During the term of this Lease, I agree to pay to GRANDE CANYON LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 1st day of the month, I agree to pay a $75 late fee.

4. Equipment Warranties:

GRANDE CANYON LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to GRANDE CANYON LEASING's place of business in proper working order, less normal wear an tear.

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where

Lessee:
Lessor:

it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $200,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims, demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

GRANDE CANYON LEASING shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

Lessee: ___
Lessor: ___

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised by written notice only to GRANDE CANYON LEASING, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to GRANDE CANYON LEASING and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by GRANDE CANYON LEASING, to reimburse GRANDE CANYON LEASING for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. **Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

13. General

Lessee: ____
Lessor: ____

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you" refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | Lessee" |
|---|---|
| GRANDE CANYON LEASING | TRUE POSITION TECHNOLOGIES |
| By: | By: |
| Print: | Print: |
| Title: | Title: |
| Date: | Date: |

Lessee: ___
Lessor: ___

# EXHIBIT 6

Lease # 030801-GCL

## EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 1st day of August, 2003 by and between GRANDE CANYON LEASING, whose principal address is 31 West Robertson Street, Palatine, IL 60067, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

(1) Haas Vertica #2, Model No. CF-3, Serial No. 6275

2. Term:

The term of this lease is forty-two (42) months, beginning September 1, 2003 and ending March 1, 2007.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $ 78,000.00 |
| Monthly Payment (a) | $ 1,376.91 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 57,830.22 |
| Buyout @ | $__N/A____ |

During the term of this Lease, I agree to pay to GRANDE CANYON LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 1st day of the month, I agree to pay a $50 late fee.

4. Equipment Warranties:

GRANDE CANYON LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to GRANDE CANYON LEASING's place of business in proper working order, less normal wear an tear.

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where

Lessee: [signature]
Lessor: [signature]

it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $50,000 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims, demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

GRANDE CANYON LEASING shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

Lessee: [signature]
Lessor: [signature]

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised by written notice only to GRANDE CANYON LEASING, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to GRANDE CANYON LEASING and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by GRANDE CANYON LEASING, to reimburse GRANDE CANYON LEASING for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. **Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

13. General

Lessee: [signature]
Lessor: [signature]

I agree that:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you " refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | Lessee" |
|---|---|
| GRANDE CANYON LEASING | TRUE POSITION TECHNOLOGIES |
| By: [signature] | By: [signature] |
| Print: | Print: |
| Title: | Title: |
| Date: 5/21/13 | Date: |

Lessee: R
Lessor:

# EXHIBITS 7 AND 8

Lease #L040823-HFL-4

# EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 8th day of August, 2004 by and between HUERTH FINANCIAL LEASING, whose principal address is 1837 Seafan Circle, North Ft. Meyers, FL 33903, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, INC., whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

Please See Exhibit "A" Attached.

2. Term:

The term of this lease is forty-two (42) months, beginning September 8, 2004 and ending March 8, 2008.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $94,030.00 |
| Monthly Payment (a) | $ 940.30 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $39,492.60 |
| Buyout @ | $__N/A__ |

During the term of this Lease, I agree to pay to HUERTH FINANCIAL LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 8th day of the month, I agree to pay a $50.00 late fee.

4. Equipment Warranties:

HUERTH FINANCIAL LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to HUERTH FINANCIAL LEASING's place of business in proper working order, less normal wear an tear.

Lessee:
Lessor:

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $94,030.00 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

HUERTH FINANCIAL LEASING shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

Lessee:
Lessor:

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised be written notice only to __N/A__, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to ___N/A___ and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by HUERTH FINANCIAL LEASING, to reimburse HUERTH FINANCIAL LEASING for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment. There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

13. General

I agree that:

Lessee:
Lessor:

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you" refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | Lessee" |
|---|---|
| HUERTH FINANCIAL LEASING | TRUE POSITION TECHNOLOGIES, INC.. |
| By: [signature] | By: [signature] |
| Print: ARTHUR HUERTH | Print: |
| Title: | Title: |
| Date: 11-13-04 | Date: 11-17-04 |

Lessee: [initials]
Lessor: [initials]

Lease #L040823-HFL

# EQUIPMENT LEASE AGREEMENT

This Lease Agreement is made and entered into on this 8th day of August, 2004 by and between HUERTH FINANCIAL LEASING, whose principal address is 1837 Seafan Circle, North Ft. Meyers, FL 33903, hereinafter called "Lessor," and TRUE POSITION TECHNOLOGIES, INC, whose address is 24711 Avenue Rockefeller, Valencia, CA 91355, hereinafter called "Lessee."

In this Lease, the words "I", "me", and "my" or "we" refer to Lessee and "you" or "your" refer to Lessor.

1. Lease:

I agree to lease from Lessor the following equipment:

Please See Exhibit "A" Attached.

2. Term:

The term of this lease is forty-two (42) months, beginning September 8, 2004 and ending March 8, 2008.

3. Rental Payment and Equipment Value:

| | |
|---|---|
| Equipment Cost | $248,620.00 |
| Monthly Payment (a) | $ 2,486.20 |
| Number of Months (b) | 42 |
| Total Payments (a x b) | $ 104,420.40 |
| Buyout @ | $___N/A___ |

During the term of this Lease, I agree to pay to HUERTH FINANCIAL LEASING monthly, the monthly payments set forth above. If the monthly payment is not paid by the 8th day of the month, I agree to pay a $75.00 late fee.

4. Equipment Warranties:

HUERTH FINANCIAL LEASING does not make any representation or warranty, express or implied, in regards to the equipment, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

5. Equipment Upkeep, Inspection and Use:

I will, at my expense, have the equipment serviced according to the manufacturer's warranties and recommendations and otherwise keep it in good operating order, repair and appearance. I will have all necessary repairs made in a timely manner. I understand that I am responsible for all operating expenses arising from the use of the equipment. At the end of this Lease, if I do not exercise my purchase option in Section 9 below, I will return the equipment to HUERTH FINANCIAL LEASING's place of business in proper working order, less normal wear an tear.

Lessee: [initials]
Lessor: [initials]

EXHIBIT C

66

Unless I have your advance written approval, I will make no changes to the equipment that would decrease its value or performance or limit its use or remove the equipment from the county where it is located. I understand that all alterations I may make become your property when they are attached to the equipment. If you ask me, at any reasonable time, I will tell you where the equipment is and allow you to inspect it.

6. Equipment Damage, Loss or Potential Loss;

During the term of this Lease, I agree to be responsible for the risk of damage loss or destruction of, or to, the equipment and I will notify you immediately if any of the following events occur: loss, theft, abandonment, confiscation, destruction or damage of, or to, the equipment.

If the equipment is damaged, but is in a condition that you reasonably believe is repairable, I will have the necessary repairs made promptly at my expense. If, however, you determine the equipment is damaged beyond repair, or the equipment is lost, stolen, destroyed, abandoned, or confiscated, I agree that you will have the right to end this Lease immediately and demand immediate payment of the total remaining balance due under this lease.

I will keep the equipment insured during the Lease Term, at my expense, at a valuation of $248,620.00 as follows: fire, theft and combined additional coverage with a deductible amount of not more than $500.00.

All insurance will protect you, and me as our interests may appear and Lessor as additional named insured and loss payee. The insurance company and contents of the policy must be acceptable to you. I agree to give you whatever information you ask for regarding the insurance and any claim that might arise from the use or maintenance of the equipment.

While any loss proceeds you receive from insurance will be credited to my obligations to pay the remaining balance due under the Lease, I realize I will remain liable for any difference between the remaining balance and the loss proceeds amount.

I agree to indemnify you and hold you, or your agents and employees, harmless of, and from any and all losses, damages, claims demands or liability of any kind or nature whatsoever, including legal expenses arising from the use, condition or operations of the equipment.

HUERTH FINANCIAL LEASING shall not be liable for any loss of, damage to, or destruction of the equipment whether resulting from fire, theft, governmental actions, collision, or any cause whatsoever.

7. Default:

I will be in default on this Lease if I fail to either make a full monthly payment on time or otherwise to honor any conditions under this Lease.

If I default, you may do any or all of the following without giving me advance notice:

a. Take any reasonable measure designed either to correct the default or to save yourself from loss; in which case, I will pay you immediately for all costs and expenses incurred, including legal expense, collection costs and attorney's fees;

b. Terminate this Lease and my rights to possess and use the equipment;

c. Take possession of the equipment by any method or manner the law allows;

d. Declare immediately due and payable all rental then unpaid for the remainder of the term;

Lessee:
Lessor:

e. Lease the equipment for my account in which event I will pay any deficiency;

f. Determine my termination liability, which I agree to pay immediately;

g. Pursue any other remedies the law allows.

8. Title, Assignment and Liens;

I understand that my rights are limited to the possession and use of the equipment while I honor the conditions of this Lease. I have not right to assign, sublet, or lend any of my rights and interest in the equipment.

I promise that I will engage in no activity that would give rise to liens or other claims on the equipment. I agree to hold you harmless from, and indemnify you for all liability, loss and expense arising from the use, condition, or operation of the equipment.

9. Purchase Option:

I have/have not the option to purchase the equipment appearing on Exhibit "A". This option shall be exercised be written notice only to __N/A__, within thirty (30) months prior to the expiration of the Term, provided I am not in default of this Lease or any other obligation to ___N/A___ and I have timely paid all rental due and coming due under this Lease. The purchase price of the equipment will be the Buyout amount set forth in Section 3 above and shall be paid, in cash, at the time of exercise of the option.

10. Acceleration:

Additionally, you have the right, but not the obligation, to mitigate any losses incurred by early termination of this Lease, should I fail to pay for the equipment as specified. Mitigation may include, but is not limited to, repossession of the equipment in order to lease it to another party. If your losses cannot be fully mitigated, I will be responsible for the difference between the balance due under this Lease and the proceeds from any subsequent lease to another party. I will also be responsible for all costs incurred in enforcing this section of the Lease, including, but not limited to, legal expenses, court costs, and towing, insurance, and/or storage fees You may also use any other remedy allowed by law to enforce this obligation.

11. Governmental Fees and Taxes:

I agree to pay when due or, if paid by HUERTH FINANCIAL LEASING, to reimburse HUERTH FINANCIAL LEASING for all fees and taxes if applicable relating to the equipment and this Lease.

12. Warranty:

The equipment may be subject to a separate written warranty. **Under this Lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for a particular purpose of this equipment.** There are no promises that the equipment will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which the equipment is used. NO substitution of equipment is allowed, unless agreed to in writing by you.

13. General

I agree that:

Lessee: [signature]
Lessor: [signature]

a. If more than one Lessee signs this Lease, each Lessee will be jointly and severally liable for all Lessee's obligations under the Lease. You can waive or delay the enforcement of your rights as to one signer without affecting your rights as to any other signer(s). You can also release any signer from obligation without releasing any other signer(s) from obligation.

Your waiver of, or delay, requiring me to keep my promises, or enforcing your rights, will not affect your ability to require me to honor all conditions or to enforce your rights.

c. No changes to any of the terms or conditions of this Lease will be valid unless made in writing and signed by all parties. If any part of this Lease is prohibited by law or deemed to be unenforceable, the remaining terms shall prevail.

d. You have no obligation to provide replacement equipment for any reason whatsoever.

e. California law governs the terms and conditions of this Lease.

f. I acknowledge that neither you nor any of your representatives have given me any information or advice on which I am relying upon regarding any possible tax consequences or benefits under this Lease.

g. All notices may be given by certified mail, return receipt required or by personal delivery.

14. Ownership:

This is a lease only and you remain the owner of the equipment. I will not transfer, sublease, rent or do anything to interfere with your ownership of the equipment.

The following disclosures are required by California law ("you" refers to the Lessee). They require Lessee's initials.

Notice to the Lessee: (a) do not sign this agreement before you read it or if it contains any blank spaces to be filled in; (b) you are entitled to a completely filled in copy of this agreement; (c) if you default in the performance of your obligations under this agreement, the equipment may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If this Lease Agreement or any portion thereof is not paid when due, Lessee promises to pay all costs of collection and reasonable attorneys' fees incurred by the Lessor hereof on account of such collection, whether or not suit is filed hereon, if the Lessor prevails at all in such collection efforts.

| "Lessor" | Lessee" |
|---|---|
| HUERTH FINANCIAL LEASING | TRUE POSITION TECHNOLOGIES, INC. |
| By: [signature] | By: [signature] |
| Print: ARTHUR HUERTH | Print: |
| Title: | Title: |
| Date: 11-13-04 | Date: 11-17-04 |

Lessee: [initials]
Lessor: [initials]

69

# EXHIBIT 29

2247



IDENTITY CHECK PRINTERS 1-888-724-7466

9KUL • NORTH AMERICAN HUNTING CLUB LIFE MEMBER

LIFE MEMBER

Date

Pay to the order of Keith B [illegible]

$ 100,000.00

One Hundred Thous[illegible]

UNION BANK OF CALIFORNIA
1-800-238-4486

WWW.IDENTITYCHECKS.COM

Memo

[redacted]

04/15/09

071108 -JK

Kirkland
EPD Acct.

2248

**EPD** INVESTMENT COMPANY, LLC

November 9, 2007

John Kirkland
Dreier, Stein, and Kahan, LLP
1620 26th Street, North Tower
6th Floor
Santa Monica, CA 90404

Re: <u>EPD Investment Company, LLC Account No. 071108-JK</u>

Dear John,

We would like to take this opportunity to welcome you as an investor to EPD Investment Company, LLC. Your check was received and the funds deposited directly into the above-referenced account.

Enclosed is the original note representing your investment with an interest rate of twelve (12.0%) percent, compounded monthly.

If at anytime you wish to withdraw funds from your investment account, you may submit a written request or phone me or Ruben Moreno directly. An "Investor Account Statement" will be provided to you semi-annually, reflecting activity through June 30th and through December 31st.

We look forward to assisting you in your investment needs. Please feel free to contact me with any questions you may have.

Sincerely,

EPD INVESTMENT COMPANY, LLC

Rebecca Johnson
Rebecca Johnson
Accounting Department

RM/rj

Enclosure

520 BROADWAY, SUITE 660 • SANTA MONICA, CA 90401 • TEL: (310) 451-4832 • FAX: (310) 394-6404

CITY NATIONAL BANK
The way up.

# Online Cash Management

## Account Details

**Click on the *Check Number* to display images (fees may apply).**
*** Images are available daily from 5 AM to 8 PM (PT).**
*** Sort data using the up (ascending) and down (descending) arrows.**
*** Export transactions by entering the *Date Range*, selecting the *Transaction Categories* and the *Export* format. Then select *Export*.**

Information valid as of Thursday, November 08, 2007 at 11:06 AM PST

11/07/2007 through 11/08/2007 for 112122257 - EPD INVESTMENT CO. LLC

| Account Selection | Account Description | Current Balance | Available Balance |
|---|---|---|---|
| 112122257 - EPD INVESTMENT CO. LLC | EPD INVESTMENT CO. LLC | 262,544.83 | 262,544.83 |

**Request Specific Date Range**

From 11/07/2007 To 11/08/2007

The system has completed your history request.

| Date | Transaction Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 11/08/2007 | INCOMING WIRE-DOM DON HAGANS (IRA) | | 10,500.00 | 0.00 |
| 11/08/2007 | INCOMING WIRE-DOM JOHN KIRKLAND | | 150,000.00 | 0.00 |
| Totals: | | 0.00 | 160,500.00 | |

First | Prev | Showing Records 1 - 2 of 2 | Next | Last

Select Export Format: QuickBooks

New Acct 071108
John Kirkland
Dreier Stein + Kahan LLP
1620 26th St., N. Tower
6th Fl
SM CA 90404

**EPD** INVESTMENT COMPANY, LLC

August 15, 2008

Re: John Kirkland Acct No. JK 6805 L

To Whom It May Concern:

Please be advised that any funds deposited to account number [redacted], EPD Investments, LLC at City National Bank for John Kirkland should reference the following:

Reference: Account JK 6805 L, John Kirkland.

Please call me with any further questions at 310-451-4832 with any further questions.

Sincerely,

Ruben Moreno

Controller

520 BROADWAY, SUITE 660 • SANTA MONICA, CA 90401 • TEL: (310) 451-4832 • FAX: (310) 394-6404

**EPD INVESTMENT CO., LLC** 69984

Union Bank of California, N.A. 10/5/2009

N/P-:INVSTR:Kirkland, John:071108-JK John C. Kirkland Loan # 1619307 7,435.52

2007 NEW EPD CNB John C. Kirkland Loan # 1619307 7,435.52

**EPD INVESTMENT CO., LLC** 69984

Union Bank of California, N.A. 10/5/2009

N/P-:INVSTR:Kirkland, John:071108-JK John C. Kirkland Loan # 1619307 7,435.52

2007 NEW EPD CNB John C. Kirkland Loan # 1619307 7,435.52

DELUXE CORP 1+800-328-0304 www.deluxeforms.com

**EPD INVESTMENT COMPANY, LLC**
**Deposit Acknowledgement**

**$100,000.00**

**Via Check No. 1568**
**Deposit Date: 04/15/09**

**A principal deposit in the amount of One Hundred Thousand Dollars and No/100 ($100,000.00) in lawful money of the United States of America was credited to your EPD Investment Company, LLC account number listed below. Interest on this deposit will begin accumulating on the deposit date noted above at the current interest rate for this account.**

**This signed deposit acknowledgement serves as an addendum to your original note from EPD Investment Company, LLC. Please keep this with your records for future reference.**

**EPD INVESTMENT COMPANY, LLC**

**Acct No. 071108-JK**
**John Kirkland**

**Note Addendum**

**NOTICE OF ASSIGNMENT**

Reference is made to the Secured Promissory Note, Continuing Guaranty, and Security Interest Agreement dated as of November 8, 2007, by and among John C. Kirkland, EPD Investment Co., LLC, and Jerrold S. Pressman, and all other Loan Documents concurrently or subsequently entered into among the parties.

Notice is hereby given that all rights of John C. Kirkland under all such Loan Documents have been sold transferred and assigned to the Bright Conscience Trust Dated September 9, 2009.

John C. Kirkland

ACKNOWLEDGED AND ACCEPTED
AS OF SEPTEMBER 10, 2009:

Jerrold S. Pressman

EPD INVESTMENT CO., LLC

By: ____________________
Name: Jerrold S. Pressman
Title: Chairman

# SECURITY INTEREST AGREEMENT

**SECURITY INTEREST AGREEMENT** ("**Security Agreement**"), dated as of November 8, 2007, by and among John C. Kirkland ("**Secured Party**" and collectively with any assignee or designee, the "**Secured Parties**"), and EPD Investment Co., LLC, a California limited liability company (the "**Debtor**").

## RECITALS

A. Reference is made to (i) the Secured Promissory Note of even date herewith (the "**Note**") to which the Debtor and Secured Party are parties, and (ii) the Loan Documents (as defined in the Note), including, without limitation, the Note. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant Loan Documents.

B. Pursuant to the Loan Documents, the Debtor has certain obligations to each of the Secured Parties (all such obligations under all Loan Documents, the "**Obligations**").

C. The Debtor has determined that it shall benefit from the execution of the Loan Documents and the transactions contemplated thereby. In furtherance thereof, and not in limitation thereof, the Debtor has deemed that the execution and delivery of this Security Agreement to which it is a party, and the Debtor's performance of its obligations under each of them, to be necessary and convenient to the conduct, promotion or attainment of the business of the Debtor from the Note or otherwise.

D. In order to induce the Secured Parties to execute and deliver the Loan Documents and to make the payments to the Debtor contemplated thereby, and as contemplated by the Loan Documents and the Note, the Debtor has agreed to grant to the Secured Parties a security interest in the Collateral (as defined below) to secure the due and punctual fulfillment of the Obligations. The Secured Parties are willing to enter into the Note and the other Loan Documents only upon receiving the Debtor's execution of this Security Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Grant of Security Interest.

(a) In order to secure the due and punctual fulfillment of the Obligations, the Debtor hereby grants, conveys, transfers and assigns to the Secured Parties (and to each of

them based on their respective Allocable Shares, as defined below) a continuing security interest in the Collateral. Each of the Secured Parties' liens in and to the Collateral shall attach to all Collateral without further act on the part of any Secured Party or Debtor. Anything contained in this Security Agreement or any Loan Document to the contrary notwithstanding, no Debtor has any authority, express or implied, to dispose of any item or portion of the Collateral

(b) For purposes of this Agreement, the following terms shall have the meanings indicated:

"COLLATERAL" includes all right, title and interest of Debtor in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: All assets of the Debtor, including, but not limited to: all personal and fixture property of every kind and nature, including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including accounts receivable), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, Securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles); all Equipment; all Intellectual Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Debtor's books relating to any and all of the above.

"CODE" is the California Uniform Commercial Code, as in effect from time to time.

"COPYRIGHTS" include all copyrights, copyright rights, applications or registrations and like protections in each work or authorship or derivative work, whether published or not (whether or not it is a trade secret) now or later existing, created, acquired or held.

"EQUIPMENT" has the meaning set forth in the Code and includes all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Debtor has any interest.

"INTELLECTUAL PROPERTY" includes all present and future (a) Copyrights, (b) trade secret rights, including all rights to unpatented inventions and know-how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) Patents; (e) Trademarks; (f) computer

software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; (j) all licenses or other rights to use any property or rights of a type described above; and (k) all applications for any of the foregoing.

"NEGOTIABLE COLLATERAL" means all of Debtor's now owned and hereafter acquired right, title, and interest with respect to letters of credit, letter-of-credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

"PATENTS" include patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions and continuations in-part of the same.

"SECURITIES" has the meaning ascribed to it in the Securities Act of 1933, as amended, and includes, but is not necessarily limited to, common stock, preferred stock, warrants, rights and other options, promissory notes or other instruments reflecting obligations of other entities.

"TRADEMARKS" include trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Debtor connected with and symbolized by any such trademarks.

(c) The security interests granted pursuant to this Section (the "**Security Interests**") are granted as security only and shall not subject any of the Secured Parties to, or transfer or in any way affect or modify, any obligation or liability of the Debtor under any of the Collateral or any transaction which gave rise thereto.

(d) The term "**Allocable Share**" means, with respect to each Secured Party (if there is more than one Secured Party), as of the relevant date, the fraction equal to (i) the outstanding principal of the Notes then held by such Secured Party, divided by (ii) the aggregate outstanding principal of the Notes then held by all Secured Parties. If there is only one Secured Party, the "Allocable Share" shall mean one hundred percent (100%).

Section 2. Filing; Further Assurances.

(a) The Debtor will, at its expense, cause to be searched the public records with respect to the Collateral and will execute, deliver, file and record (in such manner and form as each of the Secured Parties may require), or permit each of the Secured Parties to file and record. as its attorney in fact, any financing statement, any carbon, photographic or other reproduction of a financing statement or this Security Agreement

(which shall be sufficient as a financing statement hereunder), any specific assignments or other paper that may be reasonably necessary or desirable, or that the Secured Parties may request, in order to create, preserve, perfect or validate any Security Interest or to enable each of the Secured Parties to exercise and enforce its rights hereunder with respect to any of the Collateral. The Debtor hereby appoints each Secured Party as Debtor's attorney-in-fact to execute in the name and behalf of Debtor such additional financing statements as such Secured Party may request.

(b) Each Secured Party has designated an Agent as provided in the Section titled "Agent" below. Among other things, such Agent shall be agent of each such Secured Party for execution of and identification on any financing statement or similar instrument referring to or describing the Collateral.

(c) The Agent is authorized to execute and file any and all financing statements desired to be filed by the relevant Secured Party to reflect the security interest in the Collateral in any and all jurisdictions (including the U.S. Patent and Trademark Office). For such purposes, the Debtor irrevocably appoints the Agent, with full power of substitution to execute and file such financing statements naming the Debtor as debtor thereon.

(d) In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that perfection or priority of Secured Party's security interest is dependent on or enhanced by possession, Debtor, promptly upon the request of Secured Party, shall endorse and assign such Negotiable Collateral to Secured Party and deliver physical possession of such Negotiable Collateral to Secured Party.

<u>Section 3. Representations and Warranties of Debtor.</u> The Debtor hereby represents and warrants to each Secured Party (a) that the Debtor is, or to the extent that certain of the Collateral is to be acquired after the date hereof, will be, the owner of the Collateral free from any adverse lien, security interest or encumbrance; (b) that no financing statement covering the Collateral is on file in any public office, other than the financing statements filed pursuant to this Security Agreement; and (c) that the statements made in the Recitals of this Security Agreement, which are deemed incorporated herein by reference, are true, accurate and complete.

<u>Section 4. Covenants of Debtor.</u> The Debtor hereby covenants and agrees with each Secured Party that the Debtor (a) will, at the Debtor's sole cost and expense, defend the Collateral against all claims and demands of all persons at any time claiming any interest therein junior to the Secured Party's interest; (b) will provide the Secured Party with prompt written notice of (i) any change in the chief executive officer of the Debtor or the office where the Debtor maintains its books and records pertaining to the Collateral; (ii) the movement or location of all or a material part of the Collateral to or at any address other than the address of Debtor set forth in its public filings with the U.S. Securities and Exchange Commission; and (iii) any facts which constitute a Debtor Event of Default (as such term is defined below), or which, with the giving of

notice and/or the passage of time, could or would constitute a Debtor Event of Default, pursuant to the Section titled "Debtor Events of Default" below; (c) will promptly pay any and all taxes, assessments and governmental charges upon the Collateral prior to the date penalties are attached thereto, except to the extent that such taxes, assessments and charges shall be contested in good faith by the Debtor; (d) will immediately notify the Secured Party of any event causing a substantial loss or diminution in the value of all or any material part of the Collateral and the amount or an estimate of the amount of such loss or diminution; (e) will have and maintain adequate insurance at all times with respect to the Collateral, for such other risks as are customary in the Debtor's industry for the respective items included in the Collateral, such insurance to be payable to the Secured Party and the Debtor as their respective interests may appear, and shall provide for a minimum of ten (10) days prior written notice of cancellation to the Secured Party, and Debtor shall furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions; (f) will not sell or offer to sell or otherwise assign, transfer or dispose of the Collateral or any interest therein, without the prior written consent of the Secured Party, except in the ordinary course of business; (g) will keep the Collateral free from any adverse lien, security interest or encumbrance and in good order and repair, reasonable wear and tear excepted, and will not waste or destroy the Collateral or any part thereof; and (h) will not use the Collateral in material violation of any statute or ordinance the violation of which could materially and adversely affect the Debtor's business.

Section 5. Records Relating To Collateral. The Debtor will keep its records concerning the Collateral at its offices designated in the caption of this Security Agreement or at such other place or places of business of which the Secured Party shall have been notified in writing no less than ten (10) days prior thereto. The Debtor will hold and preserve such records and chattel paper and will permit representatives of the Secured Party at any time during normal business hours upon reasonable notice to examine and inspect the Collateral and to make abstracts from such records and chattel paper, and will furnish to the Secured Party such information and reports regarding the Collateral as the Secured Party may from time to time reasonably request.

Section 6. General Authority. From and during the term of any Debtor Event of Default, the Debtor hereby appoints the Secured Party the Debtor's lawful attorney, with full power of substitution, in the name of the Debtor, for the sole use and benefit of the Secured Party, but at the Debtor's expense, to exercise, all or any of the following powers with respect to all or any of the Collateral:

(a) to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due;

(b) to receive, take, endorse, assign and deliver all checks, notes, drafts, documents and other negotiable and non- negotiable instruments and chattel paper taken or received by the Secured Party;

(c) to settle, compromise, prosecute or defend any action or proceeding with respect thereto;

(d) to sell, transfer, assign or otherwise deal in or with the same or the proceeds thereof or the related goods securing the Collateral, as fully and effectually as if the Secured Party were the sole and absolute owner thereof;

(e) to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto; and

(f) to discharge any taxes, liens, security interests or other encumbrances at any time placed thereon;

provided that the Secured Party or the Agent shall give the Debtor not less than ten (10) business days prior written notice of the time and place of any sale or other intended disposition of any of the Collateral.

The exercise by the Secured Party or the Agent of or failure to so exercise any authority granted herein shall in no manner affect Debtor's liability to the Secured Party, and provided, further, that the Secured Party and the Agent shall be under no obligation or duty to exercise any of the powers hereby conferred upon them and they shall be without liability for any act or failure to act in connection with the collection of, or the preservation of, any rights under any of the Collateral and Secured Party shall not be required to proceed against any other person or entity who or which has guaranteed the performance of the Obligations or provided any security therefor before proceeding against Debtor or the Collateral.

Section 7. Debtor Events of Default.

(a) The Debtor shall be in default under this Security Agreement upon the occurrence of any of the following (each, a "**Debtor Event of Default**"):

(i) an Event of Default (as defined in the Note);

(ii) any representation or warranty made by the Debtor in this Security Agreement shall be false or misleading in any material respect;

(iii) Debtor shall breach any covenant of Debtor in this Security Agreement or in any other document or instrument executed by Debtor in favor of or for the benefit of the Secured Parties as contemplated by any of the Loan Documents.; or

(iv) A receiver or trustee shall be appointed with respect to Debtor or any of the Collateral.

(b) The Debtor hereby irrevocably agrees that, upon the occurrence of a Debtor Event of Default, the Debtor shall be deemed to have consented to an immediate conveyance and transfer to the Secured Party of the copyrights and all other rights the Debtor may have in the software included in the Collateral. In furtherance of the foregoing, and not in limitation thereof, the Debtor will, upon the occurrence of a Debtor Event of Default, deliver to the Secured Party copies of the source code of the relevant software, with accompanying written assignment of the software to the Secured Party. Without limiting the foregoing, such source code and assignment shall be in form sufficient to enable the Secured Party to register the software in Secured Party's name with the Copyright Register. The Debtor hereby agrees to take all steps necessary or appropriate, as requested by the Secured Party, to effectuate and reflect such conveyance and transfer or assignment to Secured Party. In all events, such conveyance, transfer or assignment shall be deemed to vest title in such software in the Secured Party.

(c) In furtherance of the foregoing and not in limitation thereof, the Debtor acknowledges and agrees that the Secured Party may, upon the occurrence of a Debtor Event of Default, seek the immediate entry of a preliminary injunction prohibiting the Debtor's use of such software in any shape, way or manner, including, but not necessarily limited to, through the sale of products that use any of such software, and the Debtor hereby irrevocably agrees that it will not contest an application seeking entry of a preliminary injunction and that it will accept the entry of such injunction.

Section 8. Remedies Upon Debtor Event of Default.

(a) If any Debtor Event of Default shall have occurred, then in addition to the provisions of Section 7 hereof, the Secured Party may exercise all the rights and remedies of a secured party under the Code. The Secured Party may require the Debtor to assemble all or any part of the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient. The Secured Party shall give the Debtor ten (10) days prior written notice of the Secured Party's intention to make any public or private sale or sale at a broker's board or on a securities exchange of the Collateral. At any such sale the Collateral may be sold in one lot as an entirety or in separate parcels, as the Secured Party, in its sole discretion, may determine. The Secured Party shall not be obligated to make any such sale pursuant to any such notice. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be adjourned. The Secured Party, instead of exercising the power of sale herein conferred upon it, may proceed by a suit or suits at law or in equity to foreclose the Security Interests and sell the Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(b) Upon the occurrence of an Event of Default, the security hereby constituted shall become enforceable and, in addition to all other rights and remedies available to Secured Party as provided hereafter, Secured Party may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are hereby authorized by Debtor:

(i) Proceed directly and at once, without notice, against Debtor to collect and recover the full amount or any portion of the Obligations, without first proceeding against any other person or entity, or against any security or collateral for the Obligations;

(ii) Without notice to Debtor and regardless of the acceptance of any security or collateral for the payment hereof, appropriate and apply toward the payment of the Obligations (i) any indebtedness due or to become due from Secured Party any Debtor, and (ii) any moneys, credits or other property belonging to Debtor at any time held by or coming into the possession of Secured Party;

(iii) May exercise in respect of the Collateral, in addition to other rights and remedies provided for herein and in any other Loan Document to which Debtor is a party or otherwise available to it, all the rights and remedies available to it at law (including those of a secured party under the Code) or in equity;

(iv) Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Loan Account with only the net amounts received by Secured Party in payment of such disputed Accounts after deducting all Foothill Expenses incurred or expended in connection therewith;

(v) Without notice or demand upon Debtor, make such payments and do such acts as Secured Party considers necessary or reasonable to protect its security interest in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorizes Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Secured Party's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of the Debtor's owned premises, each Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to one hundred twenty (120) days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

(vi) Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for, sale, and sell (in the manner provided for herein) the Collateral. Secured Party is hereby granted a license or other right to use, without charge, each Debtor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of advertising for sale and selling any Collateral, and each Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

(vii) Sell all or any part of the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including a Debtor's premises) as Secured Party determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(viii) Secured Party shall give notice of the disposition of the Collateral as follows:

(A) Secured Party shall give the applicable Debtor a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, then the time on or after which the private sale or other disposition is to be made; and

(B) The notice shall be personally delivered or mailed, postage prepaid, to the Debtor ten (10) days before the earliest time of disposition set forth in the notice; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market;

(ix) Secured Party may credit bid and purchase at any public sale, and, to the maximum extent permitted by law, any private sale;

(x) Secured Party may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver or keeper without the requirement of prior notice or a hearing;

(xi) Secured Party shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document; and

(xii) Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by the Debtor. Any excess will be returned, without interest and subject to the rights of third persons, by Secured Party to Debtor.

(c) Remedies Cumulative. The Secured Parties' rights and remedies under this Security Agreement, the other Loan Documents, and all other agreements shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Secured Party of one right or remedy shall be deemed an election, and no waiver by Secured Party of any Event of Default on any Debtor's part shall be deemed a continuing waiver. No delay by Secured Party shall constitute a waiver, election, or acquiescence by it

Section 9. Application of Collateral and Proceeds. The proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied in the following order of priorities: (a) first, to pay the reasonable expenses of such sale or other realization, including, without limitation, reasonable attorneys' fees, and all expenses, liabilities and advances reasonably incurred or made by the Secured Party in connection therewith, and any other unreimbursed expenses for which the Secured Party is to be reimbursed pursuant to the Section titled "Expenses; Secured Party's Lien" below; (b) second, to the payment of the Obligations in such order of priority as the Secured Party, in its sole discretion, shall determine; and (c) finally, to pay to the Debtor, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

Section 10. Expenses; Secured Party's Lien. If any Debtor Event of Default shall have occurred, the Debtor will forthwith upon demand pay to the Secured Party: (a) the amount which the Secured Party may have been required to pay to free any of the Collateral from any lien thereon; and (b) the amount of any and all reasonable out-of-pocket expenses, including, without limitation, the reasonable fees and disbursements of its counsel, and of any agents not regularly in its employ, which the Secured Party may incur in connection with the collection, sale or other disposition of any of the Collateral.

Section 11. Termination of Security Interests; Release of Collateral. Upon the earlier to occur of (a) payment or other satisfaction in full of the Note held by the Secured Party or (b) 45 days after the Registration Date (as defined in the Note), the Security Interests shall terminate and all rights to the Collateral shall revert to the Debtor. Upon any such termination of the Security Interests or release of Collateral, the Secured Party will, at the Debtor's expense, to the extent permitted by law, execute and deliver to the Debtor such documents as the Debtor shall reasonably request to evidence the termination of the Security Interests or the release of such Collateral, as the case may be.

Section 12. Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (a) personally served, (b) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (c) delivered by reputable air courier service with charges prepaid, or (d) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice given in accordance herewith. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (i) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (ii) on the second business day following the date of mailing by express courier service or on the fifth business day after deposited in the mail, in each case, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be for (i) the Debtor as provided in the Note, (ii) for each Secured Party as provided in the Note for notices to the Purchaser and (iii) for the Agent as provided in the Note for notices to the Purchaser. Any party hereto may from time to time change its address or facsimile number for notices under this Section in the manner contemplated by the Note.

Section 13. Agent.

(a) Anything in the other provisions of this Security Agreement to the contrary notwithstanding, the Secured Party may designate another person or entity to act as agent (the "**Agent**") for the Secured Party with respect to any one or more of the rights of Secured Party hereunder, including, but not necessarily limited to, the right to hold the security interest and/or be named as secured party (as agent for the Secured Party) in any filed financing statement and to take action in the name and stead of the Secured Party hereunder. Such designation may be made with or without power of substitution, Such designation shall remain in effect until canceled by the Secured Party, as provided herein; provided, however, that such cancellation shall not affect the validity of any action theretofore taken by such agent pursuant to this Security Agreement. The Debtor acknowledges and agrees to honor such designation and acknowledges that the Agent is acting as the agent of the Secured Party and not as a principal.

(b) If there is more than one Secured Party, the Agent shall act as agent for all Secured Parties. Any revocation of the authority of the Agent or the designation of an alternate Agent shall be done only by Secured Parties who represent a Majority in Interest of all the Note Holders (as defined below) at that time; provided that at all times all Secured Parties shall be represented by one and the same Agent. The term "Note Holder" means the Holder, as of the relevant date, of the Note. The term "Majority in Interest" means, as of the relevant date, with respect to the relevant classification of Note Holders, one or more Note Holders whose respective outstanding principal amounts of the Notes held by each of them, as of such date, aggregate more than fifty percent (50%) of the Allocable Shares on that date.

Section 14. Miscellaneous.

(a) No failure on the part of the Secured Party to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or remedy under this Security Agreement shall operate as a waiver thereof; nor shall any single or partial exercise by the Secured Party of any right, power or remedy under this Security Agreement preclude the exercise, in whole or in part, of any other right, power or remedy. The remedies in this Security Agreement are cumulative and are not exclusive of any other remedies provided by law. Neither this Security Agreement nor any provision hereof may be changed, waived, discharged or terminated orally but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

(b) The execution and delivery by Debtor of this Security Agreement and all documents delivered in connection herewith have been duly and validly authorized by all necessary corporate action of Debtor and this Agreement and all documents delivered in connection herewith have been duly and validly executed and delivered by Debtor. The execution and delivery by Debtor of this Security Agreement and all documents delivered in connection herewith will

not result in a breach or default of or under the Certificate of Incorporation, By-laws or any agreement, contract or indenture of Debtor. This Security Agreement and all documents delivered in connection therewith are legal, valid and binding obligations of Debtor enforceable against Debtor in accordance with their terms.

(c) In the event that any action is taken by Debtor or Secured Party in connection with the this Security Agreement, or any related document or matter, the losing party in such legal action, in addition to such other damages as he or it may be required to pay, shall pay reasonable attorneys' fees to the prevailing party.

Section 15. Separability. If any provision hereof shall prove invalid or unenforceable in any jurisdiction whose laws shall be deemed applicable, the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Secured Party.

Section 16. Governing Law.

(a) This Security Agreement shall be governed by and construed in accordance with the laws of the State of California for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws. To the extent determined by the court, the Debtor shall reimburse the Secured Party for any reasonable legal fees and disbursements incurred by the Secured Party in enforcement of or protection of any of its rights under this Security Agreement. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(b) The Debtor and the Secured Party acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Security Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Security Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

Section 17. Jury Trial Waiver. The Debtor and the Secured Party hereby waive a trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other in respect of any matter arising out of or in connection with the Note or this Security Agreement.

Section 18. Assignment. This Security Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Debtor may not assign this Security Agreement, any Loan Document or any rights or duties hereunder or thereunder without the Secured Parties' prior written consent, and any prohibited assignment shall be absolutely void. No consent to an assignment by Secured Party shall release Debtor from its

Obligations. Any Secured Party may at any time freely assign or transfer the whole or any part of its security interest granted hereunder to any one or more persons or entities, and no consent or approval by Debtor is required in connection with any such assignment. Any transferee of the Collateral shall be vested with all of the rights and powers of the assigning Secured Party hereunder with respect to the Collateral.

Section 19. Waivers. Debtor waives any and all rights against the Secured Parties, including any right that Debtor may otherwise have to require Secured Party to proceed against any other person, or proceed against or exhaust any other security, or pursue any other remedy Secured Party may have. Except as otherwise specifically and explicitly set forth in this SecurityAgreement and to the maximum extent permitted by law, Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Secured Party on which Debtor may in any way be liable.

Section 20. Arbitration. Any dispute, controversy, claim or action of any kind or nature whatsoever, including the issue of arbitrability, arising out of, in connection with or relating to this Agreement shall be resolved by final and binding arbitration before a retired judge at JAMS in Santa Monica, California, in accordance with its most expedited Streamlined Arbitration Rules, and the Final Offer (or Baseball) Arbitration Option. Any interim or final award of the arbitrator may be enforced by any court of competent jurisdiction. The prevailing party shall be awarded its arbitrator, expert witness and attorney fees, costs and expenses.

Section 21. Attorneys. Debtor acknowledges, represents, warrants and agrees that (a) neither Secured Party nor any law firm in which Secured Partner is an attorney represents Debtor or its interests in connection with this Security Agreement, and (b) Debtor has been advised to and has obtained independent counsel to advise and represent Debtor and its interests in connection with this Security Agreement.

Section 22. Construction. Neither this Security Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Secured Party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto. Unless the context of this Security Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof" "herein," "hereby," "hereunder," and similar terms in this Security Agreement refer to this Agreement as a whole and not to any particular provision of this Security Agreement. Section, subsection, clause, schedule, and

exhibit references are to this Agreement unless otherwise specified. Any reference in this Security Agreement or in any of the other Loan Documents to this Security Agreement or any of the other Loan Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements, thereto and thereof, as applicable. In the event of a direct conflict between the terms and provisions of this Security Agreement and any other Loan Document, it is the intention of the parties hereto that both such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. The inclusion herein of additional obligations on the part of each Debtor and supplemental rights and remedies in favor of Secured Party, in each case in respect of the Collateral, shall not be deemed a conflict with any Loan Document.

Section 23. Secured Party's Liability for Collateral. So long as Secured Party substantially complies with its obligations, if any, under the Code and no willful misconduct occurs, Secured Party shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Debtor.

Section 24. Indemnification. Debtor agrees to defend, indemnify, save, and hold Secured Parties and their officers, employees, and agents (each an "**Indemnified Person**") harmless against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other person, and (b) all losses (including reasonable attorneys fees and disbursements) in any way suffered, incurred, or paid as a result of or in any way arising out of, following, or consequential to transactions with Debtor, whether under this Security Agreement, the other Loan Documents or otherwise (all of the foregoing, collectively, the "**Indemnified Liabilities**"). Notwithstanding the foregoing, no Debtor shall have any obligation under this Section with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted solely from the willful misconduct of such Indemnified Person. This provision shall survive the termination of this Security Agreement.

Section 25. Entire Agreement. This Security Agreement and the Loan Documents constitute the entire agreement between the parties, and supercede and replace all prior and contemporaneous promises, representations and understandings, whether written or oral.

IN WITNESS WHEREOF, the Parties have executed this Security Agreement as of the day, month and year first above written.

SECURED PARTY:

John C. Kirkland

DEBTOR:

**EPD INVESTMENT CO., LLC**

By: ______________________
Name: Jerrold S. Pressman
Title: Chairman

AGREED AND APPROVED
AS TO FORM AND CONTENT:

**LAW OFFICES OF KEITH E. PRESSMAN**

Keith E. Pressman
Attorney for Debtor

**SECURED PROMISSORY NOTE**

**EPD INVESTMENT CO., LLC**

Issuance Date: November 8, 2007 Original Principal Amount: U.S. $150,000.00

**FOR VALUE RECEIVED,** EPD Investment Co., LLC, a California limited liability company (the "**Company**"), hereby promises to pay to the order of John C. Kirkland or his designees or assigns ("**Holder**") the amount set out above as the Original Principal Amount (as increased by the amount of any and all future loans or payments to Company or any of its affiliates, the "**Principal**") when due, whether upon the Maturity Date (as defined below), acceleration, or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal at a rate per annum equal to the Interest Rate (as defined below), from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), the Maturity Date, acceleration, redemption or otherwise (in each case in accordance with the terms hereof). This Secured Promissory Note (including all Notes issued in addition to, or exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Secured Promissory Notes (collectively, the "**Notes**" and such other Secured Promissory Notes, the "**Other Notes**") issued from time to time to Holder. All terms and conditions of this Note are hereby incorporated by reference into all such Other Notes issued by Company to Holder, regardless of form, as if set forth in full therein. Certain capitalized terms are defined below.

(1) MATURITY. On the Maturity Date, the Company shall pay to the Holder an amount in cash representing all outstanding Principal, accrued and unpaid Interest and accrued and unpaid Late Charges, if any. The "**Maturity Date**" shall be thirty (30) days following written demand made by Holder at any time after the one-year anniversary of the initial Issuance Date.

(2) INTEREST; INTEREST RATE. (a) Interest on this Note at the Interest Rate shall commence accruing on the Issuance Date, on the basis of a 365-day year and actual days elapsed and shall be payable monthly in arrears on the first day of each calendar month until the Principal is paid in full (each, an "**Interest Date**" and the period between successive Interest Dates, an "**Interest Period**"). Interest shall be payable on each Interest Date, to the Holder of this Note on the applicable Interest Date, in cash.

(b) From and after the occurrence of an Event of Default, the Interest Rate shall be increased to twenty-four percent (24%) per annum. In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the Interest as calculated at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

(3) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default. Each of the following events shall constitute an "**Event of Default**":

(i) the Company's failure to pay to the Holder any amount of Principal (including, without limitation, any redemption payments), Interest, Late Charges or other amounts when and as due under this Note or any other Transaction Document (as defined in the Securities Purchase Agreement), except, in the case of a failure to pay Interest and Late Charges when and as due, in which case only if such failure continues for a period of at least three (3) Business Days;

(ii) any default under, redemption of or acceleration prior to maturity of any Indebtedness of the Company or any of its affiliates, other than with respect to any Other Notes;

(iii) the Company or any of its affiliates, pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to entry of an order for relief against it in an involuntary case, (C) consents to appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**"), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(iv) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its affiliatees in an involuntary case, (B) appoints a Custodian of the Company or any of its affiliates or (C) orders the liquidation of the Company or any of its affiliates;

(v) a final judgment or judgments for the payment of money aggregating in excess of $10,000 are rendered against the Company or any of its affiliates and which judgments are not, within seventy-five (75) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within seventy-five (75) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $10,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment or the Company is contending, reasonably and in good faith, that such judgment is covered by insurance or indemnity, and is seeking a determination to such effect;

(vi) the Company materially breaches any representation, warranty, covenant or other term or condition of any Transaction Document, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least ten (10) consecutive Business Days;

(vii) any breach or failure in any respect to comply with this Note; or

(viii) any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes.

(b) Redemption Right. Upon the occurrence of an Event of Default with respect to this Note or any Other Note, the Company shall within one (1) Business Day deliver written notice thereof via facsimile and overnight courier (an "**Event of Default Notice**") to the Holder. At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note the Holder is electing to redeem. Each portion of this Note subject to redemption by the Company pursuant to this Section 3(b) shall be redeemed by the Company at a price equal to the Outstanding Amount (the "**Event of Default Redemption Price**"). Redemptions required by this Section 3(b) shall be made in accordance with the provisions below. To the extent redemptions required by this Section 3(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments.

(4) RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL. The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes in writing all of the obligations of the Company under this Note and the other Transaction Documents in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance satisfactory to the Required Holders and approved by the Required Holders prior to such Fundamental Transaction, including agreements to deliver to each holder of Notes in exchange for such Notes a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to the Notes, including, without limitation, having a principal amount and interest rate equal to the principal amounts and the interest rates of the Notes held by such holder and having similar ranking to the Notes, and satisfactory to the Required Holders. Upon the occurrence of any Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein. The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions.

(5) NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(6) SECURITY. This Note and the Other Notes are secured to the extent and the manner set forth in the Security Interest Agreement of even date herewith.

(7) COVENANTS.

(a) Rank. All payments due under this Note (a) shall rank *pari passu* with all Other Notes and (b) shall be senior to all other Indebtedness of the Company and its affiliates.

(b) Incurrence of Indebtedness. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its affiliates to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than (i) the Indebtedness evidenced by this Note and the Other Notes and (ii) other Permitted Indebtedness.

(c) Existence of Liens. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its affiliates to, directly or indirectly, allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its affiliates (collectively, "**Liens**") other than Permitted Liens.

(d) Restricted Payments. The Company shall not, and the Company shall not permit any of its affiliates to, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Permitted Indebtedness, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing; provided that notwithstanding the foregoing, no principal (or any portion thereof) of any Subordinated Indebtedness may be paid (whether upon maturity, redemption, acceleration or otherwise) so long as this Note is outstanding.

(e) Restriction on Redemption and Cash Dividends. Until all of the Notes have been redeemed or otherwise satisfied in accordance with their terms, the Company shall not, directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on its capital stock without the prior express written consent of the Required Holders.

(8) VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES. The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any change or amendment to this Note or the Other Notes.

(9) TRANSFER. This Note may be freely offered, sold, assigned or transferred by the Holder without the consent of the Company.

(10) REGISTRATION. The Company shall maintain a register (the "**Register**") for the recordation of the names and addresses of the holders of each Note and the principal amount of the Notes held by such holders (the "**Registered Notes**"). Upon its receipt of a notice to assign or sell all or part of any Registered Note by a Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate principal amount as the principal amount of the surrendered Registered Note to the designated assignee or transferee.

(11) REISSUANCE OF THIS NOTE.

(a) Transfer. If this Note is transferred, the Holder may, but shall not be required to surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note, registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less then the entire outstanding Principal is being transferred, a new Note (in accordance with Section 14(d)) to the Holder representing the outstanding Principal not being transferred.

(b) Lost, Stolen or Mutilated Note. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note representing the outstanding Principal.

(c) Note Exchangeable for Different Denominations. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) Issuance of New Notes. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued Interest and Late Charges on the Principal and Interest of this Note, from the Issuance Date.

(e) This Note may not be modified orally, but only in writing signed by Holder.

(12) REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Note shall be

cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(13) PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(14) CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and all the Holders and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(15) FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(16) DISPUTE RESOLUTION. In the case of a dispute as to the determination of the arithmetic calculation of any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile within one (1) Business Day of receipt of the Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within one (1) Business Day of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within one (1) Business Day submit via facsimile the disputed arithmetic calculation of any Redemption Price to a retired judge at JAMS in Santa Monica, California. The Company, at the Company's expense, shall cause the arbitrator to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such arbitrator's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(17) NOTICES; PAYMENTS.

(a) Notices. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore.

(b) Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; provided that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day and, in the case of any Interest Date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of Interest due on such date. Any amount of Principal or other amounts due under the Transaction Documents, which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of twenty-four percent (24%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**"). Each payment due under this Note shall be applied first to any penalties, late charges, or additional costs owed by Company hereunder, then to the payment of accrued interest then due, and thereafter to the reduction of the unpaid principal balance of this Note.

(18) CANCELLATION. After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(19) WAIVER OF NOTICE. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and all Loan Documents.

(20) GOVERNING LAW; JURISDICTION; JURY TRIAL. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of California. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against

the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(21) CERTAIN DEFINITIONS. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(b) "**Change of Control**" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the membership interests in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities, or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(c) "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(d) "**Fundamental Transaction**" means that the Company shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company to another Person, or (iii) allow another Person or Persons to make a purchase, tender or exchange offer that is accepted by the holders of more than the 50% of the outstanding shares of Voting Stock (not including any shares of Voting Stock held by the Person or Persons making or party to, or associated or affiliated with the Person or Persons making or party to, such purchase, tender or exchange offer), or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than the 50% of either the outstanding shares of Voting Stock (not including any shares of Voting Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party

to, such stock purchase agreement or other business combination), or (v) reorganize, recapitalize or reclassify its Common Stock, (vi) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 50% of the issued and outstanding Common Stock or the aggregate ordinary voting power represented by issued and outstanding Common Stock.

(e) **"GAAP"** means United States generally accepted accounting principles, consistently applied.

(f) **"Indebtedness"** of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with generally accepted accounting principles (other than trade payables entered into in the ordinary course of business), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with generally accepted accounting principles, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(g) **"Interest Rate"** means twelve percent (12%) per annum, compounded monthly.

(h) **"Outstanding Amount"** means the sum of (A) the portion of the Principal to be redeemed or otherwise with respect to which this determination is being made, (B) accrued and unpaid Interest with respect to such Principal and (C) accrued and unpaid Late Charges with respect to such Principal and Interest.

(i) **"Permitted Indebtedness"** means (A) Indebtedness incurred by the Company in connection with letters of credit now or hereinafter provided by the Company in the ordinary course of its business to unaffiliated third-party landlords as security deposits pursuant to real property leases, (B) guarantees by the Company of any Indebtedness incurred by an affiliate in connection with real property lease obligations with unaffiliated third-party landlords which do not in an aggregate exceed $10,000, (C) Indebtedness incurred by the

Company that is made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement acceptable to the Holder and approved by the Holder in writing, and which Indebtedness does not provide at any time for (1) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (2) total interest and fees at a rate in excess of the Interest Rate hereunder (the "**Subordinated Indebtedness**"), (D) Indebtedness secured by Permitted Liens, (E) extensions, refinancings and renewals of any items of Permitted Indebtedness, provided that the principal amount is not increased or the terms modified to impose more burdensome terms upon the Company or its affiliate, as the case may be and (F) Indebtedness evidenced by this Note and the Other Notes.

(j) "**Permitted Liens**" means (i) Liens in favor of Holder, (ii) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (iii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iv) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (v) Liens securing the Company's obligations under the Notes, (vi) Liens (A) upon or in any equipment acquired or held by the Company or any of its affiliates to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (vii) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (i) and (vi) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (viii) Liens securing the Company's obligations under this Note and the Other Notes; (ix) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its affiliates taken as a whole, (x) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods and (xi) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 3(a)(v).

(k) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(l) "**Required Holders**" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding.

(m) "**Successor Entity**" means the Person, which may be the Company, formed by, resulting from or surviving any Fundamental Transaction or the Person with which such Fundamental Transaction shall have been made.

(n) "**Voting Stock**" of a Person means the capital stock, membership interests or other equity of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

(22) SAVINGS CLAUSE. In the event that, at any time or for any reason, the Interest Rate, or any payment by or act of the Company or the Holder, shall result in charging or payment of interest which would exceed the limit authorized by or be in violation of the law of the jurisdiction applicable to this Note, then *ipso facto* the obligation of the Company to pay interest or perform such act or requirement shall be reduced to the limit authorized under such law, so that in no event shall the Company be obligated to pay any such interest, perform any such act or be bound by any requirement which would result in the payment of interest in excess of the limit so authorized. In the event the Interest Rate or any payment by or act of the Company shall result in the extraction of a rate of interest in excess of a sum which is lawfully collectible as interest, then such amount (to the extent of such excess not returned to the Company) shall, without further agreement or notice between or by the Company or the Holder, be deemed applied to the payment of principal, if any, hereunder immediately upon receipt of such excess funds by the Holder, with the same force and effect as though the Company had specifically designated such sums to be so applied to principal and the Holder had agreed to accept such sums as an interest-free prepayment of this Note. If any part of such excess remains after the principal has been paid in full, whether by the provisions of the preceding sentences of this Section or otherwise, such excess shall be deemed to be an interest-free loan from the Company to the Holder, which loan shall be payable immediately upon demand by the Company. The provisions of this Section shall control every other provision of this Note or any Loan Document.

(23) FULL RECOURSE NOTE. This Note is a full recourse promissory note. Accordingly, notwithstanding that Company's obligations under this Note are secured by the Collateral, in the event of a material default hereunder, Holder shall have full recourse to all the other assets of Company. Moreover, Holder shall not be required to proceed against or exhaust any Collateral, or to pursue any Collateral in any particular order, before Holder pursues any other remedies against Company or against any of Company's assets. No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the Principal of this Note at the time, place, and rate, and in the coin or currency, as herein prescribed. This Note is direct obligations of the Company.

(24) SEVERABILITY. Every provision of this Note is intended to be severable. If any term or provision hereof is declared by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

(25) Time is of the essence of this Note and the performance of each of the covenants and agreements contained herein.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

EPD INVESTMENT CO., LLC

By:______________________________
Name: Jerrold S. Pressman
Title: Chairman

Acknowledged and Agreed:

______________________________
Keith E. Pressman, Member

# EXHIBIT 30

**Lewis R. Landau** (SBN 143391)
**Attorney-at-Law**
22287 Mulholland Hwy., # 318
Calabasas, California 91302
Voice & Fax: (888) 822-4340
*Email: Lew@Landaunet.com*

Attorney for Defendants,
John C. Kirkland, individually and
Poshow Ann Kirkland, solely as Trustee
of the Bright Conscience Trust
Dated September 9, 2009

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,<br><br>Consolidated Debtors.<br><br>EIN No. xxx-0994<br><br>JASON M. RUND, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>JOHN C. KIRKLAND, an individual, and POSHOW ANN KIRKLAND, individually and as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,<br><br>Defendants. | Case No. 2:10-bk-62208-ER<br><br>Chapter 7<br><br>Adv. No. 2:12-ap-02424-ER<br><br>**SUPPLEMENTAL RESPONSES TO REQUESTS FOR ADMISSIONS**<br><br>**PROPOUNDING PARTY**: Jason M. Rund, Chapter 7 Trustee<br><br>**RESPONDING PARTY**: John C. Kirkland<br><br>**SET NO.**: One |

## PRELIMINARY STATEMENT

The Responding Party's responses to the Propounding Party's Requests for Admission are made solely for the purpose of and with respect to the above-referenced adversary proceeding. These responses shall not constitute a waiver of any objections which may be asserted during the course of this adversary proceeding, litigation and/or trial with respect to the competency, relevancy, materiality, propriety and admissibility of any document or any evidence. Responses to these Requests for Admissions are being made after reasonable search and investigation by the Responding Party. However, investigation and discovery are continuing and, in the course thereof, the Responding Party may discover further information. Upon discovery of further information, the Responding Party will supplement its response. The Responding Party therefore reserves the right to rely on or use such information so discovered through future discovery or at trial.

## GENERAL OBJECTIONS TO EACH AND EVERY REQUEST FOR ADMISSION

1. The Responding Party objects to each and every request for admission to the extent that it is overbroad, burdensome, oppressive, irrelevant, not calculated to lead to the discovery of admissible evidence, an invasion of the Responding Party's attorney-client privilege and attorney work product privilege, and/or other improper requests to disclose privileged or confidential information.

2. The Responding Party further objects to each and every request for admission to the extent that the burden of producing the information requested outweighs its apparent value to the matters and issues before this Court.

3. The Responding Party further objects to each and every request for admission which requests public information that is readily available to the Propounding Party, such as public court records.

4. The Responding Party further objects to each and every request for admission as not proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

**SUPPLEMENTAL RESPONSES TO REQUESTS FOR ADMISSIONS**

**REQUEST FOR ADMISSION NO. 16:**

Admit that YOU prepared letters to the FTB on PRESSMAN's behalf in 2004 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, the request for admission is denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party has no recollection of preparing such letters, and is aware of no information establishing that he prepared such letters. Responding Party recalls that letters were prepared by tax attorneys at his former firm. On this basis, the request is denied.

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU sent letters to the FTB on PRESSMAN's behalf in 2004 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU prepared letters to the IRS on PRESSMAN's behalf in 2004 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, the request for admission is denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party has no recollection of preparing such letters, and is aware of no information establishing that he prepared such letters. Responding Party recalls that letters were prepared by tax attorneys at his former firm. On this basis, the request is denied.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU sent letters to the IRS on PRESSMAN's behalf in 2004 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that YOU prepared letters to the FTB on PRESSMAN's behalf in 2005 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, the request for admission is denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party has no recollection of preparing such letters, and is aware of no

information establishing that he prepared such letters. Responding Party recalls that letters were prepared by tax attorneys at his former firm. On this basis, the request is denied.

**REQUEST FOR ADMISSION NO. 21:**

Admit that YOU sent letters to the FTB on PRESSMAN's behalf in 2005 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 22:**

Admit that YOU prepared letters to the IRS on PRESSMAN's behalf in 2005 while YOU were an attorney at Greenberg Traurig LLP.

**RESPONSE:**

Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, the request for admission is denied.

**SUPPLEMENTAL RESPONSE:**

Responding Party has no recollection of preparing such letters, and is aware of no information establishing that he prepared such letters. Responding Party recalls that letters were prepared by tax attorneys at his former firm. On this basis, the request is denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that YOU sent letters to the IRS on PRESSMAN's behalf in 2005 while YOU were an attorney at Greenberg Traurig LLP.