Case 2:12-ap-02424-ER Doc 73 Filed 09/26/13 Entered 09/26/13 16:21:12 Desc
Main Document Page 69 of 74

LUCE FORWARD
LUCE, FORWARD, HAMILTON & SCRIPPS LLP



**California Rules of Professional Conduct**

**Rule 3-300 Avoiding Interests Adverse to a Client**

A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

*Discussion:*

Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client. Such an agreement is governed, in part, by rule 4-200.

Rule 3-300 is not intended to apply where the member and client each make an investment on terms offered to the general public or a significant portion thereof. For example, rule 3-300 is not intended to apply where A, a member, invests in a limited partnership syndicated by a third party. B, A's client, makes the same investment. Although A and B are each investing in the same business, A did not enter into the transaction "with" B for the purposes of the rule.

Rule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees. (Amended by order of Supreme Court, operative September 14, 1992.)

LUCE FORWARD

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Mr. Jerrold S. Pressman
EPD Investment Co., LLC
February 26, 2010
Page 14

**Rule 3-310 Avoiding the Representation of Adverse Interests**

(A) For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) 'Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

LUCE FORWARD
LUCE, FORWARD, HAMILTON & SCRIPPS LLP



(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

(a) such nondisclosure is otherwise authorized by law; or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

**Discussion:**

Rule 3-310 is not intended to prohibit a member from representing parties having antagonistic positions on the same legal question that has arisen in different cases, unless representation of either client would be adversely affected.

LUCE FORWARD

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Mr. Jerrold S. Pressman
EPD Investment Co., LLC
February 26, 2010
Page 16

Other rules and laws may preclude making adequate disclosure under this rule. If such disclosure is precluded, informed written consent is likewise precluded. (See, e.g., Business and Professions Code section 6068, subdivsion (e).)

Paragraph (B) is not intended to apply to the relationship of a member to another party's lawyer. Such relationships are governed by rule 3-320.

Paragraph (B) is not intended to require either the disclosure of the new engagement to a former client or the consent of the former client to the new engagement. However, both disclosure and consent are required if paragraph (E) applies.

While paragraph (B) deals with the issues of adequate disclosure to the present client or clients of the member's present or past relationships to other parties or witnesses or present interest in the subject matter of the representation, paragraph (E) is intended to protect the confidences of another present or former client. These two paragraphs are to apply as complementary provisions.

Paragraph (B) is intended to apply only to a member's own relationships or interests, unless the member knows that a partner or associate in the same firm as the member has or had a relationship with another party or witness or has or had an interest in the subject matter of the representation.

Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners or a corporation for several shareholders, the preparation of an ante-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, §962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2).

Subparagraph (C)(3) is intended to apply to representations of clients in both litigation and transactional matters.

In State Farm Mutual Automobile Insurance Company v. Federal Insurance Company (1999) 72 Cal.App. 4th 1422 [86 Cal.Rptr.2d 20], the court held that subparagraph (C)(3) was

LUCE FORWARD

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Mr. Jerrold S. Pressman
EPD Investment Co., LLC
February 26, 2010
Page 17

violated when a member, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding State Farm, subparagraph (C)(3) is not intended to apply with respect to the relationship between an insurer and a member when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

There are some matters in which the conflicts are such that written consent may not suffice for non-disciplinary purposes. (See Woods v. Superior Court (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185]; Klemm v. Superior Court (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; Ishmael v. Millington (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

Paragraph (D) is not intended to apply to class action settlements subject to court approval.

Paragraph (F) is not intended to abrogate existing relationships between insurers and insureds whereby the insurer has the contractual right to unilaterally select counsel for the insured, where there is no conflict of interest. (See San Diego Navy Federal Credit Union v. Cumis Insurance Society (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].) (Amended by order of Supreme Court; operative September 14, 1992; operative March 3, 2003.)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**Landau Gottfried & Berger LLP;** 1801 Century Park East, Suite 700; Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): ***NOTICE OF MOTION AND MOTION OF DEFENDANT JOHN C. KIRKLAND TO COMPEL ARBITRATION AND STAY ADVERSARY PROCEEDING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOHN C. KIRKLAND*** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 26, 2013**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Larry W Gabriel lgabriel@ebg-law.com
- Michael I Gottfried mgottfried@lgbfirm.com, ncereseto@lgbfirm.com;rmartin-patterson@lgbfirm.com;kalandy@lgbfirm.com
- Ashley M McDow amcdow@bakerlaw.com, jbelton@bakerlaw.com;rojeda@bakerlaw.com;amcdow@ecf.inforuptcy.com
- Jason M Rund (TR) trustee@srlawyers.com, jrund@ecf.epiqsystems.com
- Scott C Timpe stimpe@mbnlawyers.com, scott.timpe@gmail.com;aacosta@mbnlawyers.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
- Corey R Weber ecf@ebg-law.com, cweber@ebg-law.com
- Robert G Wilson rwilson@lgbfirm.com, kalandy@lgbfirm.com
- Aleksandra Zimonjic azimonjic@lgbfirm.com, marizaga@lgbfirm.com;scolen@lgbfirm.com;ncereseto@lgbfirm.com;vedwards@lgbfirm.com

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) **September 26, 2013**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Ernest M. Robles
United States Bankruptcy Court
Los Angeles Division-Roybal Federal Bldg.
255 East Temple Street, Suite 1560
Los Angeles, CA 90012-3332

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 26, 2013 | Kelsey Alandy | *Kelsey Alandy* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

# EXHIBIT Q




# LIMITED-LIABILITY COMPANY CHARTER

I, DEAN HELLER, the Nevada Secretary of State, do hereby certify that **PLUSH LOUNGE LAS VEGAS, LLC** did on **May 9, 2003,** file in this office the Articles of Organization for a Limited-Liability Company, that said Articles are now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain the provisions required by the laws governing Limited-Liability Companies in the State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office in Carson City, Nevada, on **May 12, 2003.**




Dean Heller

Secretary of State

By Camiane C. Smelt

Certification Clerk

Dep(s) ______ Pl(s) 6 EXHIBIT for I.D.
MITCH A. GENSER, CSR #239, NP
Date: 6/26/1
Witness: KIRKLAND



6

DEAN HELLER
Secretary of State

202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684 5708

**Limited-Liability Company**
**Articles of Organization**
(PURSUANT TO NRS 86)

FILED # LLC 6841-03

MAY 0 9 2003

IN THE OFFICE OF
DEAN HELLER, SECRETARY OF STATE

*Important: Read attached instructions before completing form.*

| | |
|---|---|
| 1. Name of Limited-Liability Company: | PLUSH LOUNGE LAS VEGAS, LLC |
| 2. Resident Agent Name and Street Address: (must be a Nevada address where process may be served) | National Corporate Research, Ltd.<br>Name<br>202 South Minnesota Street, Carson City, NEVADA 89703<br>Physical Street Address, City, Zip Code<br>Additional Mailing Address, City, State, Zip Code |
| 3. Dissolution Date: (OPTIONAL-see instructions) | Latest date upon which the company is to dissolve (if existence is not perpetual): ______ |
| 4. Management: (check one) | Company shall be managed by ✓ Manager(s) OR ______ Members |
| Names Addresses, of Manager(s) or Members: (attach additional pages as necessary) | S.C. Club, L.P.<br>Name<br>520 Braodway, Suite 660, Santa Monica, CA 90401<br>Street Address, City, State, Zip Code<br>Name<br>Street Address, City, State, Zip Code<br>Name<br>Street Address, City, State, Zip Code |
| 5. Other Matters: (see instructions) | Number of additional pages attached: 0 |
| 6. Names, Addresses and Signatures of Organizer(s): (attach additional pages if there are more than 2 organizers) | Richard Arthur — [signature] Richard Arthur<br>Name, Signature<br>523 West 6th Street, Suite 741, Los Angeles, CA 90014<br>Address, City, State, Zip Code<br>Name, Signature<br>Address, City, State, Zip Code |
| 7. Certificate of Acceptance of Appointment of Resident Agent: | I, National Corporate Research, Ltd. hereby accept appointment as Resident Agent for the above named limited-liability company.<br>[signature], Asst VP — A. P. Polizzi, Asst. VP — May 9, 2003<br>Authorized Signature of R.A. or On Behalf of R.A. Company, Date |

*This form must be accompanied by appropriate fees. See attached fee schedule.*

Nevada Secretary of State Form LLCART1999.01
Revised on: 06/20/01

# EXHIBIT R

PLEASE CONFORM

GREENBERG TRAURIG, LLP
JOHN C. KIRKLAND (SBN 149453)
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: (310) 586-7786
Facsimile: (310) 586-0286
Email: kirklandj@gtlaw.com

Attorneys for Plaintiff
PLUSH LOUNGE LAS VEGAS, LLC

FILED
CLERK, U.S. DISTRICT COURT
JUN 13 2006
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| PLUSH LOUNGE LAS VEGAS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>HOTSPUR RESORTS NEVADA, INC.,<br><br>Defendant. | Case No. CV 06-2626 FMC (TLx)<br><br>**DECLARATION OF JOHN C. KIRKLAND, ESQ. IN SUPPORT OF PLAINTIFF'S OPPOSITIONS**<br><br>Date: June 26, 2006<br>Time: 10:00 a.m.<br>Ctrm: 750<br><br>Hon. Florence Marie Cooper |

Exhibit 22 EXHIBIT for I.D.
MITCH A. GENSER, CSR#8239, NP
Date: 6/23/17
Witness: Kirkland

Exhibit A

**DECLARATION OF JOHN C. KIRKLAND, ESQ.**

I, John C. Kirkland, hereby declare as follows:

1. I am an attorney at law, duly licensed to practice before all Courts of the State of California, including the United States District Court for the Central District of California. I am a shareholder in the law firm of Greenberg Traurig LLP, counsel of record for plaintiff Plush Lounge Las Vegas, LLC ("Plush") herein.

2. I serve as general outside counsel for Plush. I have represented the principals of Plush for more than a decade, and have represented Plush since its formation. I am the company's registered agent for service of process in the State of California. I caused its Articles of Organization to be filed with the Secretary of State of Nevada on May 9, 2003, Articles of Conversion to be filed in Nevada on April 21, 2006, and Limited Liability Company Articles of Organization-Conversion to be filed with the Secretary of State of California on April 21, 2006. I also drafted the company's Operating Agreement on May 9, 2003.

3. Plush is a limited liability company duly organized and existing under the laws of the State of California. Its principal place of business is, and since formation has been, located at 520 Broadway, Suite 660, Santa Monica, California 90404. All of the company's documentation and records are located at its offices in Santa Monica, California. The company does not maintain any records outside the State of Calfornia.

4. The sole member of Plush Lounge is S.C. Club, L.P., which is a limited partnership duly organized and existing under the laws of the State of California. S.C. Club, L.P. is also the manager of Plush. S.C. Club, L.P.'s principal place of business is located at 520 Broadway, Suite 660, Santa Monica, California. The general partner of S.C. Club, L.P. is S.C. Club, Inc., which is a corporation duly organized and existing under the laws of the State of California. Its principal place of business is also located at 520 Broadway, Suite 660, Santa Monica, California. The sole limited partner of S.C.

Club, L.P. is Jerrold S. Pressman. Mr. Pressman permanently resides in Santa Monica, California, and has been a citizen of the State of California for more than thirty years.

5. As noted in the complaint filed in this action, Plush has no members that are citizens of Nevada. Rather, at all times relevant to this action, its sole member has been a citizen of the State of California.

6. After Plush was forced out of business by the wrongful conduct of defendant Hotspur Resorts Nevada, Inc. ("Hotspur"), Plush laid off all of its employees. Plush does not currently have any employees. Based upon my investigation in this matter, plaintiff currently intends to call the following non-employee witnesses at trial, who it believes have knowledge of the facts underlying this matter. Each witnesses name, city of residence, and a general summary of their anticipated testimony, are as follows:

a. Christine Kamps, Los Angeles, California, had multiple meetings and conversations with executives and consultants of defendant Hotspur, including negotiations and discussions with Thaddus Alston, Amin Lalji, Mansoor Lalji and David Barens who made the representations to Plush that form the basis for plaintiff's complaint and (in the case of Alston and the Laljis) made the decisions and took the actions on which all causes of action are based, attending weekly meetings, overseeing management, consolidating results and interacting with Hotspur on a daily basis, including multiple meetings in Santa Monica, California, at which the false and fraudulent misrepresentations were made by Alston and the Laljis;

b. Jerrold Pressman, Santa Monica, California, was initially contacted by defendant Hotspur in Santa Monica, California, and conducted multiple negotiations, meetings, conversations and communications, including meetings with the Laljis and Alston in Santa Monica, California;

c. Cherri Bell, Torrance, California, received and communicated with Hotspur individuals and negotiated arrangements on behalf of Ms. Kamps and Mr. Pressman;

d. Raul Ordaz, Los Angeles, California, responsible for installing, maintaining and overseeing the construction and installation at the Plush Lounge, and was present when defendant Hotspur refused to allow Plush to remove furniture, fixtures and equipment from the facilities, as alleged in plaintiff's conversion cause of action;

e. Ruben Moreno, Los Angeles, California, the accountant and controller who oversaw computation of all calculations and sales, and has knowledge of all financial aspects of the case, including all of plaintiff's damages;

f. Jeffrey Haines, Los Angeles, California, Executive Chef who was involved in the setting up the Plush Lounge nightclub, and negotiating special events with defendant Hotspur;

g. Thomas Ferro, Los Angeles, California, former Vice President and General Manager of the Westwood One division of Viacom, routinely visited the Plush Lounge nightclub and interacted with the parties, has knowledge of the damages to Plush caused by defendant's improper conduct, including the lack of advertising relating to attendance at live musical events at the club, as alleged in the monopoly and trademark declaratory relief causes of action, and the nightclub market in the Los Angeles and Summerlin areas;

h. Sandra Heredia, Los Angeles, California, Account Executive responsible for consolidating and auditing sales and expenses for Plush;

i. Keith Pressman, Westwood, California, President and Operator of Plush Lounge;

j. Roger LeBlanc, Los Angeles, California, booking agent with 15 years of experience who booked acts at Plush Lounge, personally experienced effects of defendant's conduct as alleged in the intentional interference and monopoly causes of action;

k. Gloria Martin, Los Angeles, California, participated in consolidating and overseeing the financial records of Plush Lounge since its inception, as well as tracking daily sales and receipts;

l. Brad Kemp, Los Angeles, California, responsible for queuing up special musical events at Plush Lounge, as well as installation and operation of equipment that was converted;

m. Rick Fall, Los Angeles, California, part of team that created events and tracked clientele for Plush Lounge, particularly overseeing security and dealing with observations and perceptions of club clientele;

n. David Jenison, Los Angeles, California, newspaper and magazine reporter who will testify to his own personal experiences visiting Plush Lounge, the level of advertising and the lack of signage impact on the club, particularly with respect to the relevant music and nightclub markets, including bands that have played at the Plush Lounge and similar venues in Los Angeles, California, which would have sold out as they have in other venues but for the improper conduct of defendant;

o. Paul Joseph, Los Angeles, California, Executive Producer for Clear Channel for 17 years, has personal knowledge regarding the anti-competitive effects of defendant's conduct;

p. Von Freeman, Los Angeles, California, former Chief of Special Promotions for KIIS-FM and Clear Channel for Nevada and California, has personal knowledge regarding the damages caused by the lack of signage and ability to adequately identify the club's location due to defendant's conduct; and

q. Kim Koury, Los Angeles, Calfiornia, Public Relations and Radio Advertising liaison for the Plush Lounge to the marketing and public relations community.

7. The four primary Hotspur witnesses that plaintiff intends to call at trial are its president, Thaddus Alston, Hotspur principals Amin Lalji and Mansoor Lalji who reside in Vancouver, Canada, and former Hotspur consultant and representative David Barens, who resides in the State of Texas. Plaintiff anticipates each of the four will be forced to testify that they acted as representatives of defendant Hotspur in the negotiations, met with Ms. Kamps and Mr. Pressman, and were the decision makers regarding the tortious conduct alleged in the complaint.

8. Plaintiff does not anticipate Gustav Mauler will testify at trial, since his knowledge is only nominally relevant to the claims in this case. Negotiations between GP II and Hotspur do not form the basis for plaintiff's claims, which are based on the representations made directly by Hotspur's representatives (principally Alston, the Laljis and Barens) to Plush's representatives (principally Kamps and Pressman). Mr. Mauler's wife, business partner and attorney have no relevant knowledge that plaintiff is aware of, and is not expected to be called as witnesses at trial.

9. Plaintiff does not anticipate that Andrew Jenkin will testify at trial, since he has no knowledge of any facts relevant in this action. Failure of GP II to pay CAM charges and rent when due under the Lease is not in dispute in this action.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 12th day of June, 2006 at Santa Monica, California.

John C. Kirkland

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is **2450 Colorado Avenue, Suite 400E, Santa Monica, CA 90404.**

On **June 12, 2006**, I served the **DECLARATION OF JOHN C. KIRKLAND, ESQ. IN SUPPORT OF PLAINTIFF'S OPPOSITIONS** on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope, postage prepaid, addressed as follows:

Andrew S. Pauly, Esq.
Maryann R. Marzano, Esq.
Greenwald Pauly Foster & Miller
1299 Ocean Avenue, Suite 400
Santa Monica, CA 90401-1007

☒ **(BY MAIL)**

☒ I deposited such envelope in the mail at Santa Monica, California. The envelope was mailed with postage thereon fully prepaid.

☒ I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Santa Monica, California, in the ordinary course of such business.

☐ **(BY FEDERAL EXPRESS)**
I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for delivery by Federal Express. Under the practice it would be deposited with Federal Express on that same day with postage thereon fully prepared at Santa Monica, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if delivery by Federal Express is more than one day after date of deposit with Federal Express.

☐ **(BY FACSIMILE)**
On Type Date here, I transmitted the foregoing document(s) by facsimile sending number. Pursuant to rule 2009(i)(4), I caused the machine to print a transmission record of the transmission, a true and correct copy of which is attached to this declaration.

☐ **(BY PERSONAL SERVICE)**
I delivered such envelope by hand to the offices of the addressee. Executed on Type Date here, at Santa Monica, California.

☒ **(FEDERAL)** I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on **June 12, 2006**, at Santa Monica, California.

[signature]
Signature

Monique Bonaparte
Print Name

# PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is The Water Garden, 1620 26th Street, 6th Floor, North Tower, Santa Monica, California 90404.

On **November 14, 2007**, I served the foregoing document described as **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS *PARTIAL* OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND COMPEL DEPOSITIONS** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Andrew S. Pauly, Esq.
Maryann R. Marzano, Esq.
Greenwald, Pauly, Foster & Miller, APC
1299 Ocean Avenue, Suite 400
Santa Monica, CA 90401-1007
**Facsimile: (310) 395-5961**

Attorneys for Defendant
Hotspur Resorts Nevada, Inc

X **BY MAIL:** I caused such envelope to be deposited in the mail in Santa Monica, California. The envelope was mailed with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business.

___ **BY PERSONAL SERVICE:** I caused such envelope to be delivered by hand to the offices of the addressee(s).

X **BY FACSIMILE SERVICE:** I caused such documents to be transmitted via facsimile to the addressee(s) at the facsimile number(s) listed above.

___ **BY OVERNIGHT/FEDERAL EXPRESS SERVICE:** I caused such envelopes to be delivered to the offices of the addressee(s) via overnight/FedEx next business-day service.

Executed on **November 14, 2007**, at Santa Monica, California.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

[signature]
Ivette Grano

DREIER STEIN & KAHAN LLP

944296_1.DOC

# EXHIBIT S

Mark G. Tratos (Bar No. 1086)
Bradley Boodt (Bar No. 5228)
F. Christopher Austin (Bar No. 6559)
GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89109
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

and

John C. Kirkland
2450 Colorado Avenue
Suite 400 East
Santa Monica, California 90404
Telephone: (310) 586-7786
Facsimile: (310) 586-0286

Counsel for Plaintiff
PLUSH LOUNGE LAS VEGAS, LLC

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PLUSH LOUNGE LAS VEGAS, LLC,<br>Plaintiff,<br>v.<br>HOTSPUR RESORTS NEVADA, INC.,<br>Defendant. | Case No.<br>**COMPLAINT**<br>**AND REQUEST FOR JURY TRIAL** |

Plaintiff PLUSH LOUNGE LAS VEGAS, LLC ("**Plush**"), by and through its attorneys, Greenberg Traurig, LLP, as and for its Complaint against Defendant HOTSPUR RESORTS NEVADA, INC. ("**Hotspur**"), alleges as follows:

**NATURE OF ACTION**

1. Plush operated the Plush Lounge nightclub located within the JW Marriott Las Vegas Resort & Spa (the "**Marriott**") in the Summerlin community in Las Vegas, Nevada. This is a federal antitrust and unfair competition action, with pendant claims for interference with contract and fraud against a shell company of the infamous Lalji family who--along with

Case 2:08-cv-06335-BES-LRL Document 1 Filed 05/20/08 Page 2 of 36

numerous hotels and other properties worldwide--controls the club's landlord through a string of off-shore entities.

2. Plush's claims arise out of a civil conspiracy among the Lalji front companies and various third-party intermeddlers to drive Plush out of business, stealing and effectively destroying the value of millions of dollars spent by Plush in remodeling and operating the nightclub. Using baseless claims and misrepresentations, Defendant fraudulently induced Plush to enter into a Management Agreement with GP II, LLC ("**GP II**") and to remodel premises belonging to one of the Laljis' many front companies which they use as their private piggy bank, in order to illegally profit by misappropriating the value of Plush's investment.

## JURISDICTION AND VENUE

3. This Court has federal question subject matter jurisdiction over this antitrust and unfair competition dispute pursuant to 15 U.S.C. §§ 15 and 1121, 28 U.S.C. §§ 1331, 1337 and 1338, and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367, since the state law claims are so related to the federal claims that they form part of the same case and controversy.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and the claims arose in substantial part in this District. Since Defendant does business and can be found in this district, the Court has personal jurisdiction over the Defendant.

## THE PARTIES

5. Plush is a limited liability company, duly organized and validly existing under the laws of the State of Nevada.

6. Defendant Hotspur Resorts Nevada, Inc. is a purported corporation, allegedly organized and existing under the laws of the State of Nevada.

## GENERAL ALLEGATIONS

7. Pursuant to a written Management Agreement with GP II, the tenant of the Plush Lounge premises, and managed by renown master chef Gustav Moeler ("**Gustav**"),

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

Case 2:08-cv-06335-BES-LRL Document 1 Filed 05/20/08 Page 3 of 36

Plush financed, remodeled and operated the "Plush Lounge" nightclub in the Marriott. The premises on which club is operated are leased by GP II pursuant to a written Retail Lease Agreement, ostensibly from Defendant Hotspur, an entity created to exploit hundreds of millions of dollars in value created by prior lenders and investors who received nothing from Defendant's hostile takeover of the property via bankruptcy. Copies of the Management Agreement and Lease are attached hereto as **Exhibits "1" and "2,"** respectively. The Lease, initially and as amended, was drafted by counsel for Defendant.

8. At the time the Management Agreement was entered into, the premises consisted of a failed restaurant in an increasingly deserted section of the resort hotel casino that Defendant was seeking to revitalize for its own profit. Defendant aggressively courted Plush, whose manager financed, remodeled and operates the Key Club nightclub on the world famous Sunset Strip in West Hollywood, California. In order to fraudulently induce Plush into investing millions of dollars into the premises for Defendant's benefit, Defendant and its cohorts made promises and assurances that the full leverage of all of the resort's assets would be utilized to ensure the club's success, including, without limitation, that the assets of Defendant and JW Marriott:

(a) were fully committed to filling the retail space in the middle passageway between the two towers of the Marriott where the club was located, thereby creating huge traffic flow that would benefit the Plush Lounge;

(b) would heavily promote and advertise the club extensively throughout the resort and casino, including on video screens throughout the resort and on televisions within individual hotel rooms; and

(c) would promptly construct a *large* and prominent "Plush Lounge" sign outside the Marriott to attract patrons, increase awareness of the club among local residents, and encourage and allow them to find the club in order to attend live concerts and other promoted events.

9. Financial projections were prepared based on the Defendant's lavish and elaborate claims, that outlined the club being fully open five or six nights per week, with

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

double shifts of customers on weekends, one from 8:00 p.m. to 10:30 p.m. for advertised live music events, and one from 11:00 p.m. to 4:00 a.m. for promoted dance club nights, thus generating substantial revenue almost every night and multiple revenue streams at least two nights per week. Defendant claimed that these projections were conservative, and that their complete support would allow the club to exceed all expectations.

10. As a quid-pro-quo for the promised advantages that the club would be able to leverage from the resort, GP II agreed to pay CAM (customary maintenance) charges based on the value to be created by these assets, to partially offset the cost of providing the many benefits the Marriott would provide.

11. In order to further induce Plush into parting with its money, Defendant amended the Lease and made Plush an express third-party beneficiary, thus ensuring--Defendant claimed--that Plush's seven figure investment in the club would be fully protected despite any eventuality. Plush reasonably relied on Defendant's written agreements and extensive additional oral promises, and to its detriment entered into the Management Agreement and invested in excess of a million dollars in remodeling the club into a state of the art nightclub with "all the standard ultralounge amenities," a "sexy atmosphere" and "swanky interior," as well as "unique features that set it apart from all the others."

12. After entering into the Management Agreement, Plush spent considerable time, money and effort designing a substantial remodel of the premises in order to open a new, first-class nightclub. At a cost of millions of dollars as well as substantial time and effort, Plush completed remodeling and opened the new facility.

13. Although Hotspur and the Marriott got exactly what they wanted, Plush did not receive any of the promised benefits. Defendant never put up the large sign promised, never provided the in room advertising, and even refused to permit Plush to advertise the club's location. Indeed, Defendant failed to leverage any of Defendant's vast assets to market the club.

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

Case 2:08-cv-06335-BES-LRL Document 1 Filed 05/20/08 Page 5 of 36

14. Despite the many promises, for *years* Defendant took no action to install a large sign to allow anyone to find the club, and, on information and belief, did not even bother applying for a permit to do so. Incredibly, Defendant did not even allow the installation of a small sign, even though it had all necessary approvals.

15. Rather, Defendant and Marriot took efforts to impeded Plush's advertising efforts at every turn and to undermine the business in favor of Defendant's competing venues at the Marriott.

16. Defendant even refused to allow Plush to tell potential customers where the club was located! When Plush put up a billboard sign advertising that it was located at the Marriot, Defendant made them take it down under threat of legal action and termination of the lease for stating that the club was located at the Marriot.

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

17. Defendant, however, used all of its vast assets and resources to promote competing venues within the resort. Defendant has employed all of the marketing techniques it promised Plush to exclusively promote its own competing venues, events and services. Defendant has placed large advertisements on the exterior of the building to promote its own interests. Defendant has promoted their own events and catering services with in-room advertising and interior signage.

18. As the owner of the entire resort, Defendant has a natural monopoly over the provision of food and beverage, live event and nightclub services within the Marriott. Defendant wrongfully used its monopoly power to restrain Plush from attracting patrons and from advertising both within the Marriott and within the Summerlin casino resort area.

19. The predictable result has been the demise of the club just two years after opening. In addition to Plush's capital investment, Plush has lost millions more in operating profits it should and would have earned over the last two years, if Defendant had lived up to its many promises, its contractual obligations under which Plush is a beneficiary, or even just not interfered with Plush's attempts to make the club a success. Rather, Defendant unlawfully exercised its monopoly power over the club, costing the club millions of dollars in

lost revenue from hundreds of missed concerts, dance nights, food and beverage sales, and admission fees that will never be recovered.

20. Though doing nothing to actually perform as promised, Defendant continued to make representations that the situation would improve, all the while extracting forbearance and additional payments from Plush. Notwithstanding the significant problems, Plush agreed to stay in the premises, and to make the substantial additional investment necessary to operate the property and seek to make it successful.

21. As it became increasingly clear that Plush was receiving no benefit from the common areas of the Marriott, Defendant agreed to an abatement of common area maintenance ("**CAM**") charges, in order to allow Plush some minimal relief from the financial black hole that Defendant had placed Plush into. This understanding was confirmed by letters, specifically stating that the CAM charges would be abated until the signage and other problems were fixed. Copies of the letters confirming the abatement of CAM charges are attached hereto as **Exhibit "3"**.

22. Then, having placed the club in severe financial distress by its own wrongful conduct, Defendant suddenly insisted that the club pay hundreds of thousands of dollars in allegedly defaulted CAM charges, even though it had agreed to abate them. At the beginning of the 2005 holiday season, Hotspur surreptitiously posted an eviction notice, and attempted to have Plush summarily evicted from the premises without any actual notice or opportunity to be heard. Defendant sought to use the threat of eviction during the only month of the year in which the club actually had a chance to earn any real revenues to extort money to which Defendant had no lawful right.

23. When its initial extortion attempts were thwarted, Defendant then sought to force Plush to give up all of its rights to damages due to Defendant's wrongful conduct. When Plush refused to give in, Defendant wrongfully and summarily evicted Plush from the premises.

24. Defendant entered into an express and implicit civil conspiracy to drive Plush out of business, deprive it of its contractual rights under the lease, and force Plush from the

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

Case 2:08-cv-06335-BES-LRL Document 1 Filed 05/20/08 Page 7 of 36

premises, thereby allowing Defendant to steal millions of dollars of value due to Plush's effort and investment and leaving Defendant with decreased competition to its own food, beverage and live event services. The specific goal of Defendant was to deprive Plush of the benefits of its investment, and wrongfully convert the value created by Plush to Defendant's own benefit.

25. Defendant has taken its actions in bad faith, and for the sole purpose of damaging Plush, driving it out of business in favor of Defendant's competing interests and forcing Plush from the property, so that Defendant could take the benefits for itself.

## FIRST CLAIM FOR RELIEF

**(Illegal Maintenance of Monopoly in the Relevant Market Under Section 2 of the Sherman Act)**

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

26. Plush repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

27. As set forth above, Defendant possesses monopoly power in the markets for food and beverage services, nightclubs and lounges, and live music event venues within the Marriot resort and within the Summerlin area of Las Vegas, Nevada.

28. Through the anticompetitive conduct described herein, Defendant has willfully maintained its monopoly power by anticompetitive and unreasonably exclusionary conduct.

29. Defendant has acted with the intent to maintain its monopoly power in the markets, and its illegal conduct has allowed it to do so, in violation of Section 2 of the Sherman Act, 15 USC § 2.

30. The conduct of the Defendant occurred in and affected interstate commerce. Las Vegas is a world famous tourist destination, attracting customers from throughout the country, including a substantial portion from Southern California where the Key Club is located. Defendant and the Marriott advertise nationwide to attract interstate customers and to promote their own interests in the markets.

31. The anticompetitive acts of Defendant have harmed consumers and competition.

32. As a direct, foreseeable and proximate result of Defendant's unlawful maintenance of its monopoly within the markets in violation of Section 2 of the Sherman Act, Plush has been deprived of the benefits of free and fair competition on the merits.

33. Plush has been and will continue to be damaged in amounts in excess of $8,500,000.00, to be proven at trial. Plush is entitled to recover treble damages in a sum in excess of $25,500,000.00 in accordance with the provisions of the Sherman Act.

34. Plush's injury is of the type the antitrust laws are intended to prevent and thus constitutes antitrust injury.

**SECOND CLAIM FOR RELIEF**

**(Declaratory Relief under the Lanham Act)**

35. Plush repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

36. Plush is the exclusive licensee of the federally registered trademark PLUSH® for nightclub services featuring musical performances and dining, Registration Number 2546339, registered by the United States Patent and Trademark Office on March 12, 2002.

37. On information and belief, Defendant is the exclusive licensee in Summerlin, Nevada, of the federally registered trademarks JW MARRIOTT HOTEL® for hotel, restaurant, catering, bar and lounge services; provision of facilities for meetings, conferences and exhibitions, Registration Numbers 2393255 and 2399675, registered by the United States Patent and Trademark Office on October 10 and 31, 2000.

38. Defendant misused and abused its trademark rights in the "JW Marriott" trademarks to unlawfully prevent Plush from lawfully promoting its business by identifying itself in advertisements as being located in the JW Marriott resort.

39. An actual and justiciable controversy exists between the parties, in that Plush contends that Defendant was entitled under the Lanham Act to prohibit Plush from any use of term "JW Marriott," that Defendant's refusal to allow Plush to advertise its location in the JW Marriott resort (a) was improper, (b) can be used as an element of Plush's claims for damages against Defendant, and (c) is a valid legal defense to Defendant's bad faith

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

claims that it is owed back rent and CAM charges from the premises by GP II; whereas Defendant denies all of the foregoing.

40. Plush requests declaratory relief of its rights and entitlements with regard to its fair use of the foregoing trademarks.

## THIRD CLAIM FOR RELIEF

**(Intentional Interference with Contract and Prospective Business Advantage)**

41. Plush repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

42. Plush and GP II are, and at all material times hereto have been, parties to a written Management Agreement between them. Plush has a contractual entitlement to all of the rights and benefits due to the tenant under the agreement, including without limitation the right to operation of the nightclub premises, and the peaceful and quiet enjoyment thereof. The contractual rights of Plush under the Management Agreement was of substantial actual and potential economic benefit to Plush.

43. Each of the Defendant is, and at all times pertinent hereto was, fully aware of the Management Agreement between Plush and GP II, and the actual and potential benefits to Plush thereunder.

44. Defendant has, and at all times pertinent hereto has had, actual notice of the existence of the contractual relationship between Plush and GP II, and the terms of the written contract between them, but virtue of having been provided with copies of the Management Agreement.

45. Defendant knew, or reasonably should have known, that its breaches of the Lease with GP II, and its misrepresentations and misconduct as alleged herein would be, was and is detrimental to Plush and its rights and interests.

46. Defendant actually, knowingly and wrongfully interfered with Plush's rights under the Management Agreement and with Plush's contractual relationship with GP II in order to deprive Plush of the economic advantages due to it under the agreement.

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 10 of 36

47. Defendant further interfered with Plush's actual and prospective economic relationships with third parties by refusing to advertise and promote the Plush Lounge nightclub as promised, and by improperly attempting to evict, and constructively and actually evicting Plush from the premises.

48. As a proximate and legal result of Defendant's wrongful conduct, Plush has been damaged in an amount in excess of $1,500,000.00 to be proven at trial.

49. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation operating profits that should have been earned over the last two years, in an amount in excess of $2,000,000.00 to be proven at trial.

50. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation the ability to (a) properly maintain and operate the nightclub, (b) attract and book top local, national and international performers, private parties, promotions, benefit and award shows, (c) maintain the reputation of Plush as one of the premiere nightclubs in Las Vegas, (d) open and manage Plush nightclubs throughout the country and the world, and (e) open, operate and promote radio and television studios in connection with Plush, all to its damage in an amount in excess of $5,000,000.00 to be proven at trial.

51. By engaging in the foregoing conduct, Defendant acted with oppression, fraud and malice, entitling Plush to exemplary and punitive damages, in an amount sufficient to punish and make an example of the Defendant, in an amount in excess of $100,000,000.00 to be determined by the jury at trial.

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

**FOURTH CLAIM FOR RELIEF**

**(Fraud)**

52. Plush repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 11 of 36

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

53. Defendant and its cohorts, and each of them, engaged in an ongoing pattern and scheme to defraud Plush through repeated misrepresentations, fraudulent promises made without any intention of ever performing, and ongoing concealment of the same.

54. Plush reasonably relied upon the Defendant's representations, and, as a result of this reliance, was materially misled and was fraudulently induced to invest time, money and effort in remodeling and operating the Plush Lounge nightclub, and has incurred significant losses which continue until now.

55. As a proximate and legal result of Defendant's wrongful conduct, Plush has been damaged in an amount in excess of $1,500,000.00 to be proven at trial.

56. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation operating profits that should have been earned over the last two years, in an amount in excess of $2,000,000.00 to be proven at trial.

57. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation the ability to (a) properly maintain and operate the nightclub, (b) attract and book top local, national and international performers, private parties, promotions, benefit and award shows, (c) maintain the reputation of Plush as one of the premiere nightclubs in Las Vegas, (d) open and manage Plush nightclubs throughout the country and the world, and (e) open, operate and promote radio and television studios in connection with Plush, all to its damage in an amount in excess of $5,000,000.00 to be proven at trial.

58. By engaging in the foregoing conduct, Defendant acted with oppression, fraud and malice, entitling Plush to exemplary and punitive damages, in an amount sufficient to punish and make an example of the defendants, in an amount in excess of $100,000,000.00 to be determined by the jury at trial.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 12 of 36

**FIFTH CLAIM FOR RELIEF**

**(Unfair Competition)**

59. Plush repeats and re-alleges each and every allegation set forth in this Complaint as if set forth here in full.

60. Defendant and its cohorts, and each of them, engaged in an ongoing pattern and scheme to unlawfully and unfairly compete with Plush as set forth hereinabove, in order to drive the Plush Lounge nightclub out of business to the benefit of Defendant and its interests.

61. As a proximate and legal result of Defendant's wrongful conduct, Plush has been damaged in an amount in excess of $1,500,000.00 to be proven at trial.

62. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation operating profits that should have been earned over the last two years, in an amount in excess of $2,000,000.00 to be proven at trial.

63. As a further proximate result of Defendant's wrongful conduct, Plush has been deprived of actual and potential business, including without limitation the ability to (a) properly maintain and operate the nightclub, (b) attract and book top local, national and international performers, private parties, promotions, benefit and award shows, (c) maintain the reputation of Plush as one of the premiere nightclubs in Las Vegas, (d) open and manage Plush nightclubs throughout the country and the world, and (e) open, operate and promote radio and television studios in connection with Plush, all to its damage in an amount in excess of $5,000,000.00 to be proven at trial.

64. By engaging in the foregoing conduct, Defendant acted with oppression, fraud and malice, entitling Plush to exemplary and punitive damages, in an amount sufficient to punish and make an example of the defendants, in an amount in excess of $100,000,000.00 to be determined by the jury at trial.

/ / /

/ / /

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

Case 2:06-cv-00335-BES-LRL Document 1 Filed 03/20/06 Page 13 of 36

Greenberg Traurig, LLP
Suite 500 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Plush prays for judgment against Defendant as follows:

1. For special damages in excess of $1,500,000.00, according to proof at trial;
2. For general damages in excess of $2,000,000.00, according to proof at trial;
3. For compensatory damages in excess of $5,000,000.00, according to proof at trial;
4. For treble damages in excess of $25,500,000.00, according to proof at trial;
5. For punitive damages in excess of $100,000,000.00, according to proof at trial;
6. For attorney's fees, expenses and costs of suit; and
7. For such other and further relief as the Court deems just and appropriate

DATED this 20th day of March, 2006.

GREENBERG TRAURIG, LLP

Mark G. Tratos (Bar No. 1086)
Bradley N. Boodt (Bar No. 5228)
F. Christopher Austin (Bar No. 6559)
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89109
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

John C. Kirkland
2450 Colorado Avenue
Suite 400 East
Santa Monica, California 90404
Telephone: (310) 586-7786
Facsimile: (310) 586-0286

Counsel for Plaintiff

# EXHIBIT 1

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "**Agreement**"), entered into and effective as of May 9, 2003 (the "**Effective Date**"), by and between ~~GUSTAV CHARTERED INTERNATIONAL~~GUSTAV, LLC ("**Tenant**") and PLUSH LOUNGE LAS VEGAS, LLC ("**Manager**") with respect to the following:

A. Tenant is the ~~tenant of a nightclub, bar and restaurant~~operator of OXO Restaurant (the "**Club**"), more particularly described below.

B. Tenant desires to contract with Manager for Manager to manage the Club on Tenant's behalf under the name "*Plush* Lounge" pursuant to the terms and conditions set forth herein.

C. Tenant and Manager desire to evidence their agreement with respect to the operation, direction and management of the Club as more particularly set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, Tenant and Manager hereby agree as follows:

## ARTICLE I.
## THE CLUB

Tenant represents and warrants that the Club currently consists of and includes, but is not limited to, the following:

a. An area in excess of 10,000 square feet, including bars, adjoining areas, main indoor area and adjacent outdoor patios (the "**Premises**")-, within the Resort at Summerlin located at 221 North Rampart Boulevard at the corner of Summerlin Parkway in Las Vegas, Nevada, previously known as XO Restaurant;

b. The leasehold interest in the Premises, as set forth in the~~November 2, 1998~~ Lease Agreement, ~~as amended~~attached hereto as Exhibit A (the "**Lease**") between Tenant,~~dba Spiedini Ristorante,~~ and~~The Resort at Summerlin, L.P., predecessor in interest to~~ Hotspur Resorts Nevada, Inc. (the "**Landlord**");

c. Furniture, furnishings, wall coverings, floor coverings, window treatments, lighting and sound equipment, computer systems and software, fixtures and equipment forming part of, or situated in, the Premises (the "**FF&E**");

~~d. Chinaware, glassware, silverware, linens, and other items of a similar nature situated in the Premises (the "**Operating Equipment**"); and~~

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 16 of 36

e. ~~Stock and inventories of paper supplies, cleaning materials, and consumable items and food and beverage (the "Operating Supplies").~~

## ARTICLE II.
## OPERATING TERM AND TERMINATION

2.1. The initial term (such initial term as may be renewed hereunder, the "Term") of this Agreement will commence on the Effective Date and will continue until and including November 2, 2008. This Agreement will be renewed automatically for two successive Terms of five years each thereafter, unless the Lease options are not timely~~and properly~~ excercised by Tenant.

2.2. This Agreement may be terminated at any time by the written agreement of both parties.

## ARTICLE III.
## USE AND OPERATION OF THE CLUB

3.1. <u>**Use And Operation**</u>.

a. Manager covenants to undertake on behalf of Tenant (i) all marketing and sales operations of the Club (including, but not limited to, the sale of food and beverage, developing and implementing marketing and advertisement campaigns for the Club), (ii) operation and management of the Club as a premier nightclub and (iii) all related activities which are customary and usual to such marketing, sales, operation and management, and, insofar as will be feasible, will conduct such operations consistently with customary business and hospitality practices in premium Las Vegas resort nightclubs.

b. It is understood that Manager will have within the terms and provisions of this Agreement, control and discretion in the sales, marketing, related account management and operation of the Club and will retain control and management over such activities and all properties relating to the Club throughout the term of this Agreement. Without limiting the generality of the foregoing, such control of and discretion by Manager will include and extend to, among others, the use of the Club for all customary purposes, charges to be made for and the terms and procedures of admittance to the Club, for privileges for entertainment and amusement, and for food and beverage, the right to employ, train, discipline, transfer, terminate and select the employees of the Club, the right to negotiate all necessary organized labor and/or union contracts and agreements, the right to conduct any necessary negotiations with any federal, state and local governmental and regulatory agencies (the "**Agencies**") and any other government entity on matters pertaining to the Club, <u>provided</u>, <u>however</u>, that Manager will not enter into any agreements which are binding upon Tenant without the approval of the Tenant and will not conduct any negotiations with any Agency without the prior knowledge and direction of Tenant, which will not be unreasonably delayed or withheld. Manager will provide notice to Tenant of any special or extraordinary salary, bonus or other benefits. Without limiting Manager's control and discretion as set forth in this Section, Tenant

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 17 of 36

may submit to Manager the Tenant's comments on the management and the Club staff, which comments Manager agrees to consider in good faith.

3.2. **Trademark.**

Manager will obtain the non-exclusive right and license to use the trademark "*plush*" as registered with the United States Patent and Trademark Office, Registration No. 2546339 (the "**Trademark**") during the Term, solely as the name of the Club or as otherwise deemed necessary or appropriate by Manager.

3.3. **Food and Beverage.**

a. Tenant represents, warrants and covenants that ~~it~~Gustav International Chartered is now the holder of,~~and will maintain during the Term,~~ all requisite licenses and permits to allow the service of food, beverages and alcoholic beverages in the Club (the "**Licenses**").

b. Tenant will use its best efforts to ~~transfer and assign~~secure the addition of Gustav, LLC and Plush Lounge Las Vegas, LLC to all Licenses and to secure all benefits thereof to ~~Manager.~~

Manager, provided, however, that any costs, fees and/or additional fees and expenses of securing any licensing necessary for Plush Lounge Las Vegas, LLC shall be paid by Manager and shall not be treated as Operating Expenses.

c. Throughout the Term, Tenant will use commercially reasonable best efforts to provide food and food service for the Club in accordance with the recipes and amenities reasonably requested by Manager, consistent with the type and quality of food and food service provided at premier resort restaurants and nightclubs in the Las Vegas area. Manager will reimburse Tenant on a monthly basis for food provided to the Club, based on Tenant's actual cost including costs of food, preparation, transportation and labor but excluding any overhead, cost allocations or profit. All food and food service costs will be treated as Operating Expenses.

d. Throughout the Term, Tenant will order from its distributor and cause to be delivered to the Club all liquor, beverages and related supplies requested by Manager. Manager will timely reimburse Tenant on a monthly basis for liquor provided to the Club, by directly paying the distributor or by paying to Tenant the actual amount due to the distributor on each monthly invoice prior to the due date therefor. All liquor and beverage costs will be treated as Operating Expenses.

3.4. **Rent.**

Throughout the Term, Manager will timely reimburse Tenant on a monthly basis for all rent and related charges due to Landlord for the Premises, by directly paying the Landlord or by paying to Tenant the actual amount due to the Landlord~~ for the pro rata portion that the Club constitutes of all space leased by Tenant~~. All rent and other amounts paid to Landlord will be treated as Operating Expenses.

3.5. **Independent Contractor Relationship.**

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 19 of 36

— OUTSIDE THE ORDINARY COURSE OF BUSINESS.

a. Tenant agrees that in respect to the performance of Manager's services, as more particularly stated above, Manager will be acting solely as an independent contractor of the Tenant and solely for the Manager's own account.

b. Tenant authorizes Manager for its own account to negotiate service contracts, agreements and licenses with regard to the operation of the Club, provided, however, that Manager will be required to obtain the prior written consent of Tenant, which will not be unreasonably delayed or withheld, with respect to any of the foregoing which ~~would be~~ are to be treated as Operating Expenses.

c. Tenant authorizes Manager to make purchases for its own account of all beverages, and supplies and such other services and merchandise as are necessary for the proper operation and servicing of the Club and to receive all such beverages, merchandise and supplies and to employ and consume them in the ~~binding upon Tenant.~~ maintenance and operation of the Club, which cost will be treated as Operating Expenses.

d. Tenant also authorizes Manager, as a part of the general management of the Club, to settle on terms and conditions as Manager will deem in the best interest of the Club, any and all claims or demands arising out of the operation of the Club irrespective of whether or not legal action has been instituted, and Tenant ~~and to employ and consume them in the maintenance and operation of the Club, provided, however, that the aggregate amount of such purchases will be payable by Manager to Tenant.~~ agrees that such sums will, to the extent proper in accordance with good accounting practice, be paid out of the Club's income and be an operating expense.

e. Manager will hold harmless, indemnify and defend Tenant from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees and accounting fees arising solely out of or resulting solely from Manager's negligence, gross negligence, willful misconduct or fraud. Tenant will hold harmless, indemnify and defend Manager from and against claims, damages, losses and expenses, including but not limited to attorneys' fees and accounting fees, arising solely out of or resulting solely from Tenant's negligence, gross negligence, willful misconduct or fraud.

3.6. **Agreements.**

Manager undertakes to operate and provide in the Club all facilities and services normally operated or provided directly by operators of Clubs of comparable class and standing. Manager will have the right to enter into agreements with regard to the Club for a term of not more than one year with commercially reasonable terms including reasonable provisions for renewal. Any payments received under any concession will be included in Net Profits, as hereinafter defined.

3.7. **No Agency, Partnership or Joint Venture.**

This Agreement will be construed to create an independent relationship between Tenant and Manager and nothing herein contained will constitute or be construed to be or create an agency, partnership, joint venture or other relationship between the Tenant, its

successors or assigns, on the one part, and Manager, its successors or assigns, on the other part.

## ARTICLE IV
## MANAGEMENT AND OTHER FEES AND TENANT'S RETURN

4.1. **Management Fee.**

Manager will be entitled to charge as an expense of operation of the Club and to retain as its management fee (the "**Management Fee**") an amount equivalent to 4% of the Net Profits of the Club, as defined in Article V. Each calendar year, the Management Fee will accrue and not be payable until after Manager has made Net Profits distributions of at least $500,000 per year.

4.1.a. **Guaranteed Minimum Payment**

Manager agrees to fund all operational short falls and guarantees Tenant a minimum payment of One Hundred-[redacted] Thousand ($1[redacted]0,000.00) Dollars per year for the life of the Management Agreement. Notwithstanding the terms of Article XIII, if the minimum guaranteed payment is not paid after the first Twelve (12) months of operation, Tenant has the option to take over the business and covert it back to a restaurant, for a total payment to Manager of Twenty-Five Thousand ($25,000.00) Dollars.

4.2. **Incentive Commission.**

Manager will be entitled to charge as an expense of operation of the Club and to retain as an incentive commission (the "**Incentive Commission**") an amount equivalent to 55% of the Net Profits of the Club, as defined in Article V, and which amount is inclusive of the 5% of profits payable to Jeff Carlis, the payment of ~~V.~~ which Manager hereby assumes as its sole responsibility. The Incentive Commission will be payable immediately after the remaining Net Profits for the same period have been distributed to Tenant. To the extent that there are not sufficient funds from Net Profits, after payment of Operating Expenses and withholding of a reasonable cash reserve, to pay to Manager all or any portion of the Incentive Commission due under this Section, payment thereof may be deferred by Manager; provided, however, that all Net Profits for each calendar year will be distributed to Tenant and Manager within 60 days after the end of the year.

4.3. **Operating Account.**

a. All revenues derived from the operation of the Club and received by either Manager or Tenant will be initially deposited in the Club's account (which will be exclusively maintained by Manager in Manager's name). Manager will not be liable for any loss of funds deposited to any account designated by Tenant other than for loss caused by negligence, gross negligence, willful misconduct or fraud of Manager or its agents in handling such funds.

b. Manager may maintain a cash balance according to anticipated or usual and customary project operating capital which Manager determines to be necessary for

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 21 of 36

operation of the Club. Tenant will not be liable for any loss of funds deposited to the Operating Account other than for loss caused by negligence, gross negligence, willful misconduct or fraud of Tenant or its agents in handling such funds, provided, however, that Manager will not be deemed an agent of Tenant. All checks for the withdrawal of funds from the Operating Account will bear the signatures of such management officers of the Club or Manager as Manager will designate.

c. For purposes of this Agreement, **"Operating Account"** will mean one or more accounts set up by Manager at a bank designated by Manager and reasonably approved by Tenant for the payment of day-to-day expenses and over which Manager will have full signatory authority.

4.4. **Final Payment By Manager.**

Within 60 days of the termination or expiration of this Agreement, Manager will account for and pay to Tenant the Tenant's share of all amounts generated by the operation of the Club, including the balances, if any, in the Operating Account and any reserve accounts established hereunder, after giving effect to all sums which Manager is entitled to retain in accordance with the terms of this Agreement.

## ARTICLE V.
## DETERMINATION OF NET PROFITS

5.1. **Books And Records.**

Manager will keep adequate books of account and other records usual and customary in the hospitality industry in accordance with applicable generally accepted accounting principles (GAAP), reflecting the results of sales, marketing and operation of the Club.

5.2. **Determination Of Net Profits.**

a. The term **"Net Profits"** as used herein will mean, with respect to the period in question, the amount by which Gross Income exceeds the sum of the Operating Expenses.

b. The term **"Gross Income"** means all income and proceeds of sales or services of any kind, whether in cash or other form of payment, derived from the use, patronage or other enjoyment of the Club or for the sale of any goods, services or other items sold on or provided from the Club in the ordinary course of the Club's operation including, without limitation, all income received from guests, licensees and concessionaires and other services to guests of the Club, together with any and all proceeds of any policy of business interruption insurance, but excluding the following: (i) any excise, value added, sales or use taxes or similar governmental charges collected directly from patrons or guests, or as a part of the sales price of any goods, services or displays, such as gross receipts, admission, cabaret or similar or equivalent taxes imposed by governmental or quasi-

governmental entities; (ii) receipts from condemnation awards or sales in lieu of or under threat of condemnation; (iii) proceeds of insurance for capital losses (other than business interruption insurance proceeds); (iv) refunds, rebates, proceeds of sales whether dispositions of capital assets, furniture and equipment or operating equipment which transactions are not in the ordinary course of business; (v) gratuities collected for the benefit of employees; (vi) proceeds of any financing or refinancing of the Club; (vii) the initial operating funds deposited in the Operating Account by Manager, and (viii) [illegible]% of all revenues from "vip" or Club memberships or benefits. 25

c. The term "**Operating Expenses**" means all costs and expenses of maintaining, conducting and supervising the operation of the Club, and specifically including the following expenses which are incurred by Manager on behalf of Tenant pursuant to this Agreement or as otherwise specifically provided herein and which are properly attributable to a given period under Manager's system of accounting: (i) the cost of food and beverages sold or consumed and all Operating Equipment and Operating Supplies, including any duties, charges or levies, and the cost of transportation, delivery and storage thereof; (ii) salaries and wages of Club personnel, including costs of payroll taxes and employee benefits and all other similar expenses; (iii) the cost of all other goods and services obtained by Manager in connection with its operation of the Club including, without limitation, heat and utilities, office supplies and all services performed by third parties, including leasing expenses in connection with telephone and data processing equipment and such other equipment; (iv) the cost of repairs to and maintenance of the Club; (v) municipal, county, state and federal license and permit fees; (vi) sales and use taxes, but not including any portion thereof collected directly from guests or patrons or as part of the sales price of any goods, services or displays except to the extent included in Gross Income; (vii) all professional fees incurred in the operation of the Club, including, but not limited to, legal fees and accounting fees; (viii) the costs and expenses of technical consultants and specialized operational experts for specialized services; (ix) all expenses for marketing the Club, including expenses of advertising, sales promotion and public relations activities, including direct and indirect marketing costs of affiliates of Manager; (x) the Management ~~Fee,~~Fee; (xi) all rent and related costs for the Premises; (xii) any other expenses including all Capital Expenses; (xiii) all insurance and liability expenses related to the Club; (xiv) a reasonable allocation of Group Services and other overhead; and (xiv) the amount of any reasonable reserves withheld by Manager pursuant to the provisions of this Agreement, until the time for the final payment to Tenant as provided for in Section 4.4 above.

d. "**Capital Expenses**" means items which are not expensed according to applicable generally accepted accounting principles (GAAP), including,

\\LA-SRV01\181731v01

Case 2:06-cv-00335-BES-LRL Document 1 Filed 03/20/06 Page 23 of 36

but not limited to, capital improvements and expenditures for replacements, substitutions and additions to FF&E, other than the initial FF&E costs provided for in Section 5.3(a) below.

5.3. **Additions to and Replacement of Furnishings and Equipment.**

a. Manager will pay the cost of initial replacement and additions to FF&E and Operating Equipment ("**FF&E Cost**") deemed by Manager to be necessary or desirable to make the Premises suitable for operation as the "*Plush* Lounge" Club. Such initial FF&E Cost will not be deducted as an Operating Expense. All FF&E and Operating Equipment, upon acquisition and installation, will become part of the Premises.

b. In the ordinary course of business, Manager may pay additional FF&E Costs for such replacements of, and additions to, the FF&E and Operating Equipment as deemed by Manager in its reasonable discretion to be necessary or desirable. Any such FF&E Cost will be an Operating Expense. All FF&E and Operating Equipment, upon acquisition and installation, will become part of the Premises.

c. Manager may set aside a reasonable reserve in the Operating Account deemed by Manager to be necessary or desirable for future replacement of FF&E and Operating Equipment.

## ARTICLE VI.
## REPAIRS AND MAINTENANCE; ALTERATIONS; STRUCTURAL REPAIRS AND CHANGES

6.1. **Repairs and Maintenance.**

Manager agrees to maintain the Club in good repair and condition, ordinary wear and tear excepted.

6.2. **Alterations.**

Manager will have the right, from time to time, during the term of this Agreement, to make such alterations, additions, or improvements in or to the Club as are customarily made in the operation of deluxe Clubs, as an Operating Expense. In the event that such alterations, additions or improvements are not provided for out of cash flow, Manager will obtain the written consent of Tenant prior to making any such alterations, additions or improvements, and Tenant agrees that, solely with respect to such alterations, additions or improvements that do not constitute a fundamental change in the character of the Club, such written consent will not be unreasonably withheld or delayed.

6.3. **Structural Repairs and Changes.**

In the event that, at any time during the term of this Agreement, structural repairs to or changes in the Club will be required by reason of any laws, ordinances, rules or regulations now or hereafter in force, or by order of any governmental or municipal

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 24 of 36

power, department, agency, authority or officer, such repairs or changes will be made and paid for by Tenant, provided, however, that Tenant will retain the right reasonably to contest the requirement that such structural repairs and/or changes be made, and, in such case, Tenant will be bound to make such changes only following the issuance of a non-appealable decision or order from an appropriate governmental authority. The structural repairs or changes will be made with as little hindrance to the operation of the Club as possible.

6.4. **Conduct of Work.**

All repairs, alterations, additions and improvements will be made under Manager's supervision, and will be accomplished in such a way as to maintain the character and quality of the Club.

## ARTICLE VII.
## GENERAL COVENANTS OF MANAGER AND TENANT

7.1. **Group Services.**

a. Manager will provide or may cause its affiliated companies to provide, in the sales, marketing and operation of the Club, reservations, credit card, central billing, event and business promotion, sales promotion, publicity and public relations, front and back office, food and beverages, personnel and other operational departmental supervision and control and all other group benefits, services, facilities and advertising furnished to other clubs owned or operated by Manager and its affiliated companies (herein called "**Group Services**").

b. Manager will be entitled to charge the operation of the Club and to be reimbursed for all costs and expenses incurred by Manager in the rendition of said Group Services, on a reasonable allocated basis in the case of Group Services as hereinabove defined or other services performed on behalf of more than one of the clubs operated by Manager, including the Club, provided, however, that, such reimbursement will be limited to the extent of the then prevailing market costs and expenses, and provided, however, that, with respect to any such costs and expenses that are not ordinary and customary, Manager will obtain the prior written consent of Tenant which will not be unreasonably withheld.

7.2. **Tenant's Right Of Inspection And Review.**

Manager will accord to the officers, accountants, employees, agents, and attorneys of Tenant the right to enter upon any part of the Club upon reasonable notice, at all reasonable times during the term of this Agreement for the purpose of examining or inspecting the same or of examining or making extracts from the books and records of the Club, or for any other necessary or desirable purpose, provided, however, that Tenant will use its best efforts to insure that such entry causes as little disturbance to the business of the Club as possible, and provided further that, absent exigent circumstances in the

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 29 of 36

reasonable opinion of Manager, such access will be by advance notice and appointment at a mutually convenient time during regular business hours. The cost of any such investigation or audit will be Tenant's separate cost and expense and not an Operating Expense. Manager agrees to meet with Tenant or its officers every quarter (or more frequently in the event of extraordinary circumstances) regarding matters concerning the Club.

7.3. **Insurance.**

a. Tenant agrees that, at all times during the term of this Agreement, Tenant will use its best efforts to continue in full force and effect, and to cause Manager to be named as an additional or co-insured on, all public liability, indemnity, property damage and litigation insurance currently in effect with respect to the Club, in accordance with the requirements imposed on Tenant in connection with the Lease. In connection therewith, Manager agrees to timely reimburse, Manager will timely reimburse Tenant for insurance coverage provided to the Club, by directly paying the insurance company or by paying to Tenant the actual amount due to the insurer on each invoice prior to the due date therefor. Tenant will present to Manager within 30 days of any request therefor, copies of all insurance policies or certificates covering Manager and Tenant as named, additional or co-insureds.

b. To the extent that Tenant is not able to obtain or maintain insurance coverage, despite the best efforts of Tenant as provided in the above Section to obtain such insurance, Manager will procure and maintain all such insurance coverage for the Club deemed necessary by Manager, and will use its best efforts to cause Tenant to be named as an additional or co-insured on all such policies. Manager will furnish to Tenant satisfactory evidence of all insurance maintained by Manager pursuant to this Section.

c. Manager agrees to comply with, fulfill and perform all rules, orders, ordinances, regulations and requirements, imposed by, or in connection with, or affecting the premiums for, policies of insurance upon the Club, and relating to the use of the Club by Manager or any other persons. If Manager will fail to comply with, fulfill and perform any such rules, order, ordinances, regulations or requirements, Tenant may, but will be under no obligation to, comply with, fulfill and perform the same and Tenant will be reimbursed for any and all sums expended by it therefore. All insurance costs will be treated as Operating Expenses (except to the extent such cost or expense results solely from the gross negligence or willful misconduct of Manager, which cost or expense will be deducted from the Management Fee).

7.4. **Reports.**

Case 2:06-cv-00335-BES-LRL Document 1 Filed 03/20/06 Page 26 of 36

a. All books of account and all other records relating to or reflecting the sales, marketing and operation of the Club, including, but not limited to, any and all marketing agreements and agreements with affiliates of Manager or Tenant, will be kept at the principal office of Manager or at the Club. If such books on account are kept at the principal office of Manager, accurate and current copies will be kept at the Club or provided to Tenant upon request. All books and records, wherever kept, will be available to Tenant and its representatives at all reasonable times for examination, audit, inspection and reproduction. All such books and records pertaining to the Club, including, without limitation, books of account, will be the property of Manager.

b. Manager will deliver to Tenant no later than 20 days after the end of each calendar quarter, a quarterly report of the state of the business and affairs of the operation of the Club for the immediately preceding quarter and the year to date, which report will include (i) a balance sheet, (ii) a profit and loss statement, (iii) a statement which details the computation of all fees payable to Manager for the prior quarter, (iv) the balance of all bank accounts maintained by Manager in connection herewith, (v) an adjusting statement showing the actual cash position of the Club for the quarter and year to date, and (vi) a statement indicating the allocation of the reserve amount for each quarter, to the extent the same are provided for in the budget.

c. Within 90 days after the end of each year, Manager agrees to deliver to Tenant a profit and loss statement showing the results of operations of the Club during the preceding year, containing a computation of the Net Profits of the Club for such period.

d. If Tenant will not present objections to the certified statement of profit and loss and of Net Profits for any year within 30 days after the receipt by Tenant of such statement from Manager, such certified statement will be deemed correct and conclusive for all purposes. The parties will endeavor to resolve any objections, which may be presented within 45 days.

e. All of the reports set forth in this Article and elsewhere in this Agreement will be in a form reasonably acceptable to Tenant. In addition, Manager will produce from time to time such other reports and records as Tenant, in its reasonable discretion, may request upon reasonable notice, <u>provided, however</u>, that the obligation to produce such reports and records does not substantially impair the ability of Manager to comply with its other obligations pursuant to this Agreement. The cost of all reports prepared in accordance with this Article and elsewhere in this Agreement will be treated as an Operating Expense.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 27 of 36

## ARTICLE VIII.
## DAMAGE TO AND DESTRUCTION OF THE CLUB

### 8.1. Repairs Following Damage Or Destruction.

Following the occurrence of a fire or other casualty affecting all or a portion of the Club, Manager may elect to repair, restore, rebuild or replace any damage to, or impairment or destruction of, the Club in its sole and absolute discretion. In the event that Manager fails to elect within 90 days following the occurrence of a casualty, to repair, restore, rebuild or replace any such material damage, impairment or destruction of the Club, Tenant may elect to terminate this Agreement upon 30 days' prior written notice to Tenant. If only a part of the Club will be damaged by the occurrence of a fire or other casualty such that said damage does not make it unreasonable or imprudent, in the reasonable opinion of Manager, to operate the Club as a club of the same type and class immediately preceding the taking or condemnation, Manager may elect to repair any damage to the Club, or to alter or modify the Club, or any part thereof, so as to render the Club a complete and satisfactory architectural unit as a Club of substantially the same type and class immediately preceding the fire or other casualty.

## ARTICLE IX.
## CONDEMNATION

### 9.1. Total Condemnation.

If the whole of the Club will be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceedings by any competent authority, or if such a portion thereof will be taken or condemned as to make it imprudent or unreasonable, in the reasonable opinion of Manager, to use the remaining portion as a Club of the type and class immediately preceding such taking or condemnation, then, notwithstanding the provisions of Article II, Manager may terminate this Agreement as of the date of the taking.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 28 of 36

### 9.2. Partial Condemnation.

If only a part of the Club will be taken or condemned and the taking or condemnation of such part does not make it unreasonable or imprudent, in the reasonable opinion of Manager, to operate the Club as a Club of the same type and class immediately preceding the taking or condemnation, Manager may elect to repair any damage to the Club, or to alter or modify the Club, or any part thereof, so as to render the Club a complete and satisfactory architectural unit as a Club of substantially the same type and class immediately preceding the taking or condemnation. In the event that Manager does not elect to repair said damage, or to alter or modify the Club as set forth in the preceding sentence, and, in the reasonable opinion of Tenant, such election would not permit Manager to operate the remainder Club as a Club of the type and class immediately preceding such taking or condemnation, then, notwithstanding the provisions of Article II, Tenant may elect to terminate this Agreement.

## ARTICLE X.
## RIGHT TO PERFORM COVENANTS OF OTHER PARTY

If either party fails to make any payment or perform any act required under the terms of the Lease, this Agreement or any other Agreement between the parties, then the other party may elect to do so. Any such election will not release the other party from its obligation, and the electing party will not be deemed to have waived any right or remedy under this Agreement.

## ARTICLE XI.
## DEFAULT

### 11.1. Events of Default.

Following 60 days notice and opportunity to cure, the following will constitute events of default under this Agreement entitling the innocent party to exercise any rights and remedies provided under this Agreement, including the termination of this Agreement and the recovery of damages, the equitable right of specific performance, and such other rights and remedies as may be provided by law:

a. The failure of Manager to pay or provide sums due to Tenant or third parties as required under the terms of this Agreement;

b. The appointment of a receiver by a judicial or administrative body of competent jurisdiction;

c. The filing by or against either party of any petition, consent or application under any bankruptcy or similar law for relief or accommodation concerning the payment of its obligations; provided, that if the institution of any such proceedings is by a third party, then no event of default will occur if unless ordered effective by a court of competent jurisdiction;

d. The wrongful voluntary abandonment of the Club by Manager at any time; and

e. The failure of Manager or Tenant to perform any promise or undertaking of this Agreement, provided that if such failure cannot be cured within 60 days but within such time the party in default commences action to cure and diligently continues to and does cure such default, then no event of default will occur.

11.2. **Waiver.**

No failure by Manager or Tenant to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof, will constitute a waiver of such breach or any subsequent breach of such covenant, agreement, term or condition. No condition, agreement, term or condition of this Agreement and no breach thereof will be waived, altered or modified except by written instrument. No waiver of any breach will affect or alter this Agreement, except as to the specific written waiver.

11.3. **Bona Fide Dispute.**

Notwithstanding the foregoing, neither party will be deemed to be in default under this Agreement if a bona fide dispute with respect to any of the foregoing events of default has arisen between the Parties and such dispute has been submitted to arbitration in accordance with Article XV below.

**ARTICLE XII.**
**ASSIGNMENT AND SUCCESSORS AND ASSIGNS**

12.1. **Assignment By Manager.**

Manager will not have the right to assign this Agreement or its rights and interest in the operation of the Club~~-without 30 days' prior written notice to Tenant~~. Notwithstanding the foregoing, Manager will be permitted to assign this Agreement ~~without~~with 30 days prior notice to an entity affiliated with Manager, provided that such entity controls, is controlled by, or is under common control with Manager, and assumes all obligations of Manager under this Agreement.

12.2. **Assignment By Tenant.**

a. Tenant may sell, assign or transfer its rights under the Lease or otherwise divest itself of the Club only if (a) the assignee assumes all obligations under this Agreement, or (b) prior to any such transfer, Tenant pays to Manager the estimated Management Fee and Incentive Commission

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 30 of 36

through the end of the Term, calculated based on the Net Profits for the immediately previous 12 months.

b. Tenant will not have the right to assign this Agreement without 30 days' prior written notice to Manager. Notwithstanding the foregoing, Tenant will be permitted to assign this Agreement without prior notice to an entity affiliated with Tenant, provided that such entity controls, is controlled by, or is under common control with Tenant, and assumes all obligations of Tenant under this Agreement.

12.3. **Right of First Refusal.**

During the Term, each will have the right of first refusal to purchase all rights of the other party relating to the Club, including without limitation all rights under this Agreement and the Lease, and all FF&E, Operating Equipment and Operating Supplies of the Premises. Except as permitted in this Article, neither party will, at any time during the Term, sell the Club or any interest therein, without first giving written notice thereof (which will include the exact and complete terms of the proposed sale offered by a third party) to the other party. Within 30 days after receipt of any such notice, the receiving party will provide written notice whether it elects to exercise its right of first refusal and purchase the Club upon the terms set forth in the notice. Failure to provide such notice of exercise of the right of first refusal within such time period will be deemed election not to exercise the right, and the notifying party may complete the sale to the third party on the same terms. In the event the receiving party elects (or is deemed to have elected) not to exercise the right, and the notifying party fails to consummate the sale to the third party on the same terms within 90 days thereafter, both parties will continue to have the right of first refusal with respect to any subsequent transactions. The provisions of this Section will survive the termination of this Agreement.

12.4. **Successors And Assigns.**

Subject to the provisions of the preceding Sections of this Article, the terms, provisions, covenants, undertakings, agreements, obligations and conditions of this Agreement will be binding upon and will inure to the benefit of the successors in interest and the assigns of the parties.

## ARTICLE XIII.
## NON-DISTURBANCE AND ATTORNMENT OF LEASE

An express condition precedent to the effectiveness of this Agreement will be Landlord entering into a non-disturbance and attornment agreement with Manager and Tenant in form and substance reasonably satisfactory to Manager. The parties will use their respective commercially reasonable best efforts to cause Landlord to enter into such an agreement.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 31 of 36

## ARTICLE XIV.
## BUYOUT

14.1. **Buyout By Tenant.**

Upon 60 days' written notice at any time after December 31, 2005, Tenant will have the right to terminate this Agreement and assume all rights of Manager relating to the Club, including without limitation any rights under the Lease, and all FF&E, Operating Equipment and Operating Supplies of the Premises, in exchange for cash payment to Manager of an amount equal to one of the following:

a. If Manager has not then distributed Net Profits of at least $200,000 (following 60 days' notice to Manager to elect to advance the difference): $25,000.

b. If Manager has not then distributed Net Profits of at least $500,000 (following 60 days' notice to Manager to elect to advance the difference): $200,000.

c. The higher of $1,528,000 or two times the earnings before interest, taxes, depreciation and amortization ("**EBITDA**") of the Club for the prior 12 months.

14.2. **Buyout By Manager.**

Upon 60 days' written notice at any time after December 31, 2005, Manager will have the right to terminate this Agreement and assume all rights of Tenant relating to the Club, including without limitation all rights under the Lease, and all FF&E, Operating Equipment and Operating Supplies of the Premises, in exchange for cash payment to Tenant of an amount equal to one of the following:

a.. If Manager has not then distributed Net Profits of at least $500,000: $1,528,000.

b. The higher of $1,528,000 or two times the EBITDA of the Club for the prior 12 months.

14.3. **Buyout Process.**

The buyout shall be accomplished by the tender of cashier's check or wire transfer on the amount provided for above in this Article, at which time the other party shall immediately deliver full and complete possession of the Club, and transfer and assign all of its rights under the Lease and any other applicable documentation, after which this Agreement shall be deemed terminated. All assets will be purchased "as is" in whatever condition they are in at the time of the buyout, and without warranty or recourse by the transferring party. In connection with the buyout of the assets provided for in this Article, the buyer will not assume any liabilities of the other party except of the then remaining obligations under the Lease.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 32 of 36

## ARTICLE XV.
## ARBITRATION

Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, will be referred to and finally resolved by arbitration before a retired judge at JAMS. In connection with any such arbitration, the parties will be entitled to discovery including, without limitation, the right to require by notice the appearance of any other party at a deposition of such party, the service of written interrogatories and the production, upon notice, of documents, all as provided under the law applicable to this Agreement in a case brought before a court of law. If arbitration is initiated by Manager, the place of the arbitration hearing will be Las Vegas, Nevada; if arbitration is initiated by Manager, the place of the arbitration hearing will be Santa Monica, California. Each party waives any right which it may have to any substantive review of any arbitration awarded by the court of the jurisdiction in which the arbitration is conducted and agrees that the award of the arbitrators in any such arbitration proceedings will be final and without any right of appeal. The arbitration award may be entered as a final judgment in the court of any jurisdiction in which such entry will be recognized under applicable law. Any arbitration award will include an award of costs and attorneys' fees to the prevailing party. Upon the application of any party to this Agreement, and whether or not an arbitration proceeding has yet been initiated, all courts having jurisdiction hereby are authorized to: (a) issue and enforce in any lawful manner such temporary restraining orders, preliminary injunctions and other interim measures of relief as may be necessary to prevent harm to a party's interests or as otherwise may be appropriate pending the conclusion of arbitration proceedings pursuant to this Agreement; (b) enter and enforce in any lawful manner such judgments for permanent equitable relief as may be necessary to prevent harm to a party's interests or as otherwise may be appropriate following the issuance of arbitral awards pursuant to this Agreement. Each party involved in any arbitration proceeding pursuant to this Section will pay its own expenses in connection therewith.

## ARTICLE XVI.
## FURTHER INSTRUMENTS

Tenant will as may be required from time to time register this Agreement, execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action reasonably necessary to make this Agreement fully and legally effective, binding, and enforceable as between the parties and as against third parties. Any fees or expenses incurred in connection therewith will be borne by Tenant.

## ARTICLE XVII.
## NOTICES

17.1. <u>Form and Manner of Service.</u>

All notices hereunder will be in writing and will be deemed to have been sufficiently given or served for all purposes when presented personally or sent by overnight mail or

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 33 of 36

by telefax addressed to Tenant or Manager at the addresses stated above, or to such other address as either party may subsequently designate by like notice hereunder.

17.2. **Effective Date.**

Notice will be deemed effective as follows:

(1) If delivered personally to the office of either party, upon delivery;
(2) By facsimile, on the same date of confirmed transmission; or
(3) By overnight mail our courier, one (1) day after mailing.

17.3. **Addresses.**

**Tenant:**

Gustav Chartered International
221 North Rampart Boulevard
Las Vegas, NV 89145
Telephone:
Facsimile:
Attention:

Copies of all notices to Tenant will also be sent to:

Telephone:
Facsimile:
Attention:

**Manager:**

Plush Lounge Las Vegas, LLC
c/o Key Club
520 Broadway, Suite 660
Santa Monica, CA 90401
Telephone: 310-451-3281
Facsimile: 310-394-6404
Attention: Mr. Jerrold S. Pressman

Copies of all notices to Manager will also be sent to:

Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: 310-586-7786
Facsimile: 310-586-0286
Attention: John C. Kirkland, Esq.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 34 of 36

## ARTICLE XVIII.
## PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or sections contained in this Agreement will be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement will be construed as if such phrases, sentences, clauses or sections had not been inserted in this Agreement.

## ARTICLE XIX.
## COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which will constitute an original, but all of which, taken together, will constitute one and the same Agreement.

## ARTICLE XX.
## ATTORNEYS' FEES

In the event of any conflict between the parties with respect to the terms, covenants and conditions of this Agreement, and/or the interpretation thereof, the prevailing party in any such conflict will be entitled to an award of its reasonable attorneys' fees in connection therewith, including court costs.

## ARTICLE XXI.
## SPECIAL CONDITIONS

21.1. **Conditions.**

It is further understood and agreed that the obligations of Manager under this Agreement are subject to the following conditions being satisfied at all times during the term of this Agreement, failing which Manager will have the right to terminate this Agreement in accordance with the terms of Article II hereof:

(1) Manager will have obtained, with the co-operation and assistance of Tenant, appropriate assurances from the proper Agencies as to the right of Manager to operate the Club pursuant to this Agreement and to serve food, beverages and alcohol at the Club.

~~(2) Tenant, prior to delivery of the Club, will procure or obtain a transfer of all necessary consents, licenses, and permits from the proper authorities in the Agencies to enable Manager to legally and properly perform its obligations under this Agreement.~~

21.2. **Other Agreements.**

Manger and Tenant may agree to evidence certain of the terms and conditions contained in this Agreement in other management agreements or other instruments in order to comply with the applicable Agencies or to properly reflect the allocation of payments or obligations hereunder to appropriate jurisdictions; provided, however that any such other agreements or instruments will be consistent with this Agreement and in the event of any conflict or ambiguity between this Agreement and any such other documents, the terms of this Agreement will prevail.

## ARTICLE XXII.
## CONFIDENTIALITY

Manager and Tenant agree to keep all information regarding the Club that is gained pursuant to the activities of each under this Agreement, including, without limitation, any financial information, strictly confidential (other than information which is a matter of public knowledge or is provided in other sources readily available to the public); provided, however, that any of such information may be disclosed to Tenant's or Manager's accounting firms, law firms, consulting firms and service firms, and, in the case of Manager, to potential purchasers, of prospective lenders and to investors, provided that (i) such permitted recipients are informed that all such information is confidential in nature and are directed to treat such information with strict confidence, (ii) such permitted recipients have agreed to maintain the confidentiality of such materials and (iii) Tenant or Manager will only disclose such information as is necessary to permit such permitted recipients to assist Tenant or Manager in the operation of the business of each and neither will disclose any such information to the extent such information exceeds the information such permitted recipients require to assist Tenant or Manager in the operation of the business of each. Tenant and Manager may, however, disclose such confidential information in response to a subpoena, court order or similar process, or as otherwise required by applicable law or regulation, provided in the case of subpoena, court order or similar process, the party subject to a subpoena makes reasonable efforts to obtain a protective order and/or injunctive relief which prohibits or exempts disclosure and notifies the other party hereto of such subpoena, court order or similar process immediately after receiving the same.

## ARTICLE XXIII.
## APPROVAL; CONSENT; AUTHORIZED REPRESENTATIVE

Except as otherwise provided herein, the words "approval" and "consent" (and any variations thereof) as used herein will mean the prior written approval or consent, which will not be withheld or delayed unreasonably. With respect to any approval or consent herein or any official communication between the parties hereto, Manager's authorized representative will be Mr. Jerrold Pressman, unless and until replaced or removed by notice from Manager to Tenant, and Tenant's authorized representative will be Mr. Guyton Nowlen unless and until replaced or removed by notice from Tenant to Manager.

Case 2:08-cv-00335-BES-LRL Document 1 Filed 03/20/08 Page 36 of 36

## ARTICLE XXIV.
## INTEGRATION

This Agreement and any other agreements made pursuant to Section 22.2 (the "Agreements") represent the entire agreement between the parties with regard to all matters involved in this Agreement and supersede any and all prior or contemporaneous agreements, whether written or oral. The Agreements may not be modified or amended, except in writing signed by all parties. No waiver of any provision of the Agreements will be effective unless it is in writing and signed by the party against whom it is asserted, and any such waiver only will be applicable to the specific instance to which it relates and will not deemed to be a continuing or future waiver, or waiver of any other provision in the Agreements.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

G.P. LLC
~~GUSTAV CHARTERED INTERNATIONAL~~LLC

By: [signature]
Its: GUSTAV MAULER

PLUSH LOUNGE LAS VEGAS, LLC

By: [signature]
Its: Pres.

Case 2:06-cv-00335-BES-LRL Document 1-2 Filed 03/20/06 Page 1 of 1

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Plush Lounge Las Vegas LLC

**DEFENDANTS**
Hotspur Resorts Nevada, Inc.

**(b)** County of Residence of First Listed Plaintiff: Clark
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Clark
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Greenberg Traurig, 3773 Howard Hughes Parkway, Suite 500 N, Las Vegas, NV 89109, 702.792.3773

Attorneys (If Known)
Goold, Patterson et al., 4496 S. Pecos Rd., Las Vegas, NV 89121, 702.436.2000

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☒ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**: 15 USC Sec, 2; 1051 et seq.

Brief description of cause: federal antitrust and unfair competition action

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $**

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE: 3/20/2006

SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# EXHIBIT 2

Case 2:06-cv-00335-BES-LRL Document 1-3 Filed 03/20/06 Page 2 of 18

# RETAIL LEASE AGREEMENT

**BY AND BETWEEN**

**HOTSPUR RESORTS NEVADA, INC.,**

**a Nevada corporation**

**AND**

**GP II, LLC**

**a Nevada limited liability company**

Case 2:06-cv-00335-BES-LRL Document 1-3 Filed 03/20/06 Page 3 of 18


| | | |
|---|---|---|
| ARTICLE 1. | LEASE SUMMARY | 1 |
| ARTICLE 2. | DEFINITIONS | 3 |
| ARTICLE 3. | PREMISES | 5 |
| ARTICLE 4. | LEASE TERM | 5 |
| ARTICLE 5. | RENT AND DEPOSIT | 6 |
| ARTICLE 6. | USE OF PREMISES AND OPERATION OF BUSINESS | 10 |
| ARTICLE 7. | UTILITIES | 15 |
| ARTICLE 8. | TAXES | 16 |
| ARTICLE 9. | COMMON AREA | 19 |
| ARTICLE 10. | MAINTENANCE AND REPAIRS | 21 |
| ARTICLE 11. | ALTERATIONS, FIXTURES AND EQUIPMENT | 22 |
| ARTICLE 12. | INDEMNITY AND WAIVER | 24 |
| ARTICLE 13. | INSURANCE | 24 |
| ARTICLE 14. | DAMAGE AND RESTORATION | 28 |
| ARTICLE 15. | EMINENT DOMAIN | 29 |
| ARTICLE 16. | LIENS AND ENCUMBRANCES | 31 |
| ARTICLE 17. | RIGHT OF ACCESS | 31 |
| ARTICLE 18. | ASSIGNMENT AND SUBLETTING | 32 |
| ARTICLE 19. | TRANSFER OF LANDLORD'S INTEREST | 36 |
| ARTICLE 20. | NOTICES | 37 |
| ARTICLE 21. | SURRENDER OF POSSESSION AND REMOVAL OF PROPERTY | 37 |
| ARTICLE 22. | QUIET ENJOYMENT | 39 |
| ARTICLE 23. | SUBORDINATION | 39 |
| ARTICLE 24. | ESTOPPEL CERTIFICATE | 40 |
| ARTICLE 25. | TENANT'S DEFAULT | 40 |
| ARTICLE 26. | WAIVER OF DAMAGES FOR REENTRY | 43 |
| ARTICLE 27. | LANDLORD'S DEFAULT | 43 |
| ARTICLE 28. | WAIVER OF DEFAULT | 44 |
| ARTICLE 29. | ATTORNEYS' FEES | 44 |
| ARTICLE 30. | NO PARTNERSHIP | 45 |
| ARTICLE 31. | SUCCESSORS | 45 |
| ARTICLE 32. | LIMITATION OF LIABILITY | 45 |
| ARTICLE 33. | FORCE MAJEURE | 45 |
| ARTICLE 34. | INTERPRETATION; JOINT AND SEVERAL LIABILITY | 46 |
| ARTICLE 35. | SEVERABILITY | 46 |
| ARTICLE 36. | NOTICE REGARDING MORTGAGEE | 46 |
| ARTICLE 37. | RECORDING | 46 |
| ARTICLE 38. | AUTHORITY | 46 |
| ARTICLE 39. | ENTIRE INSTRUMENT | 47 |
| ARTICLE 40. | BROKERS | 47 |
| ARTICLE 41. | OPTION TO EXTEND TERM | 48 |
| ARTICLE 42. | TERMINATION | 49 |
| ARTICLE 43. | PRIOR LEASE | 49 |

Case 2:06-cv-00335-BES-LRL Document 1-3 Filed 03/20/06 Page 4 of 18

ARTICLE 44. SAVINGS PROVISION....49
EXHIBIT "A": SITE PLAN OF RESORT....51
EXHIBIT "A-1": LEGAL DESCRIPTION OF RESORT....52
EXHIBIT "B": CROSSHATCH PLAN OF THE PREMISES....53
EXHIBIT "C": CONSTRUCTION EXHIBIT....54
EXHIBIT "D": SIGN CRITERIA....58
EXHIBIT "E": RULES AND REGULATIONS....59
EXHIBIT "F": FORM OF TENANT'S ESTOPPEL CERTIFICATE....59
EXHIBIT "G": FORM OF SUBORDINATION OF MORTGAGE....65

Case 2:06-cv-00335-BES-LRL Document 1-3 Filed 03/20/06 Page 3 of 18

# RETAIL LEASE AGREEMENT

This lease agreement ("Lease") is made as of December 31, 2003, between HOTSPUR RESORTS NEVADA, INC., a Nevada corporation ("Landlord") and GP II, LLC, a Nevada limited liability company ("Tenant").

## ARTICLE 1. LEASE SUMMARY

The following summarizes certain provisions of this Lease. Each reference in this Lease to any of the provisions contained in this Article 1 shall be deemed to incorporate all of the terms of such provision. In the event of any conflict between any provision in this Article 1 and a provision in the balance of this Lease, the latter shall control.

1.1 Tenant's Trade Name: The Plush Lounge.

1.2 Resort's Name: The Resort at Summerlin.

1.3 Resort: The property outlined on the Site Plan attached hereto as Exhibit "A" is referred to in this Lease as the "Resort." The Resort is more particularly described in Exhibit "A-1" and is located in the City of Las Vegas, State of Nevada at 221 North Rampart Boulevard, Las Vegas, Nevada 89145.

1.4 Premises: The area crosshatched on Exhibit "B" to this Lease is referred to in this Lease as the "Premises." (See Article 3.) The Premises are located in the Resort and contain a Floor Area of approximately ten thousand (10,000) square feet, together with the patio area adjacent to the Premises on the exterior of the Building. Landlord and Tenant shall jointly undertake to measure the Premises in accordance with BOMA standards to determine the precise leaseable area of the Premises, which measurement shall be, for the purposes of this Lease, the leaseable area of the Premises.

1.5 Term: Initial term shall be from the Commencement Date through and including December 31, 2009. Tenant shall have the right to extend the term with two (2) options of five (5) years. (See Article 4, Article 41 and Article 42.)

1.6 Commencement Date: December 31, 2003.

1.7 Base Rent: A monthly base rent of Ten Thousand Dollars ($10,000.00) for each calendar month through and including December 2005. Commencing January 1, 2006, the monthly base rent shall be Eleven Thousand Two Hundred Fifty ($11,250.00) for the remainder of the initial Term. Should Tenant exercise the first option to extend the Lease Term, as set forth in Article 1.5, the monthly base rent during such first option Term shall be Twelve Thousand Three Hundred Seventy-Five Dollars ($12,375.00). Should Tenant exercise the second option to extend the Lease Term, as set forth in Article 1.5, the monthly base rent during such second option Term shall be Thirteen Thousand Six Hundred Twelve and 50/100 Dollars ($13,612.50).

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 6 of 18

1.8 Base Rent Adjustment: As set forth in Section 1.7.

1.9 Prepaid Rent: None.

1.10 Security Deposit: None.

1.11 Percentage Rent Rate: The Percentage Rent rates shall be six and one-half percent (6.5%) of Gross Sales during the initial Term and each option term (See Article 5.4 and 5.6.).

1.12 Permitted Use of Premises: Solely for the operation of a "Plush" nightclub and lounge, including service of alcoholic and nonalcoholic beverages. In the event Tenant ceases operation of the Premises as a "Plush" nightclub and lounge, Tenant may operate the Premises as what would generally be considered a "first class," "upper end" and/or "gourmet" restaurant, provided that Tenant's use of the Premises as a restaurant (a) does not conflict, as determined by Landlord, with any other restaurant in the Resort, and (b) Tenant obtains the Landlord's written consent for such use. (See Article 6).

1.13 Hours of Operation: Not less than three (3) days a week, with minimum hours of 6:00 p.m. to 1:00 a.m. each day; provided, however, that Tenant, at its discretion, may extend the hours of operation. If Tenant operates the Premises as a restaurant, as permitted under Section 1.12, the hours of operation shall be at least six (6) days a week, with minimum hours of 5:00 p.m. to 12:00 midnight each day (See Article 6.)

1.14 Address for Notices: (See Article 20.)

To Landlord: Hotspur Resorts Nevada, Inc.
221 N. Rampart Boulevard
Las Vegas, Nevada 89145
Attention: Andrew Jenkin

w/copies to: Bill Roberts
100 Park Royal, Suite 300
West Vancouver, B.C. V7T 1A2

and Thaddas Alston, Esq.
16202 Beach Drive, N.E.
Seattle, Washington 98155

To Tenant: GP II, LLC
3330 West Desert Inn Road, Suite A
Las Vegas, Nevada 89102

1.15 Commission(s) Payable to Broker(s) per Separate Agreement(s): Landlord has no brokers involved in this transaction is not responsible for paying any commissions.

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 7 of 18

1.16 Rate of Additional Rent if Tenant Fails to Open on Time: Not Applicable.

1.17 [Intentionally Omitted].

1.18 Tenant's Work: Tenant shall perform improvement work to the Premises pursuant to Construction Exhibit "C" attached hereto.

## ARTICLE 2. DEFINITIONS

2.1 Additional Rent means all monetary obligations of the Tenant under this Lease other than Base Rent or Percentage Rent, including, but not limited to, the obligations to pay security deposits, Common Area Expenses, taxes, utilities, insurance premiums, repair costs, and any amounts required to be paid under this Lease.

2.2 Base Rent means the amounts set forth in Article 1.7.

2.3 Building means the building of which the Premises are a part, including, without limitation, the patio and the service court and canopies and building overhangs.

2.4 [Intentionally Omitted].

2.5 Commencement Date means December 31, 2003.

2.6 Common Area means all areas within the exterior boundaries of the Resort which are now or hereafter made available by Landlord for the nonexclusive use, convenience and benefit of Landlord and Tenant and other persons, including, without limitation, automobile parking areas (including any parking structures), driveways, open or enclosed malls, trash enclosures not for the exclusive use of a tenant in the Resort, canopies, building overhangs, utility rooms, areas of ingress and egress, walkways, sidewalks, stairways, elevators, pay phones, restrooms, and landscaped and planted areas.

2.7 Common Area Expenses means those expenses described in Article 9.3(b) and any other expenses designated as Common Area Expenses under the terms of this Lease.

2.8 Common Area Maintenance means maintenance required to be done pursuant to Article 9.3(a).

2.9 Comparison Month. Not Applicable.

2.10 [Intentionally Omitted].

2.11 Effective Date means the date that all of the rights and obligations of Landlord and Tenant under this Lease commence, which date is the last date either Landlord or Tenant executed and delivered this Lease.

Case 2:06-cv-00335-BES-LRL Document 1-3 Filed 03/20/06 Page 8 of 18

2.12 Floor Area means (a) as to the enclosed portion of any building within the Resort, the actual number of square feet of floor space, including mezzanine(s), measured in accordance with BOMA standards, and (b) as to a space located outside of an enclosed building in the Resort (such as Tenant's patio), the actual number of square feet of any area in the Resort exclusively used by a particular tenant, excluding parking, measured from the exterior faces of walls, fences, or boundary markers.

2.13 Gross Sales means Tenant's gross sales from the Premises as further defined in Article 5.5.

2.14 [Intentionally Omitted].

2.15 Lease Year means that period of twelve (12) consecutive months beginning on the Commencement Date or, if the Commencement Date falls on a day other than the first day of any month, then beginning on the first day of the calendar month immediately following the Commencement Date and each twelve (12) calendar month period thereafter during the Term; provided that the first Lease Year shall include any partial calendar month between the Commencement Date and such first (1st) day, and the last Lease Year shall contain such period of time as there is from the beginning of the last Lease Year to the termination or expiration of this Lease.

2.16 Mortgagee means the holder of any mortgage or the beneficiary of any deed of trust or other encumbrance executed by Landlord and covering the Premises, or any part thereof.

2.17 Percentage Rent means the share of Tenant's Gross Sales payable to Landlord pursuant to Articles 5.4 through 5.8.

2.18 Premises means the area or space which is crosshatched on Exhibit "B," as described in Article 1.4.

2.19 Real Property Taxes means those taxes and assessments described in Article 8.2 as they apply to the Resort or any portion thereof, including the Premises.

2.20 Rent means all rent due under this Lease and consists of Base Rent, Percentage Rent and Additional Rent.

2.21 Resort means the property described in Article 1.3.

2.22 Rules and Regulations means those rules and regulations described in Article 6.3.

2.23 Site Plan means Exhibit "A."

2.24 [Intentionally Omitted]

2.25 Tenant Alterations means any alterations, additions or improvements to the interior or

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 9 of 18

exterior of the Premises made by Tenant, or by Landlord at the request of Tenant.

2.26 Tenant's Work means the work Tenant is required to perform pursuant the provisions of this Lease, including the work set forth in Exhibit "C."

2.27 Term means the period of time set forth in Article 1.5, during which period Tenant has the right to occupy the Premises subject to the provisions of this Lease, which right to occupy may be earlier terminated in accordance with the provisions of this Lease.

2.28 Transfer Consideration means that consideration described in Article 18.9.

## ARTICLE 3. PREMISES

3.1 Lease of Premises. Landlord hereby leases the Premises to Tenant and Tenant hereby leases the Premises from Landlord, for the Term, at the Rent and upon the covenants and conditions set forth in this Lease.

3.2 [Intentionally Omitted].

3.3 [Intentionally Omitted].

3.4 Layout of Resort. Tenant accepts the layout of the Resort existing on the Commencement Date and further acknowledges and agrees that Landlord may, in its sole discretion, change the shape, size, location, number and extent of the improvements shown thereon and eliminate or add any improvements to any portion of the Resort, provided that Landlord may not change the size or location of the Premises without Tenant's consent, which shall not be unreasonably withheld. Additionally, subject to any governmental requirements, Landlord shall not modify or reconfigure the exterior parking lot closest to the Premises in a manner that will reduce the number of parking spaces in by more than ten percent.

## ARTICLE 4. LEASE TERM

4.1 Term. The Term shall begin on December 31, 2003 and shall continue for the period set forth in Article 1.5.

4.2 [Intentionally Omitted].

4.3 Condition of Premises. Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the Premises or the Resort or with respect to the suitability or fitness of either for the conduct of Tenant's business or for any other purpose. Tenant has taken possession of the Premises on the Commencement Date and by doing so (a) acknowledged that it has inspected the Premises and the Resort; (b) established conclusively that the Premises and the Resort were at such time in satisfactory condition and in

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 10 of 18

conformity with this Lease and all zoning or other governmental requirements in all respects; and (c) accepted the Premises and the Resort in their condition as of the Commencement Date "AS IS" and subject to all faults and infirmities, whether then, now, or hereafter existing. Nothing contained in this Article 4.3 shall affect the commencement of the Term or the obligation of Tenant to pay Rent as provided in Article 5.

4.4 Opening For Business. Tenant shall open the Premises for business promptly upon completion of Tenant's Work, but in no event later than December 31, 2003.

## ARTICLE 5. RENT AND DEPOSIT

5.1 Rent. Tenant covenants and shall pay to Landlord at the first address set forth in Article 1.14, or such other place as Landlord may from time to time designate in writing to Tenant, without prior demand, deduction or set-off, commencing on the earlier of (a) Tenant opening for business in the Premises, or (b) December 31, 2003, and continuing after such date during the Term, the Rent provided in this Article 5. All Rent shall be paid in lawful currency of the United States of America. However, Tenant may elect to tender Tenant's personal or business account check; provided, however, that if any such check should for any reason within Tenant's control fail to clear the bank and the proceeds are not credited to Landlord's account, thereafter Tenant, at Landlord's election, shall tender the Rent by cashier's check or in cash.

5.2 Base Rent. Tenant shall pay the Base Rent in equal monthly installments, in advance, on the first day of each month commencing on the Commencement Date and continuing for the duration of the Term.

5.3 [Intentionally Omitted].

5.4 Percentage Rent. Tenant shall also pay as Percentage Rent for each calendar year, an amount calculated in accordance with Article 5.6.

5.5 Gross Sales.

(a) Gross Sales means the selling price of all merchandise, goods or services sold, leased, licensed, or delivered in or from the Premises, including orders and sales made using electronic media, by Tenant, its subtenants, licensees or franchisees, whether for cash or on credit (whether collected or not), including the amount received by reason of orders taken on the Premises, and whether made by store personnel or vending machines. Gross Sales shall also include all revenue received by Tenant from the sale of all merchandise, goods or services sold in or from the Premises by any concessionaire of Tenant. Gross Sales shall also include all revenue from entrance or cover fees of any kind, including without limitation all sales of tickets, all "door" sales and all membership fees; provided, however, such amounts shall be reduced by Tenant's costs of all such sales, such costs not to exceed the actual amount of such sales. All sales originating at the Premises shall be accounted for and entered into the Resort's "Micros" system which services the Premises, and shall be considered as made and completed therein,

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 11 of 18

even though bookkeeping and collection of the account may be transferred to another place and even though orders may be filled and deliveries may be made from a place other than the Premises. All deliveries to customers made from the Premises, or prepared at the Premises, shall be considered to be made in and from the Premises even though orders may be taken elsewhere.

(b) Notwithstanding the foregoing, Gross Sales shall not include, or if included there shall be deducted (but only to the extent they have been included), the following:

(i) The selling price of all merchandise returned by customers and accepted for full credit, or the amount of discounts, refunds, and allowances made on such returned merchandise, but the use of any such credit or discounts to purchase other merchandise shall not be excluded;

(ii) Merchandise returned to suppliers or transferred in original packages without any processing or preparation to another place of business or warehouse owned by or affiliated with Tenant;

(iii) Sums and credits received in the settlement of claims for loss of or damage to merchandise;

(iv) To the extent that same are actually paid (but excluding any and all interest and penalties assessed thereon), sales and use taxes, so-called luxury taxes, consumers' excise taxes, gross receipts taxes and other similar taxes now or in the future imposed on the sale of merchandise or services; and

(v) Sales of fixtures, equipment or personal property which are not stock in trade.

5.6 Reporting and Payment of Percentage Rent.

(a) Within twenty (20) days after the end of each calendar month which falls either wholly or partially within the Term, and continuing through the calendar month in which this Lease terminates, Tenant shall deliver to Landlord a written statement certifying Gross Sales during said calendar month. Within twenty (20) days after the end of each calendar quarter during the Term, Tenant shall deliver to Landlord a written statement certifying Gross Sales during such calendar quarter, together with payment to Landlord of quarterly Percentage Rent calculated as follows:

(i) For each full or partial month during the calendar quarter, multiply the Gross Sales during the month by the Percentage Rent rate for that month (as set forth in Article 1.11) to obtain the monthly product;

(ii) Add the product for each month during the calendar quarter to obtain the quarterly sum;

(iii) Subtract from that sum the aggregate Base Rent actually paid during the

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 12 of 18

quarter.

A calendar quarter is a three (3) month period commencing with the months of January, April, July and October. All monthly and quarterly statements shall be certified to be correct by Tenant or by an authorized officer or partner of Tenant, as appropriate.

(b) Within thirty (30) days after the expiration of each calendar year, or of the calendar quarter in which this Lease terminates, Tenant shall determine the Gross Sales for the calendar year or partial calendar year, as the case may be, and calculate the Percentage Rent for said calendar year or partial calendar year by multiplying the total Gross Sales for the calendar year by the Percentage Rent rate set forth in Article 1.11 and subtracting the Base Rent actually paid during said calendar year. Tenant shall notify Landlord in writing of the amount of Percentage Rent so calculated and the amount of any adjustment required to conform the quarterly payments to the yearly Percentage Rent, which amounts shall be certified to be correct by Tenant or by an authorized officer of Tenant as appropriate. Concurrently with delivery of the notice, Tenant shall pay to Landlord any additional Percentage Rent due to Landlord for the preceding calendar year or for the partial calendar year, as appropriate. During the Term, any overpayment shall be credited by Landlord against the next Rent owed by Tenant as it falls due. If this Lease has terminated, any overpayment shall be credited against any amounts owed to Landlord by Tenant, or, if none, shall be paid by Landlord to Tenant.

(c) Notwithstanding anything to the contrary contained herein, in the event of any assignment or sublease pursuant to Article 18, the following shall apply. Only for purposes of determining Gross Sales and Percentage Rent and for no other purposes, the Term shall be treated as having expired and the assignee's or sublessee's Commencement Date shall be treated as having occurred as of the effective date of the assignment or sublease. Not less than ten (10) days prior to the effective date of the assignment or sublease Tenant shall deliver to Landlord a written statement certified by Tenant or by an authorized officer or partner of Tenant to have been made in good faith and based on previous sales records from the Premises, estimating Gross Sales through and including the effective date of the assignment or sublease. The statement shall also include the forwarding address of Tenant and the location after the effective date of the assignment or sublease of the books and records of sales from the Premises occurring prior to such effective date. Such location shall in all events be in Nevada. Based on the estimate of Gross Sales Tenant shall calculate the Percentage Rent owing for the calendar year, or partial calendar year, and pay such amount to Landlord concurrently with the delivery of the statement. Thereafter, Tenant, as the transferor, shall within ten (10) days after the effective date of the assignment or sublease comply with all of the provisions of Article 5.6(b) to determine actual Gross Sales. Any overpayment shall be credited against any amounts owed to Landlord by Tenant, or, if none, shall be paid by Landlord to Tenant. Landlord's audit rights as provided in Article 5.8 shall commence with respect to Tenant's sales for said calendar year, or portion thereof, irrespective as to whether or not a statement has been received from Tenant. The effectiveness of any assignment or sublease is specifically conditioned on Tenant's delivering to Landlord the statement of estimate Gross Sales and the concurrent payment of Percentage Rent, if any.

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 13 of 18

5.7 Records. Tenant shall maintain and shall require its sublessees, licensees, and concessionaires to maintain in the Premises or at another location approved in writing by Landlord, for not less than two (2) years after the delivery to Landlord of Tenant's final certified statement for the calendar year, complete, accurate and customary records and accounts of inventory, purchases, receipt of merchandise at the Premises and of daily Gross Sales. Tenant further agrees to keep at the above described location, for at least two (2) years following the end of each calendar year, all pertinent original sales records, which shall include: (a) all cash register tapes; (b) serially numbered sales slips; (c) the originals of all mail orders at and to the Premises; (d) the original records of all telephone or other electronically transmitted orders at and to the Premises; (e) settlement-report sheets of transactions with Tenant's subtenants, licensees and concessionaires, if any; (f) the original records showing that merchandise returned by customers was purchased at the Premises; (g) other sales records, if any, which would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of Tenant sales; (h) copies of any and all sales tax returns filed by Tenant with any taxing authority; and (i) the records specified in (a) to (h) above of all of Tenant's subtenants, licensees and concessionaires, if any. In the event of any controversy regarding the Percentage Rent payable hereunder, Tenant shall maintain said records until the controversy has ended. Landlord may at any reasonable time during business hours, personally or through duly authorized agents, at its own expense inspect and make copies of such records, together with any other documents bearing on Tenant's Gross Sales. Notwithstanding the foregoing, Tenant further agrees to locate and maintain the aforementioned records at the Premises if required to do so by the Nevada gaming authorities and in such method as determined by the Nevada gaming authorities.

5.8 Audit. Landlord may cause an audit to be made of the business transacted in or from the Premises, whether or not included in Gross Sales, for a prior calendar quarter. Landlord's right to conduct such an audit shall expire two (2) years after delivery to Landlord of Tenant's final certified statement for such calendar quarter. If the audit discloses that Tenant's reports understated Gross Sales for the period audited, an adjustment shall be made to reflect the proper amount of Gross Sales and Tenant shall immediately pay to Landlord any increase in the amount of Percentage Rent due. If the audit further discloses that Tenant's reports understated Gross Sales by two percent (2%) or more of Gross Sales, as reflected on Tenant's final certified statement, Tenant shall, in addition, immediately pay to Landlord the cost of the audit and, further, shall pay the cost of Landlord's next audit when such costs are incurred by Landlord. If Tenant has furnished any statement which understates Gross Sales by three percent (3%) or more of Gross Sales as reflected on Tenant's final certified statement, such act shall constitute a default under Section 25.1 of this Lease. Any information gained by Landlord from such statements or audit shall be confidential and shall not be disclosed, except to carry out the purposes hereof. However, Landlord may divulge such information in connection with any financing arrangements or sale or exchange of the Premises by Landlord.

5.9 [Intentionally Omitted].

5.10 [Intentionally Omitted]

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 14 of 18

5.11 Additional Rent. Tenant shall also pay all Additional Rent as defined in Article 2.1.

## ARTICLE 6. USE OF PREMISES AND OPERATION OF BUSINESS

6.1 Regulation Of Use.

(a) The Premises shall be occupied and used by Tenant solely under the trade name and solely for the purpose of conducting the business stated in Articles 1.1 and 1.12, respectively. Tenant specifically acknowledges that the name "Key Club / Plush" represents a specific concept and product for a nightclub and lounge operation existing on the Commencement Date, and shall operate the Premises consistent with such concept and product, unless otherwise agreed in writing by Landlord. Tenant shall not use or permit the Premises, or any part thereof, to be used under any other trade name without Landlord's prior consent, which may be given in Landlord's sole and absolute discretion.

(b) Tenant shall at all times operate its business in a first-class manner and shall employ its best judgment, effort and ability to operate said business in a manner calculated to attract the maximum volume of trade or patronage attainable. Tenant shall operate its business in full compliance with all applicable health and safety codes, and shall keep the Premises free of pests, vermin and any other condition which could create a health or safety risk to the Premises, Tenant's employees and customers, other tenants and patrons of the Resort. Tenant shall at all times keep and maintain within and upon the Premises an adequate stock of merchandise and trade fixtures to service and supply the usual and ordinary demands and requirements of its customers. Tenant shall use for office or non-selling purposes only such space as is reasonably required for Tenant's business.

(c) Tenant shall, at Tenant's own expense, comply with all present or future laws, regulations, and other requirements of any governmental authority affecting Tenant's use or occupancy of the Premises, and with all requirements of the insurance underwriting board or insurance inspection bureau having or asserting jurisdiction (or any other body performing like functions), and of all insurance companies writing policies covering the Premises. Tenant shall pay all costs, claims, and penalties that may in any manner arise out of or be imposed because of the failure of Tenant to comply with these covenants. The foregoing shall cover all requirements whether or not foreseeable at the present time and regardless of the expense attendant thereto. The judgment of any court of competent jurisdiction or the admission of Tenant in any action or proceeding against Tenant, whether Landlord be a party hereto or not, that Tenant has violated any such order or statute in said use shall be conclusive of that fact as between Landlord and Tenant.

(d) Tenant shall, at its own expense, procure each and every permit, license, certificate, or other authorization and any renewals, extensions, or continuances of the same required in connection with the lawful and proper use of the Premises and the Building. Neither Tenant's failure to procure such permit, license, certificate, or other authorization, nor the revocation of the same, shall in any way affect Tenant's liability for the payment of Rent or the

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 15 of 18

performance or observance of any of the covenants or conditions contained herein which Tenant is required to perform and observe. Tenant shall discontinue any use of the Premises which is declared by any governmental authority having jurisdiction to be a violation of law. Such use shall be discontinued as promptly as possible, but in all events if Landlord gives Tenant notice of such violation, Tenant, shall discontinue such use immediately following receipt of such notice.

(e) No use shall be made or permitted of the Premises, or any part thereof, nor any acts done or omissions made which shall constitute waste, a nuisance or unreasonable annoyance or which may disturb the quiet enjoyment of other tenants, concessionaires, licensees or occupants of the Resort or which shall violate, make inoperative or increase the existing rate of any insurance policy held by or for the benefit of Landlord, or which will create or emit unusual, offensive, hazardous or excessive quantities of dust, gas, smoke, fumes, odors or other substances or cause excessive noise or vibrations. Tenant shall promptly upon demand reimburse Landlord for any additional premium charge for any such policy by reason of Tenant's failure to comply with the provisions of this Article.

(f) Tenant agrees that all nontoxic and nonhazardous trash and rubbish of Tenant shall be deposited only within Tenant's receptacles placed in the trash area designated by Landlord to be used by Tenant, and that there shall be no other trash receptacles permitted to remain outside of the Building. Tenant further agrees that it shall, at its sole cost, properly and safely handle, store and dispose of all toxic, hazardous or potentially hazardous substances in accordance with all applicable laws. Tenant shall not allow any such toxic, hazardous, or potentially hazardous substance to be stored on, or to remain outside of, the Premises.

(g) Tenant may not display or sell food, beverages or merchandise or allow carts, portable signs, devices or any other objects to be stored or to remain outside the defined exterior walls or roof and permanent doorways of the Building, provided, however, Tenant may sell food, beverages or merchandise in the patio area which is part of the Premises. No aerial or antenna shall be erected on the roof or exterior walls of the Building without first obtaining the consent of Landlord. Any aerial or antenna so installed without such consent shall be subject to removal, at Tenant's expense, without notice or liability at any time. In addition, Tenant will not solicit in any manner in the Common Area.

(h) Tenant shall use its best efforts to complete, or cause to be completed, all deliveries, loading, unloading and services to the Premises prior to 10:00 A.M. Tenant shall use its best efforts to cause delivery trucks or other vehicles servicing the Premises to park or stand only in areas as designated by Landlord for such vehicles from 6:00 A.M. to 5:00 P.M. Landlord reserves the right further to regulate the activities of the Tenant in regard to deliveries and servicing of the Premises, and Tenant agrees to abide by such further nondiscriminatory Rules and Regulations of Landlord.

(i) Tenant shall not, without Landlord's prior written consent, which may be granted or withheld in Landlord's sole and absolute discretion, install any security screens, bars or other similar devices nor make any other Tenant Alterations to any area involving the storefront window or visible from outside the Premises.

(j) Tenant shall not, without Landlord's prior written consent, (i) conduct any auction or bankruptcy sale, (ii) conduct any fire sale except as a result of a fire on the Premises, (iii) conduct any close-out sale except in connection with the expiration of the Term or (iv) sell any so-called "surplus", "Army and Navy," or "secondhand" goods, as those terms are generally used at this time and from time to time hereafter, on or from the Premises.

(k) Tenant shall remain open for business during the hours set forth in Article 1.13 of this Lease, continuously and uninterruptedly during the Term.

(l) Any provision of this Lease to the contrary notwithstanding, Tenant specifically acknowledges that Landlord has granted to a third party the exclusive right to conduct gaming and operate games (as those terms are defined under the Nevada Gaming Control Act, Chapter 463 of Nevada Revised Statutes) in, on or about the Resort, and Tenant shall not use, or allow the use of, any part of the Premises or any part of the Resort for the conduct gaming or the operation of games.

(m) Tenant acknowledges that the Premises is part of an upscale resort hotel and casino, and that the area of the Resort in the vicinity of the Premises is used and frequented not only by guests of Tenant, but also by guests and invitees of the hotel, the casino and other retail tenants of the Resort. Tenant further acknowledges that its Permitted Use of the Premises has the potential to generate noise and activity that could disturb and/or disrupt the use and enjoyment of the Resort by guests, invitees and tenants. Accordingly, Tenant agrees:

(i) that Tenant shall maintain orderly control of its patrons, whether inside or outside the Premises;

(ii) that Tenant shall maintain noise levels in the Premises such that any noise emanating from the Premises to any other portion of the Resort shall not offend hotel guests or in any way interfere with the operation of the Resort; and

(iii) that Tenant shall immediately upon written or oral demand of Landlord undertake such commercially reasonable measures to as Landlord may require to alleviate any disruption or disturbance resulting from failure to comply with subparagraphs (i)-(iii), above. Should Tenant fail to immediately undertake such measures, then Landlord shall have the right to do so on Tenant's behalf, and Tenant shall reimburse Landlord for the cost and expense of doing so.

(n) Landlord and Tenant acknowledge that the volume of patronage for the Premises may require, from time to time, that Tenant queue its patrons desiring entrance into the Premises in the Common Areas adjacent to the point of public ingress and egress of the Premises. Tenant shall manage such queues in a manner that does not interfere with or impede the pedestrian traffic inside or outside of the Resort and/or the business of any other tenant of the Resort. Any queuing shall be limited to an area parallel to the wall of the exterior of the Premises adjacent to the point of ingress and egress to the Premises and shall not extend more than five (5) feet from such wall into the Common Area. Such area shall be delineated with a "velvet" rope connected to standards, as is generally used for creating such queue or line facilities. Consistent with the

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 17 of 18

provisions of Section 6(m)(i), above, Tenant shall supervise and maintain orderly control of its patrons in such queue area.

6.2 Signs and Advertising.

(a) Tenant may, at its own expense, erect and maintain within the interior sales areas of the Building, all signs and advertising matter customary and appropriate in the conduct of Tenant's business, subject to Landlord's right to remove any signs or advertising matter which constitute a nuisance or an unreasonable annoyance to the public, to other occupants of the Resort or to Landlord.

(b) Tenant will not place or permit to be placed or maintained on any door, window (interior or exterior), wall, roof or other portion of the exterior of the Premises any sign, awning, canopy, decoration, advertising matter or other thing of any kind unless under the full and complete control of Landlord with Landlord's prior written consent and the approval of any governmental authority having jurisdiction. Tenant shall not install or maintain any device (other than security systems) that is audible from outside the Premises. All signs must conform in all respects to the sign criteria for the Resort set forth in Exhibit "D" and to all Rules and Regulations regarding the display of signs in the Resort as such are currently set forth in Exhibit "E." Tenant shall, at its own expense, maintain and keep in good repair all installations (including utility lines), signs, and advertising devices which it is permitted by Landlord to maintain. Upon termination or expiration of this Lease Tenant shall, at its own expense, promptly remove all such installations, signs, and devices and repair any damage caused by such removal.

(c) Tenant shall not display, paint or place any advertising materials on any vehicle parked in the Common Area, nor shall Tenant distribute, or cause to be distributed, in the Resort, any other advertising materials.

(d) Landlord and Tenant acknowledge that Landlord shall endeavor to secure all necessary consents for and to construct a large sign to be placed upon the exterior portion of the Resort, as determined by Landlord, for the purpose of advertising Landlord's restaurant tenants, including Tenant. The tenants utilizing the sign shall, on a prorated basis, reimburse Landlord all costs of securing such consents and all costs of construction of such sign. The costs of maintenance and operation of such sign shall be prorated among such tenants and shall be included as part of Common Area Maintenance for such tenants.

(e) All materials advertising or promoting Tenant's business in the Premises which may, from time to time during the Term be distributed by or on behalf of Tenant, shall contain a clear and conspicuous reference to the Resort, including its full and complete name. To the extent Tenant wishes to be included in any written, audio or video materials, Tenant agrees to provide to Landlord materials requested by Landlord including written copy, pictures, video clips or other materials which shall be at Tenant's expense. The production of the completed audio or video materials for distribution to Landlord's customers shall be at Landlord's expense. Landlord further agrees that to the extent there is a video produced to be presented on the

Case 2:08-cv-00335-BES-LRL Document 1-3 Filed 03/20/08 Page 18 of 18

television communications in the Hotel rooms, Tenant's business shall be included in said video based upon the provisions of this paragraph 6.2(d).

6.3 Rules and Regulations. Tenant agrees to comply with the Rules and Regulations attached hereto as Exhibit "E" and any amendments, modifications or additions thereto which may hereafter be adopted and published by written notice to tenants by Landlord, for the safety, care, security, good order, and cleanliness of the Premises and the Resort. Landlord shall not be liable to Tenant for any violation of such Rules and Regulations by any other occupant or invitee of the Resort.

6.4 Right to Cure. In the event of a violation of a provision of Article 6, in addition to any other remedy available to Landlord, Landlord shall have the right to enter upon the Premises and cure any violation of this Article 6 and repair any damage caused by such cure, all without liability to Tenant. Tenant shall pay all costs incurred by Landlord in connection with such cure upon demand.

6.5 Stability; Competition. Landlord and Tenant acknowledge and agree that Tenant's contribution to commerce within the Resort is important in Landlord's determination to execute this Lease with Tenant. Landlord and Tenant agree that a successful retail operation demands experience and close personal attention. Landlord and Tenant further agree that retail operations fail at a significantly high rate, and that this failure rate is due, in part, to overextension of resources as a result of expansion. Tenant also acknowledges that its contribution to commerce within the Resort will be substantially reduced if during the Term, either Tenant or any other person, firm or corporation, including any licensee of Tenant's trade name, shall operate, manage or conduct any business within commercial proximity of the Resort using the trade name specified in Article 1 of this Lease, or if Tenant, directly or indirectly, shall own, manage or operate any business similar to the business Tenant is operating in the Premises within commercial proximity of the Resort; provided, however, that Landlord specifically acknowledges that Landlord may from time to time permit Tenant the use of all or a portion of the convention area of the Resort for special events and Landlord further acknowledges and approves the operation of the Speidini Ristorante and The Cigar Bar by Gustav International Chartered, an affiliate of Tenant, as exist on the Commencement Date. Therefore, Tenant agrees that neither Tenant nor any person who controls or is controlled by Tenant shall own, operate or have or acquire an interest in a business similar to the business Tenant is operating in the Premises within a driving radius of three (3) miles in any direction from the closest boundary of the Resort. In addition to any other remedies provided in this Lease or under Nevada law, if Tenant should ever violate this covenant, Landlord, at its option, may elect to (i) terminate this Lease or (ii) include, as part of Gross Sales, one hundred percent (100%) of all sales from such similar business for purposes of calculating Percentage Rent hereunder, which the parties agree represents a fair and reasonable estimate of the costs incurred by Landlord as a result of such reduction in Tenant's contribution to commerce at the Resort.

Landlord's Initials ______ Tenant's Initials ______

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 1 of 21

6.6 Exclusivity. Tenant acknowledges that no representations have been made by Landlord or any other person or entity acting or purporting to act on behalf of Landlord, regarding Landlord's intent or ability to lease or not to lease space at the Resort or any other tenant engaging in the same or a competing or wholly unrelated business to the business to be conducted by Tenant in the Premises.

6.7 Employee Parking. Landlord may, from time to time, designate that portion, if any, of the Common Area which may be used for automobile parking by Tenant and Tenant's employees, sublessees, concessionaires, and licensees. Such persons may not park on any portion of the Common Area, except that which is so designated. As of the date of this Lease, the area shown on the Site Plan as "Employee Parking," if any, has been designated for the parking of vehicles belonging to such persons.

6.8 Guests. Tenant agrees that guests staying at Landlord's hotel at the Resort and other invitees of the Landlord ("Guests") may pay for any and all merchandise and services at the Premises by charging same to its room at Landlord's hotel or other programs set up by Landlord upon presentation of such Guests room keys or card key. Not less than two (2) times per day, Tenant shall notify Landlord of all such billings of which Tenant has not previously notified Landlord. Such notice shall include a copy of the receipt, the name, room number and signature of the Guest ("Guest Documentation"), but in no event shall Landlord be obligated to reimburse Tenant the cost of merchandise and/or services so charged by Guests of Landlord if Tenant fails to notify Landlord of said charge within twenty-four (24) hours of the time when said charges were incurred. Landlord shall reimburse Tenant the actual retail cost of the merchandise and services so charged by the Guests of Landlord within thirty (30) days following receipt by Landlord of the Guest Documentation.

6.9 [Intentionally Omitted].

6.10 Retail Valet Parking. Landlord may, in its discretion, establish a valet parking service to serve the retail tenants of the Resort, including Tenant. Landlord shall determine the location and operating procedures for such service. The costs of establishing and operating such service shall be included as part of Tenant's Common Area Expenses.

## ARTICLE 7. UTILITIES

7.1 Payment of Utility Charges. During the Term, Tenant shall pay before delinquency or as otherwise provided in this Lease all charges for water, gas, heat, air cooling, electricity, power, telephone, trash disposal, and other utility services used on or serving the Premises until the expiration of the Term. Nothing contained in this Lease shall limit or restrict Landlord in any way from granting or using utility easements on, across, over and under the Resort.

7.2 Landlord's Option to Provide Services. At any time during the Term, Landlord may elect, by thirty (30) days notice to Tenant, to provide any or all of the utilities serving the

Premises; provided, however, that the charges for such utility services shall not exceed those that would have been charged by a serving public utility or which would have been incurred by the Tenant in operating and maintaining an independently operated system. The charges for such utility services shall be determined on an equitable basis. If Tenant fails to pay its share of any such charges to Landlord within ten (10) days after receipt by Tenant of a bill therefore, Landlord may stop and discontinue, without further notice to Tenant, all such utilities furnished to the Premises by Landlord.

7.3 Interruption of Service. Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service being furnished to the Premises. No such failure or interruption shall entitle Tenant to terminate this Lease.

7.4 Utility Deregulation. In the event any one or more utilities serving the Resort either have been, or are in the future, deregulated by the appropriate governmental authorities having jurisdiction over such utilities so that more than one provider of such deregulated utility may be permitted to serve the Resort, Landlord, in Landlord's sole and absolute discretion, shall choose which provider(s) shall serve the Resort. Landlord shall have the right at any time and from time to time to (i) act as the provider of any such utilities itself by co-generating or purchasing power and/or other utility services on behalf of Tenant, (ii) to act as the sole energy aggregator to contract for power on Tenant's behalf, and (iii) to switch providers at any time. In no event, shall Tenant have any right to contract with any party to provide any utilities to the Premises.

## ARTICLE 8. TAXES

8.1 Personal Property Taxes. Tenant shall during the Term pay or cause to be paid not later than ten (10) days before delinquency, all public charges, property taxes and assessments on the furniture, fixtures, equipment and other personal property of, or being used by, Tenant at any time situated on or installed in the Premises. If any such taxes on Tenant's personal property are levied against Landlord and if Landlord pays the same, which Landlord shall have the right to do regardless of the validity of such levy, but only under protest if requested by Tenant, or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such personal property of Tenant and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof, but only under protest if requested by Tenant, Tenant shall repay to Landlord upon demand the taxes so levied against Landlord, or the portion of such taxes resulting from such increase in assessment, as the case may be; provided that Tenant shall have the right, in the name of the Landlord and with Landlord's full cooperation, but at no cost to Landlord, to bring suit in any court of competent jurisdiction to recover the amount of any such taxes so paid under protest. Any amount so recovered shall belong to Tenant, provided any amounts advanced by Landlord have been first repaid.

8.2 Real Property Taxes.

(a) Tenant shall, in accordance with this Article 8.2, pay the amount of any and all Real Property Taxes which shall during the Term be levied or assessed against all or any portion

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 3 of 21

of the Premises. As used in this Article 8.2, the word "Premises" includes the land underlying the Premises. Real Property Taxes on the Common Area are paid pursuant to Article 9.

(b) Real Property Taxes shall include any and all amounts payable under any recording covenants, conditions or restrictions which affect the Resort and any and all amounts payable for taxes and assessments imposed, levied or assessed against the Premises (including the underlying land), or any portion thereof, including any reassessment thereof at any subsequent time, whether such taxes are measured in whole or in part by the value of the Premises or by the amount of any Rent paid to Landlord under this Lease for the use and occupancy thereof. Real Property Taxes shall include the amount of any surtax or deferred tax which is imposed, levied or assessed either at the time of any transfer or assignment of the Premises, or any interest therein, or upon the occurrence of any other event, which surtax or deferred tax is imposed, levied or assessed for the purpose of recapturing any Real Property Taxes, (i) the imposition, levy or assessment of which had been previously deferred, and (ii) which would have, but for such deferral, been previously imposed or levied upon or assessed against the Premises or any portion thereof; provided, however, that Tenant's share of such deferred taxes shall be prorated to cover only the period of time within the tax fiscal year for such deferred taxes during which this Lease was in effect; provided, however, that Tenant shall not be liable for any amount of such tax imposed for a period of time prior to the Commencement Date. Real Property Taxes shall be liberally construed so that Tenant shall, during the entire Term, pay not only any and all Real Property Taxes imposed or levied upon or assessed against the Premises under the law existing as of the date of execution of this Lease, but any and all other taxes (collectively "In Lieu Taxes") which may hereafter be imposed, levied or assessed, in conjunction with, in lieu of, as an alternative to, as an offset against or as the result of any deferral of any such Real Property Taxes and any other special, unforeseen or extraordinary taxation, however described, relating to the Resort. The foregoing notwithstanding, Real Property Taxes shall not include (i) personal property taxes or franchise taxes payable by Landlord; or (ii) any taxes imposed or levied upon or assessed against Tenant's fixtures, equipment, merchandise or other personal property located in, upon or about the Premises, which property Tenant agrees to cause to be assessed separately from the Premises; or (iii) federal or state income taxes. Tenant shall, promptly upon written demand from Landlord and without additional consideration, execute an addendum to this Lease which specifically refers to and expressly incorporates any such In Lieu Taxes; provided, however, the failure or refusal of Tenant to execute such an addendum to this Lease will not affect any obligation of Tenant under this Article. Nothing contained in this Lease shall be deemed or construed to require Tenant to pay or discharge any tax or increase thereof which may be levied as a result of the voluntary or involuntary sale, assignment or transfer of all or any portion of Landlord's interest in the Premises.

(c) Any Real Property Taxes for the first (1st) and last years of the Term shall be prorated between the parties. With respect to any assessment which may be levied upon the Premises and which under the laws then in force may be evidenced by bonds payable in installments, the computation of the tax payable by Tenant hereunder shall be limited to the installments payable during the Term.

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 4 of 21

(d) If the tenant improvements in the Premises, whether installed or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for Real Property Tax purposes at a valuation materially higher than the valuation at which typical or standard tenant improvements in other space in the Resort are assessed, then the Real Property Taxes levied against Landlord or Landlord's property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Article 8.1. If the records of the Assessor of the County in which the Premises are located are available and sufficiently detailed to serve as a basis for determining whether said tenant improvements are assessed for Real Property Tax purposes at such higher valuation, such records shall be binding on both Landlord and Tenant for purposes of this Article 8. If such records are not available or sufficiently detailed to serve as a basis for making such determination, the total cost of construction of such tenant improvements, as determined by the records of Landlord and Tenant, shall be used.

(e) If the Premises are separately assessed and billed pursuant to a segregated tax assessment, Tenant shall pay at least ten (10) days prior to delinquency the amount of such Real Property Taxes directly to the tax collector. Tenant shall furnish to Landlord, prior to delinquency date, evidence of payment of such Real Property Taxes.

(f) If the Premises are not separately assessed and billed pursuant to a segregated tax assessment, then Tenant shall pay to Landlord, by the latter of ten (10) days before delinquency or ten (10) days after receipt of a statement setting forth the amount owed, Tenant's share of the Real Property Taxes. Subject to Article 8.2(d), Tenant's share of the Real Property Taxes shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax bill, such proportion to be determined by Landlord from the records of the Tax Assessor of the County in which the Premises are located. If such records are not available or are not sufficiently detailed, (i) Tenant's share of the tax bill for improvements shall be determined by multiplying the amount allocated to improvements in the tax bill by a fraction the numerator of which is the Floor Area of the Premises and the denominator of which is the total Floor Area of buildings in the Resort which are included in the tax bill, whether occupied or not; and (ii) Tenant's share of the tax bill for land shall be determined by multiplying the amount allocated to land in the tax bill by a fraction the numerator of which is the square footage of the land contained in the Premises and the denominator of which is the square footage of all land covered by the tax bill.

(g) Notwithstanding anything to the contrary herein contained, Landlord may elect to require Tenant to pay Real Property Taxes in accordance with the provisions of this Article 8.2(g). Beginning at the Commencement Date and at the beginning of each calendar year thereafter, Landlord shall furnish to Tenant a statement setting forth the estimated Real Property Taxes to be levied upon and assessed against the Premises for the immediately succeeding calendar year or fraction thereof. Tenant shall pay such estimated Real Property Taxes to Landlord monthly in equal installments which shall be made concurrently with the payment of each installment of Base Rent. Within sixty (60) days after the end of each calendar year or fraction thereof, or within sixty (60) days of any reassessment, Landlord shall furnish to Tenant a statement in writing, certified by Landlord to be correct, showing the actual Real Property Taxes

Case 2:06-cv-00335-BES-LRL Document 1-4 Filed 03/20/06 Page 5 of 21

levied upon and assessed against the Premises during the immediately preceding calendar year or fraction thereof or the applicable calendar year, if there has been a reassessment. At that time an adjustment shall be made between Landlord and Tenant, so that Tenant's payments of Real Property Taxes for the preceding year or fraction thereof shall equal the actual amount of such Real Property Taxes for the same period. Any overpayment by Tenant upon such adjustment shall be credited by Landlord to the monthly installments of estimated Real Property Taxes next falling due, and any underpayment by Tenant shall be paid to Landlord with the next installment of estimated Real Property Taxes or if the Term has ended, then promptly upon Tenant's receipt of Landlord's statement.

8.3 Business Taxes. Tenant shall pay all special taxes and assessments and license fees imposed by reason of the use of the Premises for the specific purposes set forth in this Lease or attributable to Tenant's business operations. Tenant shall pay to Landlord, within ten (10) days after Landlord's written request, Tenant's share of any business license, gross rents, or other tax imposed on Landlord by reason of Landlord's ownership or operation of the Resort except such tax as may be imposed on Landlord's net income from the Resort.

8.4 [Intentionally Omitted]

## ARTICLE 9. COMMON AREA

9.1 [Intentionally Omitted].

9.2 Use. Landlord shall have general possession, management and control of the Common Area and may from time to time adopt Rules and Regulations pertaining to the use thereof and may expand, contract or change the Common Area as Landlord deems desirable. Landlord may, in its sole and absolute discretion, change the shape, size, location, number and extent of the improvements of the Common Area and eliminate or add any improvements to any portion of the Common Area; provided, however, subject to any governmental requirements, Landlord shall not modify or reconfigure the exterior parking lot closest to the Premises in a manner that will reduce the number of parking spaces in by more than ten percent. During the Term, Tenant, its sublessees, concessionaires, licensees, invitees, customers, and employees, shall have the nonexclusive right to use the Common Area for the purposes intended in common with Landlord, other owners of portions of the Resort, other occupants of the Resort, and their respective sublessees, concessionaires, licensees, customers and employees and with the owners, tenants, subtenants, licensees, employees and customers of the adjoining parcels described in reciprocal easement agreements, if any, now or hereafter of record, subject to the provisions of this Lease and to the Rules and Regulations for the use therefor. Tenant shall, after ten (10) days notice from Landlord, abide by reasonable amendments to such Rules and Regulations and use its best efforts to cause its officers, employees, agents, customers and business invitees to conform thereto. Landlord may at any time close any portion of the Common Area to effect construction, repairs or changes thereto, or to prevent the acquisition of public rights in such area, and may do such other acts in and to the Common Area as in its judgment may be desirable to improve the convenience thereof. Tenant shall not at any time interfere with the use of the

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 8 of 21

Common Area by Landlord, or other tenants or any other person entitled to use the Common Area.

9.3 Maintenance; Common Area Costs.

(a) During the Term, Landlord shall operate and maintain the Common Area and all improvements thereon in compliance with governmental requirements but otherwise as Landlord, in its sole and absolute discretion, shall determine. Common Area Maintenance shall include without limitation: (i) property management; (ii) cleaning and removing rubbish and dirt (not including removal of Tenant's trash from the Premises, which removal is the sole responsibility of Tenant); (iii) cleaning, maintaining, resurfacing, repaving, repairing, replacing, and remarking paved and unpaved surfaces, curbs, directional and other signs, landscaping, gardening, decorating (permanent or temporary, seasonal or otherwise), lighting facilities, drainage, and other similar items; and (iv) maintenance or replacement of utility installations underlying the Common Area if not maintained or replaced by utility companies. All such work and services shall be performed and provided in such manner as Landlord shall, acting in good faith and using its business judgment, determine to be appropriate to the maintenance and operation of the Resort.

(b) Common Area Expenses shall include all costs and expenses incurred in connection with Common Area Maintenance and all other costs and expenses incurred by Landlord in connection with the operation of the Common Area during each calendar year or portion thereof during the Term including, without limitation: (i) costs for labor, payroll taxes, materials, and supplies; (ii) costs for all utility services utilized in connection with the Common Area, including all water supplied to the Common Area; (iii) all premiums on compensation, casualty, public liability, property damage, and other insurance on the Common Area; (iv) all costs, rental or otherwise, for tools, machinery, and equipment used in connection with the maintenance of the Common Area; (v) all Real Property Taxes and personal property taxes levied or assessed against the Common Area or against property used in connection with the Common Area (including In Lieu Taxes of the type described in Article 8); (vi) any costs incurred as a result of governmental requirements and any regulatory fee or surcharge or similar imposition imposed by governmental entities based upon or measured by the number of parking spaces or the areas devoted to parking in the Common Area; (vii) costs of personnel for policing the Common Area (as deemed necessary by Landlord); (viii) such other costs and expenses as may be incurred in operating and maintaining the Common Area; (ix) costs of materials, supplies, repairs, maintenance, painting, relocation of facilities, resurfacing of paving, lighting, cleaning, sweeping, painting, compliance with laws, ordinances and codes, removing of rubbish or debris, policing and inspecting, providing janitorial services, fire protection and security alarm systems and equipment, and all utility services utilized in connection with the Common Area not separately metered to tenants; and (x) a property management fee of fifteen percent (15%) of the foregoing Common Area Expenses, payable to Landlord or to an entity controlled or affiliated with Landlord. Common Area Expenses shall include depreciation of Common Area improvements (excluding improvements constructed in connection with the initial construction of the Common Area); provided, however, that any Common Area improvements that are included in Common Area Expenses shall be in Landlord's opinion, based on reasonable

Case 2:06-cv-00335-BES-LRL Document 1-4 Filed 03/20/06 Page 7 of 21

business practices, cost effective for the maintenance of the Common Area. Common Area Expenses shall not include any costs incurred by Landlord to modify or reconfigure the exterior parking lot closest to the Premises.

(c) Landlord may appoint a substitute operator, including but not limited to, any tenant in the Resort, to carry out any or all of Landlord's rights and duties with respect to the Common Area as provided in this Lease; and Landlord may contract with such operator on such provisions and conditions and for such period as Landlord deems appropriate; and if Landlord does so, either, but not both, the substitute operator or the Landlord shall be entitled to receive the management fee provided in Article 9.3(b).

9.4 Records. Landlord shall keep accurate records showing in reasonable detail all expenses incurred for such Common Area Expenses. These records shall, upon reasonable request, but not more often than once each calendar year, be made available during business hours at the offices of Landlord for inspection by Tenant.

9.5 Tenant's Share and Payment. Tenant shall pay to Landlord its pro rata share of Common Area Expenses. Tenant's pro rata share shall be a fraction, the numerator of which is the Floor Area of the Premises, as set forth in Article 1.4, or as increased during the Term, and the denominator of which is ninety-five percent (95%) of the aggregate leasable Floor Area in the Resort. On or before the Commencement Date and each calendar year thereafter, Landlord shall furnish to Tenant an itemized statement setting forth Landlord's estimate of the total and Tenant's pro rata share of projected Common Area Expenses for the immediately succeeding calendar year or partial calendar year. Tenant shall pay its pro rata share of such estimated expenses in equal monthly installments concurrently with each installment of Base Rent. Within sixty (60) days after the end of each calendar year or, if this Lease terminates on other than the last day of a calendar year, then sixty (60) days after the termination date, Landlord shall furnish to Tenant a statement in writing showing the actual Common Area Expenses incurred for the preceding calendar year or partial calendar year, as the case may be, and Tenant's pro rata share thereof. At such time an adjustment shall be made between Landlord and Tenant, so that Tenant's payments of estimated Common Area Expenses for the preceding year or partial year is equal to Tenant's pro rata share of actual Common Area Expenses for the same period. Any overpayment by Tenant shall be, at Landlord's election, credited by Landlord to the monthly installments of estimated Common Area Expenses falling due thereafter or refunded to Tenant or, if the Lease has terminated, then any overpayment shall be credited against any amounts owed to Landlord by Tenant, or, if none, shall be paid to Tenant, and any underpayment by Tenant shall be paid to Landlord within thirty (30) days of notice to Tenant of such underpayment.

## ARTICLE 10. MAINTENANCE AND REPAIRS

10.1 Landlord's Repairs. Landlord shall make all repairs required of it under Articles 14 and 15 hereof.

10.2 Tenant's Repair and Maintenance.

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 8 of 21

(a) Tenant shall, at all times, at its sole cost and expense, maintain the Premises, including, but not limited to, the trash area and service court in a clean, neat, sanitary and orderly condition. Except as provided in Article 10.1, Tenant's maintenance of the Premises shall include without limitation, the maintenance, replacement and repair of any storefront, doors, interior and exterior windows, including casements, glass, including plate glass, closing devices, floors, foundations, interior and exterior walls (including bearing walls), roof, landscaping, sidewalks, lighting, plumbing, and sanitary facilities and Tenant shall be responsible for the cost of maintaining and repairing the heating, ventilation and air conditioning ("HVAC") facilities. The facilities and fixtures shall be kept (repaired, maintained, replaced, or added to) at all times by Tenant in accordance with all governmental requirements and insurance requirements. Tenant hereby waives any rights it may have to make repairs or perform maintenance as may be provided in Nevada law or any law, ordinance or regulation which may now exist or hereafter be enacted or enforced which confers upon Tenant the right to make any repairs to the Premises, for the account of Landlord. Except as expressly provided in Article 10.1, Landlord shall not be obligated to make repairs, replacements or additions of any kind whatsoever upon the exterior or interior of the Premises or upon any equipment contained in or serving the Premises.

(b) If Tenant refuses or neglects to perform its obligations under Article 10.2(a), to Landlord's reasonable satisfaction as soon as reasonably possible after demand, Landlord, in addition to any other remedies it may have, may make such repairs without any liability to Tenant for loss or damage to Tenant's merchandise, fixtures or other property, or to Tenant's business, and upon completion thereof Tenant shall pay to Landlord the cost of such repairs plus twenty percent (20%) for overhead upon presentation of the bill therefor.

## ARTICLE 11. ALTERATIONS, FIXTURES AND EQUIPMENT

11.1 Fixtures and Equipment.

(a) During the Term, Tenant may install in the Premises such trade fixtures and equipment as Tenant may deem advisable for the conduct of its business. Tenant shall not place a load upon any portion of the Building exceeding the structural and load-bearing specifications for which the Building was designed or which may be allowed by law. All equipment shall be installed and used so as not to violate any of the provisions of Article 6.1.

(b) Tenant shall provide Landlord with a list of all articles of personal property and all business and trade fixtures, machinery and equipment, cabinetwork, furniture and movable partitions owned by Tenant and kept on the Premises or installed by Tenant at its expense in the Premises. All such items shall be and remain the property of Tenant and may be removed by Tenant at any time during the Term when Tenant is not in default hereunder, provided that Tenant repairs any damage to the Premises or the Building caused by such removal.

11.2 Alterations.

(a) During the Term, Tenant shall have the right to make, at its own expense, such Tenant Alterations in and to the interior of the Premises (i) as Tenant may reasonably deem

Case 2:06-cv-00335-BES-LRL Document 1-4 Filed 03/20/06 Page 9 of 21

advisable for the conduct of its business, (ii) which are nonstructural, and (iii) which do not affect the exterior walls or roof of the Building. Tenant shall not make any structural Tenant Alterations in or to the Building or any changes to the exterior walls or roof of the Building without first submitting written plans and specifications of such Tenant Alterations to Landlord and obtaining Landlord's written approval thereof, which shall not be unreasonably withheld. Tenant shall make at its sole expense such changes, alterations or additions in and to the Building as may be required by any public laws or ordinances or insurance requirements from time to time applicable to and by reason of Tenant's use and occupancy of the Building; provided, however, that any changes so required to be made by Tenant which are structural or are to the exterior of the Building shall not be made until plans and specifications for such changes have been approved by Landlord, which approval will not be unreasonably withheld, and further provided that if such changes or alterations shall be required irrespective of Tenant's use and occupancy and are to the exterior of the Building, then, in such event, the same shall be made by Landlord at its own expense. All Tenant Alterations shall conform to applicable regulations, statutes and ordinances and to all applicable provisions from Exhibit "C."

(b) Notwithstanding anything to the contrary contained in Article 11.2(a), any Tenant Alteration of any kind, whether structural or nonstructural, made to any area involving the Building windows or visible from the Building windows, must have Landlord's prior written approval, which approval shall not be unreasonably withheld.

(c) Before commencing any Tenant Alteration work, whether or not Landlord's consent is required under the terms of this Section 11.2, comply with the notice provisions of Article 16.2 and shall secure, at Tenant's sole cost and expense, a dual obligee performance and completion bond and a lien indemnity bond reasonably satisfactory to Landlord for such work, and shall record evidence of such bond as required under NRS 108.234.

(d) Promptly upon completion by Tenant of any Tenant Alterations, Tenant shall furnish to Landlord one reproducible set of as-built drawings and specifications, or such other drawings and specifications as Landlord may require in lieu of such as-built drawings and specifications.

11.3 Required Alterations. If any alteration, addition or change shall be required by law, the requirements of any insurance company (as a condition to the issuance or continuation of insurance coverage) or the insurance underwriting board or insurance inspection bureau having or asserting jurisdiction or any similar body, to be made to the Premises by reason of either (a) Tenant's failure to maintain the Premises in the manner required hereby; or (b) Tenant's use of the Premises, a change in the manner or mode of Tenant's use of the Premises, or the location of partitions, trade fixtures or other contents of the Premises, then such alterations, additions or changes, subject to the provisions of Article 11.2 hereof, shall be made promptly and paid for by Tenant. Tenant shall be responsible and shall pay for the costs of any penalties imposed by the above authorities if any such penalty is the result of any act or omission of Tenant.