Case 2:06-cv-00335-BES-LRL Document 1-4 Filed 03/20/06 Page 10 of 21

## ARTICLE 12. INDEMNITY AND WAIVER

12.1 Indemnity. Tenant shall indemnify and save Landlord, its officers, directors, employees and agents harmless from and against any and all liens, claims, demands, actions, causes of action, obligations, penalties, charges, liabilities, damages, losses, costs or expenses, including reasonable attorneys' fees and costs and expenses of litigation and appeal, arising from or connected with any construction performed by Tenant, or the conduct or management of the business conducted by Tenant on the Premises, or by Tenant's use or occupancy of the Premises and the Common Area, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed under this Lease, or from violations of or noncompliance with any governmental requirements or insurance requirements, or from any acts or omissions of Tenant or any person upon the Premises by license or invitation of Tenant or occupying the Premises or any part thereof under Tenant. Landlord shall indemnify Tenant and save Tenant harmless from and against any claims, demands, actions, liabilities, damages, losses, costs or expenses, including reasonable attorneys' fees and costs and expenses of litigation and appeal, arising directly from Landlord's gross negligence or willful misconduct with respect to any covenant or agreement on the part of Landlord to be performed under this Lease.

12.2 Waiver. All property kept, stored or maintained on the Premises shall be so kept, stored or maintained at the sole risk of Tenant; and except in the case of Landlord's gross negligence or willful misconduct, Landlord shall not be liable, and Tenant waives all claims against Landlord, for damages to persons (including personal injury or death) or property sustained by Tenant or by any other person or firm resulting from the condition of the Premises or any equipment located therein becoming out of repair, or through use of the Premises or the sidewalks adjacent thereto, or through the acts or omissions of any persons present in the Resort or renting or occupying any part of the Resort, or for loss or damage resulting to Tenant or any other person or their property from fire or any other casualty, whether or not insured against, including without limitation burst, stopped or leaking sewers, pipes, conduits, or plumbing fixtures, or for interruption of any utility services, or from any failure of or defect in the heating ventilation and air conditioning system or any electric line, circuit, or facility, or any other type of improvement or service on or furnished to the Premises, or from theft, explosion, falling plaster, steam, water or rain or from any other patent or latent cause whatsoever or resulting from any accident in, on or about the Premises.

## ARTICLE 13. INSURANCE

13.1 Use; Rate. Tenant shall not carry any stock of goods or conduct any activities in or about the Premises which will in any way increase insurance rates or invalidate or cause the cancellation of any insurance coverage, including, but not limited to, liability insurance in the Resort or property insurance on any building or buildings in the Resort. Tenant shall pay on demand any increase in premiums that may result from Tenant's vacating or otherwise failing to occupy the Premises or because of any other act or omission by Tenant.

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 11 of 21

13.2 Policy Form. All policies of insurance provided for in this Article 13 (a) shall be issued by insurance companies which have a general policy-holder's rating of not less than A/XII in the most currently available Best's Insurance Reports and which are qualified to do business in the State of Nevada; (b) shall be issued in the name of Landlord and, at the option of Landlord, in the name of the Mortgagee and any other interest designated by Landlord; (c) shall be for the mutual and joint benefit and protection of Tenant and Landlord and, at the option of Landlord, the Mortgagee, and, when required by such agency, any public agency; and (d) shall be approved as to form and substance by the first Mortgagee. Copies of all such policies of insurance or original certificates or endorsements thereof shall be delivered to Landlord concurrently with the date Tenant takes possession of the Premises for any purpose and thereafter not less than thirty (30) days prior to the expiration of each such policy. Tenant shall keep the Premises insured as required in this Article continuously throughout the Term. All policies of insurance shall provide that Landlord, although named as an insured, shall nevertheless be entitled to recover under said policies for any loss, injury or damage to Landlord, its servants, agents and employees by reason of the act or negligence of Tenant. All policies of insurance to be obtained by Tenant shall provide that the same shall not be canceled or the coverage thereunder reduced, except upon thirty (30) days notice to Landlord and any Mortgagee. Landlord may carry the insurance provided for herein under a blanket policy or policies of insurance carried by Landlord.

13.3 Tenant's Liability Insurance. Tenant shall at all times after being given possession of the Premises for any purpose maintain in full force and effect a policy or policies of comprehensive liability insurance insuring against liability for injury to or death of persons or loss of or damage to property occurring in, on or about the Premises and any portion of the Common Area which is subject to Tenant's exclusive control. Such insurance shall include, but not be limited to, personal injury, products/completed operation, blanket contractual, owner's and contractor's protective (with respect to Tenant's Work and Tenant Alterations made by Tenant during the period of Tenant's occupancy of the Premises), broad form property damage liability coverage, and owned, nonowned and hired automobile liability and shall be in an amount of not less than Five Million and No/100ths Dollars ($5,000,000.00) combined single limit. Said insurance policy or policies shall contain the following provisions:

(a) severability of interest;

(b) cross-liability;

(c) an endorsement which states: "Such insurance as is afforded by this policy for the benefit of the Landlord and/or Mortgagee or required by any public agency shall be primary with respect to any liability or claim arising out of occupancy of the Premises by Tenant or Tenant's business, and any insurance carried by Landlord shall be noncontributory"; and

(d) an endorsement which states: "It is agreed that such insurance as is afforded by this policy shall apply to the Landlord, its partners, officers, agents, employees and representatives as additional insureds, but only with respect to legal liability or claims caused by, arising out of, or resulting directly or indirectly, from the occupancy of the Premises and operations of the named insured."

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 12 of 21

The amount of Tenant's liability insurance coverage may be increased from time to time by Landlord to a level that is deemed reasonably necessary by Landlord or any Mortgagee to prudently protect their interests.

13.4 Worker's Compensation Insurance. Tenant, and all of Tenant's contractors and subcontractors, shall at all times maintain worker's compensation insurance, including employer's liability, in compliance with Nevada law.

13.5 Personal Property Insurance. Tenant shall at all times after being given possession of the Premises for any purpose and continuing throughout the Term hereof, at its sole cost and expense, maintain in full force and effect insurance against fire, vandalism, malicious mischief and such additional and other perils as now are or hereafter may be included in an "All Risks" insurance coverage, which shall insure Tenant's interest in trade fixtures, furnishings, equipment, stock, improvements and betterments, and other items of personal property, expense, business interruption, or loss of income in an amount not less than one hundred percent (100%) of their replacement value. Said insurance policy shall provide for the following:

(a) no coinsurance or contribution clause;

(b) replacement cost endorsements; and

(c) deductible amount not to exceed Five Thousand and No/100ths Dollars ($5,000.00) without the prior written consent of the Landlord, which consent shall not be unreasonably withheld.

As long as this Lease is in effect, the proceeds from any such policy shall be used for the repair and replacement of Tenant's fixtures, equipment, merchandise and business interruption or loss of income.

13.6 Landlord's Insurance.

(a) Landlord shall during the Term maintain in effect a policy or policies of comprehensive liability insurance insuring against loss, damage or liability for injury to or death of any person or loss or damage to property occurring in the Common Area, with not less than Two Million and No/100ths Dollars ($2,000,000.00) combined single limit. Landlord or any Mortgagee may from time to time require that such insurance limits be increased to a level which Landlord or any Mortgagee reasonably deems necessary for full and adequate protection. The cost of said insurance shall be a Common Area Expense and borne in accordance with Article 9.

(b) Landlord shall procure and maintain fire and extended insurance coverage on the Building (excluding Landlord's interest in the Tenant Alterations and Tenant's Work) in an amount not less than ninety percent (90%) of the actual replacement cost as the same may exist from time to time during the Term, with such deductibles as Landlord shall elect. Such insurance shall provide protection against all perils included within the classification "Fire and Extended Coverage" together with insurance against sprinkler damage, vandalism, malicious mischief and such other risks as may be required by any lender of Landlord having a lien on the

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 13 of 21

Premises or as Landlord shall elect to insure. Subject to the rights of any mortgagee, the proceeds of such insurance shall be used for the repair or replacement of the property so insured, except that upon termination of this Lease following a casualty, the proceeds shall be paid to Landlord. Tenant shall pay any increase in Landlord's insurance premium if the increase is specified by the carrier as having been caused by the occupancy, or any act or omission of Tenant other than occupying the Premises for the use permitted under Articles 1.1 and 1.12.

13.7 Property Insurance. Tenant shall, at its sole cost and expense during the Term maintain in effect "All Risks" insurance against damage by fire, vandalism, malicious mischief and other perils contained within the classification of "All Risks" for an amount equal to not less than one hundred percent (100%) of the replacement cost of the Premises and the Building, all improvements constructed thereon and any additions thereto or replacements thereof, covering the Premises, exclusive of foundation and excavation costs, together with loss of rents insurance on the Premises against loss by perils covered by such insurance in amounts not less than one (1) year's full Rent, the proceeds of which shall be payable to Landlord and any Mortgagee, as their interests may appear. Said insurance shall not contain a coinsurance or contribution provision, but will contain replacement cost endorsement and deductibles reasonably acceptable to Landlord. If Tenant or Landlord is obligated to reconstruct the Building and/or the Premises pursuant to Article 14, then Landlord or the Mortgagee shall make an amount equivalent to the proceeds of the casualty insurance available for such reconstruction.

13.8 Waiver of Subrogation. Landlord and Tenant hereby grant to each other on behalf of the insurer providing liability or other insurance to either of them with respect to the Premises or as otherwise required by this Lease, a waiver of any right of subrogation that either party or any such insurer of any one party may acquire against the other party by virtue of payment of any such loss under such coverage. Each party shall cause each insurance policy obtained by it to provide that the insurance company waives all right of recovery by Waiver of Subrogation against either party in connection with any damage covered by any policy.

13.9 Landlord's Right to Provide Insurance. If Tenant refuses or fails to provide the insurance required to be carried by Tenant pursuant to this Article 13, Landlord shall have the right, but not the obligation, to obtain such insurance and, within ten (10) days after receipt by Tenant of Landlord's request for reimbursement, Tenant shall reimburse Landlord for the cost of such insurance.

13.10 Self-Insurance. Landlord may comply with any of its insurance obligations hereunder in whole or in part by means of self-insurance, insurance deductibles, or without insurance, in which event, Landlord will make available for the purposes described herein an amount equal to the proceeds which would have been paid if Landlord had obtained the insurance described in Article 13.6 hereof. If Landlord elects so to comply with its insurance obligations and if Tenant, pursuant to the provisions of this Lease, is to reimburse Landlord for all or any portion of the cost of such insurance, Landlord may charge Tenant and Tenant shall pay to Landlord an amount equal to the cost of such insurance if it had been obtained by Landlord.

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 14 of 21

## ARTICLE 14. DAMAGE AND RESTORATION

14.1 Duty to Restore. Unless Landlord elects to terminate this Lease pursuant to Article 14.2, if the Premises or the Common Area is partially or totally damaged by fire or other casualty against which property damage insurance is required to be carried pursuant to this Lease, this Lease shall not terminate, and the Premises or Common Area shall be rebuilt to the extent of, and after receipt of, the insurance proceeds, with due diligence but without payment of overtime or other premiums. With respect to the Common Area, Landlord shall restore them in the same manner as the Common Area work was done originally. With respect to the Building and the Premises, Landlord and Tenant shall restore them in the same manner and to the extent as work was done by each of them in the original construction and fixturizing of the Premises. If Tenant has failed to obtain and maintain in force the insurance required by this Lease, Tenant shall promptly pay to Landlord an amount equal to the proceeds that would have been available if such insurance were in effect. If the Premises are reconstructed, then in all events such payment shall be made to Landlord prior to the commencement of any repair or restoration pursuant to this Article 14. Tenant shall provide Landlord with evidence satisfactory to Landlord that such funds are available for such repair or restoration.

14.2 Landlord's Election to Restore or Terminate. If the improvements on the Premises or any portion of the Resort, whether or not the Premises are a part thereof, are damaged by an insured casualty to the extent of at least fifty percent (50%) of their replacement cost (cost to repair or replace at the time of loss without deduction for physical depreciation) during the Term other than during the last three (3) years of the Term, or to the extent of at least ten percent (10%) thereof during the last three (3) years of the Term, or to any extent by an uninsured cause (or an insured cause for which the Mortgagee does not make available the proceeds of the insurance resulting from such casualty), Landlord shall, within not more than ninety (90) days after such damage, notify Tenant of Landlord's election to terminate this Lease or to cause the restoration of the Premises and such portion of the balance of the Resort as in Landlord's sole discretion is necessary to create an economically feasible commercial unit. If Landlord elects to cause the repair or restoration of the damage, then with respect to the Premises, Landlord and Tenant each shall restore them in the same manner and to the same extent as work was done by each of them in the original construction and fixturizing of the Premises, and the damage in the balance of the Resort shall likewise be restored to the extent required in the preceding sentence. In the event of a casualty not required to be insured against pursuant to this Lease, the parties shall bear the cost of such repair or restoration in the same manner and proportion as they did for the original construction. If Landlord elects not to cause restoration, this Lease shall terminate effective as of the date of such damage upon the giving of notice of election by Landlord to Tenant.

14.3 Compensation. Each party shall use good faith efforts to effect any repair or restoration promptly and in such manner as not unreasonably to interfere with Tenant's use and occupancy of the Premises or the other party's construction; however, no damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or other portion of the Resort.

14.4 Tenant's Property. Landlord shall not be obligated to repair any damage of any kind to

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 15 of 21

Tenant's personal property or Tenant Alterations or replace same. If this Lease is not terminated, Tenant shall, at its cost and expense, repair or replace Tenant's personal property and Tenant Alterations.

14.5 Waiver. As a material inducement to Landlord entering into this Lease, with respect to any destruction (including any destruction necessary in order to make repairs required by any declaration of any authorized public authority) which Landlord is obligated to repair or may elect to repair under the terms of this Article 14, the provisions of Nevada law are irrevocably waived by Tenant.

14.6 Election to Terminate. In case of any damage or destruction which the Constructing Party is required to repair as provided in Articles 14.1 and 14.2 above, provided the terminating party is not in default under the Lease, the other party may terminate this Lease by notice to the Constructing Party any time prior to the completion of the required repairs if the Constructing Party has not restored and rebuilt the Premises (exclusive of any property of Tenant or Tenant Alterations) to substantially the same condition as existed immediately prior to such damage or destruction within one (1) year of destruction, or within such additional period thereafter (not exceeding six (6) months) as shall equal the aggregate period the Constructing Party may have been delayed in doing so by adjustment of insurance or force majeure.

14.7 Rent Adjustment. Tenant agrees to procure and maintain business interruption insurance. Accordingly, during the period of repair and restoration the Base Rent shall not abate. To the extent Tenant is unable to operate from the Premises during the period of repair and restoration, Tenant shall not be obligated to pay Percentage Rent.

14.8 Total Destruction. A total destruction of the Resort shall automatically terminate this Lease.

## ARTICLE 15. EMINENT DOMAIN

15.1 Definition. If there is any taking of or damage to all or any part of the Resort or any interest therein because of the exercise of the power of eminent domain or inverse condemnation, whether by condemnation proceedings or otherwise, or any transfer of any part of the Resort or any interest therein made in avoidance thereof (all of the foregoing are hereinafter referred to as a "taking"), the rights and obligations of the parties with respect to such taking shall be as provided in this Article 15. For purposes of this Article the "date of taking" means the date of entry into possession by, or the vesting of title in, the condemning authority, whichever is earlier.

15.2 Total Condemnation. If there is a taking of all of the Premises, this Lease shall terminate automatically.

15.3 Partial Condemnation of Floor Area. If twenty-five percent (25%) or more but less than one hundred percent (100%) of the Floor Area of Tenant's Premises shall be taken, either party may terminate this Lease; or if twenty-five percent (25%) or more of the aggregate Floor Area of

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 18 of 21

all buildings in the Resort be taken, whether or not Tenant's Premises are taken, Landlord may terminate this Lease. The terminating party shall give the other party notice of such election not later than thirty (30) days after the date of taking. If neither party gives such notice or less than twenty-five percent (25%) of the Floor Area of either Tenant's Premises or buildings in the Resort shall be taken, this Lease shall remain in full force and effect and Rent shall be adjusted as provided in Article 15.7.

15.4 Condemnation of Common Area. If twenty-five percent (25%) or more of the Common Area shall be taken, Landlord may terminate this Lease. Landlord shall give written notice to Tenant of such election not later than thirty (30) days after the date of taking. If Landlord does not give such notice or more than seventy-five percent (75%) of the Common Area will be available after such taking, this Lease shall remain in full force and effect. Notwithstanding anything to the contrary contained herein, if a taking of a portion of the Common Area results in a violation of or noncompliance with governmental requirements, then Landlord may elect to terminate this Lease by giving the notice described herein.

15.5 Termination Date. If this Lease is terminated as to a portion or all of the Premises pursuant to this Article 15, such termination shall be effective as of the date of taking.

15.6 Repair and Restoration. If this Lease is not terminated pursuant to this Article 15, the Constructing Party shall restore with reasonable diligence the remainder of the Premises, and the Landlord shall restore the remainder of the Common Area, so far as practicable to a complete unit of similar quality, character, and condition as that which existed immediately prior to the taking, provided that the scope of work shall not exceed the original scope of work done by the Constructing Party in constructing the Premises and the Landlord in constructing the Common Area, and further provided that neither the Constructing Party nor Landlord shall be obligated to expend more than the amount which was awarded and received for such purpose in connection with the taking.

15.7 Rent Adjustment. If this Lease is not terminated as provided in this Article 15, the Base Rent shall be reduced in proportion to the ratio of the Floor Area taken from the Premises to the total Floor Area of the Premises immediately before the taking.

15.8 Award. The entire award or compensation in such proceedings, whether for a total or partial taking or for diminution in the value of the leasehold or for the fee shall belong to and be the property of Landlord. Tenant hereby assigns its right to any such award to Landlord; provided that Tenant shall be entitled to recover from the condemnor such compensation as may be separately awarded by the condemnor to Tenant or recoverable from the condemnor by Tenant in its own right for the taking of trade fixtures and equipment owned by Tenant (meaning personal property, whether or not attached to real property, which may be removed without injury to the Premises) and for the expense of removing and relocating such personal property. Notwithstanding the foregoing, any such portion of Landlord's reward attributable to Tenant's leasehold improvements shall be paid over by the Landlord to Tenant in the ratio that the unexpired portion of the Term bears to the whole term.

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 17 of 21

## ARTICLE 16. LIENS AND ENCUMBRANCES

16.1 Mechanic's Liens. Tenant shall keep the Premises and the Resort free of any liens or claims of lien arising from any work performed, material furnished, or obligations incurred by Tenant in connection with the Premises or the Resort, and Tenant agrees to defend, indemnify and hold harmless Landlord from and against any such lien or claim or action thereon, together with related costs of suit and attorneys' fees incurred by Landlord. All of Tenant's approved work shall be done in accordance with this Lease and Landlord's rules and regulations for contractors and shall be done by duly licensed contractors in accordance with all applicable laws, codes, ordinances, rules and regulations, and Tenant shall obtain at its cost any required permits, licenses or inspections for performance of its work and pay all fees associated therewith. Notwithstanding the aforesaid, if any mechanic's lien shall at any time, whether before, during or after the Term, be filed against any part of the Resort or Premises by reason of work, labor, services or materials performed for or furnished to Tenant, Tenant shall forthwith cause the lien to be discharged or bonded off to the satisfaction of Landlord. If Tenant shall fail to cause such lien to be discharged or bonded off within ten (10) days after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may discharge the lien by paying or bonding around the amount claimed to be due. The amount paid by Landlord, and all costs and expenses, including reasonable attorney's fees incurred by Landlord in procuring the discharge of the lien, shall be due and payable by Tenant to Landlord as additional rent on the first day of the next following month, or if the Lease has terminated, upon demand.

16.2 Notice. Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord (expressed or implied) to any contractor, subcontractor, laborer, or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration, or repair to the Premises, any buildings or improvements thereon, or any part thereof. Landlord shall have the right at all reasonable times to post and keep posted on the Premises such notices of nonresponsibility as Landlord may deem necessary for the protection of Landlord and the fee of the Premises from mechanics' and materialmen's liens. Tenant shall give Landlord written notice of intended construction alteration or repair work at least twenty (20) days before the commencement thereof to afford Landlord an opportunity to post notices of nonresponsibility.

16.3 Encumbrances. Tenant shall not cause or suffer to be placed, filed or recorded against the title to the Premises, the Resort or any part thereof, any mortgage, deed of trust, security agreement, financing statement or other encumbrance.

## ARTICLE 17. RIGHT OF ACCESS

17.1 Entry by Landlord. Landlord and its authorized agents and representatives shall be entitled at all reasonable times (if after business hours then upon 24 hours prior notice) and at any time in case of an emergency (a) to enter the Premises to inspect the same, or to cure a default of Tenant or to protect the interests of Landlord, or to post notices of nonresponsibility;

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 18 of 21

and (b) to take required materials and equipment into the Premises and perform required work therein, including the erection of scaffolding, props, or other devices for the purpose of making alterations, repairs or additions to the Premises as may be provided in this Lease or as may be agreed upon by the parties or as Landlord may be required by law to make or for maintaining any service provided by Landlord to Tenant hereunder, without any rebate of Rent to Tenant for any loss of occupancy or quiet enjoyment of the Premises, or damage, injury or inconvenience thereby occasioned. Such entry shall be in such a manner as to cause as little disturbance to Tenant as is reasonably practical, however, Landlord shall not be required to perform any such work after regular working hours or on weekends or holidays. Tenant shall permit Landlord or its agents, upon request, to enter the Premises or any part thereof, at reasonable times during normal business hours to show the Premises to the fee owners, landlords of superior leases, holders of encumbrances on the interest of Landlord under this Lease, or prospective purchasers or Mortgagees of the Resort, and during the period of six (6) months prior to the expiration date of this Lease, to prospective tenants. Landlord shall also have the right to enter the Premises at such times as such entry shall be required by an emergency affecting the Premise or any other portion of the Resort. If during the last month of this Lease Tenant shall have removed substantially all of Tenant's property and personnel from the Premises, Landlord may enter the Premises and repair, alter and redecorate the same, without abatement of Rent and without liability to Tenant, and such acts shall have no effect on this Lease.

17.2 Reserved to Landlord. All except the inside surfaces of all walls, windows and doors bounding the Premises (including exterior building walls, core corridor walls and doors and any core corridor entrance), and any space in or adjacent to the Premises used for shafts, stacks, pipes, conduit, fan rooms, ducts, electric or other utilities, sinks or other building facilities, and the use thereof, as well as access thereto through the Premises for the purposes of operation, maintenance, decoration and repair, are reserved to Landlord. Tenant shall permit Landlord to install, use and maintain pipes, ducts and conduits within the demising walls, bearing columns and ceilings of the Premises.

## ARTICLE 18. ASSIGNMENT AND SUBLETTING

18.1 Consent Required. Except as specifically provided in this Lease, Tenant shall not assign this Lease or any interest herein or sublet, license, grant any concession, or otherwise give permission to anyone other than Tenant to use or occupy all or any part of the Premises without the prior written consent of Landlord. The sale, assignment, transfer or disposition, whether for value, by operation of law, gift, will, or intestacy, of (a) twenty-five percent (25%) or more of the issued and outstanding stock of Tenant if Tenant is a corporation; or (b) the interest of any member, general partner, joint venturer, or co-tenant, if Tenant is a limited liability company, partnership, joint venture, or co-tenancy, respectively, shall be deemed an assignment of this Lease under this Article 18.1.

A consent by Landlord to any "one assignment" or sublease shall not be deemed to be a consent to any other assignment or sublease. Any attempt by Tenant to assign or sublease the Premises in violation of this Article 18 shall be void and of no force or effect and may, at the option of Landlord, be deemed a default under this Lease. Any attempt by Tenant to assign or sublet in

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 19 of 21

excess of ten percent (10%) of the Floor Area of the Premises in violation of this Article 18 shall be grounds for immediate termination of this Lease, at the option of Landlord.

18.2 Notice of Intent. If Tenant shall, at any time during the Term, desire to assign this Lease or sublet all or part of the Premises, Tenant shall give notice thereto to Landlord, which notice shall be accompanied by:

(a) a conformed or photostatic copy of the proposed assignment or sublease, the effective or commencement date of which shall be not less than sixty (60) nor more than one hundred eighty (180) days after the giving of such notice;

(b) a statement setting forth, in reasonable detail, the identity of the proposed assignee or subtenant, the nature of its business, its proposed use of the Premises and its past business experience with the proposed use;

(c) current financial information with respect to the proposed assignee or subtenant, including its most recent financial statement;

(d) banking and business references of the proposed assignee or subtenant;

(e) evidence that the proposed assignee's or subtenant's business:

(i) is in keeping with the then current standards of the Resort;

(ii) is limited to the use expressly permitted under this Lease; and

(iii) will not violate any negative covenant as to use contained in any other lease of space in the Resort; and

(f) evidence that the proposed assignee or subtenant is a reputable person or entity of good standing in the business community.

18.3 Landlord's Consent. Tenant acknowledges that, in entering into this Lease, Landlord has agreed to a relationship with Tenant, relying not only on Tenant's use of the Premises, but also relying Tenant's business experience, knowledge and personal attention. Accordingly, Landlord may withhold its consent to any assignment or subletting of Tenant's interest in this Lease for any reason or for no reason, in Landlord's sole discretion. In the event that (i) Tenant complies with all of the provisions of Article 18.2, (ii) Tenant is not in default under this Lease, and (iii) Landlord consents to the proposed assignment or sublease, then the following shall be conditions of Landlord executing such assignment or sublease:

(a) The proposed sublease or assignment shall be in a form reasonably satisfactory to Landlord and the Mortgagee and shall comply with the provisions of this Lease.

(b) There shall not be more than one subtenant on the Premises.

(c) The Rent and other terms and conditions of the assignment or sublease are the

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 20 of 21

same as those contained in the proposed assignment or sublease furnished to Landlord pursuant to Article 18.2.

(d) Tenant shall reimburse Landlord for costs and expenses that may be incurred by Landlord in connection with said assignment or sublease, including without limitation the costs of making investigations as to the acceptability of the proposed transferee and legal costs incurred in connection with the granting or withholding of any requested consent.

(e) The sublease or assignment shall not provide for an option on behalf of the transferee thereunder to extend or renew the term of such agreement beyond the then current expiration or termination date of this Lease.

(f) Tenant has delivered to Landlord the certified statement, including the estimate of Gross Sales, and made the payment required by Article 5.6(c).

(g) The provisions of Article 18.4 have been or will be complied with.

18.4 Conditions Upon a Transfer of Interest. With respect to each and every sublease or assignment whether made with Landlord's consent pursuant to Article 18.3 or without Landlord's consent pursuant to Article 18.7, it is further agreed that the following conditions shall be complied with:

(a) No sublease shall be for a term ending later than one day prior to the expiration date of this Lease.

(b) No sublease or assignment shall be valid, and no subtenant or assignee shall take possession of the Premises or any part thereof, until an executed counterpart of such agreement has been delivered to Landlord.

(c) Each sublease or assignment shall provide that it is subject and subordinate to this Lease and the matters to which this Lease is or shall be subordinate.

(d) The transferee has executed, acknowledged and delivered to Landlord an agreement, in form and substance satisfactory to Landlord, whereby the transferee shall assume for the express benefit of Landlord all of the obligations of this Lease on the part of Tenant to be performed or observed and whereby the transferee shall agree that the provisions contained in Article 18, shall notwithstanding such assignment or transfer, continue to be binding upon it in respect as to all future assignments and transfers.

(e) Tenant shall remain primarily liable for the performance of all covenants, conditions and provisions of the Lease, unless released in writing by Landlord.

(f) Any Transfer Consideration is paid to Landlord.

18.5 Failure to Deliver. In the event that Landlord consents to a proposed assignment or sublease and Tenant fails to execute and deliver to Landlord the assignment or sublease to which

Case 2:08-cv-00335-BES-LRL Document 1-4 Filed 03/20/08 Page 21 of 21

Landlord consented within ninety (90) days after the giving of such consent, then Tenant shall again comply with all of the provisions and conditions of this Article 18 before assigning this Lease or subletting all or part of the Premises.

18.6 Rent Adjustment. If Landlord shall give its consent to any assignment of this Lease or to any sublease, in consideration therefore Base Rent shall be increased to "Fair Market Rent." The Fair Market Rent shall be determined by Landlord and shall be the amount that is then currently being charged to retail tenants entering into new leases on a per square foot, per month basis, for the use described in Article 1.12 of the Lease, in a substantially similar location for substantially similar space.

18.7 Successor Corporations. If Tenant is a corporation, the provisions of this Article requiring Landlord's consent shall apply to a transfer of fifty-one percent (51%) or more, to non-stockholders as of the date of this Lease, non-family members or a non-family member controlled trust, of the stock of Tenant as if such transfer of the stock were an assignment of this Lease; but said provisions shall not apply to transactions with a corporation (a) into which, or with which, Tenant is merged or consolidated; (b) to which substantially all of Tenant's assets are transferred; (c) that controls, is controlled by, or is under common control with Tenant; or (d) after transfer to family members or a family controlled trust, provided that; in the event of (a), (b), (c),or (d) the successor to Tenant has a net worth, computed in accordance with generally accepted accounting principles, at least equal to the greater of (i) the net worth of Tenant immediately prior to such merger, consolidation, or transfer; or (ii) the net worth of Tenant herein named on the date of this Lease, and proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction.

18.8 Modifications of Lease After Transfer. The joint and several liability of Tenant and any immediate or remote successor in interest to Tenant, and the due performance or observance of the obligations of this Lease on Tenant's part, shall not be discharged, released, or impaired in any respect by any agreement or stipulation made by Landlord extending the time of, or modifying any of the obligations of, this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease.

18.9 Transfer Consideration. "Transfer Consideration" means: (a) in the case of a subletting, any consideration paid or given, directly or indirectly, by the subtenant to Tenant pursuant to the sublease for the use of the Premises, or any portion thereof, over and above the Rent, including any Additional Rent, however denominated in this Lease, payable by Tenant to Landlord for the use of the Premises, or portion thereof (In determining the amount of such consideration, it shall be appropriate to prorate the amount payable by Tenant to Landlord under this Lease if less than all of the Premises is sublet); (b) in the case of either an assignment or a sublease, any consideration paid or given, directly or indirectly, by the subtenant or assignee to Tenant in exchange for entering into the sublease or assignment, but shall not include reimbursement for any security deposit, reimbursement of the cost of any improvements, fixtures or furnishings installed in the Premises by Tenant or any payment for merchandise, of Tenant not in excess of Tenant's cost thereof. As used herein, consideration shall include consideration in any form,

including but not limited to money, property, assumption of liabilities other than those arising under this Lease, discounts, services, credits or any other item or thing of value. Irrespective of the form of such consideration, Landlord shall be entitled to be paid in cash in any amount equivalent to the aggregate of the cash portion of the Transfer Consideration and the value of any noncash Transfer Consideration received by Tenant. In the event that any Transfer Consideration is paid or given in installments, Landlord shall receive each such installment at the time paid or given.

18.10 Specific Membership Interests of Tenant. Landlord and Tenant acknowledge that Tenant is a Nevada limited liability company, and that Gustav International Chartered, a Nevada corporation ("Gustav"), is a member of Tenant. Landlord and Tenant further acknowledge that Gustav leases other retail space in the Resort from Landlord and, prior to the Commencement Date, Gustav leased the Premises from Landlord. Landlord and Tenant further acknowledge that Tenant has entered into a management agreement with Plush Lounge Las Vegas, LLC, a Nevada limited liability company, to operate and manage a Plush on the Premises. Landlord and Tenant further acknowledge that the principal of Plush Lounge Las Vegas, LLC, a Nevada limited liability company ("Plush Lounge") is Jerrold Pressman, who is experienced in operating and managing Plushes at other locations. Accordingly, Landlord and Tenant agree that should Plush Lounge cease to manage the business operations of Tenant on the Premises, then in such event, Tenant shall have the right to (a) continue to operate the Premises as a Plush or such other business operation as approved by Landlord pursuant to the provisions of Article 6.1, or (b) change the operation of the Premises to a restaurant, as provided in Section 1.12 of the Lease, or (c) terminate this Lease after giving Landlord not less than thirty (30) days (being a full calendar month) notice of such election to terminate. (By way of illustration only, should Tenant notify Landlord of its election to terminate the Lease on March 15, the effective date of termination would be April 30).

Landlord and Tenant further agree that this Lease, and the rights and obligations of Tenant hereunder, are separate and distinct from any other lease or leases of Tenant or Tenant's affiliates at the Resort, and that the obligations of the tenant under any such lease or leases shall not be attributable to Tenant as an obligation under the terms of this Lease, unless otherwise agreed in writing by Landlord and Tenant.

## ARTICLE 19. TRANSFER OF LANDLORD'S INTEREST

In the event of any transfer or transfers of Landlord's interest in this Lease, the Premises or the Resort, other than a transfer for security purposes only, the transferor shall be automatically relieved and discharged of any and all covenants, obligations and liabilities contained in or derived from this Lease accruing from and after the effective date of such transfer. The transferee shall be deemed, without any further agreement between the parties or their successors-in-interest or between the parties and any such transferee, to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord under this Lease, provided such obligations and liabilities are assumed in writing by the transferee (specifically,

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 2 of 19

the transferee is to acknowledge and assume its obligations under the lease), and that Landlord advises Tenant in writing of the transfer or transfers of Landlord's interest in the Lease, the Premises or the Resort. It is intended hereby that the covenants and obligations contained in this Lease on the part of Landlord shall, subject to the foregoing, be binding on Landlord, its successors and assigns, only during and with respect to their respective periods of ownership.

## ARTICLE 20. NOTICES

Whenever under this Lease provision is made for the giving of notices, statements, consents or demands, such notices, statements, consents or demands shall be in writing and signed by or on behalf of the party giving the notice or consent or making the statement or demand. Such notice, statement, consent or demand shall be deemed to be served when personally delivered or one (1) business day after being accepted for next business day delivery by a nationally recognized overnight courier service (e.g. Fed Ex), or three (3) days after being sent by registered or certified mail deposited in the United States mail, postage prepaid, with return receipt requested, addressed to the party to whom such notice, consent, statement or demand is to be given at the addresses stated in Article 1.14. The address(es) of either party may be changed for the purpose of this Article by notice to the other party.

## ARTICLE 21. SURRENDER OF POSSESSION AND REMOVAL OF PROPERTY

21.1 Holding over.

(a) If Tenant holds the Premises after the expiration of the Term with the written consent of Landlord, such holding over shall, in the absence of a written agreement on the subject, be deemed to have created a tenancy from month-to-month, terminable on thirty (30) days written notice by either party to the other, at a minimum monthly rent equal to one-twelfth (1/12th) of the greater of (i) the total of Base and Percentage Rents paid by Tenant to Landlord during the immediately preceding twelve (12) month period; or (ii) one hundred fifty percent (150%) of the annual Base Rent applicable at the date of expiration or earlier termination of this Lease. Such holding over shall be subject otherwise to all terms of this Lease, including the payment of Additional Rent and increases to Base Rent under Article 1.7. Nothing contained in this Article shall be construed as consent to such holding over.

(b) If Tenant fails to surrender the Premises upon the expiration or termination of this Lease, Tenant shall indemnify and hold harmless Landlord from loss or liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant arising out of such failure.

21.2 Merger. The voluntary or other surrender of this Lease by Tenant to Landlord, or a mutual termination thereof, shall not work a merger, and shall at the option of Landlord operate as an assignment to it of any or all subleases or subtenancies affecting the Premises.

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 3 of 19

21.3 Surrender of Possession. Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession of the Premises to Landlord in as good order and condition as it was at the Commencement Date, reasonable wear and tear and repairs which are Landlord's obligation excepted; and, subject to Article 11 and Article 21.5, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, all furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitioning and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and all similar articles of any other persons claiming under Tenant unless Landlord exercises its option to have any subleases or subtenancies assigned to it. Tenant shall repair all damage to the Premises resulting from such removal.

21.4 Landlord's Rights to Remove Tenant's Property. Whenever Landlord shall reenter the Premises as provided in this Lease, any property of Tenant or any person claiming through or under Tenant not removed by Tenant or such other person claiming through or under Tenant upon expiration or termination of this Lease (or within forty-eight (48) hours after a termination by reason of Tenant's default) shall be considered abandoned and Landlord may, but shall not be limited to, (a) retain such Property as its own and use such property in any manner Landlord may determine, in its sole discretion, in which event Tenant waives and releases any right, claim or interest in such property, or (b) remove any or all of such items and dispose of same in any matter or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant. If Tenant shall fail to pay the cost of storing any such property after it has been stored for a period of sixty (60) days or more, Landlord may sell any or all of such property at public or private sale, in such manner and at such times and places as Landlord, in its sole discretion, may deem proper, without notice to or demand upon Tenant, for the payment of all of any part of such charges or the removal of any such property, and shall apply the proceeds of such sale: first, to the costs and expenses of such sale, including attorneys' fees actually incurred; second, to the payment of the cost of or charges for storing any such property; third, to the payment of any other sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof; and fourth, the balance, if any, to Tenant.

21.5 Tenant's Removal of Property. All fixtures, equipment, alterations additions, improvements and appurtenances built into or made an integral part of the Premises prior to or during the Term, whether by Landlord at its expense or at the expense of Tenant or both, shall be and remain part of the Premises and shall not be removed by Tenant at the end of the Term unless Landlord requires or consents to such removal. If Landlord requires or consents to such removal, Tenant shall repair all damage resulting from such removal which shall include the patching and filling of holes and repair of structural and nonstructural damage. Such fixtures, equipment, alterations, additions, improvements and/or appurtenances shall include, but not be limited to, all floor coverings, ceiling installations, drapes, paneling, molding, doors, vaults (exclusive of vault doors), plumbing systems, electrical systems, lighting systems, HVAC, silencing equipment, communication systems, fixtures and outlets for the systems mentioned above and for telephone, radio, telegraph and television purposes. All other trade fixtures and equipment installed in the Premises by Tenant shall be removed by Tenant at the expiration or termination of this Lease in accordance with Article 21.3.

## ARTICLE 22. QUIET ENJOYMENT

Subject to the provisions of this Lease and conditioned upon the timely performance of all of the provisions to be performed by Tenant hereunder, Landlord shall secure to Tenant during the Term the quiet and peaceful possession of the Premises.

## ARTICLE 23. SUBORDINATION

This Lease is subject and subordinate to all ground or underlying leases, mortgages and deeds of trust which now affect the Resort or any part thereof, or Landlord's interest or estate therein, or portion thereof, or which affect the ground or underlying leases, if any, and all advances thereunder made prior to on or after the date of this Lease, and to all renewals, modifications, consolidations, replacements and extensions thereof. This Lease may, at the option of Landlord, be made subordinate to any ground or underlying leases, mortgages or deeds of trust which may hereafter affect the Resort or any part thereof, or affect the ground or underlying leases; provided, that Landlord delivers to Tenant a nondisturbance and attornment agreement in the standard form attached hereto as Exhibit "G" which provides that Tenant's right to quiet possession of the Premises shall not be disturbed so long as Tenant shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is terminated pursuant to specific terms contained herein. As they relate to any deed of trust encumbering the Resort and to all renewals, modifications, consolidations, replacements and extensions thereof, the provisions of this Article shall be self-operative and no further instrument of subordination under this Article shall be required in confirmation of any subordination provided herein. Tenant or Tenant's successors in interest, will execute and deliver upon the demand of Landlord, any and all instruments desired by Landlord subordinating this Lease to such lease or deed of trust, including any deed of trust. Landlord is hereby irrevocably appointed and authorized as agent and attorney-in-fact of Tenant to execute all such subordination instruments if Tenant fails to execute such instruments within ten (10) days after notice from Landlord demanding the execution thereof. This Lease or Landlord's interest herein or both may be assigned by Landlord to any mortgagee or trust deed beneficiary as additional security. In the event of any foreclosure sale or sales under the any deed of trust, this Lease shall continue in full force and effect and the Tenant shall attorn and acknowledge such foreclosure purchaser or purchasers as landlord under this Lease, or at such purchaser's option, shall enter into a new lease upon the identical terms and provisions as are contained in this Lease. Tenant, at the written request of any lessor under a ground or underlying lease, shall attorn to such lessor, or at such lessor's option, shall enter into a new lease for the balance of the terms hereof upon the identical terms and provisions as are contained in this Lease. Notwithstanding anything contained in this Lease to the contrary, the provisions of this Article may not be amended with respect to any mortgage or deed of trust, without the written consent of the Beneficiary, or any beneficiary or mortgagee or holder of such deed of trust or mortgage.

## ARTICLE 24. ESTOPPEL CERTIFICATE

Tenant shall, at any time and from time to time within fifteen (15) days after written request therefor by Landlord, execute, acknowledge and deliver to Landlord a completed estoppel certificate materially in the form attached hereto as Exhibit "F," or in such other form as reasonably provided by a party requesting such estoppel certificate. Tenant shall concurrently provide Landlord with any reasonably related information requested by Landlord, including, but not limited to, a representation and warranty in form satisfactory to Landlord stating that Tenant as well as any guarantors of Tenant are solvent and free from bankruptcy, reorganization, or arrangement proceedings and have not made a general assignment for the benefit of creditors, and Tenant's then current financial statements, as required by Landlord. If Tenant fails to deliver such certificate within said fifteen (15) day period, it shall be conclusively deemed to mean that the information set forth in the estoppel certificate submitted to Tenant by Landlord is correct.

## ARTICLE 25. TENANT'S DEFAULT

25.1 Defaults. The occurrence of any of the following shall constitute a default under this Lease:

(a) Tenant's failure to pay Rent or to make any other payment required to be made by Tenant hereunder precisely when due.

(b) Tenant's failure to strictly comply with the terms and provisions of Article 6.1(e), (m) or (n), Article 8, Article 18, or paragraphs 6, 12 and 16 of Exhibit E of this Lease.

(c) Tenant's failure to maintain in full force and effect any policies of insurance required to be maintained by Tenant pursuant to the provisions of Article 11 of this Lease.

(d) Tenant's failure to cause to be released any mechanics' or materialmen's liens filed against the Premises within ten (10) calendar days after the date same shall have been filed.

(e) Tenant's failure to observe or perform any other provision of this Lease to be observed or performed by Tenant, other than those described in Articles 25.1 (a), (b), (c) and (d) above, where such failure continues for twenty (20) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of such failure cannot reasonably be cured within such twenty (20) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion. Such twenty (20) day notice shall be in lieu of and not in addition to any notice required under Nevada law.

(f) The attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days, except if such seizure is in connection with a federal bankruptcy action in which Tenant is the debtor.

25.2 Remedies. In the event of any default by Tenant hereunder as provided in Article 25.1,

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 8 of 19

then, in addition to any other remedies available to Landlord at law or in equity, all of which rights and remedies shall be cumulative, with the exercise of one or more rights or remedies not to impair Landlord's rights to exercise any other right or remedy, and all of which may be exercised with or without legal process as then may be provided or permitted by the laws of the State of Nevada, Landlord shall have the following remedies:

(a) Landlord may terminate this Lease and all rights of Tenant by giving notice to Tenant of such election if Landlord elects so to terminate this Lease, Landlord may recover from Tenant:

(i) the worth at the time of award of any unpaid Rent which has been earned at the time of such termination; plus

(ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss Tenant proves could have been reasonably avoided; plus

(iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus

(iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; plus

(v) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

As used in clauses (i) and (ii) above, the "worth at the time of award" is computed by allowing interest at the highest rate allowed to be charged by nonexempt lenders on other than consumer loans under Nevada laws. As used in clause (iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent.

(b) If Landlord elects to terminate the Lease, Landlord shall also have the right to reenter the Premises and remove all persons, and to take possession of and remove all equipment and fixtures of Tenant in the Premises.

(c) If Landlord does not elect to terminate this Lease as provided in Article 25.2(a) above, Landlord may from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due. In such event, Landlord shall have the right to reenter and take possession of the Premises, to remove all persons and property therefrom, which property may be stored by Landlord at a warehouse or elsewhere at the risk, expense and for the account of Tenant, and to relet the Premises, or any part thereof, for the account of Tenant, for such term, upon such conditions and at such rent as Landlord in its sole discretion may deem proper. To the fullest extent permitted by law, the

proceeds of any reletting shall be applied: first, to pay to Landlord all costs and expenses of such reletting (including without limitation, costs and expenses of retaking or repossessing the Premises, removing persons and property therefrom, securing new tenants, and if Landlord shall maintain and operate the Premises, the costs thereof); second, to pay any indebtedness of Tenant to Landlord other than Rent; third, to the Rent due and unpaid hereunder; and, fourth, the residue, if any, shall be held by Landlord and applied in payment of other or future obligations of Tenant to Landlord as the same may become due and payable, and Tenant shall not be entitled to receive any portion of such revenue.

(d) Nothing in this Article shall be deemed to affect Landlord's right to indemnification for liability or liabilities arising prior to termination of this Lease for personal injury or property damage under the indemnification clause or clauses contained in this Lease.

25.3 Notice of Termination. No reentry or reletting of the Premises shall be construed as a election by Landlord to terminate either Tenant's right to possession or this Lease unless a written notice of such intention is given by Landlord to Tenant; and notwithstanding any such reletting without such termination, Landlord may at any time thereafter elect to terminate Tenant's right to possession and this Lease.

25.4 Waiver of Notice; Performance by Landlord. Notwithstanding any provision of this Article 25, (a) if Tenant is required to comply with any governmental requirement, Tenant shall not be entitled to notice of default from Landlord and right to cure beyond the period within which such compliance may be required (except that if Landlord is served with such notice in lieu of Tenant being served, then for purposes of this Lease, Tenant's cure period shall commence on the date Tenant receives notice from Landlord); or (b) if this Lease expressly provides for termination effective on service of notice, Tenant shall be entitled to cure its default only if the right to cure is required by law; or (c) if in Landlord's judgment the continuance of any default by Tenant for the full period of notice provided for herein will jeopardize the Premises or the rights of Landlord, Landlord may, with or without notice, elect to perform those acts with respect to which Tenant is in default for the account and at the expense of Tenant. If by reason of such default by Tenant, Landlord is compelled to pay or elects to pay any sum of money, including, but without limitation, reasonable attorneys' fees, such sum or sums so paid by Landlord, with interest thereon from the date of such payment at the rate provided in Article 25.5 of this Lease, shall be due from Tenant to Landlord on the first day of the month next following such payment by Landlord.

25.5 Interest and Late Charges. Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed covering the Premises. Accordingly, any sum accruing to Landlord under the terms and provisions of this Lease which shall not be paid when due shall bear interest at a rate of fifteen percent (15%) per annum from the date the same becomes due and payable by the terms and provisions of this Lease until paid, unless otherwise specifically provided in this Lease. In addition, Tenant shall

pay to Landlord a service charge in the amount of One Hundred and No/100ths Dollars ($100.00) and following each second consecutive late payment of Rent, Landlord may elect to require Tenant to pay Rent three (3) months in advance. The parties hereby agree that such late charges represent a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charges by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

25.6 Other Remedies.

(a) Nothing contained in this Lease shall limit Landlord to the remedies set forth in this Article 25, and particularly those which are set forth in Article 25.2. Upon Tenant's default Landlord shall be entitled to exercise any right or remedy then provided by law or in equity, including, but without limitation, the right to obtain injunctive relief, specific performance and the right to recover all damages caused by Tenant's default in the performance of any of its obligations under this Lease.

(b) All covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any abatement of Rent. If Tenant shall fail to pay any sum of money, other than Rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue beyond any applicable grace period set forth in Article 25.1, Landlord may, but shall not be obligated so to do, and without waiving or releasing Tenant from any obligations of Tenant, make on Tenant's behalf any such payment or perform any such other act to be made or performed by Tenant as provided in this Lease. All sums so paid by Landlord and all necessary incidental costs, together with interest thereon at the rate of fifteen percent (15%) from the date of such payment by Landlord, shall be payable to Landlord on demand and Tenant covenants to pay any such sums, and Landlord shall have, in addition to any other right or remedy of Landlord, the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of Rent.

## ARTICLE 26. WAIVER OF DAMAGES FOR REENTRY

Tenant hereby waives all claims for damages that may be caused by Landlord's reentering and taking possession of the Premises or removing and storing the property of Tenant as herein provided, and Tenant shall save Landlord harmless therefrom, and no such reentry shall be considered to be a forcible entry.

## ARTICLE 27. LANDLORD'S DEFAULT

In the case of Landlord's default, Landlord shall commence to cure such default immediately after receipt of written notice from Tenant specifying the nature of such default and shall complete such cure within thirty (30) days thereafter, provided that if the nature of a nonmonetary default is such that it cannot be cured within said thirty (30) day period, Landlord shall have such additional time as may be reasonably necessary to complete its performance so

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 9 of 19

long as Landlord has proceeded with diligence after receipt of Tenant's notice and is then proceeding with diligence to cure such default. Landlord shall not be deemed to be in default based upon any violation by any other tenant of its lease including violation or expansion or conflicting interpretation of that tenant's use clause. Tenant's sole and exclusive remedies against Landlord for Landlord's default shall be actions for specific performance, injunction or damages, but shall not include any right to withhold Rent or to terminate this Lease; provided, however, Tenant may offset from its Rent the undisputed amount of any charges of Tenant's customers billed to such customers' Resort hotel room, collected by Landlord and not paid to Tenant by the last day of the month following the date of such collection by Landlord.

## ARTICLE 28. WAIVER OF DEFAULT

The waiver by either party of any default in the performance by the other of any provision, covenant or condition contained herein shall not be construed to be a waiver of any preceding or subsequent default of the same or any other provision, covenant or condition contained herein. The subsequent acceptance of Rent or other sums hereunder by Landlord shall not be deemed a waiver of any preceding default other than the failure of Tenant to pay the particular Rent or other sum or portion thereof so accepted, regardless of Landlord's knowledge of such preceding default at the time of acceptance of such Rent or other sum.

## ARTICLE 29. ATTORNEYS' FEES

Should Landlord engage the services of an attorney to enforce any provision of this Lease or right of the Landlord hereunder, Tenant shall pay to Landlord upon demand Landlord's attorney's fees and costs so incurred. Notwithstanding the foregoing sentence, if either party hereto shall file any action or bring any proceeding against the other party arising out of this Lease or for the declaration of any rights hereunder, the prevailing party therein shall be entitled to recover from the other party all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party as such party is determined by a court, an arbitrator or by settlement. Such attorneys' fees shall be deemed to have accrued on the commencement of such action or proceeding and shall be paid whether or not such action is prosecuted to judgment.

If either party ("secondary party") without its fault is made a party to litigation instituted by or against the other party or by or against any person holding under or through the other party ("primary party"), the primary party shall save and hold the secondary party harmless from any liability or judgment rendered against the secondary party, or the Premises or any part thereof, and shall pay to the secondary party all costs and expenses, including reasonable attorneys' fees, incurred by the secondary party in connection therewith.

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 10 of 19

## ARTICLE 30. NO PARTNERSHIP

Landlord shall not in any way or for any purpose be deemed a partner, joint venturer, or member of any joint enterprise with Tenant.

## ARTICLE 31. SUCCESSORS

Subject to Article 18 hereof relating to assignment, this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their successors. The term "successors" is used herein in its broadest possible meaning and includes, but is not limited to, heirs, executors, administrators, assignees, sublessees, and every person succeeding to any interest in this Lease or the Premises of Landlord or Tenant herein, whether such succession results from the act or omission of such party.

## ARTICLE 32. LIMITATION OF LIABILITY

Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the Resort, subject to the prior rights of any Mortgagee, and subject to the Landlord's rights under a leasehold interest in the Resort or part thereof, if any, for the collection of any judgment, or other judicial process, requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other assets of the Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

## ARTICLE 33. FORCE MAJEURE

In the event that either party hereto is delayed, hindered in or prevented from the performance of any act required under this Lease by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws, regulations or orders, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the provisions of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Article 33 shall not operate to excuse Tenant from prompt payment of Rent or any other payments required under the provisions of this Lease.

## ARTICLE 34. INTERPRETATION; JOINT AND SEVERAL LIABILITY

The captions by which the Articles of this Lease are identified are for convenience only and shall not affect the interpretation of this Lease. Wherever the context so requires, the singular number shall include the plural, the plural shall refer to the singular, and the neuter gender shall include the masculine and feminine genders. As used in this Lease, the word "person" means any natural person or persons in individual or representative capacities and any entity or entities of any kind whatsoever, including, without limitation, corporations, partnerships and associations, or any combination of persons and entities. If there is more than one signatory hereto as Tenant, the liability of such signatories shall be (a) joint and several and (b) the act of or notice from, or notice or refund to, or the signature of, any one or more of them with respect to the tenancy of this Lease shall be binding upon each and all of the persons executing this Lease as Tenant with the same force and effect as if each and all of them had so acted or so given or received such notice or refund or so signed.

## ARTICLE 35. SEVERABILITY

If any provision of this Lease, the deletion of which would not adversely affect the receipt of any material benefit by either party hereunder, shall be held invalid or unenforceable to any extent, the remainder of this Lease shall not be affected thereby and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

## ARTICLE 36. NOTICE REGARDING MORTGAGEE

If Landlord encumbers or has encumbered the premises with the lien of a deed of trust or mortgage, Tenant agrees, provided Tenant has received a written request from Landlord and prior written notice of the name and address of the Mortgagee, to send to the Mortgagee a copy of each notice of Landlord's default under this Lease which Tenant sends to Landlord and to accept performance by the Mortgagee of Landlord's obligations under this Lease.

## ARTICLE 37. RECORDING

This Lease shall not be recorded, but if Landlord so requests, Tenant and Landlord agree to execute a memorandum of this Lease, in recordable form, which may thereafter be recorded by Landlord or Tenant.

## ARTICLE 38. AUTHORITY

If Tenant is a corporation, partnership or limited liability company each individual executing this

Lease on behalf of said corporation, partnership or limited liability company represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such corporation, partnership or limited liability company in accordance with a duly adopted resolution of the Board of Directors of such corporation, partnership or limited liability company or in accordance with the Bylaws (or other controlling rules) of such corporation, partnership or limited liability company, and that this Lease is binding upon such corporation, partnership or limited liability company in accordance with its terms.

## ARTICLE 39. ENTIRE INSTRUMENT

This Lease and the exhibits and addendum attached, if any, set forth the entire agreement between the parties. Tenant covenants that it has examined the Premises and knows the condition thereof and is familiar with the Resort and the surrounding geographical area. Tenant enters into this Lease on the basis of its own independent investigation only and not based on any statement or representation of anyone else including, but not limited to, Landlord's intent or ability to lease or not to lease space in the Resort to any other tenant engaging in the same or a competing or a wholly unrelated business to the business to be conducted by Tenant in the Premises. Except as specifically set forth herein, there are no agreements, representations, or warranties whatsoever as to any matter. Any prior conversations or writings are merged herein, superseded hereby and extinguished. No person has the power or authority to bind the parties to any agreement not set forth herein. No subsequent amendment to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by Landlord and Tenant. Submission of this Lease for examination does not constitute an option for the Premises and becomes effective as a Lease only on the Effective Date. If any provision contained in an Exhibit or an addendum is inconsistent with the body of this Lease, the provision contained in said Exhibit or addendum shall supersede the provision in the body of the Lease. By placing their initials in the spaces provided below, Landlord and Tenant acknowledge that each has read and understands the provisions of this Article and each agrees to be bound thereby.

Landlord's Initials ______________ Tenant's Initials ______________

## ARTICLE 40. BROKERS

Landlord warrants to Tenant that no broker or finder other than the one identified as Landlord's broker in Article 1.15, if any, has been engaged by Landlord in connection with this Lease or any of the agreements contained herein. Landlord agrees to pay, pursuant to a separate agreement all broker's commissions or finder's fees which may be payable to such Landlord's broker in connection with this transaction. Tenant warrants to Landlord that no broker or finder other than the one identified as Tenant's broker in Article 1.15, if any, has been engaged by Tenant in connection with this Lease or any of the agreements contained herein. Landlord and Tenant

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 13 of 19

agree that Landlord has no obligation to such Tenant's broker. In the event of any claims for a broker's or finder's fee or commission in connection with the negotiation, execution or performance of this Lease, Tenant shall indemnify, defend and hold Landlord harmless from and against any such claim if it is based upon any statement or representation by Tenant.

## ARTICLE 41. OPTION TO EXTEND TERM

41.1 Option. Tenant shall have the option to extend the Term of this Lease for the period set forth in Article 1.5 of this Lease, such option period to commence upon the date following the expiration date of the then current Term. Tenant may exercise any such option only as follows:

(a) Not less than two hundred seventy (270) days nor more than three hundred sixty-five (365) days prior to the expiration of the then current Term, Tenant may exercise an option to extend the Term (the "Notice"). Upon Landlord's receipt of the Notice the procedures set forth in Article 41.2 shall be followed to determine the Base Rent to be paid by Tenant during the extended Term.

(b) Tenant's right to exercise any option is conditioned on all of the following:

(i) This Lease being in full force and effect at the time notice is given;

(ii) Tenant neither being in default at the time notice is given nor having been in default at any time during the Term for a period of more than thirty (30) consecutive days; and

(iii) The original Tenant neither having assigned its interest in this Lease nor having sublet the Premises or any part thereof.

(c) If after receipt by Landlord of Tenant's Notice, but prior to the commencement of the extended Term, Tenant defaults and such default is not cured, or Tenant defaults and remains in default for a period of more than thirty (30) consecutive days, or if this Lease has been terminated, or if Tenant has assigned its interest in this Lease or sublet the Premises, then Tenant's exercise of its option shall be void and of no effect and this Lease shall terminate as of the expiration of the then current Term.

(d) Any such optional extension shall be on the provisions and conditions set forth in this Lease, including but not limited to the Base Rent adjustment provided for in Article 1.7 of this Lease, except that the option that has been exercised will cease.

(e) The options granted by this Lease are personal to the original Tenant and may not be assigned or otherwise transferred by the original Tenant.

(f) Promptly following commencement of the extended Term, Tenant will execute and deliver to Landlord a document in recordable form, prepared by Landlord, confirming the exercise of the option and the expiration date of the extended Term.

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 14 of 19

(g) Reference in the Lease to "Term" shall include the initial Term and any extension of the initial Term pursuant to this Article.

41.2 [Intentionally Omitted].

## ARTICLE 42. TERMINATION

If at any time the continued existence of this Lease, or the relationship between Landlord and Tenant created hereby, would result in disciplinary action against Landlord by the appropriate gaming authorities of the State of Nevada or Landlord's ceasing to be able to qualify for a casino gaming facility owner and/or operator license in the State of Nevada, Landlord shall have the right to terminate this Lease immediately upon written notice to Tenant. Tenant agrees to provide Landlord with all information and documentation necessary, as determined by Landlord in Landlord's sole discretion, to allow the State of Nevada to investigate Tenant, Tenant's members, officers, directors, employees and shareholders, to enable Landlord to obtain its casino gaming facility owner and/or operator license. Such information and documentation shall be provided by Tenant no later than three (3) days following receipt of Landlord's written request therefor.

## ARTICLE 43. PRIOR LEASE

Landlord and Tenant acknowledge that, as of the date of executing this Lease, Gustav (as defined in Section 18.10), which is a member of Tenant, is in possession of the Premises by reason of that certain Retail Lease Agreement by and between The Resort at Summerlin, Limited Partnership, a Nevada limited partnership, as landlord, and Gustav, which lease was rejected pursuant to that certain Order Granting Debtors' Motion for Order Approving Rejection of Real Property Space Leases entered on November 8, 2001 in the case of The Resort at Summerlin, Limited Partnership and the Resort at Summerlin, Inc., Joint Administration under Case No. BK-00-18878-RCJ in the United States Bankruptcy Court for the District of Nevada (the "Prior Lease"). Gustav continued in possession of the Premises pursuant to Section 365(h) of the Bankruptcy Code. Landlord subsequently purchased the Resort out of the bankruptcy proceedings.

Landlord and Tenant acknowledge that simultaneously with the execution of this Lease, Gustav is executing an instrument terminating all of Gustav's rights, duties and possessory interests in and to the Premises by reason of the Prior Lease and the Bankruptcy Code, and that Gustav's execution of such instrument is a condition precedent to the effectiveness of this Lease.

**ARTICLE 44. SAVINGS PROVISION.** In the event Tenant defaults under the Lease such that Landlord elects to terminate Tenant's possessory rights under the Lease, or terminate the Lease, or in the event Tenant files or is the subject of a petition under the Bankruptcy Code, then, in such event, Plush Lounge (as defined in Section 18.10) shall have the right to assume this Lease and assume possession of the Premises upon Pressman (a) curing any and all defaults incurred under the Lease prior to the date of such assumption, and (b) complying

with all requirements for Landlord's consent to an assignment of the Lease as provided in Section 18.3. Should Plush Lounge assume the Lease as provided in this Article 44, Plush Lounge shall continue to operate the Premises as a Plush unless Landlord approves of a different business operation or use pursuant to the provisions of Article 18 and 6.1

**CONSULT YOUR ATTORNEY. NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE LANDLORD AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT OR TAX CONSEQUENCES OF HIS DOCUMENT.**

**Tenant**

GP II, LLC,
a Nevada limited liability company

By: Gustav International Chartered
a Nevada corporation, its member

By:______________________
Gustav Mauler, President

Dated Signed: December 31, 2003

**Landlord**

HOTSPUR RESORTS NEVADA, INC.,
a Nevada corporation

By______________________
Print Name______________________
Title______________________

Date Signed: December ___, 2003

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 18 of 19

# EXHIBIT "A": SITE PLAN OF RESORT

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 17 of 19

# EXHIBIT "A-1": LEGAL DESCRIPTION OF RESORT

ALL OF PARCEL 1 AS SHOWN BY MAP THEREOF ON FILE IN FILE 82, PAGE 64 OF PARCEL MAPS IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA LYING WITHIN THE SOUTHWEST QUARTER (SW¼) OF SECTION 29, TOWNSHIP 20 SOUTH, RANGE 60 EAST, M.D.M., CITY OF LAS VEGAS, CLARK COUNTY, NEVADA.

Case 2:06-cv-00335-BES-LRL Document 1-5 Filed 03/20/06 Page 18 of 19

**EXHIBIT "B": CROSSHATCH PLAN OF THE PREMISES**

Case 2:08-cv-00335-BES-LRL Document 1-5 Filed 03/20/08 Page 19 of 19

# EXHIBIT "C": CONSTRUCTION EXHIBIT

## I. INTRODUCTION AND GENERAL REQUIREMENTS

### A. Plans and Approvals

It is intended that all plans be the logical outgrowth of the provisions of this Lease which describe the Resort and the matters approved by the parties pursuant to this Construction Exhibit.

### C. Conditions of Construction

1. All design and engineering shall be by architects or engineers licensed to practice in the State of Nevada and approved by Landlord. Tests and inspections shall be performed by firms whose work is approved and accepted by the governmental authorities having jurisdiction.

2. All of Tenant's contractors and subcontractors shall be licensed by the State of Nevada and, if required, by the local governmental entity having jurisdiction, and approved by Landlord and shall be required to perform all work in a thoroughly first class and workmanlike manner.

## II. TENANT'S PLANS

### A. Preparation and Approval

1. Tenant shall, within thirty (30) days following execution of the Lease, cause Tenant's architect to prepare and complete, at Tenant's expense, working drawings and specifications (the "Premises Plans") depicting the Premises and all improvements necessary for Tenant's use of the Premises, as such use is set forth in Article 1.12 of this Lease. The Premises Plans shall conform to the overall theme of the Resort and shall provide for the construction of Premises having a Floor Area as set forth in Article 1.4 of this Lease. Premises Plans shall specifically include plans and specifications for sound attenuation to conform with Article 6.1(m) of the Lease.

2. Tenant shall submit two sets of the Premises Plans to Landlord for its approval or disapproval. Landlord shall give written notice of its approval or disapproval within thirty (30) days after its receipt of the Premises Plans.

3. If Landlord disapproves the Premises Plans, Landlord shall specify the reasons for such disapproval. Tenant shall, within thirty (30) days after receipt of Landlord's disapproval of the Premises Plans, cause them to be revised to meet Landlord's objections and submit to Landlord revised Premises Plans for Landlord's approval or disapproval on the same basis as provided for herein; provided, however, that if Landlord's objections are such that Tenant cannot reasonably, based on substantially increased costs or other reasonable considerations, make them, Tenant shall give Landlord notice thereof, on or before thirty (30) days after Landlord's objections are given, and Landlord may terminate this Lease by giving notice of termination to Tenant on or before sixty (60) days after Tenant's notice.

Case 2:06-cv-00335-BES-LRL Document 1-6 Filed 03/20/06 Page 1 of 15

4. All Premises Plans which are approved in accordance with this Article II.A. are referred to herein as "Approved Premises Plans."

5. If for any reason Tenant fails to deliver to Landlord the Premises Plans in accordance with the terms of this Article II.A., such failure shall be deemed to be a default under this Lease and Landlord, along with any other remedies available to it under Article 25 of this Lease, may terminate this Lease.

B. General Standards

The Premises Plans shall comply with each of the following codes and standards:

1. The Uniform Building Code or State, County, City or other laws, codes, ordinances, and regulations, as each may apply according to the rulings of the controlling public official, agent or other person.

2. Applicable standards of the National Fire Protection Association, the National Electrical Code, the American Gas Association, and the American Society of Heating, Refrigerating and Air Conditioning Engineers.

3. Building material manufacturers' specifications.

4. Any applicable standards set forth in (a) the Summerlin Design Guidelines for Non-Residential Applications, dated April 1, 1995, as amended, (b) The Canyons Village Design Criteria, dated March 15, 1996, as may be amended from time to time (c) the Summerlin Development Standards, dated November 18, 1992, (d) the Summerlin Improvement Standards, dated August 1988, and (e) any and all other design criteria, development standards and improvement standards adopted by Landlord for the buildings and other improvements, as amended, modified or supplemented as of the date the Premises Plans are completed.

C. Modifications to Approved Plans

No changes, modifications or alterations in the Approved Premises Plans may be made without the written consent of Landlord. Any additional charges, expenses or costs, including any increased fees which Landlord may be required to pay for architectural, engineering, sewer fees, utility connections and other similar services arising by reason of any subsequent change, modification or alteration in the Approved Premises Plans made at the request of Tenant, shall be at the sole cost and expense of Tenant and shall be paid by Tenant to Landlord before the performance of the work requested by Tenant.

III. DESCRIPTION OF TENANT'S WORK

"Tenant's Work", to be provided by Tenant, at Tenant's sole cost and expense, shall include interior walls (including, without limitation, sound attenuation as approved by Landlord), all wall and floor coverings within the Premises, all HVAC within the Premises, all plumbing and electrical fixtures, all of Tenant's inventory, fixtures, equipment, including telephones, signs, furniture and decorations which Tenant shall place or install in the Premises, and all other

matters necessary to construct the Premises in accordance with the Approved Premises Plans and this Lease.

IV. TENANT'S CONSTRUCTION

A. Commencement and Completion

Tenant has substantially completed Tenant's Work as of the Commencement Date.

B. Contractor and Tenant Insurance Requirements

1. Tenant's contractors and subcontractors, at their expense or Tenant's expense, shall carry Worker's Compensation Insurance covering all of their respective employees, as well as public liability insurance, including property damage, with limits, in a form and amount carried by companies approved by Landlord, and the policies shall insure Landlord and Tenant, as well as Tenant's contractors and subcontractors.

2. Tenant, at Tenant's expense, shall obtain "All Risk" insurance covering damage to all improvements to be made by the Tenant as part of Tenant's Work. Such insurance shall be in amounts and shall contain such construction endorsements as may be required and approved by the Landlord.

3. Certificates for all of the foregoing insurance shall be delivered to Landlord before commencement of Tenant's Work and before any equipment of Tenant's contractors or subcontractors is moved on the Resort.

4. If, during the course of the performance of Tenant's Work, any damage shall occur to the improvements being made by Tenant as a part of Tenant's Work, Tenant shall repair the same at Tenant's sole cost and expense.

C. Contractor Warranties and Guarantees

Each contractor and subcontractor used in performing Tenant's Work shall warrant and guarantee that the portion thereof for which he is responsible will be free from any defects in workmanship and materials for a period of not less than one year from the date of completion thereof. Each such contractor and subcontractor shall be responsible for the replacement or repair, without additional charge, of any and all work done or furnished in accordance with this contract which becomes defective within one year after substantial completion thereof. The correction of such work shall include, without additional charge, the repairs of any and all damage to the Premises, or the Resort generally, caused as a result of such correction work. All of the foregoing warranties and guarantees as to materials or workmanship of or with respect to Tenant's Work shall be contained in the applicable contracts or subcontracts which shall be so written that such warranties and guarantees shall inure to the benefit of both Landlord and Tenant, as their respective interests may appear, and can be directly enforced by either.

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 3 of 15

D. Bond

Upon the request of Landlord, Tenant, at Tenant's expense, shall furnish, or cause Tenant's contractor(s) to furnish, a dual obligee payment and performance bond or other security in a form satisfactory to Landlord for the prompt and faithful payment and performance by Tenant of Tenant's Work.

E. Utilities

Tenant, at Tenant's expense, shall obtain and convey to Landlord all approvals with respect to any and all electrical, gas, water, telephone and other utility work as may be required by the utility company supplying service. Tenant shall obtain utility service, including meter, from the utility company supplying service unless Landlord elects to supply service and/or meters.

F. Inspection

Landlord reserves the right to inspect Tenant's Work during the course of construction, and if Landlord determines that such construction work does not comply with the terms of this Lease, Landlord shall have the right to stop such construction work until Landlord's concerns are reasonably satisfied.

G. Tenant's Cost and Expense

All work undertaken by Tenant shall be at Tenant's sole cost and expense except as specifically noted otherwise in any portion of this Lease.

H. Nonresponsibility

Landlord shall not be liable for nor have any responsibility for the security of or loss or damage to Tenant's or Tenant's employees, agents' or contractors' materials, supplies or equipment located or used in connection with Tenant's Work.

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 4 of 15

# EXHIBIT "D": SIGN CRITERIA

1. GENERAL AGREEMENT

Landlord has developed the following criteria to govern Tenant's signs. Tenant's signs shall conform in all respects to the criteria set forth in Sections 2 and 3 below, and any breach of this Sign Criteria by Tenant shall be a default under this Lease, subject only to the notice requirement contained in Article 25.1(d) of this Lease.

2. REQUIREMENTS AND GUIDELINES

THE FOLLOWING REQUIREMENTS AND GUIDELINES MUST BE FOLLOWED BY TENANT:

(a) Two copies of Tenant's sign design and fabrication plans must be submitted to the Landlord for Landlord's written approval prior to fabrication of the signs.

(b) Signs built without Landlord's approval or contrary to Landlord's corrections made on the sign design and fabrication plans, may be replaced or altered by Landlord to conform to Landlord's standards, at Tenant's sole cost and expense.

(c) No flashing signs or animation of signs will be permitted.

(d) No exposed electrical tubing or "cross-over" will be permitted.

(e) No projections above or below the "maximum sign area" will be permitted (except as otherwise approved by Landlord in writing).

(f) Sign size, materials and location shall be as shown on Exhibit "D-1."

(g) Tenant must comply with any applicable standards set forth in (a) the Summerlin Design Guidelines for Non-Residential Applications, dated April 1, 1995, as amended, (b) The Canyons Village Design Criteria, dated March 15, 1996, (c) the Summerlin Development Standards, dated November 18, 1992, (d) the Summerlin Improvement Standards, dated August 1988, and (e) any and all other design criteria, development standards and improvement standards adopted by Landlord for the Resort.

3. PAYMENT OF COSTS AND EXPENSES

(a) Tenant shall pay for all costs incurred in connection with the fabrication and installation of Tenant's signs.

(b) Tenant will be responsible for all costs and expenses related to maintenance of any of Tenant's signs. Maintenance shall be provided by Tenant as needed in order to maintain any sign in a first class condition.

## EXHIBIT "E": RULES AND REGULATIONS

Tenant covenants and agrees with Landlord that:

1. No symbol, design, name, mark or insignia adopted by Landlord for the Resort shall be used by Tenant in or about the Premises without the prior written consent of Landlord. No illuminated signs located in the interior of any store and which are visible from the outside shall advertise any product. All signs located in the interior of any store shall be in good taste so as not to detract from the general appearance of the Premises and the Resort. Tenant shall not use handbills for advertising at the Resort.

2. No awning or other projections shall be attached to the exterior walls of the Premises or the building of which it forms a part without the prior written consent of Landlord, except as set forth in the Final Plans. No curtains, blinds, shades, drapes or screens shall be attached to or hung in, or used in connection with any window or door of the Premises without the prior written consent of Landlord, such awnings, projections, curtains, blinds, shades, drapes, screens and other fixtures must be of a quality, type, design, color, material and general appearance approved by Landlord and shall be attached in the manner approved by Landlord.

3. All loading and unloading of goods shall be done only at such times, in the areas and through the entrances reasonably designated for such purpose by Landlord, and Tenant shall use its best efforts to prevent the parking or standing outside of such areas of trucks, trailers or other vehicles or equipment engaged in such loading or unloading.

4. All garbage and refuse shall be kept in the kind of container specified by Landlord and shall be placed in the areas reasonably specified by Landlord and prepared for collection in the manner and at the times specified by Landlord. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's sole cost, provided such cost shall be competitive to any similar service available to Tenant. Tenant will not install or cause to be installed any automatic garbage disposal equipment without the prior written consent of Landlord.

5. No radio or television or other similar device shall be installed, and no aerial shall be erected on the roof, on exterior walls of the Premises, or on the grounds. Any such device or aerial so installed shall be subject to removal without notice at any time.

6. No loud speakers, television sets, phonographs, radios or other devices shall be used in a manner so as to be heard outside of the Premises without the prior written consent of Landlord.

7. The following types of sales shall not be conducted on or about the Premises without the prior written consent of Landlord:

a. Sales using the auction method of selling or bankruptcy sales unless pursuant to the order of a bankruptcy court having jurisdiction,

b. Fire sales, or

c. Closing out or going out of business sales.

8. Tenant shall keep Tenant's display windows illuminated and signs and lights on the store front lighted each and every day of the Term during the hours designated by Landlord.

9. Tenant shall not place or permit any obstructions, merchandise, hand billings or soliciting of business in the corridors, sidewalks, entrances, passages, courts, corridors, elevators, stairways, parking areas, alleys, landscaping or other Common Area.

10. Tenant and Tenant's employees shall park their cars only in those portions of the parking area designated for employee parking by Landlord. Tenant shall furnish to Landlord upon request a complete list of license numbers of all automobiles operated by Tenant, its employees, subtenants, licensees or concessionaires within five (5) days of any request to do so by Landlord.

11. Tenant shall use at Tenant's sole cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may reasonably require, provided the cost thereof is competitive to any similar service available to Tenant.

12. Tenant shall not make or permit any noise or odor which Landlord deems objectionable to emanate from the Premises except normal kitchen odors, and no person shall use the Premises as sleeping quarters, sleeping apartment or lodging room.

13. Tenant shall obtain all permits and/or licenses necessary to conduct its business.

14. Except for those exclusively for use by employees of Tenant which are not visible from the sales area of Tenant or the exterior of the Premises, Tenant shall not operate any coin or token operated vending machine or similar device for the sale of any goods, wares, merchandise, food, beverages, or services, including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, food, candy, cigarettes or other commodities, without the prior written consent of Landlord.

15. Tenant shall not place or maintain any temporary fixture for the display of merchandise outside of the Premises, and Landlord shall have the right, without giving prior notice to Tenant and without any liability for damage to the Premises or Tenant's merchandise, to remove any of the same from the Premises, and, except such as shall have first received the written approval of Landlord as to size, color, location, nature and display qualities.

16. Tenant shall not make noises, cause disturbances or vibrations or use or operate any electrical or electronic devices or other devices that emit sound or other waves of

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 7 of 15

disturbances, or create odors except normal kitchen odors, any of which may be offensive to other tenants and occupants of the Resort or that would interfere with the operation of any device of equipment or radio to television broadcasting or reception from or within the Resort or elsewhere.

17. No "gaming," "gambling," "game," "gambling game," or "gaming device" shall be permitted in or about the Premises. For purposes hereof, these terms shall have the meanings set forth in N.R.S. 463.0152, N.R.S. 463.0153 and N.R.S. 463.0155 as the same may be recodified, modified or amended after the date of the Lease of which these Rules and Regulations form a part.

Tenant agrees that Landlord may amend, modify and delete these Rules and Regulations, or add new and additional reasonable rules and regulations for the use and care of the Premises, the building of which the Premises is a part, the Common Area, and all of the Resort, with at least fifteen (15) days prior written notice. Tenant agrees to comply with all such Rules and Regulations upon notice to Tenant from Landlord. In the event of any continuing breach of any Rules and Regulations herein set forth or any amendments or additions thereto, Landlord, after appropriate notice, shall have all remedies in this Lease provided for upon default of Tenant.

# EXHIBIT "F": FORM OF TENANT'S ESTOPPEL CERTIFICATE

______________________ (Lender) (Purchaser)
______________________
______________________
______________________
Attention:

RE: Lease Between Hotspur Resorts Nevada, Inc., a Nevada corporation, as Landlord ("Landlord"), and ______________________ as Tenant ("Tenant"), dated ______________________, 200__ on Property known as JW Marriott Resort Las Vegas, Golf and Spa at the Resort at Summerlin located at 221 N. Rampart Boulevard, Las Vegas, Nevada.

Dear Sirs/Madam:

The undersigned, as Tenant under the subject Lease, understands that you (Lender) are or will be [making a mortgage loan to Landlord which will be secured by property, including the Premises of the subject Lease,][purchasing the Shopping Center or a portion thereof containing the Premises] and hereby certifies, represents, warrants, confirms and agrees with you as follows for your reliance of your successors and assigns:

1. That the undersigned has accepted possession and is in actual occupancy of the Premises of the subject Lease;

2. That the Premises of the subject Lease are fully open for business and are in use by the undersigned, its employees and invitees;

3. That any and all improvements and space required to be furnished by Landlord according to the subject Lease have been completed in all respects and accepted by the undersigned;

4. That Landlord has completely fulfilled all of Landlord's duties and obligations of an inducement nature;

5. That the subject Lease has not been modified, altered, amended, changed, supplemented, terminated, or superseded in any manner except as follows: (Write "NONE" if there are none);

6. That the subject Lease sets forth all agreements and understandings of Landlord and the undersigned, as Tenant;

7. That there are no offsets or credit against rentals, that there are no claims or defenses to enforcement of the subject Lease, that rentals have not been prepaid except as provided

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 9 of 15

by the subject Lease terms, and that no periods of free rentals are applicable to the term of the subject Lease;

8. That no broker or other intermediary is entitled to receive any leasing, brokerage or other compensation out of or with respect to rentals of any kind under the subject Lease;

9. That the undersigned has no notice of a prior sale, transfer, assignment, hypothecation or pledge of the subject Lease or rents thereunder;

10. That the term of the subject Lease is for _______ years. The primary Lease term commenced on ____________________ and expires on ____________________.

11. That the monthly rental is $________________, and rent has been paid to ________________________, 200____;

12. That the undersigned hereby acknowledges and agrees that existing parking facilities meet the requirements of the subject Lease;

13. That the undersigned agrees to notify you at the above shown address, or such address as you may hereafter specify, of any material default on the part of Landlord after the date hereof unless the undersigned is advised by you that the contemplated mortgage loan from you to Landlord will not be made;

14. That the undersigned agrees that without your written consent, the undersigned will not: (a) modify or in any manner alter the terms for the subject Lease; (b) pay the rent or any other sums becoming due under the terms of the subject Lease more than two months in advance; or (c) accept Landlord's waiver of or release from the performance of any obligations of Tenant under the subject Lease;

15. That should you advise the undersigned that Landlord is in default in the indebtedness to you and request that payment of all future rentals be made directly to you pursuant to an Assignment of Leases and Rents, the undersigned agrees that the undersigned shall make all future rental payments under the subject Lease directly to you until instructed otherwise by you;

16. That the undersigned will in no event look to you for the return of any security deposit under the subject Lease, except as is actually received by you. Pursuant to the subject Lease, Tenant has not made a security deposit.

17. That none of the following events have occurred: (a) the filing by or against the undersigned of a petition in bankruptcy, insolvency, reorganization, or an action for the appointment of a receiver or trustee; or (b) the making of an assignment for the benefit of creditors;

18. That the subject Lease is in full force and effect, is not in default, and is hereby ratified and confirmed;

19. That at the date hereof, there are no defaults by Landlord or the undersigned, as Tenant, in their respective performances of any of the agreements, duties, obligations, terms and conditions of the subject Lease by them respectively to be performed which exist on the

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 10 of 15

date hereof, and that no event has occurred which, after the passage of time or after the expiration of any grace period, right of cure period, or any other period provided by law or by the Lease, would constitute a default under the subject Lease;

20. That the undersigned has not subleased or assigned, whether outright or by collateral assignment, all or any portion of the undersigned's rights under the subject Lease;

21. That the entity, person and/or officer executing this certification is empowered by action, resolution or at law to execute the same, and this certificate shall be binding on the undersigned, its successors and assigns.

[ALTERNATIVES TO ABOVE PROVISIONS IF SPACE IS LEASED BUT NOT YET OCCUPIED OR OPEN:

A. That the undersigned has no reason to believe that it will not accept possession or occupy the Premises of the subject Lease;

B. That the Premises of the subject Lease upon occupancy of the Tenant will be fully open for business and will be used by the undersigned, its employees and invitees;

C. That Tenant has no reason to believe that any and all improvements and space required to be furnished by Landlord according to the subject Lease will not be completed in all respects and accepted by the undersigned;

D. That Landlord has completely fulfilled all of Landlord's duties and obligations of an inducement nature required to be filled as of the date hereof;

E. That the term of the subject Lease is for _______ years. The primary Lease term will commence on the Lease Commencement Date set forth in the Lease.

F. That the monthly rental is $_________________, and rent has been paid to _________________________, 20____;]

(Tenant)

______________________________

By______________________________

Its______________________________

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 11 of 15

# EXHIBIT "G": FORM OF SUBORDINATION OF MORTGAGE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement ("Agreement") is made and entered into _______________, 200__, by and between: Hotspur Resorts Nevada, Inc., a Nevada corporation ("Landlord"), whose address is 221 N. Rampart Boulevard, Las Vegas, Nevada 89145, ____________________ ("Tenant") whose address is ______________________________________, and ______________________ ("Lender") whose address is ___________________________________________.

## RECITALS

A. Lender has committed to make a $________________________ loan (the "Loan") to Landlord, which Loan is to be secured by a deed of trust, security agreement and assignment of rents and leases (the "Deed of Trust") encumbering, among other things, the real property (the "Real Property") described in Exhibit "A" attached hereto and by this reference made a part hereof.

B. Landlord and Tenant entered into that certain Lease (the "Lease") dated ___________ ___, 2003 with respect to certain property (the "Premises") located in Clark County, Nevada, which property is located at or is in, on or part of that certain Real Property, all as more particularly set forth in the Lease, a true and complete copy of which has been delivered by Tenant to Lender.

C. The Lease is prior in time to the Deed of Trust and to the right, title, and interests of Lender therein and thereunder.

D. Lender's commitment to make the Loan to Landlord requires, as a condition precedent, that all leases of space in or on the Real Property be subordinate and inferior to the Deed of Trust.

E. Tenant is willing to subordinate the Lease to the Deed of Trust if Lender gives certain assurances that Tenant's possession of the real property will not be disturbed by reason of a foreclosure of the lien of the Deed of Trust.

F. Lender is willing to provide such assurance to Tenant upon and subject to the terms and conditions of this Agreement as set forth below.

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 12 of 15

AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the foregoing recitals are true and correct and incorporated in this Agreement, and further covenant and agree as follows:

1. Subordination. The Lease shall at all times from and after the date on which the Deed of Trust is made by Landlord and delivered to Lender be subject and subordinate in all respects to the Deed of Trust and to all increases, renewals, modifications, replacements, substitutions, extensions and consolidations thereof, and all other loan documents securing the Loan, provided that any and all such increases, renewals, modifications, replacements, substitutions, extensions and consolidations shall nevertheless be subject to the terms of this Agreement.

2. Opportunity to Cure. Notwithstanding any contrary provision in the Lease, no notice by Tenant to Landlord of any default by Landlord under any obligation of the Lease, which default is of such a nature as to give Tenant a right to (i) terminate the Lease, (ii) reduce the rent or any other sums payable under the Lease or (iii) any credit or offset against future rents or any other sums, if any, shall be effective unless and until (a) such notice is also given to Lender and (b) a reasonable period of time has elapsed following Lender's receipt of such notice, during which period Lender shall have the right (but not the obligation) to remedy or cure such default within a reasonable time within the context of the nature of the default.

3. Non-Disturbance. So long as Tenant is not in default in the payment of rent, additional rent, or any other charges, or in the performance of any of the other terms, covenants or conditions of the Lease, Lender shall not, by reason of foreclosure of the Deed of Trust or the exercise of any other remedy, disturb Tenant in Tenant's occupancy of the Premises or Tenant's other rights arising out of the Lease during the original or any renewal Term, subject to the terms and conditions of this Agreement and except in accordance with the terms of the Lease.

4. Receipt of Rent. No person or entity exercising a right to receive the rents payable by Tenant under the Lease (if such right arises under the Deed of Trust or any assignment of the Lease in connection with the Loan secured by the Deed of Trust) shall thereby become obligated to Tenant for the performance of any of the terms, covenants, conditions and agreements of Landlord under the Lease. Landlord and Tenant agree that Tenant shall make all payments to be made by Tenant under the Lease to such person or entity upon receipt of written notice of the exercise of such rights, and Tenant shall not prepay any sums payable by Tenant under the Lease except as expressly provided therein. Such receipt of rent by any other party shall not relieve Landlord of Landlord's obligations under the Lease, and Tenant shall continue to look solely to Landlord for the performance of such obligations.

5. Succession and Attornment. If the interest of Landlord shall be acquired by Lender by reasons of foreclosure of the Deed of Trust or other proceedings brought to enforce

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 13 of 15

the rights of the holder thereof, by deed in lieu of foreclosure or by any other method, and if Lender succeeds to the interest of Landlord under the Lease, then the Lease and the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the terms of the Lease or as provided herein, and Tenant shall be bound to Lender under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining, and any extensions or renewals thereof which may be effected in accordance with the option therefor contained in the Lease, if any, with the same force and effect as if Lender were the landlord under the Lease. Tenant does hereby attorn to Lender as Tenant's landlord, said attornment to be effective and self operative without the execution of any other instruments on the part of any party hereto immediately upon Lender's succeeding to the interest of Landlord under the Lease, and Lender shall recognize and accept Tenant as Lender's tenant thereunder and perform all of Landlord's obligations thereunder thereafter accruing subject to the terms and conditions of this Agreement. Tenant agrees, however, to execute and deliver at any time and from time to time, upon the request of Lender or of any holder(s) of any of the indebtedness of other obligations secured by the Deed of Trust or any purchaser, any instrument or certificate which, in the sole judgment of the requesting party may be necessary or appropriate (in any such foreclosure proceeding or otherwise) to evidence such attornment. Tenant hereby irrevocably appoints Lender and any other future holders of the Note or other obligations secured by the Deed of Trust or any purchaser at any foreclosure or trustee's sale, jointly and severally, the agent and attorney in fact of Tenant to execute and deliver for and on behalf of Tenant any such instrument or certificate. Such power of attorney becomes effective should Tenant fail to execute and deliver such instrument or certificate to the requesting party within three (3) days following receipt by Tenant and shall not terminate on disability of the principal. In the event of any such attornment, Tenant further waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right of election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure proceeding or trustee's sale.

6. Exculpation of Lender. In addition to and not in lieu of the provisions of this Agreement, Lender and any successor, transferee, or assignee acquiring any interest in the Real Property or the Premises or exercising any of Lender's rights with respect to the Deed of Trust provided any such party other than Lender shall have notified Tenant of its interest and notice address, shall not in any way or to any extent be:

(a) liable for any act or omission (including any breach of warranties or representations) of any prior landlord (including Landlord) in contravention of any provision of the Lease which is of a non-continuing nature, and as to those of a continuing nature which continue beyond the date on which Lender (or such successor, transferee or assignee) acquires title to the Premises, liable for any damages attributable to or arising out of the same (except that Lender shall be required to correct same); nor

(b) subject to any claims, offsets or defenses which Tenant might have against any prior landlord (including Landlord) except as expressly provided in the Lease and except for any inadvertent overpayments of percentage rent; nor

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 14 of 15

(c) liable for any rent or additional rent which Tenant might have paid for more than thirty (30) days in advance to any prior landlord (including Landlord except as expressly provided in the Lease and except for any inadvertent overpayments of percentage rent); nor

(d) bound by any agreement or modification of the Lease made without Lender's (or such successor's, transferee's or assignee's) consent; nor

(e) in any way responsible for any rental deposit, security deposit or other deposit which was delivered to any prior landlord (including Landlord) but which was not subsequently delivered to Lender; nor

(f) in any way responsible for any reimbursement for overpayment of additional rent in connection with the estimated operating expenses due under the Lease; nor

(g) in any way bound by any termination of the Lease made without Lender's prior written approval, unless such termination was made by Landlord pursuant to a breach by Tenant of any of its obligations under the Lease or due to the operation of any of the termination provisions contained in Article 14 (Damage and Restoration) or Article 15 (Eminent Domain) of the Lease; nor

(h) in any way responsible for any liability for the completion of any construction on the Real Property of tenant improvements to the Premises commenced, or agreed or represented to by any prior landlord (including Landlord); nor

(i) in any way responsible for any repairs or replacements to or required by the Premises arising prior to the date Lender takes possession of the Real Property; nor

(j) in any way responsible for any moving, relocation or refurbishment allowance or any construction of or payment or allowance for tenant improvements to the Premises or any part thereof for the benefit of Tenant; nor

(k) in any way responsible for any liability for the payment of any leasing commissions or other expenses for which any prior landlord (including Landlord) incurred the obligation to pay; nor

(l) in any way responsible for any notices given by Tenant to a prior landlord (including Landlord) unless a copy of the notice was also given to Lender.

7. Notices. All notices, demands, or requests, and responses thereto, required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been made when deposited in the United States mail, postpaid and registered or certified with return receipt requested; provided, that the time period in which a response to any notice, demand, or request must be given shall commence on the date the return receipt is signed or on the date delivery is refused by the addressee or cannot be made because of a change of address of which the sender was not notified. Any such notice shall be addressed as follows:

Case 2:08-cv-00335-BES-LRL Document 1-6 Filed 03/20/08 Page 15 of 15

If to Landlord: Hotspur Resorts Nevada, Inc.
221 N. Rampart Boulevard
Las Vegas, Nevada 89145

If to Lender: ______________________
______________________
______________________

If to Tenant: ______________________
______________________
______________________

or to such other address in the United States as Landlord, Lender or Tenant may designate by written notice in accordance with this paragraph.

8. Miscellaneous. This Agreement is governed by, and shall be construed and enforced in accordance with, the laws of the state of Nevada. In the event of any litigation (including appellate and bankruptcy proceedings) arising out of or in connection with this Agreement, the prevailing party shall be entitled to recover reasonable expenses, including attorney's fees and costs. This Agreement cannot be modified orally, but only by a writing signed by the party against whom enforcement of the change is sought. Whenever used in this Agreement and as the context may require or permit, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender shall include the other genders. Captions and paragraph headings contained in this Agreement are for convenience only and shall not affect its interpretation. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

9. Counterparts. This Agreement may be executed in counterparts, each of which shall be an original and all of which when taken together shall constitute one original document.

IN WITNESS WHEREOF, Landlord, Tenant and Lender have executed this Agreement as of the day and year first above written.

(Landlord)

Hotspur Resorts Nevada, Inc.,
a Nevada corporation

By______________________
Its______________________

Address: ______________________
______________________
______________________

Case 2:08-cv-00335-BES-LRL Document 1-7 Filed 03/20/08 Page 1 of 8

(Tenant)

______________________________

By______________________________
Its______________________________

Address: ______________________
______________________________
______________________________

(Lender)

______________________________

By______________________________
Its______________________________

Address: ______________________
______________________________
______________________________

Case 2:08-cv-00335-BES-LRL Document 1-7 Filed 03/20/08 Page 2 of 8

**Acknowledgment - Landlord**

STATE OF NEVADA )
) ss
COUNTY OF _________ )

The foregoing instrument was acknowledged before me this ____ day of _______, 200__, by__________________ as _____________________ of Hotspur Resorts Nevada, Inc., a Nevada corporation.

Notary:___________________________
Print

Notary Public, State of____________
My commission expires:_____________

**Acknowledgment - Tenant**

STATE OF NEVADA )
) ss
COUNTY OF _________ )

The foregoing instrument was acknowledged before me this ____ day of _______, 200__, by__________________ as _____________________ of ______________________.

Notary:___________________________
Print

Notary Public, State of____________
My commission expires:_____________

Case 2:06-cv-00335-BES-LRL Document 1-7 Filed 03/20/06 Page 3 of 8

**Acknowledgment - Lender**

STATE OF NEVADA )
) ss
COUNTY OF ________ )

The foregoing instrument was acknowledged before me this ____ day of _______, 200__, by__________________ as ____________________ of _____________________.

Notary:__________________________
Print

Notary Public, State of___________
My commission expires:____________

Case 2:08-cv-00335-BES-LRL Document 1-7 Filed 03/20/08 Page 4 of 8

**EXHIBIT "A"**
**LEGAL DESCRIPTION OF THE REAL PROPERTY:**

ALL OF PARCEL 1 AS SHOWN BY MAP THEREOF ON FILE IN FILE 82, PAGE 64 OF PARCEL MAPS IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA LYING WITHIN THE SOUTHWEST QUARTER (SW¼) OF SECTION 29, TOWNSHIP 20 SOUTH, RANGE 60 EAST, M.D.M., CITY OF LAS VEGAS, CLARK COUNTY, NEVADA.

# EXHIBIT 3

January 20, 2005

**<u>Via email</u>**

Andrew Jenkin
Director of Finance
J.W. Marriott Las Vegas
221 N. Rampart Blvd.
Las Vegas, NV 89145

**Re: Tenant Estoppel**

Dear Andrew:

In the spirit of your request related to the Tenant Estoppel and Subordination Agreement, I have deleted those paragraphs or sentences that might be subject to controversy. On the other hand, I am not suggesting by the elimination of these that there in fact is a controversy, but need to preserve my rights subject to my exploration of those comments and a legal review by our attorney.

If this satisfies your needs, fine, otherwise I will need some time to review and modify some of the onerous language contained in those documents.

If this is acceptable, please let me know and I will sign.

As always, if I can cooperate then I stand ready to do so.

Sincerely yours,

Jerrold S. Pressman

JSP/cb

KEYCLUB

November 14, 2005

Andrew Jenkin
Director of Finance
J.W. Marriott
221 N. Rampart Blvd.
Las Vegas, NV 89145

**Re: Plush Lounge**

Dear Andrew:

I appreciated the candid conversation we had the other day and hope to memorialize our position so that we can find a solution to the problem.

As you are aware, our club is now effectively open only two days a week, Fridays and Saturdays. The other days, Wednesdays and Thursdays, bring in revenue usually of less than $200. With this schedule, it makes it impossible for us to earn enough income to cover the rent.

At this point in time, two years after opening our doors, we still have no signage and no marquee to indicate what is happening at the club.

The original premise was to bring to the Summerlin area an extraordinary nightclub with a music and entertainment venue designed to attract the local residents. Without that signage and marquee, it is impossible for us to reach our clientele and as a result, we remain empty most of the time.

Our company has spent a fortune booking bands and events only to play them to a half empty club and later, talking to people in the area, who say "Oh, if I would have only known that they were there, we would have loved to have attended."

We were promised signage a year ago along with cooperation to influence hotel guests to use the club by creating programs including in-room television advertising, which also has never come to pass.

The primary dialog we have from the hotel when we try to advertise the club is their position that we stop mentioning that we are located in the J.W. Marriott. This creates extraordinary difficulties attempting to advertise and reach customers who are constantly saying they can't find us.

Andrew Jenkin
November 14, 2005
Page Two

In 2006, we are facing new competition from Red Rock who have all the signage and marquees they desire. As a point of information, any time we have been able to use the casino's marquee, we were able to double our patronage, sometimes even sell out, indicating that without that ingredient, we have a fatal flaw keeping us from operating a successful business.

All this leads to our effectively operating only two days a week and therefore using the benefits of the facility only two days a week and being expected to pay for seven.

The last time we discussed this in detail, you indicated to me that I should pay the outstanding CAM charges and that we would deal with it. I did that and talked to representatives of the owners who were compassionate, but sent me back to the Marriott management. During the time we were asked to sign the Estoppel Agreement, I had lengthy conversations where I received sympathy and discussed a moratorium on CAM charges until we actually had signage.

In conversations with you, I also suggested a flat rate or moratorium on CAM charges until we could solve these issues. At this time, we still have had no movement. If we are required to pay 7-day a week CAM charges, we are considering closing the operation.

I am a competitor, being able to utilize music, pool parties and entertainment. I have no doubt that with signage, we can fill the facility and ultimately contribute to the Casino and Hotel. Without this incentive to spend money on artists, because of our inability to reach the local residents, we are cutting our own throats.

We are asking for a continuation of the moratorium of CAM charges until such as a time as we receive proper signage and a negotiation of what future CAM charges should be based upon how many days we are open or a flat monthly rate.

In the spirit of attempting to continue our business on a viable basis, we look forward to your involvement and hope we can reach a solution soon.

Sincerely yours,

Jerrold S. Pressman
Chairman

JSP/cb

# EXHIBIT T

no copy

filed 10/26/07

DREIER STEIN & KAHAN LLP
John C. Kirkland (No. 149453)
Maribeth Annaguey (No. 228431)
The Water Garden
1620 26th Street
Sixth Floor, North Tower
Santa Monica, CA 90404
Telephone: (310) 828-9050
Facsimile: (310) 828-9101
Email: jkirkland@dskllp.com

Attorneys for Plaintiff
PLUSH LOUNGE LAS VEGAS, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| PLUSH LOUNGE LAS VEGAS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>HOTSPUR RESORTS NEVADA, INC.,<br><br>Defendant. | Case No. CV 06-2626 GW (JTLx)<br><br>**PLAINTIF PLUSH LOUNGE'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO COMPEL**<br><br>**[Declarations of John C. Kirkland and Monique Bonaparte filed concurrently herewith]**<br><br>Discovery Cut-off: October 5, 2007<br>Pretrial Conf.: January 10, 2008<br>Trial Date: January 22, 2008 |

Def(s) ___ Plf(s) 32 EXHIBIT for I.D.
MITCH A. GENSER, CSR #7239 NP
Date: 6/26/17
Witness: Kirkland

## I. INTRODUCTION

Plaintiff Plush Lounge Las Vegas, LLC has produced scores of pages of substantive interrogatory answers and over 25,000 pages of documents in response to Defendant's hundreds of requests. Defendant has received all reasonably responsive documents and information to which it is entitled.

In flagrant violation of the Court's October 9, 2007 order, Defendant now seeks to compel further supplemental responses to Special Interrogatory Nos. 13, 14, 15, 16, 17, 21, 22, 23 and 24, *after* expiration of the discovery cut-off, and without making *any* prior attempt to meet and confer. The October 9 order expressly stated: "The Joint Stipulation shall fully comply with Local Rule 37-2.1 and shall address **only** the discovery requests for which Plush has not previously agreed to provide supplemental responses." (Emphasis added.) Plush agreed to provide, and did provide, supplemental responses to those interrogatories. Defendant apparently deemed the responses insufficient, since it included them in its draft joint stipulation. Defendant made absolutely no attempt to meet and confer, and their inclusion in the stipulation—two days before it was due—was the first indication Plush had that Defendant was apparently unsatisfied with the supplemental responses. Defendant's motion obviously should be denied as to these responses.

Despite the reams of paper Defendant unnecessarily wasted to bring numerous, allegedly unresolved discovery issues to this Court's attention, there are *really only* ***three*** *discrete categories of discovery at issue:* (1) documents relating to a separate nightclub in Los Angles called the Key Club;[1] (2) documents from a collection lawsuit between Plush and EPD Investment Co., LLC; and (3) documents relating to contact information, job duties and prior business experience of "all persons who worked for, or provided services to, Plush" and did not reside

[1] This lawsuit concerns the Plush Lounge nightclub that was located in the Summerlin area on the edge of Las Vegas, Nevada.

in Las Vegas. Each category seeks information and documents that are not even marginally related to the claims and defenses at issue. These categories are massively overbroad and seek information from and about third parties that are not parties in this lawsuit. Defendant's motion to compel further responses as to these categories should be denied on the grounds that they seek confidential and proprietary information, are extraordinarily overbroad and unduly burdensome, and are manifestly irrelevant and not remotely reasonably calculated to lead to the discovery of admissible evidence.

As to the remaining requests and interrogatories purportedly at issue, Defendant has had several opportunities to obtain the information it seeks but failed to take steps to acquire it. Instead, Defendant conveniently leaves out its lack of diligence and non-responsiveness throughout the discovery process to create the impression that a Court Order is necessary for Plush to comply with its discovery obligations. Not so. By way of example, Defendant complains that several financial documents have not yet been produced. The truth is that Plush has made all of those documents, and others, available to Defendant since June. Indeed, Defendant's counsel spent hours reviewing box after box of documents in Plush's counsel's offices. Plush also repeatedly offered to provide copies, insisting only that Defendant agree to pay the copy costs, which Defendant refused to do until after its motion was filed (and Plush has now provided copies to Defendant). As to requests and interrogatories not encompassed within the three categories of discovery above, Plush respectfully requests that the Court deny Defendant's motion to compel on the ground that those requests and interrogatories are not truly at issue and are not properly before the Court.

## II. FACTUAL STATEMENT

### A. Procedural Posture

Plush filed the instant lawsuit in April of 2006. The discovery cut-off was October 5, 2007. Trial is scheduled to begin January 22, 2008.

### B. Plush's Complaint

Plaintiff operated the Plush Lounge nightclub located within the JW Marriott Las Vegas Resort & Spa in the Summerlin area of suburban Las Vegas. Using flagrant misrepresentations and baseless claims, Defendant fraudulently induced Plush to enter into a management agreement with Defendant's tenant, and to spend millions of dollars remodeling Defendant's premises, after which Defendant and its agents systematically drove Plush out of business through a combination of corporate and personal greed, mismanagement and complete disregard for Plush's rights. Plush filed this federal antitrust and unfair competition action, with pendant diversity claims for interference with contract and fraud, against Defendant for stealing and effectively destroying the value of millions of dollars spent by Plush in remodeling and operating the nightclub that Defendant destroyed.

### C. Defendant's Discovery and the Parties' Meet And Confer Efforts

Defendant paints a picture of itself as having diligently and relentlessly sought further responses and production of documents over the past year. This is wrong for several reasons.

First, Defendant contends that Plush has withheld damages and "back-up" financial documents for over a year. Plush made those very documents available to Defendant and indeed, Defendant's counsel personally inspected them in June 2007. (Declaration of John C. Kirkland ("Kirkland Decl."), ¶ 21). Further, due to Plush's significant productions thus far and the additional costs of producing seven more boxes of documents, Plush advised Defendant that Defendant would have to pay for copies of those documents. (*Id.* at ¶ 22). *See Cont. Ill. Bank &*

*Trust v. Caton*, 136 FRD 682, 690 (D KS 1991) (requesting party pays for cost of copying documents), *Bills v. Kennecott Corp.*, 108 FRD 459, 462 (D UT 1985) (same).

Rather than simply agreeing to pay for Plaintiff to make copies, arranging for its own copy service, or suggesting a service to Plaintiff (who obtained three estimates), Defendant delayed actually obtaining the documents by purporting to this Court to have been incapable of obtaining the documents without information from Plush. Plush has provided Defendant with estimates for copying and has repeatedly indicated to Defendant that the documents remain available for copying. Plush even copied at its own cost hundreds of pages that Defendant had separately marked during its inspection. Plush was unwilling to foot the bill for nearly 15,000 pages of additional documents, and Defendant never agree to pay to have them copied until Friday, September 28, 2007 (when they knew Plush's counsel was in four days of back-to-back depositions in this case). Regardless, Plaintiff complied, had the documents copied, and delivered them to Defendant.

Second, prior to filing its proposed motion on October 2, 2007, Defendant had not met and conferred with Plush as to alleged deficiencies in the supplemental responses Plush served on September 14, 2007. (Kirkland Decl., ¶ 14). Had Defendant made Plush aware of those issues, the parties likely would have been able to meet and confer successfully (indeed, the parties were previously able to resolve their issues as to 108 of 138 requests and interrogatories at issue). Consistent with its intent to comply with its discovery obligations, Plush prepared and submits with this opposition an index of the categories of documents produced (totaling 26,034 pages of documents), which should address Defendant's concerns as to the interrogatories identified in its joint stipulation. (Declaration of Monique Bonaparte ("Bonaparte Decl."), ¶ 2).

Third, it cannot be ignored that Defendant continues to file motions to compel against Plush without completing the meet and confer process or accurately recording the parties' meet and confer efforts. (Kirkland Decl., ¶¶ 12-18).

Moreover, Defendant's proposed joint stipulation was in violation of the Court's prior order, and failed to comply with the requirements of LR 37. For those reasons, Plush has objected to the form and substance of the proposed joint stipulations and requested that Defendant revise them before Plush executed the proposed joint stipulations. (*Id.* at ¶ 12, 16). Plush provided its own form of proposed joint stipulation, which fully complied with the Court's order and the applicable rules, a copy of which is attached as Exhibit A for Court's convenience. Defendant rejected all of Plush's changes (even to its own arguments), refused to meet and confer, and filed without Plush's signature. (*Id.* at ¶¶ 12-14, 16-18). This most recent filing is Defendant's third time filing a joint stipulation, without Defendant's signature, after ignoring Plush's requests to correct the joint stipulation. (*Id.*). Each of these motions has required Plush to expend additional time and effort to correct the issues in Defendant's papers.

The first motion, filed on or about August 20, 2007, did not even contain Plush's portion of the joint stipulation. (Kirkland Decl., ¶ 3). So, on August 22, 2007, the Court vacated the hearing on the motion and ordered the parties to meet and confer about the discovery at issue before filing another motion to compel.

Immediately upon receiving the August 22 Order, counsel for Plush reminded defense counsel that he would be out of the country beginning August 24. (Kirkland Decl., ¶ 4). He invited defense counsel to meet and confer on August 23—the day after he pulled the August 22 Order off Pacer (Defendant has failed to provide Plush with any copies of any orders). (*Id.* at ¶ 4). Defense counsel did not respond until after Mr. Kirkland's proposed meeting time and insisted on meeting and conferring on August 28 when Mr. Kirkland would be unavailable, even if it

meant meeting with another attorney from his office. (*Id.* at ¶ 5). He pointed out that such a meet and confer may not be as productive and that it would likely prolong resolution of the pending discovery issues. (*Id.*). Defense counsel remained adamant about meeting on August 28 with any representative from Plush counsel's offices. (*Id.*). The parties met and conferred on August 28, 2007 with no resolution—as expected in light of lead counsel's unavailability. (*Id.* at ¶ 6). So, on August 30, 2007, Defendant served a proposed joint stipulation and requested that Plush provide its portions by noon on September 11, 2007. The parties met and conferred again on September 10, 2007 during which time, they were able to agree on most of the discovery requests and interrogatories at issue.[2] (*Id.* at ¶ 7).

Despite their meet and confer efforts, Defendant demanded that Plush provide its portions for a joint stipulation by noon on September 11, 2007—even as to those interrogatories and requests no longer at issue. (Kirkland Decl., ¶ 9). Plush timely complied with Defendant's demands. (*Id.* at ¶ 10). In addition, as promised during their meet and confer efforts, Plush supplemented its responses and production on September 14. (*Id.* at ¶ 11).

Over a week later after Plush provided its inserts to the joint stipulation, Defendant returned the motion to compel for Plush to execute for filing on September 19. (Kirkland Decl., ¶ 12). But, Defendant failed to include any of Plush's supplemental responses in the joint stipulation and made it seem that significantly more requests and interrogatories were at issue. (*Id.*). Plush requested that Defendant revise the joint stipulation so that it accurately reflected Plush's discovery responses and the parties' meet and confer efforts. (*Id.*). Defendant repeatedly refused. (*Id.*). Instead, it filed an *ex parte* application seeking leave to have its motion to compel heard after the discovery cut-off. (*Id.* at ¶ 13).

2 Of the 138 different interrogatories and requests listed in Defendant's Joint Stipulation, only 29 interrogatories and requests remained at issue after the parties met and conferred. Additionally, most of those interrogatories and requests (22 of them) all seek information related to the Key Club – a club that is separate and distinct from the club at issue in this litigation.

On or about October 9, 2007, the Court ordered that the parties file a joint stipulation by October 16, 2007 limited to "only the discovery requests for which Plush has not previously agreed to provide supplemental responses" ("October 9 Order"). (Order dated October 9, 2007). Despite the Court's explicit instructions, Defendant provided a proposed joint stipulation that still contained interrogatories to which Plush had previously agreed to, and did, provide supplemental responses. Plush objected, but Defendant did not remove those interrogatories. (Kirkland Decl., ¶ 16). Thus, Plush prepared its own version of the joint stipulation and provided it to Defendant. (*Id.* at ¶ 17). Plush did not receive a response from Defendant to its proposed joint stipulation or to its request for status on the joint stipulation. (*Id.* at ¶ 18). Instead, Plush received a copy of Defendant's motion to compel, which it had filed again, without Plush's signature and over Plush's objection to the substance and form. (*Id.*).

## III. DEFENDANT'S MOTION AS TO THE DISCOVERY THAT IS STILL AT ISSUE SHOULD BE DENIED

### A. Defendant Failed To Meet And Confer About Any Deficiencies In Plush's Responses

Despite this Court's October 9 Order to limit the issues in the joint stipulation to "only the discovery requests for which Plush has not previously agreed to provide supplemental responses," Defendant included 8 interrogatories to which Plush agreed to supplement its responses and did supplement. Defendant alleged for the first time via its motion to compel that the responses were deficient. Had Defendant met and conferred rather than waste more time and resources trying to force other issues before this Court, the parties likely would have been able to resolve the issue in light of their prior success at narrowing the issues in dispute. Notwithstanding Defendant's failure to meet and confer, Plush prepared, and submits with this Opposition, an index of the categories of documents produced

which should assist Defendant in compiling the information responsive to the interrogatories at issue.

**B. Documents And Information Regarding The Key Club—A Separate And Independent Club Than Plush—Are Not Relevant To This Litigation And Should Not Be Produced**

This dispute solely concerns the "Plush Lounge" nightclub in Las Vegas, Nevada. Nevertheless, Defendant improperly served 21 requests concerning the "Key Club," a different nightclub in West Hollywood, California, owned and operated by third parties S.C. Club, L.P. and S.C. Club, Inc.[3] Essentially, Defendant simply "cut and paste" the same broad requests about Plush and asked them about Key Club, including confidential financial records, and virtually every document concerning any aspect of that club's operations, personnel, and advertising efforts — none of which are at issue in the present case.

Discovery is limited to that which is relevant to the claims and defenses in this matter. *Guidry v. United States*, Civ. No. 03-2647 Section "J" (2), 2004 U.S. Dist. LEXIS 25785 (E.D. La. 2004). Discovery relating to the subject matter of the litigation is only permissible with leave of Court for good cause shown. *Id.*

Defendant claims that documents pertaining to the Key Club are relevant because Plush drew on, and devised its marketing and business plans based on its experience operating the Key Club in Hollywood. The fact that Plush drew on its experience operating and marketing the Key Club in Hollywood, California, does not mean that documents related to the Key Club automatically relate to the claims and defenses in this litigation. Defendant is not automatically entitled to

---

[3] The appropriate manner of seeking such information is not requests for production of documents, which can only be directed to a party under F.R.Civ.P. 34(a), but by subpoena under F.R.Civ.P. 45. *See Clark v. Vega Wholesale, Inc.*, 181 F.R.D. 470, 472 (D. NV 1998).

seek all documents related to the Key Club's operations, financial status, investors, marketing plans, policies, and procedures and certainly not without a greater showing as to why a third party's confidential, proprietary and trade secret information should be produced. However, by Defendant's logic, if a party engaging in a new venture draws on prior experience to develop and share the new venture and a dispute arises involving the new venture, the confidential, proprietary and financial information pertaining to that party's prior experience are *ipso facto* relevant to any dispute involving the new venture. That is not the law.

A party seeking discovery is required to show that the information sought is relevant to the claims and defenses at issue. Fed. R. Civ. P. 26(b)(1). Additionally, where as here, the party seeks discovery of a third party's business plans, operations, management, financial reports and projections, marketing plans, and personnel contact information and experience, it must certainly demonstrate that the need for such information outweighs the significant privacy rights of the third party entity and individuals that are being compromised by the discovery. *Perry v. State Farm*, 734 F.2d 1441, 1447 (11th Cir. 1984); *Rubin v. Regents of Univ. Cal.*, 114 F.R.D. 1, 2 (N.D. Cal. 1986). Defendant fails to make any such showings—either as to relevance or as to the need to infringe the privacy rights of third parties.

Here, the parties are litigating Plush's claims of (1) illegal maintenance of a monopoly in the relevant market under the Sherman Act; (2) declaratory relief under the Lanham Act; (3) intentional interference with contract and prospective economic advantage; (4) fraud; (5) conversion; and (6) unfair competition. The claims are based, essentially, on Defendant's failure to fulfill its promises to Plush to market and advertise Plush Lounge and Defendant's intentional conduct that drew business away from Plush Lounge. Defendant, on the other hand, seems to contend that Plush is at fault for Plush Lounge's failure. These claims and defenses

do not in any way implicate the documents Defendant seeks pertaining to the Key Club.

Nevertheless, Defendant insists that the Key Club documents are relevant because, according to Defendant, Plush Lounge and the Key Club commingle assets, finances and personnel. Assuming that were true, Defendant still fails to articulate why the Key Club's documents are relevant. Even if there were commingling of assets, finances and personnel, Defendant does not address why the Key Club's documents regarding its own operations are necessary or relevant to establish or defend the claims in this action.

The following sections identify the various categories of documents Defendant seeks regarding the Key Club. Each category is clearly irrelevant and overbroad.

1. **Financial Documents Regarding The Key Club (Request Nos. 24, 30, 36, 39, 42, 45, 48, 63, 66, 69)**

Defendant seeks documents regarding the Key Club's revenue, expenses, profits, losses, profit and loss statements, budgets, business plans and projections. As set forth above, the Key Club is a separate and distinct entity from Plush. Its financial status and history is not, and should not be, at issue in this case.

Defendant tries to suggest relevance by arguing that the Key Club documents will be relevant to Plush's damage claims. This is simply not true. Each entity stands alone. The fact that companies have overlap in their ownership structure does not automatically mean that a dispute involving one company's profitability or business losses subjects the other to onerous discovery delving into its financial health. If transactions take place between two companies, they are documented and reflected in each company's accountings. Thus, it is unnecessary to violate another company's privacy rights by demanding that it produce all of its financial books and records simply because it transacted business with a company embroiled in litigation. Certainly a greater showing than relevance (which

Defendant cannot show) is necessary to demonstrate that a party should be required to disclose its confidential, proprietary and trade secret information.

**2. Documents Regarding Key Club's Operations and Management (Request Nos. 51, 57)**

Defendant seeks documents regarding the Key Club's operations and its management structure. The Key Club's operations are simply not relevant to the claims and defenses at issue in this litigation, i.e., Plush's operations and management. The two venues are completely different operations, with different histories, located in different geographic areas, and cater to different markets. The Key Club is a club in West Hollywood, California. It is a stand-alone club located on the Sunset Strip—home to many other trendy, Hollywood nightspots. It has been at that location for many, many years and attracts clientele from Los Angeles and the surrounding counties. Plush, on the other hand, was a new venture, opened in 2004 in Summerlin, Nevada, a small community just outside of Las Vegas. Plush was housed in a resort and expected to draw its clientele from within the resort and the surrounding community.

More importantly, the documents regarding the Key Club's operations and management structure constitute the Key Club's trade secrets and are confidential and proprietary. Defendant has not shown any reason for requiring a third party to produce its confidential, proprietary information for litigation in which it is not involved.

Documents regarding how the Key Club manages and operates its business have no relevance to how Plush managed and operated its business.

3. **<u>Documents Regarding Key Club Employees, Investors And Anyone Involved With The Key Club (Request Nos. 21, 33, 54, 60, 89, 93)</u>**

These requests, in effect, seek the production of any documents regarding any interaction third parties had with the Key Club, itself a third party. Defendant impermissibly seeks the production of:

- personal, contact and financial information pertaining to employees, vendors, investors, and members of Key Club;
- all of Key Club's communications with its investors in the Key Club <u>after</u> their investment;
- all lawsuits involving the Key Club; and
- all complaints against the Key Club.

There is absolutely no basis to demand that the Key Club—a third party with no claim in this litigation—produce any of this information. The requests are clearly overbroad and seek irrelevant, confidential information. And, even more objectionable, they infringe the privacy rights of effectively any third parties who happened to work with or for the Key Club or complained about the Key Club. It is impermissible for Defendant to require Plush to require the Key Club to provide contact information for those third parties or divulge its communications with them – especially without their knowledge or involvement in the dispute at hand. In particular, in California, the Key Club may not release information about its employees without their prior consent. See CAL. CIV. PROC. CODE § 1985.6.

Moreover, as discussed above, personal, contact and financial information pertaining to employees, vendors, investors, and members of Key Club constitutes the Key Club's trade secrets and is confidential and proprietary. Defendant has not shown any reason for requiring a third party to produce its confidential, proprietary information for litigation in which it is not involved.

Again, how are the issues that the Key Club deals with (e.g., financial or consumer related) in any way relevant to the issues with which Plush struggled during its brief tenure?

Defendant's claim that the information is relevant lacks any basis in law. *See Perry v. State Farm*, 734 F.2d 1441, 1447 (11th Cir. 1984); *Rubin v. Regents of Univ. of Cal.*, 114 F.R.D. 1, 2 (ND. Cal. 1986).

4. **Documents Regarding Key Club's Marketing And Advertising Plans (Request Nos. 12, 15, 18)**

Defendant claims that the Key Club's marketing, advertising or promotion plans are relevant because Plush modeled its marketing and advertising plans on the Key Club. Assuming that were true, that does not make the Key Club's marketing plans relevant. The relevant issues pertain to Plush's plans and expectations for its business. Undoubtedly, each new business draws on prior experience and examples from other business. That, in and of itself, does not give an opposing party carte blanche to seek the business or marketing plans for those other businesses. To suggest otherwise would open the door for competitors and new venturers to demand access to the sensitive and proprietary plans of their successful (or not so successful) competitors even though such plans have little or nothing to do with the actual issues in dispute.

Also, the documents regarding the Key Club's marketing, advertising and promotion plans constitute the Key Club's trade secrets and are confidential and proprietary. Defendant has not shown any reason for requiring a third party to produce its confidential, proprietary information for litigation in which it is not involved.

Defendant's overly intrusive discovery should be denied.

### C. <u>Documents And Information Regarding Former Employees Are Not Relevant And Invade The Privacy Rights Of Individuals Not Parties To This Litigation (Request Nos. 106-108)</u>

These requests seek the personal contact information for each and every employee, vendor or service provider of Plush Lounge. Plush initially objected to this request on the grounds that it is overbroad. As drafted, the request, quite literally, seeks information about *anyone* who ever had *anything* to do with the nightclub during its existence.

Over the course of counsels' meet and confer efforts, Defendant agreed to narrow the scope of the interrogatory to those persons involved in management of Plush Lounge's operations. Accordingly, Plush agreed to produce subject to that limitation.

Defendant, however, also seeks production of all documents pertaining to <u>all</u> persons who worked for, or provided goods or services to, Plush Lounge and that did not reside in Las Vegas, Nevada at the time they provided those services. Not only does the information seek confidential, personal information of Plush's former employees (which Plush cannot disclose without the individuals express knowledge and consent), the proposed limitation does not reasonably limit the scope of the request to categories of documents relevant to the claims and defenses in this litigation. By way of example, there is absolutely no reasonable basis to provide documents and information regarding a host that worked for Plush Lounge and lived in Boulder City or Laughlin at the time he worked for Plush Lounge. That is exactly how Defendant proposed to "narrow" the scope of the request.

This Court should deny Defendant's overbroad and irrelevant requests.

**D. Documents And Information Regarding The EPD Lawsuit Are Not Relevant To This Litigation And Should Not Be Produced (Request No. 72)**

Defendant seeks all documents from a lawsuit between Plush and EPD Investment Co., LLC ("EPD"). EPD filed the lawsuit in September 2006 for breach of contract against Plush for its failure to repay a loan. Defendant purports to know enough about the litigation to call it a "sham" but cannot identify the issues within that litigation which it contends are relevant here.

A party seeking discovery of material from other litigation must still tailor the discovery to relate to the claims and defenses in the pending action. Requests seeking the production of all documents from other litigation, without limit to the issues in dispute, are overly broad and unduly burdensome. *See, e.g.*, *Wyeth v. Impax Laboratories, Inc.*, No. Civ. A. 06-222-JJF, 2006 WL 3091331 (D. Del. 2006). In *Wyeth* the court denied defendant's motion to compel the production of documents from prior litigation involving the same patent as the one in the pending litigation because the request was overly broad and burdensome. The court found that defendant failed to demonstrate entitlement to documents from the prior litigation that involved matters not at issue in the current litigation. It reasoned that defendant "has not shown that the documents requested from [prior] litigation, beyond what Wyeth has already produced or offered to produce, are critical to resolving the issues before the Court."

Here, as in *Wyeth*, the issues in the EPD Lawsuit are not even marginally relevant to this one. To that end, Plush should not be required to produce any documents in response to this request unless Defendant can articulate some theory that demonstrates that certain documents from the EPD Lawsuit are critical to resolving the disputes in this litigation.

## IV. REQUESTS AND INTERROGATORIES THAT ARE NOT AT ISSUE

### A. Plush Has Made The Financial And Back-Up Documents Available For Defendant For Several Months

Defendant complains that Plush has withheld critical financial and "back-up" damages documents. As set forth above, Defendant's complaints are without merit. Plush has made the documents available to Defendant for several months. Defendant's counsel personally inspected them, and Plaintiff offered to provide copies at any time on request. After months of balking, Defendant finally agreed to pay for the copies, and Plaintiff had them copied. This is a non-issue.

### B. Defendant Failed To Meet And Confer About Any Deficiencies In Plush's Responses

Despite this Court's October 9 Order to limit the issues in the joint stipulation to "only the discovery requests for which Plush has not previously agreed to provide supplemental responses," Defendant included 8 interrogatories to which Plush agreed to supplement its responses and did supplement. Defendant alleged for the first time via its motion to compel that the responses were deficient. Had Defendant met and conferred rather than waste more time and resources trying to force other issues before this Court, the parties likely would have been able to resolve the issue in light of their prior success at narrowing the issues in dispute. Notwithstanding Defendant's failure to meet and confer, Plush prepared, and submits with this Opposition, an index of the categories of documents produced which should assist Defendant in compiling the information responsive to the interrogatories at issue.

## V. SANCTIONS ARE NOT WARRANTED AS DEFENDANT HAS STOOD IN ITS OWN WAY TO OBTAIN THE DISCOVERY IT SEEKS

As set forth above, Defendant has been obstinate in its quest to bring a discovery motion before this Court, no matter the merits. Thus, it seeks every

opportunity to create conflict, real or artificial, and presses forward with requests for sanctions even in the face of a non party's trade secret concerns and its economic interest to safeguard valuable proprietary records from disclosure to Defendant, a predatory competitor, who has demonstrated the capacity to destroy Plush's Las Vegas enterprise. Plush has not engaged in any sanctionable conduct by asserting the statutory privacy rights of employees that are strangers to this lawsuit and who have not waived their statuary rights to keep those records private.

Plush has pressed forward with unnecessary motion practice even in the face of concerns and objections from Plush as to the proper substance and form of the stipulations Defendant intends to file. Plush is then forced to incur time and money to address Defendant's tactics and all the while, the real issues in dispute are ignored and remain undecided. Further, Plush has made available to Defendant the documents it claims to need. There is absolutely no basis for Defendant's request for sanctions against Plush or its counsel.

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion to compel and request for sanctions should be denied in its entirety.

DATED: October 26, 2007 DREIER STEIN & KAHAN LLP

By ____________________
John C. Kirkland
Attorneys for Plaintiff
PLUSH LOUNGE LAS VEGAS, LLC

# EXHIBIT U

36

**SHERRY ANNE LEAR**
**Attorney at Law**
Bar No. 149878
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, CA 90274
Telephone: (310) 265-9010
Facsimile: (310) 265-9011

Attorney for Plaintiff EPD INVESTMENT CO., LLC

FILED
LOS ANGELES SUPERIOR COURT
JAN 03 2007
JOHN A. CLARKE, CLERK
BY B. GREGG, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| EPD INVESTMENT CO., LLC, A CA LLC, Plaintiff, vs. PLUSH LOUNGE LAS VEGAS, LLC, A CA LLL, Defendant. | CASE NO. BC 358166<br>STIPULATION FOR ENTRY OF JUDGMENT<br>Case Assigned to: Dept. 36 Judge Gregory Alarcon |

RECEIVED
DEC 21 2006
A. Caballero

IT IS HEREBY STIPULATED between Plaintiff EDP INVESTMENT CO., LLC, a California limited liability company ("Plaintiff"), and Defendant PLUSH LOUNGE LAS VEGAS, LLC, a California limited liability company ("Defendant") that judgment may and shall be entered in the above-entitled action as follows:

In favor Plaintiff EDP INVESTMENT CO., LLC, a California limited liability company, and against Defendant PLUSH LOUNGE LAS VEGAS, LLC, a California limited liability company, the principal sum of $2,397,370.77, plus interest at the rate of 10% per annum from and after April 15, 2003 ($656.81 per day) to the date of entry of judgment pursuant to the Proposed Judgment attached hereto as Exhibit "A."

It is further agreed that:

This Stipulation may be executed in multiple counterparts and/or facsimile signature, each of which shall be deemed an original agreement and all of which shall constitute one agreement, which will serve as an original.

Defendant PLUSH LOUNGE LAS VEGAS hereby waives, to the fullest extent permitted by law, its right to contest, vacate, set aside or appeal any judgment entered pursuant to this stipulation or to attack the same, directly or collaterally.

The foregoing is agreed to by:

Dated: December ___, 2006

EDP INVESTMENT CO., LLC

By: ____________________

Dated: December 20, 2006

SHERRY ANNE LEAR, Esq.
Attorney for Plaintiff EDP INVESTMENT CO., LLC

Dated: December ___, 2006

PLUSH LOUNGE LAS VEGAS, LLC

By: ____________________

TISDALE & NICHOLSON, LLP

Dated: December 18, 2006

By: ____________________
GUY NICHOLSON, ESQ.
Attorney for defendant PLUSH LOUNGE LAS VEGAS, LLC

It is further agreed that:

This Stipulation may be executed in multiple counterparts and/or facsimile signature, each of which shall be deemed an original agreement and all of which shall constitute one agreement, which will serve as an original.

Defendant PLUSH LOUNGE LAS VEGAS hereby waives, to the fullest extent permitted by law, its right to contest, vacate, set aside or appeal any judgment entered pursuant to this stipulation or to attack the same, directly or collaterally.

The foregoing is agreed to by:

Dated: December 19, 2006

BDP INVESTMENT CO., LLC

By: ____________________

Dated: December ___, 2006

____________________
SHERRY ANNE LEAR, Esq.
Attorney for Plaintiff BDP INVESTMENT CO., LLC

Dated: December 19, 2006

PLUSH LOUNGE LAS VEGAS, LLC

By: ____________________

TISDALE & NICHOLSON, LLP

Dated: December 18, 2006

By: ____________________
GUY NICHOLSON, ESQ.
Attorney for defendant PLUSH LOUNGE LAS VEGAS, LLC

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF**

I have read the foregoing ______________________________ and know its contents.

**CHECK APPLICABLE PARAGRAPHS**

___ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

___ I am ___ an Officer ___ a partner ________ ___ a ____________ of ______________ a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ___ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ___ The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

___ I am one of the attorneys for ______________________________ a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ____________________, at ____________________, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

______________________ Type or Print Name ______________________ Signature

## PROOF OF SERVICE

1013a (3) CCP Revised 5/1/88

**STATE OF CALIFORNIA, COUNTY OF** LOS ANGELES

I am employed in the county of LOS ANGELES, State of California.

I am over the age of 18 and not a party to the within action; my business address is: 609 DEEP VALLEY DRIVE, SUITE 200, ROLLING HILLS ESTATES, CA 90274

On, December 20, 2006 I served the foregoing document described as STIPULATION FOR ENTRY OF JUDGMENT

______________________ on DEFENDANT in this action

___ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

X by placing ___ the original X a true copy thereof enclosed in sealed envelopes addressed as follows:

Guy C. Nicholson, Esq.
Tisdale & Nicholson, LLP
2029 Century Park East, Suite 900
Los Angeles, CA 90067

X **BY MAIL**

___ *I deposited such envelope in the mail at ______________________, California. The envelope was mailed with postage thereon fully prepaid.

X As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Rolling Hills Estates California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on December 20, 2006, at Rolling Hills Estates, California.

___ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on ____________________, at ____________________, California.

X (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Lory Allison ______________________ [signature]

Type or Print Name Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX OR BAG)

**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal Solutions Plus Rev. 7/99

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court
JAN 03 2007
John A. Clarke, Executive Officer/Clerk
By B. Gregg, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| EPD INVESTMENT CO., LLC, A CA LLC, Plaintiff, vs. PLUSH LOUNGE LAS VEGAS, LLC, A CA LLC, et. al., Defendants | CASE NO. BC 358166 ~~[PROPOSED]~~ JUDGMENT PURSUANT TO STIPULATION CASE ASSIGNED TO DEPT. 36 JUDGE GREGORY ALARCON |

PURSUANT TO THE STIPULATION ENTEREDINTO BETWEEN THE PARTIES IN THIS MATTER AND PRESENTED TO THIS COURT,

IT IS ADJUDGED, ORDERED AND DECREED that Plaintiff EDP INVESTMENT CO., LLC, a California limited liability company, have and recover from Defendant PLUSH LOUNGE LAS VEGAS, LLC, a California limited liability company, the principal sum of $2,397,370.77, plus interest at the rate of 10% per annum ($656.81 per day) from and after April 15, 2003 to the date of entry of this judgment, in the amount of $__________ for a total sum of $__________.

Dated: 03 JAN 2007 ~~2006~~

Gregory W. Alarcon
HON. GREGORY W. ALARCON
Judge of the Superior Court



01/05

# VERIFICATION

STATE OF CALIFORNIA, COUNTY OF

I have read the foregoing ______________________________ and know its contents.

[ ] CHECK APPLICABLE PARAGRAPHS

[ ] I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[ ] I am [ ] an Officer [ ] a partner ________ [ ] a ________ of ________

________________________________________,

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. [ ] I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. [ ] The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[ ] I am one of the attorneys for ________________________________

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ________________, at ________________, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

________________________ ________________________

Type or Print Name Signature

# PROOF OF SERVICE

1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of LOS ANGELES, State of California.

I am over the age of 18 and not a party to the within action; my business address is: 609 DEEP VALLEY DRIVE, SUITE 200, ROLLING HILLS ESTATES, CA 90274

On, JANUARY 5, 2007 I served the foregoing document described as JUDGMENT PURSUANT TO STIPULATION

________________________ on DEFENDANT in this action

[ ] by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

[X] by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

Guy C. Nicholson, Esq.
Tisdale & Nicholson, LLP
2029 Century Park East, Suite 900
Los Angeles, CA 90067

[X] BY MAIL

[ ] *I deposited such envelope in the mail at ________________, California. The envelope was mailed with postage thereon fully prepaid.

[x] As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Rolling Hills Estates California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on JANUARY 5, 2007, at Rolling Hills Estates, California.

[ ] **(BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

Executed on ________________, at ________________, California.

[X] (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ ] (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Lory Allison [signature]

Type or Print Name Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)

**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal Solutions Plus Rev. 7/99

FD

FILED
LOS ANGELES SUPERIOR COURT
FEB 01 2007
JOHN A. CLARKE, CLERK
BY B. GREGG, DEPUTY

REC'D
JAN 08 2007
FILING WINDOW

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| EPD INVESTMENT CO., LLC, A CA LLC, Plaintiff, vs. PLUSH LOUNGE LAS VEGAS, LLC. A CA LLC, et. al., Defendants | CASE NO. BC 358166<br>~~[PROPOSED]~~ FINAL JUDGMENT<br>CASE ASSIGNED TO DEPT. 36 JUDGE GREGORY ALARCON |

IT IS ADJUDGED, ORDERED AND DECREED that Plaintiff EDP INVESTMENT CO., LLC, a California limited liability company, have and recover from Defendant PLUSH LOUNGE LAS VEGAS, LLC, a California limited liability company, the principal sum of $2,397,370.77, plus interest at the rate of 10% per annum ($656.81 per day) from and after April 15, 2003 to the date of January 3, 2007 (for a total of 993 days) in the amount of $652,212.33 plus costs in the amount of $385.00 for a total sum of $3,049,968.10.

Dated: 01 FEB 2007, 2007

HON. GREGORY W. ALARCON
Judge of the Superior Court

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF

I have read the foregoing ______ and know its contents.

CHECK APPLICABLE PARAGRAPHS

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I am ___ an Officer ___ a partner ______ a ______ of ______

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ___ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ___ The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I am one of the attorneys for ______

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ______, at ______, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

______ Type or Print Name ______ Signature

## PROOF OF SERVICE

1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of LOS ANGELES, State of California.

I am over the age of 18 and not a party to the within action; my business address is: 609 DEEP VALLEY DRIVE, SUITE 200, ROLLING HILLS ESTATES, CA 90274

On, JANUARY 5, 2007 I served the foregoing document described as PROPOSED FINAL JUDGMENT

on DEFENDANT in this action

___ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

X by placing ___ the original X a true copy thereof enclosed in sealed envelopes addressed as follows:

Guy C. Nicholson, Esq.
Tisdale & Nicholson, LLP
2029 Century Park East, Suite 900
Los Angeles, CA 90067

X BY MAIL

*I deposited such envelope in the mail at ______, California.

The envelope was mailed with postage thereon fully prepaid.

x As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Rolling Hills Estates California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on JANUARY 5, 2007, at Rolling Hills Estates, California.

___ (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

Executed on ______, at ______, California.

X (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Lory Allison ______ Type or Print Name ______ Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)

**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal Solutions Plus Rev. 7/99

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): TELEPHONE NO.:

SHERRY ANNE LEAR (310) 265-9010
SHERRY ANNE LEAR Fax: (310) 265-9011
ATTORNEY AT LAW Bar # 149878
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, CA 90274
ATTORNEY FOR LIEN CLAIMANT: Plaintiff EPD INVESTMENT CO., LLC

FOR COURT USE ONLY

FILED
2007 FEB 16 PM 1:11
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

NAME OF COURT: UNITED STATES DISTRICT COURT
STREET ADDRESS: 312 N. SPRING STREET
MAILING ADDRESS: Same
CITY AND ZIP CODE: LOS ANGELES, CA 90012
BRANCH NAME: CENTRAL DISTRICT OF CALIFORNIA

PLAINTIFF: EPD INVESTMENT CO., LLC

DEFENDANT: PLUSH LOUNGE LAS VEGAS, LLC

CASE NUMBER: CV 06-2626 FMC (JTLx)

# NOTICE OF LIEN
(Attachment—Enforcement of Judgment)

ALL PARTIES IN THIS ACTION ARE NOTIFIED THAT

1. A lien is created by this notice under
   a. [ ] Article 3 (commencing with section 491.410) of Chapter 11 of Title 6.5 of Part 2 of the Code of Civil Procedure.
   b. [X] Article 5 (commencing with section 708.410) of Chapter 6 of Title 9 of Part 2 of the Code of Civil Procedure.
2. The lien is based on a
   a. [ ] right to attach order and an order permitting the creation of a lien (copies attached).
   b. [X] money judgment.
3. The right to attach order or the money judgment is entered in the following action:
   a. Title of court (specify): LOS ANGELES SUPERIOR COURT
   b. Name of case (specify): EPD INVESTMENT CO., LLC VS. PLUSH LOUNGE LAS VEGAS, LLC
   c. Number of case (specify): BC 358166
   d. [X] Date of entry of judgment (specify): FEBRUARY 1, 2007
   e. [ ] Dates of renewal of judgment (specify):
4. The name and address of the judgment creditor or person who obtained the right to attach order are (specify):
   EPD INVESTMENT CO., LLC C/O Sherry Anne Lear, Esq., 609 Deep Valley Dr., Ste 200, Rolling Hills Estates, CA 90274
5. The name and last known address of the judgment debtor or person whose property is subject to the right to attach order are (specify):
   PLUSH LOUNGE LAS VEGAS, LLC, A CA LLC, 520 Broadway, Suite 660, Santa Monica, CA 90404
6. The amount required to satisfy the judgment creditor's money judgment or to secure the amount to be secured by the attachment at the time this notice of lien is filed is
   $ 3,049,968.10
7. The lien created by this notice attaches to any cause of action of the person named in item 5 that is the subject of this action or proceeding and to that person's rights to money or property under any judgment subsequently procured in this action or proceeding.
8. No compromise, dismissal, settlement, or satisfaction of this action or proceeding or any of the rights of the person named in item 5 to money or property under any judgment procured in this action or proceeding may be entered into by or on behalf of that person, and that person may not enforce any rights to money or property under any judgment procured in this action or proceeding by a writ or otherwise, unless one of the following requirements is satisfied:
   a. the prior approval by order of the court in this action or proceeding has been obtained;
   b. the written consent of the person named in item 4 has been obtained or that person has released the lien; or
   c. the money judgment of the person named in item 4 has been satisfied.

**NOTICE The person named in item 5 may claim an exemption for all or any portion of the money or property within 30 days after receiving notice of the creation of the lien. The exemption is waived if it is not claimed in time.**

Date: FEBRUARY 12, 2007

SHERRY ANNE LEAR
(TYPE OR PRINT NAME)

(SIGNATURE OF LIEN CLAIMANT OR ATTORNEY)

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF

I have read the foregoing ________________________________________ and know its contents.

___ CHECK APPLICABLE PARAGRAPHS

___ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

___ I am ___ an Officer ___ a partner ________ ___ a ________________ of ________________

________________________________________ a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ___ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ___ The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

___ I am one of the attorneys for ________________________________________ a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ________________________, at ________________________, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

________________________ Type or Print Name ________________________ Signature

## PROOF OF SERVICE

1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of LOS ANGELES, State of California.

I am over the age of 18 and not a party to the within action; my business address is: 609 DEEP VALLEY DRIVE, SUITE 200, ROLLING HILLS ESTATES, CA 90274

On, FEBRUARY 12, 2007 I served the foregoing document described as NOTICE OF LIEN

________________________ on ALL PARTIES in this action

___ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

X by placing ___ the original X a true copy thereof enclosed in sealed envelopes addressed as follows:

Andrew S. Pauly, Esq.
Maryann R. Marzanno, Esq.
Greenwald, Pauly, Foster & Miller
1299 Ocean Avenue, Suite 400
Santa Monica, CA 90401-1007

Ann Loeb, Esq.
Dreier, Stein & Kahan, LLP
1620 26th Street
North Tower, 6th Floor
Santa Monica, CA 90404

X BY MAIL

X *I deposited such envelope in the mail at Rolling Hills Estates, California. The envelope was mailed with postage thereon fully prepaid.

___ As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at ________________ California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on February 12, 2007, at Rolling Hills Estates, California.

___ **(BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

Executed on ________________, at ________________________, California.

___ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

X (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Lory Allison
Type or Print Name

[signature]
Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)

**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)