STEVEN T. GUBNER – Bar No. 156593
COREY R. WEBER – Bar No. 205912
MICHAEL W. DAVIS – Bar No. 274126
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: cweber@bg.law
mdavis@bg.law

Special Litigation Counsel for
Jason M. Rund, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

EPD INVESTMENT COMPANY, LLC, and JERROLD S. PRESSMAN,

Consolidated Debtors.

JASON M. RUND, CHAPTER 7 TRUSTEE,

Plaintiff,

vs.

JOHN C. KIRKLAND, an individual, and POSHOW ANN KIRKLAND as TRUSTEE of the BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009,

Defendants.

Case No. 2:10-bk-62208-ER
[Lead Case]

Chapter 7

Adv. No. 2:12-ap-02424-ER

**SEPARATE STATEMENT IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY ADJUDICATION REGARDING THE TRUSTEE'S FIRST CLAIM FOR RELIEF FOR DISALLOWANCE OF CLAIMS, OR, IN THE ALTERNATIVE, FOR EQUITABLE SUBORDINATION OF CLAIMS AND PROOFS OF CLAIM; CONCLUSIONS OF LAW**

[Notice of motion, memorandum of points and authorities, declarations of Jason M. Rund, Corey R. Weber, and Thomas Jeremiassen, proposed judgment, and request for judicial notice are filed concurrently herewith.]

**Hearing:**
**Date:** October 17, 2017
**Time:** 11:00 a.m.
**Place:** Courtroom 1568
United States Bankruptcy Court
255 E. Temple Street
Los Angeles, CA 90012

**TO THE HONORABLE ERNEST M. ROBLES, JUDGE OF THE UNITED STATES BANKRUPTCY COURT, THE OFFICE OF THE UNITED STATES TRUSTEE, DEFENDANTS JOHN C. KIRKLAND AND POSHOW ANN KIRKLAND IN HER CAPACITY AS TRUSTEE OF THE BRIGHT CONSCIENCE TRUST DATED SEPTEMBER 9, 2009, AND ALL OTHER INTERESTED PARTIES:**

Jason M. Rund, the duly appointed and acting Chapter 7 Trustee (the "Trustee") for the consolidated bankruptcy estate of debtors EPD Investment Co., LLC ("EPD") and Jerrold S. Pressman ("Pressman") (Pressman and EPD, collectively, the "Debtors"), hereby submits the following Separate Statement of Uncontroverted Facts and Conclusions of Law pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056 and Local Rule 7056-1(b)(2) in support of the Trustee's motion for summary adjudication (the "Motion") in favor of the Trustee and against defendant Poshow Ann Kirkland ("Poshow Kirkland"), in her capacity as trustee of the Bright Conscience Trust Dated September 9, 2009 (the "BC Trust") disallowing the purported secured claims listed in Poshow Kirkland's Claim Nos. 171, 235, 236 and 13 (collectively, the "Claims"), and the amounts listed in the Claims, pursuant to Fed. R. Bankr. P. 3001, 3007, 11 U.S.C. §§ 502 and 552; or, in the alternative, equitably subordinating any amount of the Claims that may be allowed to all other allowed unsecured claims in this case, pursuant to 11 U.S.C. § 510(c). The Motion is made pursuant to Fed. R. Civ. P. 56, Fed. R. Bank. P. 7056 and Loc. Bankr. R. 7056-1.

## 1. STATEMENT OF UNCONTROVERTED FACTS

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. On December 12, 2011, Poshow Kirkland filed proof of claim nos. 171 ("Claim 171"), 235 ("Claim 235"), and 236 ("Claim 236") in the Debtors' bankruptcy case. Claim 171, Claim 235 and Claim 236 each list an amount owed of $2,672,000 as a secured claim. The basis listed for Claim 171, Claim 235 and Claim 236 is "money."<br><br>Claim 171, Claim 235 and Claim 236 state that the | **Exhibits A-D** to the concurrently filed Request for Judicial Notice in Support of the Motion (the "RJN") (Proofs of Claim 171, 235, 236, and 13).<br><br>Declaration Of Jason M. Rund, Chapter 7 Trustee, In Support Of Chapter 7 Trustee's: (1) Motion For |

| | |
|---|---|
| amount listed of $2,672,000 includes interest or other charges, but no itemized statement of interest or charges is attached. An interest rate of 12% per annum is listed in Item 4.<br><br>Claim 171, Claim 235 and Claim 236 are each signed by Poshow Kirkland in her capacity as trustee of the BC Trust.<br><br>On February 15, 2013, Poshow Ann Kirkland filed proof of claim no. 13-1 in Jerrold Pressman's bankruptcy case (prior to consolidation), Case No. 2:12-bk-13760-ER ("Claim 13"). Claim 13 lists an amount of $3,529,000 as a secured claim. The basis for Claim 13 is "money." Claim 13 states that the amount listed includes interest or other charges, but no itemized statement of interest or charges is attached. An interest rate of 24% per annum is listed in Item 4. Claim 13 is signed by Poshow Ann Kirkland in her capacity as trustee of the BC Trust. | Summary Adjudication Regarding The Trustee's First Claim For Relief For Disallowance Of Claims, Or, In The Alternative, For Equitable Subordination Of Claims And Proofs Of Claim; And, (2) Motion For Summary Adjudication Regarding The Second, Third And Sixth Claims For Relief For Avoidance And Recovery Of Fraudulent Transfers Made With Actual Intent ("Rund Declaration"), ¶¶ 7-10; Exhibits 1-4. |
| 2. No documents are attached to Claim 171, Claim 235 and Claim 236, and each state "Trustee has file". Other than documents produced informally or formally by Defendants, in connection with Debtors' bankruptcy case and the related adversary proceeding, the Trustee has not received any documents from Defendants which support or purport to support Proofs of Claim 171, 235, 236, or 13.<br><br>Defendants' document productions in this matter are attached to the Declaration of Corey R. Weber as Exhibits 10 and 11 (April 7, 2017, May 5, 2017, and May 10, 2017) other than those documents, other than those identified production, Defendants have not produced any other documents in the adversary proceeding (other than any documents identified as having been produced by John Kirkland during his Rule 2004 Exam).<br><br>***<br><br>"Q Have you produced all documents showing your loans to or investments in EPD?<br>A I produced whatever I had." | RJN, **Exhibits A-D** (Proofs of Claim 171, 235, 236, 13).<br><br>Rund Declaration, ¶¶ 7-10; Exhibits 1-4.<br><br>Weber Declaration, p. 3, ¶¶ 12 and 13.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 278, lines 19-21. |
| 3. Poshow Kirkland listed the amount of | Weber Declaration, pp. 3-4, ¶ 14 and |

| | |
|---|---|
| $2,672,000 based solely on someone from debtor Jerrold Pressman's office telling her to write it in.<br><br>"Q BY MR. WEBER: Have you seen this document before?<br>A (In English) Yes. I wrote this form and I signed it. I saw this one.<br>Q That's your signature at the bottom?<br>A (In English) Yes.<br>Q And is that your handwriting—<br>A (In English) Yes.<br>Q --in Sections 1 through 7?<br>A (In English) Yes.<br>Q How did you arrive at the amount $2,672,000?<br>A (In English) I find out from Jerry's office; someone told me.<br>Q You called up and someone gave you the amount?<br>A (In English) I don't recall. I just—someone tell me to write this number, Jerry's office, somebody there.<br>Q You don't recall who?<br>A I don't recall who.<br>Q And did you base that amount off of anything else?<br>A (In English) No. I know I have to file at that time. So I just find out the number and I wrote it there. Somebody from EPD's office tell me that's the amount they owed us, owed my kids' trust."<br><br>***<br><br>"Q If you look below that, it says "Amount of secured claim," and then it looks like you wrote in $2,672,000; is that right?<br>A (In English) Yes.<br>Q And how did you know that the Bright Conscience Trust had a secured claim for two million six hundred 72 thousand dollars?<br>A (In English) I don't recall how I find out, phone call or in person. I don't recall how I get that specific number." | Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 40-41, lines 14-25 and 1-12; pp. 43-44, lines 25 and 1-13. |
| 4. On June 4, 2012, the Court entered an order substantively consolidating the EPD bankruptcy case and the Jerrold Pressman bankruptcy case.<br><br>The Order states that "[a]ll claims filed in the Pressman Bankruptcy Case shall be deemed to have been filed in the EPD Bankruptcy Case against the Consolidated Estate, without the need for claimants to file additional proofs of claim in the EPD Bankruptcy Case." | RJN, **Exhibit E**, Order Granting Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co., LLC and Jerrold S. Pressman (Docket No. 69 in Case No. 2:12-bk-13760-ER). |

| | |
|---|---|
| 5. Notwithstanding the Court's Order regarding substantive consolidation and in regard to the filing of claims (Docket No. 69 in Case No. 2:12-bk-13760-ER), on February 15, 2013, Poshow Kirkland filed proof of claim no. 13 ("Claim 13") in debtor Jerrold Pressman's bankruptcy case, Case No. 2:12-bk-13760-ER. Claim 13 lists an amount owed of $3,529,000.00.<br><br>Claim 13 states that the amount listed of $3,529,000 includes interest or other charges, but no itemized statement of interest or charges is attached. An interest rate of 24% per annum is listed in Item 4.<br><br>Claim 13 is signed by Poshow Kirkland in her capacity as trustee of the BC Trust. | RJN, **Exhibit D** (Proof of Claim 13)<br><br>RJN, **Exhibit E**, Order Granting Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co., LLC and Jerrold S. Pressman (Docket No. 69 in Case No. 2:12-bk-13760-ER).<br><br>Rund Declaration, ¶ 10; Exhibits 4. |
| 6. No documents are attached to Claim 13. | RJN, **Exhibit D** (Proof of Claim 13)<br><br>Rund Declaration, ¶ 10; Exhibits 4. |
| 7. Claim 171, Claim 235 and Claim 236 are duplicative claims.<br><br>"Q And so the same claim was filed three times?<br>A (In English) It looks like it.<br>Q Are Exhibits 2, 3 and 4 all based on the same thing?<br>A (Through the interpreter) The same form I fill up and it was filed three times.<br>Q Do you know why?<br>A (In English) I don't recall the reason. I don't recall how that happened." | RJN, at **Exhibits A-C** (Proofs of Claim 171, 235, and 236).<br><br>RJN, at **Exhibit F**, Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees, filed on July 23, 2014 (Docket No. 1048), p. 4 of 13, lines 22-24 and fn 4 ("It appears that the Trust POC was assigned three different claim numbers – 171-1, 235-1, and 236-1; however the Trust is not sure why this was done, as the content of each is identical.")<br><br>Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, request no. 195.<br><br>Weber Declaration, p. 3, ¶ 8 and Exhibit 6 to the Weber Declaration, Poshow Kirkland responses to RFAs, request no. 11.<br><br>Weber Declaration, pp. 3-4, ¶ 14 and |

| | |
|---|---|
| | Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 46, lines 14-23. |
| 8. Claim 13 is the same as Claim 171, Claim 235 and Claim 236, but includes additional interest.<br><br>"If you look in Section 1, it lists an amount $3,529,000. Do you see that?<br>A (Through the interpreter) Yes, I saw that.<br>Q And how did you come up with that amount?<br>A (In English) Money plus interest.<br>Q What interest rate?<br>A (In English) 24 percent." | RJN, **Exhibits A-D** (Proofs of Claim 171, 235, 236, 13).<br><br>Weber Declaration, p. 2, ¶ 1 and Exhibit 1 to the Weber Declaration, Defendant's Initial Disclosures, pp. 10-11, lines 12-26, and 1-4.<br><br>Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 47, lines 17-24. |
| 9. The Claims are for approximately $2 million plus interest.<br><br>The BC Trust asserts that it is "the most senior secured creditor in the estate, holding a $3.5 million claim which is secured by a senior security interest in all assets and perfected by the filing of a UCC-1 financing statement. The Trust's liquidated claim is for approximately two million dollars ($2,000,000.00) in cash, plus accrued interests."<br><br>"Based on the Bright Conscience Trust's current information, as shown in detail in the chart below, the Bright Conscience Trust seeks to recover from the Debtors and their assets and combined estate a first position secured claim in the principal amount of $2,055,466.23 plus interest at the maximum legal rates, plus any amounts received by Debtors, or transferred to third parties for the benefit of Debtors, or an amount according to proof at trial, plus interest at the maximum legal rates, including but not limited to the following:<br>9/28/07 $200,000.00<br>9/28/07 $400,000.00<br>11/8/07 $150,000.00<br>3/27/08 $150,000.00<br>6/20/08 $100,000.00<br>8/18/08 $855,466.23<br>4/14/09 $100,000.00<br>7/24/09 $100,000.00 | RJN, at **Exhibit F**, Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees, filed on July 23, 2014 (Docket No. 1048), p. 3 of 13, lines 11-15.<br><br>Weber Declaration, p. 2, ¶ 1 and Exhibit 1 to the Weber Declaration, Defendant's Initial Disclosures, pp. 10, lines 12-26. |

| **TOTAL $2,055,466.23"** | |
|---|---|
| 10. The Claims are based upon an assignment from John Kirkland to Poshow Kirkland in her capacity as trustee for the BC Trust. The assignment is based on a Notice of Assignment dated September 9, 2009.<br><br>John Kirkland's answer states in pertinent part that "[a]nwering paragraph 40, Kirkland admits the BC Trust is the assignee of Kirkland's EPD Interests and the BC Trust's proofs of claim are based upon that interest." John Kirkland's answer filed on December 6, 2013 (Docket No. 119), p. 4, ¶ 40, lines 20-22.<br><br>***<br><br>Poshow Kirkland's answer states in pertinent part that "[a]nwering paragraph 40, BC Trust admits the BC Trust is the assignee of John C. Kirkland's EPD Interests and the BC Trust's proofs of claim are based upon that interest." Poshow Kirkland's answer filed on July 26, 2016 (Docket No. 209), p. 5, ¶ 40, lines 3-5.<br><br>***<br><br>"As security for the investment, EPD granted Kirkland a security interest in the assets of EPD. [App. Ex. 3] The Trust was formed in or about September 2009. [App. Ex. 3] Thereafter, Kirkland assigned his interest in the prior investments in EPD, as represented by the underlying loan documents (including but not limited to a Security Interest Agreement), to the Trust. [App. Ex. 3]" Appellants' Opening Brief filed by Poshow Kirkland, in the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-09023-SJO (Docket No. 9), filed on February 11, 2014, pp. 8-9 of 19.<br><br>***<br><br>"In or about September 2009, immediately after having their first child, Mr. Kirkland assigned his interest in the Note and Security Agreement to the Trust (the "Assignment")." Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees (Docket No. 1048) filed on July 23, 2014, p. 4 of 13, lines 8-9. | RJN, at **Exhibit F**, Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees<br><br>RJN, **Exhibits G and H** (Defendants' Answers to Second Amended Complaint).<br><br>RJN, **Exhibit I** (Appellants' Opening Brief filed by Poshow Kirkland, in the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-09023-SJO)<br><br>Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, at Exhibit 7 thereto (Notice of Assignment).<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at Exhibit 45 thereto (Notice of Assignment).<br><br>RJN, **Exhibit P**, Notice of Motion and Motion of Defendant John C. Kirkland to Compel Arbitration and Stay Adversary Proceeding, Exhibits A, D, E, F, and G (copies of the Security Interest Agreement, Funding Agreement, Forbearance Agreement, and Additional Forbearance Agreement) |

| | |
|---|---|
| 11. The Notice of Assignment dated as of September 9, 2009, and as acknowledged and accepted as of September 10, 2009, states "[r]eference is made to the Secured Promissory Note, Continuing Guaranty, and Security Interest Agreement dated as of November 8, 2007, by and among John C. Kirkland, EPD Investment Co., LLC, and Jerrold S. Pressman, and all other Loan Documents concurrently or subsequently entered into among the parties. Notice is hereby given that all rights of John C. Kirkland under all such Loan Documents have been sold transferred and assigned to the Bright Conscience Trust Dated September 9, 2009." The Notice of Assignment is signed by John Kirkland, and as acknowledged and accepted by Jerrold Pressman individually and as Chairman of EPD. | Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including the Notice of Assignment.<br><br>Weber Declaration, p. 10, ¶ 30 and Exhibit 29 to the Weber Declaration, documents produced by Jerrold Pressman (Debtor's "file" for John Kirkland, including a copy of the Secured Promissory note and Notice of Assignment) |
| 12. Poshow Kirkland is the wife of John Kirkland and is the trustee of the BC Trust.<br><br>John Kirkland's answer states in pertinent part that "[a]nwering paragraph 4, Kirkland admits defendant Poshow Ann Kirkland ("Ann") is a resident of California, is his wife, and is the trustee of the Bright Conscience Trust." John Kirkland's answer filed on December 6, 2013 (Docket No. 119), p. 2, ¶ 4, lines 7-9.<br><br>Poshow Kirkland's answer states in pertinent part that "[a]nwering paragraph 4, BC Trust admits defendant Poshow Ann Kirkland was a resident of California, is John C. Kirkland's spouse, and is the trustee of the BC Trust." Poshow Kirkland's answer filed on July 26, 2016 (Docket No. 209), p. 2, ¶ 4, lines 13-14. | RJN, **Exhibits G and H** (Defendants' Answers to Second Amended Complaint). |
| 13. John Kirkland was married to Poshow Kirkland at the time the assignment was signed, at the time the UCC-1 financing statement was filed in favor the BC Trust and against the assets of EPD and Pressman, and at the time the Claims were filed. They have been married since February 2009 and are still married at present. They have lived together in the same home since their marriage in February 2009.<br><br>***<br><br>"Q When did you get married to John Kirkland?<br>A (In English) February 17, 2009.<br>Q February 17, 2009?<br>A (In English) Yes." | Weber Declaration, p. 3, ¶ 8 and Exhibit 6 Poshow Kirkland's responses to RFAs, request nos. 3-6.<br><br>Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland's responses to RFAs, request nos. 3-6.<br><br>Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 13, lines 4-7; p. 14, lines 5-9. |

| | |
|---|---|
| ***<br><br>“”Q And have you been married to John Kirkland since February 2009?<br>A (In English) Yes.<br>Q And you’re still married to him today?<br>A (In English) Yes.”<br><br>***<br><br>“Q Were you aware that EPD was making mortgage payments on your house?<br>A (In English) I don't know.<br>Q In 2009, you and Mr. Kirkland lived at the same home; is that correct?<br>A (In English) After I married him, yes.<br>Q After February 2009?<br>A (In English) Yes.<br>Q Did you make the mortgage payments on the house after that?<br>A (In English) Not me, no.<br>Q Do you know who made the mortgage payments on the house after that?<br>A (In English) I don't know.<br>Q Do you know why EPD would be paying the mortgage payments on your house with Mr. Kirkland?<br>A (Through the interpreter) I don't know.” | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 68, lines 8-24. |
| 14. The Kirklands have two children together.<br><br>“Q And do you and Mr. Kirkland have kids?<br>A (In English) Yes, we have two children.<br>Q And what years were they born?<br>A (In English) Hunter is August 3rd, 2009, and Sienna is June 26, 2012.” | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 14, lines 10-14. |
| 15. The BC Trust was formed on or about September 9, 2009 for the benefit of the Kirklands’ children.<br><br>“In September 2009, John assigned his security interest in EPD’s assets to the Trust, an irrevocable trust for the benefit of the Kirklands’ children that was created as part of routine estate planning when their son was born in August 2009, for which Ann serves as sole trustee. (2 ER 97 (¶ 29); 3 ER 384).” Appellants’ Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79. | RJN, **Exhibit J**, Appellants’ Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 154, lines 9-21. |

| | |
|---|---|
| *** <br><br> "Q What is the Bright Conscience Trust? <br> A It's a family trust that was created after the birth of my son for estate planning purposes. <br> Q For estate planning purposes? <br> A Correct. <br> Q When was the Bright Conscience Trust formed? <br> A September 9th, 2009. <br> Q You said it was after the birth of your son? <br> A Yes. <br> Q When was your son born? <br> A August 2009." | |
| 16. Kirkland was the settlor of the BC Trust, and his children are the beneficiaries. <br><br> "Q Were you the settlor? <br> A I believe that's correct. <br> Q Any other settlors? <br> A No. <br> Q Who are the beneficiaries under the trust? <br> A My kids. <br> Q Anyone else? <br> A I don't believe so. Maybe their kids. <br> Q Your kids are still minors? <br> A Yes." <br><br> *** <br><br> "Q You previously testified you had two children with John Kirkland named Hunter and Sienna; is that correct? <br> A (In English) Yes. <br> Q And was the Bright Conscience Trust set up for the benefit of Hunter and Sienna? <br> A (In English) Yes. <br> Q And are they the sole beneficiaries under the trust? <br> MR. LANDAU: "They" being the kids? <br> MR. WEBER: Right. <br> MR. LANDAU: Okay. <br> THE DEPONENT: (In English) They all are. Yes, they are. Yes, this trust is formed for them. So yes, it is for them. <br> Q BY MR. WEBER: Are there any other beneficiaries under the Bright Conscience Trust? <br> A (In English) No." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 155, lines 16-25. <br><br> Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 16, lines 2-19. |
| 17. The BC Trust did not pay Kirkland any | Weber Declaration, p. 4, ¶ 15 and |

| | |
|---|---|
| amount in exchange for the assignment of interests regarding EPD.<br><br>"Q Were whatever interests you had in EPD assigned to the Bright Conscience Trust?<br>A Yes.<br>Q And do you recall when that occurred?<br>A No.<br>Q Did the Bright Conscience Trust pay you any amount for that assignment?<br>A Yes. I had a support obligation to the kids. So it was to fulfill my obligation to my children under the law.<br>Q When did you get married to Mrs. Kirkland, Poshow Ann Kirkland?<br>A February 2009.<br>Q And are you still married today?<br>A Yes.<br>Q And your kids are kids of you and Poshow Ann Kirkland?<br>A Yes.<br>Q So what are you referring to in terms of support obligation?<br>A If you have a child, under the law, you're obligated to support that child.<br>Q But you're supporting your children anyway, aren't you?<br>A You're obligated to.<br>Q So how is that relevant to payment to you in regard to formation of the trust?<br>A Because the trust was formed in order to fulfill that legal obligation; pay for their college and their education and their support.<br>Q Is any amount currently being paid by the trust to your kids?<br>A No.<br>Q Or for their benefit?<br>A No.<br>Q Has any amount been paid for their benefit?<br>A No.<br>Q Has any amount been paid to them?<br>A. No. You have all their money.<br>Q So it's just a – it's a future purported obligation for college?<br>A No, it's –it was, and is, an obligation that I have to support my kids, and to fulfill that obligation, I created the trust.<br>Q What amount did the Bright Conscience Trust pay you in return for the assignment of your interests in | Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 156-158, lines 6-25, 1-25, and 1-21.<br><br>Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 32-34, lines 22-25, 1-25 and 1. |

| | |
|---|---|
| regard to EPD?<br>A Whatever amount I put in is the amount that went to their support.<br>Q But I'm asking you, did the Bright Conscience Trust pay you and money or give you any property when you assigned your interest to the Bright Conscience Trust?<br>A It did not pay me any money, it gave me an equal—any amount I put in fulfilled that exact amount of my legal obligation to my kids by definition.<br>Q Other than fulfillment of the obligation that you contend occurred, is there anything else that the Bright Conscience Trust or Poshow Ann Kirkland or your kids provided you in exchange for the assignment?<br>A I don't recall.<br>Q You don't recall any?<br>A I don't recall either way."<br><br>***<br><br>"Q When your husband assigned the loan or investments with EPD to the Bright Conscience Trust, did your husband—did you or the Bright Conscience Trust pay anything in exchange for that?<br>A (In English) No. The certificate said it's irrevocable. There is no that kind of thing. I don't know.<br>Q Did you pay any amount to your husband in exchange for the assignment of the loans or investments regarding EPD?<br>A (In English) No. Oh, I see your question. Now I get it. Of course not.<br>Q And did the Bright Conscience Trust pay anything or give any property to your husband in exchange for the assignment of the EPD loans or investments?<br>A (In English) I need a break.<br>Q I'd like your response first and then you can take a break.<br>A (In English) There is—we didn't do that things you said. No, we don't. I don't…<br>Q The Bright Conscience Trust—<br>A (In English) Bright Conscience Trust didn't pay John Kirkland to put his loan into the Bright Conscience Trust. Actually, this is John's love to his children, pure conscience that he want to make sure our children will be provided for. So he formed the trust and then we both sign it. He formed the trust with me and he—and I am, the sole trustee." | |
| 18. The BC Trust and Poshow Kirkland did not | Weber Declaration, p. 3, ¶ 10 and |

| | |
|---|---|
| separately invest money in or loan money to the Debtors. The Claims are solely based on the assignment from John Kirkland.<br><br>"Q Bright Conscience Trust or your wife never separately invested funds in EPD or loaned funds to EPD, did they?<br>A Not to my knowledge.<br>Q So whatever interests they have are based on your interests?<br>A Whatever interests they have are based on the assignment.<br>Q The assignment from you?<br>A From me, correct." | Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, request nos. 216-219 (as to Poshow Kirkland).<br><br>Weber Declaration, p. 10, ¶ 31 and Exhibit 30 to the Weber Declaration, John Kirkland's supplemental responses to RFAs, request nos 197 ("…Responding Party admits that, rather than depositing any amounts with the Debtors, the trust is the assignee of loans to the Debtors and the obligations of the Debtors thereunder.")<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 315, lines 13-22. |
| 19. The Kirklands claim in their Initial Disclosures that the BC Trust is entitled to over $2 million plus interest based on the following:<br><br>"Based on the Bright Conscience Trust's current information, as shown in detail in the chart below, the Bright Conscience Trust seeks to recover from the Debtors and their assets and combined estate a first position secured claim in the principal amount of $2,055,466.23 plus interest at the maximum legal rates, plus any amounts received by Debtors, or transferred to third parties for the benefit of Debtors, or an amount according to proof at trial, plus interest at the maximum legal rates, including but not limited to the following:<br><br>9/28/07 $200,000.00<br>9/28/07 $400,000.00<br>11/8/07 $150,000.00<br>3/27/08 $150,000.00<br>6/20/08 $100,000.00<br>8/18/08 $855,466.23<br>4/14/09 $100,000.00<br>7/24/09 $100,000.00<br>**TOTAL $2,055,466.23** | Weber Declaration, p. 2, ¶ 1 and Exhibit 1 to the Weber Declaration, Defendant's Initial Disclosures, at pp. 10-11, lines 12-26 and 1-4. |

| | |
|---|---|
| The Bright Conscience Trust also seeks to recover contractual interest of 12% per annum on each amount from each date set forth above, and contractual default interest of 24% on all amounts from the date of default to the date all amounts due are paid to the Bright Conscience Trust." | |
| 20. Poshow Kirkland is unsure as to whether any of the investments or loans listed in the Kirklands' initial disclosures as comprising the Claims were made with the exception of $100,000 check.<br><br>"Q Do you know if your husband deposited, loaned or invested $200,000 in EPD or with Jerrold Pressman on September 28, 2007?<br>A (Through the interpreter) I don't know.<br>Q Do you know if your husband deposited, loaned or invested $400,000 with EPD or Jerrold Pressman on September 28, 2007?<br>A (Through the interpreter) I don't.<br>Q Do you know if your husband loaned, invested or deposited $150,000 with EPD or Jerrold Pressman on November 8, 2007?<br>A (In English) That I don't know.<br>Q Do you know if your husband loaned, deposited or invested $150,000 with EPD or Jerrold Pressman on March 27, 2008?<br>A (In English) I don't know.<br>Q Do you know if your husband loaned, invested or deposited $100,000 with EPD or Jerrold Pressman on June 20th, 2008?<br>A (In English) 100,000 three times. I don't know which date of that. I do deliver a personal check from John to Jerry's house.<br>Q One personal check for $100,000?<br>A (In English) Uh-huh. I personally bring it to him. But I don't know which date, if it's June 20th or April 14th, 2009, or if it was July 24, 2009; I don't know which one time. And I don't know if that check is in here or not. But I can tell you. I personally delivered the check, but I don't know the purpose of the check.<br>Q Do you know if your husband, John Kirkland, loaned, invested or deposited $855,466.23 on August 18th, 2009?<br>A (In English) No, I don't know.<br>Q And do you know whether your husband loaned, deposited or invested $100,000 with Jerry Pressman on April 14th, 2009?<br>A (In English) I don't recall. | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 78-80, lines 7-25, 1-25 and 1-5. |

| | |
|---|---|
| Q Do you know if your husband loaned, deposited or invested $100,000 with EPD or Jerrold Pressman on July 24th, 2009?<br>A (In English) I don't know. I don't recall. I don't know if that—which time will be the time of that check and if the check is for his—for this or not; he didn't tell me.<br>Q Other than that $100,000 check, have you seen copies of any other checks or wire transfers from your husband to EPD or to Jerrold Pressman?<br>A (In English) No." | |
| 21. The amount listed by Poshow Kirkland in the Claims, and the amounts listed by the Kirklands in their initial disclosures, include amounts that John Kirkland paid to persons and entities that are not debtors in this bankruptcy case—Keith Pressman and Broadway Entertainment Marketing, Inc.<br><br>"Q How much do you believe you loaned to EPD?<br>A Somewhere right around $2 million.<br>Q And that's to EPD itself?<br>A Yes.<br>Q That's not amounts that you paid to other entities?<br>A It would include anything, everything.<br>Q And what do you mean by "everything"?<br>A Any money that I paid to EPD or to related entities or anyone at its request would be included as part of the loan.<br>Q So if you paid money to Broadway Entertainment Marketing, Inc., that's included in here?<br>A Yes.<br>Q And in the two million you mentioned?<br>A Yes.<br>Q And how about if you paid money to Keith Pressman?<br>A Yes.<br>Q That's included?<br>A Yes.<br>Q And if you paid money to S.C. Club, L.P.?<br>A I don't think I ever did, but yes, that would be included."<br><br>***<br><br>"Q As to the amount on September 28, 2007, for $200,000, do you know if that amount was put into EPD, Jerrold Pressman, or some other person or entity?<br>A I don't know what Jerry did with the check when I | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 29-30, lines 19-25 and 1-18; and, pp. 147-148, lines 22-25 and 1-16.<br><br>Expert Report of Thomas P. Jeremiassen, CPA/CFF, CIRA, concurrently filed herewith (the "Expert Report"), at pp. 21-22. |

| | |
|---|---|
| handed it to him. I handed the check to Jerry.<br>Q Do you know who you wrote that check to?<br>A I think Keith Pressman.<br>Q Made payable to Keith Pressman?<br>A I think so, but I'm not sure.<br>Q As to the second item, September 28, 2007, for $400,000, do you know who you paid that amount to?<br>A I handed that check to Jerry Pressman.<br>Q And do you know who it was payable to?<br>A Whoever he said to make it payable to; I think BEM, but, I'm not sure.<br>Q Broadway?<br>A Yes.<br>Q As to the—<br>A I assume. I assumed, I guess. I don't recall." | |
| 22. Consolidated Debtor Jerrold Pressman together with Keith Pressman, held the only membership interests in EPD. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 3 thereto (EPD's Operating Agreement).<br><br>RJN, **Exhibit ZZ**, EPD's Summary of Schedules filed in the Bankruptcy Case, Docket No. 110.<br><br>RJN, **Exhibit N**, Statements of Information. |
| 23. Keith Pressman was the president of EPD. He also held EPD membership interests. Keith Pressman is also debtor Jerrold Pressman's son.<br><br>"Q And how about EPD?<br>A EPD, I was on there as—I don't remember what my capacity was, but I was a partial owner. And I think I was an officer if I remember correctly.<br>Q I think I already stated this on the record, but just in case, when I refer to "EPD," I'm referring to EPD Investment Co., LLC.<br>A Yes."<br><br>***<br>"Q If you flip to the second page in this document, it's a Statement of Information filed on May 24th, 2004; is that right?<br>A Correct.<br>Q And you're listed as the president of EPD; is that right? | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 22-23, lines 19-25 and 1-2; pp. 30-31, lines 6-25 and 1.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 27-28, lines 24-25, and 1-11; pp. 31-32, lines 8-25, and 1-16. |

A Yes.
Q In 2004, were you the president of EPD?
A I would assume so.
Q Were you the president of EPD during 2003 as well?
A You know, I don't have a memory of it. I don't know. Maybe. I mean, it seems like I would be.
Q How about 2005 through 2010, were you also the president of EPD?
A I don't know. I would guess so.
Q Were you some type of an officer for EPD between 2003 and 2010?
A I don't know from memory, but I believe I probably was."

***

Q Is that how Mr. Kirkland became an attorney for EPD or Plush or Broadway or the other entities?
A I'm sure it was.
Q So your father would have known him back when he was in law school too; is that right?
A Yes.
Q And your father is Jerrold Pressman?
A Yes.
Q So when you and Mr. Kirkland were roommates, your father would sometimes visit and get to know Mr. Kirkland?
A Yes."

***

"Q I'd like to introduce Exhibit 4.
(Chapter 7 Trustee's Exhibit 4 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: For the record, it's an Operating Agreement of EPD.
Q Mr. Pressman, have you seen this document before?
A Since I signed it, I assume I did.
Q On the second to last page, there are signature blocks for "Manager" and two members. Do you see that
A Yes.
Q Is the third signature block, which is "Member," your signature?
A Yes.
Q And are the above two signatures Jerrold Pressman's signature?
A It looks like it, yes.
Q And if you flip to the last page, it lists Jerrold

| | |
|---|---|
| Pressman as a 49% member and you as a 51% member. Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A I believe so.<br>Q How much did you pay for your membership interests?<br>A I don't remember the mechanics of it. I mean, I know my father -- what I do remember is he had put me on for estate purposes, whatever that means. But I don't know how he -- what the mechanics were regarding how I got the interest, I just don't know." | |
| 24. John Kirkland has known Keith Pressman and Jerrold Pressman since the 1980s. John Kirkland and Keith Pressman were roommates during law school, and remained friends thereafter.<br><br>John Kirkland's answer filed on December 6, 2013 (Docket No. 119), p. 3, ¶ 28, lines 25-27 states in pertinent part that "[a]nswering paragraph 28, Kirkland admits that he graduated from UCLA Law School and that Keith Pressman was his roommate for a period of time that included a portion of law school and after."<br><br>***<br><br>Poshow Kirkland's answer filed on July 26, 2016 (Docket No. 209), p. 4, ¶ 28, lines 7-9 states in pertinent part that "[a]nswering paragraph 28, BC Trust admits that John C. Kirkland graduated from UCLA Law School and that Keith Pressman was his roommate for a period of time that included a portion of law school and after."<br><br>***<br><br>"Q How long have you known Mr. Kirkland?<br>A I've known him since law school, the first year of law school.<br>Q You were classmates?<br>A For one year.<br>Q What year was that?<br>A '87.<br>Q Were you also roommates during that period?<br>A Yes.<br>Q Were you friends as well?<br>A Yes.<br>Q And that was at Pepperdine Law School? | RJN, **Exhibits G,** John Kirkland's Answer, p. 3, ¶ 28, lines 25-27; **H**, Poshow Kirkland's Answer, p. 4, ¶ 28, lines 7-9.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 26-27, lines 4-25 and 1-23. |

| | |
|---|---|
| A Correct.<br>Q And then after that one-year period, did Mr. Kirkland transfer to UCLA?<br>A Yes.<br>Q And did you remain roommates after that time period?<br>A Yes.<br>Q For how long?<br>A I don’t remember, but maybe a few years.<br>Q And then after you finished being roommates, did you remain friends with Mr. Kirkland?<br>A Yes.<br>Q Are you still a friend of Mr. Kirkland?<br>A I consider him a friend.<br>Q You’ve known each other for a long time?<br>A Yes. I don’t see him a lot, but he’s always going to be my friend.<br>Q Were you invited to his weddings?<br>A Yes.<br>Q Did you attend?<br>A No.<br>Q Sent a gift?<br>A I’m sure I did.<br>Q Do you still talk with Mr. Kirkland once in a while?<br>A Yes.<br>Q Normal chitchat or conversation, that type of thing?<br>A Yes.<br>Q So you keep up with each other’s lives?<br>A Yes.” | |
| 25. Jerrold Pressman met John Kirkland while Kirkland was in law school given that Kirkland and Keith Pressman were roommates and friends. That relationship led to John Kirkland becoming the attorney for Jerrold Pressman’s entities.<br><br>“Q During law school, is that also when you met Jerrold Pressman?<br>A Yes.<br>Q And that’s because that was Keith’s dad?<br>A Correct.”<br><br>***<br><br>Q Is that how Mr. Kirkland became an attorney for EPD or Plush or Broadway or the other entities?<br>A I’m sure it was.<br>Q So your father would have known him back when he was in law school too; is that right?<br>A Yes. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 18-19, lines 22-25 and 1.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 27-28, lines 24-25 and 1-11. |

| | |
|---|---|
| Q And your father is Jerrold Pressman?<br>A Yes.<br>Q So when you and Mr. Kirkland were roommates, your father would sometimes visit and get to know Mr. Kirkland?<br>A Yes." | |
| 26. Following graduation from law school, starting in the 1990s, John Kirkland was outside counsel for companies partially owned or controlled by Jerrold Pressman. John Kirkland's representation continued until after the Order for Relief was entered in the EPD bankruptcy case.<br><br>"Q When did Mr. Kirkland—strike that. Did Mr. Kirkland, his firms, also represent other entities you're affiliated with?<br>A His firms have, yes.<br>Q And which entities?<br>A I can't guarantee I'm going to remember them all, but certainly the Plush Lounge in Las Vegas, the Key Club or S.C. Club, L.P., Stretto. You're talking about pre- and post-2003; right?<br>Q 2003 or after.<br>A Then it wasn't Stretto, it was before. I'm not sure if there were other ones after 2003; it's a possibility. EPD in the bankruptcy.<br>Q And by "Plush," are you referring to Plush Lounge Las Vegas, LLC?<br>A Yes.<br>Q I'll just refer to it as "Plush," if that's okay.<br>A Certainly.<br>Q And he represented S.C. Club, L.P.?<br>A Yes.<br>Q And that's also known as the Key Club?<br>A Yes.<br>Q How about S.C. Club, Inc.?<br>A That was the general partner. So it's possible." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 34-35, lines 3-25 and 1-3. |
| 27. Although John Kirkland's firms represented Pressman's entities, Kirkland had the relationship with Jerrold Pressman.<br><br>"Q Mr. Kirkland was representing S.C. Club, L.P. probably before and after 2003?<br>A You keep on saying "Mr. Kirkland." It's Mr. Kirkland's firm. I dealt with various people in Mr. Kirkland's firm. He was the guy I looked to. Bust most of the things we dealt with had specialty | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 36-37, lines 17-25 and 1-2.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| requirements, and he would refer us to the specialist at those firms.<br>Q But he had the relationship with you when you were dealing with those firms?<br>A Absolutely."<br><br>***<br>"Q Were you the person with the relationship with Mr. Pressman at Greenberg Traurig?<br>A I would have probably been listed as the origination partner." | from the deposition of John Kirkland, p. 70, lines 21-24. |
| 28. EPD was formed as a California limited liability company on June 27, 2003. The Limited Liability Company Articles of Organization filed with the California Secretary of State lists John Kirkland as the agent for service of process in Section 3. Section 10 of the Articles of Organization requests that the Articles be returned to "JOHN C. KIRKLAND GREENBERG TRAURIG, LLP 2450 COLORADO AVENUE, SUITE 400E SANTA MONICA, CALIFORNIA 90404." | RJN, **Exhibit L**, Limited Liability Company Articles of Organization, File No. 200317910131. |
| 29. EPD's Operating Agreement, in Paragraph 4, also lists John Kirkland as the registered agent, and Jerrold Pressman confirmed that Kirkland was the agent for service of process.<br><br>"Q I'd like to introduce Exhibit 3. (Chapter 7 Trustee's Exhibit 3 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Mr. Pressman, is this the Operating Agreement for EPD?<br>A Yes, it is."<br><br>***<br><br>"Q Was EPD formed as a limited liability company on or about June 27th 2003?<br>A Yes.<br>Q And was John Kirkland the agent for service of process upon its formation?<br>A Yes, his firm, Greenberg Traurig." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 32, lines 19-25; and at Exhibit 3 thereto (EPD's Operating Agreement).<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 30, lines 8-13. |
| 30. A declaration filed by John Kirkland in 2010 reflected that he was aware that he was the agent for service of process for EPD.<br><br>"I am listed with the California Secretary of State as Agent for Service of Process for EPD Investment Co., | Defendants Objection to Report and Recommendations of U.S. Magistrate Judge (Entry of Default), Declaration of John C. Kirkland, *Huerth v. Pressman, et al.*, Case No. 1:10-cv-05049, United States District Court |

| | |
|---|---|
| LLC, a California limited liability company, and EPD Investment Leasing Co., LLC, a California limited liability company. I am not Agent for Service of Process for any other named defendants in the above-entitled matter." | for the Northern District of Illinois, Western Division, filed on October 6, 2010 (Docket No. 22), at Docket No. 22-1, p. 7 of 9, ¶ 3. |
| 31. The Statement of Information that EPD filed with the California Secretary of State on May 24, 2004 lists John Kirkland as the agent for service of process in Section 6. In Section 7 of the Statement of Information, it lists the address of the agent for service of process as "C/O Greenberg Traurig 2450 Colorado Ave., Ste. 400E Santa Monica CA 90404." Subsequent Statements of Information filed by EPD with the California Secretary of State on April 1, 2005 and April 26, 2007 check a "No Change Statement" box.<br><br>On the May 24, 2004 Statement of Information, Keith Pressman is listed as the President of EPD, and Ruben Moreno is listed as the Secretary. | RJN, **Exhibit N**, Statements of Information. |
| 32. John Kirkland filed a Resignation of Agent Upon Whom Process May Be Served with the California Secretary of State on January 28, 2011. | RJN, **Exhibit O**. |
| 33. Kirkland was the attorney for EPD.<br><br>"Q And this Operating Agreement was entered into on June 27, 2003?<br>A Yes.<br>Q Was Mr. Kirkland your attorney at that point?<br>A His firm was.<br>Q Was he the attorney for both you and EPD?<br>A I didn't have a personal attorney.<br>Q So he was just EPD's attorney?<br>A Again, his firm was. He was in so many firms, I don't recall which firm it might have been. It was Greenberg Traurig, they were the attorneys of record, and he worked for them. I dealt with several attorneys at the firm." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 33-34, lines 14-25 and 1-2. |
| 34. John Kirkland also paid amounts to EPD for "fees."<br><br>A document produced by EPD's accountant, Theodore Jonavic, also shows $216,000 paid by John Kirkland to EPD for "fees." | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, p. 133, lines 12-14 (and Exhibit 26 thereto, document |

| | |
|---|---|
| ***<br><br>"Q. So it appears that John Kirkland paid EPD $216,000 for fees?<br>A. That's what it looks like, yes." | produced by Jonavic). |
| 35. John Kirkland was a lawyer and equity partner at Greenberg Traurig LLP between in or about 2000 through in or about 2008, and was then an equity partner at Luce Forward Hamilton & Scripps LLP from 2009 until 2011.<br><br>"Q What years were you an attorney at Greenberg Traurig?<br>A 2000-ish to 2008-ish.<br>Q And were you an equity partner there?<br>A Yes. A "shareholder" is how they structure it, but equity partner, same thing.<br>Q Were you a shareholder there the entire time?<br>A Yes."<br><br>***<br><br>"I also was a full equity partner at Greenberg Traurig LLP for half dozen years. Greenberg is an international, full-service law firm with approximately 1,750 attorneys serving clients from more than 35 offices worldwide. From 2009 until early 2011, I was a full equity partner at Luce Forward Hamilton & Scripps LLP ("Luce Forward")." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 65-66, lines 21-25, and 1-4.<br><br>RJN, **Exhibit P**, Notice of Motion and Motion of Defendant John C. Kirkland to Compel Arbitration and Stay Adversary Proceeding, Declaration of John C. Kirkland, ¶ 2. |
| 36. Between 2004 and 2006, Kirkland and his law firm, Greenberg Traurig, prepared and sent letters to the California Franchise Tax Board on behalf of debtor Jerrold S. Pressman.<br><br>"Q Did you also represent Jerrold Pressman in regard to issues with the California Franchise Tax Board?<br>A I think Greenberg Traurig did.<br>Q And was that while you were at Greenberg Traurig as an attorney?<br>A Yes, and maybe after I left; I don't know."<br><br>***<br><br>"Q And did you send letters to the Franchise Tax Board in regard to whatever the issue was with the Franchise Tax Board? | Weber Declaration, pp. 5-6, ¶ 18 and Exhibit 16 to the Weber Declaration, custodian of records declaration by Michael Alvarez on behalf of Greenberg Traurig.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 24, lines 1-7 and 15-23; p. 51, lines 11-20; p. 52, lines 20-24; p. 61, lines 10-25; p. 71, lines 13-21; p. 287-290, lines 1-25, 1-25, 1-25, 1-4, and 12-23; and, p. 290, lines 1-23.<br><br>Weber Declaration, p. 10, ¶ 33 and |

| | |
|---|---|
| A The firm did.<br>Q Did you sign any letters and send them to the Franchise Tax Board?<br>A I would not have sent them; it's possible I signed letters. I was one of the attorneys at Greenberg."<br><br>***<br><br>"Q The page starting GT002172, and it goes through 002178.<br>A Okay.<br>Q Now, is that a letter that's set up for your signature to send to the California Franchise Tax Board?<br>A It's a draft of a letter that someone has set up for my signature, yes.<br>Q Dated July 8, 2005?<br>A Yes.<br><br>***<br><br>"Q Do you recall signing the final version of this letter?<br>A I don't recall either way.<br>Q You may have, but you don't recall?<br>A Correct."<br><br>***<br><br>"Q If you look at the letter that starts with GT002632.<br>A Again, none of these are letters, these are all drafts.<br>Q Looking at 002632 through 2636?<br>A Yes.<br>Q Is that another letter set up for your signature to send to the California Franchise Tax Board?<br>A It appears to be another draft. This one looks like it's undated.<br>Q Do you recall having seen this letter before?<br>A No.<br>Q Do you recall if it was sent?<br>A No."<br><br>***<br><br>"Q As to the final version of any of these letters sent to the Franchise Tax Board, would you have read them prior to signing them?<br>A I don't recall.<br>Q Do you generally read letters before signing them?<br>A If they're written by somebody I trust, I may or may not. If they're not written by somebody I trust, I don't | Exhibit 32 to the Weber Declaration, John Kirkland's Supplemental Responses to RFAs, request nos. 17, and 21. |

| | |
|---|---|
| sign them.”<br><br>***<br>“ Q BY MR. WEBER: Do you know what letters you actually signed and sent to the Franchise Tax Board on behalf of EPD or Pressman during 2004 and 2005?<br>A I'm sure I didn't send any. I don't recall which, if any, I signed.<br>Q You don't recall sending any letters to the Franchise Tax Board on behalf of Pressman or EPD?<br>A I'm sure I did not. I'm sure it would have been whoever wrote the letter or their secretary or my secretary, but I certainly wouldn't do it. Q I like to introduce Exhibit 109. (Chapter 7 Trustee's Exhibit 109 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Is that your signature on the Verification on the very last page?<br>A Yes.<br>Q Did you review the Supplemental Responses to Requests for Admissions before you signed that Verification?<br>A Yes.<br>Q If you look on page 3, Request for Admission 17 says, "Admit you sent letters to the FTB on Pressman's behalf in 2004 while you were an attorney at Greenberg Traurig, LLP." And if you look down at the Supplemental Response on lines 11 and 12, it says "Admit." Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A Well, I guess it depends on what you mean by "sent." My firm sent letters to the FTB on Pressman's behalf. I certainly wouldn't be the one to have sent those letters; the associate did it or the secretary did it. I may or may not have signed some of them; I don't recall. I know that letters were sent. So I'm admitting that letters were sent by Greenberg Traurig to the FTB on behalf of Pressman. I didn't for a moment mean I'm the one who put them in the mailbox; I would never do that.<br>Q If you look at Request for Admission 21, "Admit you sent letters to the FTB on Pressman's behalf in 2005 while you were an attorney at Greenberg Traurig, LLP." And if you look at the next page, where it says, "Supplemental Response" on lines 5 and 6, it says, "Admit." Do you see that?<br>A Yes.<br>Q And you're admitting that you sent letters on Pressman's behalf to the FTB during 2005? | |

| | |
|---|---|
| A Certainly letters were sent from Greenberg Traurig to the FTB on Pressman's behalf; I personally didn't send them. If you think that by this I meant I personally sent them, then I apologize for admitting, I should not have. I did not personally send anything to the FTB. So I guess I should amend these and say "Denied" if that's how you interpret that. That's not how I interpreted it when I answered."<br><br>***<br>"Q And were those letters to the Franchise Tax Board set up for your signature?<br>A I don't recall. I don't recall what letters were actually sent. I know that letters were actually sent to the FTB and the IRS. This doesn't specify any specific letters. So I don't recall what was actually sent. I know that something was sent, but I don't know what it was, but it certainly wasn't sent by me. It says here, "Greenberg Traurig sent letters to the FTB and the IRS on behalf of their client, Pressman."<br><br>***<br><br>**REQUEST FOR ADMISSION NO. 17:**<br>Admit that YOU sent letters to the FTB on PRESSMAN's behalf in 2004 while YOU were an attorney at Greenberg Traurig LLP.<br><br>**RESPONSE:**<br>Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.<br><br>**SUPPLEMENTAL RESPONSE:**<br>Admit.<br>***<br><br>**REQUEST FOR ADMISSION NO. 21:**<br>Admit that YOU sent letters to the FTB on PRESSMAN's behalf in 2005 while YOU were an attorney at Greenberg Traurig LLP.<br><br>**RESPONSE:** | |

| | |
|---|---|
| Objection. The request for admission contains ambiguous, compound, conjunctive, or disjunctive statements. Subject to this objection and the general objections stated above, and based on information and belief, Responding Party admits that letters were signed by Responding Party in Responding Party's capacity as counsel and sent by Greenberg Traurig; the request for admission is otherwise denied.<br>**SUPPLEMENTAL RESPONSE:**<br>Admit. | |
| 37. Kirkland signed the letters to the Franchise Tax Board.<br><br>"Q Did Kirkland ever represent you in dealings with the California Franchise Tax Board?<br>A His firm did.<br>Q And did Mr. Kirkland have any involvement in that?<br>A Only signing the letters. They had two tax experts in their firm that I dealt with all the time.<br>Q And what information did the letters Mr. Kirkland signed provide?<br>A Just the comments of what I and the two female individuals in his firm developed to fight the FTB on the taxes that they were attempting to go against, not EPD but against Stretto." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 55-56, lines 20-25 and 1-8. |
| 38. The letters written for John Kirkland's signature on behalf of Jerrold Pressman to be sent to the California Franchise Tax Board represented and presented detailed information that Pressman was heavily in debt, had no unencumbered assets, had no source of income except for social security, and had interests in businesses that had negative value or were unsaleable. The letters included detailed information about EPD's insolvency, that EPD was heavily in debt, and that EPD required new investments or loans each year just to break even from a cash flow basis.<br><br>-"Please note that Mr. Pressman is 69 years old and his only current income is from social security. He has incurred more than $10 million in business losses in the last five years, and has received no personal income from his business in that time. His total debt exceeds $48,000,000. All of his real property is mortgaged and virtually all of his other assets are subject to security interests in excess of their ready market value." Letter | Weber Declaration, pp. 5-6, ¶ 18 and Exhibit 16 to the Weber Declaration, custodian of records declaration by Michael Alvarez on behalf of Greenberg Traurig.<br><br>Weber Declaration, pp. 2-3, ¶ 5 and Exhibit 4 to the Weber Declaration, Trustee's RFA's to John Kirkland's, request nos. 85-121.<br><br>Weber Declaration, p. 10, ¶ 32 and Exhibit 32 to the Weber Declaration, John Kirkland's supplemental responses to RFAs, request nos. 85-121. |

| | |
|---|---|
| from John Kirkland to the California Franchise Tax Board dated October 4, 2004. GT002119-2127 at 2119.<br><br>-"Mr. Pressman is a 70-year old retiree, deeply in debt, with virtually no current income or unencumbered assets." Letter dated July 8, 2005. GT002172-2178 at 2173.<br><br>-"To the contrary, Mr. Pressman has borrowed substantially and is heavily in debt. The enclosed sampling of promissory notes give an indication of the depth of his financial distress. His borrowings over the years through EPD Investment Co. (originally operated by Mr. Pressman as a sole proprietorship for thirty years, and now operated as an LLC managed and controlled by his son, attorney Keith Pressman, on behalf of the investors) are now tens of millions of dollars, which are personally guaranteed by Mr. Pressman and secured by a lien on his home and a blanket UCC-1 on all his assets." GT002172-2178 at 2173.<br><br>-"If the FTB believes this taxpayer will have "future earning potential," as your November 19, 2005 letter states, the FTB is mistaken. Mr. Pressman has provided extensive data showing that his living expenses have been paid for the past several years through various lines of credit, including his American Express card. Mr. Pressman's tax returns for 2000 and 2001 show losses of approximately $2 million, and his tax return for 2002 shows losses in excess of $3 million. His tax return for 2003, which has been filed since the Offer in Compromise was submitted, shows losses of $3.8 million, all of which were connected to poor investments from the past. His income is substantially less than his losses. Indeed, Mr. Pressman's only steady income stream is his social security payment of $1,400 per month." Letter dated December 23, 2005. GT002227-2229 at 2228.<br><br>-"Indeed, if the FTB were to file a lien against Mr. Pressman, he may be forced to file for bankruptcy. Mr. Pressman currently finds himself with over $48 million of debt, all of which is being managed through various loans, notes and lines of credit. If a lien were to be filed by the FTB against Mr. Pressman, his creditworthiness would be erased, which would place him in default with his secured creditors. Any lien | |

| | |
|---|---|
| filed by the FTB now would put the FTB behind roughly $48 million in secured debt, including multiple mortgages on all of his real estate, and multiple blanket security interests in all his other assets, which would mean the FTB would collect nothing. Mr. Pressman's assets come no where near the amount of the multiple liens upon them, as his Offer in Compromise showed." Letter dated December 23, 2005. GT002227-2229 at 2228.<br><br>-"EPD has a total liabilities of over $47 million, including over $36 million in promissory notes for funds received from third-parties, most of which are personally guaranteed by Mr. Pressman. Mr. Pressman's personal repayment obligations to the company are secured by a perfected, blanket, first-priority UCC-1 security interest on all of his assets. EPD estimates a $3.4 million loss for last year. The company received approximately $9 million in 2004, most through third-party loans, including approximately $1.5 million from IRA accounts. Because of the company's high interest expense, over the past three years of economic downturn, it has been unable to earn income in excess of outgoing funds, thereby creating a large negative cash flow. Currently, the interest requirement exceeds $3 million per year and has averaged approximately $1.5 million per year in demand principal repayments, requiring at least $4.5 million of new loans, investment or income per year just to break even cash flow wise." Undated letter. GT002632-2636 at 2633.<br><br>"The equity interest in EPD is obviously unsaleable due to its massive debt load and negative net worth. The $36 million in secured debt—which encumbers all of Mr. Pressman's other assets—effectively prevents Mr. Pressman from using any proceeds from the sale of any of the assets discussed below to pay the tax obligation." Undated letter. GT002632-2636 at 2633.<br><br>"Mr. Pressman's business has generated heavy losses and has had no income for more than five years. None of the entities have any saleable assets with equity in excess of secured liens and other debts. With the exception of BEM, which has no assets, Mr. Pressman does not own a controlling interest in any of the entities, and would not have the ability to force sale or distribution even if they had any positive value (which they do not). As non-controlling interests in private | |

| | |
|---|---|
| companies with negative net worth, they would be difficult, if not impossible to sell, even if he were permitted to do so. Most of Mr. Pressman's equity interests are subject to pledge agreements or shareholder lock-ups, and therefore could not be sold even if they had a positive value (which they do not). Finally, as noted above, all of Mr. Pressman's assets—including his equity interests in all of the above entities, and all of the proceeds thereof—are subject to over $36 million is [sic] secured loans to third parties. Accordingly, he would be unable to use any such funds to pay the tax liability even if they existed (which they do not)." Undated letter. GT002632-2636 at 2636. | |
| 39. Greenberg Traurig obtained the information for the letters prepared to send to the California Franchise Tax Board from Jerrold Pressman.<br><br>"Q Did Kirkland ever represent you in dealings with the California Franchise Tax Board?<br>A His firm did.<br>Q And did Mr. Kirkland have any involvement in that?<br>A Only signing the letters. They had two tax experts in their firm that I dealt with all the time.<br>Q And what information did the letters Mr. Kirkland signed provide?<br>A Just the comments of what I and the two female individuals in his firm developed to fight the FTB on the taxes that they were attempting to go against, not EPD but against Stretto.<br>Q I'd like to introduce Exhibit 10. (Chapter 7 Trustee's Exhibit 10 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: For the record, this is a Declaration by the custodian of records for Greenberg Traurig LLP attaching various documents.<br>Q Mr. Pressman, I'm going to ask you to turn to the page that's Bates stamped in the lower right-hand corner 082995.<br>A Okay.<br>Q And that should be a letter dated October 4th, 2004.<br>A Right.<br><br>***<br><br>Q Did you provide Mr. Kirkland, or other people at his firm, with that information? | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 55-56, lines 20-25, and 1-22; pp. 57-58, lines 23-25, and 1-9; p. 61, lines 2-4, and 21-23; p. 62, lines 21-23; p. 63, lines 3-6; p. 64, lines 3-5 and 11-16; p. 65, lines 12-14; p. 66, lines 15-18; p. 69, lines 9-14; p. 70, lines 7-17; p. 71, lines 9-11; p. 72, lines 4-6, p. 77, lines 8-10; p. 78, lines 1-3; p. 80, lines 11-13, p. 85, lines 11-13, p. 85, lines 11-13; pp. 85-86, lines 24-25, and 1-21 |

| | |
|---|---|
| A I supplied the other people, 1 Carol Perrin and Grace Chung.<br>Q At Mr. Kirkland's firm?<br>A Yes.<br>Q And then Mr. Kirkland was to be the signatory on this letter?<br>A Well, obviously out of courtesy, I guess, since he's the lead person or my contact, he signed the letter. But I only dealt with the girls, the women at that firm.<br><br>***<br><br>Q Did you provide Mr. Kirkland, or people at his firm, with that information?<br>A Yes.<br><br>***<br><br>Q And did you provide Mr. Kirkland or someone at his firm with that information?<br>A I did.<br><br>***<br><br>Q And did you provide that information to Mr. Kirkland or someone at his firm?<br>A I did.<br><br>***<br><br>Q If you skip to page 6 of this document, which is TP-R 083013, the last page of this particular letter.<br>A Got it.<br><br>***<br><br>Q Did you provide that information to Mr. Kirkland or someone at his firm?<br>A Yes, I did.<br><br>***<br><br>Q If you look at the next letter, which starts on T-PR 083015 and goes through 083017. This appears to be a letter dated December 23rd, 2005, from Mr. Kirkland to the Franchise Tax Board. Do you see that?<br>A Yes.<br><br>*** | |

Q And did you provide that information to Mr. Kirkland or someone at his firm?
A Yes, to Diana Perrin.

***

Q Did you provide that information to Mr. Kirkland or someone at his firm?
A Well, there is a good deal of hyperbole there, but yes.

***

Q If you look at the next document, which starts at T-PR 083023 and goes through 083027, it appears to be an undated letter from Mr. Kirkland to the California Franchise Tax Board. Do you see that?
A Yes.

***

Q Is that information that you provided to Mr. Kirkland or someone at his firm?
A I don't know.
Q Is it accurate?
A I don't know.
Q Do you know where else they would have gotten that information?
A No. I just don't recall the numbers.
Q You don't know if it's accurate?
A No. I'm trying to look at it myself, and I can't figure it out at the moment.

***

Q Did you provide that information to Mr. Kirkland or someone at his firm?
A Yes.

***

Did you provide that information to Mr. Kirkland or someone at his firm?
A Yes.

***

Q And did you provide that information to Mr. Kirkland or someone at his firm?

| | |
|---|---|
| A Yes.<br><br>***<br><br>Q And did you provide that information to Mr. Kirkland or someone at his firm?<br>A I did.<br><br>***<br><br>Q And did you provide that information to Mr. Kirkland or someone at his firm?<br>A I did.<br><br>***<br><br>Q Did you provide that information to Mr. Kirkland or someone at his firm?<br>A Yes.<br><br>***<br><br>Q So Mr. Kirkland, in signing these letters or having them for his signature, did have information regarding your financial status; correct?<br>A Not particularly.<br>MR. LANDAU: Objection.<br>THE DEPONENT: I don't know whether he read the information or not, he just signed it. Obviously, I never dealt with him at his firm on these issues. So he could have looked at it. I doubt if he did, but he could have. But I have no information whether he did or not.<br>Q BY MR. WEBER: Why do you doubt he looked at letters that he signed?<br>A Because this was not his expertise, this was tax issues. This had nothing to do with the thing that I normally hire Mr. Kirkland to do as an attorney. These were the tax experts for his company. So he wasn't even in the meetings when I attended them.<br>But the letters were set up for his signature?<br>A By them, not by me. So I can't speak to what he did or what he looked at or what he saw. | |
| 40. While an attorney and equity partner at Greenberg Traurig, John Kirkland knew that EPD and Jerrold Pressman had borrowed tens of millions of dollars through EPD and that Jerrold Pressman's assets were encumbered by a blanket UCC-1 in favor of EPD. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 57-58, lines 10-25 and 1-15. |

| | |
|---|---|
| "Q Well, was Mr. Pressman heavily in debt?<br>A I assume if we said he was, then he was.<br>Q Was he subject to financial distress?<br>A That's a wiggle word; it doesn't have any meaning.<br>Q It doesn't have any meaning whatsoever?<br>A It doesn't have any legal meaning. It's what we would call "fluff." It's just—it sounds impressive to say to somebody, but it doesn't have any specific meaning.<br>Q What does "financial distress mean to you?<br>A Nothing.<br>Q Do you know if at that point EPD and Pressman had borrowed tens of millions of dollars through EPD?<br>A I believe that's correct.<br>Q And that was your understanding at the time?<br>A I believe so.<br>Q And that those amounts were all personally guaranteed by Mr. Pressman and secured by a lien on his home and a blanket UCC-1 on his assets?<br>A I believe that I saw a UCC-1 filed in favor or EPD from Mr. Pressman personally. I probably was aware of it at that time. And this mortgage, I'm not sure if I've ever seen it, but I assume I was aware of it. I think there was a blanket lien from Mr. Pressman individually in favor of EPD Investment Company, LLC. That was my understanding at the time, I think." | |
| 41. John Kirkland admits that all of Jerrold Pressman's assets were encumbered by secured loans between 2007-2010. | Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland's responses to RFAs, request nos. 51-54. |
| 42. Plush Lounge Las Vegas, LLC was formed as a Nevada limited liability company on May 9, 2003. National Corporate Research, Ltd. was listed in Section 7 of the Limited Liability Company Articles of Organization as the registered agent for Plush. | RJN, **Exhibit Q**, State of Nevada Limited Liability Charter and Limited Liability Company Articles of Organization. |
| 43. In an e-mail dated May 9, 2003 from John Kirkland to Jerrold Pressman, it states "We had the Plush Lounge Las Vegas, LLC filed with the Nevada Secretary of State today. A copy of the filing is attached for your records." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at Exhibit 6 thereto. |
| 44. In 2006, Kirkland was general outside counsel for Plush Lounge Las Vegas, LLC, and had represented the principals of Plush for more than a decade.<br><br>Kirkland's declaration filed with the United States District Court for the Central District of California, | RJN, **Exhibit R**, Declaration filed with the United States District Court for the Central District of California, Western Division, on or about June 12, 2006, Case No. CV-06-2626 FMC (TLx). |

| | |
|---|---|
| Western Division, on June 12, 2006, Case No. CV-06-2626 FMC (TLx) states in paragraph 2 that "I serve as general outside counsel for Plush. I have represented the principals of Plush for more than a decade, and have represented Plush since its formation. I am the company's registered agent for service of process in the State of California. I caused its Articles of Organization to be filed with the Secretary of State of Nevada on April 21, 2006, and Limited Liability Company Articles of Organization-Conversion to be filed with the Secretary of State of California on April 21, 2006. I also drafted the company's Operating Agreement on May 9, 2003."<br><br>***<br><br>Kirkland's declaration filed with the United States District Court for the Central District of California, Western Division, on or about June 12, 2006, Case No. CV-06-2626 FMC (TLx) states in paragraph 4 that "The sole member of Plush Lounge is S.C. Club, L.P., which is a limited liability partnership duly organized and existing under the laws of the State of California. S.C. Club, L.P. is also the manager of Plush. S.C. Club, L.P.'s principal place of business is located at 520 Broadway, Suite 660, Santa Monica, California. The general partner of S.C. Club, L.P. is S.C. Club, Inc., which is a corporation duly organized and existing under the laws of the State of California. Its principal place of business is also located at 520 Broadway, Suite 660, Santa Monica, California. The sole limited partner of S.C. Club, L.P. is Jerrold S. Pressman."<br><br>***<br><br>"Q And in 2006, were you general outside counsel for Plush?<br>A Yes<br>Q Had you represented the principals of Plush for more than a decade?<br>A Yes.<br>Q And the principals of Plush were the Pressmans?<br>A I think the principals of Plush or the principal of Plush was S.C. Club, L.P., S.C., Inc. and Jerrold Pressman, according to this." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 82, lines 1-11.<br><br>RJN, Exhibit K, Complaint for Compensatory and Punitive Damages filed on behalf of Broadway Entertainment Marketing, Inc. on May 22, 2008 in the case titled *Broadway Entertainment Marketing, Inc. v. RJV Capital, Ltd., et al.*, Superior Court of the State of California, County of Los Angeles, Case No. BC 391366. |
| 45. Plush's Operating Agreement dated May | Weber Declaration, p. 4, ¶ 15 and |

| | |
|---|---|
| 9, 2003 states in Paragraph 1.2 that "[t]he business, property and affairs of the Company will be managed and directed by the number of Managers determined as provided herein, which will initially be one. S.C. Club, L.P. will serve as the initial Manager." Section 1.3 states that "[t]he initial Members are as set forth on the attached Exhibit 1, incorporated herein by reference, each of whom is admitted to the Company as a Member as of the date hereof…" Exhibit 1 listed S.C. Club, L.P. as holding 100% of the initial membership interests. The Operating Agreement is signed by Keith Pressman as President of S.C., Inc., the general partner of S.C. Club, L.P., both as manager and member. | Exhibit 13 to the Weber Declaration, at Exhibit 74 thereto, e-mail from John C. Kirkland attaching copy of Plush's Operating Agreement |
| 46. Keith Pressman was the president of S.C., Inc., the general partner of S.C. Club, L.P. S.C. Club, L.P. was a member of Plush Lounge Las Vegas, LLC.<br><br>"Q Were you the president of S.C., Inc.?<br>A Yes.<br>Q And was S.C., Inc. the general partner of S.C. Club, L.P.?<br>A Yes.<br>Q And S.C. Club, L.P. was the member and manager of Plush; is that right?<br>A Yes." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 36-37, lines 22-25 and 1-4. |
| 47. On March 20, 2006, Kirkland filed a complaint on behalf of Plush against Hotspur Resorts Nevada, Inc. in the United States District Court for the District of Nevada, Case No. 2:06-cv-00335. The litigation was heavily contested and lasted until November 3, 2008.<br><br>"Plush filed the instant lawsuit in April of 2006. The discovery cutoff was October 5, 2007. Trial is scheduled to begin January 22, 2008." | RJN, **Exhibit S**, Plush v. Hotspur complaint, United States District Court for the District of Nevada, Case No. 2:06-cv-00335 (Docket No. 1).<br><br>RJN, **Exhibit T**, Plaintiff Plush Lounge's Opposition to Defendant's Renewed Motion to Compel, Plush Lounge Las Vegas, LLC v. Hotspur Resorts Nevada, Inc., Case No. CV 06-2626 GW (JTLx), filed on or about October 26, 2007, p. 4, lines 3-4. |
| 48. Kirkland knew that EPD loaned Plush money and that Plush and EPD had common ownership.<br><br>"Q Do you know if EPD had any relation to Plush?<br>A I think it loaned Plush money. I don't think it had any ownership relationship, based on this explanation. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 83-84, lines 25, and 1-14. |

| | |
|---|---|
| It says here that the sole member of Plush Lounge is S.C. Club, L.P., which is also the manager. And the general partner of S.C. Club, L.P. is S.C. Inc. And the sole limited partner of S.C. Club, L.P. is Jerrold Pressman. So unless EPD is a shareholder of S.C. Club, Inc., then there would be no equity relationship. But I believe that EPD loaned Plush money. And there was an interrelated ownership or relationship or control due to Mr. Pressman's involvement or possibly both Pressmans' involvement." | |
| 49. Kirkland had longstanding business and personal relationships with the Pressmans, EPD and Plush.<br><br>"Q Now, as of 2006, did Mr. Kirkland represent both EPD and Plush at that point?<br>A I don't know who he officially represented.<br>Q Had he represented both in the past?<br>A I mean, from my knowledge, I don't remember specifically who he represented.<br>Q He was an agent for service of process for EPD?<br>A Yes.<br>Q And he also assisted in the formation of Plush?<br>A Yes.<br>Q And he was also a family friend?<br>A Yes." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 45, lines 4-18.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 38 thereto (Retainer agreement dated February 26, 2010). |
| 50. Even in cases where John Kirkland or his law firms did not formally represent EPD, such as the Plush v. Hotspur litigation, John Kirkland controlled EPD's legal advice and actions.<br><br>On March 21, 2006, Christopher Austin of Greenberg Traurig sent an e-mail to Kirkland stating "I note that EPD Investment Company, LLC is the secured party on the UCC-1 filing for the inventory at Plush Lounge. I assume EPD is another company owned/controlled by Jerry and that we are counsel for EPD. Can you confirm the relationship? I'm in the process of preparing the letter demanding the delivery/return of the remaining items identified on the UCC-1 that we were unable to recover because Marriott kicked us out, and it seems to me that the demand should come from the secured party EPD as well as (or perhaps exclusive of) Plush Lounge Las Vegas, LLC (the identified Debtor). Your thoughts?" | Weber Declaration, pp. 5-6, ¶ 18 and Exhibit 16 to the Weber Declaration, custodian of records declaration by Michael Alvarez on behalf of Greenberg Traurig, at bates nos. GT006342; GT006155.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 75-76, lines 9-25, and 1-9, (and at Exhibit 17 thereto, e-mail exchange between Christopher Austin and Kirkland); and, p. 78, lines 3-7. |

| | |
|---|---|
| On March 21, 2006, Kirkland sent an e-mail to Christopher Austin at Greenberg Traurig, stating "Please make the demand on behalf of the Plush. I'll have a different lawyer make the demand on behalf of EPD."<br><br>On March 21, 2006, Christopher Austin responded "Will do."<br><br>On March 27, 2006, Kirkland replied to Christopher Austin "Status?"<br><br>***<br><br>"Q I'd like to introduce Exhibit 17.<br>(Chapter 7 Trustee's Exhibit 17 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Is this an e-mail you received from Christopher Austin on March 21, 2006?<br>A Yes.<br>Q What is Mr. Austin referring to in this e-mail?<br>A "I note that EPD Investment Company, LLC is the secured party on the UCC-1 filing for the inventory of Plush Lounge. I assume EPD is another company owned/controlled by Jerry and that we are counsel for EPD. Can you confirm the relationship? "I'm in the process of preparing the letter demanding the delivery/return of the remaining items identified on the UCC-1 that we were unable to recover because Marriott kicked us out, and it seems to me that the demand should come from the secured party EPD as well as (or perhaps exclusive of) Plush Lounge Las Vegas LLC (the identified debtor). Your thoughts?"<br>Q Do you know what he was referring to?<br>A It sounds like he's talking about items left in the space where the Plush Lounge nightclub was located at the Marriott Hotel."<br><br>***<br><br>"Q If you didn't represent EPD at the time, why would you care one way or the other?<br>A Well, they were related to Plush in some way. Mr. Pressman was involved with both and we wanted the equipment out of the hotel…" | |

| | |
|---|---|
| 51. On August 13, 2006, John Kirkland sent an e-mail to an attorney, Sherry Ann Lear, and copied on Keith Pressman, asking Lear to represent EPD in a suit against Kirkland's client, Plush, and providing instructions as to obtaining a stipulated judgment in favor of EPD and against Plush, obtaining a judgment based on the stipulated judgment, and then filing a notice of judgment lien.<br><br>"I would like you to please represent Keith Pressman's company EPD INVESTMENT CO., LLC, a California limited liability company, and file a standard Judicial Council form breach of contract action in LASC against PLUSH LOUNGE LAS VEGAS, LLC, a California limited liability company. Keith or Jerry can give you the $ amount of the claim. I represent Plush. There is no dispute that the amount is owed, and we will likely just stipulate to entry of the judgment. EPD is the entity through which their investors invested money in Plush. We want the investors to be protected, but due to the obvious conflict I cannot represent both sides in the same lawsuit. EPD needs to get a judgment, and file an abstract of judgment in LA County, perfect the foreign judgment in Nevada, and file a notice of judgment lien in a pending federal court action in which I represent Plush, PLUSH LOUNGE LAS VEGAS, LLC vs. HOTSPUR RESORTS NEVADA, INC., USDC/CDC Case No. CV06-2626 FMC (TLx)."<br><br>"Q Did you suggest that she file a complaint in state court?<br>A Yes.<br>Q And did you suggest that she go ahead and file it and get a Stipulated Judgment with Plush?<br>A Yes.<br>Q And did you also suggest that after getting a judgment that she obtain a Judgment Lien?<br>A Yes.<br>Q And did you also suggest to her that after obtaining a Judgment Lien, that she take some sort of action to file a Notice of Judgment Lien in the Plush vs. Hotspur litigation?<br>A. Yes. And suggest, I don't know about suggest, but we—I discussed that with her and with the client, and with my client and with the court, and ultimately that's what we did."<br><br>*** | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 86-87, lines 17-25, and 1-8; pp. 90-91, lines 22-25, and 1-7; and Exhibit 23 thereto (e-mail exchange between Sherry Anne Lear and Kirkland). |

| | |
|---|---|
| "Q So you're telling her to then get a judgment, file the abstract and perfect the judgment and file a Notice of Judgment Lien?<br>A Well, I'm giving my view of what I think should be done.<br>Q And that's to obtain a judgment against your client?<br>A Yes.<br>Q And file a Notice of Judgment Lien as to your client?<br>A Yes." | |
| 52. Kirkland went to law school with Sherry Ann Lear.<br><br>"Q Have you heard of someone named Sherry Ann Lear?<br>A Yes.<br>Q Who is that?<br>A She's a lawyer.<br>Q. And did you also go to law school with her?<br>A Yes.<br>Q How long have you known Ms. Lear?<br>A Since law school." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 71-72, lines 22-25, and 1-6. |
| 53. Kirkland did not believe that it was a conflict of interest to provide instructions to prospective counsel for EPD in regard to a case against Plush.<br><br>"Q At that point, you represented Plush; is that right?<br>A Yes.<br>Q And did you represent EPD?<br>A No, Sherry represented EPD.<br>Q Do you know if you had a conflict of interest at that point being involved or giving direction regarding litigation between EPD and Plush?<br>A Well, I couldn't give direction to opposing counsel. I wouldn't have any conflict of being involved in representing my client, which was Plush. So I'm not sure—I guess the short answer is no, I'm not aware of any conflict.<br>Q And you didn't represent EPD at that point?<br>A I don't recall." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 87-88, lines 16-25, and 1-6. |
| 54. John Kirkland took the position in the Plush v. Hotspur litigation that the EPD v. Plush | RJN, **Exhibit T**, Opposition to Defendant's Renewed Motion to |

| | |
|---|---|
| lawsuit was "not even marginally relevant" to the Plush v. Hotspur lawsuit.<br><br>In Plush's Opposition to Defendant's Renewed Motion to Compel filed by Kirkland with the United States District Court for the Central District of California, Case No. CV 06-2626 GW (JTLx) on or about October 26, 2007, it states that "Defendant seeks all documents from a lawsuit between Plush and EPD Investment Co., LLC ("EPD"). EPD filed the lawsuit in September 2006 for breach of contract against Plush for its failure to repay a loan. Defendant purports to know enough about the litigation to call it a "sham" but cannot identify the issues within that litigation which it contends are relevant here."<br><br>The Opposition further states that "Here, as in *Wyeth*, the issues in the EPD Lawsuit are not even marginally relevant to this one. To that end, Plush should not be required to produce any documents in response to this request unless Defendant can articulate some theory that demonstrates that certain documents from the EPD Lawsuit are critical to resolving the disputes in this litigation."<br><br>***<br><br>"Q So did you consider the EPD vs. Plush case related or having any relevance to the Plush vs. Hotspur case?<br>A No.<br>Q None whatsoever?<br>A I don't know what that means.<br>Q You didn't think that the cases were in any way related?<br>A Correct.<br>Q You didn't think that filing a litigation to get a Judgment Lien to file in the other made them in any way related?<br>A No." | Compel filed by Kirkland with the United States District Court for the Central District of California, Case No. CV 06-2626 GW (JTLx) on or about October 26, 2007.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 103-104, lines 22-25, and 1-9. |
| 55. EPD filed the complaint against Plush in the Superior Court for the State of California, County of Los Angeles, on September 8, 2006 (Case No. BC358166). The complaint included causes of action for breach of contract, money due on note and common count. | RJN, **Exhibit BBB**, complaint in *EPD v. Plush, et al.*, Superior Court for the State of California, County of Los Angeles, filed on September 8, 2006 (Case No. BC358166). |
| 56. At the time of the lawsuit, Keith Pressman was an officer of both EPD and Plush, and John | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, |

| | |
|---|---|
| Kirkland was the agent for service of process for both EPD and Plush.<br><br>“Q Were you an officer of both EPD and Plush at that time?<br>A Yes.”<br><br>***<br><br>“Q So at that point, Mr. Kirkland was the agent for service of process for both EPD and Plush?<br>A Correct.<br>Q And you were an officer for both EPD and Plush?<br>A Yes.<br>Q And EPD filed a suit in state court against Plush; is that right?<br>A That’s right.” | bracketed portions of transcript from the deposition of Keith Pressman, p. 47, lines 22-24; p. 49, lines 14-22. |
| 57. The retainer check for counsel for EPD was paid for by S.C. Club, L.P., the manager of adverse party Plush.<br><br>“Q On the final page there is a check from S.C. Club, L.P. to Ms. Lear with a memo “Retainer fee Plush Lounge.” Do you see that?<br>A Yes.<br>Q And is that your signature on that check?<br>A Yes.<br>Q Do you recall signing that?<br>A No.<br>Q So it looks like S.C. Club, L.P. paid Ms. Lear’s retainer check; right?<br>A Yes.<br>Q And S.C. Club is the manager of Plush; is that right?<br>A Yes.<br>Q So Ms. Lear was effectively retained using money from the defendant in the suit where she was being retained by the plaintiff in the suit?<br>A Yeah, I don’t remember the situation, the circumstances.<br>Q But is that right?<br>A That sounds right.” | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 69-70, lines 15-25 and 1-11. |
| 58. Exhibit A to the complaint is a document titled “Multiple Advance Promissory Note” as to $2.5 million owed by Plush to EPD and is dated April 15, | RJN, **Exhibit Q**, State of Nevada Limited Liability Company Charter for Plush. |

| | |
|---|---|
| 2003. The signatures also state that it is signed on April 15, 2003. The Multiple Advance Promissory Note was signed before either Plush or EPD were formed as limited liability companies.<br><br>Plush was formed as a Nevada limited liability company on May 9, 2003. The Articles of Organization for Plush filed with the Nevada Secretary of State on May 9, 2003 list S.C. Club, L.P. as the manager.<br><br>The Operating Agreement for Plush is also dated May 9, 2003, and is signed by Keith Pressman as President of S.C., Inc., the general partner of S.C. Club, L.P. S.C. Club, L.P. is listed as the manager and member of Plush.<br><br>Kirkland sent an e-mail to Jerrold Pressman on May 9, 2003 stating "We had the Plush Lounge Las Vegas, LLC filed with the Nevada Secretary of State today. A copy of the filing is attached for your records."<br><br>The Operating Agreement for Plush was backdated given that on June 6, 2003, Kirkland sent an e-mail to Jerrold Pressman stating "Attached is my initial draft of an Operating Agreement for Plush Lounge Las Vegas, LLC."<br><br>***<br><br>"Q Can you think of any explanation as to how Plush Lounge Las Vegas, LLC could sign a Promissory Note before it's formed as a limited liability company?<br>A I have no idea.<br>Q Do you know if this Promissory Note was back dated?<br>A I have no idea.<br>Q Have you ever back dated agreements and signed them?<br>A No.<br>Q Now, Mr. Moreno also signed on behalf of EPD on April 15, 2003; is that right?<br>A Yes.<br>Q Isn't that before EPD was formed as a limited liability company?<br>A Yes, it looks like it is.<br>Q And if you look at Exhibits 3 and 4, it looks like EPD was formed as an LLC on June 27, 2003, which is a couple months after this Promissory Note was | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at Exhibit 6 thereto, e-mail from Kirkland to Jerrold Pressman including attachment.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at Exhibit 10 thereto, e-mail from Kirkland to Jerrold Pressman including attachment.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 41-42, lines 13-25 and 1-15. |

| | |
|---|---|
| executed; is that right?<br>A Correct.<br>Q Do you know how Mr. Moreno could sign a Promissory Note on behalf of EPD a couple months before it was formed as an LLC?<br>A I have no idea.<br>Q You can't think of any explanation?<br>A No." | |
| 59. The Multiple Advance Promissory Note was signed by Keith Pressman on behalf of Plush and by Ruben Moreno on behalf of EPD.<br><br>"Q Now, there is a signature block for Plush. Do you see that?<br>A Yes.<br>Q Is that your signature?<br>A Yes.<br>Q And do you recognize the signature for EPD?<br>A Ruben Moreno.<br>Q Who is Ruben Moreno?<br>A He's been the bookkeeper for the entities.<br>Q For EPD and the other entities?<br>A Yes.<br>Q Is he also the bookkeeper for Plush?<br>A Probably.<br>Q Did Mr. Moreno work for you and your dad, Jerrold Pressman?<br>A I don't remember what specific entity he worked for. I know he did work for all the entities; I don't know who specifically was the entity that he was hired by.<br>Q And what people did he report to?<br>A He reported to Jerry.<br>Q Your dad?<br>A My dad.<br>Q Anyone else?<br>A I don't think so."<br><br>***<br><br>"Q If you look at Exhibit A to this Complaint, it's a Multiple Advance Promissory Note from Plush to EPD. Do you see that?<br>A Yes.<br>Q And it's dated April 15, 2003. Do you see that?<br>A Yes.<br>Q And on the last page of that document, there is a | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 39-40, lines 25 and 1-25.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 106-107, lines 14-25 and 1-14. |

| | |
|---|---|
| signature on behalf of Plush. Do you see that?<br>A Yes.<br>Q And do you recognize the signature?<br>A Yes.<br>Q And whose signature is that?<br>A Keith's, Keith Presman.<br>Q And below there is a signature on behalf of EPD. Do you recognize that?<br>A Yes.<br>Q And whose signature is that?<br>A Ruben Moreno.<br>Q Ruben Moreno worked for you?<br>A Worked for EPD. I assume he did at that time, yes,<br>Q And Keith Pressman is your son; correct?<br>A Yes." | |
| 60. As to promissory notes and other legal documents, Keith Pressman would generally sign the documents that Jerrold Pressman handed him without review.<br><br>"Q And do you do any due diligence or review of documents regarding amounts owed before you sign them?<br>A Usually my father is running the businesses. And he may explain it to me at the time, but I just trust him and I trust his judgment. So a lot of times I'm not 100 percent up to speed and I just go on what he tells me.<br>Q And sign?<br>A Sure.<br>Q And in addition to Promissory Notes, is that true of other documents?<br>A Yes.<br>Q So anything that your father, Jerrold Pressman, would hand to you in terms of a legal document to sign, if he told you to sign it, you would sign it?<br>A Yes. Usually there is some discussion and he explains it. But I trust what he says, so I feel comfortable.<br>Q And you wouldn't generally look into the circumstances behind it, you would just take what he said at face value?<br>A I take what he says at face value. I might look into the circumstances, maybe, but usually I take what he tells me at face value." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 43-44, lines 3-25 and 1-3. |
| 61. Keith Pressman does not recall a lawsuit | Weber Declaration, pp. 4-5, ¶ 16 and |

| | |
|---|---|
| by EPD against Plush and could not think of a reason why EPD would sue Plush.<br><br>"Q At some point, did EPD sue Plush Lounge or Plush?<br>A I don't remember offhand.<br>Q Can you think of a reason why EPD would have sued Plush?<br>A It's not ringing a bell.<br>Q Both companies were effectively operated by entities that you and your dad, Jerrold Pressman, controlled; right?<br>A Correct.<br>Q Can you think of any reason why EPD would have sued Plush?<br>A Not offhand."<br><br>***<br>"Q Why would two companies that are controlled by the same people file a lawsuit against each other?<br>A You know, again, I would be guessing; I don't remember anything about it; I don't think I was involved.<br>Q Do you remember approving it?<br>A No.<br>Q Logically thinking, can you think of any reason as to why two related companies would sue each other when they were both under control of the exact same people?<br>A Again, I'm not going to guess.<br>Q You never discussed that with Mr. Kirkland?<br>A I don't believe so.<br>Q How about with your dad?<br>A Probably not. I mean, I don't remember offhand; I don't think so." | Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 37-38, lines 18-25 and 1-5; pp. 49-50, lines 23-25 and 1-16. |
| 62. Jerrold Pressman had EPD file the lawsuit against Plush to obtain a protective lien to protect EPD's assets from creditors.<br><br>"Q Did EPD at some point sue Plush Lounge or Plush?<br>A They did, but I don't remember all the details of it, but, yeah, I think they did.<br>Q Do you know why?<br>A To protect its interest.<br>Q Protect whose interest, EPD's?<br>A Yes. Well, since we were both parties, basically, we were just trying to protect it from outside creditors, if there were any.<br>Q So at the time the suit was filed, were EPD and | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 103, lines 1-16; p. 105, lines 9-17; p. 217, lines 22-24. |

| | |
|---|---|
| Plush both controlled by you?<br>A Yes.<br>Q But EPD sued Plush?<br>A Yes. Plush owed EPD over $2 million. EPD had loaned Plush over $2 million."<br><br>***<br><br>"Q Was the purpose of the lawsuit to obtain a judgment and a lien in favor of EPD against Plush's assets?<br>A That's correct.<br>Q And was the idea to file the lien in that pending Plush vs. Hotspur litigation?<br>A Something like that, yeah."<br><br>***<br><br>"Q You filed the EPD vs. Plush suit to protect EPD's assets; right?<br>A To protect EPD's assets, yes." | |
| 63. It was also John Kirkland's understanding that EPD filed the lawsuit against Plush to obtain a judgment lien to file in the Plush v. Hotspur litigation.<br><br>"Q Are you aware that at some point EPD filed a lawsuit against Plush?<br>A Yes<br>Q And do you know why the lawsuit was filed?<br>A To perfect the claim in a manner that would enable it to file a judgment lien.<br>Q And file a judgment lien that would be in relation to the Hotspur litigation?<br>A Yes." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 84, lines 15-23. |
| 64. On or about January 3, 2007, EPD and Plush filed a Stipulation for Entry of Judgment. Based on the Stipulation for Entry of Judgment, a Judgment Pursuant to Stipulation was entered on January 3, 2007, and a Final Judgment was entered on February 1, 2007. A Notice of Lien was filed on February 16, 2007.<br><br>The Superior Court entered a Judgment Pursuant to Stipulation on January 3, 2007. The Superior Court thereafter entered a Final Judgment in favor of EPD and against Plush on February 1, 2007 in the principal sum of $2,397,370.77 plus interest and costs. | RJN, **Exhibit U**, Stipulation for Entry of Judgment, Case No. 358166, filed on January 3, 2007; Judgment Pursuant to Stipulation, filed on January 3, 2007; Final Judgment, filed on February 1, 2007; Notice of Lien, filed on February 16, 2007. |
| 65. Starting in 2007, Kirkland began investing | RJN, **Exhibits G,** John Kirkland's |

| | |
|---|---|
| money in EPD.<br><br>John Kirkland's answer filed on December 6, 2013 (Docket No. 119), p. 4, ¶ 29, lines 3-4 state in pertinent part that "[a]nswering paragraph 29, Kirkland admits that he invested in EPD in an amount in excess of $150,000 of his personal funds."<br><br>***<br><br>Poshow Kirkland's answer filed on July 26, 2016 (Docket No. 209), p. 4, ¶ 29, lines 13-14 states in pertinent part that "[a]nswering paragraph 29, BC Trust admits that John C. Kirkland invested in EPD in an amount in excess of $150,000 of his personal funds."<br><br>***<br><br>"Between 2007 and 2009, the Trust and/or Kirkland, the assignor of certain interests in EPD Investment Company, LLC ("EPD") presently owned by the Trust, invested $2,100,000 in EPD."<br><br>***<br><br>"Between 2007 and 2009, John Kirkland ("Mr. Kirkland"), the husband of Ms. Kirkland, loaned EPD Investment Co., LLC ("EPD") and Jerrold Pressman ("Pressman")(collectively the "Debtors") approximately two million dollars ($2,000,000.00)."<br><br>***<br><br>"Prior to his legal representation of EPD, John personally invested over $2 million in the company."<br><br>***<br><br>" Q Is this right around the time period when you first invested or loaned money to EPD?<br>A I don't recall.<br>Q Do you recall if it was in 2007?<br>A I think this must have been later, but I'm not sure.<br>Q I'd like to introduce Exhibit 33.<br>(Chapter 7 Trustee's Exhibit 33 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Is this a letter that you wrote to Mr. Pressman and sent on or about September 28, | Answer; and, **H**, Poshow Kirkland's Answer.<br><br>RJN, **Exhibit F**, Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees, filed on July 23, 2014 (Docket No. 1048), p. 3 of 13, lines 17-19.<br><br>RJN, **Exhibit I**, Appellants' Opening Brief filed by Poshow Kirkland, United States District Court for the Central District of California, Western Division, Case No. 2:13-CV-09023-SJO, filed on February 11, 2014 (Docket No. 9), p. 8 of 19.<br><br>RJN, **Exhibit J**, Appellants' Opening Brief filed by the Kirklands, United States Court of Appeals for the Ninth Circuit, Case No. 14-55740, filed on January 16, 2015 (Docket No. 23-1), p. 15 of 79.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 109, lines 7-25. |

| | |
|---|---|
| 2007?<br>A Yes.<br>Q Is that your signature?<br>A Yes.<br>Q You refer to an initial investment in EPD. Do you see that?<br>A Yes." | |
| 66. In a Conflict Waiver and Consent dated November 7, 2007, first produced by the Kirklands in April 2017, there are representations and warranties including that if amounts are not repaid to Kirkland when required, that Kirkland's interests will become directly adverse to EPD and Pressman and their property:<br><br>"5. EPD and Pressman understand that, if Kirkland invests or loans money to EPD or Pressman, or obtains a security interest in the property of assets of EPD or Pressman, Kirkland's interests as an investor or lender may be adverse to the interests of EPD and Pressman, and their property, in that Kirkland's interest will be to ensure repayment of his debt, and preservation of assets for his benefit, not to protect the interests of EPD or Pressman.<br><br>6. EPD and Pressman understand that, if the loans are not repaid when required, Kirkland's interests will become directly adverse to the interests of EPD and Pressman, and their property."<br><br>The Conflict Waiver is signed by Jerrold Pressman individually and on behalf of EPD.<br><br>***<br><br>Q Exhibit C is a document called "Conflict Waiver and Consent." I would appreciate you taking a moment to page through the four pages and confirm when you're ready that, in fact, you've signed the document on the last page.<br>A Yes, I did.<br>Q Those are your signatures?<br>A Yes.<br>Q Is the document a true, accurate, complete and genuine copy of a Conflict Waiver and Consent between EPD, Kirkland and Pressman?<br>A Are we on Exhibit C? | Weber Declaration, p. 3, ¶ 12 and Exhibit 10**,** documents produced by Defendants including the Conflict Waiver and Consent dated November 7, 2007.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 213, lines 1-18. |

| | |
|---|---|
| Q Yes, the one you just confirmed you signed. I'm just asking you to confirm that it's a genuine and complete document.<br>A Yes.<br>Q It is, sir?<br>A Yes. | |
| 67. Although John Kirkland has referred to the investments as loans, the Kirklands have regularly referred to the amounts as investments. John Kirkland's understanding was that the "investors" in EPD were actually lenders.<br><br>"Kirkland was also an investor in EPD." Appellant's Opening Brief filed by Kirkland, Case No. 2:13-cv-08768-SJO (Docket No. 12) filed on March 13, 2014, p. 10 of 36.<br><br>***<br><br>"Prior to his legal representations of EPD, John personally invested over $2 million in the company." Appellants' Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79.<br><br>***<br><br>"Between 2007 and 2009, the Trust and/or Kirkland, the assignor of certain interests in EPD Investment Company, LLC ("EPD") presently owned by the Trust, invested $2,100,000 in EPD." Appellants' Opening Brief filed by Poshow Kirkland, in the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-09023-SJO (Docket No. 9), p. 8 of 19.<br><br>***<br><br>"Q Did EPD have investors?<br>A I don't believe so. I believe they had the equity owners and they had lenders, creditors.<br>Q And how was it set up? Some person or entity would loan money to EPD and then EPD would go ahead and use those funds?<br>A I don't know. I would assume so."<br><br>*** | RJN, **Exhibit V**, Appellant's Opening Brief filed by Kirkland, Case No. 2:13-cv-08768-SJO (Docket No. 12) filed on March 13, 2014, p. 10 of 36.<br><br>RJN, **Exhibit J**, Appellants' Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79.<br><br>RJN, **Exhibit I**, Appellants' Opening Brief filed by Poshow Kirkland, in the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-09023-SJO (Docket No. 9), p. 8 of 19.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 25, lines 15-21; and pp. 109-110, lines 23-25, and 1-12. |

| | |
|---|---|
| "You refer to an initial investment in EPD. Do you see that?<br>A Yes.<br>Q Why do you refer to it as an investment rather than a loan?<br>A Vernacular.<br>Q Are they different?<br>A "Investment" is a broad term that is used kind of generically, like res judicata. So in the business sense, they're not different. This is a colloquially written letter. There is a legal distinction between an equity investor and a lender or creditor. An investor would have a risk of loss, a lender or creditor would not. So I'm using "investment" in the generic sense." | |
| 68. Notwithstanding John Kirkland's understanding that the "investors" in EPD were lenders, Kirkland argued in pleadings filed in the bankruptcy case that the other investors were investors, and not lenders, based on documents referencing investments. The arguments made by Kirkland cited to documents from EPD stating "investor" and "investment" even though Kirkland had also received documents from EPD using the terms "investor" and "investment."<br><br>"Moving parties clearly understood that they were <u>investors</u> subject to risk that the lease payments might be interrupted, delayed or unpaid, not lenders with a permanent, unconditional, immediate payment right. (*See, e.g.*, Leslie Huerth Decl., Exh. "B" ("We would like to take this opportunity to welcome you as an <u>investor</u> with EPD Investment Company, LLC.") (emphasis added). The myriad emails and other miscellaneous documents attached to the various declarations are replete with references to investments and investors."<br><br>***<br><br>I'd like to introduce Exhibit 29.<br>///<br>///<br>(Chapter 7 Trustee's Exhibit 29 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Do you recognize this letter? | RJN, **Exhibit W**, Alleged Debtor's Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 24), pp. 4-5 of 9, lines 24-25 and 1-4.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 143-145, lines 23-25, 1-25, and 1-4. |

| | |
|---|---|
| A I don't recognize -- I know what it is, but I had nothing to do with it.<br>"Q Do you recall if Mr. Kirkland began investing in EPD around November of 2007?<br>A That's what this appears to be.<br>Q And he got 12 percent interest?<br>A Yes.<br>Q This says, "We would like to take this opportunity to welcome you as an investor to EPD Investment Company, LLC."<br>A Yes.<br>Q Was it your understanding that Mr. Kirkland was an investor?<br>MR. LANDAU: I'll object to that question as vague and ambiguous. You defined the term "investor" at the beginning of the examination. Is this something different now?<br>MR. WEBER: I'm asking about the specific language in this document.<br>THE DEPONENT: Well, I actually don't believe they were investors as such, but it's irrelevant. I consider them just lenders. But it's just a play on words. | |
| 69. All of the amounts deposited by "investors" in EPD were loans rather than investments, and John Kirkland's investment was the same as the other investments. EPD did not distinguish between loans and investments.<br><br>"Q Do you recall if Mr. Kirkland began investing in EPD around November of 2007?<br>A That's what this appears to be.<br>Q And he got 12 percent interest?<br>A Yes.<br>Q This says, "We would like to take this opportunity to welcome you as an investor to EPD Investment Company, LLC."<br>A Yes.<br>Q Was it your understanding that Mr. Kirkland was an investor?<br>MR. LANDAU: I'll object to that question as vague and ambiguous. You defined the term "investor" at the beginning of the examination. Is this something different now?<br>MR. WEBER: I'm asking about the specific language in this document.<br>THE DEPONENT: Well, I actually don't believe they were investors as such, but it's irrelevant. I consider them just lenders. But it's just a play on words. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 144-145, lines 8-25 and 1-19; and p. 23, lines 7-16.<br><br>Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 44-45, lines 20-25 and 1-20. |

| | |
|---|---|
| Q BY MR. WEBER: Was Mr. Kirkland, along with the other people that put money in for things other than leases, all lenders in your view?<br>A Yes. This was a stock letter. This was not a personal letter. This was a letter that just came off a computer.<br>Q Anyone that put money into EPD, if it wasn't for leases, it would have been as a loan?<br>A A loan or a designated deposit for a designated purpose, like buying a house for them.<br>Q And Mr. Kirkland wouldn't have been any different in that regard from the other people that put in money for things other than leases; is that right?<br>A That's correct."<br><br>***<br>"Q You mentioned you received loans from people investing or lending money to EPD?<br>A Lending money to EPD.<br>Q And did you generally refer to them as investors?<br>A I don't know, maybe. It's a loose word. I don't want to deal in semantics. They loaned money to the company. If you want to call them investors for the purpose of this conversation, I'll be glad to designate that."<br><br>***<br><br>"Q With regard to any of the funds put into EPD by investors, do you know if they were investments or loans?<br>A No, I didn't ever get into the nature of that.<br>Q Do you know if there were funds put into EPD that were loans rather than investments?<br>A Yes, possibly.<br>Q Do you know what the distinction was between the ones that were loans versus the ones that were investments?<br>A What was the first part?<br>Q For the funds put into EPD that you think were loans, what makes you think they were loans rather than investments?<br>A Because we paid them back.<br>Q And you didn't pay the investors back?<br>A No, we would pay—like if there was a loan, we would pay the loan back.<br>Q So how did you know it was a loan rather than an investment that was getting repaid?<br>A I don't think we distinguished that, that this is a loan | |

| | |
|---|---|
| and this is an investment.<br>Q Do you know if the funds that were put into EPD were subject to risk of loss?<br>A I don't know what that means." | |
| 70. On or about November 8, 2007, John Kirkland prepared a Security Interest Agreement, had Jerrold Pressman sign it while Kirkland was representing Jerrold Pressman's entities as an attorney, and obtained a signature from Jerrold Pressman because "he's smarter than most."<br><br>"Q I'd like to introduce Exhibit Number 30. (Chapter 7 Trustee's Exhibit 30 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. LANDAU: Counsel, I just want to remind you that you said you were going to break at 1:00.<br>MR. WEBER: Okay. Do you want to take a -- let me just ask a couple questions on this document and then we can break, if that's okay.<br>Q Mr. Pressman, if you look to the last page of this document, is that your signature where it says "Debtor, Jerrold S. Pressman"?<br>A Yes.<br>Q Do you recognize the other signatures on that page?<br>A Well, I'm not that familiar with Mr. Kirkland's signature, but I assume that's his signature, and it's definitely Keith's signature.<br>Q Do you know who prepared this agreement?<br>A I'm sure Mr. Kirkland did.<br>Q Do you know the purpose of the agreement?<br>A Exactly what it says, a Security Interest Agreement.<br>Q Did the other people loaning or investing money in EPD get this type of agreement?<br>A Not one like this. But yes, from time to time, everybody would come in with their attorneys or their accountants and wanted different types of documentation or a different kind of note or different kind of language, but not like this.<br>Q Do you know why Mr. Kirkland got that kind of document and other people that loaned money didn't?<br>A I say this facetiously, but he's smarter than most. It's not a bad idea. But to me, I've never seen a security agreement this thick. Q Was he also your attorney or EPD's attorney at that time?<br>A I don't believe he was, no.<br>Q Was he the attorney for entities that you controlled or owned at that time? | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 145-148, lines 20-25, 1-25, 1-25, and 1-2; and Exhibit 30 thereto (Security Interest Agreement).<br><br>RJN, **Exhibit J**, Appellants' Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79.<br><br>RJN, **Exhibit P**, Notice of Motion and Motion of Defendant John C. Kirkland to Compel Arbitration and Stay Adversary Proceeding, Exhibit A (Security Interest Agreement). |

| | |
|---|---|
| A Yes.<br>So he had a preexisting relationship with you as an attorney for either you or entities you were affiliated with; is that right?<br>A That's right.<br>Q Did he demand this document?<br>A Yes.<br>Q And he drafted it?<br>A Yes.<br>Q And did he know that other people that loaned money to EPD weren't given this kind of document?<br>A I didn't ask.<br>Q He just told you this is what he needed?<br>A That's what he said.<br>Q And you agreed?<br>A Absolutely."<br><br>***<br><br>The Security Interest Agreement contains the following definition of "COLLATERAL":<br><br>"COLLATERAL" includes all right, title and interest of Debtor in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: All assets of the Debtor, including, but not limited to: all personal and fixture property of every kidn and nature, including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including accounts receivable), chattel paper (whether tangible or electronic), deposit accounts , letter-of-credit rights (whether or not the letter of credit is evidence by a writing), commercial tort claims, Securities and all other investment property, supporting obligations, and any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles); all Equipment; all Intellectual Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds and claims against third parties) of, any and all of the above, and all Debtor's books relating to any and all of the above.<br><br>*** | |

| | |
|---|---|
| "Prior to his legal representation of EPD, John personally invested over $2 million in the company. (2 ER 97 (¶29), 220.) As collateral for John's personal loans to EPD, the company signed a Security Interest Agreement in November 2007 granting him a security interest in all of EPD's assets." Appellants' Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 15 of 79. | |
| 71. Although Keith Pressman confirmed his signature on the Security Interest Agreement, he did not recall reviewing it, or approving it, and did not prepare it.<br><br>"Q Do you recall reviewing this agreement?<br>A I don't recall offhand.<br>Q Do you recall approving it as to form and content?<br>A I don't remember.<br>Q Do you remember who prepared it?<br>A No.<br>Q Did you prepare it?<br>A No.<br>Q You're not a transactional or corporate attorney, are you?<br>A I am not.<br>Q You wouldn't prepare this type of document; is that right?<br>A Correct." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 180-181, lines 18-25 and 1-7. |
| 72. Also on or about November 8, 2007, John Kirkland prepared a Secured Promissory Note, and had Jerrold Pressman sign it, while Kirkland was representing Jerrold Pressman's entities as an attorney.<br><br>MR. WEBER: I'd like to introduce Exhibit 31.<br>(Chapter 7 Trustee's Exhibit 31 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: For the record, it's a document entitled "Security Promissory Note."<br>MR. WEBER: Mr. Pressman, have you seen this document before?<br>A Yes.<br>Q And on the last page, is that your signature on behalf of EPD?<br>A Yes. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 148-149, lines 10-25, and 1-2.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 149-150, lines 15-25 and 1-5. |

| | |
|---|---|
| Q And is that Keith Pressman's signature?<br>A Yes.<br>Q This is a Secured Promissory Note dated<br>1 November 8, 2007, for $150,000; is that right?<br>A That's correct.<br><br>***<br><br>"Q And this, again, like the last document, is this a note that most investors or lenders to EPD got?<br>A No.<br>Q Were there any others that got this kind of note?<br>A Not like this, but some of them definitely did have their attorneys look over and change the language to a different kind of Promissory Note or a different type of document, but not like this.<br>Q Did Mr. Kirkland get this document because he demanded it?<br>A Yes.<br>Q And he was also an attorney for you or entities that you were affiliated with at that point?<br>A That I was related to, yes." | |
| 73. The Secured Promissory Note dated November 8, 2007 was for "Original Principal Amount: U.S. $150,000.00." The Secured Promissory Note provides for an interest rate of 12% per annum, and 24% per annum on default. It is signed by Jerrold Pressman as Chairman of EPD, and as "Acknowledged and Agreed" by Keith Pressman as a member of EPD. Although the Secured Promissory Note is signed as "Acknowledged and Agreed" by Keith Pressman as a member of EPD, he did not recall reviewing it, or approving it, and did not prepare it<br><br>MR. WEBER: I'd like to introduce Exhibit 31.<br>(Chapter 7 Trustee's Exhibit 31 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: For the record, it's a document entitled "Security Promissory Note."<br>MR. WEBER: Mr. Pressman, have you seen this document before?<br>A Yes.<br>Q And on the last page, is that your signature on behalf of EPD?<br>A Yes.<br>Q And is that Keith Pressman's signature?<br>A Yes. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 148-149, lines 10-25, and 1-2; and Exhibit 31 thereto.<br><br>Weber Declaration, p. 10, ¶ 30 and Exhibit 29 to the Weber Declaration, documents produced by Jerrold Pressman (Debtor's "file" for John Kirkland, including a copy of the Secured Promissory Note).<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 181-182, lines 12-25, and 1-19.; and Exhibit 62 thereto. |

| | |
|---|---|
| Q This is a Secured Promissory Note dated<br>1 November 8, 2007, for $150,000; is that right?<br>A That's correct.<br><br>***<br>"Q I'd like to introduce Exhibit 62.(Chapter 7 Trustee's Exhibit 62 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: This document is titled "Security Promissory Note" between Mr. Kirkland and EPD, also dated November 8, 2007.<br>Q Do you see that?<br>A Yes.<br>Q For $150,000?<br>A Yes.<br>Q And on the last page, there is a slot that says, "Acknowledged and Agreed." And it has a signature block and it says, "Keith E. Pressman, member." Do you see that?<br>A Yes.<br>Q Is that your signature?<br>A Yes.<br>Q And is that your dad's signature?<br>A Yes.<br>Q Do you recall reviewing this agreement?<br>A I don't recall.<br>Q Or Note?<br>A I don't recall.<br>Q Do you recall approving this Secured Promissory Note?<br>A I don't recall.<br>Q Did you draft it?<br>A No.<br>Q Again, this isn't the type of document you would draft; right?<br>A Correct." | |
| 74. Also on or about November 8, 2007, John Kirkland prepared a Continuing Guaranty, and had Jerrold Pressman sign it, while Kirkland was representing Jerrold Pressman's entities as an attorney. The Continuing Guaranty was signed by Kirkland as lender, and by Jerrold Pressman on behalf of EPD and individually.<br><br>"Q I'd like to introduce Exhibit 35. (Chapter 7 Trustee's Exhibit 35 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: This is a document that I think the | Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including the Continuing Guaranty.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 155-156, lines 3-25, and 1-4. |

| | |
|---|---|
| Kirklands produced that I don't believe was in the books and records turned over. It's a document entitled "Continuing Guaranty," dated November 8, 11 2007.<br>Q Have you seen this document before?<br>A Yes.<br>Q If you look at the last page, is that your signature for yourself and EPD?<br>A Yes.<br>Q And is this another document that Mr. Kirkland demanded of you?<br>A Yes.<br>Q When did he sign this document?<br>A I don't know. Is it dated?<br>Q November 8, 2007.<br>A That's what it looks like.<br>Q Do you remember signing it on or about<br>25 that date?<br>A I remember just signing a whole bunch of documents kind of at the same time, but I can't tell you for sure what day I signed it or if it was exactly that date." | |
| 75. Kirkland demanded the Continuing Guaranty.<br><br>"MR. WEBER: This is a document that I think the Kirklands produced that I don't believe was in the books and records turned over. It's a document entitled "Continuing Guaranty," dated November 8, 2007. Have you seen this document before?<br>A Yes.<br>Q If you look at the last page, is that your signature for yourself and EPD?<br>A Yes.<br>Q And is this another document that Mr. Kirkland demanded of you?<br>A Yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 155, lines 7-19. |
| 76. The Continuing Guaranty states in Paragraph D that "Each of the Guarantors will derive financial benefit from the Payments and the other Loan Documents. Pressman is Chairman of EPD and holds a membership interest in EPD, as does Pressman's son, attorney Keith Pressman. EPD owes substantial sums to Pressman. In addition, Pressman has an outstanding note to EPD, and has granted a lien to EPD. Broadway Entertainment Marketing ("BEM") owes substantial debts to EPD. BEM and Keith Pressman pay substantial fees to Debtor's sister companies. The execution and delivery of this Continuing Guaranty by both Guarantors is a condition precedent to the making of the Payments by Lender." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 35 thereto (Continuing Guaranty dated November 8, 2007).<br><br>Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including the Continuing Guaranty. |

| | |
|---|---|
| 77. The Continuing Guaranty states in Paragraph E that monies that Kirkland pays to Broadway or Keith Pressman for consulting fees, advisory fees, professional service fees and legal fees are amounts that are considered a loan by John Kirkland and must be repaid by EPD. No explanation is provided as to how the payment of fees is a loan subject to repayment, and no explanation is provided as to why fees paid to Broadway or Keith Pressman are loans subject to repayment by EPD.<br><br>"Each of the Guarantors has advised, represented, warranted and guaranteed to Lender that he will receive a bottom line, cumulative net return on investment of at least 12% per annum (24% on default) from Debtor for any and all payments made by or on behalf of Lender, from time to time prior to, on and after the date of this Continuing Guaranty, whether to Debtor, on Debtor's behalf, for Debtor's benefit, or at either Guarantor's direction or recommendation, including without limitation all loans directly to Debtor pursuant to the Note or Loan Documents, all additional funds loaned to Debtor from time to time, all payments to the Debtor for consulting fees, advisory fees, and professional service fees, all payments to BEM for consulting fees, advisory fees, and professional service fees, and all payments to Keith Pressman for consulting fees, advisory fees, professional service fees, and legal fees, and all payments to any other sister company of EPD, (any and all such loans and payments, collectively, the "**Payments**")." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 35 thereto (Continuing Guaranty dated November 8, 2007).<br><br>Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including the Continuing Guaranty. |
| 78. Keith Pressman could not think of any reason why the Kirklands or the BC Trust would have a right to a continuing guaranty.<br><br>"Q Do you know why Mr. Kirkland would be entitled to a Continuing Guaranty from EPD?<br>A No." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 183, lines 13-15. |
| 79. Broadway owed substantial sums to EPD when the Continuing Guaranty was entered into.<br><br>"Q So at the point this was entered into, Broadway Entertainment Marketing owed substantial amounts to EPD?<br>A Right.<br>Q Is that accurate? | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 157, lines 1-11. |

| | |
|---|---|
| A Yes.<br>Q Do you know how much?<br>A Not at that point.<br>Q Did Mr. Kirkland perform legal services for Broadway?<br>A I don't know; he may have." | |
| 80. Pressman's rationale for having EPD be responsible for paying amounts paid by Kirkland to Broadway was because "that was our deal."<br><br>"Q Why would EPD be responsible for repaying amounts that Mr. Kirkland paid to Broadway for consulting fees, advisory fees or professional service fees?<br>A Because that was our deal." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 160, lines 17-21. |
| 81. Pressman could not explain why a consulting fee, advisory fee or professional service fee would be a loan subject to repayment by EPD other than that was the deal they made.<br><br>"Q But if it's a consulting fee, how is that a loan?<br>A Well, I frankly—and I don't know at this point—I don't remember the reason for that. And I don't know if he did do that, whether he paid a consulting fee to Broadway; I don't think he did. I know he paid a fee to Keith, but I don't think he paid one to the other companies, so I don't know if that's relevant.<br>Q How is payments of an advisory fee or a professional service fee a loan?<br>A Well, that was his deal. That was the deal." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 161-162, lines 17-25 and 1-4. |
| 82. The amounts paid by Kirkland to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees were directed that way by Jerrold Pressman, and Keith Pressman reported the payments as income. Pressman could not explain why a consulting fee, advisory fee or professional service fee paid by Kirkland to Keith Pressman would be a loan subject to repayment by EPD other than that was the deal they made.<br><br>"Q How are payments to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees a loan?<br>A Well, to be honest, here's the way that one works, because I do know that one on both sides of the story. Keith hadn't collected any monies from the company for any salaries for years, and we were getting ready to | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 162-163, lines 5-25 and 1-18. |

| | |
|---|---|
| pay him some money. And I just said, "John, instead of"—I don't know if I told John this, but from my standpoint, instead of me taking the money from EPD and giving it to Keith or Broadway, I'll just have John give it to EPD. Now, Keith recorded it as income, reported it on his income tax. What John did with it, I don't know. But again, John had the option originally saying to me, "I'll just put it all in EPD and you can pay Keith or do anything you want." But that was the deal after we arranged. I honestly don't remember specifically saying to John, "As long as you don't care, give Keith the 200 grand and he'll report it as income." Because he would have reported it as income whether he got it from me or John.<br>Q How would income received by Keith Pressman from John Kirkland as a legal fee or a consulting fee, or whatever else, how would that be a loan that EPD would owe?<br>A Because that's what the documents say. That's what the deal was.<br>Q And who came up with that?<br>A Me or him; I don't know.<br>Q And how—<br>A I agree with you. In retrospect, I agree with you, it looks like of weird. I don't remember all the things that were happening at that date, so there may have been a compelling reason for me to have done it." | |
| 83. Kirkland paid amounts to Broadway and Keith Pressman because Jerrold Pressman told him to do so. Even though these amounts were paid to non-Debtors, the amounts are still identified in the BC Trust's proofs of claims as purported repayment obligations of the Debtors.<br><br>"Q Do you recall paying any amounts to Keith Pressman for legal fees?<br>A I don't recall. I think I paid Broadway $400,000 and Keith $200,000.<br>Q For what?<br>A Because Jerry told me that's what he wanted the checks written to."<br><br>***<br><br>"Q Can you think of any reason why if you paid fees of any kind to Broadway that that would be an obligation owed by EPD? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at:<br>p. 118, lines 9-15;<br>pp. 119-120, lines 12-25, and 1-13;<br>pp. 121-122, lines 8-25, and 1;<br>pp. 126-127, lines 18-25, 1-17;<br>pp. 151-152, lines 11-25, and 1-7;<br>pp. 152-153, lines 17-25, and 1-4;<br>and,<br>pp. 153-154, lines 21-25, and 1-3. |

| | |
|---|---|
| A The pitch that Jerry gave me, the explanation he gave me is, "You are investing in this enterprise, Jerry Pressman, Inc., for lack of a better vernacular. And the money goes wherever it goes and you pay whoever you pay. And at the end of the day, I and EPD will guarantee that you will get back your money, plus interest." So I said, "make sure the documents reflect that."<br>Q Aside from that pitch, can you think of any reason why EPD would be liable for fees that you paid Broadway?<br>A Yes. I assume that the money was going there because Jerry wanted it to go there. I assume Broadway provided something to EPD of value. I assumed Keith Pressman provided something to EPD of value, services, money, what have you. They were all related entities. And whether I paid a check to Jerry individually, to EPD, to Broadway, to Keith, to Plush, to whoever, I didn't think about it, which is why I wanted to be sure that the documents reflected that I didn't have to think about it. Any money that went to that enterprise would be guaranteed unconditionally by EPD."<br><br>***<br><br>"Q Can you think of any reason why payments by you to Keith Pressman of fees of any kind would be an obligation of EPD?<br>A Well, if Jerry Pressman asked me to pay it in connection with money that EPD owed Pressman, Keith Pressman, or services that he was providing or what have you, then I'm writing the check, the money is coming out of my pocket to benefit EPD. EPD is promising it's going to put the money back in my pocket. So if he wanted checks written to different people, I was going to be crystal clear that EPD was on the hook to pay me back, which it was.<br>Q So why would you categorize something like a fee instead of a loan if it was being paid to Broadway?<br>A I don't recall characterizing it as anything. I recall asking Jerry, "Who do you want the checks payable to," and he told me and I wrote the checks."<br><br>***<br><br>"Q And you never questioned as to why consulting fees, advisory fees or professional service fees paid to BEM, Broadway Entertainment, or to Keith Pressman | |

| | |
|---|---|
| would be an obligation of either EPD or Jerrold Pressman?<br>A I don't recall ever having any conversation using those terms.<br>Q Do you recall thinking about why those could possibly be obligations of EPD or Jerrold Pressman?<br>A It wasn't a mystery. It was very clear to me from what Mr. Pressman said. He said, "You're investing in an overall enterprise. And from time to time, I may have you write checks to whoever for whatever. Whoever or whatever the check is for, if you loan $200,000 to Keith Pressman, I'm going to make sure that you get that money back, plus interest. And you don't have to worry about what he's going to do with the money, trust me, I know what I'm doing. I've been doing this for 30 years. You don't have to know in each instance exactly what's going on. I'll just ask you to give me money, you'll give it to me and I'm guaranteeing and EPD is guaranteeing you'll get paid back." And I said, "Fine."<br><br>***<br><br>"Q BY MR. WEBER: Is this a check you wrote to Broadway on or about March 16, 2008?<br>A It is a check to BEM as one of the documents. It also looks like there is a deposit slop and the back of a check.<br>Q Is that your signature on the check?<br>A Yes.<br>Q And that's an amount payable to Broadway?<br>A Yes.<br>Q And if you look in the line at the lower left, it says "For fees." Do you see that?<br>A Yes.<br>Q Do you know what you're referring to?<br>A No.<br>Q Do you know why you would write "For fees"?<br>A I did whatever Jerry asked me to do, so I assume that's what he said to put.<br>Q Do you know if you were paying fees to Broadway Entertainment?<br>A I have no recollection."<br><br>***<br><br>Q Exhibit 42 appears to be another check to Broadway, this one dated September 28, 2007; is that right? | |

| | |
|---|---|
| A One of four documents is a check payable to the order of BEM. Both of the checks are payable to BEM.<br>Q Is that your signature on the check for $400,000 to Broadway?<br>A To BEM, yes."<br>Q And is "BEM" Broadway?<br>A I don't know.<br>Q Can you think of what else it would be?<br>A No."<br><br>***<br><br>"Q Is it your understanding that these two checks to BEM, Exhibits 41 and 42, are included in the chart that you included with your Initial Disclosures?<br>A Yes.<br>Q And is it your understanding that those two checks are also included in the amounts in the Proofs of Claim filed by the Bright Conscience Trust?<br>A Yes." | |
| 84. Keith Pressman could not think of a reason why payments to him or EPD or other entities for consulting or legal fees would be loans subject to repayment by EPD.<br><br>"Q Can you think of any reason why, if Mr. Kirkland made a payment to EPD for consulting fees, as to why that would be a loan subject to repayment?<br>A I don't know.<br>Q You're not aware of any?<br>A I'm not.<br>Q Can you think of any reason why, if Mr. Kirkland paid EPD some amount for advisory fees, that that would be a loan subject to repayment?<br>A I don't know.<br>Q Can you think of any reason why, if Mr. Kirkland paid EPD for professional service fees, why that would be a loan subject to repayment?<br>A I don't know.<br>Q Can you think of any reason why, if Mr. Kirkland gave any amount whatsoever to Broadway, why that would be something that EPD would have to repay?<br>A I don't know.<br>Q You can't think of any reason?<br>A No.<br>Q Can you think of any reason why, if Mr. Kirkland wrote a check to Broadway or sent a wire to Broadway | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 193-195, lines 14-25, 1-25 and 1-4; p. 197, lines 2-6. |

| | |
|---|---|
| for consulting fees paid to Broadway, why that would be a loan to be repaid by EPD?<br>A I don't know.<br>Q How about, can you think of any reason why, if Mr. Kirkland paid an amount to you, Keith Pressman, for consulting fees, advisory fees, professional service fees, or legal fees, why that would be a liability or a loan that EPD would have to repay?<br>A I don't know.<br>Q Can you think of any reason?<br>A No."<br><br>***<br>"Q Can you think of any reason why Mr. Kirkland would deposit funds with you?<br>A I don't know offhand.<br>Q Or deposit funds into your account at EPD?<br>A I don't know offhand." | |
| 85. Poshow Kirkland could not think of a reason why payments to Keith Pressman or EPD or other entities for consulting or legal fees would be loans subject to repayment by EPD.<br><br>"Q Can you think of any reason why if your husband paid EPD or Jerrold Pressman consulting fees, advisory fees or professional service fees, why that would be something that EPD or Jerrold Pressman would have to repay?<br>A (In English) I don't know.<br>Q Have you ever heard of a company called Broadway Entertainment Marketing, Inc.?<br>A (In English) I don't recall.<br>Q Can you think of any reason why if your husband, John Kirkland, paid consulting fees, advisory fees or professional service fees to Broadway Entertainment Marketing, Inc. that would be something that EPD or Kerry Pressman would have to repay?<br>A (In English) I don't recall. I don't know. I don't know.<br>Q Can you think of any reason why if your husband, John Kirkland, paid money to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees those would be amounts that EPD or Jerry Pressman would have to repay?<br>A (In English) I don't know why.<br>Q You can't think of any reason why?<br>A (In English) No, that's correct." | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 81-82, lines 21-25 and 1-19. |

| | |
|---|---|
| 86. S.C. Club owed substantial sums to EPD when the Continuing Guaranty was entered into, and Kirkland performed legal work for S.C. Club.<br><br>"Q At the point that this was signed, did Mr. Kirkland perform legal work for S.C. Club, L.P.?<br>A Yes.<br>Q And did S.C. Club, L.P. owe substantial sums to EPD at that point?<br>A Yes.<br>Q And who was Mr. Kirkland paid by?<br>A I don't know.<br>Q S.C. Club?<br>A I don't know?<br>Q Or EPD?<br>A Well, he wasn't paid, it was his firm that would have been paid. So I really don't have any idea who paid the bill. Because even traditionally, the way things work, EPD may pay the bills, but it charges the company for it and it's repaid. Because as the accountant handling all the money, it does that. But that doesn't mean he could have got paid direct; it could have gone either way." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 157-158, lines 12-25 and 1-5. |
| 87. Plush owed substantial sums to EPD when the Continuing Guaranty was entered into, and Kirkland performed legal work for Plush.<br><br>"Q At the point this was entered into, did Plush Lounge owe substantial amounts to EPD?<br>A Yes.<br>Q And did Mr. Kirkland perform legal work for Plush?<br>A Yes.<br>Q In that Hostspur litigation?<br>A Yes.<br>Q Do you recall how much he or his firm received in payment for that case?<br>A No.<br>Q Do you know where the money came from?<br>A One of the entities, but I don't know for sure.<br>Q One of your entities?<br>A Yes. Again, if it came from EPD, it would have been charged to Plush Lounge.<br>Q But at that point, Plush owed money to EPD?<br>A Yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 158-159, lines 24-25 and 1-18. |
| 88. John Kirkland argued in pleadings he filed on behalf of EPD and Jerrold Pressman that interest in excess of 10% per year is usurious. | RJN, **Exhibit X**, Memorandum of Points and Authorities in Opposition to Plaintiff's Application for Right to |

| | |
|---|---|
| "Even if the alleged notes on which Plaintiff sues are deemed to evidence actual "loans" made by Plaintiff to Defendants, these loans would violate the California Constitution and the California Finance Lenders Law and therefore should not be enforced by this Court against any of the Defendants. First, the California Constitution provides that interest on any loan in California—whether consumer or commercial—may not exceed 10% per annum. Cal. Const. Art. 15, section 1. In this case, Plaintiff's alleged Notes require interest payments of 12%. They are therefore usurious and unenforceable." | Attach Order and Order for Issuance of Writ of Attachment, *Hansel v. EPD, et al.,* Case No. SC 106151, Superior Court for the State of California, County of Los Angeles, filed on May 11, 2010, pp. 6-7, lines 24-25 and 1-2. |
| 89. John Kirkland maintains that there was no conflict in him or the BC Trust being an investor in EPD while he and his firms served as counsel for EPD and for Jerrold Pressman's other entities.<br><br>"Q If you look at Paragraph 6, it says "EPD and Pressman understand that, if the loans are not repaid when required, Kirkland's interests will become directly adverse to the interests of EPD and Pressman, and their property. Do you see that?<br>A Yes.<br>Q Was it your understanding that if the loans were not timely repaid, that your interests would become directly adverse to EPD and Pressman?<br>A No.<br>Q Why is that?<br>A I don't think I gave any thought at all to not being repaid.<br>Q But if the amounts weren't repaid, would that make your interests directly adverse to EPD and Pressman?<br>A I never thought about it.<br>Q I'm not asking what you thought about, I'm asking now whether it's the case.<br>A I don't think so, no."<br><br>***<br><br>"Q What was your view as to whether or not there was a conflict of interest between you and EPD at that point?<br>A There was no conflict.<br>Q You didn't believe that even though you had loaned money or invested money with EPD, that that presented a conflict in representing EPD against a suit brought by another investor or lender? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 115-116, lines 11-25, and 1-6; and, pp. 200-201, lines 10-25, and 1-2. |

| | |
|---|---|
| A Well, I did not, no. And the loan was at that point held by my family trust. But even if it weren't, I still don't believe there is any conflict. My recollection is that her loan was materially different than my loan.<br>Q How so?<br>A I don't recall. But I don't think that I would make any—my recollection is that I did not believe there was any conflict and that's still my belief." | |
| 90. John Kirkland maintains that there was no conflict in asserting affirmative defenses that the other investors were receiving a usurious interest rate and were not lenders licensed by the State of California pursuant to the California Finance Lenders Law.<br><br>"Q Do you believe as you're sitting here today that there was any actual conflict at any point?<br>A No.<br>Q Do you think that-so you don't think that the Bright Conscience Trust or you being a lender to EPD presented any type of conflict?<br>A No.<br>Q And you don't believe that the Bright Conscience Trust obtaining a UCC-1 financing statement as to EPD and Pressman's assets presented a conflict?<br>A No.<br>Q And you don't believe that making arguments as to usurious interest or California finance lenders law as to those investors or lenders present a conflict?<br>A No.<br>Q At any point?<br>A Correct." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 294-295, lines 20-25, and 1-12. |
| 91. John Kirkland received the same or greater interest rate from EPD as compared with the other EPD investors.<br><br>"Q As of when these General Denials were filed in 2010, was either Mr. Kirkland or his family trust an investor in EPD?<br>A Yes. Prior to 2010, yes.<br>Q And do you know if the interest rates being provided to Mr. Kirkland, were they the same as the interest rates being provided to these EPD investors?<br>A Well, to the best of my recollection, some of these people were really older, so they may have had a lesser interest rate, you know, reflected 10 years ago or 15 years before.<br>Q So if anything, Mr. Kirkland's interest rate would | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 122-123, lines 11-25 and 1-9. |

| | |
|---|---|
| have been higher?<br>A Not higher than 12 percent I don't think. No, I'm sure not higher than 12 percent.<br>Q If anything, it may be higher than the interest rate provided to these investors?<br>A Yes.<br>Q The other investors didn't get an interest rate above 12 percent; right?<br>A No.<br>Q Did Mr. Kirkland get 12 percent?<br>A Yes." | |
| 92. Even though John Kirkland argued that amounts received by other EPD investors were usurious, Kirkland does not believe that he or the BC Trust were subject to usury restrictions.<br><br>"Q Was there any issue in regard to that interest rate being potentially usurious under California law?<br>A No.<br>Q And why is that?<br>A The agreement had a standard usury savings clause. And the amount of the original loan was over $300,000, so it was exempt from usury." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 35, lines 8-15. |
| 93. John Kirkland testified that "I think Jerry's view was, he paid 12 percent and he agreed to pay 12 percent interest, he was going to pay 12 percent interest and that's the way it was… He didn't want to argue some legal technicality to get him out of his obligation. He felt he agreed to pay 12 percent and that's what he wanted to pay. Whether it was usury or not, he didn't care."<br><br>"Q Do you recall discussing the 12 percent<br>19 interest issue with Jerrold Pressman and Katy Werner?<br>A I do generally with Jerry, I don't think with Katy.<br>Q What did you discuss?<br>A I don't recall specifically. I know the 12 percent issue. 12 percent is higher than 10 percent. But I think Jerry's view was, he paid 12 percent and he agreed to pay 12 percent interest, he was going to pay 12 percent interest and that's the way it was.<br>Q Did he discuss the issue of --<br>A He didn't want to argue some legal technicality to get him out of his obligation. He felt he agreed to pay 12 percent and that's what he wanted to pay. Whether it | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 234-235, lines 18-25, and 1-9. |

| | |
|---|---|
| was usury or not, he didn't care." | |
| 94. John Kirkland argued in state court pleadings filed on behalf of Jerrold Pressman and EPD against EPD investors that the failure of the investors to be licensed with the State of California pursuant to the California Finance Lenders Law prevented the investors' recovery from EPD and Pressman.<br><br>"In addition, to ensure the enforcement of the protections provided by Article 15 of the California Constitution, the Legislature enacted the California Finance Lenders Law. This law requires that, subject to some limitations, anyone who makes more than one loan over $10,000.00 in any 12 month period be a properly licensed broker or finance lender as provided by law. Plaintiff has provided no evidence that she has such a license or is otherwise exempt from this law, yet it is Plaintiff's burden to prove any exemption from these laws by a preponderance of the evidence."<br><br>***<br><br>"In truth, Plaintiff is caught squarely between a rock and a hard place. If the funds were investments, then they were at risk, and not subject to an unconditional repayment obligation. If they were promissory notes, then she is a lender, and subject to the California Finance Lenders Law. *See* Cal. Fin. Code. § 22100. *Cf. Ury v. Jewlers Acceptance Corp.*, 227 Cal.App.2d 11 (1964) (lack of compliance not timely raised). The only exception under California law, as found by any California court, is for making less than one loan per year. *See* Cal. Fin. Code § 22050(e). If the notes were loans, not investments, then Plaintiff made multiple loans, and does not fall within the safe harbor. She cannot claimn that this was merely a personal accommodation between friends, and the [sic] seek collection like a bank. Here [sic] position is entirely self-defeating. The internal inconsistence within her own position precludes a finding of probable validity, and the Court cannot find that plaintiff will likely obtain a judgment on such claims. *See Bank Nederland*, , 61 Cal. App. 4th at 1390. Lastly, Plaintiff argues that there should be no consequence at all for | RJN, **Exhibit X**, Memorandum of Points and Authorities in Opposition to Plaintiff's Application for Right to Attach Order and Order for Issuance of Writ of Attachment, *Hansel v. EPD, et al.*, Case No. SC 106151, Superior Court for the State of California, County of Los Angeles, filed on May 11, 2010, pp. 7, lines 3-10.<br><br>RJN, **Exhibit Y**, Defendant Jerrold Pressman's Opposition to Plaintiff's Ex Parte Attachment Motion, *Hansel v. EPD Investment Co., LLC, et al.*, Case No. SC 106151, Superior Court of the State of California, County of Los Angeles, Central District, filed on June 23, 2010, p. 7, lines 6-23. |

| | |
|---|---|
| her failure to be properly licensed. But the law does not give a right without a remedy. At a bare minimum, Plaintiff must become a properly licensed lender before bringing a collection action to enforce a series of loans made in violation of the law. Like a corporation that has been suspended, she cannot come before the Court seeking legal relief until she has complied with the mandatory licensing provisions of the law." | |
| 95. John Kirkland made those arguments both before and after receipt of an e-mail from Katy Werner on June 10, 2010 stating "Jerry would like to have a conference call among the three of us tomorrow morning. Are you available? He wants to talk about some documents he found in his Hansel file today that he thinks we may need to address. Documents that talk about the interest payments and a letter that says her EPD account is "payable on demand."<br><br>"Q I'd like to introduce Exhibit 85. (Chapter 7 Trustee's Exhibit 85 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: At the bottom --<br>A This Exhibit 84 refreshes -- indicates that Ruben was obviously in the drafting of this Declaration because he's copied on that e-mail. It's actually sent to him.<br>Q If you look at the bottom of page 85, is that an e-mail you received from Katy Werner on June 10, 2010?<br>A There is an e-mail from Katy to me and Lisa saying, "Jerry wants to know if the declaration is okay." And then an e-mail from me to Katy saying, "Flip the order, start with the first sentence of par 10, and go through Hansel's decl using words like false, untrue, misleading, incorrect, etc." And then an e-mail from Katy to me saying "Jerry would like to have a conference call."<br>Q Did you have a conference call?<br>A I don't recall.<br>Q You sent and received those e-mails?<br>A Yes." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 240-241, lines 18-25, and 1-17; and, at Exhibit 85 thereto (E-mail from Katy Werner to John Kirkland dated June 10, 2010). |
| 96. John Kirkland made the same arguments regarding the California Finance Lenders Law in his filings on behalf of EPD in the bankruptcy case.<br><br>"Moving parties are a group of related, disgruntled investors who are unhappy that the investment risks they chose to take have not panned out as they had | RJN, **Exhibit W**, Alleged Debtor's Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 24), p. 2 of 9, lines 5-10; and, p. 5 of 9, lines 10-25. |

| | |
|---|---|
| hoped, and are now lashing out for someone to blame. Though their cash flow problems are unfortunate, they are hardly unique in today's economy; that is the nature of investing. Moving parties have no one to blame but themselves for their own investment decisions. Their funds were fully at risk, and EPD owes them nothing.<br><br>…<br><br>Moving parties are now asserting in the various pending actions that their investments with EPD were not investments at all, but were actually permanent, unconditional loans that had to be repaid immediately, with no risk of loss. However, if that were the case, the creditors would be lenders, subject to the California Finance Lenders Law. They are not so licensed, and as such cannot sue to collect on the alleged loans. *See* Cal. Fin. Code § 22100. The creditors are caught squarely between a rock and a hard place. If the funds were investments, then they were at risk, and not subject to an unconditional repayment obligation. If they were pure loans, then the moving parties are lenders, and subject to the California Finance Lenders Law. They have failed to comply with the law, and therefore cannot sue to collect any alleged loans. *See* Cal. Fin. Code § 22100; *Ury v. Jewlers Acceptance Corp.*, 227 Cal.App.2d 11 (1964). The only exception under California law, as found by any California court, is for making fewer than one loan per year. *See* Cal. Fin. Code § 22050(e). If the notes were loans, not investments, then the creditors made multiple loans, and cannot possibly fall within the safe harbor. They cannot claim that the temporary notes were merely a personal accommodation between friends, and then seek collection like a bank. Their position is entirely self-defeating." | |
| 97. Even though John Kirkland argued that other EPD investors were subject to the California Finance Lenders Law, he argued that he and the BC Trust are not.<br><br>"Q And were you concerned about any requirement to comply with the California Finance Lenders Law?<br>A No.<br>Q And why is that?<br>A It was only one loan; it wouldn't apply.<br>Q Did you loan all the amounts at the same time?<br>A No.<br>Q And over what period of time did you loan the | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 35-36, lines 16-25, and 1-10; and, pp. 149-150, lines 13-25, and 1-18. |

| | |
|---|---|
| amounts?<br>A I don't recall. Two or three years, probably.<br>Q And you believe they are all part of the same loan notwithstanding the lapse in time?<br>A I believe they were all part of the single loan, yes.<br>Q Did you agree on the total amount at the beginning?<br>A No, we agreed on a minimum amount."<br><br>***<br><br>"Q And is it your contention that these were all part of a single loan?<br>A Yes.<br>Q One single loan from you to EPD and Jerrold Pressman?<br>A From me to EPD; correct.<br>Q Over the course of approximately two years?<br>A The first check is 9-28-07 and the last is 7-24-09.<br>Q And you believe that's all part of one loan?<br>A Yes, I do.<br>Q And why is that?<br>A Because it was.<br>Q Other than just saying that it was, what are you relying on?<br>A I don't have any idea what you're asking me.<br>Q Why do you think that all of those amounts payable to EPD or other entities or people over the course of almost two years are part of a single loan transaction?<br>A Because they were a single loan from me to EPD.<br>Q But other than just saying that as a fact, what are you basing that on?<br>A I'm basing it on that's what it was. I don't know what you—I don't know what more you're looking for. That's what occurred. That's what it was. That's the answer." | |
| 98. John Kirkland believed that the argument he asserted on behalf of EPD regarding the California Finance Lenders Law was a "pretty weak argument" but that he gave it the "old college try."<br><br>"Q Why did either Katy Werner or Jerrold Pressman think that argument was a stretch?<br>A It was a pretty weak argument. It wasn't quite frivolous, but it was a pretty weak argument.<br>Q But you still made it?<br>A Yes. Our obligation as lawyers is to aggressively make every argument we can on behalf of our clients and that's what we did. That one I think we lost—well, I know we lost, but we gave it the "old college try." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 229, lines 8-17. |

| | |
|---|---|
| 99. The Kirklands and the BC Trust are not, and have never been, lenders licensed with the State of California pursuant to the California Finance Lenders Law.<br><br>"Q Is the argument that you were saying was a—and I don't think your words were a stretch, but something to that effect?<br>A Somebody said it was a stretch and I can't disagree with that characterization. It's a pretty weak argument. It's not quite a frivolous argument, but it's a pretty weak argument.<br>Q Were you or your wife ever licensed lenders pursuant to the California Finance Lenders Law?<br>A No.<br>Q Did you think there was any type of conflict issue in making this argument when the same thing could apply potentially to you or your wife or your family trust?<br>A No.<br>Q Why is that?<br>A Because I don't." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 250, lines 4-21.<br><br>Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland's Responses to RFAs, Set One, pp. 40-46, RFA Nos. 154-176. |
| 100. A UCC-1 financing statement was filed in favor of the BC Trust against the assets of the Debtors on September 11, 2009.<br><br>"Following the assignment of the foregoing interests to the Trust, a UCC-1 Financing Statement was recorded in favor of the Trust." [App. Ex. 3]" Appellants' Opening Brief filed by Poshow Kirkland, in the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-09023-SJO (Docket No. 9), filed on February 11, 2014, p. 9 of 19. | RJN, **Exhibit Z,** UCC-1. |
| 101. On May 5, 2010, a UCC-3 financing statement amendment was filed as to the BC Trust's purported lien. It states: "This amendment is to clarify and confirm that the prior grant of security of did not include the stock of North Hills Industrial Park, Inc., a California S-Corporation.<br><br>Poshow Ann Kirkland alleges that the UCC-3 was unauthorized.<br><br>"Although there appears to have been an amendment to the UCC-1 filed in or about May 2010, it was not authorized by either Mr. Kirkland or Ms. Kirkland, and | RJN, **Exhibit AAA,** UCC-3. RJN, at **Exhibit F**, Objection of Poshow Ann Kirkland, Individually and as Trustee of the Bright Conscience Trust, to Motion of Trustee for Order Authorizing Trustee to Pay Unpaid Prior Allowed Interim Fees, filed on July 23, 2014 (Docket No. 1048), p. 4 of 13, lines 13-15. |

| | |
|---|---|
| thus, is void." | |
| 102. Lisa Underkoffler sent the UCC-3 (among other documents) to NCR for filing on May 5, 2010, stating: "Amy – can you please file the attached UCCs in CA? Bill to 37998.1. Thanks so much." The e-mail was sent from the address "LUnderkoffler@LUCE.com" | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena, pp. 1308-1314. |
| 103. On May 7, 2010, Amy Brown of NCR wrote back to Lisa Underkoffler, attaching a filed and recorded copy of the UCC-3, stating "Lisa: Please find attached the acknowledgment of filing of a UCC-3 Amendment in the state of California for each of the secured parties listed above. The original will follow via regular mail. Thanks so much!" | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena, pp. 1278-1284. |
| 104. Lisa Underkoffler testified that she would not have filed any of the documents without John Kirkland's authorization.<br><br>"Q Would you have sent UCC statements for filing with National Corporate Research in relation to EPD if John Kirkland hadn't authorized them in advance?<br>A No." | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 70, lines 12-15. |
| 105. Kirkland and his firm, Luce Forward, were attorneys for EPD at the time the UCC-1 was filed, having been formally engaged as "general outside counsel" pursuant to a retainer letter dated February 17, 2009 and faxed to Luce Forward on June 17, 2009.<br><br>A retainer letter from John Kirkland at Luce Forward to EPD dated February 17, 2009 states "[w]e are pleased you have chosen Luce Forward as legal counsel to represent EPD Investment Co., LLC and its affiliates (collectively, "EPD")." The letter further states that "[y]ou have asked and we have agreed to act as general outside counsel for EPD."<br><br>The retainer letter was signed by Jerrold Pressman on behalf of EPD and faxed to Luce Forward on June 17, 2009.<br><br>***<br><br>"Q Were you an attorney for EPD at the time that the UCC-1 was filed in favor of the Bright Conscience Trust?<br>A Yes. I filed it at the request of EPD, on their behalf as their attorney. | RJN, **Exhibit P**, Notice of Motion and Motion of Defendant John C. Kirkland to Compel Arbitration and Stay Adversary Proceeding, Exhibit G to Declaration of John C. Kirkland (the declaration states that it is an "Engagement and Fee Agreement dated February 17, 2009 and signed June 17, 2009".<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 273, lines 2-25. |

| | |
|---|---|
| Q So you were an attorney filing a UCC-1 when you were also the party that would benefit from the UCC-1?<br>A No, it was my family trust, it was not me.<br>Q Your family trust for which your wife is the trustee and your kids or the kids of your kids are beneficiaries?<br>A Correct. I don't know if I filed it as attorney for EPD. I filed it because Jerry asked me to file it.<br>Q for the benefit of your family?<br>A No, to fulfill EPD's obligation to file it. EPD was obligated to file it and they breached that obligation. And they entered into an agreement with the trust that they would waive the claim for the breach if it was filed. And so he asked me to file it so that he was sure it would get filed. Because last time it didn't. So he wanted to make sure he had someone file it who would and that someone was me." | |
| 106. Notwithstanding the signed retainer agreement stating that Luce Forward was general outside counsel for EPD, the Kirklands deny that John Kirkland or Luce Forward were general outside counsel for EPD during 2009, 2010 or 2011. | Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, request nos. 250-251, 253-254, 256-257.<br><br>Weber Declaration, p. 3, ¶ 8 and Exhibit 6 to the Weber Declaration, Poshow Kirkland responses to RFAs, request nos. 97-98, 100-101, and 103-104. |
| 107. John Kirkland yelled at Pressman during a call prior to filing the UCC-1 financing statement and Kirkland threatened a lawsuit.<br><br>"Q Did Mr. Kirkland yell at you?<br>A Yes, he did.<br>Q Did he demand that the UCC-1 be filed immediately in favor of the Bright Conscience Trust?<br>A Well, I'm trying to think. I don't remember whether we did it or whether he then took it on himself to do it, which he had the right to do. And that was my position, "Well, you have the right to do it anyways, you don't have to wait for me to do it." But I think the document said we would do it or we told him we would do it. Anyway, it was a bad situation. We really screwed up.<br>Q Did he threaten litigation against EPD or you?<br>A He actually did; I don't think he meant it.<br>Q What did he say? | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 167-168, lines 7-25 and 1-8; p. 218, lines 4-17.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 191, lines 10-22. |

| | |
|---|---|
| A You know, "We can sue you for that." If some creditor came forward in between—because we didn't know the damage at that time, whether there was any. And I don't think it turned out there was any damage. It all happened before the lawsuit, before anyone got a lien against us, so I don't think he was harmed by it. But I think that was his position. If he was harmed by it, he might sue me. And I would have to hire him to defend me, by the way."<br>***<br><br>"Q When Mr. Kirkland yelled at you and it sounded like he threatened a lawsuit, potentially, at some point in 2009 is that right?<br>A Yes.<br>Q Did you ever think that the issue of him or his family trust potentially having litigation against EPD created an actual conflict between him representing EPD?<br>A As I indicated to you, I don't think he really meant it, based on the relationship. I mean, I screwed up. We screwed up, no question. He had a right to be really mad. And you know when people are mad, they say things that—I mean, I honestly didn't think he would do that."<br><br>***<br><br>"Q Did you yell at Mr. Pressman during that phone call?<br>A I believe I raised my voice, yes. I was very upset.<br>Q Did you threaten legal action against him or EPD?<br>A No.<br>Q None whatsoever?<br>A No. I would guess that he inferred that I did, but I think he was hearing in his own head, because I think he felt very guilty for what he had done. I take him at his word that he did it accidentally, but it was a pretty major screw-up." | |
| 108. Jerrold Pressman did not want to get on Kirkland's bad side.<br><br>"Q BY MR. WEBER: You mentioned during your 2004 exam, one of them, I think, that you thought Mr. Kirkland was a very powerful individual?<br>A Yes.<br>Q Something to the effect that you didn't want to get on his bad side?<br>A I meant from a business standpoint, that he knew a | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 219, lines 12-20. |

| | |
|---|---|
| lot of people that I knew, not from a physical standpoint." | |
| 109. John Kirkland instructed that the UCC-1 be filed in favor of the BC Trust and against the assets of EPD and Pressman.<br><br>On September 10, 2009, Kirkland sent an e-mail to Amy Brown at National Corporate Research, Ltd. stating "Please file the attached in California. Not a rush."<br><br>***<br><br>"Q. Do you recall right around September 11, 2009, instructing someone to file a UCC-1 in favor of the Bright Conscience Trust and against the assets of EPD and Pressman?<br>A Yes.<br>Q And do you recall who you instructed to do that?<br>A Some filing service.<br>Q Do you recall if it was National Corporate Research?<br>A I do not."<br><br>***<br><br>"Q Did you send the e-mail at the bottom of the first page to National Corporate Research on September 10, 2009?<br>A Yes.<br>Q And were you asking them to file a UCC-1 in favor of the Bright Conscience Trust and against the assets of EPD and Pressman?<br>A I was just asking them to file the attached document. "Please file the attached in California."<br>Q And what is "the attached"?<br>A The UCC-1.<br>Q In favor of the Bright Conscience Trust?<br>A Yes.<br>Q And against the assets of EPD and Pressman?<br>A Yes, Jerrold Pressman." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 181, lines 6-16; p. 182, lines 4-20; and Exhibit 47 thereto (E-mail from Kirkland to Amy Brown dated September 10, 2009).<br><br>Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena. |
| 110. A UCC-1 financing statement was filed on September 11, 2009 with the California Secretary of State, with the BC Trust listed as the secured party, and EPD and Jerrold Pressman listed as the debtors. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 181, lines 6-16; p. 182, lines 4-20; and Exhibit 47 thereto (E-mail from Kirkland to Amy Brown dated |

| | |
|---|---|
| | September 10, 2009).<br><br>RJN, **Exhibit Z**, UCC-1 filed with the California Secretary of State on September 11, 2009. |
| 111. On September 14, 2009, Alexis Cassidy at National Corporate Research, Ltd. sent John Kirkland an e-mail stating "John, Attached, is the filed UCC-1 from California for "EPD Investment Co., LLC". The original will be sent regular mail." The e-mail attached a UCC Filing Acknowledgement, and file-stamped copy of the UCC-1, in favor of the BC Trust and against the assets of EPD and Jerrold Pressman.<br><br>"Q I'd like to introduce Exhibit 51. (Chapter 7 Trustee's Exhibit 51 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Did you receive this e-mail from National Corporate Research on September 14th, 2009?<br>A Yes." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 185, lines 11-18; and, at Exhibit 51 thereto (E-mail from Alexis Cassidy to Kirkland dated September 14, 2009).<br><br>Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena. |
| 112. Poshow Kirkland demanded that Jerrold Pressman file the UCC-1, but did not authorize John Kirkland to file it.<br><br>"Q Did you authorize your husband to file a UCC-1 for the Bright Conscience Trust?<br>A (In English) How the UCC finally got filed, all I care is it did.<br>Q But my question is, did you authorize your husband, John Kirkland, to file a UCC-1 for the Bright Conscience Trust?<br>A (In English) I asked Jerry to do it.<br>Q My question is, did you authorize your husband to do it?<br>A (In English) I don't recall if I have a conversation with John about that.<br>Q So you're not sure if you authorized him?<br>A (In English) I don't recall.<br>Q I'd like to introduce Exhibit 21. (Chapter 7 Trustee's Exhibit 21 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Have you seen this e-mail chain before?<br>A (In English) I haven't seen this one. I haven't seen this e-mail.<br>Q Did you authorize your husband, John Kirkland, to send National Corporate Research a UCC-1 for filing in favor of the Bright Conscience Trust? | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 92-93, lines 9-25 and 1-24. |

| | |
|---|---|
| MR. LANDAU: Objection; asked and answered.<br>THE DEPONENT: What was that?<br>MR. LANDAU: I objected to the question as being asked and answered already.<br>Q BY MR. WEBER: You can answer.<br>A (In English) This is Jerry promise me he will file.<br>Q Did you authorize your husband to send this e-mail chain?<br>A (In English) I didn't ask John Kirkland to do it." | |
| 113. Keith Pressman could not think of any reason why the Kirklands or the BC Trust would have a security interest as to the debtors' assets.<br><br>"Q Do you know if your dad or you authorized a security interest in favor of Mr. Kirkland or his family trust against EPD's assets?<br>A I don't know.<br>Q You don't recall that?<br>A No.<br>Q Do you know why Mr. Kirkland, as an investor or lender, would be entitled to some type of security interest in EPD's assets different from any other investor or lender in EPD?<br>A I don't know.<br>Q Are you aware of any reason?<br>A No.<br>Q You're not aware of any reason why he would be entitled to that?<br>A No.<br>Q Or why his family trust would be entitled to that?<br>A No.<br>Q Or why his wife would be entitled to that?<br>A No."<br><br>***<br><br>"Q Can you think of any reason why Mr. Kirkland, his wife or his family trust would be entitled to a first priority UCC-1 Financing Statement as to EPD's assets or your dad's assets?<br>A No."<br><br>***<br><br>"Q It looks like Mr. Kirkland sent in a UCC-1 filing statement to be filed with the Secretary of State whereby Bright Conscience Trust dated September 9th, | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 179, lines 3-23; p. 190, lines 4-8; p. 198, lines 10-19; p. 199, lines 5-11. |

| | |
|---|---|
| 2009, would have a lien against EPD's assets and your dad's assets; is that right?<br>A Yes.<br>Q Can you think of any reason why Mr. Kirkland or the Bright Conscience Trust would be entitled to that?<br>A No."<br><br>***<br><br>"Q Can you think of any reason as to why Mr. Kirkland, Mrs. Kirkland or the Bright Conscience Trust would be entitled to a UCC-1 against your dad or EPD's assets?<br>A I don't know.<br>Q You're not aware of any?<br>A I'm not aware of any." | |
| 114. Jerrold Pressman does not think that the BC Trust or the Kirklands should be entitled to be senior in priority to other investors, but claims that is the deal he made with Kirkland.<br><br>"Q Is there a reason why you think that the Kirklands are entitled to monies from the bankruptcy estate or EPD before other lenders or investors get money?<br>A The truth is, no, I don't think he should be entitled to it, but that's the deal I made. At the time I made it, I didn't expect that it would be coming down to a "Sophie's Choice" between him and everybody else. At the time I made it, with that $4 million loan coming in, I had total confidence that everybody would be treated equal. Had I known the situation, I would agree, I don't think one creditor should get it. But that's the document, that's the contract. That's what I agreed to do. And as a man of my word, that's what's got to happen. I don't even like what's happening, but that's what it is." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 224-225, lines 25 and 1-16. |
| 115. On February 9, 2009, before the date of Luce Forward's retainer letter sent to EPD, John Kirkland had Jerrold Pressman and Keith Pressman sign a General Release in favor of Kirkland in exchange for $1,000. Among other things, the General Release purported to release "claims of legal malpractice, breach of fiduciary duty, fraud, negligent misrepresentation, professional or ordinary negligence, and all claims in any way arising out of or relating to any prior or current representation of EPD or its affiliates, and any transaction between the parties." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 32 thereto (General Releases dated February 9, 2009).<br><br>Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including the Notice of |

| | |
|---|---|
| Kirkland obtained a similar General Release from Jerrold Pressman individually. | Assignment. |
| 116. Just days after the BC Trust was formed, and John Kirkland assigned his interests in EPD to the BC Trust, HMB Holdings, LLC was formed as a Delaware limited liability company with the Delaware Secretary of State on September 14, 2009. Kirkland signed the Limited Liability Company Certificate of Formation using his electronic /s/ signature as the "Authorized Person" for HMB. The registered agent listed for HMB was National Corporate Research, Ltd. | RJN, **Exhibit BB**, State of Delaware Limited Liability Company Certificate of Formation filed on September 14, 2009; Certification by the Delaware Secretary of State. |
| 117. The day after HMB was formed as a limited liability company by John Kirkland, on September 15, 2009, Kirkland sent an e-mail to Alexis Cassidy at National Corporate Research, Ltd. attaching UCC-1 financing statements in favor of HMB and against the assets of EPD and Pressman to be filed with the California Secretary of State. Kirkland's e-mail states "please also file the attached in CA. not a rush"." The address listed for HMB Holdings, LLC at the top of the financing statements was "601 South Figueroa Street, Suite 3900 Los Angeles, CA 90017."<br><br>The address listed was the address of Luce Forward. | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena at pp. 1261-1264. |
| 118. On September 16, 2009, Alexis Cassidy of National Corporate Research, Ltd. sent an e-mail to Kirkland stating "John, Attached, is the filed UCC-1 from California for "EPD Investment Co., LLC". The original will be sent regular mail." The e-mail attached a UCC filing acknowledgement and file-stamped copy of the UCC-1 filed in favor of HMB and against the assets of EPD. | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena at p. 1256-1258. |
| 119. HMB is an entity comprised of certain investors in EPD that threatened legal action and an involuntary bankruptcy case against EPD, and then agreed to defer legal action against EPD in exchanges for a security interest in the Debtors' assets.<br><br>"Q And are you familiar with an entity called HMB Holdings, LLC?<br>A Yes.<br>Q What's HMB?<br>A I don't remember what it stood for. It was a group of investors that had gotten together and agreed to defer legal action if I would give them a security | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 41, lines 8-25.<br><br>RJN, **Exhibit CC**, Claim 209.<br><br>RJN, **Exhibit DD**, Third Omnibus Motion for Approval of Compromises, pp. 328-329.<br><br>RJN, **Exhibit FF**, Eighth Omnibus |

| | |
|---|---|
| interest in EPD to the extent of—I can't recall exactly, but I think about $15- to $16 million, that group.<br>Q And did they also, in addition to—strike that. So they threatened legal action against EPD or you?<br>A Yes.<br>Q Did that group of people, HMB, also threaten an involuntary bankruptcy case against EPD?<br>A Yes, some of them did." | Motion for Approval of Compromises, pp. 479-480, 484-485. |
| 120. HMB was formed during 2009, within six months from the time that payments from EPD to investors stopped.<br><br>"Q BY MR. WEBER: Have you seen Exhibit 6 before?<br>A I don't know; I may have.<br>Q And for the record, it's a document from the Delaware Secretary of State in regard to the formation of HMB. Mr. Pressman, is it your understanding that HMB was formed on or about September 14, 2009?<br>A I don't recall.<br>Q Sometime in 2009?<br>A Yes.<br>Q Do you recall when HMB, or the group of people that made up HMB, threatened legal action against EPD or you?<br>A Well, certainly within the six months previous from the point that payments stopped being made. I can't tell you when that date was, but it was between three and six months prior to the forming of HMB or my agreement to do so.<br>Q Was that the same time that they threatened an involuntary bankruptcy case?<br>A Yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 47-48, lines 7-25 and 1-3. |
| 121. Kirkland was the "authorized person" who formed HMB, and instructed that a UCC-1 be filed in favor of HMB and against the assets of EPD and Pressman.<br><br>"Q Were you an authorized person for HMB?<br>A I don't recall."<br><br>***<br><br>"Q Did you assist in filing a UCC Financing Statement in favor of HMB and against the assets of EPD and Pressman? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 184, lines 10-11; p. 185, lines 7-10; p. 187, lines 3-16; and, p. 188, lines 2-4.<br><br>RJN, **Exhibit BB**. |

| | |
|---|---|
| A I don't recall."<br><br>***<br><br>"Q And did you receive the filed UCC-1 in favor of HMB and against EPD?<br>A I don't recall.<br>Q But it's attached to this e-mail; correct?<br>A It's attached to this paper you handed me.<br>Q Was that an e-mail that you received?<br>A The first page is.<br>Q But it notes that there is an attachment; correct?<br>A It does note that there is an attachment.<br>Q And it says, "John, attached is the filed UCC-1 from California for EPD Investment Co. LLC."<br>A That's what it says."<br><br>***<br><br>"Q Did you submit the UCC-1 with the California Secretary of State directly or indirectly?<br>A I don't recall." | |
| 122. National Corporate Research, the same company used by Kirkland and Lisa Underkoffler with other filings, filed the HMB Articles of Organization.<br><br>"Q Ms. Underkoffler, have you seen this document before?<br>A Not that I recall.<br>Q And it's a State of Delaware Limited Liability Company Certificate of Formation for HMB Holdings, LLC; is that correct?<br>A Yes.<br>Q And it's signed John C. Kirkland, Authorized Person. Do you see that?<br>A Yes.<br>Q Do you know if you submitted this for filing with any type of service?<br>A I don't recall.<br>Q And this is—it references a National Corporate Research, Limited, above. Do you see that?<br>A Yes.<br>Q Okay. And that's the same company that did those other filings we just looked at?<br>A Yes." | RJN, **Exhibit BB**.<br><br>Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 66-67, lines 21-25 and 1-14. |
| 123. John Kirkland also obscured the UCC-1 filing in pleadings filed in this bankruptcy case. The | RJN, **Exhibit III**, Motion for Appointment of Interim Trustee, filed |

| | |
|---|---|
| petitioning creditors originally moved for the appointment of an interim trustee [Docket No. 6], and raised the issue of the BC Trust and HMB UCC-1 filings ("[d]uring the time period while the Petitioning Creditors and Hansel stopped receiving interest payments and were not repaid on the Notes on demand, EPD has proceeded to encumber its assets with consensual liens by entities that appear related to and/or controlled by Pressman and his attorneys")<br><br>John Kirkland's response, on behalf of EPD [Docket No. 24], was to downplay the UCC-1 filing as having been filed more than a year before, and as "nothing unusual or improper" and "standard fare". | in EPD's bankruptcy case on January 11, 2011 (Docket No. 6), at p. 16 of 21, lines 2-5.<br><br>RJN, **Exhibit W**, Alleged Debtor's Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 24), p. 7 of 9, lines 4-8. |
| 124. John Kirkland also sent e-mail instructions for the UCC-1 to be filed in favor of HMB and against the assets of EPD and Pressman, and the UCC-1 was filed on September 16, 2009.<br><br>"Q I'd like to introduce Exhibit 51. (Chapter 7 Trustee's Exhibit 51 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Did you receive this e-mail from National Corporate Research on September 14th, 2009?<br>A Yes.Q Did you assist in filing the paperwork for -- I'm sorry. This is in regard to Bright Conscience Trust. I'd like to introduce Exhibit 52. (Chapter 7 Trustee's Exhibit 52 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: And I'll note for the record that there is an attachment to this document that my colleague said was produced in this fashion. But if you look at the cover of this document, it doesn't list an attachment. So I'll just note it for the record. I think that's the way it was produced.<br>Q On September 14th, 2009, did you cause an additional UCC to be filed in favor of HMB Holdings, LLC and against the assets of Jerrold Pressman?<br>A I don't recall.<br>Q How about against the assets of EPD?<br>A I don't recall.<br>Q Are these e-mails on the first page e-mails you sent or received?<br>A The first page is an e-mail from Alexis Cassidy to me and an e-mail from me to her and an e-mail from her to me. There is no indication any attachments or | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 185-187, lines 11-25, 1-25, and 1-19 (and Exhibits 51-53 thereto, e-mails and attachments). |

| | |
|---|---|
| other pages.<br>Q I'd like to introduce Exhibit 53.<br>(Chapter 7 Trustee's Exhibit 53 was marked for identification by the Deposition Officer and is attached hereto.) Q BY MR. WEBER: Is this an e-mail you received from National Corporate Research on or about 1 September 16, 2009?<br>A Yes.<br>Q And did you receive the filed UCC-1 in favor of HMB and against EPD?<br>A I don't recall.<br>Q But it's attached to this e-mail; correct?<br>A It's attached to this piece of paper you handed me.<br>Q Was that an e-mail that you received?<br>A The first page is.<br>But it notes that there is an attachment; correct?<br>A It does note that there is an attachment.<br>Q And it says, "John, attached is the filed UCC-1 from California for EPD Investment Co. LLC."<br>A That's what it says.<br>Q So did you receive this?<br>A I received the first page; I don't know about anything else." | |
| 125. HMB waived its purported secured claim (notice of motion and Third Omnibus Motion for Approval of Compromises, including a settlement with HMB (Docket Nos. 769 and 770 and 840)), agreed that its purported secured proof of claim was disallowed and agreed that the purported secured claim filed and/or recorded in favor of HMB and against the Debtors and their assets was avoided and recovered by the Trustee. | RJN, **Exhibit CC**, Claim 209.<br><br>RJN, **Exhibit DD**, Third Omnibus Motion for Approval of Compromises, pp. 361-361, paragraphs 2(d) and 3.<br><br>RJN, **Exhibit EE**, Order Approving Third Omnibus Motion for Approval of Compromises. |
| 126. At the time that John Kirkland filed the UCC-1 on behalf of the BC Trust in September 2009, EPD was experiencing cash flow issues, creditors were contacting EPD about cash flow issues, and lenders or investors other than the BC Trust and HMB were not receiving security agreements or UCC-1 filings.<br><br>"Q Is it your understanding that the Bright Conscience Trust filed a UCC-1 against EPD's assets and your assets in or about September 2009?<br>A Yes.<br>Q And as of September 2009, were creditors or investors, lenders in EPD contacting EPD about cash | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 192, lines 2-24.<br><br>Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 110, lines 12-15; p. 108, lines 8-11; p. 107, lines 17-19; p. 106, lines 23-25; p. 106, lines 4-6. |

| | |
|---|---|
| flow issues?<br>A Probably, yes.<br>Q And was EPD experiencing cash flow issues during September 2009?<br>A Yes; it was awaiting a loan.<br>Q So at that point, were any other lenders or investors getting Security Agreements or UCC Financing Statements?<br>A No.<br>Q Just Mr. Kirkland?<br>A Yes.<br>Q Or his family trust?<br>A Yes.<br>Q And HMB?<br>A Yes.<br>Q No one else?<br>A That's correct."<br><br>***<br><br>"Q Had this issue, in regard to the ability of EPD to pay investors, started far before September 30, 2009?<br>A I'm going to assume, yes."<br><br>***<br><br>"Q And was having EPD cash flow liquidity issues as of September 30, 2009?<br>A Yes."<br><br>***<br>"And was EPD having money or liquidity issues as of October 12, 2009?<br>A Yes."<br><br>***<br><br>"Q Was EPD having money issues and liquidity issues going back to October 15, 2009?<br>A It looks like it, yes."<br><br>***<br><br>"Q Was EPD having money and liquidity problems back in May 2009?<br>A I'm going to assume, yes, from this e-mail."<br><br>*** | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 106-108, lines 25, 1-25 and 1-4; p. 211, lines 3-6.<br><br>RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 14, lines 5-8. |

| | |
|---|---|
| "Q At some point in 2008 or 2009, did EPD begin experiencing cash flow issues?<br>A Yes, I believe so.<br>Q Do you recall what the circumstances were?<br>A No.<br>Q There was some type of a cash crunch?<br>A Yes.<br>Q Do you recall approximately when that happened?<br>A Not offhand. I guess around—I mean, I don't remember specifically.<br>Q Somewhere in the 2008/2009 time frame?<br>A Yes.<br>Q And did EPD start getting a lot of calls from investors and lenders asking about the status of their money on deposit with EPD?<br>A I know there were calls.<br>Q A lot of calls?<br>A Yes.<br>Q And e-mails?<br>A I'm sure there were.<br>Q Was the general nature that the investors or lenders were wondering if their money was safe or whether they could get it back, that type of inquiry?<br>A Yes.<br>Q And what was the response by EPD?<br>A I don't remember.<br>Q Who responded to the investors or lenders during that time period?<br>A I think mostly my dad."<br><br>***<br><br>"Q You testified earlier somewhere in the 2008/2009 time frame, that's generally when the cash crunch hit EPD?<br>A That's about right."<br><br>***<br><br>"Beginning in early or mid-2009, EPD stopped making regular payments to Creditors. After that point, the Creditors repeatedly contacted me regarding the status of refinancing of the real property owned by NHIP and/or the sale of stock of NHIP, in order to generate funds to pay creditors." | |
| 127. The BC Trust and HMB obtained UCC-1 filings because they demanded it and because Jerrold | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, |

| | |
|---|---|
| Pressman did not want to be sued.<br><br>"Q Other than Mr. Kirkland and HMB, other lenders or investors weren't given a UCC Financing Statement, right, or a Security Agreement in 2009; right?<br>A Remember, most of these investors go back 15 or 20 years. HMB didn't even occur until, what, 2009. So obviously there was never an issue for the previous 30 or 40 years.<br>Q But among those, EPD or Kirkland or Bright Conscience Trust, they got it because they demanded it?<br>A Because I didn't want to get sued. Just like there is a whole group of people. And if that whole group of people, which are very strong people—one of them was a bankruptcy attorney—I was dead. I would have never got the loan. So I did it with my arm being twisted. But again, nobody loaned money to EPD after 2009. I mean if they did, it was just nickels and dimes. I'll bet you I didn't get 10- or $15,000 after that, so there was no one to notify; this was all after the fact." | bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 201-202, lines 21-25 and 1-16. |
| 128. The credit line that Jerrold Pressman relied on had been terminated in 2008, which caused a cash crunch at EPD in 2009, prior to the BC Trust's UCC-1 filing.<br><br>"Q Now at some point in 2009, was there a cash flow issue that EPD started to encounter?<br>A There certainly was. It's called the economic crisis of America.<br>Q And do you recall approximately when that was?<br>A I believe my credit line, or the credit line that I was always dependent on, in 2008 was cancelled by the bank, along with all of their customers that had real estate securing those loans. And as the effect of the economic crisis, all of the customers of—the major customers of Broadway Entertainment, which were the movie studios, ran out of money and couldn't pay their bills. So I would say that we ran into some serious cash flows. Once the credit line was gone, I had no source—I couldn't sell property any longer because we required those funds to post bonds to sell the properties." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 37-38, lines 11-25 and 1-4. |
| 129. In 2009, after EPD's cash crunch, EPD was not able to pay investors amounts requested by the investors, and EPD started getting a heavy volume of calls from investors as to the status of their funds. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold |

| | |
|---|---|
| "Q But when an investor requested their funds in 2009, after the cash crunch happened, if they requested their funds, was EPD able to repay them at that point?<br>A Not at the time they requested it. But I did tell them if they could just hang on. And I showed them the documents from the bank, that it would just hopefully be a short period of time and I would have the funds to pay them.<br>Q Did EPD start receiving a heavy volume of calls and e-mails from investors during 2009 as to the status of their funds?<br>A Yes.<br>Q On a daily basis?<br>A Probably."<br><br>***<br><br>"Q At some point in 2009, did investors start demanding amounts that EPD wasn't able to pay?<br>A Yes.<br>Q Do you recall when that was?<br>A No, I don't.<br>Q Was it at some point in 2009?<br>A Yes.<br>Q Was it in the summertime?<br>A I don't remember.<br>Q What generally happened? Investors contacted EPD asking for money and EPD just didn't have the money to pay it?<br>A Yeah, basically. That's what ended up happening.<br>Q So what did EPD tell the investors at that point?<br>A From what I recall, Jerry was working on some kind of loan to get everybody the cash they needed.<br>Q And was he successful in getting that loan?<br>A I don't think it ever came through, no."<br><br>***<br><br>"Beginning in early or mid-2009, EPD stopped making regular payments to Creditors. After that point, the Creditors repeatedly contacted me regarding the status of refinancing of the real property owned by NHIP and/or the sale of stock of NHIP, in order to generate funds to pay creditors." | Pressman, pp. 39-40, lines 21-25 and 1-10.<br><br>Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 26-27, lines 5-25 and 1.<br><br>RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 14, lines 5-8. |
| 130. On July 24, 2009, John Kirkland entered into a Funding Agreement with EPD and Jerrold Pressman. The Funding Agreement is signed by | RJN, **Exhibit J**, Appellants' Opening Brief filed by the Kirklands, Case No. 14-55740, United States Court of |

| | |
|---|---|
| Kirkland, and by Jerrold Pressman individually and on behalf of EPD. The Funding Agreement reflected in the Recitals that Kirkland was aware of EPD's cash flow issues at that time, stating "EPD has advised Investor that, due to temporary cash flow constraints, EPD has an immediate need for $100,000. The Recitals also reflected that EPD had been paying Kirkland's mortgage payments, stating "EPD states that it has paid approximately $75,000 to Investor's mortgage lender for the benefit of Investor over the last year, in monthly payments of approximately $7,500, and will make additional monthly payments in accordance with this Agreement."<br><br>"In July 2009, due to EPD's immediate cash flow needs, John lent EPD an additional $100,000. (2 ER 220.)." Appellants' Opening Brief, Case No. 14-55740, filed by the Kirklands with the United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 16 of 79.<br><br>***<br><br>"WHEREAS, EPD has advised Investor that, due to temporary cash flow constraints, EPD has an immediate need for $100,000".<br><br>***<br><br>"Q Do you recall during mid 2009, EPD or Pressman telling you that they had cash flow issues?<br>A Yes<br>Q And do you recall when exactly that was?<br>A Mid to fall, somewhere around there.<br>Q And what did they say or how did you find out?<br>A I think Jerry said, "I need a hundred grand; there is some short-term issues." And I said, "Fine."<br><br>***<br><br>"Q Do you recall any financial issues during 2009?<br>A No, other than I think Jerry asked for $100,000 in 2009, whenever that was. I don't remember when that was.<br>Q And that was due to financial constraints; correct?<br>A That was in July of 2009, due to cash flow constraints.<br>Q So you were aware that there were some cash flow constrains at least beginning in July 2009? | Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 16 of 79.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, at Exhibit 35 thereto (Funding Agreement dated July 24, 2009, at p. 1).<br><br>Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants including Funding Agreement and Notice of Assignment.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 142, lines 9-21; and p. 195, lines 1-14. |

| | |
|---|---|
| A I was aware on July 24th, 2009, that EPD had temporary cash flow constraints and needed $100,000." | |
| 131. Pressman was concerned about the inability to pay back investors.<br><br>"Q Did Mr. Pressman ever express concern to you during 2009 or 2010 about the inability to pay back investors?<br>A Yes, he was concerned. He was trying to take care of it.<br>Q Do you know what he was concerned about?<br>A Just concerned that there was a shortage of cash." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 127, lines 3-10. |
| 132. In 2009, investors also started threatening lawsuits and an involuntary bankruptcy proceeding against EPD.<br><br>"Q BY MR. WEBER: Now, at some point in 2009, did any creditors or investors start threatening suits against EPD or you?<br>A Yes.<br>Q Do you recall how many?<br>A No, not the exact number, but certainly more than 20.<br>Q And did any of those investors also threaten an involuntary bankruptcy case against EPD?<br>A Yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 40-41, lines 23-25 and 1-7. |
| 133. Notwithstanding that EPD was unable to pay debts as they became due, John Kirkland and Luce Forward filed pleadings in the bankruptcy case asserting that EPD was in fact paying debts as they became due.<br><br>"Moving parties have utterly failed to make any factual showing that EPD is generally not paying its debts as they become due. This is not surprising given that, with the exception of the claims described above and claims of similar ilk which are subject to bona fide disputes, EPD does not have a single past due bill or late payment. In other words, EPD is generally paying its debts as they become due, unless such debts are subject to a bona fide dispute." | RJN, **Exhibit W**, Alleged Debtor's Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 24), p. 6 of 9, lines 22-26. |
| 134. During the same time period during which John Kirkland made investments in EPD, Kirkland recommended that Jerrold Pressman hire Katy Werner, | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| Werner was a former California attorney who had been suspended (and was later disbarred) based on a felony conviction against her in 2006 for grand theft by fiduciary, grand theft by fiduciary from an elder, and forgery.<br><br>"Q Did you recommend Ms. Werner for a position with EPD or Broadway?<br>A I think when he said he needed a secretary, I think I said—he knew Katy and I think I said she was looking for a job.<br>Q Was that after she had been suspended or disbarred?<br>A I think so.<br>Q And after her criminal conviction?<br>A I think so.<br>Q Did you know that she had been suspended or disbarred at that point?<br>A Yes.<br>Q And did you know she had a felony conviction against her?<br>A I don't recall.<br>Q Why did you recommend someone who had been suspended or disbarred go work for EPD or Broadway?<br>A That had nothing to do with it. I thought she would be a good secretary."<br><br>***<br><br>"Q You said you were convicted of a criminal offense?<br>A Yes.<br>Q Do you recall what the offense was?<br>A Theft.<br>Q Do you recall if it was a felony conviction?<br>A Yes.<br>Q And what year was that?<br>A It was 2006.<br>Q And at that point, after the felony conviction was entered, were you disbarred at that point?<br>A I was.<br>Q And you were disbarred in 2006?<br>A Yes.<br>Q And is that why you stopped practicing law at that point?<br>A I mean, it was just confirmation that's not what I wanted to do anymore. But I saw firsthand what I had been learning previously through my work at O'Melveny on a number of cases that are beyond the scope of this, that litigation was not the way to resolve | from the deposition of John Kirkland, pp. 163-164, lines 10-25, and 1-4.<br><br>Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 89-92, lines 17-25, 1-25, 1-25 and 1-5. |

| | |
|---|---|
| conflicts, especially certain kinds of conflicts, and it just confirmed that for me.<br>Q But then also at that point once you were disbarred, you couldn't lawfully practice law?<br>A Correct. But I didn't even—I also just knew I wasn't even going to try to get my license back because you can also try.<br>Q Did John Kirkland know about your disbarment?<br>A Yes.<br>Q In 2006?<br>A Yes.<br>Q And did—<br>A Well, I don't know if he knew in the time frame; I don't remember when exactly he knew.<br>Q Did he know about your felony conviction?<br>A At some point.<br>Q Do you know if he knew about your disbarment and felony conviction when he introduced you to the potential job at Broadway?<br>A I don't know the timing.<br>Q Do you recall approximately what year you would have told him about the disbarment and conviction?<br>A It was probably after.<br>Q After what point?<br>A I think it was after the disbarment.<br>Q And was it at some point prior to when you began working for Broadway?<br>A Yes.<br>Q So Mr. Kirkland would have known about the disbarment and criminal conviction when you introduced you to Mr. Pressman in regards to—<br>A He didn't introduce me to Mr. Pressman.<br>Q when he set up the meeting between you and Mr. Pressman about the potential job?<br>A Yes.<br>Q And he was aware of that also when he provided the legal work for you to do at his direction?<br>A Yes." | |
| 135. Kirkland did not believe that there was any issue with EPD hiring a convicted felon who had been suspended or disbarred.<br><br>"Q Didn't you see any problem with someone who had been suspended or disbarred based on a felony conviction going to work for an investment company?<br>A No.<br>Q Why not?<br>A Why would I? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 164-165, lines 12-25, and 1. |

| | |
|---|---|
| Q I'm asking you.<br>A The question doesn't make any sense to me.<br>Q Does it make any sense as to why there may be an issue with having someone who had a felony conviction go work for an investment company?<br>A Correct.<br>Q You didn't see any issue with that?<br>A She was a secretary. I didn't see any issue." | |
| 136. Jerrold Pressman and Keith Pressman confirmed that John Kirkland referred Katy Werner as an employee.<br><br>"Q And who introduced you to Ms. Werner?<br>A She came in either by—either John Kirkland personally called me and told me about her or she told me that John Kirkland recommended her; I don't remember.<br>Q So Mr. Kirkland recommended Katy Werner?<br>A Well, yeah."<br><br>***<br><br>"Q Do you recall how she found the job with the various entities?<br>A I think she came from John Kirkland.<br>Q Mr. Kirkland referred her?<br>A I believe so.<br>Q Did he recommend her?<br>A I assume so. I just don't remember how it happened, I just remember that she did come through him."<br><br>***<br><br>"Q Do you know why Mr. Kirkland would bring a person who had been suspended from the State Bar and convicted of a felony and introduce them to work for EPD or the other entities?<br>A I don't remember the specifics." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 87, lines 8-14.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 57, lines 10-18; p. 66, lines 15-19. |
| 137. Katy Werner (formerly known as Katherine Jean Sabich-Robison), an employee of or independent contractor for EPD and Broadway, was previously convicted of a felony in 2006 for grand theft by fiduciary, grand theft by fiduciary from an elder, and forgery. | RJN, **Exhibit HH**, Recommendation of Summary Disbarment re Katherine Jean Sabich-Robison, Case No. 05-C-02150, State Bar Court Clerk's Office, Los Angeles |

| | |
|---|---|
| The Recommendation of Summary Disbarment filed with the State Bar Court pm August 5, 2010, and signed by the Presiding Judge, states in pertinent part that "[o]n May 10, 2006, a jury found Sabich-Robison guilty of felony violations of Penal Code sections 506 (grand theft by fiduciary), 487, subdivision (a) (grand theft), 470, subdivision (a) (forgery), and 368, subdivision (d) (grand theft by fiduciary from elder). Effective June 24, 2006, we placed her on interim suspension. Sabich-Robison unsuccessfully appealed her judgment of conviction, and on June 24, 2010, the State Bar transmitted evidence that Sabich-Robison's conviction was final."<br><br>***<br><br>Q And then I'd like to introduce Exhibit 31.<br>///<br>(Chapter 7 Trustee's Exhibit 31 was markedfor identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Have you seen this document before?<br>A Yes.<br>Q Is this the document by which you were disbarred?<br>A Yes.<br>Q And the disbarment occurred in 2010 rather than 2006; correct?<br>A Yes. I didn't really even know. As I said, I was so disillusioned and disheartened by the entire process that I really didn't want anything more to do with litigation to the extent I could avoid it.<br>Q On the second paragraph it said that the felony convictions you were convicted of were grand theft by fiduciary, grand theft forgery, and grand theft fiduciary from elder; is that correct?<br>A Yes.<br>Q And it says that effective June 24, 2006, that you were placed on interim suspension; is that correct?<br>A Yes.<br>Q And then you appealed your conviction, but the appeal wasn't successful?<br>A Correct.<br>Q And then in June 2010 you were disbarred, is that correct, or June or August 2010?<br>A That's what it says."<br><br>***<br>"Q Ms. Werner, on the exhibits we looked at before in | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 92-94, lines 24-25, 1-25 and 1-5; pp. 139-140, lines 25 and 1-16. |

| | |
|---|---|
| relation to the State Bar proceedings on the conviction and suspension and disbarment, it listed a different name. Do you recall that?<br>A Yes.<br>Q and what name was that?<br>A Sabich-Robison.<br>Q You're Katharine Sabich-Robison?<br>A I was; I'm no longer.<br>Q That was a former name?<br>A Yes. That was my married name, which was a hyphenated name that was because my mother died when I was very young. And my father, who was Eric Werner, wanted me to take her name, her maiden name, and hyphenate it with my husband's. So that was that. That was my name. So then I was divorced right after the conviction." | |
| 138. Jerrold Pressman and Keith Pressman knew of Katy Werner's background and Jerrold Pressman still hired her and kept her as an employee.<br><br>"Q Did you tell Mr. Pressman about her suspension or disbarment?<br>A I did or she did, I don't recall; I think she probably did.<br>Q Did you tell Mr. Pressman about her felony conviction?<br>A I did or she did. I think she probably did.<br>Q Mr. Pressman didn't see an issue with that either?<br>A I don't know; you would have to ask him.<br>Q Not that you're aware of?<br>A Not that I'm aware of."<br><br>***<br><br>"Q Do you know if Ms. Werner was previously a practicing attorney?<br>A Yes.<br>Q And are you aware that she was suspended and then got disbarred?<br>A Yes.<br>Q When did you become aware of that?<br>A I don't remember.<br>Q Was it around the time she got hired?<br>A I don't remember.<br>Q And was your dad aware of that as well?<br>A I don't remember.<br>Q Were you also aware that she had a felony conviction against her? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 165, lines 2-14.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 58, lines 4-24; p. 65, lines 16-24; p. 66, lines 8-14.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 88, lines 9-21. |

| | |
|---|---|
| A Yes.<br>Q And do you recall when you became aware of that?<br>A I don't remember?<br>Q Was it sometime while she was working for the various entities?<br>A Yes, I think so."<br><br>***<br>"Q Was there any concern with having someone who had a felony conviction being brought in to work for a company that handled people's investments or money?<br>A You know, I don't remember the—I mean, I know she was at a pretty low level. I don't think she handled the money. I mean, I don't remember the exact conversations, but I don't remember her having much control of anything."<br><br>***<br>"Q You don't recall any concern with having someone who had been convicted of a felony interacting with lenders or investors regarding their money?<br>A No. My dad made the decision. And I don't remember the—you know I'm sure we had a discussion and it came up. And I know he pretty much made the decision. I don't remember the discussion."<br><br>***<br><br>"Q And were you also aware that she had been suspended or disbarred?<br>A Yes.<br>Q And were you aware of that when you hired her?<br>A I'm pretty sure I was, or I would have known it very soon thereafter.<br>Q Were you aware that Ms. Werner had a felony conviction against her?<br>A I did find that out, but I don't remember when, whether it was before or after. I knew that she had been in jail. But to the extent of it, I wasn't aware of the details." | |
| 139. Katy Werner was an employee of or independent contractor for EPD.<br><br>"MR. WEBER: This is a document filed in the District Court for the Northern District of Illinois in the Huerth v. Pressman, et al., case titled, "Declaration of Katharine Werner." It appears to have been filed on August 5, 2013. | RJN, **Exhibit II**, Declaration of Katharine Werner, Arthur Huerith, et. al. v. Jerrold Pressman, et. al., Case No. 10-05049, United States District Court, Northern District of Illinois, Western Division (Document No. 114-9). |

| | |
|---|---|
| Q Do you recognize this Declaration?<br>A I vaguely recall it. I'm just sort of looking over it.<br>Q Sure.<br>A I vaguely recall this.<br>Q Is that your signature on the last page, page 11 of 11?<br>A Yes.<br>Q Did you prepare this Declaration?<br>A I provided information to my attorney at the time to prepare it and then reviewed it and approved and signed.<br>Q The second paragraph says, "I have never been an employee of Jerrold Pressman or a shareholder, member, officer, director of any Pressman owned/controlled entity ('Pressman Entities'), with the exception of EPD Investment Co, LLC ('EPD'). While I was an employee of EPD, I occasionally gave miscellaneous assistance to other Pressman Entities from time to time." Do you see that?<br>A I do.<br>Q Were you an employee of EPD?<br>A I guess so. I really don't recall whether I was an employee or an independent contractor.<br>Q Didn't you previously state that you were an employee or independent contractor of Broadway rather than EPD?<br>A Probably. Like I said, I really have very little recollection of any of this; I really don't know. It's possible.<br>Q You don't recall who you were employed by?<br>A Not really. No, I really don't. We operated out of the same offices." | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 114-115, lines 4-25 and 1-18. |
| 140. Notwithstanding Katy Werner's criminal conviction and suspension in 2006 for grand theft by fiduciary, grand theft by fiduciary from an elder, and forgery, John Kirkland had Katy Werner prepare pleadings, declarations and discovery responses for him. Kirkland referred to this as "secretarial" work, and stated that having an attorney at Luce Forward perform that work would be "idiotic."<br><br>"Q Your response that same day was, "Have Katy do it. Send her the last one we did." Do you see that?<br>A Yes.<br>Q Were you saying that Katy Werner should do it?<br>A Yes. She would take the prior pleading and, you know, change the names, et cetera. The substantive work was already done, so she was doing secretarial | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 205-206, lines 6-25, and 1-15; and, pp. 242-243, lines 17-25, and 1-4. |

| | |
|---|---|
| work. I didn't want Lisa to have to do it, so I wanted Katy to do it.<br>Q Why didn't you have an attorney at Luce Forward do it?<br>A That would be idiotic. It was secretarial work. I would never have a lawyer do secretarial work.<br>Q So drafting an opposition is secretarial work?<br>A That's not what is happening here, it's clear. The opposition had already been done in a similar case, and all she was doing is taking the prior pleading and recharging it to be filed in this case. That's a secretary's job, not a lawyer's job.<br>Q So that's a secretary's job to take a pleading from a similar case and turn it into a pleading for whatever case you're working on?<br>A To do the first round of it, yes, absolutely. And then Theona or I would revise it and file it. But saying, "Here's a pleading for an identical motion in an identical case, all you've got to do is change the names and the case numbers and the dates and then hand it back to me," no question, that's secretarial work.<br>Q It's not legal work?<br>A It's not legal work."<br><br>***<br><br>"Q And did you have Ms. Werner prepare and draft discovery responses?<br>A Yeah. I think I said,"Here's the responses. Here's what questions you're responding to; plug it in." That's typically how I do discovery responses. I tend to be very repetitive. So I have some pretty standard responses. And then I say, "okay, for Number 1, object on A, B and C, Number 2, C, D and E, Number 3, A, B and D." And then I have my secretary do that, or in this case, Jerry's secretary. It looks like in this case it was mostly objections. So it would have been me saying, "Here's my standard objections, plug them in as follows." | |
| 141. Katy Werner "didn't intend to" perform legal work, but drafted pleadings at John Kirkland's instructions if Jerrold Pressman asked her to do so.<br><br>"Q After you joined Broadway, did you perform any legal work for EPD?<br>A I didn't intend to.<br>Q What do you mean by that?<br>A I did what Keith and Jerry instructed me to do as an | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 29-30, lines 18-25 and 1-3; pp. 45-46, lines 10-25 and 1-15. |

| | |
|---|---|
| executive assistant. And how that ended up being received might be different, but I only did what I was told to do.<br>Q And that was by Jerry Pressman and Keith Pressman?<br>A Correct."<br><br>***<br><br>"Q Do you know why he would have you draft a legal pleading for him? Strike that. You didn't work for Mr. Kirkland at that point, did you?<br>A No. But if he asked Jerry to have me do something and Jerry was okay with it, Jerry would ask me to do something. If Jerry said, "No, I don't want her doing that," then Jerry would say no.<br>Q So you drafted legal pleadings for Mr. Kirkland during this time frame?<br>A Occasionally I would do draft letters. I would do draft—simple draft pleadings, especially if they were just a repeat of something that had already been done, just the same way that a paralegal or a legal assistant would do.<br>Q Do you know why Mr. Kirkland didn't have an attorney or someone at his law firm do that?<br>A I don't.<br>Q You said you weren't a practicing attorney at this point; right?<br>A Correct.<br>Q Did you ever tell Mr. Kirkland that you weren't practicing as an attorney and discuss whether you should be drafting legal pleadings?<br>A I didn't.<br>Q So you prepared the legal pleadings for Mr. Kirkland?<br>A I did. I mean, as long as it is reviewed and adequately supervised by an attorney licensed in the jurisdiction, then it is—you know, there is no unauthorized practice." | |
| 142. Pleadings drafted by Katy Werner at John Kirkland's instruction, while she was a "secretary" at EPD included oppositions, reply briefs and discovery responses.<br><br>"Q BY MR. WEBER: Ms. Werner, do you recall receiving this e-mail from Ms. Underkoffler?<br>A I don't recall specifically.<br>Q Was this, again, in reference to Mr. Kirkland asking you to draft an opposition? | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 46-47, lines 16-25 and 1-2 (as to Exhibit 8 to the Werner transcript); pp. 47-48, lines 21-25 and 1-8 (as to Exhibit 9 to the Werner transcript); pp. 54, lines 1-16 (as to Exhibit 12 to the Werner transcript); |

| | |
|---|---|
| A Yes, it sounds like it. As I said, I don't recall this specifically, but that's what it sounds like."<br><br>***<br><br>"Q On these e-mails you're communicating with Ms. Underkoffler and Mr. Kirkland about drafting legal documents for a case?<br>A Yes.<br>Q And so you asked Ms. Underkoffler to send documents in Word format and the motion so you could take a look at it?<br>A Yes.<br>Q And you also asked for the general denial that Mr. Kirkland filed?<br>A That's what it says. Like I said, I don't remember all of this specifically, but that's what it says."<br><br>***<br><br>"Q Ms. Underkoffler was asking for you to draft a reply brief and also to draft discovery responses?<br>A Yes, that's what it appears to be.<br>Q And that instruction, was that at the behest of Mr. Kirkland?<br>A Is suppose, yes. That would appear to be true also.<br>Q Did anyone else direct Ms. Underkoffler's actions in sending e-mails other than Mr. Kirkland.<br>A I don't know.<br>Q Are you aware of any?<br>A I'm not aware of any.<br>Q Ms. Underkoffler was Mr. Kirkland's assistant?<br>A I believe so."<br><br>***<br>"Q BY MR. WEBER: Do you recall sending or receiving the e-mails on this e-mail chain except for the top two between Ms. Underkoffler and Mr. Kirkland?<br>A I don't. But again, I don't have any reason to believe that they weren't sent to me or received by me.<br>Q These e-mails, again, are in regard to you preparing pleadings at the direction of Mr. Kirkland; is that correct?<br>A Correct."<br><br>***<br><br>"Q So following your e-mail to Mr. Kirkland and Mr. Pressman in regard to the Declaration that we looked at | p. 54-55, lines 21-25 and 1-5 (as to Exhibit 13 to the Werner transcript); pp. 64-65, lines 2-25 and 1-11 (as to Exhibit 14 to the Werner transcript). |

| | |
|---|---|
| in Exhibit 15, Mr. Kirkland wrote, "This is awful. Nothing like what I asked for. Submitting this would guarantee we lose and probably makes the judge rethink attachment against Jerry personally." Do you see that?<br>A I do.<br>Q And then you wrote back, "I guess I really have no idea what you want. I'm at a complete loss. I really tried just writing the facts I thought they were. I suggest we not file until tomorrow unless you want to write something quickly." "Did the court specific" – probably specify.<br>A Yes.<br>Q "5 calendar days as opposed to court days? B/c," because, "court days would be tomorrow. I feel completely paralyzed to do anything right now." Do you see that?<br>A I do.<br>Q Do you recall having that discussion?<br>A No, but I can see having that discussion.<br>Q You have no reason to believe you didn't send and receive these e-mails?<br>A No, I could absolutely see sending and receiving these e-mails.<br>Q If Mr. Kirkland wasn't happy with your drafting of a Declaration, do you know why he or someone at his law firm didn't do it?<br>A I have no idea.<br>Q And you're not sure why Mr. Kirkland was asking you to draft these things instead of someone at his law firm?<br>A No idea." | |
| 143. E-mails sent by Katy Werner to John Kirkland, Lisa Underkoffler and Jerrold Pressman related to issues and legal research regarding substantive legal issues including EPD's affirmative defenses that the 12% interest rate offered by EPD was usurious, and that the California Finance Lenders Law applied.<br><br>"Q BY MR. WEBER: Do you recall sending this e-mail to Mr. Kirkland and copied Jerry Pressman and Ms. Underkoffler on June 7, 2010?<br>A No, I do not, but I have no reason to think I didn't.<br>Q This mentions changes to a Declaration, is that correct?<br>A It does.<br>Q And the last sentence says, "We need to talk about the issues—especially the 12% interest rate, etc." Do | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, p. 56, lines 3-22 (as to Exhibit 14 to the Werner transcript); pp. 71-72, lines 1-25, and 1-19. |

| | |
|---|---|
| you see that?<br>A Yes.<br>Q Do you remember what the issue was on the 12 percent interest rate?<br>A I don't."<br><br>***<br><br>"Q In the e-mail at the top it says, "Here it is. I was working on the last section re usury and ca finance lenders law. Not much out there. Do you see that?<br>A Yes, I do.<br>Q Does that refresh your recollection as to the usury in California Finance Lenders Law issues?<br>A It doesn't, frankly. But it appears I did so some drafting research on that.<br>Q If you look at page 6 of the attached brief, it references that the California Constitution provides the interest on any loan in California—whether consumer or commercial—may not exceed 10% per annum." Do you see that?<br>A I do.<br>Q And then after a citation to the California Constitution it says, "In this case, Plaintiff's alleged Notes require interest payments of 12%." Do you see that?<br>A I do.<br>Q And does that refresh your recollection as to the usury arguments?<br>A At least I see it on paper.<br>Q Did you do the legal research for drafting briefs for Mr. Kirkland?<br>A I did some legal research or I may have looked at briefs that either John had or Keith Pressman had.<br>Q Do you know if you came up with this issue in terms of the maximum interest rate in California or Mr. Kirkland did?<br>A I don't recall." | |
| 144. A judgment was later entered against Katy Werner, Theodore Jonavic, Ruben Moreno, S.C. Club, L.P., Thom Ferro and Ice Skating Enterprises, Inc., in relation to their interactions with EPD investors. The judgment against Werner was entered in the *Huerth v. EPD, et al.* case pending in the United States District Court in the amount of $924,000.00, collectively with the other defendants, plus an additional $10,000.00.<br><br>The judgment states "IT IS HEREBY ORDERED | RJN, **Exhibit JJ**, Judgment in a Civil Case, *Huerth v. Jonavic, et al.*, United States District Court for the Northern District of Illinois, Case No. 1:10-cv-05049, filed on December 12, 2012 (Docket No. 97).<br><br>Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| AND ADJUDGED (1) that Defendants Moreno, Werner, and Ferro be held liable for compensatory damages in the amounts of $924,000.00 as to the Huerths, and $10,000.00 as to Leslie Huerth, with the amounts being included within, and not cumulative of, the judgment as to the other defaulted defendants; (2) that Defendant Jonavic be held liable for trebled damages under RICO in the amounts of $2,772,000.00 ($924,000.00 x 3) as to the Huerths and $30,000.00 ($10,000.00 x 3) as to Leslie Huerth; (3) that Defendant S.C. Club, L.P. be held liable for $9,194.50; (4) that Defendant Ice Skating Enterprises, Inc. be held liable for $12,025.00; and (5) that all of the defaulted defendants be held jointly and severally liable for Plaintiffs' attorneys fees and costs in the amount of $66,432.32."<br><br>***<br><br>"Q BY MR. WEBER: Is this the judgment that was entered in the case?<br>A Yes.<br>Q There was a judgment entered against you in the amount of $924,000 against you collectively with the other defendants?<br>A Yes.<br>Q And also an additional $10,000?<br>A Yes, that's what it says." | from the deposition of Katharine Werner, p. 87, lines 6-17. |
| 145. Kirkland and Luce Forward sent an additional retainer agreement to EPD and Jerrold Pressman in regard to a pending state court case brought by EPD investor Michelle Hansel. The retainer agreement states "[y]ou have asked Luce Forward Hamilton & Scripps LLP (the "Firm") to represent you and EPD in connection with a litigation matter brought by EPD investor Michelle Hansel." The retainer agreement is signed by Kirkland on behalf of Luce Forward, and by Jerrold Pressman individually and as Managing Member of EPD.<br><br>"MR. WEBER: I'd like to introduce Exhibit 38.(Chapter 7 Trustee's Exhibit 38 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: This purports to be another Engagement Agreement between EPD and Luce Forward dated February 26, 2010.<br>Q If you look at the signature page, which is page 12, is | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 171, lines 7-22; and at Exhibit 38 thereto (Retainer agreement dated February 26, 2010). |

| | |
|---|---|
| that your signature?<br>A Yes.<br>Q And did you enter into this agreement with Mr. Kirkland and Luce Forward in regard to the Hansel case?<br>A I must have. My signature is on it. The answer is yes." | |
| 146. Katy Werner drafted the declaration of Ruben Moreno, and circulated revised drafts, usually without copying Ruben Moreno on the e-mails.<br><br>On June 7, 2010, Katy Werner sent an e-mail stating "Please provide thoughts on the declaration. What we say in it obviously forms the factual basis for the brief, which we need, since our CA Finance Lenders Law argument is a stretch."<br><br>On June 7, 2010, John Kirkland responded by e-mail "this is awful. nothing like what i asked for submitting this would guarantee we lose, and probably makes the judge rethink attachment against jerry personally".<br><br>On June 8, 2010, Katy Werner sent an e-mail stating "Please review this revised version and call me. Jerry wants to know how we should address the 12% interest—as a legal matter. Any ideas?"<br><br>On June 9, 2010, Katy Werner sent an e-mail stating "Don't know what's going on with the brief or declaration or even whether I was supposed to keep working on either of them. Anyway, here's a revised version of the declaration."<br><br>On June 22, 2010, John Kirkland sent an e-mail stating "Revised draft of Moreno declaration attached." | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, Exhibit 15 thereto (E-mail from Katy Werner to Jerrold Pressman and John Kirkland dated June 7, 2006).<br><br>Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, Exhibit 16 thereto (E-mail from John Kirkland to Katy Werner and Jerrold Pressman dated June 7, 2006).<br><br>Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, Exhibit 17 thereto (E-mail from Katy Werner to John Kirkland and copied on Lisa Underkoffler dated June 8, 2006).<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, Exhibit 84 thereto (E-mail from Katy Werner to John Kirkland dated June 9, 2010).<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, Exhibit 15 thereto (E-mail from John Kirkland to Jerrold Pressman and |

| | |
|---|---|
| | Keith Pressman dated June 22, 2010). |
| 147. On June 23, 2010, John Kirkland filed the Declaration of Ruben Moreno in the *Hansel v. EPD, et al.* state court litigation. | RJN, **Exhibit KK**, Declaration of Ruben Moreno in Opposition to Plaintiff's Application for Right to Attach Order and Order for Issuance of Writ of Attachment, *Hansel v. EPD, et al.*, Superior Court for the State of California, County of Los Angeles, Case No. SC 016151, filed on June 23, 2010. |
| 148. Kirkland filed the declaration of Ruben Moreno with a forged signature. Although Kirkland testified that Moreno had someone else sign it, Moreno testified that he does not recall reviewing the declaration before it was filed, or authorizing anyone to sign it on his behalf.<br><br>"Q It's Ruben Moreno's Declaration; correct?<br>A Yes.<br>Q Did he provide any input into the Declaration?<br>A Yes.<br>Q Did he verify its contents?<br>A yes.<br>Q Did you talk with him about the contents of the Declaration?<br>A Yes.<br>Q And he believed all the contents of the Declaration were true and correct once it was finalized?<br>A Yes.<br>Q Did Mr. Moreno sign the Declaration before it was filed?<br>A I don't recall. I think for at least one declaration he did. He was out of the office and had somebody sign for him. But I don't think I was aware of that until later.<br>Q Someone signed a Declaration under penalty of perjury for him?<br>A Yes. He asked somebody, maybe Sherry or someone in the office to sign for him. Someone in whose office?<br>A His office.<br>Q And when did you become aware of that?<br>A Sometime later. I wasn't aware at the time, but I found out later, I don't recall when."<br><br>***<br><br>"Q For the record, this document titled "Declaration | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 229-231, lines 25, 1-25, and 1-3.<br><br>Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 46, lines 3-25; p. 53, lines 10-21. |

| | |
|---|---|
| of Ruben Moreno in Opposition to Plaintiff's Application for Right to Attach Order and Order for Issuance of Writ of Attachment" was previously introduced during Mr. Moreno's Rule 2004 Examination. Mr. Moreno, if you flip to what's stamped at the top, it's page 7 of 12. Do you see that there is a signature?<br>A Yes.<br>Q And do you see the signature block where it says "Ruben Moreno" printed?<br>A Yes.<br>Q Is that your signature?<br>A No.<br>Q Do you recognize whose signature it is?<br>A No.<br>Q Do you recall authorizing your signature to be signed by someone else on this document?<br>A I don't remember that, no.<br>Q Do you recall reviewing this Declaration before it was filed with the court?<br>A I don't recall, no."<br><br>***<br><br>"Q This appears to have been filed by Mr. Kirkland with the Superior Court, based on the cover page. Do you recall ever talking with Mr. Kirkland about a Declaration of yours that he was going to file in a pending case?<br>A I don't remember that.<br>Q And it's not your signature and you don't recall authorizing it?<br>A Yes, that's not my signature.<br>Q And you didn't authorize your signature on this document?<br>A I don't recall that." | |
| 149. John Kirkland filed the forged declaration, and cited to the declaration, in this bankruptcy case.<br><br>"For example, the Declaration of Ruben Moreno filed in the Hansel case refutes all of the factual claims made by Hansel. (RJN, Exh. 18.) As set forth in detail in Mr. Moreno's sworn declaration, the alleged notes were, as noted on their very face, only "Temporary" to facilitate a long-term investment by Hansel in equipment leases. (*See* RJN, Exh. 18 (Moreno Decl.), ¶¶ 3-7 and Exh. "A".) The temporary loans were in fact converted to such investments." | RJN, **Exhibit LL**, Alleged Debtor's Request for Judicial Notice in Support of Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 23), Exhibit 18 (Moreno Declaration).<br><br>RJN, **Exhibit W**, Alleged Debtor's Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January |

| | |
|---|---|
| | 19, 2011 (Docket No. 24), p. 4 of 9, lines 13-17. |
| 150. Moreno was not aware as to why Katy Werner drafted his declaration and he did not discuss the declaration with Kirkland or Katy Werner.<br><br>"Q Do you know why Katy Werner would be drafting your Declaration?<br>A No.<br>Q Were you aware of that?<br>A No.<br>Q Did Mr. Werner or Mr. Kirkland discuss this Declaration with you?<br>A Not that I remember, no."<br><br>***<br>"Q Do you recall discussing the draft Declaration with Katy Werner or Jerry Pressman or John Kirkland?<br>A No.<br>Q Do you recall anyone providing you an opportunity to provide comments or changes to this Declaration before it was filed?<br>A I don't recall.<br>Q And someone else signed it representing that they were you?<br>A Yes." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 115, lines 14-21; pp. 116-117, lines 16-25 and 1. |
| 151. Kirkland testified that Moreno had personal knowledge of the content of the declaration filed by Kirkland in a state court case, and again in the Bankruptcy Case.<br><br>"Q Did Mr. Moreno have personal knowledge as to the items discussed in this Declaration?<br>A I think some of them are things that need personal knowledge, and as to those, he was the only one who did. And most of them are more sort of generic arguments and anybody could have attested to those.<br>Q Do you know if, for instance, looking at Paragraph 9, if Mr. Moreno had ever looked at IRS publication 525 or had any knowledge as to what that was?<br>A I know he had because I discussed it with him. I discussed Hansel's Form 1040 with in the context of 525.<br>Q If you look at Paragraph 10, there is a reference to Form 6198. Do you know if Mr. Moreno had any knowledge as to that form?<br>A Again, I discussed it with him. So I know that he | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 246-247, lines 20-25, and 1-14. |

| | |
|---|---|
| did because we reviewed both those in the context of preparing this Declaration." | |
| 152. Moreno testified that, contrary to the declaration of Ruben Moreno filed by Kirkland in a state court case, and again in the Bankruptcy Case, the statement in the declaration that Moreno was the custodian of records for EPD was not accurate.<br><br>"Q In the next sentence it mentions that you were the custodian of books, records and files relating to some of EPD's transactions. Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A I don't believe so. Any books and records would have to go through Jerrold Pressman. I was not in charge of that." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 48, lines 3-11. |
| 153. Moreno testified that, contrary to the declaration filed by Kirkland in a state court case, and again in the Bankruptcy Case, the statement in the declaration that a citation to the definition of a loan versus an investment from a financial dictionary was not written by him, that he had never looked at the financial dictionary and that he did not write that statement.<br><br>"Q If you look at Paragraph 4, it quotes a definition from the financial dictionary. Do you see that?<br>A Okay.<br>Q Then it says, "The distinguishing feature of an investment, as opposed to a loan, is that an investment is characterized by risk of loss." Do you see that?<br>A Yes.<br>Q Do you remember writing that?<br>A No, I do not.<br>Q Have you ever looked at the financial dictionary before?<br>A No." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 48, lines 12-25. |
| 154. Moreno testified that, contrary to the declaration of Ruben Moreno filed by Kirkland in a state court case, and again in the Bankruptcy Case, he had never heard of IRS Publication 525 or IRS Form 6198, had not read them and did not know what they were.<br><br>"Q If you look on Paragraph 9, there is a reference to IRS Publication 525. Do you see that? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 49-50, lines 11-25 and 1-11. |

| | |
|---|---|
| A Yes.<br>Q Have you ever heard of IRS Publication 525?<br>A No.<br>Q Have you ever read it?<br>A No.<br>Q Do you know what it is?<br>A No.<br>Q If you look at Paragraph 10, there is a reference to IRS instructions to Form 6198. Do you see that?<br>A Yes.<br>Q Do you know what Form 6198 is?<br>A No.<br>Q Have you ever seen it before?<br>A No.<br>Q There is a reference to a Tax Code specifically requiring that amounts be at risk in relation to that paragraph. Do you see that, Paragraph 10?<br>A Yes.<br>Q Do you know what that means?<br>A No." | |
| 155. Moreno testified that, contrary to the declaration of Ruben Moreno filed by Kirkland in a state court case, and again in the Bankruptcy Case, the statement in the declaration that Moreno generated promissory notes for EPD was not accurate.<br><br>"Q Paragraph 13 references you generating Promissory Notes. Do you see that?<br>A Yes.<br>Q Did you ever generate Promissory Notes for EPD?<br>A No.<br>Q Never?<br>A No, I didn't generate those.<br>Q So that's not accurate?<br>A No." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 51, lines 2-12. |
| 156. Moreno testified that, contrary to the declaration of Ruben Moreno filed by Kirkland in a state court case, and again in the Bankruptcy Case, the statement in the declaration that EPD received funds from lessors and then sent them on was something that he had no knowledge of.<br><br>"Q Paragraph 17 says, "For the initial three years of the investments, EPD Investment Co. received monthly payments from the lessors and sent them to Ms. Hansel at her request. Do you see that? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 51, lines 13-25. |

| | |
|---|---|
| A Yes.<br>Q Is that something you wrote?<br>A No.<br>Q Do you have any knowledge of EPD receiving monthly payments from lessors?<br>A No.<br>Q Or paying—<br>A I don't remember any of that." | |
| 157. Jerrold Pressman confirmed that John Kirkland worked on the declaration of Ruben Moreno.<br><br>"Q Was Mr. Kirkland involved in the drafting of the Ruben Moreno Declaration?"<br>A Well, it looks like it went back and forth. I don't know who did it. Perhaps he just got tired of the back-and-forth and ultimately did it himself. His name is on the top of this, so the answer is yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 97, lines 12-18. |
| 158. The additional Luce Forward retainer agreement in regard to the Hansel litigation includes a section regarding waiver of conflicts of interest reflecting that the interests of John Kirkland and the BC Trust were "currently aligned" with EPD but that the interests could diverge in the future.<br><br>"As you know, I personally have represented you, your family and your affiliated persons on various legal matters. In addition, I have longstanding personal and professional relationships with you and EPD. The above described matter may present potential or actual conflicts of interest between EPD and you personally, because although currently aligned it is possible that your interests may in the future diverge. In addition, the matter may present potential or actual conflicts of interest between EPD and me personally, because my family trust is an investor with EPD, although those personal interests may currently be aligned with representing you and EPD in the present dispute, it is possible that this may change in the future."<br><br>***<br><br>"MR. WEBER: I'd like to introduce Exhibit 38.(Chapter 7 Trustee's Exhibit 38 was marked for identification by the Deposition Officer and is attached hereto.) | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 171-172, lines 7-23, and 1-17; and at Exhibit 38 thereto (Retainer agreement dated February 26, 2010). |

| | |
|---|---|
| MR. WEBER: This purports to be another Engagement Agreement between EPD and Luce Forward dated February 26, 2010.<br>Q If you look at the signature page, which is page 12, is that your signature?<br>A Yes.<br>Q And did you enter into this agreement with Mr. Kirkland and Luce Forward in regard to the Hansel case? I must have. My signature is on it. The answer is yes.<br>Q If you look on the top of page 4, it says, "As you know, I personally have represented you, your family and your afilliated (sic) persons on various legal matters. In addition, I have longstanding personal and professional relationships with you and EPD." Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A Yes.<br>Q And it says, "The above-described matter may present potential or actual conflicts of interest between EPD and you personally, because although currently aligned, it is possible that your interests may in the future diverge. In addition, the matter may present potential or actual conflicts of interest between EPD and me personally because my family trust is an investor with EPD, although those personal interests may currently be aligned with representing you and EPD in the present dispute, it is possible that this may change in the future." | |
| 159. Pressman was not concerned about Kirkland's conflict because Kirkland "may have been highly motivated to protect his own funds."<br><br>"Q Did you think it was an issue having an investor in EPD represent EPD in a suit brought by a different investor?<br>A Perhaps he was highly motivated to protect his own funds. I don't find any problem with that.<br>Q Was he representing his own interests or EPD's interests?<br>A When he was defending us—when his firm defended me against Hansel?<br>Q Yes.<br>A I can't speak for what he thinks or what was in his mind.<br>Q To your knowledge. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 172-173, lines 20-25 and 1-10. |

| | |
|---|---|
| A Even to my knowledge. I hired that firm to represent me. I can't explain what they were thinking." | |
| 160. John Kirkland claims that he never considered the issue of a conflict in him or his family trust being an investor in EPD and having a purported security interest against the Debtors' assets while he and his firm was counsel for EPD in defending suits by other investors.<br><br>"Q Was it in the interest of you and your family trust to defeat the suits brought by Hansel and Jenny Lee Bridal?<br>A I never considered that question. I don't think it made any difference.<br>Q And why is that?<br>A Because they had a secured UCC. So whether EPD won or lost wouldn't affect the trust.<br>Q So you were okay either way because the Bright Conscience Trust had filed a UCC-1; is that correct?<br>A I never considered the question. If I'm representing a client, I'm trying really hard to win. And if I win, that's very good, and if I lose, that's very bad. So no, I was not okay either way; I wanted to win for my client.<br>Q But the Bright Conscience Trust was protected because you had caused a UCC-1 to be filed; is that right?<br>A I never considered the question.<br>Q But I'm asking you now.<br>A I don't know. I'd have to think about it.<br>Q And when you represented EPD in defending against the involuntary bankruptcy filing, wasn't it in your family trust's interest that the involuntary not have an order for relief entered.<br>A I never considered the question at the time. It was in everyone's best interests, Hansel's, EPD's, Pressman's and everyone else on the planet other than your firm that the order for relief be denied. It was disastrous for every human being on the planet who doesn't work here."<br><br>***<br><br>"Q And when you were defending against the involuntary bankruptcy filing, were you representing your interests and your family's interests or EPD's interests?<br>A EPD's interests.<br>Q Did you disclose any type of an actual conflict at that point? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 296-297, lines 13-25, and 1-20; and, p. 299, lines 9-17. |

| | |
|---|---|
| A I'm not aware of any actual conflict at any point." | |
| 161. Keith Pressman does not recall any discussion or disclosure of a conflict by John Kirkland.<br><br>"Q On the third page of this document, on Number 5, it says, "EPD and Pressman understand that if Kirkland invests or loans money to EPD or Pressman or obtains a security interest in the property or assets of EPD, Kirkland's interests an investor or lender may be adverse to the interests of EPD and Pressman, and their property, in that Kirkland's interests will be to ensure repayment of his debt, and preservation of the assets for his benefit, not to protect the interests of EPD or Pressman." Do you see that?<br>A Yes.<br>Q Did you ever discuss that with your dad or with Mr. Kirkland?<br>A No.<br>Q Do you know how Mr. Kirkland could represent EPD against one or more of the investors that had filed suit against EPD when Mr. Kirkland had disclosed this actual conflict of interest?<br>A I don't know.<br>Q Do you know how Mr. Kirkland or his law firm could represent EPD in trying to prevent the involuntary bankruptcy filing when he had that type of conflict?<br>A I don't know.<br>Q Did Mr. Kirkland ever discuss or disclose that conflict to you?<br>A No." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 184-186, lines 14-25, 1-25, and 1-2. |
| 162. Lisa Underkoffler, was John Kirkland's legal secretary at Luce Forward, and before that at Dreier Stein & Kahan.<br><br>"Q And who is John Kirkland?<br>A He was an attorney that I worked for starting at Dreier and continuing on while I was at Luce Forward.<br>Q And were you Mr. Kirkland's legal secretary?<br>A I was.<br>Q And were you his—strike that. How many years approximately were you Mr. Kirkland's legal secretary for?<br>A I'd say two.<br>Q And that was spanning the time at Dreier and at Luce Forward? | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 13-14, lines 15-25 and 1-4. |

| | |
|---|---|
| A Yes.<br>Q And did Mr. Kirkland have only one legal secretary?<br>A Yes." | |
| 163. Lisa Underkoffler connected John Kirkland with Matt Gruenberg in regard to Gruenberg assisting Kirkland in defending the state court litigation against EPD. Underkoffler had been both Kirkland and Gruenberg's assistant while at Dreier, Stein & Kahan LLP.<br><br>"Q When did you first meet John Kirkland?<br>A Well, we worked in the same office at the Dreier firm, but I never worked for him. We shared a secretary. When the firm was kind of unwinding and partners were going to various other firms, I kind of stayed in touch with my secretary. And she introduced me to him and basically helped me get contract work from him. So I never really worked for him. I don't really know him very well. But Lisa, his assistant, she had like four or five lawyers on her desk and I was one of them.<br>Q Is that Lisa Underkoffler?<br>A Yes."<br><br>***<br><br>"Q And what was the context that you heard about EPD in?<br>A I had been looking, like I said, for contract work and kind of reaching out to different partners from the firm that I knew because I didn't know very many people in L.A. And Lisa called me one day and said that John had a client, John Kirkland had a client that he wanted me to see if I would work with or introduce. I can't remember specifically the conversation, but that's how.<br>Q And the client was EPD?<br>A Yes."<br><br>***<br><br>"Q Do you know who introduced you to Mr. Gruenberg?<br>A Actually, Mr. Kirkland's secretary." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 17-18, lines 20-25 and 1-8; and, p. 20, lines 4-15.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 117, lines 15-17. |
| 164. Even though Matt Gruenberg is not a litigator, Gruenberg defended litigation for EPD at John Kirkland's instruction. Gruenberg described himself as | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| "a quasi junior associate" and "doing work for a partner."<br><br>"Q What type of legal services did you provide for EPD?<br>A Just defending like routine breach of contract claims in state court.<br>Q Anything else?<br>A No.<br>Q You said you're not a litigator, though; correct?<br>A That's correct.<br>Q Do you know why you were selected to perform litigation-related services for EPD?<br>A No, I don't.<br>Q Did Mr. Kirkland select you to do that?<br>MR. MICK: Lacks foundation.<br>THE DEPONENT: Like I said, I got a call from Lisa. I had been looking for work and I think she was trying to help me. It was presented as, you know, John will give me the litigation documents and I'm just going to have to coordinate the filing. And I even made some appearances. I was kind of like a quasi junior associate. I was like a fourth year lawyer at the time; I was just doing work for a partner.<br>Q BY MR. WEBER: And the "John" you're referring to is John Kirkland?<br>A Yes." | from the deposition of Matthew Gruenberg, pp. 25-26, lines 9-25 and 1-9. |
| 165. Matt Gruenberg worked under the supervision of John Kirkland.<br><br>"Q The work that you performed was directly on behalf of the entity rather than contracted out from a law firm; is that correct?<br>A No. I was taking direction from the law firm and Kirkland. I would agree, though, that I didn't have a written agreement with the law firm.<br>Q So the legal services you performed for EPD were based on direction from John Kirkland or Luce Forward?<br>MR. MICK: Overbroad; may be compound.<br>THE DEPONENT: More or less, yes."<br><br>***<br>"Q And with each of these cases where you were defending EPD and/or Mr. Pressman, did you generally coordinate any action in those cases with Mr. Kirkland and Ms. Underkoffler?<br>A Yes. | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 24-25, lines 16-25 and 1-2; p. 56, lines 8-16; pp. 86-87, lines 15-25 and 1-10. |

| | |
|---|---|
| Q And you followed Mr. Kirkland's instructions as to each of the pieces of pending litigation?<br>A Yes."<br><br>***<br><br>"Q Now, as to each of the actions that—strike that. As to each of the pleadings or discovery that were prepared, served, filed on behalf of EPD and Pressman that we've reviewed, did you prepare, file, serve all of that at the instruction of Mr. Kirkland?<br>A Yes, either him or Theona, yes.<br>Q Theona Zhordania?<br>A Yes, or Lisa Underkoffler.<br>Q And all three of them worked at Luce Forward?<br>A Yes.<br>Q And Ms. Zhordania and Ms. Underkoffler worked directly for Mr. Kirkland?<br>A I know Lisa did. Ms. Zhordania could have worked for other people. But she worked for him in regards to these matters, yes.<br>Q She was subordinate to Mr. Kirkland on these matters?<br>A Yes." | |
| 166. The general theme of Matt Gruenberg's actions as counsel was to delay the litigation.<br><br>"Q In the entire time that you performed legal services for EPD and Mr. Pressman, did you ever discuss the nature of EPD's business with Mr. Pressman or anyone with EPD?<br>MR. MICK: Compound.<br>THE DEPONENT: No. it was really just -- you know, they wanted me to just basically delay the settlement of these lawsuits and that was really it, and just coordinating with John to respond.<br>Q BY MR. WEBER: What do you mean by delay in settling the lawsuits?<br>A In the state court cases, they just wanted me to like -- I don't remember specifically any specific conversations, but I just remember the general theme was to like respond to cases or, like, undo a default and just provide, basically, just general litigation assistance.<br>Q Did anyone instruct you to make the cases take as long as possible to get to trial?<br>A I don't remember that specific instruction. But I remember there being kind of like a theme. I remember there was one, I don't remember specifically, but there | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 65-66, lines 17-25 and 1-20; pp. 87-88, lines 18-25 and 1-23. |

| | |
|---|---|
| was one case involving like a mediation that they just wanted to push out, push the mediation out.<br>Q The instructions as to pushing mediations out or any other actions, were those instructions from Mr. Kirkland?<br>A Yes, I believe so."<br><br>***<br><br>"Q Earlier you mentioned a general theme of delay in the litigation; is that correct?<br>A Yes.<br>Q I think you said that you couldn't recall an overt instruction to delay, but that was the general theme of the way the defense of the litigation was conducted; is that correct?<br>A Yes.<br>Q And in terms of that general theme or strategy of delay, was it Mr. Kirkland who came up with that strategy?<br>A I believe so; Kirkland and maybe Pressman to some degree.<br>Q Do you know what the object of the delay was?<br>A No. Well, that's not entirely accurate. Now that I recall, toward the end of—I mentioned that there was some real estate. And toward the end, I think they were trying to refinance the real estate. And it was communicated to me, I remember, that they would use those proceeds to pay people.<br>Q The people that were the plaintiffs in the state court litigation?<br>A Yes.<br>Q So the delay may have been to wait for the financing to occur and then use those funds to pay the plaintiffs in the suits?<br>A I don't know that that was—I mean, that would be speculation, but I just remember that was what was told to me through kind of the end of my involvement." | |
| 167. Matt Gruenberg and John Kirkland filed general denials in various state court cases filed by EPD investors against EPD and Jerrold Pressman including affirmative defenses that the interest rate was usurious, and that the funds were investments rather than loans that required repayment and Matt Gruenberg was not sure if he authorized anyone else to sign for him. | RJN, **Exhibit LL**, Alleged Debtor's Request for Judicial Notice in Support of Objection to Petitioning Creditors' Motion for Appointment of Interim Chapter 7 Trustee, filed on January 19, 2011 (Docket No. 23), p. 2, and Exhibits 4 (general denial filed in *Jenny Lee Bridal, LLC v. EPD, et al.*), 8 (general denial filed in *Dittmar v. Pressman, et al.*) and 17 (general |

| | |
|---|---|
| | denial filed in *Hansel v. EPD, et al.*) thereto.<br><br>RJN, **Exhibits MM and NN**, general denial filed in *Druckman v. EPD, et al.*, Case No. BC 450557, Superior Court for the State of California County of Los Angeles, filed on January 4, 2011; general denial filed in *Harvey v. Pressman, et al.*, Case No. SC 108418, Superior Court for the State of California, County of Los Angeles, filed on March 16, 2011. |
| 168. Before John Kirkland got involved in one of the state court cases against EPD and Jerrold Pressman, Jerrold Pressman had Katy Werner file an answer to the complaint under Keith Pressman's name. On February 25, 2010, Katy Werner sent an e-mail to John Kirkland stating in pertinent part that "[w]e have a case in Santa Monica brought by an investor against EPD and Jerry. Jerry had me answer under Keith's name—plain vanilla answer."<br><br>"Q I'd like to introduce Exhibit 56. (Chapter 7 Trustee's Exhibit 56 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Are these e-mails you sent to or received from Katy Werner on February 25th, 9 2010?<br>A Yes.<br>Q Is this Ms. Werner reaching out to you to represent EPD and Jerrold Pressman in a suit brought by an investor?<br>A It's Katy saying that Jerry would like me to substitute into a case and handle it ex parte.<br>Q Do you know what case that was?<br>A I assume it's Hansel, but that's a guess." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 193, lines 3-17 and Exhibit 56 thereto (e-mails between John Kirkland and Katy Werner). |
| 169. General denials were filed on behalf of EPD under Matt Gruenberg's signature in several cases and were served by Lisa Underkoffler, John Kirkland's assistant. Many of the general denials purporting to include Gruenberg's signature were forged.<br><br>"Q Mr. Gruenberg, on Exhibit 5, the General Denial, is that your signature?<br>A No.<br>Q Do you recognize that signature? | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 26-27, lines 24-25 and 1-4; pp. 27-28, lines 17-25 and 1; pp. 32-33, lines 9-25 and 1-5; pp. 40-41, lines 13-25 and 1-2. |

| | |
|---|---|
| A No, I mean, it looks like my name, but it's not my signature."<br><br>***<br><br>"Q And if you look on the next page, the Proof of Service on this document says it was served by Lisa Underkoffler. Do you see that?<br>A Yes.<br>Q And that was your assistant at Dreier?<br>A Yes.<br>Q And John Kirkland's assistant at Dreier and Luce?<br>A Correct."<br><br>***<br>"Q On Exhibit 8, the General Denial, is that your signature?<br>A No.<br>Q It's not your signature?<br>A No.<br>Q Do you know whose signature that is?<br>A No. I mean, it looks like it's my name, but it's not my handwriting.<br>Q And did you authorize your signature on Exhibit 8, the General Denial?<br>A I don't recall.<br>Q If you look at the next page, it appears to be served by Lisa Underkoffler; is that correct?<br>A Yes.<br>Q So this is the second General Denial that appears with your name on it on the first page but served by Ms. Underkoffler. Do you recall if the pleadings that you prepared in the state court litigation matters were served by Ms. Underkoffler as a matter of course?<br>A I believe so. I don't recall precisely, but I believe so."<br><br>***<br>"Q On Exhibit 14, the General Denial, do you see there is a signature block with your name?<br>A Yes.<br>Q Is that your signature?<br>A No.<br>Q Do you recognize the handwriting?<br>A Only that it's similar to the other ones we looked at, but no, I don't.<br>Q Did you authorize your signature on this General Denial?<br>A I don't recall. | |

| | |
|---|---|
| Q And if you look at the next page on the General Denial, the Proof of Service states that it was served by Lisa Underkoffler; is that correct?<br>A. Yes." | |
| 170. Underkoffler, a legal assistant at Luce Forward, served the general denials and case management conference statements at the direction of Kirkland or Gruenberg, who was working with Kirkland on the cases against EPD.<br><br>"Q If you look on the second page, there is a proof of service. Do you see that?<br>A Uh-huh.<br>Q Is that your signature?<br>A Yes.<br>Q But on the first page, the caption lists the Law Offices of Matthew B. Gruenberg. Do you see that?<br>A Yes.<br>Q Do you know why you served a document on November 19, 2010, for a different law firm?<br>A I guess I was asked to do this.<br>Q Do you know who asked you to do it?<br>A I don't recall specifically.<br>Q And in—on November 18, 2010, was EPD a client of Luce Forward?<br>A Yes.<br>Q And who at Luce Forward had the client relationship with EPD at that point?<br>A John Kirkland.<br>Q Is there anyone other than Kirkland who could have instructed you to serve this?<br>A No."<br><br>***<br><br>"Q And on the second page you'll notice there is a proof of service that has what purports to be your signature. Do you see that?<br>A Yes.<br>Q And is that your signature?<br>A Yes.<br>Q And again, this document is served with the caption name at the top for Law Offices of Matthew B. Gruenberg. Do you see that?<br>A Yes.<br>Q And would it be Mr. Kirkland who would have instructed you to serve this?<br>A Yes." | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 23-24, lines 8-25 and 1-4; p. 24, lines 12-24; p. 26, lines 4-22; p. 28, lines 2-24; and, p. 29, lines 7-24. |

| | |
|---|---|
| ***<br><br>And, Ms. Underkoffler, on the second page there is a proof of service with what purports to be your signature. Do you see that?<br>A Yes.<br>Q And is that your signature?<br>A Yes.<br>Q And, again, on the first page, the law firm filing this appears to be Law Offices of Matthew B. Gruenberg. Do you see that?<br>A Yes.<br>Q And do you know why you would have served this document?<br>A No.<br>Q And would it be Mr. Kirkland who instructed you to serve this document?<br>A I don't know.<br>Q Could anyone else at Luce Forward have instructed you to serve this document?<br>A No.<br><br>***<br><br>And, Ms. Underkoffler, on the last page there is a proof of service with what purports to be your signature. Do you see that?<br>A Yes.<br>Q And is that your signature?<br>A Yes.<br>Q Did you prepare this case management statement?<br>A I don't recall.<br>Q And on the front page it's listed as having been filed by the Law Offices of Matthew Gruenberg. Do you see that?<br>A Yes.<br>Q And do you recall who instructed you to serve this document?<br>A No.<br>Q Could it have been anyone other than Mr. Kirkland?<br>A Yes.<br>Q And who would that be?<br>A Matt.<br>Q Matt Gruenberg? But Matt Gruenberg didn't work for Luce Forward, did he?<br>A No.<br><br>*** | |

| | |
|---|---|
| "Q And how would Matt Gruenberg have the ability to instruct you to serve something if he was not working for Luce Forward at that point?<br>MR. GREGORY: Question calls for speculation. You can go ahead and answer.<br>THE WITNESS: He would call me and ask me to do it.<br>BY MR. WEBER:<br>Q As, like, a favor?<br>MR. GREGORY: Objection. Same objection.<br>THE WITNESS: I would think that if he asked me to do it, it would be because he was working together with John on this, and Matt would call me and ask me to do it.<br>BY MR. WEBER:<br>Q Anyone other than Matt Gruenberg or John Kirkland that could have instructed you to serve this?<br>A No." | |
| 171. Case management statements were also filed with what purported to be Matt Gruenberg's signature, but which were forged.<br><br>"Q BY MR. WEBER: Mr. Gruenberg, have you seen this document before?<br>A Not that I can recall.<br>Q Mr. Gruenberg, if you look at the page that's Bates stamped T/PR 070527, do you see that?<br>A Yes.<br>Q And there is a signature block at the end that appears to be for your signature. Do you see that?<br>A I do.<br>Q And is that your signature?<br>A It's not.<br>Q So the signature on the page purports to be your signature but it is not your signature?<br>A That's correct.<br>Q And do you know whose handwriting that is?<br>A I don't.<br>Q Did you authorize someone else to sign your name on this Case Management statement?<br>A I really can't recall."<br><br>***<br>"Q If you look at the fourth page, there is a signature block for you. Do you see that?<br>A I do.<br>Q And is that your signature?<br>A No. | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 34-35, lines 12-25 and 1-6; p. 39, lines 3-20. |

| | |
|---|---|
| Q Do you recognize the handwriting?<br>A No. I mean it looks like the other one we looked at a few moments ago.<br>Q And if you look on the next page, T/PR 073745, this Case Management Statement appears to have been served by Lisa Underkoffler; is that correct?<br>A Yes.<br>Q Do you recall preparing this Case Management Statement?<br>A No.<br>Q And do you recall authorizing your signature on this Case Management Statement?<br>A I don't recall, no." | |
| 172. Gruenberg did not come up with the affirmative defenses in the general denials that he filed, or that were filed under his caption.<br><br>"Q For the record, there are three affirmative defenses listed on Exhibit 5 and Mr. Gruenberg has the sole copy of Exhibit 6. Mr. Gruenberg, did you come up with those affirmative defenses listed in the General Denial that's Exhibit 5 and Exhibit 6?<br>A. No.<br>Q And who came up with those affirmative defenses?<br>A I don't know.<br>Q Do you know if it was Mr. Kirkland?<br>A I couldn't say with certainty. He had someone else, an associate he worked with, so I don't know if it was—I don't know. I know I didn't come up with them, but it came from the Luce Forward firm.<br>Q So it would have been Mr. Kirkland or someone who worked at Luce Forward that came up with the affirmative defenses?<br>A I believe so."<br><br>***<br><br>"Q And did you come up with these affirmative defenses listed in Exhibit A?<br>A No.<br>Q Was it either Mr. Kirkland or someone who had worked for Luce Forward that came up with these affirmative defenses?<br>A I believe so, yes."<br><br>***<br><br>"Q That appears to be different. Now, did you come up with these affirmative defenses on Exhibit 11? | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 29-30, lines 22-25 and 1-16; p. 33, lines 19-25; pp. 37-38, lines 23-25 and 1-5. |

| | |
|---|---|
| A Not to my recollection.<br>Q And did Mr. Kirkland or some other attorney at Luce Forward come up with these affirmative defenses?<br>A I really can't recall, but I assume so." | |
| 173. Jerrold Pressman also did not come up with the affirmative defenses in the Hansel case.<br><br>"Q Do you know who came up with these affirmative defenses?<br>A Of course not.<br>Q Was it you?<br>A No.<br>Q Was it an attorney?<br>A I have no idea. I'm sure it was an attorney; it sure wasn't me." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 116, lines 6-13. |
| 174. Jerrold Pressman also did not come up with the affirmative defenses in the Dittmar case.<br><br>"Q If you look, the affirmative defenses listed appear to be identical to the last ones we looked at for the Hansel case; is that right?<br>A Yes.<br>Q Did you come up with these affirmative defenses?<br>A No.<br>Q Was it an attorney?<br>A I'm sure it was." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 117, lines 3-11. |
| 175. Jerrold Pressman also did not come up with the affirmative defenses in the Druckman case.<br><br>"Q Did you come up with these affirmative defenses?<br>A Again, I'm not an attorney, no." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 120, lines 18-20. |
| 176. Responses to interrogatories were also served with Gruenberg's signature, but which signatures were not his signature.<br><br>"MR. WEBER: These purport to be responses of EPD to Form Interrogatories. And similar to the statements made with the Complaints, General Denials and Case Management Statements, this is marked "Conflidential" but is simply a discovery pleading in a state court litigation case.<br>Q Mr. Gruenberg, do you recognize this document?<br>A No, I don't recall it.<br>Q If you look at the page that's Bates stamped T/PR | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 49-50, lines 7-25 and 1. |

| | |
|---|---|
| 078505.<br>A Yes.<br>Q Do you see a signature block with your name?<br>A Yes.<br>Q Is that your signature?<br>A No.<br>Q The signature on that page is not your signature?<br>A That's correct." | |
| 177. Poshow Kirkland asserts that she has had the sole authority to act on behalf of the BC Trust since its inception, and that John Kirkland is not authorized to act on behalf of the BC Trust.<br><br>"THE DEPONENT: (In English) Mr. Weber, when you say "family trust," I want to make sure you understand. This formed trust is -- I am the sole trustee. I am in charge of this trust, the money for my kids. And I make the sole decisions. When you say "family," John and I, we are family. But he work. After I married him, I haven't. If anything happen to him, then he just want to make sure his children, our kids, will be provided for." | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, p. 15, lines 4-12. |
| 178. Even though Poshow Kirkland testified that there is no basis for a UCC-1 to be filed against Keith Pressman's assets, and even though she had no knowledge of a UCC-1 being filed, the BC Trust filed a UCC-1 as to Keith Pressman.<br><br>"Q Has the Bright Conscience Trust ever done business with Keith Pressman?<br>A (In English) You mean the business, Bright Conscience Trust?<br>Q Correct.<br>A Of course not. I'm in charge of it. Anything like that, I should know.<br>Q Has the Bright Conscience Trust ever loaned money to Keith Pressman?<br>A (In English) I don't recall signing loan documents under the Bright Conscience Trust.<br>Q And—<br>A (In English) Let me rephrase it. I don't recall I sign any loan document for BCT to Keith Pressman.<br>Q Do you recall investing any—the Bright Conscience Trust investing any money with Keith Pressman?<br>A (In English) I don't recall.<br>Q Do you recall giving any money to Keith Pressman | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 70-73, lines 22-25, 1-25, 1-25 and 1-10.<br><br>RJN, **Exhibit OO**, UCC-1 filed with the California Secretary of State on March 4, 2010. |

| | |
|---|---|
| on behalf of the Bright Conscience Trust?<br>A (In English) I don't know. No, I don't recall.<br>Q Can you think of any reason why the Bright Conscience Trust would file a UCC Financing Statement against Keith Pressman's assets?<br>A (In English) Really? I don't know anything about it.<br>Q Can you think of any reason why the Bright Conscience Trust would have filed a UCC Financing Statement against Keith Pressman's assets?<br>A (In English) No. Why we will do that? Keith didn't owe Bright Conscience the money. That was—when John invest Jerry Pressman and EPD and that loan Note assigned it to Bright Conscience Trust and that's the only one, that UCC paper that I want Jerry file. But I don't know anything about Keith Pressman.<br>Q I'd like to introduce Exhibit 12. (Chapter 7 Trustee's Exhibit 12 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Have you seen this document before?<br>A (In English) This is—I haven't seen this one.<br>Q Did you instruct that a UCC-1 be filed against Keith Pressman's assets?<br>A (In English) No. No. I don't know—I don't know anything about this.<br>Q And after you became the trustee of the Bright Conscience Trust in September 2009, were you the only person authorized to act on behalf of the trust?<br>A (Through the interpreter) Yes.<br>Q So can you explain how this got filed?<br>A (In English) No, I cannot explain. No, this is not the one I would be expecting. The other one that with Jerry, that one I know about it. And that one is very important. But this one, I don't see how will this be filed and covered and grant the Bright Conscience Trust the security interest." | |
| 179. The BC Trust filed the UCC-1 financing statement on March 4, 2010, listing Keith Pressman as the debtor and the BC Trust as the secured party. | RJN, **Exhibit OO**, UCC-1 filed with the California Secretary of State on March 4, 2010. |
| 180. Even though Poshow Kirkland testified that there is no basis for a UCC-1 to be filed against EPD Investment Leasing Co., LLC's assets, and even though she had no knowledge of a UCC-1 being filed, the BC Trust filed a UCC-1 as to EPD Investment Leasing Co., LLC.<br><br>"Q Have you heard of a company called EPD | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 73-75, lines 11-25, 1-25 and 1-24.<br><br>RJN, **Exhibit QQQ**, UCC-1 filed |

| | |
|---|---|
| Investment Leasing Co., LLC?<br>A (In English) No.<br>Q You're not familiar with that company?<br>A (In English) Not very—not familiar.<br>Q Did the Bright Conscience Trust ever loan money to EPD Investment Leasing Company, LLC?<br>A (In English) I don't—I don't recall.<br>Q Did the Bright Conscience Trust ever invest money with EPD Investment Leasing Company, LLC?<br>A (In English) No, I don't think so.<br>Q Did Bright Conscience Trust ever give money of any kind to EPD Investment Leasing Company, LLC?<br>A (In English) No. I don't recall.<br>Q Did you ever file a UCC-1 Financing Statement on behalf of the Bright Conscience Trust against the assets of EPD Investment Leasing Company, LLC?<br>A (Through the interpreter) No.<br>Q Did you ever authorize to file a UCC-1 Financing Statement on behalf of the Bright Conscience Trust against the assets of EPD Investment Leasing Co., LLC?<br>A (In English) No. Formally, no.<br>Q Was your husband, John Kirkland, authorized on behalf of the Bright Conscience Trust to instruct that UCC Financing Statements be filed?<br>A (In English) I'm very clear on that. I am the sole trustee of Bright Conscience Trust. I can make decisions; no one else can do that for me.<br>Q And Mr. Kirkland wasn't authorized to file UCC Financing Statements on behalf of the trust?<br>A (In English) Correct. He has no authority to authorize me to do that. (Through the interpreter) He has no—I have never authorized him to do that. And he also has no power to ask me to do that.<br>Q I'd like to introduce Exhibit 13 (Chapter 7 Trustee's Exhibit 13 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Have you seen this e-mail before?<br>A (Through the interpreter) No, I never seen it.<br>Q Do you know who Amy Brown is?<br>A (Through the interpreter) I don't.<br>Q Are you familiar with a company called National Corporate Research?<br>A (Through the interpreter) No.<br>Q Do you know why Mr. Kirkland instructed Ms. Brown to file a UCC-1 with the California Secretary of State in favor of the Bright Conscience Trust and against the assets of EPD Investment Leasing | with the California Secretary of State on May 5, 2011. |

| | |
|---|---|
| Company, LLC on April 29th, 2011?<br>A (In English) I don't know.<br>Q Was he authorized to do this?<br>A (In English) No.<br>Q And you weren't aware of this?<br>A (In English) Yeah, I don't know about this filing." | |
| 181. On April 29, 2011, John Kirkland sent an e-mail to Amy Brown of National Corporate Research, Ltd. stating "Please file the attached UCC-1 with the California Secretary of State." The e-mail attaches a UCC-1 financing statement in favor of the BC Trust and against the assets of EPD Investment Leasing Co., LLC. | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena (E-mail from John Kirkland to Amy Brown dated April 29, 2011), pp. 1285-1286. |
| 182. National Corporate Research is the company used by Luce Forward and Lisa Underkoffler for filings with the California Secretary of State.<br><br>"Q Who is Amy Brown?<br>A She was a person I worked with at National Corporation. She was my contact there.<br>Q And what type of an entity is that?<br>A They would do filings with the Secretary of State.<br>Q And is that the company that Luce Forward used?<br>A I don't recall how I got in contact with Amy.<br>Q Did you use Amy in that company for multiple filings or just that one?<br>A No, I used her a lot."<br><br>***<br>"Q And is National Corporate Research the company that you were referring to before in terms of Secretary of State filings?<br>A Correct.<br>Q And Amy Brown worked for that company?<br>A Yes.<br>Q And how about Alexis Cassidy?<br>A Yes." | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 51-52, lines 23-25 and 1-8; p. 64, lines 13-20.<br><br>Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena |
| 183. On May 5, 2011, Amy Brown of National Corporate Research, Ltd. sent an e-mail to John Kirkland with the subject "EPD Investment Leasing Co., LLC" and stating "John: Please find attached the acknowledgement of filing a UCC-1 Financing Statement in the state of California for the debtor listed above. The original will follow via regular mail." The e-mail attaches a UCC filing acknowledgement and a | Weber Declaration, p. 6, ¶ 20 and Exhibit 18, document production by National Corporate Research, Ltd. pursuant to subpoena (E-mail from Amy Brown to John Kirkland dated May 5, 2011), pp. 1287 – 1289. |

| | |
|---|---|
| file-stamped copy of the UCC-1 financing statement filed on May 2, 2011 in favor of the BC Trust and against the assets of EPD Investment Leasing Co., LLC. | |
| 184. The UCC-1 filed by John Kirkland for the BC Trust against EPD Investment Leasing Co., LLC's assets came approximately one year after Kirkland formed EPD Investment Co., LLC as a limited liability company. On May 18, 2010, EPD Investment Leasing Co., LLC's Limited Liability Company Articles of Organization were filed with the California Secretary of State. The organizer, and also agent for service of process, listed on the Articles of Organization in Sections 3 and 7 is John Kirkland. | RJN, **Exhibit PP**, Limited Liability Company Articles of Organization filed on May 18, 2010. |
| 185. Poshow Kirkland and the BC Trust did not designate John Kirkland to testify on behalf of the BC Trust for the Rule 2004 examination.<br><br>RFA 81 requests that Poshow Kirkland "[a]dmit that YOU designated KIRKLAND as the person most qualified to testify for the BC Trust at the Rule 2004 Examination of KIRKLAND that took place on May 27, 2011 in the BANKRUPTCY CASE." Poshow Kirkland's supplemental response to RFA 81 is "Responding Party has no recollection of designating Mr. Kirkland as the person most qualified to testify for the Bright Conscience Trust, and has located no such designation. On this basis, the request is denied." Poshow Kirkland's Supplemental Responses to Requests for Admission served on April 21, 2017, p. 8, lines 9-20. | Weber Declaration, p. 8, ¶ 24 and Exhibit 22 to the Weber Declaration, Poshow Kirkland Supplemental Responses to RFAs, request no. 81, p. 8, lines 9-20. |
| 186. Poshow Kirkland does not recall designating John Kirkland to testify on behalf of the BC Trust at the Rule 2004 examination and was not aware that John Kirkland appeared and testified in that capacity. Poshow Kirkland assets that she is the only authorized person to speak on behalf of the BC Trust.<br><br>"Q Were you aware at the beginning of the bankruptcy case that your husband, Mr. Kirkland, appeared on behalf of the Bright Conscience Trust at an examination?<br>A (In English) I don't recall.<br>Q Do you recall authorizing your husband, Mr. Kirkland, to appear on behalf of the Bright Conscience | Weber Declaration, p. 8, ¶ 24 and Exhibit 22 to the Weber Declaration, Poshow Kirkland Supplemental Responses to RFAs, request no. 81 ("Responding Party has no recollection of designating Mr. Kirkland as the person most qualified to testify for the Bright Conscience Trust, and has located no such designation. On this basis, the request is denied.)<br><br>Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| Trust to give testimony in the bankruptcy case?<br>A (In English) I don't recall.<br>Q Is the only person that's authorized to speak on behalf of the Bright Conscience Trust you?<br>A (In English) Uh-huh. Sorry. Yes. I am the sole trustee, I make the decision.<br>Q And have you been the only authorized person to speak on behalf of the Bright Conscience Trust since it was formed?<br>A (Through the interpreter) Yes."<br><br>***<br><br>"THE DEPONENT: (Through the interpreter) Did you ask me whether my husband needs my authorization in order to appear in court?<br>"Q BY MR. WEBER: In order to provide testimony on behalf of the Bright Conscience Trust.<br>"MR. LANDAU: Same objection.<br>"THE DEPONENT: What?<br>"MR. LANDAU: I objected to the question as calling for a legal conclusion.<br>"Q BY MR. WEBER: You can answer.<br>"A No, I can't.<br>"THE DEPONENT: Can I say that?<br>MR. LANDAU: You can say whatever you want.<br>"Q BY MR. WEBER: No answer isn't an answer.<br>"A (In English) Then strike it.<br>"Q BY MR. WEBER: Mrs. Kirkland, do you have an answer?")<br>THE DEPONENT: When John and I formed this trust, he just only thinking of Hunter Kirkland, his future and wanting to protect him for to make sure he will be provide for. That's from a father's love. And if anything about the trust, when we formed it, there is not -- the EPD loan is not fulfilled. We didn't release the claim. And then until it's too late, we have to file the proof of claim. So John do the testimony. I am not surprised he will do that. And I don't recall how our conversation about it.<br><br>***<br><br>"Q BY MR. WEBER: Do you recall authorizing John Kirkland to testify on behalf of the Bright Conscience Trust?<br>A (In English) I don't recall.<br>Q Have you ever authorized anyone to testify on behalf of the Bright Conscience Trust? | from the deposition of Poshow Kirkland, pp. 98-99, lines 22-25 and 1-14; pp. 101-102, lines 7-25, and 1-11; and, pp. 102-103, lines 12-25 and 1-8. |

| | |
|---|---|
| A Have I? Does "testify" mean having attorneys to represent me, representing our trust?<br>Q Provide testimony under oath similar to today.<br>A (Through the interpreter) What's your question, then?<br>Q Have you ever authorized anyone to testify under oath on behalf of the Bright Conscience Trust?<br>A (In English) I don't recall.<br>Q And you don't recall authorizing Mr. Kirkland to testify on behalf of the Bright Conscience Trust under oath?<br>MR. LANDAU: Asked and answered.<br>THE DEPONENT: (In English) I don't recall. | |
| 187. Notwithstanding that Poshow Kirkland does not recall designating or authorizing John Kirkland to testify on behalf of the BC Trust in the bankruptcy case, Kirkland appeared at the Rule 2004 examination on behalf of the BC Trust.<br><br>"Q. And are you here as a result of the Motion For Rule 2004 examination?<br>A. Apparently so.<br>Q. And in the Motion for Rule 204 examination, you were requested as a witness or examinee in your individual capacity or as counsel for the debtor; there's also a request for the Bright Conscience Trust, person most knowledgeable of that entity, to appear on a later date. Are you here today on behalf of that entity as well?<br>A. Yes." | Weber Declaration, p. 8, ¶ 24 and Exhibit 22 to the Weber Declaration, transcript from the Kirkland Rule 2004 examination transcript, May 27, 2011, pp. 11-12, lines 17-25 and 1-2.<br><br>RJN, **Exhibit QQ**, Motion by Chapter 7 Trustee for Examination of, and Production of Documents and Things By: (1) The Person(s) Most Qualified for Debtor EPD Investment Co, LLC; (2) Jerrold Pressman; (3) Keith Pressman; (4) Ruben Moreno; (5) John C. Kirkland; (6) The Person(s) Most Qualified for Broadway Entertainment Marketing, Inc.; (7) The Person(s) Most Qualified for S.C. Club, L.P.; (8) The Person(s) Most Qualified for S.C. Club, Inc.; (9) The Person(s) Most Qualified for the Bright Conscience Trust; (10) The Person(s) Most Qualified for HMB Holdings, LLC; and (11) Ted Jonavic Pursuant to Fed. R. Bank. P. 2004 (Docket No. 123). |
| 188. John Kirkland asserted in responses to requests for admission that he was designated by the BC Trust to testify at the Rule 2004 examination, but in deposition testimony denies having appeared as a designated person for the BC Trust.<br><br>"Q Did you previously appear in a Rule 2004 examination in this case, in the bankruptcy case on | Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, request nos. 235.<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript |

| | |
|---|---|
| behalf of the Bright Conscience Trust?<br>A No.<br>Q You didn't appear as the designated person most knowledgeable or person most qualified on behalf of the Bright Conscience Trust?<br>A No.<br>Q Who represented the Bright Conscience Trust during the Rule 2004 examination?<br>A I don't have any idea of what you're talking about.<br>Q So your testimony is you did not—you were not the designated person most knowledgeable or person most qualified on behalf of the Bright Conscience trust at the Rule 2004 examination. Is that right?<br>A Correct.<br>Q do you know if the Bright Conscience designated a person most knowledgeable or person most qualified for the Rule 2004 examination?<br>A The trust isn't an entity, so it couldn't.<br>Q Did your wife designate you as a person most knowledgeable or person most qualified for the Rule 2004 examination?<br>A The trust is not an entity. It can't have a person most knowledgeable. Only an entity can have a person most knowledgeable. The trust is not an entity; therefore, it cannot have such a thing?<br>Q Did your wife ask you to testify at the Rule 2004 examination in this case, in the bankruptcy case, in regard to the Bright Conscience Trust?<br>A I won't answer that.<br>Q Because of the marital privilege?<br>A Correct." | from the deposition of John Kirkland, pp. 285-287, lines 24-25, 1-25, and 1-8. |
| 189. Kirkland is the person most qualified to testify on behalf of the BC Trust as to Claim 171, Claim 235, Claim 236 and Claim 13. | Weber Declaration, pp. 8-9, ¶ 26 and Exhibit 24 to the Weber Declaration, Poshow Kirkland's Supplemental Responses to Requests for Admission Served on or about May 23, 2017, Supplemental Responses to RFAs 83-86, pp. 3-4. |
| 190. Kirkland will not respond as to whether he participates in the decision-making for the BC Trust, claiming marital privilege.<br><br>"Q Who makes the decisions on behalf of the Bright Conscience Trust?<br>A My wife.<br>Q Has she made every decision for the Bright | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 284-285 lines 14-25, and 1-14. |

| | |
|---|---|
| Conscience Trust since its formation?<br>A Yes.<br>Q Do you have any input into the decisions?<br>A I'm not sure I understand the question?<br>Q Do you discuss the decisions with your wife before she makes them?<br>A I won't answer that.<br>Q And why is that?<br>A It's privileged.<br>Q And which privilege?<br>A Marital communication.<br>Q In her capacity as trustee of the trust?<br>A I don't think you have—I don't think it's a capacity question. Any type of communication between husband and wife that doesn't involve third parties is privileged.<br>Q Including any in regard to the Bright Conscience Trust and its actions in regard to EPD?<br>A I don't think there is any subject matter limitation. If it's a confidential communication between husband and wife, it's privileged under federal law." | |
| 191. The facts stated in the objection that Kirkland filed on behalf of EPD to the motion to appoint an interim trustee were not accurate and instead were characterized by Kirkland as "argument."<br><br>"Q Are the arguments made in this objection accurate?<br>A They're arguments. I don't know that an argument can be accurate; they're arguments.<br>Q On the first page, on lines 25 through 26, it says, "The alleged Debtor is generally paying its debts as such debts become due, unless such debts are the subject of a bonafide dispute." Do you see that?<br>A Yes.<br>Q Was that accurate?<br>A As far as I know.<br>Q Well, was EPD paying its debts as they became due to you or the Bright Conscience Trust at that point?<br>A I don't think they were due."<br><br>***<br><br>"Q If you look on the second page, lines 7 through 9, it says, "Though their cash flow problems are unfortunate, they are hardly unique in today's economy. That is the nature of investing."<br>A Yes.<br>Q And then it says, "Moving parties have no one to | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, at p. 270, lines 6-21; pp. 271-272, lines 13-25, and 1-12; and, pp. 274-275, lines 13-25, and 1-5. |

| | |
|---|---|
| blame but themselves for their own investment decisions. Their funds were fully at risk, and EPD owes them nothing." Do you see that?<br>A Yes.<br>Q Accurate?<br>A It's an argument.<br>Q Nothing more than an argument?<br>A I don't know. It's an argument.<br>Q Were your funds fully at risk?<br>A No.<br>Q Were your wife and your family trust's investments or loans fully at risk?<br>A No.<br>Q And why is that?<br>A They were documented loans. The loan documents speak for themselves."<br><br>****<br><br>"Q If you look toward the bottom of page 2, starting on line 23, it says, "Conversely, if the instant application were somehow granted, it would trigger the standard bankruptcy default provisions in virtually every contract, loan and other agreement to which EPD is a party, destroy its credit, and effectively put the company out of business. The loss would be catastrophic." Do you see that?<br>A Is that accurate?<br>Q I was psychic. That's exactly what happened. Yes.<br>A. It's accurate?<br>Q Yes. It's not accurate. It's an argument. But that is exactly what happened. The bankruptcy was filed. And was confirmed as a 7, and you wiped out the estate." | |
| 192. John Kirkland's declaration filed in the bankruptcy case for reconsideration of the entry of the Order for Relief stated that he had personal knowledge of the facts in the declaration, and that "[t]he motion should be granted ex parte or set for hearing on shortened notice, because if not immediately set aside the entry of an Order for Relief would have devastating consequences on an Alleged Debtor. Because it would effectively cause an Alleged Debtor to cease its ability to operate as a going concern, the damage caused by such an order could not be undone, and would effectively result in the destruction of the company's business, or diminution in value of the estate, to the | RJN, **Exhibit RR**, Declaration of John C. Kirkland in Support of Alleged Debtor's Notice of Motion and Motion for Reconsideration of Court's Order for Relief in an Involuntary Case, filed on February 9, 2011 (Docket No. 33), p. 2 of 2, ¶¶ 1, lines 4-6, and 3, lines 10-15. |

| | |
|---|---|
| detriment of all creditors. Accordingly, immediate relief is necessary." | |
| 193. Kirkland testified that the facts stated in Kirkland's declaration to which he stated he had personal knowledge were in regard to a "generic" debtor and not as to EPD.<br><br>"Q On Paragraph 3, starting at line 11, it says, "If not immediately set aside, the entry of an Order for Relief would have devastating consequences on an Alleged Debtor. Because it would effectively cause an Alleged Debtor to cease its ability to operate as a going concern, the damage caused by such an order could not be undone and would effectively result in the destruction pf the company's business or diminution in value of the estate to the detriment of all creditors. Accordingly, immediate relief is necessary." Do you see that?<br>A Yes.<br>Q Accurate?<br>A It's an argument.<br>Q This is a Declaration, not a pleading.<br>A Correct.<br>Q Is it accurate?<br>A It's an argument. It is, in fact, exactly what happened to this particular alleged debtor. So obviously my psychic abilities were dead on. You destroyed the business, you wiped it out, you caused devastating consequences, so the destruction of the business, diminution in the value of its assets. So all of the things I said could happen to an alleged debtor did, in fact, happen to this particular debtor because of the Chapter 7 bankruptcy. So it was a pretty good psychic prediction, sadly.<br>Q When you're referring to an "alleged debtor," are you referring to EPD?<br>A No.<br>Q Just the generic debtor?<br>A Yes.<br>Q And Paragraph 1 says that you have personal knowledge of the facts set forth in the Declaration. Is that right?<br>A Yes.<br>Q And did you have personal knowledge of the facts set forth in Paragraph 3?<br>A Yes. It's an argument. I'm making the argument; I have personal knowledge of it.<br>Q Personal knowledge of an argument? | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 276-278, lines 24-25, 1-25, and 1-18. |

| | |
|---|---|
| A Yes. It's my prediction of the future and my prediction unfortunately came true; I was dead on." | |
| 194. EPD was not paying debts as they became due in 2011, and was not operating as a company.<br><br>"Q In January 2011, did EPD have past due bills or payments?<br>A I believe so."<br><br>***<br><br>"Q As of January 2011, do you know if EPD was operating as a company?<br>A I don't think so.<br>Q Do you know if it was engaged in any business?<br>A I don't believe so.<br>Q Other than fielding calls or e-mails from investors trying to find out what was going on with their money?<br>A Not to my knowledge.<br>Q In January 2011, do you know if EPD was paying its debts as they became due.<br>A I don't know.<br>Q As of January 2011, wasn't EPD getting a lot of calls from investors asking where their money was?<br>A Correct. Yeah, so they weren't.<br>Q So EPD was not paying its debts as they became due in January 2011; is that right?<br>A Correct." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 211, lines 7-9; pp. 209-210, lines 13-25 and 1-7. |
| 195. Kirkland filed substitutions of attorney, substituting in Matthew Gruenberg in place of Kirkland and Luce Forward, testifying that he had Gruenberg's permission.<br><br>"Q Did Mr. Gruenberg authorize you or Ms. Underkoffler to file these substitutions with his electronic signature?<br>A Yes.<br>Q He did?<br>A Yes.<br>Q In writing?<br>A I don't recall.<br>Q Did he ever give you a handwritten signature on these documents?<br>A I doubt it." | RJN, **Exhibit SS**, Substitution of Attorney, filed on April 25, 2011 (Docket No. 117).<br><br>RJN, **Exhibit TT**, Substitution of Attorney, filed on April 26, 2011 (Docket No. 119).<br><br>Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 279-280, lines 20-25, and 1-5. |
| 196. Gruenberg was not authorized to practice in the | Weber Declaration, pp. 7-8, ¶ 23 and |

| | |
|---|---|
| United States District Court for the Central District of California.<br><br>"Q And are you admitted to practice in the District Court or Bankruptcy Court for the Central District of California?<br>A Not to my knowledge, no." | Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 76, lines 11-14. |
| 197. Kirkland did not have Gruenberg's permission to use his electronic signature on substitutions.<br><br>"Q BY MR. WEBER: Mr. Gruenberg, have you seen these Substitution of Attorney forms before?<br>A Not to my recollection, no.<br>Q Do you recall authorizing your "/s/" to substitute in as counsel of record for EPD in the bankruptcy case?<br>A I recall this being an issue. I did not authorize to be technically substituted into this case, no.<br>Q If you look on the third page of each of these documents, they purport to both be served by Ms. Underkoffler; is that correct?<br>A Yes.<br>Q Did you review either of these substitutions before they were filed?<br>A No, I don't believe so. I don't recall.<br>Q And you didn't authorize your electronic signature on either of these documents?<br>A No.<br>Q And you don't think you're admitted to practice in the District Court or Bankruptcy Court for the Central District of California?<br>A That's correct." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 77-78, lines 9-25 and 1-6. |
| 198. Gruenberg never agreed to substitute in as counsel for EPD in the bankruptcy case.<br><br>"Q This is an e-mail that states it's from you to John Moe on June 13, 2011. Do you see that?<br>A Yes.<br>Q And you wrote, "After re-reading my e-mail, I want to make something clear. I do not know who filed the substitution or when it was filed. I only learned that it was filed after getting the e-mail from Corey Weber with the substitution form attached. I then called Lisa and she confirmed that it had been filed." Do you see that?<br>A Yes.<br>Q And "Lisa" is Lisa Underkoffler?<br>A Yes. | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 78-81, lines 19-25, 1-25, 1-25, and 1-5. |

| | |
|---|---|
| Q So you didn't know that a substitution of counsel in the bankruptcy case had been filed until I brought that to your attention; is that correct?<br>A Yes.<br>Q So you didn't know that a substitution of counsel in the bankruptcy case had been filed until I brought that to your attention; is that correct?<br>A Yes.<br>Q And then after that, you called and spoke with Lisa Underkoffler, and Ms. Underkoffler said that it had been filed?<br>A I don't remember the sequence of events, but that's what the e-mail says, yes.<br>Q Did Ms. Underkoffler explain how she filed it without your authorization for your electronic signature?<br>A I don't recall.<br>Q If you look below that, there is an e-mail from you and it appears to be part of that same chain with Mr. Moe. And it says, "This is not entirely accurate. John Kirkland never in fact asked me if I would or could sub in as counsel in the bankruptcy matter. He filed it without notice to me, my consent or discussion with me of any kind whatsoever. The only conversation John and I had with regard to EPD and substitutions was for the state court litigation, which as far as I understand, is primarily stayed because of the bankruptcy. I do recall that Lisa Underkoffler asked me if I would sub in for the bankruptcy matter and I said absolutely not," with "absolutely not" underlined. "Apparently, the substitution was filed anyway. It has become clear to me that John Kirkland used me to achieve some mysterious ends. I appreciate the work you are doing to relieve me in a joint motion but if possible, I would like it to be stronger with regard to my cause." Do you see that?<br>A Yes.<br>Q This reference is a conversation where you spoke with Ms. Underkoffler and she asked you to substitute in as bankruptcy counsel for EPD and you said "absolutely not"; is that correct?<br>A Yes.<br>Q Do you recall any of the other substance of the conversation?<br>A I actually don't remember the conversation.<br>Q But the statements here in your e-mail are accurate?<br>A Yes, as far as I can recall. I know I never agreed to substitute in." | |

| | |
|---|---|
| 199. Kirkland's legal secretary, Lisa Underkoffler, filed the substitutions at Kirkland's direction even though Kirkland knew that Gruenberg had not authorized his electronic signature on the substitutions.<br><br>"Q So Mr. Kirkland instructed you to file the substitution before you had spoken with Mr. Gruenberg?<br>A Yes.<br>Q And did you obtain any signature from Mr. Gruenberg on a substitution?<br>A No.<br>Q It appears on each of these there is a "/S" from Mr. Gruenberg?<br>A Yes.<br>Q Do you recall who put in the "/S" form?<br>A I don't recall.<br>Q Do you know if Mr. Kirkland had any discussions with Mr. Gruenberg getting his authorization to put a "/S" for him?<br>A I don't think he did.<br>Q And do you base that on anything?<br>A I asked John if he knew that Matt was doing this, and he said, "Just file it."<br>Q So Mr. Kirkland instructed you to file it even though Mr. Gruenberg didn't know he was being substituted in as counsel?<br>A That's my understanding, yes.<br>Q And at some point Mr. Gruenberg found out about that and you spoke with him?<br>A Yes.<br>Q Was Mr. Gruenberg upset about it?<br>A I believe so, yes.<br>Q And you spoke with him—with him regarding it?<br>A Right, yes.<br>Q And he was upset?<br>A Yes.<br>Q And what do you recall the specifics of what he said?<br>A Other than him saying, "I'm not allowed to practice in bankruptcy court," I don't know what else we talked about." | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 60-61, lines 5-25 and 1-15. |
| 200. Gruenberg does not know why Kirkland filed the substitutions without Gruenberg's permission.<br><br>"Q This references, "It has become clear to me that John Kirkland used me to achieve some mysterious | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 81, lines 13-20. |

| | |
|---|---|
| ends. Do you see that?<br>A Yes.<br>Q Do you know what Mr. Kirkland was trying to accomplish, what those mysterious ends were?<br>A I still don't know, no." | |
| 201. Underkoffler testified that Kirkland "pushed the envelope" and was "right up against the line" in regard to actions as a lawyer.<br><br>"Q Did Mr. Kirkland sometimes push the envelope in things he did on behalf of clients?<br>MR. GREGORY: Objection. Calls for speculation; improper expert testimony. She's not an attorney. She wouldn't know that. Also lack of foundation.<br>MR. WEBER: You can answer.<br>THE WITNESS: In my opinion, yes.<br>BY MR. WEBER: How so?<br>MR. GREGORY: Same objection. But you can go ahead and answer.<br>THE WITNESS: Yeah, I'm not qualified because I don't really know where the envelope is. But it seemed to me like he was always kind of just right up against the line on things. And I can't really—you're going to ask me for specifics; I can't really say, but I just had that general feeling.<br>BY MR. WEBER:<br>Q Do you recall any instances that—where you thought he might be close to or over the line in terms of things he did?<br>MR. GREGORY: Objection. Question calls for speculation. I think she said she doesn't; she can't recall anything specifically.<br>THE WITNESS: Yeah, I can't really give you an example.<br>BY MR. WEBER:<br>Q Just the general feel?<br>A Yes.<br>Q Different from other attorneys that you work for?<br>A Yes.<br>Q Mr. Kirkland fairly combative?<br>A Yes.<br>Q Was that with opposing counsel or other people too?<br>A Opposing counsel.<br>Q Sometimes took extreme positions?<br>A Yes." | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, bracketed portions of the transcript from the deposition of Lisa Underkoffler, pp. 80-81, lines 6-25 and 1-21. |
| 202. Associates commented to Underkoffler about Kirkland's practices as an attorney. | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, |

| | |
|---|---|
| "Q Did any associates or attorneys at Luce Forward or Greennberg—or not Greenberg—Dreier ever comment to you as to strong positions taken by Mr. Kirkland?<br>A Yes.<br>Q And do you recall the nature of the comments?<br>A I recall Vicky Pham being skeptical of some of the practices John had.<br>Q Do you recall any specifics?<br>A No.<br>Q Anyone else other than Ms. Pham?<br>A No. Not to say there weren't; I just don't recall.<br>Q When she commented to you, was it in regard to a question as to whether it was an ethical position or supported by case law?<br>A I would say probably an ethical issue. I don't think it was a case law issue."<br>***<br>"Q Ms. Pham was an attorney at Luce Forward as well?<br>A Yes.<br>Q And was she an associate?<br>A Yes.<br>Q And was she supervised by Mr. Kirkland?<br>A Yes." | bracketed portions of the transcript from the deposition of Lisa Underkoffler, p. 82, lines 4-20; p. 46, lines 9-15. |
| 203. Kirkland "pushed the envelope" in litigation, only producing documents that were helpful to his position, and objecting to the rest.<br><br>"Q BY MR. WEBER: At the bottom of the first page, is that an e-mail that Lisa Underkoffler sent to you on July 1, 2010?<br>A Yes.<br>Q And she asks, "Are we producing doc? I've prepared verifications for Jerry to sign."<br>A Yes.<br>Q And your response is, "Yes, but only helpful ones."<br>A Yes.<br>Q What did you mean by that?<br>A I assume I meant we were objecting to production of some documents and we were only producing ones we thought were helpful.<br>Q You weren't producing any documents that would potentially harm your client's case?<br>A I don't know. I'm inferring from what I say. I say, "Yes, but only helpful ones." So I would assume that means we've objected. I think earlier there was an indication we objected to a lot of these requests. So | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 251-252, lines 10-25, and 1-12. |

| | |
|---|---|
| now we've said, "We've objected. You're not entitled to these, but we're going to produce some notwithstanding objections, but the ones we're going to produce are helpful. And we're still objecting to producing the ones we don't think are helpful. But again, that's a guess based on what I'm reading. I don't have any recollection specifically." | |
| 204. John Kirkland also "pushed the envelope," instructed Gruenberg in the Huerth litigation to use the least knowledgeable person as a declarant because there would be less to potentially impeach them with later on.<br><br>"Q Do you know why you told Matt Gruenberg, "No, you want to use your least knowledgeable people for Declarations? Provides less to impeach them with down the line at trial or depo"?<br>A I just told you that's protected attorney work product.<br>Q do you believe that Declarations should be signed by people with less knowledge?<br>A I won't answer that question?<br>Q And why is that?<br>A Because you're basing it on attorney work product after I told you it was work product.<br>Q I'm asking you as a general matter. Do you generally have people sign Declarations that have the least knowledge?<br>A I won't answer the question, because you're basing it on attorney work product after being advised it was work product.<br>Q Work product, performing work on behalf of whom?<br>A I don't recall. It doesn't matter. I hold the privilege."<br><br>***<br>"Q It looks like down below you're asking Mr. Kirkland who can provide an affidavit for EPD Investment Leasing Co., and Mr. Kirkland responds, "yes. only choices would be ruben, keith or jerry." Do you see that?<br>A Yes.<br>Q Is that Ruben Moreno, Keith Pressman and Jerry Pressman?<br>A I believe so.<br>Q And then you replied, "ok, I'll use jerry since he is the easiest to obtain signature from." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 262, lines 1-22.<br><br>Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 69-70, lines 10-25 and 1-10. |

| | |
|---|---|
| A I see that.<br>Q But that was your response?<br>A Yes.<br>Q And Mr. Kirkland wrote, "no, you want to use your least knowledgeable people for declarations. provides less potentially to impeach them with down the line, at trial or depo." Is that correct?<br>A I see that, yes.<br>Q And then you responded, "makes sense. probably Keith then. You okay with him?" Is that correct?<br>A Yes.<br>Q Do you recall any of that discussion?<br>A No." | |
| 205. On or about October 31, 2012, the Trustee filed his adversary complaint against the Kirklands (Docket No. 1), initiating Adv. No. 2:12-ap-02424-ER. | RJN, **Exhibit UU**, Complaint. |
| 206. The Trustee filed amended complaints on December 7, 2012, August 12, 2016, and October 14, 2016. The operative complaint is the Fourth Amended Complaint. | RJN, **Exhibits UU – XX**. |
| 207. On or about December 6, 2013 (Docket No. 119), John Kirkland filed his answer to the complaint. | RJN, **Exhibit G**, answer to complaint. |
| 208. On or about July 26, 2016, Poshow Kirkland filed her answer to the complaint (Docket No. 209). | RJN, **Exhibit H**, answer to complaint. |
| 209. On or about December 23, 2016, the Kirklands served their initial disclosures. | Weber Declaration, p. 2, ¶ 1 and Exhibit 1 to the Weber Declaration, Defendant's Initial Disclosures. |
| 210. The deposition of witness Matthew B. Gruenberg in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on May 2, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Matthew B. Gruenberg, and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the witness, Stephen R. Mick of Barnes & Thornburg LLP. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew B. Gruenberg. |
| 211. The deposition of witness Lisa Underkoffler in the adversary proceeding titled *Rund v.* | Weber Declaration, pp. 6-7, ¶ 21 and Exhibit 19 to the Weber Declaration, |

| | |
|---|---|
| *Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on May 25, 2017. The court reporter was Christine Sperbeck of Barkley Court Reporters, CSR 14008. Attendees at the deposition included the court reporter, Lisa Underkoffler, and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the witness, Keith Gregory of Snell & Wilmer, LLP. The court reporter, Christine Sperbeck, certified the deposition transcript. | bracketed portions of the transcript from the deposition of Lisa Underkoffler. |
| 212. The deposition of witness Katharine Werner in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 1, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Katharine Werner, and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner. |
| 213. The deposition of witness Ruben Moreno in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 19, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Ruben Moreno, and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the Kirklands, Lewis Landau. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno. |
| 214. The deposition of witness Jerrold Pressman in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 21, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Jerrold Pressman and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the Kirklands, Lewis Landau. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman. |
| 215. The deposition of witness Keith Pressman in the adversary proceeding titled *Rund v. Kirkland, et* | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, |

| | |
|---|---|
| *al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 23, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Keith Pressman, and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner. The court reporter, Mitch Genser, certified the deposition transcript. | bracketed portions of transcript from the deposition of Keith Pressman. |
| 216. The deposition of defendant John C. Kirkland in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 26, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, John Kirkland and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the Kirklands, Lewis Landau. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland. |
| 217. The deposition of defendant Poshow Kirkland in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 28, 2017. The court reporter was Mitch Genser of Barkley Court Reporters, CSR No. 4239. Attendees at the deposition included the court reporter, Poshow Kirkland and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner, and counsel for the Kirklands, Lewis Landau. The court reporter, Mitch Genser, certified the deposition transcript. | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland. |
| 218. The deposition of Theodore Jonavic in the adversary proceeding titled *Rund v. Kirkland, et al.* in the bankruptcy case titled *In re EPD Investment Co., LLC and Jerrold S. Pressman* took place on June 30, 2017. The court reporter was Cindy DuRivage of Barkley Court Reporters, Nevada CSR No. 451. Attendees at the deposition included the court reporter, Theodore Jonavic and counsel for the Trustee, Corey R. Weber of Brutzkus Gubner. The court reporter, Cindy DuRivage, certified the deposition transcript. | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic. |
| 219. The total amount actually deposited by John Kirkland with the Debtors into his EPD "account" is $521,608.23. BRG's analysis includes a credit for a 4/15/2009 deposit from Keith Pressman, was deposited into K. Pressman's account, and EPD deposited a | Expert report, pp. 19-22.<br><br>Weber Declaration, p. 3, ¶ 12 and Exhibit 10, documents produced by Defendants, including bank |

| | |
|---|---|
| check from K. Pressman.<br><br>BRG has confirmed that the other four transfers totaling $850,000 were not received by EPD or Pressman. BRG has confirmed that two transfers ($400,000 on September 27, 2007 and $150,000 on March 26, 2008) were received by BEM. A notation on the March 26, 2008 check indicated that the payment was for "Fees." The other two transfers ($200,000 on September 27, 2007 and $100,000 on June 19, 2008) were, according to notations in EPD's records, received by K. Pressman. When these transfers were made, BEM and K. Pressman were debtors of EPD. Kirkland produced a "Continuing Guaranty" agreement, dated as of November 8, 2007, among Kirkland, as lender; EPD, as debtor and guarantor; and Pressman, as guarantor. Among the terms of the agreement is that EPD is obligated to provide Kirkland a "cumulative net return on investment of at least 12% per annum (24% on default)" for all loans made to EPD, as well as all payments for "consulting fees, advisory fees, and professional service fees" to EPD, BEM, K. Pressman, and "any other sister company of EPD."<br><br>FOOTNOTE 10 re: $100,000 transfer in the amount of $100,000: "This payment was received from K. Pressman. A notation in QuickBooks indicates that Kirkland's check was deposited into K. Pressman's account, and EPD deposited a check from K. Pressman."<br><br>FOOTNOTE 11: "In addition to these transfers, BRG observed EPD's receipt from Kirkland of a check in the amount of $16,142.00<br><br>According to EPD's QuickBooks, Kirkland's investment accounts were credited for each of the above transactions, with the exception of the August 18, 2008 transaction. For that transaction, only $255,466.23 was credited to Kirkland's investor account, with the remaining $600,000.00 booked to a revenue account entitled "Consulting & Professional Fees", with the description "Nominee Distribution." BRG has confirmed that the other four transfers totaling $850,000 were not received by EPD or Pressman. BRG has confirmed that two transfers ($400,000 on September 27, 2007 and $150,000 on March 26, 2008) were received by BEM. A notation on the March 26, 2008 check indicated that the payment | statements and canceled check. |

| | |
|---|---|
| was for "Fees." The other two transfers ($200,000 on September 27, 2007 and $100,000 on June 19, 2008) were, according to notations in EPD's records, received by K. Pressman. When these transfers were made, BEM and K. Pressman were debtors of EPD. Kirkland produced a "Continuing Guaranty" agreement, dated as of November 8, 2007, among Kirkland, as lender; EPD, as debtor and guarantor; and Pressman, as guarantor. Among the terms of the agreement is that EPD is obligated to provide Kirkland a "cumulative net return on investment of at least 12% per annum (24% on default)" for all loans made to EPD, as well as all payments for "consulting fees, advisory fees, and professional service fees" to EPD, BEM, K. Pressman, and "any other sister company of EPD." | |
| 220. The following are disbursements from EPD that were paid to Union Bank for the benefit of Kirkland<br><br>Date / Amount<br>10/5/2008 $7,437.50<br>11/5/2008 $7,437.50<br>12/5/2008 $7,437.50<br>1/5/2009 $7,437.50<br>2/5/2009 $7,437.50<br>3/5/2009 $7,809.38<br>4/5/2009 $7,435.52<br>5/5/2009 $7,435.52<br>6/5/2009 $7,435.52<br>7/5/2009 $7,435.52<br>8/5/2009 $7,435.52<br>9/5/2009 $7,435.52<br>10/5/2009 $7,435.52<br>12/14/2009 $7,807.30<br><br>Total $104,852.82<br><br>"According to EPD's QuickBooks, each of the above transactions was booked as a reduction to the liability account associated with Kirkland. Also, for each, the QuickBooks entry and the check referenced "John C. Kirkland" along with a loan account number, evidencing that the payments were on account of a loan that Kirkland had with Union Bank."<br><br>*** | Weber Declaration, p. 9, ¶ 27 and Exhibit 25, canceled checks from Debtor's bank records showing payments to Union Bank for John Kirkland's benefit.<br><br>Expert report, pp. 19-20.<br><br>RJN, **Exhibit J**, Appellants' Opening Brief filed by the Kirklands, Case No. 14-55740, United States Court of Appeals for the Ninth Circuit on January 16, 2015 (Docket No. 23-1), p. 16 of 79. |

| | |
|---|---|
| On July 24, 2009, John Kirkland entered into a Funding Agreement with EPD and Jerrold Pressman. The Funding Agreement is signed by Kirkland, and by Jerrold Pressman individually and on behalf of EPD. The Funding Agreement reflected in the Recitals that Kirkland was aware of EPD's cash flow issues at that time, stating "EPD has advised Investor that, due to temporary cash flow constraints, EPD has an immediate need for $100,000. The Recitals also reflected that EPD had been paying Kirkland's mortgage payments, stating "EPD states that it has paid approximately $75,000 to Investor's mortgage lender for the benefit of Investor over the last year, in monthly payments of approximately $7,500, and will make additional monthly payments in accordance with this Agreement." | |
| 221. As of August 30, 2017, the Estate had cash of about $3,376,977.18 and total receipts of about $8,821,503.98.<br><br>The funds in the Estate were collected are as follows:<br>a. Court-approved settlement of claims against Luce Forward Hamilton & Scripts, LLP ($750,000) regarding fraudulent transfer, legal malpractice, breach of fiduciary duty and other claims based on actions by John C. Kirkland ("Kirkland") while an attorney and partner at Luce Forward;<br>b. Court-approved settlement of claims against Greenberg Traurig, LLP ("Greenberg Traurig") ($500,000) regarding legal malpractice, breach of fiduciary duty and other claims based on actions by Kirkland while an attorney and partner at Greenberg Traurig;<br>c. Court-approved settlement of claims against Robert Geringer ("Geringer") and Pressman ($3,615,817.85) (the net amount received after payment of National Mortgage Resources, Inc.'s secured claim was $3,306,651.15) based on the resolution of potential claims against Geringer and on the amounts that would otherwise have been paid to Jerrold Pressman in connection with the sale of stock in North Hills Industrial Park, Inc. to Geringer;<br>d. Distribution in the bankruptcy case entitled *In re Sidecreek Development, Inc.* ($50,000) based on a settlement;<br>e. Proceeds from the Court-approved sale of stock in Ice Skating Enterprises, Inc. ($80,000) (the | Declaration Of Jason M. Rund, Chapter 7 Trustee, In Support Of Chapter 7 Trustee's: (1) Motion For Summary Adjudication Regarding The Trustee's First Claim For Relief For Disallowance Of Claims, Or, In The Alternative, For Equitable Subordination Of Claims And Proofs Of Claim; And, (2) Motion For Summary Adjudication Regarding The Second, Third And Sixth Claims For Relief For Avoidance And Recovery Of Fraudulent Transfers Made With Actual Intent, ¶¶ 5-6.<br><br>2:10-bk-62208-ER at Docket Nos: 249, 278, 576, 613, 688, 743, 750, 840, 842, 970, 982, 1018, 1019, 1099, and 1117. |

| | |
|---|---|
| net amount received after payment of tax liens and escrow fees was $54,588.83) regarding shares of stock in Ice Skating Enterprises, Inc. for $80,000 collectively to buyers James Rosenbaum Miller Carbonic, Inc.; and<br>e. Court-approved settlements ($3,811,650.83) based on claims to avoid and recover alleged fraudulent and/or preferential transfers and potential defendants regarding alleged preferential and/or fraudulent transfers. | |
| 222. EPD was operated as a Ponzi scheme by its managing Member, Jerrold Pressman.<br><br>EPD's activities reveal the following characteristics, which are indicative of a Ponzi scheme:<br>• Reliance on outside Investor money;<br>• Investor money was not used according to the stated purpose;<br>• New Investor money was used to pay returns promised to earlier Investors; and<br>• The business lacked profits sufficient to provide the promised returns, and, therefore, depended on an ever increasing supply of investor money. | Expert Report, at p. 10 |
| 223. The Expert Report concludes that "…without the infusion of new Investor money, EPD would not have been able to meet its obligations to its earlier and new Investors."<br><br>As illustrated in the preceding paragraphs, EPD had no ability to meet its obligations to Investors without the influx of new money from Investors. The following chart illustrates, for the same period, how EPD was able to pay its Investors [chart]. Given the manner in which EPD accounted for payments to Investors, it is difficult to break down the Investor payments between interest payments and principal repayments, but what is clear from the above analysis is that without the infusion of new Investor money, EPD would not have been able to meet its obligations to its earlier and new Investors. | Expert Report at pp. 13-14. |
| 224. The analysis performed in the Expert Report shows that EPD did in fact use new investor funds to pay amounts to or for the benefit of other investors. However, the need for new investor funds to pay other investors did not begin in 2009, but instead was the way EPD funded investor payments from 2004 through 2009. | Expert Report at pp. 13-14. |

| | |
|---|---|
| 225. The Expert Report includes a tracing analysis of investor funds and finds that:<br><br>"The above examples illustrate a pattern of EPD's use of Investor loan proceeds to pay obligations to other Investors, as well as for the benefit of its principals, Pressman and K. Pressman. In total, during the periods illustrated, receipts from Investors totaled approximately $8.3 million, while other receipts during the periods totaled approximately $400,000. From these proceeds, cash disbursements to Investors totaled approximately $3.2 million and payments made for the benefit of Pressman and K. Pressman totaled approximately $3.9 million. The source of payments made for the return of loan principal or for interest on the loans of earlier Investors was new loans from other Investors, as opposed to revenue realized from any legitimate business activities. This scheme perpetuated a fraud that enabled EPD's principals to benefit from substantial transfers made from EPD's bank accounts." | Expert Report at pp. 6-7. |
| 226. The Expert Report includes a chart showing that the amounts paid to investors had to come from other investors because the cash from other sources was insufficient to pay the amounts to investors. | Expert Report at p. 13. |
| 227. The Expert Report finds that there were insufficient funds from sources other than new investments to pay amounts the amounts paid by EPD to other investors:<br><br>"As the above summary illustrates, substantial amounts for interest on the Investor notes accrued during the period, but there was not nearly sufficient net cash inflows from non-Investor activities during the same period. For the six year period, non-Investor activities resulted in negative net cash flows of over $10.5 million, and 2009 was the only year during which there was a positive net cash flow. Therefore, the only way for EPD to meet its interest obligations on the notes, as well as its obligations to repay any principal, was to obtain additional loans from Investors." | Expert Report at p. 11. |
| 228. The Expert Report also finds that EPD's payment to and for the benefit of some investors using other investors' money created net winners and net losers:<br><br>"The schedule illustrates that there were 81 net "winner" Investor groups who received | Expert Report at p. 4. |

| | |
|---|---|
| approximately $19.7 million more than what was invested with EPD during the Seven Year Period. Conversely, there were 78 net "loser" Investor groups who invested approximately $30.2 million more than what was returned by EPD during the Seven Year Period." | |
| 229. The Expert Report finds that the transfers from to other related entities resulted in net outflows from EPD:<br><br>"As the above summary illustrates, more cash was disbursed to the Related Entities, or to other entities for the benefit of the Related Entities, than was received. During the Seven Year Period, a total of approximately 2,700 cash transactions took place with the Related Entities. This equates to an average of more than one transaction per day during that period. It appears that EPD was used as a sort of "cash flow" tool for these entities. At all times during the Seven Year Period, the cumulative amounts disbursed to the entities was greater than the cumulative amounts received from the entities. According to EPD's QuickBooks, the amounts owed to EPD from these entities at the end of each year from 2003 to 2010 ranged from approximately $19.8 million to approximately $28.7 million."<br><br>The total net outflows to the other entities was $1,552,000 for the period from December 8, 2003 through December 7, 2010, and was $1,554,000 for the period from 2004 through 2009. | Expert Report at pp. 8, and 11. |
| 230. The Expert Report shows that, between December 8, 2003 and December 7, 2010, EPD made net payments to or for the benefit of Jerrold Pressman in the amount of $4,679,000, and made net payments to or for the benefit of Keith Pressman in the amount of $2,227,000. The total net amount paid to or for the benefit of the Pressmans was $6,906,000 during that seven-year period. The payments made by EPD on behalf of the Pressmans included credit card payments, mortgage and loan payments, car payments, insurance, alimony and taxes. During that period, EPD had net losses each year, and negative capital accounts.<br><br>EPD's Schedule B, part of the statements and schedules signed by Jerrold Pressman, listed a note | Expert Report at p. 9.<br><br>RJN, **Exhibit ZZ**, EPD's Summary of Schedules filed in the Bankruptcy Case, Docket No. 110. |

| | |
|---|---|
| receivable from Jerrold Pressman in excess of $24 million.<br><br>The total amount of cash disbursements for the period December 8, 2003 through December 7, 2010 by the EPD related to Jerrold Pressman was $9,094,000 and related to Keith Pressman was $7,019,000. | |
| 231. The Expert Report further details EPD's net losses each year between 2004 and 2009, as listed in EPD's QuickBooks, which show net losses of ($3,347,000) in 2004, ($1,906,000) in 2005, ($5,069,000) in 2006, ($743,000) in 2007, ($873,000) in 2008, and ($2,505,000) in 2009. The negative net equity of EPD started at ($3,085,000) in 2004, and increased to ($24,202,000) in 2009. | Expert Report at p. 14. |
| 232. The Expert Report states that:<br><br>"It is difficult to fathom how EPD could ever be profitable. Its only function appeared to be a funding source for the Related Entities and a means by which to fund the lifestyles of its members, Pressman and K. Pressman. EPD had no interest in the Related Entities; therefore, it had no ability to share in any profits. Rather, it appears that, at best, EPD could just hope to be paid back for its advances made to the Related Entities. It appears that the Related Entities advances and loans were unsecured." | Expert Report at p. 14. |
| 233. Jerrold Pressman's tax returns and transcripts also reflected continuing net losses by Jerrold Pressman as an individual. | Expert Report at pp. 15-16. |
| 234. Keith Pressman could not explain what EPD did as a business other than a company that receives monies as loans or investments and then makes investments or pays peoples' bills.<br><br>"Q What kind of business is EPD?<br>A I don't know how it would be technically classified.<br>Q What's your understanding of what EPD did?<br>A It makes investments. People put their money in, I guess as a loan, and investments are made. And it just invests in different businesses."<br><br>***<br><br>"Q So people would put money into EPD as an investment or as a loan?<br>A You know, I don't even remember how it | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 59-60, lines 20-25 and 1; pp. 60-61, lines 21-25 and 1-24; pp. 62-63, lines 16-25 and 1; pp. 63-64, lines 9-25 and 1. |

| | |
|---|---|
| specifically happened. Like I said, I wasn't involved in the day to day. So I don't know how everything was structured, necessarily; I never really got involved in that end. So I don't know exactly how the business model worked.<br>Q You don't know if funds put in were investments as compared with loans?<br>A You know, I knew at one point. But again, it's been so long, and it's been out of my mind for many, many years. I don't remember specifically how my father structured it. I think they were loans.<br>Q And your dad structured how the money came in and whether it was an investment or a loan?<br>A I don't remember how he structured it. I mean, I think it was—if I remember correctly, I think they were loans. I don't remember if there was different forms of the money coming in. I don't remember how he set it up. I just never had any involvement in that end.<br>Q Once the money came into EPD, what did EPD do with it?<br>A You know, I know he made investments, but I don't know—again, structurally, I don't know how that was done. I don't know how it was classified and how specifically things happened. I just—I don't remember the specifics of the business."<br><br>***<br>"Q You said after the funds came in, EPD made investments after that, but you weren't sure of the general nature of the investments; is that right?<br>A You know, the way my father had everything set up in different entities, I never—you know, I may have had a better knowledge at the time of how it all kind of worked, but now it's just all—I can't really distinguish how it was done, what was EPD, how it was structured; I would be kind of guessing at this point. I wouldn't be able to give you an accurate assessment."<br><br>***<br><br>"Q Other than taking in money and investing it in something, did EPD do anything else as a business?<br>A Again, I don't know what was done as EPD or maybe as another business. I know people's—it handled some people's—paid some people's bills. I don't know if that's specifically EPD as an entity that did it or if that was an offshoot, but I know that was one thing is that bills would be paid on people's behalves. | |

| | |
|---|---|
| Q So someone would deposit money, and then EPD would pay credit card bills or mortgage payments or utility payments, something like that?<br>A Yes.<br>Q Why wouldn't people just put it in a bank?<br>A I don't know. Just for convenience, to have someone kind of manage your money and make your payments for you." | |
| 235. Keith Pressman was not aware of EPD having an operating business that needed cash flow.<br><br>"Q Did EPD have some type of an operating business that needed cash flow?<br>A I mean, that doesn't sound right. I really don't know what—I can't really speak for what the whole setup was." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 63, lines 4-8. |
| 236. Keith Pressman had a discussion with Jerrold Pressman regarding whether EPD was a Ponzi scheme. Keith Pressman did not remember the conversation but believed his father's explanation.<br><br>"Q Did your dad ever discuss with you the issue as to whether EPD was operating as a Ponzi scheme?<br>A I mean, at some point we probably had the discussion that it wasn't a Ponzi scheme.<br>Q Do you recall why he said it wasn't?<br>A I mean, I don't remember the conversation. But again, he didn't have to get into too much detail. I know he's not a dishonest guy. And if he tells me it's not, I believe him.<br>Q You don't know how EPD could afford to theoretically pay investors or lenders 12 percent per year?<br>A No, I don't know that exactly. But I know he structured deals and was a good businessman. And he said there was assets to back everything up, and, again, I believed him. He might have gone into some detail with me many years ago, but I don't remember the specifics, but I was satisfied." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 216-217, lines 23-25 and 1-16. |
| 237. Employees of EPD did not have any clear understanding of what EPD did as a business other than that it paid people's bills and paid investors on monthly equipment lease income.<br><br>"But my question was, you worked for EPD; correct? | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 133-134, lines 14-25 and 1-4; p. 135, lines 10-16; p. 67, lines |

| | |
|---|---|
| A Yes.<br>Q But you had no understanding of the type of business EPD was?<br>A not really. I mean, it was some sort of investment company. I didn't know the exact nature of the legal structure or the business entity. I know enough of that kind of law to know that I can't just state with any certainty what it is exactly that EPD does, I can't. I don't know what else to tell you. That's why I went into the law; I think everybody else just pushes papers around on their desk. I used to say, "What does an investment banker do but push papers around their desk." When I grew up, it was lawyers or doctors; that's all there is."<br><br>***<br><br>"Q When investors provided funds to EPD, do you know where they went?<br>A No.<br>Q Do you know who would know that?<br>A Jerry.<br>Q Anyone else?<br>A Not that I know of."<br><br>***<br><br>"Q Was that accurate, that EPD didn't make investments?<br>A I guess. Like I said, I really had no understanding. I really had no understanding of what was going on, I really didn't. I think when I talked to Jerry, he explained it to me again and I did get it. And I honestly—whenever Jerry would explain it to me, I got it, I did get it and I understood. So if I wrote it, I believed it. And of I wrote that, I believed it to be the truth. But I obviously didn't get it the first time I spoke with him or somebody and spoke to Ruben and got confirmation and that was what I wrote. So I got it at that point. I immediately lost it. I had it for maybe two seconds, enough to put it on paper. But that's what I mean, I have no independent knowledge of this."<br><br>***<br><br>"Q Do you know how EPD could afford to pay investors 12 percent on investments?<br>A No.<br>Q Did you ever talk with Mr. Pressman about that? | 4-20; p. 136, lines 10-22.<br><br>Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 58-59, lines 4-25 and 1-6.<br><br>RJN, **Exhibit M**, Defendants' Objection to Report and Recommendation of U.S. Magistrate Judge (Entry of Default) (Docket No. 22, Case No. 1:10-cv-05049, United States District Court For the Northern District of Illinois, Western Division), declaration of Keith E. Pressman, ¶ 10 (page 2 of 9). |

| | |
|---|---|
| A Again, probably at least once, maybe twice, and I might have understood it at that time. I have no idea now.<br>Q Were you ever skeptical as to how they could generate that much in return to pay investors 12 percent?<br>A No. At the time when he explained it, I wasn't skeptical.<br>Q Looking back on it, are you somewhat skeptical?<br>A No, not at all."<br><br>***<br>"Q If you look at the first page, the last paragraph. The second sentence in that paragraph says, "EPD acts as an intermediary, investment placement company for private investors seeking to invest funds in third-party equipment leases in California." Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A Yes.<br>Q Then it says, "Said equipment leases purport to provide investors monthly lease payment income from third parties and certain tax deductions that are made available by the IRS to purchasers of equipment that is leased for use in a trade or business." Do you see that?<br>A Yes.<br>Q Is it accurate?<br>A Yes.<br>Q How do you know those statements are accurate?<br>A That's what EPD did. They would pay out investors on monthly lease payment income.<br>Q Other than that and paying the investors' bills, do you have any other understanding as to what EPD did?<br>A No."<br><br>***<br><br>"10. All EPD investors become independent, non-exclusive lessors of equipment to third parties in California." | |
| 238. Keith Pressman could not explain the 12% interest rate, and had never seen EPD's financial documents or tax returns.<br><br>"Q Do you know if EPD was offering a high interest rate to investors or lenders?<br>A It was offering a good interest rate.<br>Q Do you remember if it was 12 percent? | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 64-65, lines 2-25 and 1-12. |

| | |
|---|---|
| A That sounds right.<br>Q How could EPD afford to pay investors or lenders 12 percent?<br>A Again, I know the company made investments, so off of the investments I would assume.<br>Q So EPD was generating a profit in excess of 12 percent a year that could allow it to repay investors 12 percent on their money?<br>A That sounds right.<br>Q And how did it do that?<br>A Again, I know that investments were made, but I don't remember in what capacity. But I just—again, my father had it all set up. I really didn't have any involvement in that end of it, so I'm just kind of giving you my knowledge from the outside.<br>Q Can you remember seeing any financial document from EPD showing that EPD was generating more than 12 percent per year in profits?<br>A I don't think I've ever seen the documents directly.<br>Q Do you know if EPD was operating at a net loss year after year?<br>A I don't believe so.<br>Q What's your understanding?<br>A Just, you know, all my information is through my father. I never heard of anything like that, so I would assume not.<br>Q You never saw the financial documents for EPD at any time?<br>A No.<br>Q How about the tax returns?<br>A No." | |
| 239. There is no explanation that employees could provide as to why EPD did not have funds to repay investors.<br><br>"Q Did you ever ask Jerry Pressman as to, you know, why EPD didn't have funds on hand from the investors to repay them?<br>A I believe I did. And I believe he explained it to me, as I said. I couldn't sit here today explaining that, but I remember that at the time I completely understood, and it seemed perfectly logical. In fact, as I recall, there was property that if they sold at the time would be sold at a loss and would be a loss for everyone, whereas, if it was held, it would be sold. And this was through his connections with, you know, whoever the investment arm is or whoever the investment company is that he as | Weber Declaration, p. 6, ¶ 22 and Exhibit 20 to the Weber Declaration, bracketed portions of the transcript from the deposition of Katharine Werner, pp. 110-111, lines 5-25 and 1-8. |

| | |
|---|---|
| the conduit was working with. And if they could be patient, that would be a better option. In the meantime, I think he was seeking a loan to tide the investors over on their distributions.<br>Q So he was trying to buy time until—<br>A I have no idea. That's what I had in my mind. Whether that's correct or not, I'm telling you right now that could be completely wrong. But I know that every time I had any questions, he was able to answer them in a way that I completely believed and sounded from a financial and business standpoint and from a legal standpoint and from a personal, ethical—from every standpoint seemed like a perfect—not perfect, but a plausible reasoning for the situation." | |
| 240. Counsel for EPD did not have any clear understanding of what EPD did as a business.<br><br>"Q Do you know what kind of business EPD is or was?<br>A I thought it was like a leasing company, equipment leasing company.<br>Q Do you recall anything else about the general nature of their business or what they did?<br>A They owned or operated like a nightclub in L.A. and maybe one in Las Vegas.<br>Q Anything else?<br>A Toward the very end of work I did for them, I learned that they owned some real estate as well in Tennessee, or somewhere in the south; I don't remember." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 64-65, lines 21-25 and 1-8. |
| 241. EPD was in the business of paying peoples' bills.<br><br>"Q What kind of company was EPD? What did it do?<br>A The main thing that I worked with it is, we paid people's bills; it was personal card, mortgages.<br>Q And by "personal cards," do you mean credit cards?<br>A Yes.<br>Q And anything else?<br>A I was just involved with that. There was so many other entities that I was working on. EPD was just paying bills for people.<br>Q Do you know if EPD had any sort of an ongoing business at any point?<br>A What do you mean?<br>Q Did it actually do anything as a company other than pay people's bills?<br>A I'm not sure. I'm not completely—you know, I | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 18-19, lines 3-25 and 1-7. |

| | |
|---|---|
| only knew that part of it.<br>Q You worked for EPD for 10 years; right?<br>A Yes.<br>Q And was that starting before EPD was formed as a limited liability company?<br>A I don't know.<br>Q During that roughly 10-year time period, are you aware of any ongoing business activities that EPD had other than paying people's bills?<br>A No. I wasn't really—Jerry was the main EPD guy. My role was just to take care of the bills; and not just me, it was several staff." | |
| 242. EPD's investors put money into EPD and could take it out at any time, similar to a bank account.<br><br>"Q You mentioned EPD had investors?<br>A Yes. We called them investors. People we paid their bills for, we just called them investors.<br>Q And did those people put money into EPD?<br>A Yes.<br>Q And do you know why they put money into EPD?<br>A No.<br>Were the investors able to take money out of EPD at any time?<br>A Yes.<br>Q And what would they do? Would they just contact you or Jerry Pressman?<br>A Jerry. I would take direction from Jerry, me or whoever the staff was. I wasn't dealing with them.<br>Q And upon request they could take money out?<br>A Yes.<br>Q So effectively, it was like using EPD like a bank account?<br>A Yes." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 22-23, lines 5-25 and 1-2. |
| 243. Money deposited by investors in EPD was deposited into EPD's general bank account and comingled with all other funds. There were no segregated funds for investors.<br><br>"Q When investors put money into EPD, do you know where the money went?<br>A What do you mean?<br>Q Where was it deposited?<br>A City National Bank.<br>Q Into EPD's bank account.?<br>A Yes.<br>Q Did EPD have a separate bank account for each of | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 23-24, lines 14-25 and 1-6.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 25-26, lines 14-25 and 1-10. |

| | |
|---|---|
| the investors who invested money?<br>A No.<br>Q Was it all just deposited into one general bank account?<br>A Yes.<br>Q And that was just a general EPD bank account?<br>A Yes.<br>Q So the funds were commingled together?<br>A Yes."<br><br>***<br><br>"Q So if someone were to deposit a million dollars, one of the investors or lenders, that money would—the check or wire transfer would go into EPD's general checking account?<br>A Yes, it would.<br>Q And were there segregated accounts within EPD's bank accounts for each investor or lender?<br>A No different than any bank. You make your deposit and it goes into one fund. The purpose for the people putting the money in is for EPD's use. And it's just a loan. It's no different than getting a second mortgage and putting the money into your account.<br>Q So all the investor or lender funds went into one general bank account for EPD and were commingled together; is that right?<br>A Yes.<br>Q And that's what you're referring to by saying that the money is "fungible," that the dollars were all sort of aggregated together and could be used for anything?<br>A That's correct." | |
| 244. Even though investors received regular account statements, the amount held in EPD's bank account was less than the value of the investments listed on the account statements.<br><br>"Q Did the investors receive regular account statements as to how much money they had in EPD?<br>A Yes.<br>Q And who generated those account statements?<br>A There was a variety of us, you know; there was like five or six of us.<br>Q Did you generate some of the account statements?<br>A Some of them, yes.<br>Q So if an account statement said that there was $100,000 in that person's EPD account, was $100,000 physically in EPD's bank account? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 24, lines 7-25; pp. 126-127, lines 3-25 and 1-2.<br><br>Weber Declaration, p. 9, ¶ 28 and Exhibit 27 to the Weber Declaration, City National Bank balance statements.<br><br>Expert Report, generally, and at page 11. |

| | |
|---|---|
| A It could have been. I mean, you know, it fluctuated.<br>Q Was there enough in EPD's bank account at any given time to pay the investors what they had deposited in EPD?<br>A I don't think so, no."<br><br>***<br><br>"Q The account statements that were sent out to investors, were those done on a monthly basis or a quarterly basis?<br>A Every six months.<br>Q And were those just generated through Excel?<br>A Yes.<br>Q And who generated those?<br>A Me and the rest of the accounting staff, and the receptionist would help.<br>Q And the amounts on those account statements didn't necessarily reflect the amounts that were in EPD's bank accounts; is that right?<br>A Yes, that's correct.<br>Q The account statements reflected the amounts that the investors put in and took out and interest or lease payments?<br>A Yes.<br>Q Whether or not EPD actually still had those funds?<br>A Yes.<br>Q So if EPD had transferred the funds somewhere else, those funds would still be reflected on the account statements sent to the investors?<br>A Yes." | |
| 245. EPD did not have funds on hand to back-up the amounts in the account statements. EPD's account statements to 2009 and 2011 show that EPD had only minimal cash on hand. For instance, in September 2009, when the BC Trust was formed and the UCC-1 was filed, EPD's bank account had a beginning balance of $8,559.49 and an ending balance of $65,160.86<br><br>"Q When someone put money into EPD as an investment or a loan, they were given an account number by EPD; is that right?<br>A That's correct.<br>Q And then they received monthly or quarterly or some sort of periodic statement detailing what their | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 24-25, lines 24-25 and 1-13.<br><br>Weber Declaration, p. 9, ¶ 28 and Exhibit 27 to the Weber Declaration, City National Bank balance statements (September 2009 statement bears bates stamp TR 005683).<br><br>Expert Report, generally, and at page 11. |

| | |
|---|---|
| investment or loan was and what interest had accrued and what deposits and withdrawals had been made; is that right?<br>A Yes, it is.<br>Q And if someone, for instance, received a statement saying that they had a million dollars in an EPD account, did EPD actually have those funds on hand?<br>A Of course not." | |
| 246. The amounts invested in or lent to EPD were payable on demand by the investors or lenders.<br><br>"Q When an investor lender was depositing money, do you know if they could request those funds back on demand or 30 days after demand?<br>A They are all demand notes, to the best of my recollection.<br>Q So they could theoretically demand the money at any point?<br>A That's correct." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 26, lines 11-18. |
| 247. The investors in EPD did not know what their funds would be used for.<br><br>"Q When people invested or loaned money, did they know what the money was going to be used for?<br>A No.<br>Q You didn't tell them?<br>A I didn't know." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 24, lines 6-10. |
| 248. EPD did not provide updates as to the status of what the funds were being used for because the funds were "fungible."<br><br>"Q Did you provide any updates to the investors or lenders at any time as to what their funds were being used for?<br>A I know that we've had this discussion before, Corey. The dollars are fungible. We don't say, "This is your dollars going into this thing." All the money was put into one place. And just like any bank, the bank loans out money. And it's not your money or their money or their money, it's just money. So some people from time to time might have asked what some of our investments were in, but as to any specific person with any specific investment, the answer would be no." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 24, lines 11-23; pp. 25-26, lines 14-25 and 1-10. |

| | |
|---|---|
| ***<br><br>"Q So if someone were to deposit a million dollars, one of the investors or lenders, that money would—the check or wire transfer would go into EPD's general checking account?<br>A Yes, it would.<br>Q And were there segregated accounts within EPD's bank accounts for each investor or lender?<br>A No different than any bank. You make your deposit and it goes into one fund. The purpose for the people putting the money in is for EPD's use. And it's just a loan. It's no different than getting a second mortgage and putting the money into your account.<br>Q So all the investor or lender funds went into one general bank account for EPD and were commingled together; is that right?<br>A Yes.<br>Q And that's what you're referring to by saying that the money is "fungible," that the dollars were all sort of aggregated together and could be used for anything?<br>A That's correct." | |
| 249. Once money from investors was deposited into EPD's bank account and was "fungible," it would be used to pay bills of that investor or other investors, or to repay other investors.<br><br>"Q Where would the money go if it wasn't in the bank account?<br>A It would pay people's bills. That was it pretty much.<br>Q If an investor deposited funds into EPD, were those funds sometimes used to pay amounts to other investors?<br>A I would imagine so, because it was all the same bank account.<br>Q And were funds deposited by one investor used to pay credit card or mortgage payments for other investors?<br>A I'm not sure. I mean, it was just all in one account. It was one account coming in and one account—everything was coming in and out of one account."<br><br>***<br><br>"Q When an investor put money into EPD, I know you said that the funds became fungible at that time; is that | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 25, lines 1-16.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 74-76, lines 12-25, 1-25 and 1.<br><br>Expert Report, generally, and at pages 13-14. |

| | |
|---|---|
| right?<br>A Yes.<br>Q So if another investor asked for money, either as interest or principal repayment the next day, the funds that the other investor had just put into EPD the prior day could have been used to pay the other investor; is that right?<br>MR. LANDAU: Objection; incomplete hypothetical.<br>THE DEPONENT: Well, what you're saying is, if we had a million dollars in the bank account and someone requested $10 and someone requested $10, that they would get the $10 from the guy that put the $10 or would they get it from the 1 million that was already in the bank account. The bank account was there. So obviously, there was never a point in time, until the total crisis of 2009, where there wasn't more than enough cash flow to handle every single payment without one investor. Never did we require one investor's dollar to make payments to people.<br>Q BY MR. WEBER: The money that was used to repay investors wasn't any type of segregated funds, it was just funds in the general EPD bank account or a loan; is that right?<br>A You have to think of it like a bank. People put money into one account, and when people take their money out, it comes from one account.<br>Q So it was someone's funds that was used to repay them. It may have been their funds, it may have been someone else's funds, but it was just funds in that bank account?<br>MR. LANDAU: Objection; vague and ambiguous.<br>THE DEPONENT: Correct, it was just funds in that bank account.<br>Q BY MR. WEBER: Which was everyone's collective funds?<br>A That's true." | |
| 250. The bills paid by EPD for investors included credit card payments, mortgage payments and other bills.<br><br>"BY MR. WEBER: So EPD would pay, for instance, credit card payments for investors; is that right?<br>A That's correct.<br>Q And how about mortgage payments?<br>A Mortgage payments, utility bills, doctor bills. They would buy houses for them with their money, where they would put in million dollars in because they were going to be gone and they needed someone to put the | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 76, lines 8-17. |

| | |
|---|---|
| money into escrow on their behalf." | |
| 251. Moreno was not aware of any measures to ensure that there were sufficient funds on hand to repay investors amounts that they had deposited with EPD.<br><br>"Q Did EPD take any steps to make sure that there were sufficient funds in the bank account to repay investors the amounts they had deposited?<br>A I'm sure, you know, Jerry had it. That was not something I did.<br>Q You're not aware of any measures that EPD took to make sure there was enough in the bank account to be able to repay investors the amounts they had deposited?<br>A Yeah, I was not in charge of that. It was just a bookkeeping function for me.<br>Q Are you aware of any measures, though?<br>A No, I'm not aware." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 25-26, lines 17-25 and 1-4. |
| 252. EPD would make payments for investors upon request.<br><br>"Q And could the investors also ask you to pay a mortgage payment or a credit card payment?<br>A Yes.<br>Q And did they do that?<br>A Yes. Not me directly, it would always come from—I took direction from Jerry. I wasn't on the bank account; I couldn't sign the checks.<br>Q So they would reach out to Jerry Pressman and say, "Pay my credit card," and it would go ahead and get paid?<br>A Yes. He would approve everything." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 23, lines 3-13. |
| 253. EPD investors were promised between 8 and 12% interest on their investments, but Moreno did not know how they could afford to pay that interest rate and does not recall EPD generating profits in excess of 8 to 12% per year.<br><br>"Q Do you know what type of an interest rate EPD promised investors?<br>A I'm sorry?<br>Q Strike that. Did EPD promise investors some type of an interest rate on their investments?<br>A Yes.<br>Q Do you know what it was?<br>A I think it was between 8 and 12 percent. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 72-73, lines 1-25 and 1-2. |

| | |
|---|---|
| Q Do you know how EPD could afford to pay that interest rate?<br>A No.<br>Q You don't recall any sort of an on-going business for EPD, do you?<br>A Just all the entities that I'm telling you; the ice rinks, nightclubs, the radio stations. You know, we managed nightclubs in Palm Springs, Las Vegas.<br>Q Do you recall EPD generating profits in excess of 8 to 12 percent a year on whatever it did?<br>A I don't recall that, no.<br>Q Do you know how EPD could afford to pay investors 8 or 12 percent return on their investments?<br>A No, I never got involved in that.<br>Q Did you ever question how EPD could promise those type of interest rates?<br>A No." | |
| 254. Kirkland sent an e-mail stating that he did not believe the "fungible" money defense, but when asked about the e-mail, stated he could not recall.<br><br>"Q BY MR. WEBER: Is the e-mail at the very top of the page an e-mail you sent to Mr. Pressman and Matt Gruenberg on October 15, 2010?"<br>THE DEPONENT: Yes.<br>MR. WEBER: You say, "If we can't show anything, and rely on 'money as fungible," she would get it all."<br>Q Do you see that?<br>A Yes.<br>Q What are you referring to?<br>A I don't recall." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 268, lines 1-13. |
| 255. Moreno was not aware as to whether EPD had any assets.<br><br>"Q Did EPD own any assets?<br>A I don't know.<br>Q Do you know if it owned any real property?<br>A I don't know the structure; I don't know that.<br>Q Do you know if it owned any physical assets?<br>A No, I don't know." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 29-30, lines 21-25 and 1-3. |
| 256. Entries on EPD's balance sheet could be changed simply upon instruction by Jerrold Pressman. Ruben Moreno testified that Jerrold Pressman could direct him or other accounting | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben |

| | |
|---|---|
| personnel to make changes to EPD's balance sheet and that the changes would be made without question.<br><br>"Q So any entry on the Balance Sheet could be changed by someone if Mr. Pressman instructed that it be done?<br>A Yes.<br>Q And Mr. Pressman didn't provide any reasoning for the changes, he just said "Do it"?<br>A Yes." | Moreno, p. 121, lines 11-17. |
| 257. EPD's employees performed services for all Jerrold Pressman companies.<br><br>"Q How many people worked for EPD during the time that you were there?<br>A I would say about 10.<br>Q At any given time?<br>A Yes. It wasn't a lot. There were a lot of different aspects in the office, but I guess everybody worked on everything.<br>Q What did the other people who worked there do?<br>A It was ice rinks. We had a radio station there, movie premieres, like book advertising, and Key Club, Plush Lounge.<br>Q When you say "ice rinks," is that something EPD did or something a different entity did?<br>A Well, we all worked—it wasn't like—how do I say it? We all worked together on everything.<br>Q All the companies?<br>A All the companies, yes. And then I had my own gigs that had nothing to do with EPD that I also worked on.<br>Q Do you know which entity did things regarding ice rinks?<br>A What do you mean?<br>Q Did EPD as a company do anything relating to ice rinks?<br>A Because we were all under the EPD thing, so we did everything. Do you know what I mean? We all worked under the whole umbrella of different companies there. It wasn't like this is EPD and they don't do this, or this is Broadway and they don't do that. We all worked on everything." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 19-20, lines 8-25 and 1-14. |
| 258. The nightclubs, S.C. Club, Key Club, Broadway and Plush all owed EPD money.<br><br>"Q You said based on the Balance Sheet that the | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben |

| | |
|---|---|
| nightclubs, S.C. Club and Key Club owed EPD money; right?<br>A Yes.<br>Q And Broadway owed EPD money; right?<br>A Yes.<br>Q And Plush owed EPD money; right?<br>A Yes."<br><br>***<br><br>"Q Do you know if EPD transferred monies to those entities?<br>A Yes.<br>Q Do you know for what purpose?<br>A Just intercompany funding.<br>Q Short-term funding or loans?<br>A Yes.<br>Q And then at some point some of the amounts got repaid to EPD?<br>A Yes.<br>Q Do you know if at the time of the bankruptcy those entities owed monies to EPD?<br>A I'd have to look at the Balance Sheet.<br>Q Could you take a look at Exhibits 10 through 12 and let me know if Broadway, S.C. Club/Key Club and Plush Lounge owed money to EPD.<br>A Yes.<br>Q Did Broadway owe money to EPD?<br>A Yes.<br>Q How much?<br>A It looks like $4.7 million.<br>Q Did Plush owe money to EPD?<br>A Yes.<br>Q How much?<br>A $45,406.<br>Q Did S.C. Club or Key Club owe money to EPD?<br>A Yes.<br>Q How much?<br>A $6,000,723."<br><br>***<br>"Q And what does Exhibit 10 reflect as the amounts owed from those entities to EPD?<br>A $4,412,000.<br>Q For which entity?<br>A Broadway Entertainment.<br>Q That's the amount that Broadway owed EPD?<br>A Yes.<br>Q And how about the other ones? | Moreno, p. 128, lines 10-17; pp. 85-87, lines 23-25, 1-25 and 1-2; p. 87, lines 12-24.<br><br>Expert Report, p. 11.<br><br>RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26 (page 8 of 101). |

| | |
|---|---|
| A The other ones. Plush Lounge is the same. And Key Club is a different amount.<br>Q And what does Exhibit 10 say about Key Club?<br>A Exhibit 10 says, $12,567,253."<br><br>***<br>For the six year period, non-Investor activities resulted in negative net cash flows of over $10.5 million, and 2009 was the only year during which there was a positive net cash flow (fn 7). Therefore, the only way for EPD to meet its interest obligations on the notes, as well as its obligations to repay any principal, was to obtain additional loans from Investors.<br><br>Footnote 7: This was due to more funds received from Related Entities than were disbursed to Related Entities during 2009. However, significant amounts were still owed to EPD from Related Entities as the end of 2009. According to EPD's balance sheet as of December 31, 2009, the amounts due from Related Entities totaled over $27 million.<br><br>***<br><br>"SC Club L.P. d/b/a Key Club<br><br>The Debtor is a limited partner of SC Club L.P. SC Club was formed in 1997 and operated as a music and nightclub venue on Sunset Boulevard in Los Angeles. SC, Inc. (see below) is general partner for this company. Assets include leasehold improvements in the building. The company subleased the space and the "Key Club" name to the current tenant, and also pledged a security interest in the leasehold improvements and the name to the landlord. Liabilities exceed the assets by approximately $3 million. The company ceased operations in 2009. The company and the Debtor are currently defendants in a lawsuit filed by the landlord for unpaid rent."<br><br>"Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption: 0.00" | |
| 259. EPD's funds were used to pay Jerrold Pressman's expenses.<br><br>"Q Did Mr. Pressman also owe amounts to EPD?<br>A I don't know.<br>Q Is that reflected on the Balance Sheet? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 87-89, lines 25, 1-25 and 1-11. |

| | |
|---|---|
| A I don't see it.<br>Q And you're looking at Exhibit 10?<br>A Yes.<br>Q How about Exhibits 11 or 12, do they reflect amounts owed from Mr. Pressman to EPD?<br>A Yes.<br>Q How much?<br>A It says here, 24 million. It's a receivable, though.<br>Q Mr. Pressman owed 24 million to EPD?<br>A Yes.<br>A Yes, according to this Exhibit 12.<br>Q Did Jerrold Pressman take funds out of EPD?<br>A Yes.<br>Q Do you know what he did with them?<br>A No.<br>Q Could Mr. Pressman—<br>A I mean, we paid the mortgage out of EPD and some of the credit cards for the businesses out of EPD.<br>Q How about did you pay Mr. Pressman's credit cards?<br>A Yes.<br>Q And Mr. Pressman's mortgage?<br>A Yes.<br>Q Mr. Pressman's car payments?<br>A Yes.<br>Q And when I say "you," I meant EPD for all those.<br>A Okay.<br>Q And is the answer still the same?<br>A Yes." | |
| 260. EPD's funds were used to pay Keith Pressman's expenses.<br><br>"Q Did EPD also pay Keith Pressman's mortgage payments?<br>A No, he didn't have one.<br>Q Did EPD pay Keith Pressman's rent?<br>A Yes. Actually, I'm not sure. He could have paid it out of his own account.<br>Q Did EPD pay Keith Pressman's car payments?<br>A Possibly, yes.<br>Q Did EPD pay Keith Pressman's utility payments?<br>A Maybe.<br>Q Did EPD pay Keith Pressman's credit card payments?<br>A Yes."<br><br>*** | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 89, lines 12-25.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 97-99, lines 18-25, 1-25 and 1-15; p. 215, lines 14-20 |

| | |
|---|---|
| "Q Did you and your dad have accounts at EPD?<br>A I did.<br>Q And what was the nature of the account?<br>A My money went into the account.<br>Q And was it an investment? Was it a loan?<br>A I don't know how it was characterized.<br>Q Who put in the funds, you personally?<br>A It was my funds, but my father handled all my business and my money, so he just did everything for me.<br>Q So he put money into your EPD account?<br>A Correct.<br>Q And then would that money be used to pay your bills?<br>A Yes.<br>Q And credit cards?<br>A Yes.<br>Q Lease payments for cars?<br>A Yes.<br>Q Rent for your apartments?<br>A Yes.<br>Q Utilities?<br>A Yes.<br>Q Between 2003 and 2010, was that all true?<br>A Yes.<br>Q And do you know where your dad got the money from during that time period to put into your account?<br>A I don't remember the specifics. I knew I had some ownership interests in some companies. And just whatever monies would come to me would go into the account.<br>Q The ownership interests that you had in companies, did you pay for them?<br>A I don't remember.<br>Q Do you ever remember writing a check for an ownership interest in a company?<br>A I don't remember how I got them.<br>Q Do you know roughly how much money EPD paid on your behalf in credit cards, lease payments, rent, utilities, all those type of things, between 2003 and 2010?<br>A No.<br>Q Who would write the checks for those items?<br>A I'm not sure.<br>Q It wasn't you though; right?<br>A I don't think so."<br><br>*** | |

| | |
|---|---|
| "Q But aside from your dad putting money in, did you put any money in of your own funds you were earning while you were working as an attorney or for a business or anything of that sort?<br>A I don't remember.<br>Q If you did, was it much?<br>A Probably not." | |
| 261. Moreno was not aware if amounts from Kirkland were loans or investments.<br><br>"Q Do you know if Mr. Kirkland loaned funds to EPD?<br>A I don't know the nature of the deal, if it was a loan or whatever it was, but he had written checks to EPD, yes." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 44, lines 2-6. |
| 262. Moreno had not heard of the BC Trust. He thought that John Kirkland was an investor but did not recall how much he invested.<br><br>"Q You've never heard of an entity called the Bright Conscience Trust?<br>A No, off the top of my head, no."<br>***<br><br>"Q Do you know if the Bright Conscience Trust ever invested funds with EPD?<br>A Not off the top of my head.<br>Q Do you know if Bright Conscience Trust ever loaned funds to EPD?<br>A I don't know."<br><br>***<br>"Q Was Mr. Kirkland an investor in EPD?<br>A I think so, yes.<br>Q Do you know how much he invested?<br>A Not off the top of my head, no.<br>Q And have you ever heard of an entity called the Bright Conscience Trust?<br>A No.<br>Q Have you ever heard of someone named Poshow Ann Kirkland?<br>A No. Is that John Kirkland?<br>Q No.<br>A That's why I'm saying. Because I've heard of John Kirkland." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 43, lines 13-15; pp. 43-44, lines 21-25 and 1; p. 37, lines 9-21. |

| | |
|---|---|
| 263. EPD did not distinguish between loans and investments.<br><br>"Q With regard to any of the funds put into EPD by investors, do you know if they were investments or loans?<br>A No, I didn't ever get into the nature of that.<br>Q Do you know if there were funds put into EPD that were loans rather than investments?<br>A Yes, possibly.<br>Q Do you know what the distinction was between the ones that were loans versus the ones that were investments?<br>A What was the first part?<br>Q For the funds put into EPD that you think were loans, what makes you think they were loans rather than investments?<br>A Because we paid them back.<br>Q And you didn't pay the investors back?<br>A No, we would pay—like if there was a loan, we would pay the loan back.<br>Q So how did you know it was a loan rather than an investment that was getting repaid?<br>A I don't think we distinguished that, that this is a loan and this is an investment.<br>Q Do you know if the funds that were put into EPD were subject to risk of loss?<br>A I don't know what that means." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 44-45, lines 20-25 and 1-20. |
| 264. Moreno had heard of HMB but did not know what it is.<br><br>"Q How about a company called HMB Holdings, LLC?<br>A I've heard of it.<br>Q Do you know what it is?<br>A No." | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 43, lines 16-20. |
| 265. EPD was having money and liquidity issues going back to May 2009.<br><br>"Q Was EPD having money and liquidity problems back in May 2009?<br>A I'm going to assume, yes, from this e-mail."<br><br>***<br><br>"Q Had this issue, in regard to the ability of EPD to pay investors, started far before September 30, 2009? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 110, lines 12-15; p. 108, lines 8-11; p. 107, lines 17-19; p. 106, lines 23-25; p. 106, lines 4-6.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from |

| | |
|---|---|
| A I'm going to assume, yes."<br><br>***<br><br>"Q And was having EPD cash flow liquidity issues as of September 30, 2009?<br>A Yes."<br><br>***<br>"And was EPD having money or liquidity issues as of October 12, 2009?<br>A Yes."<br><br>***<br><br>"Q Was EPD having money issues and liquidity issues going back to October 15, 2009?<br>A It looks like it, yes."<br><br>***<br><br>"Q At some point in 2008 or 2009, did EPD begin experiencing cash flow issues?<br>A Yes, I believe so.<br>Q Do you recall what the circumstances were?<br>A No.<br>Q There was some type of a cash crunch?<br>A Yes.<br>Q Do you recall approximately when that happened?<br>A Not offhand. I guess around—I mean, I don't remember specifically.<br>Q Somewhere in the 2008/2009 time frame?<br>A Yes.<br>Q And did EPD start getting a lot of calls from investors and lenders asking about the status of their money on deposit with EPD?<br>A I know there were calls.<br>Q A lot of calls?<br>A Yes.<br>Q And e-mails?<br>A I'm sure there were.<br>Q Was the general nature that the investors or lenders were wondering if their money was safe or whether they could get it back, that type of inquiry?<br>A Yes.<br>Q And what was the response by EPD?<br>A I don't remember."<br><br>*** | the deposition of Keith Pressman, pp. 106-108, lines 25, 1-25 and 1; p. 211, lines 3-6. |

| | |
|---|---|
| "Q You testified earlier somewhere in the 2008/2009 time frame, that's generally when the cash crunch hit EPD?<br>A That's about right." | |
| 266. In 2009, after EPD's cash crunch, EPD was not able to pay investors amounts requested by the investors, and EPD started getting a heavy volume of calls from investors as to the status of their funds.<br><br>"Q But when an investor requested their funds in 2009, after the cash crunch happened, if they requested their funds, was EPD able to repay them at that point?<br>A Not at the time they requested it. But I did tell them if they could just hang on. And I showed them the documents from the bank, that it would just hopefully be a short period of time and I would have the funds to pay them.<br>Q Did EPD start receiving a heavy volume of calls and e-mails from investors during 2009 as to the status of their funds?<br>A Yes.<br>Q On a daily basis?<br>A Probably."<br><br>***<br><br>"Beginning in early or mid-2009, EPD stopped making regular payments to Creditors. After that point, the Creditors repeatedly contacted me regarding the status of refinancing of the real property owned by NHIP and/or the sale of stock of NHIP, in order to generate funds to pay creditors." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 39-40, lines 21-25 and 1-10.<br><br>RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 14, lines 5-8. |
| 267. In 2009, investors also started threatening lawsuits and an involuntary bankruptcy proceeding against EPD.<br><br>"Q BY MR. WEBER: Now, at some point in 2009, did any creditors or investors start threatening suits against EPD or you?<br>A Yes.<br>Q Do you recall how many?<br>A No, not the exact number, but certainly more than | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 40-41, lines 23-25 and 1-7. |

| | |
|---|---|
| 20.<br>Q And did any of those investors also threaten an involuntary bankruptcy case against EPD?<br>A Yes.” | |
| 268. Keith Pressman and EPD employees were not clear as to why there were not sufficient funds on hand to repay investors or lenders.<br><br>“Q And do you know why EPD wasn’t able to repay lenders or investors at that point?<br>A I don’t know the specifics.<br>Q Just that there wasn’t an ability to repay at that point?<br>A There wasn’t an ability. I think I remember some cash, some credit lines being cut, but I don’t remember the specifics.<br>Q Was your dad trying to arrange a credit line during that time period?<br>A I think so.<br>Q Do you know why a credit line would be needed to refund amounts that were on deposit by investors or lenders?<br>A I really don’t remember the specifics.” | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 108, lines 5-19. |
| 269. Jerrold Pressman did not share details re EPD’s finances with anyone but Ruben Moreno.<br><br>“Q Did your dad ever discuss his finances with you?<br>A No.<br>Q Or the finances of EPD or any of the other companies?<br>A No.<br>Q He was the only one who knew what was going on financially?<br>A Yes.<br>Q How about Ruben Moreno, did he know?<br>A I’m sure he did.<br>Q Anyone else?<br>A I don’t know.” | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 123, lines 7-19. |
| 270. Keith Pressman did not recognize any fiduciary duties in regard to EPD.<br><br>“Q As an officer of EPD, didn’t you have fiduciary duties to EPD to generally monitor what was going on in the business?<br>A I don’t know. I don’t believe so. Again, I can’t answer that. I don’t know if that’s an issue. But I can | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 135-136, lines 24-25 and 1-23. |

| | |
|---|---|
| definitely tell you I didn't…<br>A You're an attorney. And you're aware of the concept of fiduciary duty; right?<br>A Correct.<br>Q And officers and directors owe fiduciary duties to companies that they're officers and directors of, do they not?<br>A Correct. But I can't really comment on it; it's not my area of expertise. I can just tell you I didn't have any day-to-day knowledge.<br>Q And is that because you were more affiliated with these entities for estate planning purposes for your dad?<br>A Yes.<br>Q You didn't actually have a management or supervisory or any other type of role in the companies?<br>A Correct.<br>Q Including EPD?<br>A Correct." | |
| 271. Keith Pressman could not think of any reason why the Kirklands or the BC Trust would have a security interest as to the debtors' assets.<br><br>"Q Do you know if your dad or you authorized a security interest in favor of Mr. Kirkland or his family trust against EPD's assets?<br>A I don't know.<br>Q You don't recall that?<br>A No.<br>Q Do you know why Mr. Kirkland, as an investor or lender, would be entitled to some type of security interest in EPD's assets different from any other investor or lender in EPD?<br>A I don't know.<br>Q Are you aware of any reason?<br>A No.<br>Q You're not aware of any reason why he would be entitled to that?<br>A No.<br>Q Or why his family trust would be entitled to that?<br>A No.<br>Q Or why his wife would be entitled to that?<br>A No."<br><br>***<br><br>"Q Can you think of any reason why Mr. Kirkland, his wife or his family trust would be entitled to a first priority UCC-1 Financing Statement as to EPD's assets | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 179, lines 3-23; p. 190, lines 4-8; p. 198, lines 10-19; p. 199, lines 5-11. |

| | |
|---|---|
| or your dad's assets?<br>A No."<br><br>***<br><br>"Q It looks like Mr. Kirkland sent in a UCC-1 filing statement to be filed with the Secretary of State whereby Bright Conscience Trust dated September 9th, 2009, would have a lien against EPD's assets and your dad's assets; is that right?<br>A Yes.<br>Q Can you think of any reason why Mr. Kirkland or the Bright Conscience Trust would be entitled to that?<br>A No."<br><br>***<br><br>"Q Can you think of any reason as to why Mr. Kirkland, Mrs. Kirkland or the Bright Conscience Trust would be entitled to a UCC-1 against your dad or EPD's assets?<br>A I don't know.<br>Q You're not aware of any?<br>A I'm not aware of any." | |
| 272. Jerrold Pressman does not think that the BC Trust or the Kirklands should be entitled to be senior in priority to other investors, other than that is the deal he made with Kirkland.<br><br>"Q Is there a reason why you think that the Kirklands are entitled to monies from the bankruptcy estate or EPD before other lenders or investors get money?<br>A The truth is, no, I don't think he should be entitled to it, but that's the deal I made. At the time I made it, I didn't expect that it would be coming down to a "Sophie's Choice" between him and everybody else. At the time I made it, with that $4 million loan coming in, I had total confidence that everybody would be treated equal. Had I known the situation, I would agree, I don't think one creditor should get it. But that's the document, that's the contract. That's what I agreed to do. And as a man of my word, that's what's got to happen. I don't even like what's happening, but that's what it is." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 224-225, lines 25 and 1-16. |
| 273. Keith Pressman could not think of any reason why the Kirklands or the BC Trust would have a | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, |

| | |
|---|---|
| right to a continuing guaranty.<br><br>"Q Do you know why Mr. Kirkland would be entitled to a Continuing Guaranty from EPD?<br>A No."<br><br>***<br><br>"MR. WEBER: This is a document that I think the Kirklands produced that I don't believe was in the books and records turned over. It's a document entitled "Continuing Guaranty," dated November 8, 2007. Have you seen this document before?<br>A Yes.<br>Q If you look at the last page, is that your signature for yourself and EPD?<br>A Yes.<br>Q And is this another document that Mr. Kirkland demanded of you?<br>A Yes." | bracketed portions of transcript from the deposition of Keith Pressman, p. 183, lines 13-15.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 155, lines 7-19. |
| 274. Broadway owed substantial sums to EPD when the Continuing Guaranty was entered into.<br><br>"Q So at the point this was entered into, Broadway Entertainment Marketing owed substantial amounts to EPD?<br>A Right.<br>Q Is that accurate?<br>A Yes.<br>Q Do you know how much?<br>A Not at that point.<br>Q Did Mr. Kirkland perform legal services for Broadway?<br>A I don't know; he may have." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 157, lines 1-11. |
| 275. S.C. Club owed substantial sums to EPD when the Continuing Guaranty was entered into, and Kirkland performed legal work for S.C. Club.<br><br>"Q At the point that this was signed, did Mr. Kirkland perform legal work for S.C. Club, L.P.?<br>A Yes.<br>Q And did S.C. Club, L.P. owe substantial sums to EPD at that point?<br>A Yes.<br>Q And who was Mr. Kirkland paid by? | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 157-158, lines 12-25 and 1-5. |

| | |
|---|---|
| A I don't know.<br>Q S.C. Club?<br>A I don't know?<br>Q Or EPD?<br>A Well, he wasn't paid, it was his firm that would have been paid. So I really don't have any idea who paid the bill. Because even traditionally, the way things work, EPD may pay the bills, but it charges the company for it and it's repaid. Because as the accountant handling all the money, it does that. But that doesn't mean he could have got paid direct; it could have gone either way." | |
| 276. Pressman could not explain why a consulting fee, advisory fee or professional service fee would be a loan subject to repayment by EPD other than that was the deal they made.<br><br>"Q But if it's a consulting fee, how is that a loan?<br>A Well, I frankly—and I don't know at this point—I don't remember the reason for that. And I don't know if he did do that, whether he paid a consulting fee to Broadway; I don't think he did. I know he paid a fee to Keith, but I don't think he paid one to the other companies, so I don't know if that's relevant.<br>Q How is payments of an advisory fee or a professional service fee a loan?<br>A Well, that was his deal. That was the deal." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 161-162, lines 17-25 and 1-4. |
| 277. The amounts paid by Kirkland to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees were directed that way by Jerrold Pressman, and Keith Pressman reported the payments as income. Pressman could not explain why a consulting fee, advisory fee or professional service fee paid by Kirkland to Keith Pressman would be a loan subject to repayment by EPD other than that was the deal they made.<br><br>"Q How are payments to Keith Pressman for consulting fees, advisory fees, professional service fees or legal fees a loan?<br>A Well, to be honest, here's the way that one works, because I do know that one on both sides of the story. Keith hadn't collected any monies from the company for any salaries for years, and we were getting ready to pay him some money. And I just said, "John, instead | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 162-163, lines 5-25 and 1-18. |

| | |
|---|---|
| of"—I don't know if I told John this, but from my standpoint, instead of me taking the money from EPD and giving it to Keith or Broadway, I'll just have John give it to EPD. Now, Keith recorded it as income, reported it on his income tax. What John did with it, I don't know. But again, John had the option originally saying to me, "I'll just put it all in EPD and you can pay Keith or do anything you want." But that was the deal after we arranged. I honestly don't remember specifically saying to John, "As long as you don't care, give Keith the 200 grand and he'll report it as income." Because he would have reported it as income whether he got it from me or John.<br>Q How would income received by Keith Pressman from John Kirkland as a legal fee or a consulting fee, or whatever else, how would that be a loan that EPD would owe?<br>A Because that's what the documents say, That's what the deal was.<br>Q And who came up with that?<br>A Me or him; I don't know.<br>Q And how—<br>A I agree with you. In retrospect, I agree with you, it looks like of weird. I don't remember all the things that were happening at that date, so there may have been a compelling reason for me to have done it." | |
| 278. Kirkland demanded the Funding Agreement.<br><br>"MR. WEBER: This is a document entitled "Funding Agreement" dated July 24th, 2009.<br>Q Is that your signature in the signature blocks on the last page?<br>A Yes.<br>Q Is this another document that Mr. Kirkland demanded?<br>A That he what?<br>Q Demanded.<br>A Yes." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 163-164, lines 23-25 and 1-7. |
| 279. As on December 31, 2010, there is only $370,122.01 listed on EPD's balance sheet as owed to the Kirklands and the BC Trust.<br><br>"Q So if you look on page 5 of 29, below where it says "Notes Payable," two lines down, it looks like it says "Total Current Liabilities," and then it looks like it starts "Long Term Liabilities." Do you see that? | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 83-85, lines 12-25, 1-25 and 1-4; pp. 75-77, lines 13-25, 1-25 and 1-7; pp. 78-79, lines 13-25 and 1-22; pp. 80-81, lines 25 and 1-13. |

A Yes.
Q So starting from that point and going down through the pages, are those all long-term liabilities rather than notes payable?
A Yes.
Q And if you look on page 16 of 29 stamped in the lower right-hand corner.
A Okay.
Q In the middle there is an entry that says "Bright Con." Do you see that?
A Yes.
Q And it says "JK," and then there is a dollar amount. And then there is an entry that says "080818-JK," and another amount and an entry that says "071108-JK" and another amount. And then it says "Total Bright Con, $370,122.01. Do you see that?
A Yes.
Q Is that the same amount that was listed for Mr. Kirkland in Exhibits 10 and 11?
A Yes.
Q But you don't recall an entity with the name Bright Con or Bright Conscience Trust?
A Just on here; that's probably the first time I saw that.
Q Other than that one entry, can you tell me if there are any other entries related to Mr. Kirkland or Bright Con or Bright Conscience Trust on this Balance Sheet that's attached to Exhibit 12?
A No.
Q There aren't any?
A There aren't any.
Q And if there was a liability owed to Mr. Kirkland or the Bright Conscience Trust or to his wife, that should be reflected on the Balance Sheet; correct?
A Yes."

***

"Q So as of December 31, 2010, EPD's liabilities were over 51 million and its assets were approximately 16 million; is that correct?
A Yes.
Q If you look on page 7 of this Balance Sheet—it says "Page 7" in the lower right-hand corner.
A Yes.
Q Toward the top, there is an amount listed for John Kirkland with an account that's L071201-JK. Do you see that?
A Yes.
Q It says "$200,000."

| | |
|---|---|
| A Yes.<br>Q If you look on page 19, again, stamped in the lower right-hand corner.<br>A Okay.<br>Q Toward the middle of the page, there is another entry for John Kirkland, one that says "Lease Payments," and then one with an account that says "080818-JK" and one that says "071108-JK." Do you see that?<br>A Yes.<br>Q That one lists three other amounts for Mr. Kirkland that make up $370,122.01. Do you see that?<br>A Yes.<br>Q And that previous page listed $200,000.<br>A Yes.<br>Q Other than those, are there any other amounts that relate to Mr. Kirkland or his family trust?<br>A What do you mean?<br>Q On this Balance Sheet.<br>A Not that I see, no.<br>Q So if Mr. Kirkland or his family trust had monies owing to them as of this date, wouldn't those show up on EPD's Balance Sheet as a liability?<br>A They should, yes.<br>Q Can you point me to any other entries other than the ones I just mentioned that reference Mr. Kirkland or his family or his family trust?<br>A. No."<br><br>***<br><br>"Q There is an entry on the Balance Sheet John Kirkland, account number L071201-JK for $200,000. Do you see that?<br>A Yes.<br>Q And then if you look at the second page from the end of the document, which is page 6 of 7 of that second document attached.<br>A Yes.<br>Q There is another entry that's titled "K,J," which may be John Kirkland, but I'm not sure. Do you know if it is or not?<br>A Where is that?<br>Q Page 6 of 7, but it's the second page from the end of the document. There is an entry toward the bottom, "K,J."<br>A Okay.<br>Q Do you know if that's an entry related to John Kirkland? | |

| | |
|---|---|
| A I'm thinking it is only because I saw it on the other one, the exact same numbers.<br>Q You saw the same numbers in Exhibit 10?<br>A Yes.<br>Q Now, other than the entry on page 3 of 25 attached to this Exhibit 11 that has an entry for $200,000, and the entry, the second page from the end for $370,122.01, are there any other entries on the Balance Sheet relating to Mr. Kirkland?<br>A Not that I'm aware of.<br>Q Do you see any?<br>A No.<br>Q And again, if there was a liability from EPD to Mr. Kirkland or his family or his family trust, that should be reflected as a liability on the Balance Sheet, shouldn't it?<br>A Yes."<br><br>***<br>"Q Do you know what the difference between Exhibits 10 and 11 is?<br>A It looks like one of them is only a listing of the loans, only the loan part of the Balance Sheet or the liabilities, it looks like, and then the other one is the entire Balance Sheet.<br>Q Which one is the entire Balance Sheet?<br>A Exhibit 10.<br>Q And neither 10 nor 11 list any entries regarding the Kirklands other than the ones we just went through?<br>A Yes.<br>Q That's correct?<br>A Yes." | |
| 280. The schedule of deposits and withdrawals that Kirkland produced during discovery in this adversary proceeding was obtained from Jerrold Pressman or Ruben Moreno post-petition and includes deposits in non-debtor entities.<br><br>"Q Have you ever communicated with John Kirkland?<br>A Yes.<br>Q About what?<br>A He called me about a month ago to ask me for some information.<br>Q What kind of information?<br>A He wanted a listing of what he had deposited into EPD, I believe.<br>Q Anything else?<br>A That was it pretty much. It was pretty quick. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 37-39, lines 22-25, 1-25 and 1-16; pp. 60-61, lines 10-25 and 1-3; pp. 65-66, lines 24-25 and 1-9; pp. 66-67, lines 25 and 1-15. |

Q Did you speak with him by phone?
A Yes, only by phone.
Q And when you received that call, you didn't still work for EPD or Mr. Pressman, did you?
A No, I did not.
Q What did you tell him?
A I told him he would have to talk to Jerrold Pressman.
Q Did you provide anything to Mr. Kirkland?
A And then Jerrold asked me to provide him with the information.
Q Did you send information to Mr. Kirkland?
A I believe I did.
Q By e-mail?
A I think so. I don't remember or I could have faxed it over. Whatever he asked me to do after he talked to Jerry.
Q So your understanding is Kirkland then talked to Jerry Pressman and Jerry Pressman instructed you to send something to Mr. Kirkland?
A Yes.
Q So whatever it was, you didn't generate it, it was something Mr. Pressman gave to you?
A Yes.
Q Do you know what it was?
A It was a list of deposits.
Q And that came from Mr. Pressman?
A Yes.
Q Do you know how Mr. Pressman got it?
A Probably on the computer. It was probably on the computer somewhere. I might have given him the list on the computer, now that I'm thinking about it because I don't know where he would have got it at."

***

"Q Is this what you were referring to when you said you sent printouts regarding the deposits to Mr. Kirkland?
A Yes.
Q Do you know where this information came from?
A The schedule?
Q Yes.
A From the old EPD files.
Q Electronic files or print files?
A Electronic files.
Q Quickbooks?
A No, this is Excel.
Q Do you know who inputted these transactions that are reflected here?

| | |
|---|---|
| A No, I wouldn't know.<br>Q Was it you?<br>A Possibly, but not entirely. There were about five or six of us that worked on it."<br><br>***<br><br>"Q Who asked you to input all these, you or whoever inputted the entries into here—strike that. Do you know who provided instructions to input these entries?<br>A Off the top of my head, no, but I'm going to assume it was Jerrold Pressman.<br>Q Could it have been anyone else?<br>A No, it would have been Jerrold Pressman.<br>Q However Jerrold Pressman wanted something booked on the records, that's how it got booked?<br>A Yes."<br><br>***<br>"Q As to any of the entries on this sheet, can you independently verify that they're accurate?<br>A What do you mean?<br>Q Can you verify that the entries on—<br>A There is a way to verify, yes.<br>Q But as you sit here today, can you verify that any of these entries are accurate?<br>A Yes.<br>Q And how is that?<br>A Because if I look on the bank statement on 8/18/2008, for example, I can see that there is a bank wire for $855,000.<br>Q But without going back and checking against the bank statements, you couldn't verify that this is accurate?<br>A. No." | |
| 281. The schedule produced by John Kirkland during discovery in this adversary proceeding not only contains deposits with EPD, but with every non-debtor entity with which Pressman had an affiliation.<br><br>"Q MR. WEBER: Are you referring to Exhibits 10 through 12?<br>MR. LANDAU: No, it's the schedule that was sent to me. There it is. It's Number 6.<br>Q Mr. Moreno, the question is, do you know what date this schedule is current as of?<br>A The end of 2010. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 130-132, lines 17-25, 1-25 and 1-2; pp. 62-64, lines 1-25, 1-25 and 1-4.<br><br>Expert Report, pp. 19-22. |

Q Would that be December 31st, 2010?
A That would be September 1st, 2010. They're all different. Actually, no, December 1st, 2010.
Q And how do you come to that date?
A If you go to the very last page, you see under "Date," the very last date on there is December 1st, 2010?
A Yes.
Q And you're basing your answer on that entry?
A Yes.
Q And do you know how this schedule, this Exhibit 6, fits with, let's say, Exhibit 12, which is the Balance Sheet?
A This schedule reflects every deposit Kirkland made with one of Jerry Pressman's entities. And the reason, for example, if you look on 9-27-2007.
Q Yes.
A There is a $400,000 deposit that went to Broadway Entertainment. That's not going to be reflected on this schedule because this schedule only reflects the amounts that went directly into the EPD books.
MR. LANDAU: Okay. That's all I have."

***

Q So Keith Pressman wrote a check to John Kirkland?
A No, John Kirkland wrote a check to Keith Pressman.
Q And do you know why?
A I don't recall, no.
Q So that's there because John Kirkland wrote a check to Keith Pressman?
A Yes.
Q Why would a check to Keith Pressman show up on an EPD account?
A What do you mean?
Q Aren't these schedules in regard to EPD?
A Everything. They're everything deposited into all the entities. You'll see Broadway Entertainment in there.
Q Why would a payment to Keith Pressman be reflected in an account statement for EPD?
A It's just a listing of all monies John Kirkland ever gave to any entity.
Q Not necessarily EPD?
A Not necessarily EPD only.
Q Just any entity or person that had any relation to Jerrold Pressman?
A Yes, basically his companies or Keith's.
Q But why would that be reflected on an EPD account

| | |
|---|---|
| statement?<br>A I don't know. Because he deposited 200,000 into Keith's account. So this is—these schedules are every single deposit put into any of the accounts. That's how we were instructed to prepare the schedules.<br>Q Any entity?<br>A Not any, the Pressman entities.<br>Q And any payments directly to Keith Pressman?<br>A Yes.<br>Q But you don't know why John Kirkland paid Keith Pressman $200,000?<br>A No, I wouldn't know what they paid Broadway Entertainment for. I wasn't privy to any of that information.<br>Q So the next entry says "BEM Deposit ck 1030." Do you see that?<br>A Yes.<br>Q "BEM," is that Broadway?<br>A Yes.<br>Q And does that transaction reflect Mr. Kirkland deposited $400,000 into Broadway?<br>A Yes.<br>Q Do you know why Mr. Kirkland deposited $400,000 into Broadway?<br>A No." | |
| 282. Pressman does not know the amount Kirkland invested less the amounts he received.<br><br>"Q Do you know how much Mr. Kirkland actually invested in EPD less the amounts he took out of EPD?<br>A No, I don't." | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 188, lines 3-5. |
| 283. Kirkland was involved in lease transactions through EPD.<br><br>"Q On the amounts that were listed on Exhibits 10 through 12 relating to Mr. Kirkland or Bright Conscience Trust, there was a reference to lease payments; is that correct?<br>A Yes.<br>Q Was Mr. Kirkland involved in a lease transaction with EPD?<br>A Yes.<br>Q Do you know the nature of it?<br>A No.<br>Q Do you know what equipment was leased?<br>A No. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, pp. 91-92, lines 16-25 and 1-4.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, p. 183, lines 11-15. |

| | |
|---|---|
| Q Do you know the lessor or lessee?<br>A No."<br><br>***<br><br>"Q Did Mr. Kirkland participate in leases through EPD?<br>A Yes, he had one lease.<br>Q And you said leases are not loans; right?<br>A Right." | |
| 284. EPD engaged in leasing transactions even though EPD was not the lessor or lessee. EPD would receive money from investors for a third party to purchase equipment. EPD would then pay investors lease payments. Ruben Moreno and Keith Pressman were unclear as to why EPD engaged in leasing transactions.<br><br>"Q Was EPD involved in leasing transactions?<br>A I believe so, yes."<br><br>***<br>"Q And do you know if EPD was the lessor or lessee in any of those lease transactions?<br>A I always confused that. I wouldn't know if I was looking at one of them.<br>Q Do you know if EPD ever leased equipment?<br>A I don't know. I don't know the answer to that.<br>Q Do you know if EPD had any involvement in those transactions?<br>A They generated a check to the investor for the lease payment.<br>Q EPD did?<br>A Yes.<br>Q So EPD would pay the investor lease payments on a regular basis?<br>A Yes.<br>Q And would EPD receive funds from anyone in exchange for that?<br>A Yes.<br>Q From whom?<br>A From the investor who purchased the equipment.<br>Q So EPD would get a check from the investor for some amount to purchase equipment?<br>A Yes.<br>Q And then EPD would pay the investor lease payments?<br>A Yes. | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 30, lines 4-5; pp. 31-32, lines 12-25 and 1-24.<br><br>Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 73-74, lines 17-25 and 1-10. |

| | |
|---|---|
| Q But you don't know if EPD was a lessor or a lessee under the leases?<br>A I always confused them, but if I'm looking at one, it will say.<br>Q Do you know why EPD did leasing transactions?<br>A No.<br>Q Do you know why investors did leasing transactions?<br>A No."<br><br>***<br><br>"Q Do you know if EPD was also involved in equipment leases?<br>A I know there were equipment leases. I don't know specifically if it was EPD, but I think it was.<br>Q Do you recall any details as to the way the equipment leases worked?<br>A No.<br>Q Did EPD act as a lessor or lessee in regard to any equipment leases?<br>A I don't remember.<br>Q Did EPD have its investors or lenders become lessors in equipment leases?<br>A I think so.<br>Q Do you know why?<br>A I don't know the mechanics of why, but that sounds right.<br>Q Some sort of tax benefit?<br>A I don't remember the situation." | |
| 285. Keith Pressman and others could not provide any concrete details re the equipment leases.<br><br>"Q Do you know what the equipment was?<br>A I don't know offhand.<br>Q Do you know where the equipment was located?<br>A I just don't remember.<br>Q Did you ever see any of the equipment that was subject to the leases?<br>A I don't remember if—I just don't remember how that was all structured or what it was that was leased." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 74, lines 11-20. |
| 286. Keith Pressman signed equipment leases.<br><br>"Q Did you ever prepare any equipment leases?<br>A I may have. I mean, I think it would have been more boilerplate kind of thing. I don't know if I specifically prepared leases. | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 74-75, lines 21-25 and 1-16. |

| | |
|---|---|
| Q Did you ever sign equipment leases?<br>A I'm sure I must have.<br>Q Why?<br>A I don't remember why. I mean, again, it goes down to if my father said, "This is something we need to do," I would have taken him at his word that that's a good way to go and I would have—I don't remember the circumstances.<br>Q Do you recall who you would have signed equipment leases on behalf of?<br>A No.<br>Q Are you familiar with the terms of any of the equipment leases?<br>A No.<br>Q Are you familiar with what entities entered into equipment leases?<br>A Not offhand." | |
| 287. The equipment leases were given by Jerrold Pressman to Keith Pressman for signature, and Keith Pressman signed them because Jerrold Pressman told him to do so.<br><br>"Q How did you come to sign these Equipment Lease Agreements? Who gave them to you?<br>A I don't remember any of the specifics, but I would have guessed my father.<br>Q Did you ever discuss them with him?<br>A I don't have any direct knowledge or memory of these specific leases. And I don't know if I discussed it with him or if he just told me to sign them."<br><br>***<br><br>"Q Now, as to all of those exhibits, those leases, Mr. Sumian declares under penalty of perjury in this Declaration that your son, Keith Pressman, didn't have authority to enter into those on behalf of True Position Technologies.<br>MR. LANDAU: Objection. Not a question, it's a statement.<br>THE DEPONENT: What's the statement?<br>MR. WEBER: Well, you didn't let me finish.<br>Q Do you know why Keith Pressman is on those?<br>A Because I told him to.<br>Q Do you know under what authority he signed them?<br>A I believe that he had authority to do so.<br>Q And what did you base that on?<br>A Based on our relationship with True Position. It was our money. You know, everything was ours. They | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 93-94, lines 20-25 and 1-3.<br><br>Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 142-143, lines 8-25 and 1-2. |

| | |
|---|---|
| didn't invest one penny in that company." | |
| 288. Keith Pressman could not explain why the equipment leases were not sham leases. Allen Sumian, the president of the only purported lessee not owned or controlled by Jerrold Pressman, True Positions Technology, Inc. ("TPT"), states in a declaration that the equipment leases with TPT were fraudulent. The equipment leases were signed by Keith Pressman as "VP" of TPT. The Sumian declaration states that "Keith Pressman and Jerrold Pressman never had authority to take any actions on behalf of TPT, to enter into contracts, or other written agreements on behalf of TPT" and that TPT never leased the equipment in the equipment leases.<br><br>"Q Do you know if all the equipment leases that EPD or your father was involved in were sham or fake leases?<br>A I would guess not.<br>Q And why is that?<br>A Because I know my father, and I don't think he would do something like that.<br>Q Well, you just reviewed several leases that are signed by you as an officer of a company that you weren't an officer of; isn't that right?<br>A Correct.<br>Q Aren't those sham leases?<br>A Well, without not having all the information, I can't tell you. I only see what's here and I don't know all the circumstances.<br>Q You're an attorney. You can't sign an agreement on behalf of an entity that you're not an officer of as an officer; is that right?<br>A Correct.<br>Q But that's exactly what you did here, isn't it?<br>A Again, I have no knowledge of what the situation was; I would only be speculating."<br><br>***<br><br>"Q Can you think of any plausible explanation as to those equipment leases you looked at where you signed o behalf of True Position?<br>A I don't know.<br>Q You can't think of any plausible explanation as to why those occurred? | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 94-95, lines 4-25 and 1; p. 217, lines 17-23.<br><br>Weber Declaration, pp. 9-10, ¶ 29 and Exhibit 28 to the Weber Declaration, declaration of Allen Sumian. |

| | |
|---|---|
| A Not offhand, no." | |
| 289. Keith Pressman never saw the equipment being leased, and does not remember purchasing equipment after leases were entered into.<br><br>"Q In all your time working for EPD and the other entities, have you ever seen any of the equipment that's subject to these equipment leases?<br>A I don't know. I don't remember."<br><br>***<br><br>"Q So following entering into this Equipment Lease Agreement, do you recall EPD or your father or you purchasing equipment?<br>A Not offhand." | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, p. 95, lines 2-5; p. 96, lines 14-17. |
| 290. The Debtors' accountant, Theodore Jonavic, testified that equipment leasing was a "material" part of EPD's business, but that EPD was neither the lessor nor the lessee of the equipment and did not record income based on the equipment leases. EPD would record the money received from investors for equipment leases as a liability to those investors.<br><br>"Q. Was the equipment leasing a big part of EPD's business?<br>A. "Big" is a relative term.<br>Q. Material.<br>A. Material. I'd say it was material, yes.<br>Q. Material is an accounting term; is that right?<br>A. Material is an accounting term.<br>Q. What do you take material to means in terms of accounting jargon?<br>A. In terms of accounting jargon, it's probably something that represents either 30 or 40 percent of an entity's activities.<br>Q. So your understanding is that equipment leasing would have comprised at least 30 percent of EPD's business activities from 2003 forward?<br>A. I believe that's a fair statement.<br>Q. Now, since EPD was not a lessor or a lessee under the leases, did it record any income from the equipment leases?<br>A. No.<br>Q. So EPD never recorded income from equipment leasing? | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, pp. 38-39, 10-25, and 1-18. |

| | |
|---|---|
| A. Not from equipment leasing.<br>Q. How about from the money coming in from investors to purchase the equipment?<br>A. Not as income, no.<br>Q. How did EPD record the lease transactions on its books?<br>A. It didn't really record lease transactions.<br>It would record the money coming in from investors as a liability to that investor.<br>Q. And that's it?<br>A. That's it." | |
| 291. According to Jonavic, the equipment leases also did not appear on EPD's balance sheet.<br><br>"Q. But how would anything relating to a deduction for the equipment be allowed on EPD's balance sheet as a limited liability company?<br>A. Because the money advanced by EPD in order to satisfy the personal guarantees would represent what the leasing entity actually owed to EPD as a receivable, and it would be that receivable which would eventually be converted into an ownership position for Mr. Pressman of that particular leasing entity.<br>Q. So are you saying that EPD did not show equipment leasing on its balance sheet?<br>A. That is correct.<br>Q. So it showed it as a deduction on a supplemental form --<br>A. Right.<br>Q. -- but not on the balance sheet?<br>A. That is correct." | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, pp. 42-43, lines 15-25, and 1-2. |
| 292. Although Jonavic raised the issue with Jerrold Pressman and Ruben Moreno that the correct accounting treatment of the lease payments was to list the amounts as an asset on EPD's balance sheet (for amounts advanced by EPD on behalf of the lessees) rather than as deductions, Jerrold Pressman and Moreno "appreciated the comments, and then, it appears to be they ignored them."<br><br>"Q. Now, you were aware that EPD engaged in equipment leasing going back to 2003 and before; is that right?<br>A. And before, yes.<br>Q. Did you ever -- when was the first time you told Mr. Pressman or Mr. Moreno that they were accounting for | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, p. 101, lines 9-21. |

| | |
|---|---|
| the lease transactions incorrectly?<br>A. Verbally, gosh, years ago.<br>Q. 2003 or so?<br>A. Probably. Maybe even earlier than that.<br>Q. What was their response when you said that?<br>A. They appreciated the comments, and then, it appears to be they ignored them." | |
| 293. Even if the lease payments paid by EPD had been for legitimate equipment leases, even if they were recorded as assets, and even if the assets (the lease payments advanced for lessees) were collectable, EPD would still have had liabilities that exceeded its assets each year of its operation based on the balance sheets in the turns.<br><br>"Q. So even if you were to add in the lease payments as an asset, the liabilities would still dramatically exceed the assets?<br>A. That is correct." | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, p. 77, lines 13-16. |
| 294. Most of the purported lessees were businesses partially owned or controlled by Jerrold Pressman.<br><br>"Q. So on all the leases, EPD paid the monthly lease payments; is that right?<br>A. That's correct. And I can understand why.<br>Q. And EPD wasn't the lessor or the lessee?<br>A. That is correct.<br>Q. And for instance, one of the companies was SC Club, L.P.; is that right --<br>A. That is --<br>Q. -- that leased the equipment?<br>A. That is correct.<br>Q. So EPD would -- strike that. And SC Club, L.P. was an entity that was partially owned or controlled by Jerrold Pressman?<br>A. At least through 2007's tax return, the ownership of SC Club, L.P. was Mr. Pressman personally." | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, p. 102, lines 7-22. |
| 295. Keith Pressman confirmed that he signed the equipment leases as "VP" of TPT, but that he had no reason to doubt the statements made in Allen Sumian's declaration.<br><br>"Q Do you ever recall signing equipment lease agreements on behalf of True Position? | Weber Declaration, pp. 4-5, ¶ 16 and Exhibit 14 to the Weber Declaration, bracketed portions of transcript from the deposition of Keith Pressman, pp. 78-87 at lines 1-25, 1-25, 1-25, 1-25, 1-25, 1-25, 1-25, 1-25, 1-17, 1-2. |

A I don't know offhand.
Q Did you have authority to enter into equipment leases on behalf of True Position?
A I don't remember if I did; I don't remember.
Q Do you know, is Mr. Sumian the head of True Position?
A Yes.
Q So he would know whether someone had authority to enter into contracts or equipment leases on behalf of True Position; is that right?
A Yes.
Q I'd like to introduce Exhibit 16. (Chapter 7 Trustee's Exhibit 16 was marked for identification by the Deposition Officer and is attached hereto.)
MR. WEBER: I'd like you to take a few minutes to look through the Declaration of Allen Sumian and the attachments. And after you've done that, I'll ask some questions.
THE DEPONENT: Okay.
Q BY MR. WEBER: Do you know if what Mr. Sumian is saying here is accurate?
A It seems like it is.
Q In Paragraph 6 it says, "In connection with the loan from EPD Investment Co. to TPT," which is defined earlier as True Position Technologies, Inc., "Keith Pressman was appointed as the Secretary for TPT at its formation, but was never a director, employee or agent. Keith Pressman remained as secretary during the 1990s for TPT. Keith Pressman had no role at TPT as an officer, director, employee or agent at any point after the 1990s." Do you see that?
A Yes.
Q Is that accurate?
A I assume so.
Q If you look at Paragraph 7, it says, "The only people that have been authorized to take actions on behalf of TPT at any point since its incorporation, including but not limited to entering into contracts or agreements of any kind on behalf of TPT, are me and Tim Meade." Do you see that?
A Yes.
Q Is that accurate?
A Again, I don't remember personally. I don't know. It sounds right. I don't think he would say something that wasn't true.
Q Paragraph 8 says, "At no point did Keith Pressman have any authority or responsibilities with respect to TPT." Is that accurate?
A No, I didn't have any responsibilities. And again, I

don't remember if at some point -- if at any point -- I don't remember. I don't remember. I know he dealt with my father on stuff. So again, if I technically was able to do something or not, I wouldn't remember if I did.
Q Continuing on in the paragraph, it says," Keith Pressman's appointment as secretary of TPT was nominal only. Keith Pressman never performed any work or services for TPT, didn't have an office at TPT, and had no management duties or any duties or authority whatsoever. Keith Pressman and Jerrold Pressman never received salary or other income or distributions from TPT. Keith Pressman and Jerrold Pressman were never employees or agents of TPT. Keith Pressman and Jerrold Pressman never had any authority to take any actions on behalf of TPT or to enter into contracts or other written agreements on behalf of TPT." Do you see that?
A Yes.
Q Is that accurate?
A Again, he dealt with my dad on what the capacity was. So I mean, I don't have personal knowledge, but again, I have no reason to doubt what Allen would say.
Q It references some early equipment leases in relation to EPD in Paragraph 9 and Paragraph 10. Do you see that?
A Correct.
Q And then it says in Paragraph 10, "From 2000 forward, all equipment located at, and used by, TPT was either (a) owned by TPT; or (b) leased by TPT directly from the manufacturer of the equipment. After the late 1990s, TPT never leased equipment from any person or entity other than the manufacturer of the equipment." Do you see that?
A Yes.
Q Do you know if that's accurate?
A Not of my own knowledge.
Q If you look at Paragraph 14, it says, "I have reviewed a number of documents over the past few months which purport to be equipment leases between various parties as the lessor(s) and TPT as the lessee. True and correct copies of those documents that I reviewed are attached hereto as Exhibits 1-8 (collectively, the 'Purported Leases'). Prior to my review of the Purported Leases during the last few months, I had never seen the Purported Leases before. I did not authorize the Purported Leases. The Purported Leases that appear to be signed on behalf of TPT were signed without any authorization by TPT, and were signed by a person who was not an officer, director, employee or

agent of TPT as of the0 dates of the Purported Leases and who had no authority to enter into any agreement, contract, lease or other document on behalf of TPT." Do you see that?
A Yes.
Q Do you know if it's accurate?
A Not from my own personal knowledge.
Q Let's look one by one. The first one, Exhibit 1, is unsigned, so why don't we start with Exhibit 2. I'm looking at Paragraph 16. It says, "Exhibit 2 is a purported lease between TPT and an entity named Deushane Leasing Company ('DLC'), as of September 27, 2000. The document identifies the lease as 'Lease # 000927-DL.' TPT never had any discussions with DLC regarding the lease of equipment, TPT never leased any equipment from DLC, and TPT never prepared, reviewed or entered into an agreement with DLC regarding the lease of equipment. TPT never leased any equipment from DLC. TPT never agreed to pay, nor did it ever make payments to DLC (or to EPD for the benefit of DLC) on the account of this or any other purported equipment lease. Attached to Exhibit 2 is a document titled 'Financing Statement,' which appears to be connected to this purported lease. TPT never agreed to the filing of a financial statement of any sort for the benefit of DLC. To the extent that any purported leases or other contracts or agreements reflect that equipment was leased by DLC to TPT, those purported leases are fraudulent as TPT did not enter into any equipment leases or any other contract or agreement with DLC."Do you see that?
A Yes.
Q Do you know if that's accurate?
A Again, not to my personal knowledge.
Q Let's take a look at Exhibit 2. And this starts on page T-PR 060648 and continues on to 060652. This is the same document.
A So where am I going?
Q We're looking at Exhibit 2 to this document.
A Okay.
Q Actually, why don't we start with Exhibit 1.
A Okay.
Q It looks like Exhibit 1 and Exhibit 2 are unsigned. But take a look and let me know if you've ever seen those equipment leases before.
A I don't know.
Q You don't recall seeing them before?
A Not offhand.
Q How about Exhibit 3?

| | |
|---|---|
| A Exhibit 3 is entitled "Equipment Lease Agreement" between Grand Canyon Leasing and True<br>16 Position Technologies.<br>A I don't remember it offhand.<br>Q If you look at the signature page for Exhibit 3, which is located on Bates stamped page number TP-R 060658, there is a signature block for True Position. Do you see that?<br>A Yes.<br>Q Is that your signature?<br>A Yes.<br>Q And under "Title," it says, "VP"?<br>A Yes.<br>Q Vice president?<br>A Right.<br>Q Were you the vice president of True Position?<br>A I don't believe so.<br>Q And it's dated December 22nd, 2000; is that right?<br>A Yes.<br>Q Were you the vice president of True Position in December 2000?<br>A Not from what it says in the Declaration, it doesn't appear that I was.<br>Q Do you recall signing this Equipment Lease Agreement?<br>A I don't recall offhand.<br>Q Do you ever recall signing Equipment Lease Agreements on behalf of True Position?<br>A I don't remember offhand. I mean, probably. Again, I'm just assuming. If it happened -- I mean, it obviously did -- then my dad would have had me sign it. But I don't have the specific memory of it.<br>Q As to that Exhibit 3, if you look back at Mr. Sumian's Declaration in Paragraph 17, it says, starting at line nine, "I am familiar with Keith Pressman's signature and the purported lease appears to be signed by Keith Pressman as Vice President on behalf of TPT." Do you see that?<br>A Yes.<br>Q And he is correct as to that; that's your signature?<br>A Yes, it looks like it, definitely.<br>Q And then it says, "The date of the signature is December 22nd, 2000. Keith Pressman was not a vice president or an officer of TPT as of December 22nd, 2000." Is that correct?<br>A Yes.<br>Q And then it says, "Keith Pressman never had any authority at any point to enter into contracts or agreements, including but not limited to leases on | |

| | |
|---|---|
| behalf of TPT. I was the only person authorized on behalf of TPT to enter into contracts or agreements on behalf of TPT as of December 22nd, 2000." Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A I'm assuming -- you know, I wouldn't doubt what he said." | |
| 296. EPD filed tax returns for 2003 through 2008. Most of the assets listed were notes receivable and, for the 2007 and 2008 tax returns, included approximately $8 million of goodwill.<br><br>Jerrod pressman declared that "True and correct copies of EPD's tax returns for fiscal years 2003 through 2008 are attached hereto as **Exhibits U through Z**." | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 15; Exhibits U through Z thereto (EPD's tax returns for fiscal years 2003 through 2008). |
| 297. The EPD balance sheet, as reflected in the tax returns for 2003 through 2008, shows assets, liabilities and ending negative capital account balances as follows: | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 15; Exhibits U through Z thereto (EPD's tax returns for fiscal years 2003 through 2008).<br><br>Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, pp. 39-40, lines 19-25, and 1-11; p. 47, lines 14-24; pp. 53-54, lines 3-25, and 1-19; p. 59, lines 2-24, pp. 65-66, lines 20-25, and 1-21; pp. 74-75, lines 18-25, and 1-7; and Exhibits 4, 5, and 8-13 thereto. |

| **Year (as of the end of the year)** | **Assets** | **Liabilities** | **Capital Account (Equity)** |
|---|---|---|---|
| **2003** | $22,334,669 | $23,525,981 | ($1,191,312) |
| **2004** | $43,629,944 | $47,281,730 | ($3,651,786) |
| **2005** | $43,817,222 | $48,869,676 | ($5,052,454) |
| **2006** | $43,401,964 | $53,393,862 | ($9,991,898) |

| | | | |
|---|---|---|---|
| **2007** | $26,678,448 | $47,165,326 | ($20,486,878) |
| **2008** | $28,573,326[1] | $50,095,219 | ($21,521,893) |

***

MR. WEBER: Why don't we introduce Exhibit 4.
(Exhibit 4 was marked for identification by the reporter.)
BY MR. WEBER:
Q. Mr. Jonavic, have you seen this document before?
A. Yes, I have.
Q. And what is it?
A. It is a partnership tax return for EPD Investments, LLC.
Q. Was this the first tax return that was filed by EPD --
A. Yes, it is.
Q. -- as a limited liability company?
A. Yes, it is.
Q. And you prepared it?
A. Yes, I did.

***

MR. WEBER: I'd like to introduce Exhibit 5.
(Exhibit 5 was marked for identification by the reporter.)
BY MR. WEBER:
Q. Have you seen this document before?
A. Yes, I have.
Q. And this is EPD's tax return for 2004?
A. That is correct.
Q. And did you prepare it?
A. Yes, I did.

***

MR. WEBER: I'd like to introduce Exhibit 7.
(Exhibit 7 was marked for identification by the reporter.)
MR. WEBER: For the record, this also appears to be a 2004 tax return, but it appears to have been separately Bates-stamped.

[1] Schedule L, Line 13 (no amount is listed on Line 8), Other Investments, states that $8,222,362 of the assets is for goodwill and $20,445,974 is for notes receivable.

BY MR. WEBER:
Q. I was wondering if you know if there was any difference versus the last one we looked at? A. No, it doesn't look like there's any difference.
Q. It appears to be the same document?
A. It appears to be the same, yes.
MR. WEBER: I'd like to introduce Exhibit 8. (Exhibit 8 was marked for identification by the reporter.)
BY MR. WEBER:
Q. Have you seen this document before?
A. Yes, I have.
Q. And what is this document?
A. This is a 2005 partnership tax return for EPD Investments, LLC.
Q. And did you prepare it?
A. Yes, I did.
Q. You filed it with the IRS?
A. Yes.
Q. This year, it lists assets of $43,817,222; is that right?
A. $43,817,222, correct.
Q. Do you know how much in liabilities EPD had for 2005?
A. It showed 31,510,905. And apparently 17,209,754.
Q. So it's that combination of those two numbers?
A. It would be a combination.
Q. So it would be approximately just less than 49 million?
A. Just less than 49 million, that is correct.
Q. In liabilities.

***

MR. WEBER: Let's introduce Exhibit 9.
(Exhibit 9 was marked for 4 identification by the reporter.)
BY MR. WEBER:
Q. And this also appears to be a 2005 tax return for EPD, but it has a different Bates number on it, so I just wanted to check with you to see if there is any difference between the two.
A. There's no apparent difference that I can see.
Q. Just another copy of the same tax return with different Bates numbers on it?
A. That's what it appears to be.
MR. WEBER: Let's introduce Exhibit 10.
(Exhibit 10 was marked for identification by the reporter.)
BY MR. WEBER:
Q. Have you seen this document before?

A. Yes, I have.
Q. Is this EPD's tax return for 2006?
A. Yes, it looks that way.
Q. And did you prepare it?
A. Yes, I did.

***

MR. WEBER: I'd like to introduce Exhibit 11.
(Exhibit 11 was marked for identification by the reporter.)
BY MR. WEBER:
Q. For the record, this also appears to be a 2006 tax return for EPD but with different Bates numbering. Do you know if there is any difference with Exhibit 10 that we just looked at?
A. No. They both look the same to me.
Q. Just a duplicate with different Bates numbering?
A. Just a different exhibit, duplicate.
MR. WEBER: I'd like to introduce Exhibit 12.
(Exhibit 12 was marked for identification by the reporter.)
BY MR. WEBER:
Q. Have you seen this document before?
A. Yes, I have.
Q. And did you prepare it?
A. Yes, I did.
Q. This is EPD's tax return for 2007?
A. That's correct.
Q. And you filed this with the IRS?
A. Yes, I did.

***

MR. WEBER: I'd like to introduce Exhibit 13.
(Exhibit 13 was marked for identification by the reporter.)
(There was a recess taken.)
BY MR. WEBER:
Q. Mr. Jonavic, have you seen Exhibit 13 before?
A. Yes, I have.
Q. Is this EPD's tax return for 2008?
A. Yes, it is.
Q. And did you prepare it?
A. Yes, I did.
Q. And did you file it with the IRS?
A. Yes.

| | |
|---|---|
| 298. EPD did not file tax returns for 2009.<br><br>"EPD did not file tax returns for fiscal years 2009 through 2011 because EPD didn't' have the money or the paperwork to put the tax returns together and because EPD did not believed it owed taxes based on a $10 million capital loss carry forward." | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 15 |
| 299. EPD was also not profitable. EPD's tax returns showed consistent net losses between 2003 and 2008, with net losses of ($1,356,192) in 2003, ($3,223,395) in 2004, ($1,990,744) in 2005, ($5,131,269) in 2006, ($584,301) in 2007 and ($573,412) in 2008. | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 15; Exhibits U through Z thereto (EPD's tax returns for fiscal years 2003 through 2008). |
| 300. EPD's statements and schedules filed in the bankruptcy case in early 2010 list no real estate, $32,278,078.39 in personal property assets, and $70,487,483.35 in liabilities. | RJN, **Exhibit ZZ**, EPD's Summary of Schedules filed in the Bankruptcy Case, Docket No. 110. |
| 301. EPD's Schedule B, and an attachment to Schedule B, shows that the assets listed are comprised of $78.39 in cash on hand and notes receivable from: (1) Jerrold Pressman for $24,268,000; (2) S.C. Club, L.P. for $4,285,000; (3) Broadway Entertainment Marketing, Inc. for $4,413,000; and (4) Orland McCarthy for $312,000. | RJN, **Exhibit ZZ**, EPD's Summary of Schedules filed in the Bankruptcy Case, Docket No. 110. |
| 302. Jerrold Pressman filed his own bankruptcy petition and statements and schedules in 2012 listing only $27,158 in assets ($27,158 in personal property and no real property), and over $144 million in liabilities. | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |
| 303. Every business in which Jerrold Pressman held an ownership interest was listed with a value of $0 with the exception of JSP Properties, Inc., which was listed with a value of $25,000. | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |
| 304. As to S.C. Club, L.P. (which owed EPD $4,285,000 according to EPD's statements and schedules), Jerrold Pressman states in his bankruptcy petition that "Liabilities exceed the assets by approximately $3 million. The company ceased operations in 2009…" S.C. Club, L.P.'s tax returns for 2007 and 2008 | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |

| | | |
|---|---|---|
| | include balance sheets listing liabilities substantially in excess of assets. | |
| 305. | As to Broadway Entertainment Marketing, Inc. (which owed EPD $4,413,000 according to EPD's statements and schedules), Jerrold Pressman states in his bankruptcy petition that "[t]he company has no assets or liabilities. Broadway ceased operations in December 2009." | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |
| 306. | Broadway Entertainment Marketing Inc.'s tax returns for 2007 and 2008 include balance sheets listing liabilities substantially in excess of assets. | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic at Exhibits 19 and 20 thereto (Broadway Entertainment Marketing Inc.'s tax returns for 2007 and 2008) |
| 307. | The over $32 million in assets listed on EPD's bankruptcy schedules was uncollectable because Jerrold Pressman (who owed EPD $24,268,000 according to EPD's statements and schedules) had only nominal assets and over $144 million in liabilities, the ownership interests that Jerrold Pressman held in businesses had virtually no value, and the entities that owed EPD millions of dollars, S.C. Club, L.P. and Broadway, had no assets and had stopped doing business in 2009. | RJN, **Exhibit ZZ**, EPD's Summary of Schedules filed in the Bankruptcy Case, Docket No. 110.<br><br>RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |
| 308. | S.C. Club's liabilities exceeded its assets in 2007 and 2008. BEM's liabilities exceeded its assets in 2007 and 2008<br><br>"MR. WEBER: I'd like to introduce Exhibit 17.<br>(Exhibit 17 was marked for identification by the reporter.)<br>BY MR. WEBER: Q. Do you recognize this document?<br>A. Yes, I do.<br>Q. Is this SC Club, L.P.'s tax return for 2007?<br>A. That's what it appears to be, yes.<br>Q. Did you prepare it?<br>A. Yes, I did.<br>Q. Did you file it?<br>A. Looks like it was filed.<br>Q. And that's your signature, isn't it?<br>A. That's my signature, yes.<br>Q. Now, in 2007, did SC Club, L.P. have total assets of just over $6.4 million?<br>A. That is what the balance sheet reflects, yes.<br>Q. And how much in liabilities did it have?<br>A. Well, it had notes payable of 18,586,699, short-term notes of 560,139, and 122,752 in payables. | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, pp. 87-89, lines 24-25, 1-25, and 1-2; pp. 91-93, lines 22-25, 1-25, and 1-16; pp. 96-97, lines 10-25, 1-13; pp. 98-99, lines 7-25, and 1-12; and, Exhibits 17 and 18 (2007 and 2008 income tax returns for S.C. Club, L.P. Key Club) thereto; and Exhibits 19 and 20 (2007 and 2008 income tax returns for Broadway Entertainment Marketing) thereto. |

| | |
|---|---|
| Q. So it had just under $20 million in liabilities; is that right?<br>A. Just over 19 million, yeah. Yes.<br>Q. So the liabilities dramatically exceeded the assets; is that right?<br>A. That is correct.<br><br>***<br><br>MR. WEBER: I'd like to introduce Exhibit 18.<br>(Exhibit 18 was marked for identification by the reporter.)<br>BY MR. WEBER:<br>Q. Before we look at 18, looking back at Exhibit 17, the 2007 SC Club, L.P. tax return, the figures in there were based on the information and data given to you by SC Club, L.P.?<br>A. Through Mr. Moreno.<br>Q. Ruben Moreno?<br>A. Correct.<br>Q. And also Jerrold Pressman?<br>A. Correct.<br>Q. And that's the way SC Club accounted for their balance sheet and income and expenses, everything that you included on the return?<br>A. That's my understanding, correct.<br>Q. Turning to 18, have you seen this document before?<br>A. Yes.<br>Q. And is this SC Club, L.P.'s tax return for 2008?<br>A. Yes, it is.<br>Q. Did you prepare it?<br>A. Yes, I did.<br>Q. Did you file it with the IRS?<br>A. I would assume so.<br>Q. That's your signature on it?<br>A. That's my signature, but that doesn't necessarily mean it was filed.<br>Q. Now, this lists assets for SC Club, L.P. of just over $5 million for 2008; is that right?<br>A. That is correct.<br>Q. And how much in liabilities did SC Club, L.P. have in 2008?<br>A. Long-term liabilities showed 17,075,579. Short-term liabilities of 569,160, and accounts payable of 362,805.<br>Q. So SC Club, L.P. had just under $18 million in liabilities?<br>A. Correct.<br>Q. So there's substantially more liabilities than assets? | |

| | |
|---|---|
| A. That is correct.<br><br>***<br><br>MR. WEBER: I'd like to introduce Exhibit 19. (Exhibit 19 was marked for identification by the reporter.)<br>BY MR. WEBER:<br>Q. Have you seen this document before?<br>A. Yes, I have.<br>Q. Is this Broadway Entertainment Marketing, Inc.'s tax return for 2007?<br>A. Yes, it does appear to be that way.<br>Q. And did you prepare it?<br>A. Yes, I did.<br>Q. Did you file it with the IRS?<br>A. I would have to assume so.<br>Q. You signed it?<br>A. I signed it.<br>Q. So for 2007, Broadway Entertainment had assets of just over a million dollars; is that right?<br>A. That's what it shows.<br>Q. And what were its liabilities?<br>A. Its liabilities were 2,017,367, loans from shareholders, and 90,493 in other current liabilities.<br>Q. And so, the liabilities were roughly double the assets; is that right?<br>A. That's correct, but you've got to understand, if this tax return is accurate, loans from shareholders many times can be combined with the equity. Banks do that all the time.<br><br>***<br><br>MR. WEBER: I'd like to introduce Exhibit 20. (Exhibit 20 was marked for identification by the reporter.)<br>BY MR. WEBER:<br>Q. Do you recognize this document?<br>A. Yes, I do.<br>Q. Is this Broadway Entertainment Marketing, Inc.'s tax return for 2008?<br>A. Yes, it is.<br>Q. Did you prepare it?<br>A. Yes, I did.<br>Q. Did you file it?<br>A. I would assume so.<br>Q. And this year, Broadway Entertainment had roughly $1.1 million in assets?<br>A. That is correct. | |

| | |
|---|---|
| Q. And how much in liabilities?<br>A. Well, it shows 223,000 in notes payable in the year or more; 2,699,884, loans from shareholders; 97,923 in other current liabilities, and short-term notes of 552,802.<br>Q. So somewhere a little under 3-1/2 million dollars in liabilities?<br>A. That's approximately -- yes, approximately correct. However, of those liabilities, almost 2.7 million is owed to the shareholder.<br>Q. But on a balance sheet basis, the liabilities dramatically exceeded the assets; is that right?<br>A. That's correct. | |
| 309. Eleven EPD investors filed declarations in the bankruptcy case during 2011 stating that "EPD's assets are primarily secured by real estate", and that EPD had been able to maintain the real estate and has not lost real estate due to foreclosures. | RJN, **Exhibit FFF**, Declarations In Support Of Alleged Debtor's Reply Memorandum In Further Support Of Motion To Alter Or Amend Order For Relief In An Involuntary Case, Or In The Alternative For Relief From Default, filed in EPD's Bankruptcy Case on March 25, 2011 (Docket No. 83); and Additional Declarations In Support Of Alleged Debtor's Motion To Convert filed in EPD's Bankruptcy Case on April 11, 2011 (Docket No. 101). |
| 310. Even after the Order for Relief was entered in the EPD bankruptcy case and after Jerrold Pressman filed his personal bankruptcy case, Jerrold Pressman still maintained that there were sufficient real property assets to back the investments. As Jerrold Pressman stated in a declaration filed with this Court in April 2012:<br><br>"Beginning in early or mid-2009, EPD stopped making regular payments to Creditors. After that point, the Creditors repeatedly contacted me regarding the status of refinancing of the real property owned by NHIP and/or the sale of stock of NHIP, in order to generate funds for EPD to pay creditors. Creditors also repeatedly contacted me regarding the status of the Tennessee and Mississippi real property in which I hold ownership interests in order to determine EPD's ability to make payments to them. At the request of the Creditors, I | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 14, lines 5-18. |

| | |
|---|---|
| provided updates about the real property owned by other entities, and also provided documents with a full accounting of those properties to an accountant. An example of my communications with Creditors is an e-mail that I sent to Michael Kabik on December 8, 2012: "We are not an investment company. 95% of our group consists of ONLY family and extended family members. We have never had clients from the business world. For 35 years our family has pooled its resources and used the funds to purchase long term Land Development Projects. Most are located in prime areas such as Brentwood Tenn. A suburb of Nashville where we purchased and developed more than 2,000 acres in the past two decades. We currently control 250 acres of the remaining lots that have been appraised by the bank last year for more than $25,000,000 with only $4,000,000 of bank debt. All of the properties are highly valued and subject to very low loan to values." | |
| 311. EPD and its predecessor, a sole proprietorship of Jerrold Pressman obtained funds in exchange for promissory notes or demand notes that were due on demand and bore mostly double-digit interest rates per year.<br><br>The persons providing money to EPD, including John Kirkland, were often referred to as "investors," but provided the money to EPD subject to the demand notes. EPD investors generally received 12% interest per annum.<br><br>"The Sole Proprietorship and EPD obtained funds from the Creditors in exchange for promissory notes or demand notes that were due on demand or within 30 days after demand. The promissory notes and demand notes varied in interest rates, but bore mostly double-digit interest rates per year. | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶ 7, lines 3-6. |
| 312. As to Sidecreek Development, Inc. f/k/a Creekside Development, Inc., Jerrold Pressman listed a value of $0 for the ownership interests.<br><br>Schedule B in Jerrold Pressman's personal bankruptcy case states that: The Debtor has a 50% interest in Sidecreek Development, Inc. | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |

| | | |
|---|---|---|
| | ("Sidecreek"). Sidecreek is a Tennessee corporation formed in October 2004 as "Creekside Development, Inc." The company's sole asset is approximately 250 acres of vacant hillside in Brentwood and Franklin, TN valued at approximately $8 million as undeveloped land. The liabilities are approximately $4.5 million. | |
| 313. | Sidecreek filed a bankruptcy case of its own in 2012, In re Sidecreek Development, Inc., Case No. 2:12-bk-17787-ER. | RJN, **Exhibit DDD**, Sidecreek Development, Inc. bankruptcy petition filed on March 5, 2012, Case No. 2:12-bk-17787-ER, Docket No. 1. |
| 314. | The statements and schedules in the Sidecreek bankruptcy case list a value for the real property as $10 million, additional personal property of $381.30, for a total of $10,000,381.30 in assets, and $7,011,636.85 in liabilities including secured debt of $4,191,080.75. | RJN, **Exhibit EEE**, Sidecreek Development, Inc. bankruptcy statements and schedules, filed on March 14, 2012, Case No. 2:12-bk-17787-ER, Docket No. 11. |
| 315. | The Trustee ultimately received $50,000.00 from the Sidecreek bankruptcy case based on Jerrold Pressman's ownership interests. | RJN, **Exhibit HHH**, First Omnibus Motion for Approval of Compromises and Order Approving Same<br><br>Declaration Of Jason M. Rund, Chapter 7 Trustee, In Support Of Chapter 7 Trustee's: (1) Motion For Summary Adjudication Regarding The Trustee's First Claim For Relief For Disallowance Of Claims, Or, In The Alternative, For Equitable Subordination Of Claims And Proofs Of Claim; And, (2) Motion For Summary Adjudication Regarding The Second, Third And Sixth Claims For Relief For Avoidance And Recovery Of Fraudulent Transfers Made With Actual Intent, ¶ 6.d. |
| 316. | S.C. Club, L.P's 2007 tax return includes a balance sheet listing assets of approximately $6.4 million and liabilities of approximately $19 million. | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic at Exhibit 19 thereto (S.C. Club, L.P's 2007 tax return) |
| 317. | S.C. Club, L.P.'s 2008 tax return includes a balance sheet listing assets of approximately $5 million and liabilities of approximately $18 million. | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic at Exhibit 20 thereto (S.C. Club, L.P's 2008 tax return) |

| | |
|---|---|
| 318. By 2009, S.C. Club, L.P. had no assets and had ceased doing business. | RJN, **Exhibit AAA**, Jerrold Pressman's Summary of Schedules filed in his individual bankruptcy case, Case 2:12-bk-13760-ER, Docket No. 26. |
| 319. Plush Lounge Las Vegas, LLC operated a nightclub in Las Vegas.<br><br>"Q So you just gave us Broadway and Key Club. On the ISE entities, just a quick description, a synopsis of how it generated those revenues.<br>A The ISE were ice rinks. And so some of these were self-owned ice rinks and some of these were managerial ice rinks for the City of Oakland and the City of Vacaville. And this generated -- and for Escondido. And this generated, you know, tremendous cash flow where each one of them paid EPD or somebody a salary, a fee for doing it, and in addition, repaid loans of $1.7 over those -- $2.075 over the same five-year period. The Plush Lounge was the nightclub in Las Vegas that operated…" | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 250-251, lines 15-25, and 1-3. |
| 320. According to a state court lawsuit filed by EPD against Plush, and a stipulated judgment entered thereafter, Plush owed EPD millions of dollars. The complaint included causes of action for breach of contract, money due on note and common count and attached a promissory note supposedly signed by officers of EPD and Plush months before either had been formed as limited liability companies. | RJN, **Exhibit BBB**, Complaint for: 1. Breach of Contract; 2. Money Due on Note; 3. Common Count, EPD Investment Company, LLC, v. Plush Lounge Las Vegas, LLC, Case No. BC358166, Superior Court of the State of California, County of Los Angeles |
| 321. Jerrold Pressman also had no liquid assets, with UCC-1 financing statements having been filed in 2003, and again in 2009, encumbering all of his assets in favor of EPD, and with Jerrold Pressman owing approximately $25 million to EPD at all times.<br>"9. On or about July 3, 2003, I executed a $25 million revolving promissory note in favor of EPD (the "2003 Note"). … On or about July 3, 2003, I caused to be recorded a UCC-1 financing statement encumbering all of my assets in favor of EPD …<br><br>10. On or about July 21, 2009, I entered into a second $25 million revolving promissory note (the "2009 Note")… On or about July 31, 2009, I recorded a UCC-1 financing statement encumbering all of my assets in favor of EPD …" | RJN, **Exhibit GGG**, UCC-1s filed with the California Secretary of State on July 3, 2003, and July 31, 2009.<br><br>RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at ¶¶ 9 and 10, lines 14-28. |

| | |
|---|---|
| 322. As described by Jerrold Pressman, EPD was "…only an accounting entity that acted as a conduit to flow funds to entities held by me…"<br><br>Q I'd like to introduce Exhibit 60. (Chapter 7 Trustee's Exhibit 60 was marked for identification by the Deposition Officer and is attached hereto.)<br>Q BY MR. WEBER: Is this an e-mail chain between you and Mr. Kirkland dated March 21, 2011?<br>A Yes.<br>Q Did you send or receive these e-mails?<br>A What was the question?<br>Q Did you send or receive these e-mails?<br>A I don't remember. But in essence, it's correct, so...<br>Q If you look at the bottom e-mail on the first page describing EPD, it says, "It was only an accounting entity that acted as a conduit to flow funds to entities held by me."<br>Do you see that?<br>A Yes.<br>Q Is that accurate?<br>A Well, to the extent except for unusual transactions where it sold some properties or charged consulting fees, but it is accurate. | Weber Declaration, p. 5, ¶ 17 and Exhibit 15 to the Weber Declaration, bracketed portions from the transcript from the deposition of Jerrold Pressman, pp. 205-206, lines 20-25, and 1-16; and Exhibit 60 thereto, e-mail exchange between Jerrold Pressman and John Kirkland). |
| 323. A document provided by Jerrold Pressman to the Debtors' accountant, Theodore Jonavic, characterized EPD as a venture capital company. Jonavic agreed that "I guess you could consider it a venture capital company because it provided funds for these businesses to operate." However, Jonavic's response as to what EPD received in exchange for those funds was "I don't really know, to be honest with you." Jonavic had not seen any document that showed that EPD received a benefit.<br><br>"Q. So after 2003, did EPD operate as a venture capital company?<br>A. I guess you could consider it a venture capital company because it provided funds for these businesses to operate.<br>Q. And what did it get in exchange for that?<br>A. I don't really know, to be honest with you.<br>Q. Have you seen anything that would show anything that EPD got out of that?<br>A. Not EPD.<br>Q. So how would EPD be categorized as a venture capital company after June or July of 2003? | Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, pp. 130-131, lines 12-25, and 1-3; and Exhibit 25 thereto (e-mail exchange between Jerrold Pressman and Theodore Jonavic and attachment thereto). |

| | |
|---|---|
| A. Because it provided funding to these entities.<br>Q. Anything else other than just the providing of funds?<br>A. No. Probably just providing the funds." | |
| 324. The EPD balance sheet for the year ending 2010 that Ruben Moreno sent to Jerrold Pressman on March 18, 2011, March 30, 2011, and April 11, 2011 show that the Kirklands and the BC Trust were owed either $370,122.01 or $570,122.01<br><br>"Q Mr. Moreno, did you send this e-mail dated March 18, 2011, to Jerry Pressman?<br>A Yes.<br>Q And it attaches EPD's Balance Sheet as of December 31, 2010?<br>A Yes.<br>Q Did you generate this Balance Sheet?<br>A Yes. I'm going to assume, yes.<br>Q Is it from QuickBooks?<br>A Yes."<br><br>***<br><br>"Q I'd like to introduce Exhibit 11. (Chapter 7 Trustee's Exhibit 11 was marked for identification by the Deposition Officer and is attached hereto.)<br>MR. WEBER: And you'll note that this is similar to Exhibit 10. This is another e-mail that looks like it's from you to Jerrold Pressman, but Exhibit 11 is dated March 30, 2011, whereas Exhibit 10 is dated March 18, 2011. And it says that there are two attachments, "EPD Yellow Sced" and "EPD Other Sced."<br>Q Do you see that?<br>A Yes.<br>Q And is this an e-mail that you sent to Mr. Pressman on March 30, 2011?<br>A Yes.<br>Q Did he request that you send it to him?<br>A Yes.<br>Q This also attaches an EPD Balance Sheet dated December 31, 2010.<br>A Yes."<br><br>***<br><br>"Q I'd like to introduce Exhibit 12. (Chapter 7 Trustee's Exhibit 12 was marked for identification by the Deposition Officer and is attached hereto.) | Weber Declaration, p. 6, ¶ 19 and Exhibit 17 to the Weber Declaration, bracketed portions of the transcript from the deposition of Ruben Moreno, p. 73, lines 3-18 (and Exhibit 10 thereto, e-mail and attachment); pp. 77-78, lines 14-25, and 1-9 (and Exhibit 11 thereto, e-mail and attachment); and, pp. 81-82, lines 14-25, and 1-12 (and Exhibit 12 thereto, e-mail and attachment).<br><br>Weber Declaration, p. 9, ¶ 27 and Exhibit 25 to the Weber Declaration, bracketed portions of the transcript from the deposition of Theodore Jonavic, p. 136, lines 3-24; and Exhibit 29 thereto. |

| | |
|---|---|
| MR. WEBER: This is another e-mail and attached documents previously marked during your Rule 2004 Examination. The first page is an e-mail that states that it's from you to Jerrold Pressman on April 11, 2011.<br>Q Do you see that?<br>A Yes.<br>Q And is that an e-mail you sent to Mr. Pressman?<br>A Yes.<br>Q And it attaches an EPD Balance Sheet with "latest changes"?<br>A Yes.<br>Q Do you know what the changes were?<br>A No.<br>Q Do you know who made the changes?<br>A He would have asked me to make changes, but I don't know what the changes were.<br>Q "He" being Jerrold Pressman?<br>A Yes."<br><br>***<br><br>(Exhibit 29 was marked for identification by the reporter.)<br>BY MR. WEBER:<br>Q. If you look, this is an email from Ruben Moreno to Jerrold Pressman on April 11, 2011. It says, "Final EPD balance sheet with latest changes." Do you see that?<br>A. Yes, I do.<br>Q. And again, you're not a sender or recipient, but if you look on page 16 of 29, there's an entry that says, "Bright gone," and it totals $370,122.01. Do you see that?<br>A. Yes, I do.<br>Q. And it has the initials JK, which may mean John Kirkland, or it may not. Do you see that?<br>A. Yes, I do see that.<br>Q. Other than that entry, do you see any liabilities as owing to John Kirkland, his wife, or the Bright Trust?<br>A. No, I don't see anything. | |
| 325. Matthew Gruenberg previously worked with Kirkland at Dreier Stein & Kahan LLP and they shared a secretary, Lisa Underkoffler. After Dreier was unwinding, Gruenberg's secretary helped Gruenberg get work from Kirkland.<br><br>"Q When did you first meet John Kirkland?<br>A Well, we worked in the same office at the | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 17-18, lines 20-25, and 1-16. |

| | |
|---|---|
| Dreier firm, but I never worked for him. We shared a secretary. When the firm was kind of unwinding and partners were going to various other firms, I kind of stayed in touch with my secretary. And she introduced me to him and basically helped me get contract work from him. So I never really worked for him. I don't really know him very well. But Lisa, his assistant, she had like four or five lawyers on her desk and I was one of them.<br>Q Is that Lisa Underkoffler?<br>A Yes.<br>Q So Lisa Underkoffler was your assistant as well as John Kirkland's assistant at Dreier?<br>A Yes.<br>Q And did Ms. Underkoffler follow Mr. Kirkland to his next firm?<br>A Yes.<br>Q Do you know where that was?<br>A Luce Forward." | |
| 326. In the General Denial (answer) filed by Kirkland during 2010 in a lawsuit against the Debtors, *Hansel v. EPD, et al.*, Kirkland stated the following facts as separate affirmative defenses to the complaints: "1. The stated interest rate is usurious. 2. The funds were an investment, rather than a loan that required repayment."<br><br>"Q I'd like to introduce Exhibit 76. (Chapter 7 Trustee's Exhibit 76 was marked for identification by the Deposition Officer and is attached hereto.)<br>THE DEPONENT: I assume we did based on this pleading. It seems to be arguing the contra position.<br>Q BY MR. WEBER: Is that your signature on Exhibit 76, the General Denial in the Hansel case?<br>A Yes.<br>Q The defenses listed here are 1, "The stated interest rate is usurious," and 2, "The funds were an investment rather than a loan that required repayment." Is that right?<br>A Those are separate affirmative defenses to plaintiff's Complaint.<br>Q Who came up with those affirmative defenses?<br>A I don't recall." | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, p. 223, lines 5-24.<br><br>RJN, **Exhibit JJJ**, General Denial, Hansel v. EPD, et. al.; Case No. SC106151, Los Angeles Superior Court, Los Angeles County, Santa Monica Division. |
| 327. The identical affirmative defenses were raised in general denials filed by another attorney, Matthew Gruenberg on behalf of the Debtors in: (1) *Dittmar v. Pressman, et al.*, Case No. BC 446372, filed on or about November 18, 2010; | RJN, **Exhibits MM and NN**, general denial filed in *Druckman v. EPD, et al.*, Case No. BC 450557, Superior Court for the State of California County of Los Angeles, filed on |

| | |
|---|---|
| (2) Jenny Lee Bridal, LLC v. EPD Investment Co., LLC, et al., Case No. BC 427112, filed on or about November 22, 2010; and (3) Harvey v. Pressman, et al., Case No. SC108418, filed on or about March 16, 2011. | January 4, 2011; general denial filed in *Harvey v. Pressman, et al.*, Case No. SC 108418, Superior Court for the State of California, County of Los Angeles, filed on March 16, 2011.<br><br>RJN, **Exhibit KKK**, General Denial, Dittmar v. Pressman, et. al.; Case No. BC 446372, Los Angeles Superior Court, Los Angeles County.<br><br>RJN, **Exhibit LLL**, General Denial, Jenny Lee Bridal v. EPD, et. al.; Case No. BC 427112, Los Angeles Superior Court, Los Angeles County. |
| 328. The general denials were served by Lisa Underkoffler, Kirkland's assistant.<br><br>***<br>"Q And if you look on the next page, the Proof of Service on this document says it was served by Lisa Underkoffler. Do you see that?<br>A Yes.<br>Q And that was your assistant at Dreier?<br>A Yes.<br>Q And John Kirkland's assistant at Dreier and Luce?<br>A That's correct.<br>Q So even though this document at least had your signature name on the block, it was served by Luce Forward?<br>A It looks that way, yes. I don't recall."<br><br>***<br><br>"Q If you look at the next page, it appears to be served by Lisa Underkoffler; is that correct?<br>A Yes.<br>Q So this is the second General Denial that appears with your name on it on the first page but served by Ms. Underkoffler. Do you recall if the pleadings that you prepared in the state court litigation matters were served by Ms. Underkoffler as a matter of course?<br>A I believe so. I don't recall precisely, but I believe so." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, pp. 27-28, lines 17-25 and 1-5; pp. 32-33, lines 20-25 and 1-5. |
| 329. In an e-mail from Gruenberg to Kirkland on August 30, 2010, Gruenberg stated in pertinent part that "I have also prepared a General Denial that will accompany the Application. The denial | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew |

| | |
|---|---|
| raises the same two affirmative defenses that were raised in Hansel – namely, the stated interest is usurious and the funds were an investment rather than a loan that required repayment…” | Gruenberg, at Exhibit 25 thereto (E-mail from Gruenberg to Kirkland and Lisa Underkoffler, August 30, 2010 at 4:47 p.m.) |
| 330. Underkoffler and Kirkland arranged for Gruenberg to meet with Pressman regarding EPD.<br><br>“Q And what was the context that you heard about EPD in?<br>A I had been looking, like I said, for contract work and kind of reaching out to different partners from the firm that I knew because I didn't know very many people in L.A. And Lisa called me one day and said that John had a client, John Kirkland had a client that he wanted me to see if I would work with or introduce. I can't remember specifically the conversation, but that's how.<br>Q And the client was EPD?<br>A Yes.<br>Q So did you meet someone representing EPD after that point?<br>A Yes, I met Jerrold Pressman. | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 20, lines 4-18. |
| 331. Kirkland would provide instructions to Gruenberg as to what legal work to do and Gruenberg would perform the assigned work.<br><br>“Q So Mr. Kirkland would provide instructions as to what legal work to do and you would do whatever the legal work assigned was?<br>A Yes.” | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 43, lines 22-25. |
| 332. Gruenberg testified that “they wanted me to just basically delay the settlement of these lawsuits and that was really it, and just coordinating with John to respond.”<br><br>“Q In the entire time that you performed legal services for EPD and Mr. Pressman, did you ever discuss the nature of EPD's business with Mr. Pressman or anyone with EPD?<br>MR. MICK: Compound.<br>THE DEPONENT: No. it was really just -- you know, they wanted me to just basically delay the settlement of these lawsuits and that was really it, and just coordinating with John to respond.” | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 65, lines 17-25. |

| | |
|---|---|
| 333. Kirkland or an associate at Luce Forward came up with the affirmative defenses.<br><br>Q And who came up with those affirmative defenses?<br>A I don't know.<br>Q Do you know if it was Mr. Kirkland?<br>A I couldn't say with certainty. He had someone else, an associate that he worked with, so I don't know if it was -- I don't know. I know I didn't come up with them, but it came from the Luce Forward<br>12 firm.<br>Q So it would have been Mr. Kirkland or someone who worked at Luce Forward that came up with the affirmative defenses?<br>A I believe so."<br><br>***<br><br>"Q And did you come up with these affirmative defenses in Exhibit A?<br>A No.<br>Q Was it either Mr. Kirkland or someone who worked for Luce Forward that came up with these affirmative defenses?<br>A I believe so, yes."<br><br>***<br><br>"Q And did Mr. Kirkland or some other attorney at Luce Forward come up with these affirmative defenses?<br>A I really can't recall, but I assume so.<br>Q Is there anyone else who could have come up with these affirmative defenses?<br>A Well, I don't know; I would be speculating." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 30, lines 4-16; p. 33, lines 19-25; pp. 38, lines 2-9. |
| 334. As to one of the affirmative defenses based on the California Finance Lenders Law, Gruenberg does not know what that is.<br><br>"Q Do you know what the California Finance Lenders Law is?<br>A No, not really." | Weber Declaration, pp. 7-8, ¶ 23 and Exhibit 21 to the Weber Declaration, bracketed portions of the transcript from the deposition of Matthew Gruenberg, p. 59, lines 5-7. |

| | |
|---|---|
| 335. Although Kirkland and Gruenberg filed pleadings on behalf of the Debtors contending that the interest rate was usurious, Kirkland denies that the same interest rate provided to Kirkland and the BC Trust is usurious and denies that they knew it was usurious. | Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, pp. 46-49, RFA Nos. 177-184 and 188-191. |
| 336. Kirkland admits that the Proofs of Claim include interest but deny that the interest rate is usurious | Weber Declaration, p. 3, ¶ 10 and Exhibit 8 to the Weber Declaration, John Kirkland responses to RFAs, pp. 49-50, RFA Nos. 192-194. |
| 337. Poshow Kirkland testified that she did not know whether John Kirkland invested or loaned any of the amounts listed in the initial disclosures, except for a $100,000 check, and had not seen copies of any checks or wire transfers as to the other amounts.<br><br>"If you look at page 10, do you see a chart of dates and dollar amounts?<br>A (In English) I don't recall if I seen or not. What your question about this?<br>Q Do you know if your husband deposited, loaned or invested $200,000 in EPD or with Jerrold Pressman on September 28, 2007?<br>A (Through the interpreter) I don't know.<br>Q Do you know if your husband deposited, loaned or invested $400,000 with EPD or Jerrold Pressman on September 28, 2007?<br>A (Through the interpreter) I don't.<br>Q Do you know if your husband loaned, invested or deposited $150,000 with EPD or Jerrold Pressman on November 8, 2007?<br>A (In English) That I don't know.<br>Q Do you know if your husband loaned, deposited or invested $150,000 with EPD or Jerrold Pressman on March 27, 2008?<br>A (In English) I don't know.<br>Q Do you know if your husband loaned, invested or deposited $100,000 with EPD or Jerrold Pressman on June 20th, 2008?<br>A (In English) 100,000 three times. I don't know which date of that. I do deliver a personal check from John to Jerry's house.<br>Q One personal check for $100,000?<br>A (In English) Uh-huh. I personally bring it to him. But I don't know which date, if it's June 20th or April 14th, 2009, or if it was July 24, 8 2009; I don't know which | Weber Declaration, pp. 3-4, ¶ 14 and Exhibit 12 to the Weber Declaration, bracketed portions of the transcript from the deposition of Poshow Kirkland, pp. 78-80, lines 3-25, 1-25, and 1-5. |

| | |
|---|---|
| one time. And I don't know if that check is in here or not. But I can tell you, I personally delivered the check, but I don't know the purpose of the check.<br>Q Do you know if your husband, John Kirkland, loaned, invested or deposited $855,466.23 on August 18th, 2008? A (In English) No, I don't know. Q And do you know whether your husband loaned, deposited or invested $100,000 with Jerry Pressman on April 14th, 2009? A (In English) I don't recall.<br>Q Do you know if your husband loaned, deposited or invested $100,000 with EPD or Jerrold Pressman on July 24th, 2009?<br>A (In English) I don't know. I don't recall. I don't know if that -- which time will be the time of that check and if the check is for his – for this or not; he didn't tell me.<br>Q Other than that $100,000 check, have you seen copies of any other checks or wire transfers from your husband to EPD or to Jerrold Pressman?<br>A (In English) No." | |
| 338. John Kirkland's response to whether he paid fees to Broadway Entertainment Marketing, Inc. was continuously, "I don't recall"<br><br>"Q Did you pay any consulting fees to Broadway Entertainment Marketing, Inc.?<br>A I don't recall.<br>Q Did you pay any advisory fees to Broadway Entertainment Marketing, Inc.?<br>A I don't recall.<br>Q Did you pay any professional service fees to Broadway Entertainment Marketing, Inc.?<br>A I don't recall.<br>Q Did you pay any kind of fees to Broadway?<br>A I don't recall.<br>Q Can you think of any reason why you would pay fees to Broadway?<br>A Because Jerry Pressman asked me to make a check payable to Broadway and I would have said okay.<br>Q For any purpose?<br>A Correct.<br>Q Do you recall whether you paid any amounts to Keith Pressman for consulting fees?<br>A I don't recall.<br>Q Do you recall making any payments to Keith Pressman for advisory fees?<br>A I don't recall. | Weber Declaration, p. 4, ¶ 15 and Exhibit 13 to the Weber Declaration, bracketed portions of the transcript from the deposition of John Kirkland, pp. 117-118, lines 8-25, and 1-21. |

| | |
|---|---|
| Q Do you recall making any payments to Keith Pressman for professional service fees?<br>A I don't recall.<br>Q Do you recall paying any amounts to Keith Pressman for legal feas?<br>A I don't recall. I think I paid Broadway $400,000 and Keith $200,000.<br>Q For what?<br>A Because Jerry told me that's what he wanted the checks written to.<br>Q And what was your understanding as to why the money was going to Broadway?<br>A I don't recall.<br>Q You didn't ask why?<br>A If I did, I don't remember the answer or the question." | |
| 339. The claims register lists over $173 million in claims filed. | RJN, **Exhibit PPP,** Claims Register, Case No. 2:10-bk-62208-ER |
| 340. Of all the claims on the schedules, the only two purportedly secured claims are those in favor of the BC Trust and HMB, filed in September 2009. | RJN, **Exhibit PPP,** Claims Register, Case No. 2:10-bk-62208-ER |
| 341. The Rule 2004 examinations of Jerrold Pressman in the EPD Bankruptcy Case and in his capacity as an individual and as the designated person most qualified for EPD, Broadway Entertainment, S.C. Club, L.P. and S.C. Club, Inc. took place on May 17, 2011, May 31, 2011 and July 8, 2011.<br><br>"The testimony that I provided in Rule 2004 examinations on May 17, 2011, May 31, 2011, and July 8, 2011 is true and accurate to the best of my knowledge, and my testimony is accurately reflected in the transcripts prepared by the court reporter." | RJN, **Exhibit CCC**, Chapter 7 Trustee's Motion for Substantive Consolidation of the Bankruptcy Estates of Debtors EPD Investment Co. LLC, and Jerrold S. Pressman … Declaration of Jerrold S. Pressman at p. 54 of 55, ¶ 16, lines 24-27. |
| 342. The following fee applications have been filed in this Bankruptcy Case:<br><br>First Interim Application Of Berkeley Research Group, LLC For Allowance And Payment Of Fees And Expenses Incurred As Accountants And Financial Advisors For The Chapter 7 Trustee For The Period April 10, 2012 Through October 31, 2013 [Docket No. 789], approved on December 18, 2013 [Docket No. | Bankruptcy Case Docket Nos. 789, 791, 793, 852, 1131, 1133, 1145, and 1146. |

| | |
|---|---|
| 852].<br><br>First Interim Application For Award Of Compensation And Reimbursement Of Expenses Of Robert A. Hessling, APC, As General Counsel For Trustee [Docket No. 791], approved on December 18, 2013 [Docket No. 852].<br><br>Application for Compensation for Ezra Brutzkus Gubner LLP [Docket No. 793], approved on December 18, 2013 [Docket No. 852].<br><br>Second Interim Application Of Berkeley Research Group, LLC For Allowance And Payment Of Fees And Expenses Incurred As Accountants And Financial Advisors For The Chapter 7 Trustee For The Period November 1, 2013 Through July 31, 2015 [Docket No. 1131], approved on October 6, 2015 [Docket No. 1145]<br><br>Application for Compensation for Ezra Brutzkus Gubner LLP [Docket No. 1133], approved on October 6, 2015 [Docket No. 1146]. | |
| 343. The Kirklands represented in a stipulation filed in this adversary proceeding that: "Mrs. Kirkland represents that the interests of Mr. Kirkland and Mrs. Kirkland are intertwined in this adversary proceeding and that Mr. Kirkland's input as to the discovery issues is necessary prior to responding further." | RJN, **Exhibit OOO,** Stipulation To Continue Status Conference, To Extend Discovery Cutoff, And To Continue Pre-Trial Conference And Trial, Based Upon Defendant John C. Kirkland's Unavailability Due To Illness, p. 3 of 5, lines 17-22. |

**2. CONCLUSIONS OF LAW**

a. The Court must grant summary judgment if the pleadings, depositions and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (S. Ct. 1986).

b. The Court must grant summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (S. Ct. 1986).

c. The discovery cut-off date in the *Rund v. Kirkland* adversary proceeding for non-expert discovery passed on June 30, 2017 (Scheduling Order, Adv. Docket No. 255).

d. There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (S. Ct. 1986).

e. Facts are material when, under the governing substantive law, they could affect the outcome of the case. Where a case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment. Thrifty Oil Co. v. Bank of America Nat. Trust & Sav. Ass'n, 322 F.3d 1039, 1045-1046 (9th Cir. 2003).

f. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c).

g. A claim, or an interest in property of the debtor securing the claim, based on a writing, must be supported by a copy of the writing filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim. Fed. R. Bankr. P. 3001(c)(1).

h. A claimed security interest in property of the debtor must be accompanied by evidence that the security interest has been perfected. Fed. R. Bankr. P. 3001(d).

i. On December 12, 2011, Poshow Kirkland filed proof of claim nos. 171 ("Claim 171"), 235 ("Claim 235") and 236 ("Claim 236") on behalf of the BC Trust. Claim

171, Claim 235 and Claim 236 each list an amount owed of $2,672,000, as purportedly secured claims. On February 15, 2013, Poshow Kirkland filed proof of claim no. 13-1 ("Claim 13") in Case No. 2:12-bk-13760-ER (Claim 171, Claim 235, Claim 236 and Claim 13 are collectively referenced herein as the "Claims"). Claim 13 lists an amount owed of $3,529,000, as a secured claim. The basis listed for each of the Claims is "money" and "UCC-1".

j. Claim 171, Claim 235 and Claim 236 are duplicative claims. Claim 13 is also the same, but includes additional interest. The Claims have not been amended to include documentation or an itemization of claimed interest. Claims 235, 236 and 13 are appropriately disallowed and expunged as duplicative claims.

k. The presumption treating proofs of claim as *prima facie* evidence of validity and amount operates to create a mere rebuttable presumption. If rebutted, then the ultimate burden of proof is on the claimant. The BC Trust has not met its initial burden of persuasion for establishing the validity and amount of the Claims. The Claims do not attach any supporting documentation, and only include the single-page proof of claim form. The Claims do not include any substantive explanation of the amounts claimed, and do not include any itemization of claimed interest. Garner v. Shier (In re Garner), 246 B.R. 617, 622 (9th Cir. BAP 2000). Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage), 178 B.R. 222 (9th Cir. BAP 1995) (a claim must have a writing attached and otherwise be properly filed to qualify for presumptive validity). The *prima facie* validity of a claim does not attach unless the claim sets forth the facts necessary to support the claim. *Id.* at 226. *See also* Fed. R. Bankr. P. 3001(c)(1) (as to the requirement for including a contract or other writing with the proof of claim) and Fed. R. Bankr. P. 3001(c)(2)(A) (as to the requirement to include evidence that a security interest has been perfected).

l. No interest calculation is attached to the Claims with respect to individual debtor Jerrold Pressman (Claim 13-1) as is required by the Federal Rules of Bankruptcy Procedure. "[i]f, in addition to its principal amount, a claim includes interest, fees,

expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c)(2)(A). The Court may preclude the BC Trust from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the Court determines that the failure was substantially justified or is harmless; or may award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure. Fed. R. Bankr. P. 3001(c)(2)(D).

m. Further, the Trustee objected to the Claims, through this adversary proceeding, and even if the BC Trust's initial burden had been met, the burden would have reverted to the BC Trust to prove the validity of the Claims by a preponderance of the evidence. The Bankruptcy Code authorizes a "party in interest," such as the Trustee, to object to claims. 11 U.S.C. § 502(a). Fed. R. Bankr. P. 3007(b) provides that a party in interest may include the objection to the allowance of claim in an adversary proceeding. Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," then the burden reverts to the claimant to prove the validity of the claim by a preponderance of evidence. Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991); In re Consolidated Pioneer Mortgage, 178 B.R. 222, 226 (9th Cir. BAP 1995).

n. The ultimate burden of persuasion as to the Claims is on the BC Trust as the claimant. *See* In re Holm at 623; In re Heath, 331 B.R. 424 (9th Cir. BAP 2005); Garner v. Shier (In re Garner), 246 B.R. 617, 622 (9th Cir. BAP 2000).

o. The amounts subject to a security interest are limited by the type of assets held by the estate that could qualify as collateral. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of

such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

p. The Trustee's settlements obtained based on avoidance claims pursuant to 11 U.S.C. §§ 548 and 550 do not constitute the BC Trust's collateral because these actions arose post-petition and belong exclusively to the estate. The Debtors could not have had an interest in claims which did not exist prior to the petition date. *See, e.g.*, In re Ludford Fruit Prod., Inc., 99 B.R. 18, 25 (Bankr. C.D. Cal. 1989); In re Residential Capital, LLC, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013); 11 U.S.C. § 552(a) and (b)(1).

q. The Trustee's settlements obtained based on avoidance claims pursuant to 11 U.S.C. § 544 and California Civil Code § 3439, *et seq.* are claims of creditors, which the Trustee is authorized to pursue. For the purposes of these claims, the Trustee is standing in the shoes of the Debtors' creditors, not the Debtors. The Debtors could not have granted a security interest to the Kirklands, the BC Trust, or anyone else as to claims of creditors. *See*, *e.g.*, In re EPD Inv. Co., LLC, 821 F.3d 1146, 1152 (9th Cir. 2016) (analyzing a similar legal issue in an appeal from an order in this bankruptcy case, the Ninth Circuit concluded that pre-petition arbitration agreements could not bind the Debtors' creditors, or the Trustee when he stands in the creditors' shoes).

r. The "Security Interest Agreement" does not describe commercial tort claims with sufficient particularity to have created a valid lien on the claims of the Trustee. *See, e.g.*, Waltrip v. Kimberlin, 164 Cal. App. 4th 517, 528–29 (2008).

s. The "Security Interest Agreement" does not attach to after-acquired commercial tort claims of the Trustee. *See* Cal. Com. Code § 9204. California's Commercial Code permits a security interest to attach to a commercial tort claim in existence at the time

the related security agreement is entered into, if and only if, the claim is described with greater specificity than "all tort claims." *See* Cal. Com. Code § 9204 at Comment 4; Cal. Com. Code § 9108(e) ("…(e) A description only by type of collateral defined in this code is an insufficient description of either of the following: (1) A commercial tort claim…").

t. The Trustee's settlements with Greenberg Traurig LLP and Luce Forward Hamilton & Scripps LLP are not collateral for any of the Claims as they were either the proceeds of fraudulent transfer claims, were commercial tort claims that did not exist (or were not sufficiently described) at the time the "Security Interest Agreement" was executed, or were after-acquired claims that cannot constitute collateral as a matter of California law.

u. The Trustee's settlements with Greenberg Traurig LLP and Luce Forward Hamilton & Scripps LLP are not collateral for any of the Claims because allowing the BC Trust (as John Kirkland's assignee) to receive proceeds from the settlement of claims against John Kirkland's former law firms based on John Kirkland's conduct is a result that would offend public policy. *See, e.g.*, California Civil Code § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.")

v. The Trustee's settlement with Robert Geringer is not collateral for any of the Claims because a UCC-3 financing amendment was filed in May 2010 with the California Secretary of State that specifically excluded the stock of North Hills Industrial Park, Inc. from the UCC-1 filed in favor of the BC Trust. The filed UCC-3, on its face, amends the description of the collateral described by the UCC-1 as follows: "This amendment is to clarify and confirm that the prior grant of security did not include the stock of North Hills Industrial Park, Inc. a California S-Corporation."

w. Lisa Underkoffler caused the UCC-3 to be filed with either the express authority from John Kirkland or with apparent authority. John Kirkland is bound by the acts of his agents acting with the scope of the agent's authority. John Kirkland's actions on behalf on the BC Trust since the assignment to the BC Trust demonstrate that John Kirkland continued to act on behalf of the BC Trust. John Kirkland has maintained the authority to act on behalf of the BC Trust, and there is no separation or apparent distinction between John Kirkland and the BC Trust. *See, e.g.*, Official Comm. of Unsecured Creditors v. City Nat. Bank, N.A., 2011 WL 1832963, at 5 (N.D. Cal. 2011): "It is well established that a principal is bound by the acts of an agent acting within the scope of the agent's authority. *See* Cal. Civ.Code § 2330."

x. Any secured interest in the estate's net proceeds from the sale of the stock in Ice Skating Enterprises, Inc., and from the distribution in the *In re Sidecreek Development, Inc.* bankruptcy case would be more than offset by the reasonable expenses of preserving and liquidating the stock, pursuant to 11 U.S.C. § 506(c). 11 U.S.C. § 506(c) provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c). Section 506(c) applies only to an "allowed secured claim." *See* In re Golden Plan of California, Inc., 829 F.2d 705, 712 (9th Cir. 1986). "The mere processing of a claim under section 501 does not render it an 'allowed secured claim' within the meaning of section 506." Golden Plan, 829 F.2d at 713. *See also* 11 U.S.C. § 502(a) and (d). The Trustee is entitled to recover on behalf of the estate, "the reasonable, necessary costs and expenses" expended in obtaining these settlements, judgments, and proceeds. The fees and costs incurred by the Trustee on behalf of the estate include the amounts previously filed with the Court, and approved on an interim basis, in fee applications for general counsel for the Trustee, special litigation counsel for the Trustee, and forensic accountants for the Trustee

y. Neither Keith Pressman nor Broadway Entertainment Marketing, Inc. are debtors in this case, and any claims by the BC Trust against them are not claims against the Debtors or the estate. 11 U.S.C. § 502(b)(1) provides that a claim may not be allowed if it "is unenforceable against the debtor and property of the debtor, under agreement or applicable law for a reason other than because such claim is contingent or unmatured." *See, e.g.,* In re Lasky, 364 B.R. 385, 388 (Bankr. C.D. Cal. 2007).

z. The Claims on their face list an interest rate of 12% or 24%. Both of these interest rates are usurious in California and are unenforceable against the Debtors and assets of the Debtors' estate. *See* 11 U.S.C. § 502(b)(1) and Article XV, § 1 of the California Constitution. California's usury law is based upon the California Constitution and precludes "as an acceptable commercial practice" the charging of usurious interest. Fox v. Peck Iron & Metal Co., 25 B.R. 674, 690–91 (Bankr. S.D. Cal. 1982). "Under California law, "[t]he essential elements of ... usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. ... The defense of usury is generally not waivable because a usurious transaction is unlawful." Blue Growth Holdings Ltd. v. Mainstreet Ltd. Ventures, LLC, 2013 WL 4758009, at *2 (N.D. Cal. 2013). Because the rate charged was usurious, the BC Trust (as John Kirkland's assignee) is not entitled to recover any interest whatsoever. *See, e.g.*, Rochester Capital Leasing Corp. v. K & L Litho Corp., 13 Cal. App. 3d 697, 703 (Ct. App. 1970) ("While the principal of an usurious transaction is recoverable, no interest whatsoever can be claimed by the usurious lender." (internal citations omitted)).

aa. Any usury savings clause was designed to permit the collection of a usurious rate of interest without an appearance of violation of law. *See* Blue Growth Holdings at 3. The Claims themselves evidence this intent as they demand usurious interest.

bb. The BC Trust is not entitled to post-petition interest. The general rule is that post-petition interest is not available because it is given the lowest priority of distribution under 11 U.S.C. § 726. *See* In re Frontier Properties, Inc., 979 F.2d 1358, 1367 (9th Cir. 1992); 11 U.S.C. § 726 (a)(5); In re Oahu Cabinets, Ltd., 12 B.R. 160, 163 (Bankr. D. Haw. 1981).

cc. Jerrold Pressman operated EPD as a Ponzi scheme. Therefore, interest of any kind on the Claims is impermissible. The "net investment" methodology applies to claims in Ponzi scheme cases, which looks solely to deposits and withdrawals that in reality occurred. *See, e.g.*, In re Tedlock Cattle Co., Inc., 552 F.2d 1351, 1352-1354 (9th Cir. 1977) and In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122, 141 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011).

dd. The BC Trust obtained its interests in regard to the Claims through an assignment by John Kirkland. Therefore, the BC Trust's interests in regard to the Claims are subject to the rights and liabilities of John Kirkland. Johnson v. City of Fresno, 111 Cal.App.4th 1087, 1096 (2003); Searles Valley Minerals Operations, Inc. v. Ralph M. Parson Serv. Co., 191 Cal.App.4th 1394, 1402 (2011). California law is clear that "[t]he assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor prior to notice of the assignment." (1 Witkin, *supra*, Contracts, § 948, p. 844.)" The BC Trust acquired all rights and liabilities of Kirkland upon the assignment. "The assignment merely transfers the interest of the assignor. The assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor prior to notice of the assignment." (1 Witkin, *supra*, Contracts, § 948, p. 844.)" Johnson v. City of Fresno, 111 Cal.App.4th 1087, 1096 (2003). *See also* Searles Valley Minerals Operations Inc. v. Ralph M. Parson Service Company,

191 Cal.App.4th 1394, 1402 (2011) (citing Johnson v. City of Fresno)[2] and In re Boyajian, 367 B.R. 138, 145 (9th Cir. BAP 2007) aff'd, 564 F.3d 1088 (9th Cir. 2009).

ee. The BC Trust and Poshow Kirkland, as trustee of the BC Trust, do not qualify as holders in due course because they did not take the assignment for value or in good faith. Cal. Comm. Code § 3302(a). "Inadequacy of consideration is, indeed, not conclusive, but the authorities generally hold that it is a circumstance proper to be considered in determining the question of good faith. It is so held in Clark v. Troy, 20 Cal. 220." Boud v. Bearce, et al., 48 Cal.App. 46, 50 (1920).

ff. "Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c).

gg. The equitable subordination of claims generally requires findings: (1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." Henry v. Lehman Comm. Papers, Inc. (In re First Alliance Mortgage Co.), 471 F.3d 977, 1006 (9th Cir. 2006).

hh. John Kirkland is an insider of the Debtors. "Where the trustee seeks to subordinate "a claim arising from the dealings between a debtor and an insider," the court will give the insider's actions rigorous scrutiny." Stoumbos v. Kilimnik, 988 F.2d 949, 959 (9th Cir. 1993). The BC Trust (and Poshow Kirkland as trustee of the BC Trust) is John Kirkland's assignee and thereby qualifies as an insider based on the assignment given that it was not an assignment for value, but rather a transfer from John Kirkland

[2] Johnson v. City of Fresno and Searles Valley Minerals Operations Inc. v. Ralph M. Parson Service Company were cited by the Court in the tentative ruling on the motion to dismiss second amended complaint (as to Docket No. 57) heard by the Court on July 12, 2016, p. 19 of 59.

to his family Trust. *See* Johnson v. City of Fresno, 111 Cal.App.4th 1087, 1096 (2003) and Searles Valley Minerals Operations Inc. v. Ralph M. Parson Service Company, 191 Cal.App.4th 1394, 1402 (2011).

ii. John Kirkland engaged in inequitable conduct, and his misconduct injured creditors or conferred an unfair advantage on his assignee, the BC Trust. John Kirkland's actions on behalf on the BC Trust since the assignment demonstrate that John Kirkland continued to act on behalf of the BC Trust. John Kirkland has maintained the authority to act on behalf of the BC Trust, and there is no separation or apparent distinction between John Kirkland and the BC Trust.

jj. 11 U.S.C. § 510(c) provides for equitable subordination of claims (in § 510(c)(1)), or that the Court may order that a lien securing a subordinated claim be transferred to the estate (in § 510(c)(2)), after notice and a hearing. The elements of the claim for equitable subordination have been met, as provided in 11 U.S.C. § 510(c) and Henry v. Lehman Comm. Papers, Inc. (In re First Alliance Mortg. Co.), 471 F.3d 977, 1006 (9th Cir. 2006). Equitable subordination of the Claims would not be inconsistent with the Bankruptcy Code.

kk. The Trustee is entitled to summary adjudication determining that the purported secured Claims are disallowed.

ll. The Trustee is entitled to summary adjudication determining that Poshow Kirkland and the BC Trust do not have a secured claim in the Debtors' bankruptcy case, or against the Debtors, the bankruptcy estate or the assets of the Debtors' bankruptcy estate.

mm. The Trustee is entitled to summary adjudication determining that based on the concurrently-filed motion for summary adjudication as to the Trustee's claims to avoid and recover the Claims, and the purported lien referenced in the Claims, as fraudulent transfers, the Claims are disallowed pursuant to 11 U.S.C. § 502(d).

nn. The Trustee is entitled to summary adjudication determining that any allowed portion of the Claims is equitably subordinated to the claims of all other allowed general unsecured creditors

oo. The Trustee is entitled to attorney's fees and costs.

Dated: September 5, 2017

Respectfully submitted,

BRUTZKUS GUBNER

By: /s/ Corey R. Weber
COREY R. WEBER
MICHAEL W. DAVIS
Special Litigation Counsel for Jason M. Rund,
Chapter 7 Trustee

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.**

A true and correct copy of the foregoing documents entitled: **SEPARATE STATEMENT IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY ADJUDICATION REGARDING THE TRUSTEE'S FIRST CLAIM FOR RELIEF FOR DISALLOWANCE OF CLAIMS, OR, IN THE ALTERNATIVE, FOR EQUITABLE SUBORDINATION OF CLAIMS AND PROOFS OF CLAIM; CONCLUSIONS OF LAW** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 5, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael W Davis mdavis@brutzkusgubner.com, ecf@brutzkusgubner.com
Larry W Gabriel lgabriel@brutzkusgubner.com, nfields@brutzkusgubner.com
Lewis R Landau Lew@Landaunet.com
Jason M Rund (TR) trustee@srlawyers.com, jrund@ecf.epiqsystems.com
Autumn D Spaeth aspaeth@swelawfirm.com,
gcruz@swelawfirm.com;csheets@swelawfirm.com;hdavis@swelawfirm.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Corey R Weber ecf@brutzkusgubner.com, cweber@brutzkusgubner.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On ___________**,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed:

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 5, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed:

**BY PERSONAL DELIVERY**

Honorable Ernest M. Robles
United States Bankruptcy Court
Los Angeles Division – Roybal Federal Bldg.
255 East Temple Street, Suite 1560
Los Angeles, CA 90012-3332

**COURTEY COPY BY PERSONAL DELIVERY (TO BE DELIVERED ON 9/6/2017)**

Attorney for Defendants
Lewis R. Landau, Esq.
22287 Mulholland Highway, # 318
Calabasas, CA 91302

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| September 5, 2017 | MELA ZEPEDA | /s/ Mela Zepeda |
| *Date* | *Printed Name* | *Signature* |