

**FILED & ENTERED**

**FEB 17 2018**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** gonzalez **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re: EPD Investment Co., LLC, Debtor | Case No.: 2:10-bk-62208-ER<br>Adv. No.: 2:12-ap-02424-ER |
| Jason M. Rund, solely in his capacity as Chapter 7 Trustee,<br><br>Plaintiff<br><br>v.<br><br>John C. Kirkland and Poshow Ann Kirkland, solely in her capacity as Trustee of the Bright Conscience Trust Dated September 9, 2009,<br><br>Defendants | **REPORT AND RECOMMENDATION OF THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, CONTAINING PROPOSED FINDINGS AND PROPOSED FINAL JUDGMENT**<br><br>Date:     January 24, 2018<br>Time:    10:00 a.m.<br>Location: Ctrm. 1568<br>            Roybal Federal Building<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

    This Report and Recommendation is submitted by the undersigned Judge of the United States Bankruptcy Court for the Central District of California (the "Court") to the United States District Court for the Central District of California (the "District Court") pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9033, based upon the Court's determination that the Court lacks constitutional authority to enter a final judgment with respect to the matters addressed herein.[1] This is a fraudulent conveyance action, and Defendants

---

[1] In preparing this Report and Recommendation, the Court considered the following pleadings and papers:

1) Motion to Strike:
   a) Chapter 7 Trustee's Notice of Motion and Motion to Strike and Exclude Declaration and Expert Report of J. Michael Issa Filed in Opposition to Motion for Summary Adjudication Regarding the Second, Third, and Sixth Claims for Relief for Avoidance and Recovery of Fraudulent Transfers Made With Actual Intent [Doc. No. 316]
   b) Opposition to Chapter 7 Trustee's Notice of Motion and Motion to Strike and Exclude Declaration and Expert Report of J. Michael Issa Filed in Opposition to Motions for Summary Adjudication [Doc. No. 324]
      i) Notice of Supplemental Marked Deposition Transcripts in Support of Defendants' Opposition to Motion to Strike and Exclude Declaration and Expert Report of J. Michael Issa [Doc. No. 325]
   c) Chapter 7 Trustee's Reply Brief in Support of Motion to Strike and Exclude Declaration and Expert Report of J. Michael Issa Filed in Opposition to Motion for Summary Adjudication Regarding Second, Third and Sixth Claims for Relief for Avoidance and Recovery of Fraudulent Transfers Made with Actual Intent [Doc. No. 327]
      i) Notice of Supplemental Transcript Markings Re: Reply in Support of Motion to Strike [Doc. No. 328]
2) Motions for Summary Adjudication:
   a) Chapter 7 Trustee's Notice of Motion and Motion for Summary Adjudication Regarding the Trustee's First Claim for Relief for Disallowance of Claims, or in the Alternative, for Equitable Subordination of Claims and Proofs of Claim [Doc. No. 258]
   b) Chapter 7 Trustee's Notice of Motion and Motion for Summary Adjudication Regarding the Second, Third and Sixth Claims for Relief for Avoidance and Recovery of Fraudulent Transfers Made with Actual Intent [Doc. No. 259]
3) Declarations and Evidence Filed in Support of Motions for Summary Adjudication:
   a) Declaration of Jason M. Rund, Chapter 7 Trustee, in Support of Chapter 7 Trustee's [Motions for Summary Adjudications] (the "Rund Decl.") [Doc. No. 260]
   b) Declaration of Thomas P. Jeremiassen, CPA/CFF, CIRA Regarding Expert Report in Support of Chapter 7 Trustee's [Motions for Summary Adjudication] (the "Jeremiassen Decl.") [Doc. No. 261]
   c) Declaration of Corey R. Weber in in Support of [Motions for Summary Adjudication] (the "Weber Decl.") [Doc. No. 262]
      i) Notice of Errata Re Exhibits to Declaration of Corey R. Weber in Support of [Motions for Summary Adjudication] [contains corrections regarding the testimony that is and is not being offered] [Doc. No. 280]
   d) Request for Judicial Notice in Support of Chapter 7 Trustee's [Motions for Summary Adjudication] [Doc. No. 263]
      i) Notice of Errata Re: Request for Judicial Notice [sets forth correct hearing time] [Doc. No. 272]
      ii) Notice of Errata Re: Request for Judicial Notice [contains corrections regarding the captions and filing dates of certain exhibits] [Doc. No. 284]
   e) Trustee's Notice of Filing of Discovery Documents Re [Motions for Summary Adjudication] [Doc. No. 264]
   f) Separate Statement [of Uncontroverted Facts] in Support of Chapter 7 Trustee's Motion for Summary Adjudication Regarding the Trustee's First Claim for Relief for Disallowance of Claims, or, in the Alternative, for Equitable Subordination of Claims and Proofs of Claim [Doc. No. 265]
      i) Notice of Errata Re Separate Statements [Doc. No. 285]
   g) Separate Statement [of Uncontroverted Facts] in Support of Chapter 7 Trustee's Motion for Summary Adjudication Regarding the Second, Third, and Sixth Claims for Relief for Avoidance and Recovery of Fraudulent Transfers Made with Actual Intent [Doc. No. 266]
   h) Chapter 7 Trustee's Designation of Expert Witness Thomas P. Jeremiassen, CPA/CFF, CIRA (the "Jeremiassen Report") [Doc. No. 267]
   i) Notice of Lodging of Transcripts and Designation of Testimony Offered by the Chapter 7 Trustee Pursuant to Local Bankruptcy Rule 7030-1(b) in Support of Chapter 7 Trustee's [Motions for Summary Adjudication] [Doc. No. 276]
4) Defendants' Combined Opposition to Plaintiff's Motions for Summary Adjudication [Doc. No. 300]
   a) Defendants' Combined Statement of Genuine Issues in Opposition to Motions for Summary Adjudication [Doc. No. 301]
   b) Evidentiary Objections to Declarations of Allen Sumian, Corey R. Weber and Thomas P. Jeremiassen [Doc. No. 302]

have not consented to entry of final judgment by the Bankruptcy Court. Consequently, the Bankruptcy Court lacks constitutional authority to enter final judgment. *Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012).

    The Court conducted a hearing on the Motion for Summary Adjudication filed by the Chapter 7 Trustee on January 24, 2018, at 10:00 a.m. At the conclusion of the hearing, the Court took the matter under submission and requested further briefing from the parties with respect to the admissibility of certain e-mails proffered by the Trustee in support of the Motion. The Court's review of the additional briefing does not persuade the Court to depart from its tentative ruling. For the reasons in the Final Ruling set forth below,[2] the Court recommends that the District Court enter final judgment in favor of the Chapter 7 Trustee as to the second, third, and sixth claims for relief for avoidance and recovery of fraudulent transfers made with actual intent.

---

    c) Declaration of J. Michael Issa in Opposition to Plaintiff's Motions for Summary Adjudication [Doc. No. 303]
    d) Declaration of John C. Kirkland in Opposition to Plaintiff's Motions for Summary Adjudication [Doc. No. 304]
    e) Declaration of Poshow Ann Kirkland in Opposition to Plaintiff's Motions for Summary Judgment [Doc. No. 305]
    f) Declaration of Jerrold S. Pressman in Opposition to Plaintiff's Motions for Summary Adjudication [Doc. No. 306]
    g) Declaration of Ruben J. Moreno in Opposition to Motions for Summary Adjudication [Doc. No. 307]
    h) Notice of Intent to Offer Deposition Evidence at Hearing and Declaration of Lewis R. Landau in Opposition to Plaintiff's Motions for Summary Adjudication [Doc. No. 308]
    i) Proof of Service of Doc Nos. 300–308 [Doc. No. 309]
    j) Notice of Lodgment of Deposition Transcript of Thomas P. Jeremiassen [Doc. No. 322]
5) Trustee's Evidentiary Objections to Declarations Submitted in Support of Defendants' Opposition:
    a) Evidentiary Objections to Declaration of Poshow Ann Kirkland in Opposition to Motions for Summary Adjudication [Doc. No. 310]
    b) Evidentiary Objections to Declaration of Ruben J. Moreno in Opposition to Motions for Summary Adjudication [Doc. No. 311]
    c) Evidentiary Objections to Declaration of John C. Kirkland in Opposition to Motions for Summary Adjudication [Doc. No. 312]
    d) Evidentiary Objections to Declaration of Jerrold S. Pressman in Opposition to Motions for Summary Adjudication [Doc. No. 313]
6) Trustee's Responses to Evidentiary Objections to Declarations of Allen Sumian, Corey R. Weber, and Thomas P. Jeremiassen [Doc. No. 314]
7) Post-Hearing Briefing:
    a) Post-Hearing Citations to the Record at Request of Court in Support of Chapter 7 Trustee's [Motions for Summary Adjudication] [Doc. No. 333]
        i) Request for Judicial Notice in Support of Post-Hearing Citations to Record at Request of Court in Support of Chapter 7 Trustee's [Motions for Summary Adjudication] [Doc. No. 336]
    b) Response to Post-Hearing Brief Re Admission of Untimely and Privileged Deposition Transcript Exhibits [Doc. No. 335]
    c) Response to Request for Judicial Notice Re Evidentiary Objections [Doc. No. 337]

[2] The Final Ruling addresses certain evidentiary issues raised in the post-hearing briefing and addresses certain issues raised at oral argument, but otherwise maintains the tentative ruling which the Court made available to the parties prior to the January 24, 2018 hearing.

# Final Ruling

## I. Background

On December 7, 2010, creditors commenced an involuntary petition against EPD Investment Co., LLC ("EPD"). The Court entered an Order for Relief on February 9, 2011. On February 1, 2012, Jerrold S. Pressman ("Pressman") filed a voluntary Chapter 7 petition. On June 4, 2012, the bankruptcy cases of EPD and Pressman (collectively, the "Debtors") were substantively consolidated.

Pursuant to the operative Fourth Amended Complaint (the "Complaint") [Doc. No. 234] against John C. Kirkland and Poshow Ann Kirkland as Trustee of the Bright Conscience Trust Dated September 9, 2009 (the "BC Trust"), the Chapter 7 Trustee (the "Trustee") seeks to (1) disallow or equitably subordinate proofs of claim filed by the BC Trust and (2) avoid allegedly fraudulent transfers from the Debtors to Mr. Kirkland and the BC Trust.

### Summary of the Complaint's Allegations

The allegations of the Complaint are as follows: Between the 1970s and June 27, 2003, EPD Investment Co. was an unincorporated sole proprietorship run by Pressman. Complaint at ¶12. On June 27, 2003, EPD was formed as a California limited liability company to provide corporate protection and to satisfy Mr. Pressman's goal of retirement. *Id.* Upon EPD's formation in 2003, the EPD sole proprietorship's assets and liabilities were transferred from Mr. Pressman to EPD. *Id.* At all times, the members and managers of EPD were Mr. Pressman and his son, Keith Pressman ("Keith"). *Id.*

EPD operated as a Ponzi scheme since its formation in 2003. *Id.* at ¶24. Between 2003 and mid-2009, EPD repaid existing creditors by using funds from new creditors. *Id.* EPD was balance sheet insolvent from at least December 2003, according to its tax returns, and has never been profitable. *Id.* at ¶¶20–21. Many of EPD's creditors mistakenly believed that EPD owned substantial real property assets in Tennessee, Mississippi, and elsewhere, when in fact EPD owned no real property. *Id.* at ¶16. Instead, EPD owned promissory notes secured by Mr. Pressman's assets, and it was Mr. Pressman who held an ownership interest in entities owning property in Tennessee, Mississippi, and elsewhere. *Id.*

In mid-2009, EPD could not pay creditors because the companies Mr. Pressman partially owned lacked sufficient operating cash flow, and because EPD was no longer receiving cash infusions from new investors. *Id.* at ¶25.

Mr. Kirkland was outside counsel for the Mr. Pressman, EPD, and other business entities owned by the Mr. Pressman. *Id.* at ¶28. Mr. Kirkland invested and/or loaned in excess of $150,000 of his personal funds to EPD (Mr. Kirkland's "EPD Interests"). *Id.* at ¶29. In September 2009, after EPD had ceased making payments to most creditors, Mr. Kirkland assigned his EPD Interests to the BC Trust (his family trust), and/or to his wife Poshow Ann Kirkland as Trustee of the BC Trust, through a Notice of Assignment. The Notice of Assignment provides: "Notice is hereby given that all rights of John C. Kirkland under all such Loan Documents have been sold, transferred, and assigned to the Bright Conscience Trust Dated September 9, 2009." *Id.*

The BC Trust took the assignment subject to all claims and defenses of Mr. Kirkland, and did not take the assignment in good faith or for adequate consideration. *Id.* On September 11, 2009, the BC Trust filed and/or recorded a UCC-1 financing statement as to all assets of the Debtors. *Id.* On May 5, 2010, the BC Trust filed and/or recorded an amendment to the UCC-1 financing

statement, which provided that "[t]his amendment is to clarify and confirm that the prior grant of security did not include the stock of North Hills Industrial Park, Inc., a California S-Corporation." *Id.*

Mr. Kirkland was aware that EPD operated as a Ponzi scheme. In 2005, Mr. Kirkland drafted letters to the California Franchise Tax Board which stated, among other things, that EPD's liabilities exceeded its assets, that EPD had negative cash flow, and that EPD required additional investment just to break even. *Id.* at ¶30(b)(i). Despite knowing that EPD operated as a Ponzi scheme, Mr. Kirkland took actions for the benefit of the BC Trust and to the detriment of EPD's other creditors, including:

1) Arranging for Mr. Pressman, through EPD, to make monthly mortgage payments on the house in which Mr. Kirkland and his spouse resided, even though Mr. Kirkland knew that EPD was insolvent and operated as a Ponzi scheme. *Id.* at ¶30d.
2) Defending suits brought against EPD by its creditors absent a good-faith basis, while at the same time benefitting from payments made by EPD to his mortgage lender. *Id.* at ¶30e.
3) Orchestrating transfers which he knew were fraudulent under the Bankruptcy Code, for the purpose of staving off litigation by EPD's unpaid creditors. *Id.* at ¶30f.
4) Representing Plush Lounge, an entity that received significant transfers from EPD, and owed those sums to EPD, in litigation that severely depleted the assets of Plush Lounge, while simultaneously representing adverse party EPD. *Id.* at ¶30m.
5) Filing false and misleading pleadings in EPD's involuntary bankruptcy proceeding, contesting that EPD owed funds to creditors.
6) Contesting the EPD involuntary bankruptcy proceeding without a good-faith basis to do so, seeking to convert the proceeding to Chapter 11 without a good-faith basis to do so, and advising EPD and Mr. Pressman not to cooperate with the Trustee.

*First Claim for Relief: Disallowance of Proofs of Claim, or, in the Alternative, Equitable Subordination of Proofs of Claim Against the BC Trust and Mr. Kirkland*

On December 12, 2011, the BC Trust filed three proofs of claim in the bankruptcy case, all in the amount of $2.672 million. *Id.* at ¶39. On February 15, 2013, the BC Trust filed a proof of claim in Mr. Pressman's bankruptcy case—which has now been substantively consolidated with the EPD case—in the amount of $3.529 million. *Id.* All Proofs of Claim are secured claims, and were executed by Poshow Ann Kirkland as Trustee of the BC Trust. *Id.*

The BC Trust is the assignee of Mr. Kirkland's EPD Interests and the BC Trust's Proofs of Claim are based on the assignment of Mr. Kirkland's EPD Interests. *Id.* at ¶40. The BC Trust did not separately invest or loan funds to the Debtors; its rights are based solely on the assignment of Mr. Kirkland's EPD Interests, which assignment was orchestrated by Mr. Kirkland while he was counsel for Mr. Pressman and EPD. *Id.*

Mr. Kirkland engaged in inequitable conduct in his representation of EPD, as set forth above. The BC Trust, as Mr. Kirkland's assignee, stands in his shoes and took the assignment of the EPD Interests subject to Mr. Kirkland's actions. Accordingly, the BC Trust's claims should be disallowed or equitably subordinated. *Id.* at ¶42–47.

*Second through Sixth Claims for Relief: Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers*

Prior to the filing of the petition, the Debtors made transfers to the BC Trust evidenced by the liens in favor of the BC Trust. The transfer to the BC Trust is avoidable as actually fraudulent pursuant to §544 (applying California Civil Code §§3439.04(a) and 3439.07) and §548(a)(1)(A). The transfer is avoidable as constructively fraudulent pursuant to §544 (applying California Civil Code §§3439.04(b), 3439.05, and 3439.07) because it was made without the Debtors receiving reasonably equivalent value at a time when the Debtors were (1) insolvent or (2) were engaged in a business or transaction for which any property remaining was an unreasonably small capital or (3) intended to incur debts beyond their ability to pay. For the same reasons, the transfer is avoidable as constructively fraudulent pursuant to §548(a)(1)(B).

Prior to the filing of the petition, the Debtors made transfers for the benefit of Mr. Kirkland and the BC Trust by issuing checks to a Union Bank account. Those transfers are avoidable as intentionally fraudulent pursuant to §544 (applying California Civil Code §§3439.04(a) and 3439.07) and §548(a)(1)(A). Those transfers are avoidable as constructively fraudulent pursuant to §544 (applying California Civil Code §§3439.04(b), 3439.05, and 3439.07) and §548(a)(1)(B).

All the avoidable transfers are recoverable pursuant to §550(a)(1).

**Summary of the Trustee's Motion for Summary Adjudication and Motion to Strike, the Defendants' Oppositions Thereto, and the Trustee's Supporting Reply**

The Trustee moves for summary adjudication on his claims to avoid the transfers as actually fraudulent pursuant to §§544 and 548(a)(1)(A), and to recover the value of the avoided transfers pursuant to §550(a)(1).[3] The Trustee does not seek summary adjudication with respect to his claims to avoid the transfers as constructively fraudulent.

The Trustee asserts that the testimony of his expert witness, Thomas Jeremiassen, establishes that EPD operated as a Ponzi scheme between 2003 and 2010, and that the Debtors' actual fraudulent intent is established as a matter of law under the Ninth Circuit's Ponzi scheme presumption, which holds that transfers made by entities operating as Ponzi schemes are deemed to be actually fraudulent. In the alternative, the Trustee argues that the Debtors' actual fraudulent intent is shown by the presence of multiple badges of fraud, including that (1) Mr. Kirkland was on inquiry notice as to the Debtors' insolvency and Ponzi operations; and that (2) Mr. Kirkland facilitated the Debtors' fraudulent and improper conduct.

The Trustee moves to exclude the report of Defendants' expert, J. Michael Issa, on the grounds that Mr. Issa's report is not based upon sufficient facts and data, and does not correctly apply the Ninth Circuit's standard for determining whether an enterprise qualifies as a Ponzi scheme. Defendants maintain that Mr. Issa's report does not contain material errors of the type necessary to justify the harsh remedy of exclusion. Defendants further assert that the Trustee's attacks upon Mr. Issa's report go to the weight of the evidence, not its admissibility.

In Opposition to the Trustee's Motion for Summary Adjudication, Defendants assert that Mr. Issa's report—which concludes that EPD did not operate as a Ponzi scheme—creates a genuine issue of material fact for trial. In addition, Defendants assert that (1) the Trustee's claims under §544 are barred by the statute of limitations; (2) that the BC Trust acquired Mr. Kirkland's EPD Interests for value since the BC Trust provides for Mr. and Mrs. Kirkland's children, thereby

---

[3] The Trustee has filed a separate motion seeking summary adjudication with respect to the Complaint's claims under §502. Transmission of a Report and Recommendation with respect to the §502 motion is not necessary. The BC Trust has filed a proof of claim, so the Court has constitutional authority to enter final judgment with respect to the §502 claims.

satisfying the Kirklands' statutory obligation to care for their children; and (3) that judgment cannot be entered against Mr. Kirkland because he has not filed a proof of claim and does not consent to the Bankruptcy Court's jurisdiction.

In Reply to the Defendants' Opposition, the Trustee argues that (1) the §544 claims are not barred by the statute of limitations per the holding of *Bank of Am. et al. v. Rund (In re EPD Inv. Co.), LLC*, 523 B.R. 680, 692 (B.A.P. 9th Cir. 2015); (2) that there is no statutory authority for Defendants' theory that the BC Trust provided value sufficient to constitute a defense to an avoidance action by facilitating the Kirkland's obligation to care for their children; and (3) that the District Court has already ruled that Mr. Kirkland is subject to the Bankruptcy Court's jurisdiction.

## II. Findings and Conclusions

Summary adjudication is appropriate "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Civil Rule 56 (made applicable to these proceedings by Bankruptcy Rule 7056). The moving party has the burden of establishing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' only if it might affect the outcome of the case[.]" *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party" when reviewing the Motion. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

### The Court Excludes Mr. Issa's Expert Report
Federal Rule of Evidence ("FRE") 702 provides:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) the testimony is based on sufficient facts or data;
> c) the testimony is the product of reliable principles and methods; and
> d) the expert has reliably applied the principles and methods to the facts of the case.

The Trustee does not dispute that Mr. Issa is qualified to offer expert testimony as to whether EPD was a Ponzi scheme, and the Court, having reviewed Mr. Issa's qualifications, is satisfied that he possesses the requisite knowledge and skill to offer such testimony. Mr. Issa is a CPA with over 30 years' experience in turnarounds, workouts, bankruptcy, and litigation support who has testified dozens of times in bankruptcy and civil litigation. He has served in various fiduciary capacities in restructuring proceedings, including as a Chapter 11 Trustee, a Liquidating Trustee, a Chief Restructuring Officer, and a Receiver.

At issue is (1) whether Mr. Issa's testimony is based on sufficient facts or data, (2) whether Mr. Issa's testimony is the product of reliable principles and methods, and (3) whether Mr. Issa has reliably applied those principles and methods to the facts of the case. The Court finds that none of these requirements have been satisfied.

*Mr. Issa's Testimony is Not Based on Sufficient Facts or Data*

Where an expert arbitrarily declines to review probative materials, exclusion of that expert's testimony is appropriate. *See In re LLS America, LLC*, No. 09-06194-PCW11, 2013 WL 2896887, at *4 (Bankr. E.D. Wash. June 12, 2013) (excluding the testimony of an expert who failed to review the financial information that other experts in the same case relied upon). An expert's testimony may not be based solely upon studies that the expert "cherry-picked" in order to support her conclusion, *Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F.Supp.2d 1166, 1176 (N.D.Cal.2007), or be based upon a statistical "convenience sample" that is "easy to take but may suffer from serious bias," *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1040 (C.D. Cal. 2013). The underlying principle of these cases is that a witness is qualified to opine as an expert only after having thoroughly reviewed all relevant information.

Mr. Issa's testimony is not based on sufficient facts or data. First, in assessing EPD's financial position, Mr. Issa relied only upon EPD's unaudited financial statements and chose to disregard EPD's tax returns, which differed materially from the unaudited financial statements. Mr. Issa had no plausible explanation for the decision to base his analysis exclusively upon the unaudited financial statements. To the contrary, Mr. Issa testified that he did not rely upon EPD's tax returns because he did not have the ability to obtain answers to his questions about the tax returns:

> **Question (by the Trustee's counsel):** So why would you assume that unaudited financial statements were true and correct but documents submitted to the IRS not make any type of assumption as to?
> **Answer:** The answer is, in part, we had the ability to get questions answered about EPD's financial statements and not about the tax returns.
> **Question:** Why weren't you able to get questions answered about the tax returns?
> **Answer:** Mr. Jonavic didn't seem interested in talking about the tax returns.
> **Question:** And did you ask Mr. Pressman about the tax returns?
> **Answer:** We talked briefly about the tax returns.
> **Question:** What did you ask?
> **Answer:** It was a subset of a more generic conversation about the numbers. And Mr. Pressman is not a CPA, so...
> **Question:** What did he tell you in regard to the tax returns?
> **Answer:** He said that Ted Jonavic had done them.
> **Question:** Anything else?
> **Answer:** I don't recall him having a lot more to say about the tax returns

Issa Deposition Transcript [Doc. No. 328] at 32:18–33:16.

Second, Mr. Issa opined that EPD entered into legitimate equipment leases subsequent to 2003, even though Mr. Pressman was not able to provide Mr. Issa copies of those leases.[4] Mr. Issa's deposition testimony on this issue was as follows:

---

[4] Mr. Issa did review leases entered into by EPD Investment Co., the unincorporated sole proprietorship operated by Pressman from the 1970s to June 2003 that was the predecessor to EPD. The leases that Mr. Issa reviewed were

 **Question (by Trustee's counsel):** Have you ever seen a lease that EPD was involved in at any point from 2003 or after?
 **Answer:** No, I haven't.
 **Question:** Did you request that?
 **Answer:** I have.
 **Question:** And was it provided?
 **Answer:** It hasn't been provided yet.
 **Question:** And was there an explanation as to why it wasn't provided?
 **Answer:** The gist of it was, "We have to go find the stuff. It's been years. It's in storage somewhere; I can't put my hands on, but I'll get around to it," something like that.
 **Question:** How long ago was that explanation given?
 **Answer:** A month.
 **Question:** And nothing has been forthcoming since that point?
 **Answer:** I haven't seen anything since then.
 **Question:** Who told you that?
 **Answer:** I recall Mr. Pressman saying that.
 **Question:** Do you know why he would be able to provide information as of 1999 but not for after 1999?
 **Answer:** I don't know one way or the other.
Issa Deposition Transcript [Doc. No. 328] at 44:1–45:1.

 Defendants assert that Mr. Issa's failure to review the post-2003 leases is immaterial because Mr. Issa relied upon deposition testimony regarding the leases offered by Theodore P. Jonavic, Mr. Pressman's CPA. This contention is unavailing, because Mr. Issa's deposition testimony establishes that he conducted only a cursory review of Mr. Jonavic's deposition testimony prior to preparing his expert report:

 **Question (by Trustee's counsel):** Had you read the Jonavic deposition prior to signing your expert report?
 **Answer:** I had seen it, yes.
 **Question:** You had reviewed it?
 **Answer:** Yes, I haven't scoured it, but I looked at it.
 **Question:** And did you assume that the Jonavic deposition was true and correct in preparing your expert report and signing it?
 **Answer:** I didn't think about it one way or the other until I saw the deposition transcript on Mr. Jeremiassen.
 **Question:** So does the Jonavic deposition transcript change any of your assumptions or conclusions or analyses in your expert report?
 **Answer:** It does not.
Issa Deposition Transcript [Doc. No. 328] at 38:13–39:18.

 In a declaration submitted in opposition to the Trustee's Motion for Summary Adjudication, Mr. Issa states that, in his opinion, Mr. Jonavic's deposition testimony with respect to the leases "has considerable weight, particularly given that he had no discernable reason to give false testimony." Doc. No. 303 at ¶18. This later testimony contradicts Mr. Issa's statement during his deposition that he did not consider whether Mr. Jonavic's deposition was accurate until he saw Mr. Jeremiassen's deposition transcript ("I didn't think about it one way or the other until I saw

---

entered into by EPD Investment Co. in 1995 and had all terminated by 2002 or earlier. Because this litigation pertains to EPD's activities from 2003 and onward, the pre-2003 leases that Mr. Issa reviewed are not relevant.

the deposition transcript of Mr. Jeremiassen"). (Mr. Jeremiassen's deposition was not taken until December 15, 2017, well after Mr. Issa submitted his expert report on October 5, 2017.)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. This sham affidavit rule prevents 'a party who has been examined at length on deposition from rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations and quotations omitted). Because Mr. Issa's declaration testimony in opposition to the Motion for Summary Adjudication contradicts his prior deposition testimony, the later declaration testimony falls within the sham affidavit rule and therefore cannot retroactively validate the conclusions in Mr. Issa's expert report with respect to the validity of EPD's post-2003 leases. Defendants argue that the inconsistency between Mr. Issa's deposition and declaration testimony is not sufficiently "clear and unambiguous" to trigger the sham affidavit rule. *See Yeager*, 693 F.3d at 1080. There is no merit to this argument. Mr. Issa testified at his deposition that he did not think about whether Mr. Jonavic's testimony was true and correct; he later stated that Mr. Jonavic's testimony "has considerably weight, particularly given that he had no discernable reason to give false testimony." Doc. No. 303 at ¶18. The inconsistency between these statements is clear and unambiguous. The Trustee's evidentiary objection to this declaration testimony is sustained.

Third, Mr. Issa opines that Mr. Pressman's equity in various real estate projects would have been sufficient to make EPD's investors whole, if sufficient funds to complete those real estate projects had been available. However, in reaching this conclusion, Mr. Issa did not review the balance sheets or operating agreements for the companies engaged in those real estate projects. According to Mr. Issa's deposition testimony:

> **Question (by Trustee's counsel):** Well, you haven't seen the balance sheets for any of those companies, have you?
> **Answer:** We haven't seen the balance sheets….
> **Question:** You haven't seen the operating agreements for those companies, have you?
> **Answer**: No.

Issa Deposition Transcript [Doc. No. 316] at 149:13–150:16.

Fourth, Mr. Issa conducted only a partial forensic examination of EPD's books and records. As Mr. Issa stated at his deposition:

> **Question (by Trustee's counsel):** So if some financial information was listed, did you actually check that financial information against the EPD bank statements, checks, wire transfers, anything else?
> **Answer:** Yes.
> **Question:** And you confirmed they were accurate?
> **Answer:** We checked some items back to the books. We checked some items back to the bank statement. We didn't do a 100 percent forensic examination of every item between 2003 and 2010.
> **Question:** Why not?
> **Answer:** There is only so many hours in the day and only so much money in a case to work on something like that.

Issa Deposition Transcript [Doc. No. 316] at 25:2–15.

While checking only a sampling of transactions might be sufficient under certain circumstances, the Court finds that the partial forensic accounting was not adequate here, given

that Mr. Issa chose to disregard EPD's tax returns (which contained information materially different from EPD's financial statements), and did not review other critical information, such as EPD's post-2003 leases. The decision to conduct only a partial forensic accounting is particularly troubling given Mr. Issa's acknowledgment that in certain cases it was not possible to reconcile the financial statements:

> **Question (by Trustee's counsel):** Did you test any of the information in the financial statement?
> **Answer:** Sure.
> **Question:** And what was the result of the testing?
> **Answer:** The testing in some cases tied out approximately, and in some cases it was hard to get it to reconcile.

Issa Deposition Transcript [Doc. No. 316] at 160:11–17.

Where an expert arbitrarily declines to review probative materials, exclusion of the expert testimony is appropriate. In *In re LLS America, LLC*, , the court excluded the report of an expert who did not review relevant materials. The court reasoned:

> Defendants were provided between January 4, 2013 and March 5, 2013, 19 compact discs and DVDs, and the hard drive of debtor, all of which contained the information relied upon by plaintiff's experts and the Examiner. Ms. Rice did not review any of that information. She reviewed none of the evidence relied upon by the plaintiff's experts, but only their declarations and the summaries attached. She only read the final report of the Examiner. Despite the fact she did not conduct any investigation of the financial records or any other evidence, Ms. Rice submits an opinion that there is insufficient evidence to support the opinions of the plaintiff's expert witnesses.

*LLS America*, 2013 WL 2896887, at *4.

Like the expert in *LLS America*, Mr. Issa chose not to review probative information that could have meaningfully informed his conclusions. This warrants exclusion of his testimony.

*Mr. Issa's Testimony is Not the Product of Reliable Principles and Methods, and Mr. Issa Has Not Reliably Applied the Principles and Methods to the Facts of the Case*

Mr. Issa opines that EPD was not a Ponzi scheme because it loaned substantial funds to legitimate third-party real estate businesses and was repaid a portion of those funds. Mr. Issa relies upon a definition of a Ponzi scheme that is not consistent with controlling Ninth Circuit authority. Consequently, Mr. Issa's testimony must be excluded for failing to apply reliable principles and methods to the facts of the case.

"A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists." *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 531 (9th Cir. 1990).

There is no support within *Agricultural Research* for Mr. Issa's contention that an enterprise cannot qualify as a Ponzi scheme if it engages in some legitimate business operations. In *In re Bonham*, 251 B.R. 113 (Bankr. D. Ala. 2000), the court faced precisely this issue. The *Bonham* debtors operated an airline travel business whose unprofitable operations were sustained only by continuous infusions of investor cash. *Bonham*, 251 B.R. at 116–17. The debtor's expert asserted that the business was not a Ponzi scheme based on the existence of the underlying income-

producing airline ticket business. *Id.* at 130. The court rejected this assertion and excluded the testimony of the debtor's expert. The court stated that "most Ponzi schemes have at least a semblance, if not a somewhat substantial, operating 'front.'" *Id.* at 136.

Further, Mr. Issa acknowledged that EPD paid prior investors using funds raised from new investors:

> **Question (by Trustee's counsel):** In your opinion, did EPD use money coming in from investors to pay other investors?
> **Answer:** It appears that some of that went on.
> **Question:** During what period of time?
> **Answer:** Well, the time of Mr. Jeremiassen's report is 2003 to 2010. So he speaks to that in his report and in some of his exhibits, particularly Exhibit 4.
> **Question:** So it's your understanding that EPD did use money from investors to pay other investors, is that right?
> **Answer:** It appears that may be so.

Issa Deposition Transcript [Doc. No. 316] at 58:1–59:3.

The Supreme Court has held that a court may exclude an expert report where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Such an analytical gap is present here. Mr. Issa has acknowledged that EPD paid prior investors using funds from new investors. Such behavior is the hallmark of a Ponzi scheme, particularly where, as here, the business operations that did exist were not consistently profitable.

Defendants argue that EPD was not a Ponzi scheme because an *opportunity* for investors to profit existed. The premise of Defendants' argument—that a business is not a Ponzi scheme if there is some chance that its operations could generate a profit—is not correct. Many Ponzi schemes, such as the scheme at issue in *Bonham*, contain an unprofitable operating front. The remote possibility that a miracle turnaround could suddenly make the operations profitable does not defeat the Ponzi presumption. If that were the case, Ponzi scheme operators could always make the argument that the underlying unprofitable business was on the verge of a turnaround that would have occurred but for the latest recession, supply disruption, industry downturn, etc., and the Ponzi presumption could never apply.

Here, upon review of the record, the Court finds that there can be no genuine dispute that the investors in EPD never had a realistic opportunity to obtain profits from EPD's business operations. Contrary to Defendants' characterization, EPD was not a viable business that fell upon hard times as a result of the 2008 financial crisis. EPD's business consisted of investing in real estate projects undertaken by related entities. Between December 8, 2003, and December 7, 2010, EPD disbursed $32,250,000 from the related entities but received only $30,698,000 in receipts from the related entities—for a net loss of $1,552,000.[5] The chances of investors receiving a profit on account of related entity operations were more remote than even this figure suggests, because EPD made net disbursements of $4,679,000 to Jerrold Pressman and $2,227,000 to Keith Pressman.[6] Thus, during the relevant time period, EPD experienced approximately $10.85 million of negative net cash flows from activities other than investor receipts and disbursements.[7] To put the negative net cash flows in perspective, during that same

---

[5] Jeremiassen Report [Doc. No. 267] at 9.
[6] *Id.*
[7] *Id.* at 8.

period EPD raised $64,524,000 from investors.[8] That is, negative net cash flows amounted to approximately 16.8% of the amount raised from investors. Under these circumstances it cannot be said that investors had any realistic opportunity to profit.

**The Motion for Summary Adjudication is Granted**

*There is No Genuine Dispute that EPD Operated as a Ponzi Scheme*
    As noted above, a "Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected." *Agricultural Research*, 916 F.2d 531. The report of the Trustee's expert, Thomas P. Jeremiassen (the "Jeremiassen Report") establishes that EPD operated as a Ponzi scheme. First, the Jeremiassen Report demonstrates that EPD did not have sufficient funds to pay investors absent fresh deposits from new investors:
> [A] majority of the sources of EPD cash was from new loans from Investors. Similarly, a majority of the uses of EPD cash was payments to Investors or to third parties for the benefit of Investors relating to those new loans as well as loans that were outstanding ….
> [T]he only way for EPD to meet its interest obligations on the notes [owed to Investors], as well as its obligations to repay principal, was to obtain additional loans from Investors.

Jeremiassen Report [Doc. No. 267] at 4 and 11.
    Second, the Jeremiassen Report establishes that EPD's business of loaning funds to entities engaging in real estate projects (the "Related Entities") was never profitable:
> [M]ore cash was disbursed to the Related Entities, or to other entities for the benefit of the Related Entities, than was received. During the Seven Year Period [between 2003 and 2010], a total of approximately 2,700 cash transactions took place with the Related Entities. This equates to an average of more than one transaction per day during that period. It appears that EPD was used as a sort of "cash flow" tool for these entities. At all times during the Seven Year Period, the cumulative amounts disbursed to the entities was greater than the cumulative amounts received from the entities. According to EPD's QuickBooks, the collective amounts owed to EPD from these entities at the end of each year from 2003 to 2010 ranged from approximately $19.8 million to approximately $28.7 million.

*Id.* at 8.
    The declarations submitted by Mr. Kirkland and Mr. Pressman do not create a genuine dispute as to the issue of whether EPD operated as a Ponzi scheme. Mr. Kirkland's declaration contains conclusory assertions that EPD was never a Ponzi scheme. "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997). Mr. Kirkland's declaration contains no specific facts showing that EPD did not operate as a Ponzi scheme. Further, Mr. Kirkland is not an accountant and thus is not qualified to opine as to whether EPD operated as Ponzi scheme.
    Mr. Pressman's declaration similarly contains conclusory assertions that EPD was not a Ponzi scheme. Mr. Pressman is not an accountant and is not qualified to opine was to whether EPD operated as a Ponzi scheme. His statements are so vague and lacking in specificity that they have no probative value. In addition, his testimony that EPD generated over $50 million in cash from operations between 2004 and 2009 contradicts EPD's tax returns, which show that EPD

---
[8] *Id.* at 9.

had net losses. Because Mr. Pressman verified the tax returns, he cannot create a genuine dispute by submitting declaration testimony that contradicts the information contained in the tax returns.

Mr. Pressman's declaration contains a chart which states that EPD generated substantial cash from operations between 2004 and 2009. Mr. Pressman does not identify how or when the chart was generated. Consequently, the chart lacks proper foundation and is inadmissible. The Court finds that the chart was created to support Mr. Pressman's conclusory assertion that EPD generated substantial cash flows. The chart is supported only by Mr. Pressman's statements, which in turn are supported only by the chart. Such circular assertions do not create a genuine dispute as to an issue of material fact.

The chart is further undercut by Mr. Pressman's deposition testimony that he could not be certain that EPD's records were accurate:

> **Question (by Trustee's counsel):** Any reason to think that the QuickBooks records for EPD are not accurate?
>
> **Answer:** They could be not accurate, but they should be accurate.

Pressman Deposition Transcript at 228–29 and 319–34.

Mr. Pressman testifies that "EPD was a legitimate, ongoing, sustainable, revenue-producing, business operation." That testimony is inadmissible under *Yeager v. Bowlin*, which holds that "a party cannot create an issue of fact by an affidavit contradicting … prior … testimony." 693 F.3d 1076, 1080 (9th Cir. 2012). Mr. Pressman signed EPD's bankruptcy schedules under penalty of perjury. Those schedules stated that EPD had $70 million in liabilities and almost no realizable assets in 2010. The $32 million in purported assets that EPD did schedule consisted of promissory notes from Mr. Pressman and related entities that he owned and controlled. Mr. Pressman's personal bankruptcy, in which Mr. Pressman scheduled $27,000 in assets and over $144 million in liabilities, demonstrates that the purported $32 million in assets scheduled in EPD's bankruptcy had no realizable value.

Mr. Pressman testifies that EPD was not a Ponzi scheme based on the fact that EPD's predecessor entity, EPD Investment Co., engaged in profitable operations prior to 2003. That testimony is not relevant. This action is directed at EPD, not its predecessor entity, and pertains only to EPD's activities subsequent to 2003. The fact that Mr. Pressman engaged in successful business enterprises prior to 2003 is not relevant to whether EPD operated as a Ponzi scheme from 2003 onward.

As additional evidence that EPD operated as a Ponzi scheme, the Trustee asserts that the leases EPD entered into subsequent to 2003 were fraudulent. Defendants dispute this contention and maintain that the post-2003 leases were legitimate. The Court finds that, regardless of whether the post-2003 leases were legitimate, there is ample evidence that EPD was a Ponzi scheme. Therefore, the Court makes no findings with respect to whether EPD conducted a legitimate leasing business.

*The Transfers Were Actually Fraudulent Pursuant to the Ponzi Presumption*

Section 548(a)(1)(A) provides: "The trustee may avoid any transfer … of an interest of the debtor in property … that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer … with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made … indebted."

Section 544 permits the Trustee to avoid transfers that are voidable under applicable state law. The applicable state law, Cal. Civ. Code §3439.04(a), is substantially identical to §548(a)(1)(A).

In the Ninth Circuit, a debtor's actual intent to engage in a fraudulent transfer is established where the Trustee demonstrates that the debtor operated as a Ponzi scheme:

> We allow 'a finding of fraudulent intent under section 548(a)(1) … on the basis of circumstantial evidence.' Furthermore, 'the mere existence of a Ponzi scheme' is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to that section.

*Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 704 (9th Cir. 2008) (internal citations omitted).

Having established that the Debtors operated as a Ponzi scheme, the Trustee is entitled to judgment that the transfers at issue were actually fraudulent pursuant to §548(a)(1) and §544, applying Cal. Civ. Code §3439.04(a).

*The Transfers Were Actually Fraudulent Because Badges of Fraud are Present*

Because "it is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors," courts "frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805 (9th Cir. 1994). Those badges of fraud include "(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer." *Id.*

Here, there is no genuine dispute as to facts establishing the presence of multiple badges of fraud. First, Mr. Kirkland qualifies as an insider of EPD. Mr. Kirkland was EPD's agent for service of process and served as outside counsel for companies partially owned or controlled by Mr. Pressman, including Plus Lounge Las Vegas LLC, SC Club LP, and Broadway Entertainment Marketing Inc. Even in situations where Mr. Kirkland did not formally represent EPD, he controlled EPD's legal strategy. For example, on March 21, 2006, Christopher Austin, an associate at Greenberg Traurig, the law firm at which Mr. Kirkland was then a partner, sent an e-mail to Mr. Kirkland stating:

> I note that EPD Investment Company, LLC is the secured party on the UCC-1 filing for the inventory at Plush Lounge. I assume EPD is another company owned/controlled by Jerry and that we are counsel for EPD. Can you confirm the relationship? I'm in the process of preparing the letter demanding the delivery/return of the remaining items identified on the UCC-1 that we were unable to recover because Marriott kicked us out, and it seems to me that the demand should come from the secured party EPD as well as (or perhaps exclusive of) Plush Lounge Las Vegas, LLC (the identified Debtor). Your thoughts?

Doc. No. 262 at Ex. 16 (records produced by Greenberg Traurig LLP).

Mr. Kirkland responded: "Please make the demand on behalf of Plush. I'll have a different lawyer make the demand on behalf of EPD." *Id.*

Defendants object to the introduction of these e-mails on the grounds that they were not timely submitted and that they are protected by the attorney-client and work-product privileges. Defendants' objections are overruled.

With respect to timely submission, it is true that the e-mails were inadvertently omitted from the exhibits attached to the Trustee's declaration in support of the Motion for Summary Adjudication [Doc. No. 262]. However, that declaration is 2,377 pages long. In addition, the e-mails were included as exhibits to deposition transcripts that were lodged in connection with the Motion. Defendants have had an opportunity to submit additional briefing setting forth their evidentiary objections to the e-mails. Under these circumstances, it would place form over substance to strike the e-mails on timeliness grounds.

The Court rejects Defendants' argument that the e-mails are protected by the attorney-client privilege. The attorney-client privilege "normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto," and also extends "to those papers prepared by an attorney or at an attorney's request for the purpose of advising a client, provided the papers are based on and would tend to reveal the client's confidential communications." *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977). However, the privilege does not extend "beyond the substance of the client's confidential communications to the attorney" and "will not conceal everything said and done in connection with an attorney's legal representation of a client in a matter." *Id.*

The e-mails merely establish that Mr. Kirkland controlled EPD's legal strategy even in situations where he did not formally represent EPD. They do not reveal the substance of confidential communications by either Plush or EPD to Mr. Kirkland. They do not reveal any substantive legal advice given by Mr. Kirkland to either Plush or EPD. Mr. Kirkland's directive to have one attorney send a demand letter on behalf of EPD and have a different attorney send a demand letter on behalf of Plush does not constitute the type of substantive legal advice protected by the privilege. Accordingly, the attorney-client privilege does not apply.

With respect to Defendants' work-product privilege objection, the Court finds that the work-product privilege does not prevent admission of the e-mails solely for the purpose of establishing that Mr. Kirkland controlled EPD's legal strategy even when he did not formally represent EPD. The work-product privilege protects from disclosure "the mental impressions, conclusions, opinions, or legal theories ... of an attorney or other representative of a party." *Upjohn Co. v. United States*, 449 U.S. 383, 400. Here, the e-mails are relevant only insofar as they demonstrate that Mr. Kirkland controlled EPD's legal strategy; the specific legal advice Mr. Kirkland rendered is not relevant to this litigation. Therefore, admission of the e-mails for the sole purpose of establishing Mr. Kirkland's control of EPD's legal strategy does not violate the work-product privilege.

Further, as set forth below, the Court finds that multiple other badges of fraud are present. These multiple badges of fraud are sufficient to establish that the transactions at issue were fraudulent even if the Court did not consider the e-mails.

The other badges of fraud include the fact that litigation against the Debtors had been threatened at the time of the recordation of the UCC-1 financing statement in favor of the BC Trust. In addition, the financing statement was recorded during a time when EPD was experiencing serious cash flow issues. Finally, the transfers consisted of substantially all of EPD's remaining assets.

*The Trustee is Entitled to Recover the Avoided Fraudulent Transfers Pursuant to §550(a) and Cal. Civ. Code §3439.08(b)*

Section 550(a) provides that that the Trustee is entitled to recover an avoided transfer, or the value thereof, from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or from "any immediate or mediate transferee of such initial transferee." With respect to the Trustee's avoidance action under §544, Cal. Civ. Code §3439.08(b) contains a comparable provision.

The BC Trust qualifies as the initial transferee of the UCC-1 financing statement that created the security interest in favor of the BC Trust. Mr. Kirkland qualifies as the initial transferee of the mortgage payments made by EPD for his benefit. Accordingly, the Trustee is entitled to recover the transfers from the BC Trust and from Mr. Kirkland.

*Defendants' Arguments in Opposition to the Motion for Summary Adjudication Lack Merit*

None of the arguments presented by Defendants in opposition to the Trustee's Motion for Summary Adjudication have merit. First, Defendants contend that the Trustee's §544 claim is time-barred. The Order for Relief in the Debtors' bankruptcy case was entered on February 9, 2011 *nunc pro tunc* to December 7, 2010. Bankr. Doc. No. 29. The Trustee filed the Complaint on October 31, 2012. The Trustee's Complaint was filed timely pursuant to §546(a). *See Bank of Am. et al. v. Rund (In re EPD Inv. Co.), LLC*, 523 B.R. 680, 692 (B.A.P. 9th Cir. 2015) ("Accordingly, we hold that so long as a state-law fraudulent transfer claim exists on the petition date (or the date the order for relief is entered), *i.e.,* the state's applicable repose period governing the action has not yet expired on the petition date (or the order for relief date), the trustee may bring the avoidance action under § 544(b), provided it is filed within the limitations period in § 546(a). The 'reach back' period is established on the petition date (or the order for relief date) and encompasses all transfers within the relevant period provided by state law.").

Second, Mr. Kirkland argues that the Court lacks subject matter jurisdiction over him, because he has not filed a proof of claim, can no longer file a proof of claim as the claims bar date has passed, and does not consent to the Court's jurisdiction. Mr. Kirkland has already presented these arguments to the District Court, which has rejected them:

> According to Defendant [Mr. Kirkland], the Court should immediately withdraw the reference because the bankruptcy court lacks jurisdiction to enter a final judgment in fraudulent conveyance claims against non-creditor defendants. (MTW 11.) The Ninth Circuit has held that "bankruptcy courts have statutory authority to hear and enter proposed findings of fact and conclusions of law in a fraudulent conveyance proceeding asserted by a bankruptcy trustee against a noncreditor, subject to de novo review by a federal district court." *In re Bellingham,* 702 F.3d at 566. "Such cases remain in the core, and the [28 U.S.C .] § 157(b)(1) power to 'hear and determine' them authorizes the bankruptcy courts to issue proposed findings of fact and conclusions of law." *Id.* at 565–66; *see also Field v. Wells Fargo Bank,* No. 12–510 SOM/BMK, 2012 WL 6651886 (D.Haw. Dec.20, 2012) (finding no reason to withdraw the reference because the bankruptcy court retained power to hear the case).
>
> Here, the Trustee seeks to avoid fraudulent conveyances between Debtors and Defendant. Even if Defendant has not filed a claim and has transferred all of his interests to BC Trust, he is considered a noncreditor under *Bellingham.* Thus, the case is properly before the bankruptcy court which can hear the case and enter proposed findings of fact and conclusions of law.

*In re EPD Inv. Co. LLC*, No. ADV 2:12-AP-02424-ER, 2013 WL 5352953, at *4–5 (C.D. Cal. Sept. 24, 2013).

Third, Defendants assert that the BC Trust has a defense to the Trustee's avoidance claims because the BC Trust qualifies as a holder in due course that took for value and in good faith under Cal. Comm. Code §3302(a). According to Defendants, the BC Trust took for value because the beneficiaries of the BC Trust are Mr. and Mrs. Kirkland's children, and Mr. and Mrs. Kirkland are required to support their children pursuant to Cal. Fam. Code §4053(b) and (d).

Defendants do not contest that no money or property of any kind was provided by the BC Trust to Mr. Kirkland in exchange for Mr. Kirkland's assignment of his EPD Interests to the BC Trust. Defendants instead rely upon the novel proposition that the Kirkland's obligation to support their children constitutes "value" within the meaning of Cal. Comm. Code §3302(a). Defendants do not cite any authority for this proposition, and the Court finds that it lacks merit. The Kirkland's independent statutory obligation to provide for their children cannot serve as a mechanism to enable Defendants to circumvent the Bankruptcy Code's fraudulent transfer provisions. Such a result would make it far too easy for debtors to avoid obligations to their creditors.

### III. Conclusion

Based upon the foregoing, the Bankruptcy Court recommends that the District Court enter final judgment in favor of the Trustee as to the second, third, and sixth claims for relief for avoidance and recovery of fraudulent transfers made with actual intent.

###

Date: February 17, 2018

Ernest M. Robles
United States Bankruptcy Judge