

FILED & ENTERED

OCT 29 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    EPD Investment Co., LLC, and<br>Jerrold S. Pressman,<br>Consolidated Debtors. | Case No.:    2:10-bk-62208-ER<br>Adv. No.:    2:12-ap-02424-ER |
| Jason M. Rund, solely in his capacity as<br>Chapter 7 Trustee,<br><br>                                    Plaintiff,<br><br>          v.<br><br>John C. Kirkland and Poshow Ann<br>Kirkland, solely in her capacity as Trustee<br>of the Bright Conscience Trust Dated<br>September 9, 2009,<br><br>                                    Defendants. | **MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT FILED BY THE CHAPTER 7 TRUSTEE AND THE BC TRUST**<br><br>Date:         October 28, 2020<br>Time:        10:00 a.m.<br>Location:  Ctrm. 1568<br>               Roybal Federal Building<br>               255 East Temple Street<br>               Los Angeles, CA 90012 |

At the above-captioned date and time, the Court conducted a hearing on cross-motions for summary judgment (the "MSJs") filed by the Chapter 7 Trustee (the "Trustee") and the Bright Conscience Trust Dated September 9, 2009 (the "BC Trust").[1] For the reasons set forth below,

---

[1] The Court reviewed the following papers in adjudicating the MSJs:

  1)  Chapter 7 Trustee's Motion for Summary Judgment:

    a)  Chapter 7 Trustee's Notice of Motion and Motion for: (A) Summary Judgment Regarding the Trustee's: (1) First Claim for Relief for Disallowance of Claims and Proofs of Claims; (2) Alternate First Claim for Relief for Equitable Subordination of Claims and Proofs of Claims; and (3) Second, Third, Fourth, Fifth and Sixth Claims for Avoidance and Recovery of Fraudulent Transfers; or (B) In the Alternative, an

Order Adjudicating that Certain Facts Exist Without Substantial Controversy [Adv. Doc. No. 417] (the "Trustee's MSJ")

i)   Declaration of Jason M. Rund in Support of [Trustee's MSJ] [Adv. Doc. No. 418]

ii)  Declaration of Corey R. Weber in Support of [Trustee's MSJ] [Adv. Doc. No. 419]

iii) Request for Judicial Notice in Support of [Trustee's MSJ] [Adv. Doc. No. 420]

iv)  Trustee's Notice of Filing of Discovery Documents Re [Trustee's MSJ] [Adv. Doc. No. 421]

v)   Separate Statement [of Undisputed Material Facts] in Support of [Trustee's MSJ] [Adv. Doc. No. 422]

vi)  Notice of Lodgment of Proposed Order Granting [Trustee's MSJ] [Adv. Doc. No. 423]

b) Defendant Bright Conscience Trust's Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 432]

i)   Bright Conscience Trust's Statement of Genuine Disputes of Materials Facts and Statement of Additional Undisputed Facts in Opposition to Jason M. Rund's Motion for Summary Judgment [Adv. Doc. No. 432-1]

ii)  Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Appendix of Evidence in Support of Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 432-2]

iii) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Request for Judicial Notice in Support of Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 433]

iv)  Declaration of Poshow Ann Kirkland in Support of Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 434]

v)   Declaration of John C. Kirkland in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 435]

vi)  Declaration of Stephen E. Hyam in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 436]

vii) Declaration of Lisa Underkoffler in Support of Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 437]

viii)      Proof of Service Re Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Opposition to Plaintiff's Motion for Summary Judgment and Supporting Documents [Adv. Doc. No. 438]

c) Reply Brief in Support of [Trustee's MSJ] [Adv. Doc. No. 448]

2) Bright Conscience Trust's Motion for Summary Judgment:

a) Defendant Poshow Ann Kirkland, Trustee of the Bright Conscience Trust Dated September 9, 2009's Notice of Motion and Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment [Adv. Doc. No. 424] (the "BC Trust MSJ")

i)   Declaration of Poshow Ann Kirkland in Support of Motion for Summary Judgment [Adv. Doc. No. 424-2]

ii)  Declaration of John C. Kirkland in Support of [BC Trust MSJ] [Adv. Doc. No. 424-3]

iii) Declaration of Stephen E. Hyam in Support of [BC Trust MSJ] [Adv. Doc. No. 424-4]

iv) Defendant Poshow Ann Kirkland, Trustee of the Bright Conscience Trust Dated September 9, 2009's Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment [Adv. Doc. No. 424-5]

v) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Request for Judicial Notice in Support of Motion for Summary Judgment [Adv. Doc. No. 424-6]

vi) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Appendix of Evidence in Support of Motion for Summary Judgment [Adv. Doc. No. 424-7]

vii) Proof of Service Re [BC Trust MSJ] [Adv. Doc. No. 424-8]

viii)    Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Request for Judicial Notice in Support of Motion for Summary Judgment—Supplemental/Amended [Adv. Doc. No. 429]

ix) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Amended Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment [Adv. Doc. No. 430]

x) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Supplemental Appendix of Evidence in Support of Motion for Summary Judgment [Adv. Doc. No. 431]

b) Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Adv. Doc. No. 439]

i) Declaration of Jason M. Rund in Support of Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Adv. Doc. No. 440]

ii) Declaration of Corey R. Weber in Support of Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Doc. No. 441]

iii) Request for Judicial Notice in Support of Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Adv. Doc. No. 442]

iv) Evidentiary Objections in Support of Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Adv. Doc. No. 443]

v) Trustee's Notice of Filing of Discovery Documents in Support of Chapter 7 Trustee's Opposition to [BC Trust MSJ] [Adv. Doc. No. 444]

vi) Chapter 7 Trustee's Separate Statement of Disputed Material Facts in Opposition to [BC Trust MSJ] [Adv. Doc. No. 445]

c) Defendant Bright Conscience Trust's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [Adv. Doc. No. 447]

i) Poshow Ann Kirkland's, as Trustee of the Bright Conscience Trust Dated September 9, 2009, Reply Request for Judicial Notice in Support of Motion for Summary Judgment [Adv. Doc. No. 447-1]

ii) Defendant Bright Conscience Trust's Response to Objection to Evidence in Support of Reply to Plaintiff's Opposition to the Motion for Summary Judgment [Adv. Doc. No. 447-2]

iii) Defendant Poshow Ann Kirkland, Trustee of the Bright Conscience Trust Dated September 9, 2009's Objection to Plaintiff's Evidence—Deposition Testimony of Lisa Underkoffler [Adv. Doc. No. 447-3]

the MSJs are **GRANTED IN PART** and **DENIED IN PART**. The Court finds that the facts established by the jury trial, and/or the facts as to which there is no genuine dispute, support entry of the following findings:

1) The BC Trust holds an allowed secured claim in the amount of $1,950,613.41. This finding is without prejudice to the ability of the Trustee and the BC Trust to assert that the claim is subject to the following adjustments:
   a) The BC Trust may assert that the claim should be increased by approximately $75,000, based on the fact that the estate has received approximately $75,000 in proceeds from a Court-approved settlement with Union Bank, and the estate is entitled to only a single satisfaction of avoided transfers under § 550(d).
   b) The Trustee may assert that the claim is subject to being surcharged in the amount of $309,166.70 under § 506(c), based on the fact that the Trustee was required to pay this amount to facilitate a settlement with Robert Geringer.[2]

2) The BC Trust is not entitled to any interest on its claim because the Trustee is entitled to avoid the claim as an actually fraudulent transfer pursuant to § 548(a)(1)(A). Notwithstanding such avoidance, the BC Trust is entitled to a claim of $1,950,613.41 because it has established that it acquired the claim in good faith and for value pursuant to § 548(c).

3) The BC Trust's claim **does not** attach to (a) $3,886,650.83 in proceeds from the Trustee's settlement of avoidance actions or (b) $1,250,000.00 in proceeds from the Trustee's settlements with Luce Forward and Greenberg Traurig. The BC Trust's claim **does** attach to (a) $3,615,817.85 in proceeds from a settlement with Robert Geringer[3] and (b) $104,588.83 in proceeds from the sale of stock in Ice Skating Enterprises and Sidecreek Development.

4) The BC Trust is entitled to summary adjudication in its favor on the Trustee's constructively fraudulent transfer claims.

5) Neither party is entitled to summary adjudication with respect to the Trustee's equitable subordination claim.

//
//
//
//
//

---

iv) Proof of Service Re Defendant Bright Conscience Trust's Reply to Plaintiff's Opposition to Motion for Summary Judgment and Supporting Documents [Adv. Doc. No. 447-4].

[2] The issues regarding these potential adjustments to the BC Trust's claim were raised at the hearing and were not sufficiently briefed in the MSJs. The Court declines to rule upon these issues at the present time. These issues will be considered at the trial on the Trustee's equitable subordination claim.

[3] This finding is without prejudice to the Trustee's ability to assert that the BC Trust's claim can attach only to the net proceeds of the Geringer settlement ($3,615,817.85 less $309,166.70 in payments made by the estate to facilitate the settlement). This issue was not sufficiently briefed in the MSJs and will be considered at the trial on the Trustee's equitable subordination claim.

## I. Procedural Background

On December 7, 2010, creditors filed an involuntary petition against EPD Investment Co., LLC ("EPD"). Bankr. Doc. No. 1.[4] The Court entered an Order for Relief on February 9, 2011. Bankr. Doc. No. 29. On February 1, 2012, Jerrold S. Pressman ("Pressman") filed a voluntary Chapter 7 petition. On June 4, 2012, the bankruptcy cases of EPD and Pressman (collectively, the "Debtors") were substantively consolidated. Bankr. Doc. No. 227.

On October 31, 2012, the Trustee filed the complaint commencing this adversary proceeding. Adv. Doc. No. 1. The Trustee filed the operative Fourth Amended Complaint [Adv. Doc. No. 234] (the "Complaint") on October 14, 2016.[5] The Complaint seeks to (1) disallow and/or equitably subordinate proofs of claim filed by the Bright Conscience Trust Dated September 9, 2009 (the "BC Trust") and (2) avoid allegedly fraudulent transfers from the Debtors to John Kirkland ("Kirkland") and the BC Trust.

On December 17, 2018, the District Court withdrew the reference of this adversary proceeding from the Bankruptcy Court. *Rund v. Kirkland (In re EPD Investment Co., LLC)*, 594 B.R. 423 (C.D. Cal. 2018). Withdrawal of the reference was based on Kirkland's right to a jury trial conducted by the District Court. *Id.* at 426. Observing the "common issues of fact and the overlapping nature of the claims against the BC Trust and John Kirkland," the District Court found that "judicial economy and the uniformity of bankruptcy administration … would be best served by withdrawing the entire action." *Id.*

On June 4, 2019, the District Court granted the Trustee's motion to bifurcate the trial of the (1) disallowance, equitable subordination, and fraudulent transfer claims against the BC Trust and (2) the fraudulent transfer claims against Kirkland. District Court Doc. No. 117. A six-day jury trial of the Trustee's claims against Kirkland was conducted between June 25, 2019 and July 3, 2019. District Court Doc. Nos. 180–86. Specifically, the Trustee sought to avoid, as actually and constructively fraudulent, $104,852.82 in payments made by the Debtors towards the mortgage on Kirkland's home (the "Mortgage Transfers").

The jury returned a verdict in favor of Kirkland. In reaching its verdict, the jury found that EPD was a Ponzi scheme, *see* Verdict Form re Ponzi Scheme [District Court Doc. No. 174]; that Kirkland was not an insider of EPD and/or Pressman, *see* Verdict Form re Insider [District Court Doc. No. 174]; that EPD and/or Pressman transferred property to Kirkland to hinder, delay, and defraud one or more of their creditors, *see* Verdict Form No. 1 (Actual Fraud—California Law) at Question 3 and Verdict Form No. 2 (Actual Fraud—Bankruptcy Code) at Question 3 [District Court Doc. No. 174]; and that Kirkland received the Mortgage Transfers in good faith and for reasonably equivalent value, *see* Verdict Form No. 1 (Actual Fraud—California Law) at Questions 4–5; Verdict Form No. 2 (Actual Fraud—Bankruptcy Code) at Questions 4–5; Verdict

---

[4] Unless otherwise indicated, all "Adv. Doc." citations are to Adv. No. 2:12-ap-02424-ER; all "Bankr. Doc." citations are to Bankr. Case No. 2:10-bk-62208-ER; all "District Court Doc." citations are to Case No. 2:18-cv-08317-DSF; and all "Tr." citations are to the transcript of the jury trial conducted by the District Court in Case No. 2:18-cv-08317-DSF that commenced on June 25, 2019. Page citations are to the docket pagination which appears at the top of each page, not to the document's internal pagination.

[5] Adjudication on the merits was delayed as a result of a motion to compel arbitration brought by John Kirkland (the "Arbitration Motion"). A more detailed procedural history of the Arbitration Motion is set forth in Adv. Doc. No. 409.

Form No. 3 (Constructive Fraud—California Law) at Question 3; and Verdict Form No. 5
(Constructive Fraud—Bankruptcy Code) at Question 3 [District Court Doc. No. 174].

On October 3, 2019, the District Court remanded the Trustee's claims against the BC Trust to
the Bankruptcy Court, and dismissed Count 1 of the Complaint (for disallowance and/or
equitable subordination of the BC Trust's proofs of claim) as to Kirkland. District Court Doc.
No. 189 (the "Remand Order"). The District Court stated that it saw no reason why the
Bankruptcy Court could not rely upon the testimony provided during the jury trial in adjudicating
the claims against the BC Trust. *Id.* The District Court has not yet entered judgment in
connection with the jury's verdict in favor of Kirkland.

On July 22, 2020, the Court ordered the Trustee and the BC Trust to file cross-motions for
summary judgment (the "MSJ's"). Adv. Doc. No. 409. The Court set a Pretrial Conference for
December 15, 2020 at 11:00 a.m. in the event the MSJ's do not dispose of the action. *Id.*

At the time it ordered the parties to file the MSJ's, the Court noted that the Trustee and the
BC Trust had submitted briefing to the Court and to the District Court regarding the extent to
which the jury's findings as to Kirkland remain binding with respect to the Trustee's claims
against the BC Trust. The Court ruled that the following legal framework would apply to the
determination of which jury findings remained binding:

> The Court finds that all explicit and implicit findings made by the jury remain binding
> with respect to the Trustee's claims against the BC Trust. The Seventh Amendment
> provides that "no fact tried by a jury, shall be otherwise re-examined in any Court of the
> United States." The Ninth Circuit has held:
>
>> The Supreme Court has explained how to comport with the Seventh
>> Amendment when trying legal and equitable claims in the same action. In *Dairy
>> Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the Court
>> held that in cases in which legal and equitable claims turn on common issues of
>> fact, "any legal issues for which a trial by jury is timely and properly demanded
>> [must] be submitted to a jury," *id.* at 473, 82 S.Ct. 894 (citing *Beacon Theatres,
>> Inc. v. Westover*, 359 U.S. 500, 510–11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)), and
>> the jury's determination of the legal claims must occur "prior to any final court
>> determination of [the] equitable claims," *id.* at 479, 82 S.Ct. 894. Because the
>> Seventh Amendment's second clause "prohibit[s] ... the courts of the United
>> States to re-examine any facts tried by a jury" except as permitted under the
>> narrow "modes known to the common law," *Parsons*, 28 U.S. at 447–48, the
>> court then must abide by the jury's findings of fact in making any subsequent
>> rulings. *See Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991) (holding that "it
>> would be a violation of the seventh amendment right to jury trial for the court to
>> disregard a jury's finding of fact").
>>
>> It follows that "in a case where legal claims are tried by a jury and equitable
>> claims are tried by a judge, and [those] claims are 'based on the same facts,'" the
>> trial judge must "follow the jury's implicit or explicit factual determinations" "in
>> deciding the equitable claims." *L.A. Police Protective League v. Gates*, 995 F.2d
>> 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507
>> (9th Cir. 1989)). The trial court must do so in determining both liability and relief
>> on the equitable claims…. These constraints are "consistent with ... the respect

that properly is accorded to a jury verdict in our system of jurisprudence." *Miller*, 885 F.2d at 507.

*Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016).

Rather than being limited to the face of the verdict, the jury's findings include "any factual findings that the [v]erdict's contents necessarily imply." *United States v. J-M Mfg. Co., Inc.*, No. EDCV 06-55-GW(PJWX), 2018 WL 705532, at *5 (C.D. Cal. Jan. 31, 2018). To determine whether a finding is implicit in a verdict, courts review "the verdict, the instructions, and the trial record to interpret the scope of the jury's factual findings." *Id.* For example, in *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473–74 (9th Cir. 1993), a jury found that a police officer had been wrongfully terminated for refusing to consent to an unlawful search and awarded damages. The trial court denied the officer's request for reinstatement, finding that the officer would have been terminated for other misconduct even if he had consented to the search. The Ninth Circuit acknowledged that "the jury made no express finding on whether [the officer] would have been fired in any event," but found it appropriate to "determine whether it can be inferred from the jury's verdict that it found that the improper insubordination charge was the cause of [the officer's] dismissal." *Id.* at 1473. After examining the relevant jury instructions, the *Gates* court found that in "light of the causation instruction and the manner in which the case was presented to the jury, it could *not* have awarded the level of damages it awarded without finding that Gibson would not have been discharged except for his refusal to be illegally searched." *Id.* at 1474.

The Court does not agree with the Trustee's contention that only jury findings that were "critical and necessary" to the verdict remain binding with respect to the claims against the BC Trust. The Trustee's framework does not sufficiently account for the intertwined nature of the Trustee's claims against Kirkland and the BC Trust. Among other things, the Trustee alleges that the BC Trust's claims should be equitably subordinated because the BC Trust stands in the shoes of Kirkland as his assignee, and therefore Kirkland's alleged inequitable conduct should be imputed to the BC Trust. Because the Trustee's claims against the BC Trust expressly depend upon his allegations against Kirkland, the Trustee cannot pick and choose which findings made by the jury as to Kirkland remain binding with respect to his claims against the BC Trust. The Trustee's theory of the case means that the all explicit and implicit findings of the jury as to Kirkland are binding with respect to the Trustee's claims against the BC Trust. To hold otherwise would violate *Teutscher*'s directive that "in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and [those] claims are 'based on the same facts,'" the trial judge must 'follow the jury's implicit or explicit factual determinations' 'in deciding the equitable claims.'" *Teutscher*, 835 F.3d at 944.

Final Ruling Denying BC Trust's Motion to Dismiss for Failure to Prosecute [Adv. Doc. No. 409] at 27–29.

## II. Effect of the Litigation on the Administration of the Estate

An understanding of the effect of this litigation upon the administration of the estate provides necessary context for the arguments raised by the parties. The BC Trust asserts a secured claim in the total amount of $7,009,181.20, consisting of principal in the amount of $2,055,466.23 and

interest in the amount of $4,953,714.97 (with interest calculated at the rate of 10% per annum).[6]
The BC Trust maintains that its claim attaches to all assets of the estate.

The assets of the estate consist of four general categories of proceeds that have been collected by the Trustee:

1) Settlements of the Trustee's avoidance claims, in the amount of $3,886,650.83.
2) Settlements with two of Kirkland's prior law firms, based on claims related to Kirkland's actions, in the amount of $1,250,000.00.
3) A settlement with Robert Geringer, whereby Geringer paid the estate $3,615,817.85, representing the amount that Geringer paid Pressman for stock in North Hills Industrial Park, Inc.
4) Proceeds from the sale of stock in Ice Skating Enterprises, Inc. ("Ice Skating Enterprises"), in the net amount of $54,558.83, and proceeds in the amount of $50,000 in connection with Mr. Pressman's stock ownership in Sidecreek Development, Inc. ("Sidecreek Development").

The Trustee disputes the BC Trust's position that its asserted security interest extends to all assets of the estate. The Trustee's position is that if the Court finds that the BC Trust holds a secured claim, such claim can attach only to the $104,558.83 in proceeds from the Ice Skating Enterprises and Sidecreek Development stock.

As of August 24, 2020, the estate had cash on hand of $2,617,309.46 and total receipts of $8,896,503.98. Rund Decl. at ¶¶ 5–6 [Adv. Doc. No. 440]. The Court has authorized the payment of approximately $6.2 million in fees to professionals employed by the estate, on an interim basis. Aside from an interim payment to the Trustee's general counsel of approximately $100,000 authorized on August 11, 2020, the last payment to the estate's professionals was authorized in November 2017. The November 2017 payment reimbursed professionals for services performed prior to June 30, 2015.

## III. Facts Established By the Jury Trial And Facts As To Which There is No Genuine Dispute

As noted above, upon remand of the claims against the BC Trust to the Bankruptcy Court, the District Court stated that in adjudicating such claims, the Bankruptcy Court could rely upon the testimony provided during the jury trial. District Court Doc. No. 189. The facts set forth below have either been established through the jury trial, or are facts as to which there is no genuine dispute.[7]

---

[6] The BC Trust filed four duplicative proofs of claim. The BC Trust has acknowledged that it is entitled to only a single satisfaction on account of its claims and does not seek a duplicative recovery.

[7]    In accordance with the Local Bankruptcy Rules, both parties have filed statements of facts which that party contends are not subject to genuine dispute (the "Statements of UMF"). In response to each Statement of UMF, each opposing party has filed an objection. In the objections, both parties assert that almost all of the facts set forth in the opposing party's Statement of UMF are disputed.

A "dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

## A. Kirkland's Loan To Or For the Benefit of EPD

In September 2007, Kirkland and Jerrold Pressman[8] reached an agreement under which Kirkland would loan funds to EPD. Tr. 371:10–372:14 (testimony of Kirkland). The agreement was initially memorialized in a letter written by Kirkland with the heading "Re: Loans" dated September 28, 2007 (the "Letter"). Tr. 372:15–24 (testimony of Kirkland). The Letter was signed by Kirkland and Pressman, and provides in relevant part:

> Enclosed please find two checks totaling $600,000.00, reflecting my initial investment in EPD Investment Co., LLC, with an additional $150,000.00 to follow shortly.
>
> As agreed, Keith will prepare standard form, multiple advance, secured loan documents, including without limitation a Secured Promissory Note, Continuing Guaranty, Security Interest Agreement, conflict waivers, etc. in due course.

Adv. Doc. No. 424-7, Ex. 15.

On November 8, 2007, Kirkland and EPD executed the Secured Promissory Note (the "Note"), Continuing Guaranty (the "Guaranty"), and Security Interest Agreement (the "Security Agreement," and together with the Note and Guaranty, the "Loan Documents") contemplated by the Letter. Pursuant to the Loan Documents, Kirkland agreed to loan funds to or for the benefit of EPD. The Guaranty provides that EPD would be liable for all funds loaned by Kirkland, regardless of whether the funds were loaned directly to EPD or to persons or entities affiliated with EPD:

> Each of the Guarantors has advised, represented, warranted and guaranteed to Lender that he will receive a bottom line, cumulative net return on investment of at least 12% per annum (24% on default) from Debtor for any and all payments made by or on behalf of Lender, from time to time prior to, on and after the date of this Continuing Guaranty, whether to Debtor, on Debtor's behalf, for Debtor's benefit, or at either Guarantor's direction or recommendation, including without limitation all loans directly to Debtor pursuant to the Note or Loan Documents, all additional funds loaned to Debtor from time to time, all payments to the Debtor for consulting fees, advisory fees, and professional service fees, all payments to BEM for consulting fees, advisory fees, and professional

---

248 (1986). "A party asserting that a fact is genuinely disputed within the context of a motion for summary judgment must cite 'to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ....'" Civil Rule 56(c)(1)(A). *Yoo v. Zeta Interactive (In re Blue Glob., LLC)*, 591 B.R. 433, 447 (Bankr. C.D. Cal. 2018) (citing Civil Rule 56(c)(1)(A)). The Court has reviewed the relevant portions of the record as to each fact which a party asserts is disputed, and has determined that many of the disputes are not genuine. For each fact set forth in this section, the Court cites to either the jury trial which establishes the fact, or to the portions of the record demonstrating that the fact is not subject to genuine dispute.

[8] Pressman was the manager of EPD from 2003 through the end of 2010. Tr. 485:24–486:4 (testimony of Pressman). Keith Pressman, Pressman's son, held the title of president of EPD, but was not meaningfully involved in the management of the company. Tr. 486:8–13 (testimony of Pressman).

service fees, and all payments to Keith Pressman for consulting fees, advisory fees, professional service fees, and legal fees, and all payments to any other sister company of EPD (any and all such loans and payments, collectively, the "Payments").

All Payments made will be automatically added to the Principal under the Note, and each Guarantor's joint and several obligations to ensure full recovery of an amount equal to the Payments, plus interest thereon pursuant to and in accordance with the Note, will be included within the Obligations. All parties acknowledge and agree that, as of the date hereof, the principal amount of the Payments is $750,000.00.

Guaranty at ¶¶ E–G [Adv. Doc. No. 424-7, Ex. 5].

The Guaranty further provides that EPD will benefit from Payments to EPD-affiliated persons or entities as a result of the relationships among the parties:

Each of the Guarantors [EPD is defined as a "Guarantor"] will derive financial benefit from the Payments and the other Loan Documents. Pressman is Chairman of EPD and holds a membership interest in EPD, as does Pressman's son, attorney Keith Pressman. EPD owes substantial sums to Pressman. In addition, Pressman has an outstanding note to EPD, and has granted a lien to EPD. Broadway Entertainment Marketing ("BEM") owes substantial debts to EPD. BEM and Keith Pressman pay substantial fees to Debtor's sister companies.

Guaranty at ¶ D.

The Guaranty's provision that EPD is liable for Payments made directly to EPD or to an affiliate for EPD's benefit is also set forth in the Note:

EPD Investment Co., LLC (the "Company"), hereby promises to pay to the order of John C. Kirkland or his designees or assigns … the amount set out above as the Original Principal Amount (as increased by the amount of any and all future loans or payments to Company or any of its affiliates …).

Note [Adv. Doc. No. 474-7, Ex. 4].

The Security Agreement provides that Payments made pursuant to the Note are secured by "a continuing security interest in the Collateral," and defines "Collateral" as:

all right, title and interest of Debtor [EPD] in and to all of the following, whether now owned or hereafter arising or acquired and wherever located: All assets of the Debtor, including, but not limited to: all personal and fixture property of every kind and nature, including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including accounts receivable), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, Securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles); all Equipment, all Intellectual Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and

> replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Debtor's books relating to any and all of the above.

Security Agreement at ¶ 1(b) [Adv. Doc. No. 424-7, Ex. 3].

The Security Agreement states that its provisions may be modified only by a writing signed by the party against whom the modification is sought:

> Neither this Security Agreement nor any provision hereof may be changed, waived, discharged or terminated orally but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

*Id.* at ¶ 14(a).

On November 7, 2007, Kirkland, on the one hand, and EPD and Pressman, on the other hand, executed a *Conflict Waiver and Consent* [Adv. Doc. No. 419, Ex. 5] (the "Conflict Waiver"). The Conflict Waiver states that EPD and Pressman are not clients of Kirkland, but that Kirkland "has represented various persons and entities affiliated or associated with EPD and Pressman." It further provides that EPD waives any actual or potential conflicts arising in connection with the Loan Documents:

> EPD and Pressman understand that, if Kirkland invests or loans money to EPD or Pressman, or obtains a security interest in the property or assets of EPD or Pressman, Kirkland's interests as an investor or lender may be adverse to the interests of EPD and Pressman, and their property, in that Kirkland's interest will be to ensure repayment of his debt, and preservation of the assets for his benefit, not to protect the interests of EPD or Pressman.
>
> EPD and Pressman understand that, if the loans are not repaid when required, Kirkland's interests will become directly adverse to the interests of EPD and Pressman, and their property....
>
> EPD and Pressman each waive all actual and potential conflicts of interest arising out of or relating to the proposed transaction.

Conflict Waiver at ¶¶ 5–6 and 9.

## B. Payments Made by Kirkland Pursuant to the Loan Documents

Kirkland first made Payments to or for the benefit of EPD on September 27, 2007,[9] prior to the execution of the Loan Documents, because he trusted Pressman. *See* Tr. 375:9–14 (testimony of Kirkland) ("I learned a long time ago that the legal documents can never protect you if the guy wants to—well, stiff you. And if the guy is honest, it doesn't make any difference if you have a piece of paper or not. So I wasn't overly concerned about it."). The initial Payments consisted of

---

[9] For Payments made by check, the dates given are the date upon which the check was negotiated, not the date upon which Kirkland presented the check. *See Barnhill v. Johnson*, 503 U.S. 393, 399, 112 S. Ct. 1386, 1390, 118 L. Ed. 2d 39 (1992) (holding that a "transfer" under the Bankruptcy Code occurs upon the date a check is honored by the bank).

a check for $200,000 payable to Keith Pressman and a check for $400,000 payable to BEM. Adv. Doc. No. 424-7, Ex. 17 (check negotiated on September 27, 2007 payable to BEM); Tr. 474:4–22 (Kirkland's testimony that the $400,000 check was payable to BEM); Kirkland Decl. [Adv. Doc. No. 435] at ¶ 3 (Kirkland's testimony that the $200,000 check was payable to Keith Pressman). On November 8, 2007, contemporaneously with the execution of the Loan Documents, Kirkland made a further Payment of $150,000 by wire transfer (the record shows that the $150,000 Payment was made to or for the benefit of EPD pursuant to the Loan Documents, but does not reflect whether the $150,000 Payment was made directly to EPD or to an EPD-affiliated entity for EPD's benefit).[10]

On March 26, 2008, Kirkland made a Payment of $150,000 by way of a check payable to BEM. Tr. 472:16–20, 474:4–5 (testimony of Kirkland); Adv. Doc. No. 424-7, Ex. 16 (check negotiated on March 26, 2008 payable to BEM); Doc. No. 424-7, Ex. 22 (Kirkland's March 2008 bank statement, reflecting payment of the $150,000 check).

On June 20, 2008, Kirkland made a Payment of $100,000. Doc. No. 424-7, Ex. 27 (Kirkland's bank statement showing $100,000 check to an unspecified party); Doc. No. 424-3 at ¶ 11 (Kirkland's declaration testimony authenticating bank statement). The Payment was made to or for the benefit of EPD pursuant to the Loan Documents, but the record does not reflect whether the Payment was made directly to EPD or to an EPD-affiliated entity for EPD's benefit. Doc. No. 424-3 at ¶ 3 (Kirkland's testimony that the Payment was made to or for the benefit of EPD).

In August 2008, EPD arranged for the refinancing of Kirkland's home. On August 18, 2008, Kirkland caused the net proceeds of the refinancing—$855,466.23—to be wired directly to EPD as an additional Payment pursuant to the Loan Documents. Tr. 376:7–16 (testimony of Kirkland). EPD then began making the monthly mortgage payments on the refinanced loan. Tr. 377:16–18 (testimony of Kirkland). Each mortgage payment was approximately $7,400. Mortgage payments commenced on October 5, 2008 and continued through December 14, 2009. The total amount of mortgage payments made by EPD was $104,852.82 (the "Mortgage Transfers").

On April 14, 2009, Kirkland made a Payment of $100,000 by way of a check payable to Keith Pressman. Adv. Doc. No. 424-7, Ex. 23 (Kirkland's bank statement showing payment of $100,000 check); *id.*, Ex. 39 at 60:1–22 (deposition testimony of Ruben Moreno that Kirkland issued a check payable to Keith Pressman).

On July 24, 2009, Pressman told Kirkland that EPD was experiencing temporary cash flow issues. As of that date, EPD had made approximately $75,000 in Mortgage Transfers. Kirkland agreed to lend EPD an additional $100,000 pursuant to the Loan Documents. The agreement was memorialized in a *Funding Agreement*, dated July 24, 2009 [Adv. Doc. No. 424-7, Ex. 13] (the

---

[10] At trial, Kirkland testified that the $150,000 Payment was made pursuant to the Loan Documents but did not elaborate upon whether the Payment was made to EPD or to an EPD affiliate. Tr. 375:17–20. The bank statement offered by Kirkland and the BC Trust to corroborate the payment shows a wire transfer in the amount of $150,000 from Kirkland's account, but does not specify the identity of the entity or person to whom the transfer was made. Adv. Doc. No. 424-7, Ex. 21. The declaration testimony submitted by Kirkland on August 26, 2020 likewise does not specify the entity or person to whom the transfer was made. Adv. Doc. No. 424-3 at ¶ 3 (Kirkland's testimony that on November 8, 2007, he made a Payment of $150,000 "directly to EPD, or at its direction and for its benefit").

"Funding Agreement") entered into by EPD and Pressman, on the one hand, and Kirkland, on the other hand. The Funding Agreement contains a provision stating that EPD releases Kirkland from any and all claims held by EPD against Kirkland. Funding Agreement at ¶ 4. It also states that any claims against Kirkland arising under the Loan Documents must be commenced within one year of the date of execution of the Funding Agreement. *Id.* at ¶ 6. On July 24, 2009, pursuant to the Loan Documents and Funding Agreement, Kirkland made a Payment of $100,000 by way of a check payable to EPD. Tr. 378:17–380:8 (testimony of Kirkland); Adv. Doc. No. 424-7, Ex. 25 (check payable to EPD).

The following chart summarizes the Payments described above made by Kirkland pursuant to the Loan Documents:

| Date | Payment | Payment Recipient |
|------|---------|-------------------|
| 9/27/2007 | $200,000.00 | Keith Pressman |
| 9/27/2007 | $400,000.00 | BEM |
| 11/08/2007 | $150,000.00 | Record does not reflect identity of payment recipient |
| 3/26/2008 | $150,000.00 | BEM |
| 6/20/2008 | $100,000.00 | Record does not reflect identity of payment recipient |
| 8/18/2008 | $855,466.23 | EPD |
| 4/14/2009 | $100,000.00 | Keith Pressman |
| 7/24/2009 | $100,000.00 | EPD |
| **TOTAL** | **$2,055,466.23** | |

## C. Formation of the BC Trust and Kirkland's Transfer of His Interest in the Loan Documents to the BC Trust

On September 9, 2009, Kirkland and Poshow Ann Kirkland ("Poshow"),[11] Kirkland's spouse, created the Bright Conscience Trust Dated September 9, 2009 (the "BC Trust"). Tr. 396:20–398:24 (testimony of Kirkland). The BC Trust is an irrevocable trust, and its beneficiaries are Kirkland and Poshow's minor children. *Id.* Poshow is the sole Trustee of the BC Trust. Tr. 399:18–400:10 and 401:21–402:21 (testimony of Kirkland); *id.* at 666:3–14 (testimony of Pressman). On September 9, 2009, Kirkland executed a *Notice of Assignment* providing that all Kirkland's rights under the "Loan Documents have been sold transferred and assigned to the [BC Trust]." Adv. Doc. No. 424-7, Ex. 3 (Notice of Assignment); Tr. 361:20–368:5 and 398:25–400:3 (Kirkland's testimony regarding execution of the Notice of Assignment). Notwithstanding the language in the Notice of Assignment that the Loan Documents had been "sold" to the BC Trust, the BC Trust did not provide any consideration for the assignment of the Loan Documents. Poshow Depo. at 33:20–22 [Adv. Doc. No. 419, Ex. 7] ("Bright Conscience Trust didn't pay John Kirkland to put his loan into the Bright Conscience Trust.").[12]

---

[11] A given name is used to distinguish Poshow Ann Kirkland from John Kirkland. No disrespect is intended.

[12] The BC Trust asserts that it did provide consideration for assignment of the Loan Documents, because such assignment furthered the Kirklands' obligation to provide support for their children. There is no merit to the contention that a transfer in furtherance of the Kirklands' pre-existing legal obligation to support their children qualifies as consideration.

## D. Filing of the Financing Statement

The Security Agreement provides that EPD will file and record a financing statement perfecting the Security Agreement (the "Financing Statement"), or will permit Kirkland to file and record the Financing Statement as EPD's attorney in fact. Security Agreement at ¶ 2(a).

At some point in 2007 after execution of the Security Agreement, Pressman told Kirkland that EPD had filed the Financing Statement, when in fact the Financing Statement had not been filed. Tr. 388:13–23 (testimony of Kirkland).[13] On September 11, 2009, Pressman advised Kirkland that the Financing Statement had not been filed. Tr. 401:21–402:8 (testimony of Kirkland). Upon learning this information, Kirkland "went out of his mind." Tr. 667:9–12 (testimony of Pressman); *id.* at 401:21–402:18 (Kirkland's testimony that "he was not pleased," spoke to Pressman "more sternly than I probably should have," and told Pressman "I can't talk to you and I probably shouldn't be talking to you because I'm pretty upset"). Kirkland told Pressman to speak to Poshow Kirkland regarding the non-filing of the Financing Statement since the BC Trust had acquired all Kirkland's rights under the Loan Documents, and Poshow was the Trustee of the BC Trust. Tr. 402:9–21 (testimony of Kirkland).

On September 11, 2009, Pressman and Poshow, acting on behalf of the BC Trust, reached an agreement regarding the non-filing of the Financing Statement. The agreement was memorialized in a letter from Poshow to Pressman which provides in relevant part:

> Of course I accept your apology for not filing the U.C.C. statement that was supposed to be done for the trust. We trust you and know our son's money is in good hands. I understand you can get busy and distracted and things get missed…. As agreed, the U.C.C. will be filed today. In consideration, the trust will release any claims against you and EPD, and also agree to extend the loans for at least another year as you asked.

Adv. Doc. No. 424-7, Ex. 14.

On September 11, 2009, Pressman told Kirkland that he had spoken with Poshow regarding the non-filing of the Financing Statement and that the issue had been resolved. Tr. 403:20–25 (testimony of Kirkland). Pressman instructed Kirkland to file the Financing Statement. Tr. 403:25–404:3 (testimony of Kirkland). On September 11, 2009, Kirkland filed the Financing Statement pursuant to Pressman's instructions. Tr. 404:4–11 (testimony of Kirkland). On September 14, 2009, Alexis Cassidy at National Corporate Research ("NCR") sent Kirkland an e-mail verifying the filing of the Financing Statement. Kirkland Depo., Ex. 51 (e-mail from Cassidy to Kirkland dated September 14, 2009).

## E. Filing of the UCC-3 Amending the Financing Statement

On May 5, 2010, a UCC-3 amendment to the Financing Statement (the "UCC-3") was filed. The UCC-3 states: "This amendment is to clarify that the prior grant of security did not include the stock of North Hills Industrial Park, Inc., a California S-Corporation." The UCC-3 was filed

---

[13] The Trustee's objection to this testimony as hearsay is overruled. First, the Trustee waived any objection by not asserting it at the jury trial. Second, the testimony does not constitute hearsay. A statement is hearsay only if offered to "prove the truth of the matter asserted in the statement." The statement is not offered to prove that EPD filed the Financing Statement in 2007, because there is no dispute that EPD did not file the financing statement in 2007. The statement is offered only to show that Kirkland believed that the Financing Statement had been filed.

by NCR at the request of Lisa Underkoffler. At the time, Underkoffler was Kirkland's legal secretary at Luce Forward, the firm at which Kirkland was a partner. Underkoffler Depo. at 13:15–14:4 [Adv. Doc. No. 419, Ex. 14].

On May 5, 2010, Katy Werner, an employee of EPD and BEM, sent an e-mail with the subject line "Re: FW: Hansel v. EPD" to Underkoffler and Kirkland (the "May 5, 2010 E-mail"). Tr. 114:15–115:15 (Werner's testimony that she was an employee of EPD and BEM); Adv. Doc. No. 432-2, Ex. 38 (May 5, 2010 E-mail). The May 5, 2010 E-mail references, but does not attach, the UCC-3, and provides in its entirety:

> Hey Lisa,
>
> We're forwarding 2 more UCC 3 filings to be done as soon as possible. Jerry will be faxing them directly to you in the next couple of hours. Let me know if this is a problem.
>
> John, when are you back from China?

May 5, 2010 E-mail [Adv. Doc. No. 432-2, Ex. 38].

At a deposition taken on May 25, 2017, Underkoffler testified that she would not have sent the UCC-3 to NCR for filing absent Kirkland's authorization. Underkoffler Depo. at 70:12–51. However, at that same deposition Underkoffler also testified that she did not recall transmitting the UCC-3 to NCR for filing, *id.* at 68:25–69:4; that she did not recall the May 5, 2010 E-mail, *id.* at 68:12–14; that she did not recall any discussion as to why the UCC-3 was being filed, *id.* at 69:5–7; and that she did not remember who had instructed her to file the UCC-3, *id.* at 70:10–11.

In a declaration filed on September 23, 2020, Underkoffler testified that her statement at the May 25, 2017 deposition that she would not have transmitted the UCC-3 for filing absent Kirkland's authorization was "based on my general practice as a legal secretary, that I would not do anything that required an attorney's approval without receiving the attorney's approval."[14] Underkoffler Decl. [Adv. Doc. No. 437] at ¶ 3. She further testified:

> There is an e-mail from Jerrold Pressman's assistant [the May 5, 2010 E-mail], that indicates he was faxing some filings to me, and asked me to email them to an attorney service for him. For a client request like that, it has been my understanding as an experienced legal assistant that attorney approval may not be required especially when it says that Mr. Kirkland was out of the country. Also, Mr. Kirkland is not copied on my e-mail to the attorney service, which indicates that I might not have sent it at his request. Mr. Kirkland may not have authorized anything. I simply do not know. I did not recall at my deposition, and I do not recall now.

Underkoffler Decl. at ¶ 4.[15]

---

[14] The Trustee objects to this testimony, asserting that Underkoffler's deposition testimony was based on her personal knowledge and was not qualified. The Trustee's objection is overruled. Underkoffler is permitted to elaborate upon and clarify statements she made at her deposition.

[15] The Trustee's objection that this testimony is not based upon Underkoffler's personal knowledge is overruled. Underkoffler is testifying as to her understanding of the circumstances

On May 24, 2010, Kirkland sent Underkoffler an e-mail stating "[r]un a lien search on EPD Investment Co." Adv. Doc. No. 441, Ex. 32. NCR conducted the lien search at the direction of Luce Forward, Kirkland's law firm. Adv. Doc. No. 441, Ex. 13, at p. 725 (invoice issued by NCR on May 25, 2010, billing the lien search to Underkoffler at Luce Forward). The lien search shows the UCC-3 filing on May 5, 2010. Adv. Doc. No. 441, Ex. 13, at p. 727. On May 24, 2010, Kirkland sent Pressman an e-mail with the subject "FW: EPD Liens" that stated "2 liens currently in place on EPD. others have all expired." Adv. Doc. No. 441, Ex. 30.

## F. Subsequent Financing Statements Filed by the BC Trust

On March 4, 2010, the BC Trust filed a financing statement against the assets of Keith Pressman (the "March 2010 Financing Statement"). Adv. Doc. No. 420, Ex. OO. At her deposition, Poshow testified that she was the only person authorized to act on behalf of the BC Trust subsequent to its formation. Poshow Depo. at 72:24–73:3 [Adv. Doc. No. 419, Ex. 7]. She further testified that she did not direct the filing of the March 2010 Financing Statement, *id.* at 72:16–23; that she could not explain why the BC Trust would have filed a financing statement against Keith Pressman's assets, *id.* at 73:5–10; that the BC Trust had never done business with Keith Pressman, *id.* at 70:22–71:3; and that she did not recall that the BC Trust had ever loaned money to Keith Pressman, *id.* at 71:16–20.

NCR, the same entity that transmitted the UCC-3 for filing, transmitted the March 2010 Financing Statement for filing. Adv. Doc. No. 420, Ex. OO. There is no documentary evidence in the record showing who directed NCR to transmit the March 2010 Financing Statement for filing.

On May 2, 2011, the BC Trust filed a financing statement against the assets of EPD Investment Leasing Co., LLC, an entity formed in 2010 (the "May 2011 Financing Statement"). Adv. Doc. No. 420, Ex. QQQ. Kirkland caused the May 2011 Financing Statement to be filed by sending an e-mail to Amy Brown of NCR on April 29, 2011. Adv. Doc. No. 419, Ex. 13, at p. 824 (e-mail from Kirkland to Amy Brown stating "[p]lease file the attached UCC-1 with the California Secretary of State"). On May 5, 2011, Amy Brown of NCR sent Kirkland an e-mail confirming that the May 2011 Financing Statement had been filed. Adv. Doc. No. 419, Ex. 13, at p. 826.

At her deposition, Poshow testified that she had not heard of EPD Investment Leasing Co., LLC, Poshow Depo. at 73:11–13; that she did not authorize Kirkland to file the May 2011 Financing Statement, *id.* at 74:6–22; that she did not know why Kirkland caused the May 2011 Financing Statement to be filed, *id.* at 75:14–19; and that she was unaware that the May 2011 Financing Statement had been filed, *id.* at 75:22–24.

## G. EPD's Retention of Luce Forward

On June 17, 2009, Pressman, on behalf of EPD, returned to Kirkland an engagement agreement providing that Luce Forward would serve as legal counsel to EPD and its affiliates (the "Engagement Agreement"). Tr. 291:1–9 (testimony of Kirkland). The Engagement Agreement is dated February 17, 2009 but was signed by Pressman on behalf of EPD on June 17, 2009. *Id.* Kirkland was a partner at Luce Forward at the time of execution of the Engagement Agreement.

---

under which attorney approval for a filing is required. That is within the scope of her personal knowledge as a legal assistant.

## H. The Involuntary Bankruptcy Petition Against EPD

On December 7, 2010, creditors filed an involuntary Chapter 7 petition against EPD. Bankr. Doc. No. 1. On January 11, 2011, certain of the petitioning creditors moved to appoint an interim Chapter 7 Trustee. Bankr. Doc. No. 6 (the "Motion to Appoint"). On January 19, 2011, Kirkland filed on behalf of EPD an opposition to the Motion to Appoint. The opposition asserted that EPD was current on all obligations except for those subject to bona fide dispute:

> Moving parties have utterly failed to make any factual showing that EPD is generally not paying its debts as they become due. This is not surprising given that, with the exception of the claims described above and claims of similar ilk which are subject to bona fide disputes, EPD does not have a single past due bill or late payment. In other words, EPD is generally paying its debts as they become due, unless such debts are subject to a bona fide dispute.

Bankr. Doc. No. 24 at 6.

At a hearing conducted on January 20, 2011, the Court denied the Motion to Appoint. Bankr. Doc. No. 62. On February 9, 2011, the Court entered an Order for Relief against EPD. Bankr. Doc. No. 29. On that same day, Kirkland filed on behalf of EPD a motion to reconsider entry of the Order for Relief. Bankr. Doc. No. 32 (the "Motion for Reconsideration"). In a declaration submitted in support of the Motion for Reconsideration, Kirkland testified that he had personal knowledge of the following facts:

> [I]f not immediately set aside the entry of an Order for Relief would have devastating consequences on an Alleged Debtor. Because it would effectively cause an Alleged Debtor to cease its ability to operate as a going concern, the damage caused by such an order could not be undone, and would effectively result in the destruction of the company's business, or diminution in value of the estate, to the detriment of all creditors.

Bankr. Doc. No. 33 at ¶ 3.

On February 10, 2011, the Court denied the Motion for Reconsideration. Bankr. Doc. No. 36. On February 16, 2011, Kirkland filed on behalf of EPD a *Motion to Alter or Amend Order for Relief in an Involuntary Case Or, in the Alternative, for Relief from Default* [Bankr. Doc. No. 41] (the "Motion to Alter or Amend"). The Motion to Alter or Amend alleged that "entry of the order for relief will severely damage EPD's business, to the detriment of the estate and creditors." Bankr. Doc. No. 41 at 2. At a hearing conducted on March 29, 2011, the Court denied the Motion to Alter or Amend. Bankr. Doc. No. 122.

On February 24, 2011, Kirkland filed on behalf of EPD a *Motion to Convert Chapter 7 Case to a Chapter 11 Reorganization* [Bankr. Doc. Nos. 50–51] (the "Motion to Convert"). At a hearing conducted on April 12, 2011, the Court denied the Motion to Convert. Bankr. Doc. No. 126.

On March 17, 2011, the Trustee filed a motion to compel Kirkland and Luce Forward to cause EPD to file schedules, turnover books and records, and cooperate with the Trustee in the administration of the estate. Bankr. Doc. No. 68 (the "First Motion to Compel"). At a hearing conducted on April 12, 2011, the Court ordered EPD to file schedules by no later than April 14, 2011, to turnover books and records by no later than April 20, 2011, and to cooperate with the Trustee. Bankr. Doc. No. 125.

**I. Kirkland's Rule 2004 Examination Testimony**

On May 27, 2011, Kirkland appeared for a Rule 2004 examination. Kirkland stated that he was appearing both in his individual capacity and as the person most knowledgeable for the Bright Conscience Trust:

> **Question:** And in the Motion for Rule 2004 examination, you were requested as a witness or an examinee in your individual capacity or as counsel for the debtor; there's also a request for the Bright Conscience Trust, person most knowledgeable of that entity, to appear on a later date. Are you here today on behalf of that entity as well?
> **Answer:** Yes.
> **Question:** And your counsel, Mr. Sahn, does he represent you individually here today?
> **Answer:** Yes….
> **Question:** It says he represents you in your capacity as person most qualified for the Bright Conscience Trust.
> **Answer:** I would assume so.

Kirkland Rule 2004 Examination at 11:20–12:11.

At the Rule 2004 examination, Kirkland answered a number of questions regarding the Bright Conscience Trust. *See* Rule 2004 Examination at 14:18–20 (Kirkland's statement that he had not produced the trust instrument for the Bright Conscience Trust); *id.* at 15:2–6 (Kirkland's statement that he had produced all documents requested in the Rule 2004 Motion regarding the Bright Conscience Trust other than the trust instrument); *id.* 65:25–66:9 (Kirkland's testimony regarding his assignment of his interest in the Loan Documents to the Bright Conscience Trust); *id.* at 70:9–12 (Kirkland's testimony regarding the Financing Statement filed in favor of the Bright Conscience Trust); *id.* at 133:19–134:7 (Kirkland's testimony that he did not discuss with Pressman the fact that the Bright Conscience Trust was one of the two secured creditors set forth on EPD's bankruptcy schedules); *id.* at 159:19–25 (Kirkland's testimony that he did not believe it was a conflict of interest for him to represent EPD subsequent to the filing of the Financing Statement in favor of the BC Trust); and *id.* at 192:1–4 (Kirkland's testimony that he had had no discussions regarding whether the BC Trust's claim would be avoided in EPD's involuntary bankruptcy case).

In connection with these cross-motions for summary judgment, the BC Trust has taken the position that Kirkland did not testify as the person most knowledgeable of the BC Trust at the May 27, 2011 Rule 2004 examination. The BC Trust's theory is that Kirkland could not have so testified because "a trust is not an entity separate from its trustee," *Presta v. Tepper*, 179 Cal.App.4th 909, 911 (Cal. 2009), and it is therefore impossible even to designate a person most knowledgeable to testify on behalf of a trust. While that may be true, it misses the point, which is that by appearing at a Rule 2004 examination and answering a series of detailed questions regarding the BC Trust, Kirkland was acting to further the BC Trust's interests vis-à-vis its secured claim, and was in that sense taking action on behalf of the BC Trust.

**J. The Court's Approval of Settlement Agreements Between the Estate and Law Firms McKenna Long & Aldridge and Greenberg Traurig**

On October 22, 2013, the Court approved a settlement agreement between the Trustee and McKenna Long & Aldridge LLP ("McKenna Long"), the successor-in-interest to Luce Forward

by way of merger (the "Luce Forward Settlement").[16] Bankr. Doc. No. 750 (order approving
Luce Forward Settlement). The Luce Forward Settlement released Luce Forward and McKenna
Long from the Trustee's claims against the firms relating to (1) Luce Forward's post-petition
representation of EPD, including claims that Kirkland had filed false and misleading pleadings
and declarations on behalf of EPD and (2) Luce Forward's pre-petition representation of EPD,
including claims relating to Kirkland's alleged conflicts of interest. Bankr. Doc. No. 670
(Trustee's description of claims resolved by the Luce Forward Settlement).[17] McKenna Long
paid the estate $750,000.00 in exchange for the releases set forth in the Luce Forward
Settlement.

    The Luce Forward Settlement released Kirkland from "[a]ll of the Trustee's claims or
potential claims for professional negligence and/or legal malpractice and/or breach of fiduciary
duty against Kirkland … relating to or arising from the time period while Kirkland worked at,
for, or was a partner or of counsel at, McKenna Long or its predecessor, Luce Forward" except
for the following claims:

1) avoidance and recovery of transfers by EPD, Pressman, or any entity which Pressman
   had an ownership interest in, or for which Pressman was an officer, director, partner,
   limited partner, member or manager, made to or for the benefit of Kirkland, his family
   members and/or the Bright Conscience Trust (including but not limited to the transfers
   identified on Exhibits A through C of the First Amended Complaint against Kirkland and
   Poshow Kirkland, Adversary Proceeding No. 2:12-ap-02424-ER);
2) avoidance and recovery of the security interest(s), UCC-1 lien(s), and any amounts
   transferred to or for the benefit of the Bright Conscience Trust;
3) avoidance and recovery of the security interest(s), UCC-1 lien(s), and any amounts
   transferred to or for the benefit of HMB Holdings, LLC; and
4) disallowance and/or equitable subordination of any proof of claim(s) filed by or for the
   benefit of [the] Bright Conscience Trust, Kirkland, any family member of Kirkland, or by
   HMB Holdings, LLC (collectively, the "Remaining Kirkland Claims").

Luce Forward Settlement at ¶ 3 [Bankr. Doc. No. 507, Ex. A].

    In addition to the exclusion of the Remaining Kirkland Claims, the Luce Forward Settlement
also excluded "the Trustee's claims or potential claims against Kirkland … for professional
negligence and/or legal malpractice and/or breach of fiduciary duty and/or avoidance and
recovery of preferential or fraudulent transfers relating to or arising from the time periods both
before and after Kirkland worked at, for, or was a partner or of counsel at, McKenna Long …."
*Id.*

    On October 16, 2013, the Court approved a settlement between the Trustee, on the one hand,
and Greenberg Traurig LLP and Greenberg Traurig PA (collectively, "Greenberg Traurig"), on
the other hand (the "Greenberg Traurig Settlement"). Bankr. Doc. No. 743 (order approving
Greenberg Traurig Settlement). Greenberg Traurig paid the estate $500,000.00 in exchange for

---

[16] McKenna Long & Aldridge LLP merged with Luce Forward Hamilton & Scripps LLP as of
March 6, 2012. The McKenna Long Settlement released claims against McKenna Long and its
predecessor Luce Forward.
[17] The Trustee did not file a complaint against McKenna Long because a settlement was reached
at mediation prior to the Trustee's deadline to file a complaint.

the releases set forth in the Greenberg Traurig Settlement. Like the McKenna Long Settlement, the Greenberg Traurig Settlement released the Trustee's claims against Kirkland arising from his conduct while employed at Greenberg Traurig, but excluded the Remaining Kirkland Claims from the release.[18] Bankr. Doc. No. 681, Ex. A at ¶ 4 (release provision of Greenberg Traurig Settlement). Specifically, the Greenberg Traurig Settlement released the Trustee's claims "arising from or relating to … Kirkland's actions or failures to act as regard [to] the Debtors and relationships with and/or services provided to or for the benefit of the Debtors, including, but not limited to, any action for professional negligence, legal malpractice, breach of fiduciary duty, fraud, conspiracy, corporate waste or for avoidance and recovery of transfers arising under 11 U.S.C. §§ 544, 547, 548 and 550, California Civil Code § 3439, *et seq.*, and any other applicable state fraudulent transfer or fraudulent conveyance statutes." *Id.*

## IV. Summary of Arguments Made by the Parties

### A. Amount of the BC Trust's Claim

The Trustee argues that the BC Trust's claim cannot include Payments made to Keith Pressman or BEM, since Keith Pressman and BEM are not debtors and the payments to them did not benefit the estate. The BC Trust maintains that under the plain language of the Loan Documents, the BC Trust is entitled to a secured claim for the entire amount that Kirkland loaned, regardless of whether the Payments were made to EPD or to an EPD-affiliate.

### B. Assets to Which the BC Trust's Claim Can Attach

The Trustee contends that the BC Trust's claim can attach only to the $104,558.83 in proceeds collected from the liquidation of stock in Ice Skating Enterprises and Sidecreek Development. His position is that the BC Trust's claim cannot attach to $3,886,650.83 in proceeds from settlements of the Trustee's avoidance claims, since the BC Trust cannot have a security interest in claims belonging to the estate and arising only as a result of the bankruptcy petition; that the BC Trust's claim cannot attach to $3,615,817.85 in proceeds from a settlement with Robert Geringer because of the recordation of a UCC-3 providing that the BC Trust's security interest did not attach to the assets that were the subject of the Geringer settlement; and that the BC Trust's claim cannot attach to $1,250,000.00 in proceeds from settlements with two of Kirkland's prior law firms, because a security interest cannot extend to an after-acquired commercial tort claim.

The BC Trust asserts that its security interest attaches to all assets of the estate. It contends that the UCC-3 modifying the scope of its security interest is invalid because it was not authorized by the BC Trust. It maintains that its security interest attaches to the proceeds of the settlements with Kirkland's prior law firms because such proceeds are general intangibles, not after-acquired commercial tort claims. The BC Trust relies upon *In re Figearo*, 79 B.R. 914, 918 (Bankr. D. Nev. 1987) for the proposition that proceeds collected from the Trustee's settlement of avoidance actions are subject to its security interest.

//
//
//

---

[18] The term "Remaining Kirkland Claims" is defined in substantially the same way in the McKenna Long Settlement and the Greenberg Traurig Settlement.

## C. The Equitable Subordination Claim

The BC Trust contends that the jury's finding that Kirkland acted in good faith with respect to his receipt of the Mortgage Transfers requires entry of summary judgment in favor of the BC Trust on the Trustee's equitable subordination claim. According to the BC Trust, the Trustee has not alleged that the BC Trust engaged in any inequitable conduct independent of Kirkland. Since the jury's finding that Kirkland acted in good faith is inconsistent with a finding that Kirkland engaged in inequitable conduct, the BC Trust argues that summary judgment in its favor is appropriate.

The Trustee argues that the scope of the jury's good-faith finding is far more limited. His position is that the good-faith finding pertains only to the $104,852.82 in Mortgage Transfers, not to the entirety of the BC Trust's claim.

## D. The Fraudulent Transfer Claims

The Trustee argues that he is entitled to summary judgment on his fraudulent transfer claims because EPD's actual intent to defraud is established by the jury's finding that EPD operated as a Ponzi scheme. He further asserts that the BC Trust has failed to introduce sufficient evidence in support of its § 548(c) good-faith and fair-value affirmative defenses.

The BC Trust contends that the Trustee is not entitled to avoid the recordation of the Financing Statement as a fraudulent transfer because the Financing Statement merely secured the indebtedness for which EPD was already liable under the Loan Documents.

# V. Findings and Conclusions

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Civil Rule 56 (made applicable to these proceedings by Bankruptcy Rule 7056). The moving party has the burden of establishing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' only if it might affect the outcome of the case[.]" *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party" when reviewing the Motion. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

As discussed in Section III, above, these cross-motions for summary judgment differ from typical summary judgment motions in that certain facts have been established by the jury trial. As to those facts established through the jury trial, the summary judgment standard for determining whether the fact is subject to genuine dispute does not apply.

## A. The BC Trust Holds an Allowed Secured Claim in the Amount of $1,950,613.41

Pursuant to § 502(a), a "claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects." Under Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima

facie evidence of the validity and amount of the claim. To overcome the presumption of validity created by a timely-filed proof of claim, an objecting party must do one of the following: (1) object based on legal grounds and provide a memorandum of points and authorities setting forth the legal basis for the objection; or (2) object based on a factual ground and provide sufficient evidence (usually in the form of declarations under penalty of perjury) to create triable issues of fact. *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1280 (9th Cir. BAP 2000); *In re Medina*, 205 B.R. 216, 222 (9th Cir. BAP 1996); *In re Hemingway Transport, Inc.*, 993 F.2d 915, 925 (1st Cir. 1993). Upon objection, a proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." *See Lundell v. Anchor Constr. Spec., Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (citing *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)). An objecting party bears the burden and must "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Holm*, 931 F.2d at 623. When the objector has shown enough evidence to negate one or more facts in the proof of claim, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of evidence. *See Lundell*, 223 F.3d at 1039 (citation omitted).

The BC Trust filed four duplicative proofs of claim. The BC Trust has acknowledged that it is entitled to only a single satisfaction on account of its claim and does not seek a duplicative recovery. *See* Adv. Doc. No. 430 at 23 n.7 ("While the BC Trust has submitted a total of four proofs of claim in this consolidated bankruptcy case, they are all based on the same loan to EPD and the same Payments Mr. Kirkland made pursuant to that loan. It is axiomatic that only one claim may be paid."). The Court will deem the BC Trust to have consented to the withdrawal of its duplicative proofs of claim, and will treat the BC Trust as though it had filed only a single proof of claim.

The Trustee devotes substantial space to asserting that the BC Trust's claim lacks *prima facie* validity because it was not accompanied by documentation sufficient to establish that Kirkland had loaned EPD the amounts set forth in the claim. The Trustee's emphasis upon the claim's alleged lack of *prima facie* validity is misdirected. At trial, sufficient evidence was introduced to show the validity of the claim. Consequently, whether the proof of claim was *prima facie* valid is irrelevant because the evidence introduced at trial adequately establishes the claim's validity. That evidence included the Loan Documents—consisting of the Note, Guaranty, and Security Agreement—evidencing EPD's liability to repay the amounts loaned by Kirkland; copies of checks and wire transfers showing that Kirkland made Payments of $2,055,466.23 pursuant to the Loan Documents; and Kirkland's testimony that he made the Payments.

The Trustee next argues that the claim should not include Payments made to Keith Pressman or BEM. The evidence at trial shows that of the $2,055,466.23 in Payments, a total of $955,466.23 was paid directly to EPD (the Payments made on August 18, 2008 and July 24, 2009); a total of $550,000.00 was paid to BEM (the Payments made on September 27, 2007 and March 26, 2008); and a total of $300,000.00 was paid to Keith Pressman (the Payments made on September 27, 2007 and April 14, 2009). With respect to a Payment of $150,000.00 made on November 8, 2007 and a Payment of $100,000.00 made on July 20, 2008, the evidence in the record is not sufficient to indicate whether the Payments were made directly to EPD or to an EPD-affiliated entity for EPD's benefit.

The Loan Documents establish EPD's liability for all Payments made thereunder, regardless of whether the Payments were made to EPD or to an EPD-affiliated entity for EPD's benefit. *See* Note ("EPD … hereby promises to pay … the amount set out above as the Original Principle

Amount (as increased by the amount of any and all future loans or payments to [EPD] or *any of its affiliates* …"); Guaranty at ¶¶ E–G (affirming EPD's liability for all Payments made pursuant to the Loan Documents, regardless of whether those Payments were made to EPD or to an EPD-affiliated entity for EPD's benefit); Guaranty at ¶ D (explaining that EPD would derive financial benefit from Payments made to its affiliates).

There can be no dispute that under the plain language of the Loan Documents, EPD is liable for all of the Payments. The Trustee's argument that the claim should not include Payments to BEM or Keith Pressman, EPD's affiliates, because EPD derived no benefit from such Payments, proves too much. It is almost always the case that companies that find themselves within bankruptcy have incurred liabilities that, with the benefit of hindsight, prove to have been a bad deal for the company. That is why the companies have filed or have been forced into bankruptcy. The Trustee's argument that the BC Trust's claim cannot include Payments that allegedly provided EPD no benefit would subject every secured claim to the possibility of disallowance based on after-the-fact assessments as to whether the debtor's incurrence of the obligation was a wise business decision.

It is true that the Trustee has the ability, under § 548(a)(1)(B), to avoid transfers where the debtor has received "less than a reasonably equivalent value," provided that other conditions are satisfied. Section 548(a)(1)(B) is of no assistance to the Trustee with respect to his arguments regarding the allowability of Payments made to BEM and Pressman, because the Complaint does not allege that the Loan Documents are avoidable. Instead, the Complaint seeks to avoid the Financing Statement that was filed on September 11, 2009, approximately two years after the Loan Documents were executed. (As explained in Section V.B., below, the Trustee is entitled to avoidance of the Financing Statement, but the BC Trust is entitled to retain the Payments made by Kirkland because the jury's findings establish that the BC Trust received the Payments in good faith and for value.)

The Trustee objects to a finding that the BC Trust's claim includes all "Payments," as defined in the Guaranty, on the ground that the Guaranty defines "Payments" to include "consulting fees, advisory fees and professional service fees" paid to EPD or to EPD-affiliated entities. Relying upon *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987), the Trustee argues that requiring the estate to repay the BC Trust for fees paid by Kirkland to non-debtor third parties would amount to enforcement of a fraudulent contract.

In *Independent Clearing House*, the bankruptcy trustee sought to recover, as fraudulent transfers, profits that a Ponzi-scheme operator had paid to various investors. The court held that allowing the investors to recover funds beyond the principal of their investment "would be to further the debtors' fraudulent scheme at the expense" of the other investors. *Independent Clearing House*, 77 B.R. at 858.

The Court does not agree with the Trustee's contention that a finding that the BC Trust's claim includes all "Payments" as defined in the Guaranty constitutes enforcement of a fraudulent contract. First, the evidence establishes that Kirkland made Payments as requested by Pressman and neither inquired as to the purpose of the Payments or had any awareness of how EPD or EPD's affiliates internally booked the Payments. *See* Kirkland Decl. [Doc. No. 435] at ¶ 17 ("I had no knowledge of, and did not agree to, any internal classification by EPD of any portion of the $855,466.23 amount [wired to EPD on August 18, 2008] as Consulting & Professional Fees, as a Nominee Distribution, or as anything else other than a loan."); Tr. at 386:16–18 (Kirkland's testimony that he had not seen any of EPD's financial statements as of July 2009). Second, a finding that the BC Trust's claim includes all Payments as defined in the Loan Documents does

not mean that the BC Trust will recover funds in excess of the amounts that Kirkland actually paid in connection with the Loan Documents. As discussed above, the evidence establishes that Kirkland actually made $2,055,466.23 in Payments to or for the benefit of EPD. Therefore, a finding that the BC Trust holds an allowed secured claim equal to the amount of Payments made by Kirkland will not enable the BC Trust to recover more than what was loaned. As a result, such a finding will not legitimize EPD's operation as a Ponzi scheme.

The Court does find it appropriate to reduce the amount of the BC Trust's allowed secured claim by $104,852.82, the amount of the Mortgage Transfers. The jury trial established that EPD caused the Mortgage Transfers to be paid for Kirkland's benefit as a result of the Payments Kirkland had made pursuant to the Loan Documents. Accordingly, a reduction in the BC Trust's claim by the amount of the Mortgage Transfers is warranted. The Court finds that the BC Trust holds an allowed secured claim in the amount of $1,950,613.41 ($2,055,466.23 less $104,852.82). This finding is without prejudice to the BC Trust's right to assert that the claim should be increased by approximately $75,000, based on the fact that the estate has received approximately $75,000 in proceeds from a Court-approved settlement with Union Bank, and the estate is entitled to only a single satisfaction of avoided transfers under § 550(d). The finding is also without prejudice to the Trustee's right to assert that the claim is subject to being surcharged in the amount of $309,166.70 under § 506(c), based on the fact that the Trustee was required to pay this amount to obtain a settlement with Robert Geringer.[19]

## **B. The Trustee is Entitled to Partial Summary Adjudication With Respect to His Claims for to Avoid the BC Trust's Claim as an Actually Fraudulent Transfer, but the BC Trust is Entitled to Partial Summary Adjudication With Respect to Its Good-Faith and Fair Value Defenses**

Under § 548(a)(1)(A), the Trustee may avoid a transfer as actually fraudulent "if the debtor voluntarily or involuntarily made such transfer … with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made … indebted." For purposes of § 548(a)(1)(A), the "mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (internal citation omitted).

Pursuant to § 548(c), the transferee of a transfer otherwise avoidable under § 548(a)(1)(A) that "takes for value and in good faith" may retain the transfer. Within the context of a Ponzi scheme, this "good faith" defense "permits an innocent winning investor to retain funds up to the amount of the initial outlay." *Id.*

Applying these principles to the instant case, the Trustee is permitted to avoid the Financing Statement that perfected the BC Trust's lien as an actually fraudulent transfer, because the jury trial established that EPD operated as a Ponzi scheme. However, as discussed below, the jury's finding that Kirkland received the Mortgage Transfers in good faith and for reasonably equivalent value establishes the BC Trust's good-faith defense under § 548(c). As a result, the BC Trust is entitled to an allowed secured claim in the amount of the funds that Kirkland loaned ($1,950,613.41), but is not entitled to any interest thereon. The exclusion of interest from the BC

---

[19] The issues regarding these potential adjustments to the BC Trust's claim were raised at the hearing and were not sufficiently briefed in the MSJs. The Court declines to rule upon these issues at the present time. These issues will be considered at the trial on the Trustee's equitable subordination claim.

Trust's claim follows from the finding that the Financing Statement is avoidable as an actually fraudulent transfer given EPD's operation as a Ponzi scheme. Allowing interest on the BC Trust's claim would legitimize the Ponzi scheme by enabling the BC Trust to receive fictitious profits (interest on the BC Trust's loan) from the Ponzi scheme. As explained by the Ninth Circuit, in the context of a Ponzi scheme:

> [T]he general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers:
>
>> The money used for the [underlying investments] came from investors gulled by fraudulent representations. [The defendant] was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the Ponzi scheme operator]. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.
>
> *Scholes,* 56 F.3d at 757–58; *see also In re Slatkin,* 525 F.3d 805, 814–15 (9th Cir. May 6, 2008). The policy justification is ratable distribution of remaining assets among all the defrauded investors. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky."

*Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).

There is no merit to the BC Trust's argument that *Donell* does not apply because the BC Trust is a secured lender, not an investor. The fact that the BC Trust's investment in EPD took the form of a secured loan—as opposed to an unsecured equity investment—does not change the fact that allowing the BC Trust to receive interest would permit the BC Trust to benefit from fraud at the expense of other investors. The BC Trust is also correct that none of the cases cited by the Trustee applying the Ponzi presumption involve investors who took a security interest. Contrary to the BC Trust's contention, this does not mean that the Ponzi presumption cannot apply to an investor who has taken a security interest as a matter of law; it means only that it is rare for an investor in a Ponzi scheme to take a security interest.

The Court notes that the jury's findings regarding Kirkland's good-faith were only as to the $104,852.82 in Mortgage Transfers. However, a review of the evidence presented at trial, as well as the timeline of the relevant transactions, establishes that the jury could not have found that Kirkland acted in good-faith with respect to the Mortgage Transfers without also implicitly finding that Kirkland acted in good faith with respect to all of the funds loaned to or for the benefit of EPD.

In support of his contention that Kirkland had not acted in good faith, the Trustee presented to the jury evidence purporting to show that between 2004 and 2009, Kirkland knew or should have known that EPD was a Ponzi scheme that could not pay its debts as they came due absent cash infusions from new investors. Implicit in the jury's finding that Kirkland received the

Mortgage Transfers in good faith and for a reasonably equivalent value is a finding that Kirkland
was not aware that EPD was a Ponzi scheme. The jury received the following instruction
regarding good faith:

> "Good faith" means that Defendant [Kirkland] acted without actual fraudulent intent,
> that he did not collude with EPD and Pressman or otherwise actively participate in any
> fraudulent scheme, and that the circumstances were such that would not place a
> reasonable person on inquiry of EPD and Pressman's alleged fraudulent purpose,
> insolvency, or inability to pay debts as they became due and a diligent inquiry would not
> have discovered the fraudulent purpose, insolvency, or inability to pay debts as they
> became due.
>
> If you decide that Defendant knew or should have known that EPD and Pressman had
> a fraudulent intent, or that the circumstances were such that would place a reasonable
> person on inquiry of EPD and Pressman's fraudulent purpose, *insolvency, or inability to
> pay debts as they became due and a diligent inquiry would have discovered the
> fraudulent purpose, insolvency, or inability to pay debts as they became due*, then
> Defendant cannot have taken the property, interests in property, monies, or liens in good
> faith.

Jury Instruction No. 30 (emphasis added).

The jury received the following instruction regarding the definition of a Ponzi scheme:

> A Ponzi scheme is a financial fraud that induces investment—often by promising high,
> risk-free returns within a relatively short time period. In a Ponzi scheme, payments are
> made to investors or lenders from later investments or loans rather than from profits of
> the underlying business venture. The fraud consists of transferring proceeds received
> from the new investors to previous investors, thereby giving other investors the
> impression that a legitimate profit-making business opportunity exists, where in fact no
> such opportunity exists. Distributing funds to earlier investors from the receipt of monies
> from later investors or lenders is the hallmark of Ponzi schemes.

Jury Instruction No. 26.

These jury instructions demonstrate that in finding that Kirkland received the Mortgage
Transfers in good faith, the jury found that Kirkland acted without fraudulent intent, that he did
not collude with EPD and Pressman, that he did not participate in any fraudulent scheme, and
that the circumstances were not sufficient to put a reasonable person on notice of any fraudulent
activities at EPD. Given that the jury was instructed that a Ponzi scheme is a "financial fraud"
that involves giving investors the false impression that a legitimate profit-making business
opportunity exists, it could not have found that Kirkland received the Mortgage Transfers in
good faith if it also believed that Kirkland was aware that EPD was a Ponzi scheme.

As a result of the timing of the relevant transactions, the jury could not have found that
Kirkland acted in good faith with respect to his receipt of the Mortgage Transfers unless it also
believed Kirkland acted in good faith with respect to all of the Payments Kirkland made pursuant
to the Loan Documents. The Mortgage Transfers commenced on October 5, 2008 and continued
through December 14, 2009. Kirkland made the first Payment pursuant to the Loan Documents
on September 27, 2007, and made the final Payment on July 24, 2009. The jury found that

Kirkland could not have been aware of any fraudulent purpose on the part of EPD, and could not have known that EPD operated as a Ponzi scheme as of December 14, 2009, the date upon which Kirkland received the last Mortgage Transfer. Since Kirkland made the Payments prior to receiving the last of the Mortgage Transfers, he could not have been aware of any issues with EPD at the time the Payments were made.

Finally, and most significant, the timeline also means that Kirkland was acting in good faith when he recorded the Financing Statement at the direction of Pressman on September 11, 2009. The jury found that Kirkland acted in good faith with respect to the receipt of Mortgage Transfers on September 5, 2009 and October 5, 2009. It is not plausible that Kirkland was acting in good faith on September 5, was not acting in good faith when he recorded the Financing Statement at Pressman's direction on September 11, and then was acting in good faith again on October 5, 2009.

The Trustee asserts that the BC Trust has not carried its burden with respect to the good-faith defense under § 548(c). The Trustee is correct that it is the BC Trust's burden to establish its defense under § 548(c). *See In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990) (transferee bears the burden of establishing that it received the transfer in good faith).

The Trustee's theory is that the BC Trust did not obtain the benefit of the Financing Statement in good faith because Kirkland's alleged bad-faith conduct must be imputed to the BC Trust. The jury's finding that Kirkland acted in good faith prior to the recordation of the Financing Statement is fatal to this theory. By virtue of the jury's finding that Kirkland acted in good faith, the BC Trust has established its affirmative defense under § 548(c).[20]

The Trustee also seeks to avoid the filing of the Financing Statement as actually fraudulent pursuant to § 544 and Cal. Civ. Code § 3439.04. The provisions of California law regarding the avoidance of actually fraudulent transfers are substantially the same as the provisions of the Bankruptcy Code. Application of California law does not yield a result different from the application of federal law.

The BC Trust argues that the Trustee's claims to avoid the transfer as actually fraudulent fail given that the Financing Statement provided value by securing an antecedent debt. As discussed in Section V.B., below, the recordation of a Financing Statement securing an antecedent debt is not a *constructively* fraudulent transfer. However, this principle is limited to *constructively* fraudulent transfer claims; it does not apply to *actually* fraudulent transfer claims. To avoid a transfer as actually fraudulent, the Trustee is not required to show that the debtor received less than a reasonably equivalent value. All that the Trustee is required to show is that the transfer

---

[20] The Trustee asserts that triable issues of fact exist as to the BC Trust's good faith. He maintains that Poshow has not submitted any evidence showing that the BC Trust received the benefit of the Financing Statement in good faith. The Court disagrees with the assertion that Poshow has submitted no evidence as to this issue, and finds that there are no disputed issues of fact regarding the BC Trust's good faith. As set forth in Section III.D., above, the record shows that on September 11, 2009, Pressman and Poshow, acting on behalf of the BC Trust, reached an agreement regarding the non-filing of the Financing Statement. The agreement provided that Pressman would arrange for the Financing Statement to be filed, that the BC Trust would release any claims regarding the non-filing of the Financing Statement, and that the BC Trust would extend the loans for at least another year. These undisputed facts, combined with the jury's finding as to Kirkland's good faith, show that the BC Trust acted in good faith with respect to the Financing Statement.

was made "with actual intent to hinder, delay, or defraud" creditors. § 548(a)(1)(A). The cases holding that the securing of an antecedent debt constitutes value apply only to the Trustee's claims to avoid the transfer as *constructively* fraudulent under § 548(a)(1)(B), and have no application to the Trustee's claims to avoid the transfer as *actually* fraudulent under § 548(a)(1)(A).

## C. The BC Trust is Entitled to Summary Adjudication on the Trustee's Claims for Constructively Fraudulent Transfer

Under § 548(a)(1)(B), the Trustee may avoid a transfer as constructively fraudulent if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and certain other conditions are satisfied. For purposes of § 548(a)(1)(B), "value" means the "satisfaction or securing of a present or antecedent debt of the debtor …." § 548(d).

"[A] debtor's grant of a security interest in its assets to a lender who has previously given the debtor a cash loan may not be considered a [constructively] fraudulent conveyance." *In re AppliedTheory Corp.*, 330 B.R. 362, 363 (S.D.N.Y. 2005). This follows from § 548(d)'s definition of "value" as the securing of an antecedent debt, which means that "when a debtor grants a security interest to a lender in respect of antecedent debt, the debtor must *necessarily* receive reasonably equivalent value or fair consideration in exchange." *In re AppliedTheory Corp.*, 323 B.R. 838, 841–42 (Bankr. S.D.N.Y.), *aff'd,* 330 B.R. 362 (S.D.N.Y. 2005); *see also Official Comm. of Unsecured Creditors v. BNP Paribas (In re Propex, Inc.)*, 415 B.R. 321, 332 (Bankr. E.D. Tenn. 2009) ("[T]he Bankruptcy Code's fraudulent conveyance statute expressly provides that "value" includes the securing of an antecedent debt …. An untimely perfection of a security interest securing an antecedent debt … is not avoidable as a fraudulent transfer."); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 327–30 (Bankr. S.D.N.Y. 2001) (same).

Here, the Trustee seeks to avoid as constructively fraudulent the filing of the Financing Statement, which occurred on September 11, 2009. At the time the Financing Statement was filed, Kirkland had already made $2,055,466.23 in Payments to or for the benefit of EPD. The Financing Statement secured an antecedent debt and is therefore not avoidable as a constructively fraudulent transfer.

The Trustee also seeks to avoid the filing of the Financing Statement as constructively fraudulent pursuant to § 544 and Cal. Civ. Code § 3439.07. Like the Bankruptcy Code, the constructively fraudulent transfer provisions of California law define "value" as the securing of an antecedent debt. Cal. Civ. Code § 3439.03. The Trustee's constructively fraudulent transfer claim under California law fails for the same reason that the claim under § 548(a)(1)(B) fails.

## D. Neither Party is Entitled to Summary Adjudication With Respect to the Trustee's Equitable Subordination Claim

Section 510(c) provides that "the court may under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." The subordination of a claim based on equitable considerations generally requires three findings: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." *Henry v. Lehman Comm. Papers, Inc. (In re First All. Mortgage Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006). If the claimant

is not an insider or a fiduciary, "gross and egregious conduct will be required before a court will equitably subordinate a claim." *Id.*

"[T]he equitable subordination inquiry focuses on the conduct of the claimant at issue, and the nature of its relationship to the debtor." *Stoumbos v. Kilimnik*, 988 F.2d 949, 959 (9th Cir. 1993). "The remedy of equitable subordination is remedial rather than punitive in nature. A claim should be subordinated only to the extent necessary to offset the harm suffered" on account of the inequitable conduct. *Naylor v. Farrell (In re Farrell)*, 610 B.R. 317, 324 (Bankr. C.D. Cal. 2019), *appeal dismissed sub nom. Farrell*, No. 8:16-AP-01123-MW, 2020 WL 3965023 (C.D. Cal. Apr. 2, 2020) (internal citations omitted). "Subordination is a means of regulating distribution results in bankruptcy by adjusting the order of creditors' payments to the equitable levels of their comparative claim positions.... (I)ts fundamental aim is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Trone v. Smith (In re Westgate-California Corp.)*, 642 F.2d 1174, 1177 (9th Cir. 1981) (internal citation omitted).

The BC Trust raises a number of arguments that must be disposed of before the Court moves to an examination of the equitable subordination elements set forth in *First Alliance*. First, the BC Trust argues that the Luce Forward and Greenberg Traurig Settlements preclude the Trustee from asserting that the BC Trust's claim can be subordinated based on Kirkland's inequitable conduct. The BC Trust maintains that these settlements released the Trustee's claims for any tortious conduct committed by Kirkland. The BC Trust overlooks the fact that the releases in the settlements expressly carved out the Trustee's claims against Kirkland and the BC Trust that are the subject of this litigation. *See* Section III.J., above (setting forth the terms of the settlements).

Second, the BC Trust asserts that the Trustee's theory of the case—that Kirkland's alleged inequitable conduct can be imputed to the BC Trust as Kirkland's assignee—has been rejected by *U.S. Bank v. The Vill. at Lakeridge, LLC (In re The Vill. at Lakeridge, LLC)*, 814 F.3d 993, 996 (9th Cir. 2016), *aff'd sub nom. U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018). In *Lakeridge*, the court held that a creditor did not become a statutory insider solely by acquiring a claim from a statutory insider. The court held that for purposes of determining a claim's insider status, "general assignment law—in which an assignee takes a claim subject to any benefits and defects of the claim—does not apply." *Id.* at 1000. According to the BC Trust, *Lakeridge* means that when the BC Trust acquired its interest in the Loan Documents from Kirkland, the BC Trust *did not* take that interest subject to any defects emanating from Kirkland's alleged inequitable conduct.

The BC Trust's argument stretches *Lakeridge*'s holding too far. Contrary to the BC Trust's contention, *Lakeridge* did not hold that general assignment law could never apply when a transferred claim is at issue in a bankruptcy proceeding. *Lakeridge* held only that for purpose of determining a claim's insider status, general assignment law does not apply. *See Lakeridge*, 814 F.3d at 1000 ("Because insider status is not a property of a claim, general assignment law—in which an assignee takes a claim subject to any benefits and defects of the claim—does not apply."). *Lakeridge* applies only for purposes of determining a claim's insider status and does not abrogate general assignment law in its entirety. Had the *Lakeridge* court intended such a sweeping result, it certainly would have said so. Notwithstanding *Lakeridge*, general assignment law—in which the "assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor prior to notice of the assignment"—remains valid. *See Johnson v. Cty. of Fresno*, 111 Cal. App. 4th 1087, 1096, 4 Cal. Rptr. 3d 475, 482 (2003); *see also Searles Valley Minerals Operations Inc. v. Ralph M.*

*Parson Serv. Co.*, 191 Cal. App. 4th 1394, 1402, 120 Cal. Rptr. 3d 487, 493 (2011) (same). Under principles of general assignment law, the Trustee may assert that the BC Trust's claim is subject to equitable subordination based upon Kirkland's alleged inequitable conduct.

Third, the BC Trust argues that the Trustee may not rely upon Kirkland's conduct subsequent to September 11, 2010, the date upon which the BC Trust was established, in support of his equitable subordination claim. In support of this proposition, the BC Trust points to California trust law, which holds that "a settlor's conduct after an irrevocable trust has been established will not alter the nature of such a trust." *Laycock v. Hammer*, 141 Cal.App.4th 25, 31 (Cal. 2006).

A determination that the BC Trust's claim may be equitably subordinated based on Kirkland's conduct subsequent to formation of the BC Trust does not conflict with California trust law. Were the Court to equitably subordinate the BC Trust's claim, it would not be altering the nature of the trust. Instead, the Court would be limiting the BC Trust's ability obtain a distribution from the estate. Section 510 of the Bankruptcy Code authorizes the Court to limit the ability of claimants to obtain a distribution from the estate under appropriate circumstances.

Fourth, the BC Trust argues that the Trustee cannot seek equitable subordination on the basis that Kirkland was EPD's attorney and therefore a fiduciary. The BC Trust asserts that at the jury trial, the Trustee took the position that Kirkland was an insider of EPD and Pressman. According to the BC Trust, now that the jury has found that Kirkland was not an insider, the Trustee has shifted to arguing that equitable subordination is warranted based on Kirkland's status as a fiduciary (as opposed to arguing that equitable subordination is warranted based on Kirkland's status as an insider). The BC Trust's position is that claim preclusion bars the Trustee from arguing that Kirkland was a fiduciary.

"Under the doctrine of claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171, 171 L. Ed. 2d 155 (2008) (internal quotation omitted). By "precluding parties from contesting matters that they have had a full and fair opportunity to litigate," the doctrine protects against "the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* Claim preclusion applies "when there is: (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between parties." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002) (internal quotation omitted).

Here, claim preclusion does not bar the Trustee's argument that Kirkland was a fiduciary for two reasons. First, the District Court has not entered any judgment in connection with the jury's verdict in favor of Kirkland, so there is no final judgment on the merits. Second, the District Court bifurcated the trial of the Trustee's claims against Kirkland and his claims against the BC Trust. As a result of this bifurcation, the Trustee has not had a "full and fair opportunity to litigate" his claims against the BC Trust, including claims predicated upon the allegation that Kirkland is a fiduciary.[21]

---

[21] The BC Trust argues that the Trustee has been provided a full and fair opportunity to litigate his claims against the BC Trust, because the Trustee could have argued at the jury trial that Kirkland was both an insider and a fiduciary. The argument is without merit. There is nothing in the District Court's order bifurcating the trial that required the Trustee to present to the jury all his allegations against Kirkland in order to preserve those allegations which were necessary to the Trustee's case against the BC Trust.

The Trustee is not required to show that Kirkland was an insider of EPD or Pressman to prevail upon his equitable subordination claim. As explained in *First Alliance Mortgage*, equitable subordination may be invoked "[w]here non-insider, non-fiduciary claims are involved," but only upon a showing of "gross and egregious conduct." 471 F.3d at 1006. The Trustee is not required to show "gross and egregious conduct" to prevail upon his equitable subordination claim, because Kirkland was a fiduciary of EPD. Kirkland represented EPD and filed papers on its behalf subsequent to the commencement of the involuntary petition. *See* Section III.H., above. At the same time he was a fiduciary of EPD, Kirkland continued to act on behalf of the BC Trust. Kirkland directed the filing of the May 2011 Financing Statement on behalf of the BC Trust, *see* Section III.F., above, and acted on behalf of the BC Trust by providing detailed testimony with respect to the trust at the May 27, 2011 Rule 2004 examination, *see* Section III.I., above.

Having disposed of the threshold objections asserted by the BC Trust, the Court now turns to an examination of the equitable subordination factors. The Court finds that genuine issues of material fact exist which preclude the entry of summary judgment in favor of either party with respect to the equitable subordination claim. However, the findings made by the jury have substantially narrowed the facts that remain at issue.

As discussed in Section V.B., above, the jury could not have found that Kirkland acted in good faith with respect to his receipt of the Mortgage Transfers unless it also believed Kirkland acted in good faith with respect to all of the Payments Kirkland made pursuant to the Loan Documents. Kirkland received the final Mortgage Transfer on December 14, 2009. The Trustee alleged that Kirkland engaged in a number of bad-faith acts prior to this date, yet the jury still determined that Kirkland received the Mortgage Transfers in good faith. To the extent that the Trustee's equitable subordination claim is predicated upon the imputation to the BC Trust of Kirkland's conduct prior to December 14, 2009, the jury's good-faith finding has eliminated the claim. It is not possible for Kirkland to have engaged in inequitable conduct in good faith.

The jury's good-faith finding does not completely insulate the BC Trust from the Trustee's equitable subordination claim. The Trustee asserts that equitable subordination is warranted based on actions taken by Kirkland subsequent to December 14, 2009, including but not limited to actions taken by Kirkland in connection with his representation of EPD subsequent to the involuntary bankruptcy filing. The jury's finding that Kirkland acted in good faith with respect to his receipt of the Mortgage Transfers obviously says nothing about whether actions taken by Kirkland subsequent to receipt of the Mortgage Transfers were in good faith.

Although Kirkland assigned his interest in the Loan Documents to the BC Trust on September 9, 2009, the Trustee may still rely upon actions taken by Kirkland subsequent to that date in support of his equitable subordination claim. Kirkland's post-assignment actions may be imputed to the BC Trust for purposes of equitable subordination because Kirkland continued to act on behalf of the BC Trust post-assignment. Kirkland directed the filing of the May 2011 Financing Statement on behalf of the BC Trust, *see* Section III.F., above, and acted on behalf of the BC Trust by providing detailed testimony with respect to the trust at the May 27, 2011 Rule 2004 examination, *see* Section III.I., above.[22]

//

//

---

[22] The Court leaves open for the trial the issue of whether Kirkland's actions on behalf of the BC Trust were sufficient to make Kirkland either an actual or ostensible agent of the BC Trust.

## E. The BC Trust's Claim Attaches to Only Some of the Estate's Assets

Receipts generated from the Trustee's administration of the estate total $8,896,503.98. As explained below, the BC Trust's secured claim can attach to only $3,720,376.68 of these proceeds (the $3,615,817.85 collected in a settlement with Robert Geringer and the $104,558.83 collected from the liquidation of stock in Ice Skating Enterprises and Sidecreek Development).

### 1. The BC Trust's Secured Claim Does Not Attach to Proceeds from the Settlement of the Trustee's Avoidance Claims

The Trustee has collected $3,886,650.83 from the settlement of avoidance actions under § 548. As a matter of law, the BC Trust's secured claim cannot attach to these settlement proceeds.

In *McGoldrick v. Juice Farms, Inc. (In re Ludford Fruit Prod., Inc.)*, 99 B.R. 18, 24–25 (Bankr. C.D. Cal. 1989), the court rejected a creditor's contention that it held a security interest in the recoveries obtained by the Trustee through the exercise of his avoidance powers. The *Ludford Fruit* court reasoned that "it is difficult to understand how an avoidance power action that springs into being with the commencement of a bankruptcy case could be the proceeds of *any* form of collateral." *Id.*

The BC Trust cites *In re Figearo*, 79 B.R. 914, 918 (Bankr. D. Nev. 1987) for the proposition that proceeds collected from the settlement of a fraudulent transfer action may be subject to a creditor's security interest. The Court declines to follow *Figearo*, which is contrary to *Ludford Fruit*. The leading treatise, *Collier on Bankruptcy*, is consistent with *Ludford Fruit*:

> Some courts have ruled that, where the creditor has an independent right to recover the property in question, the creditor may claim an interest in that same property if and when it is recovered by the trustee pursuant to an avoiding power under the Bankruptcy Code. Under this reasoning, monies recovered as the result of a fraudulent transfer action sometimes are found to be "proceeds" of the creditor's independent right to follow such monies when they are traceable into the hands of the transferee….
>
> Once a bankruptcy case commences, however, because all recoveries under the avoiding powers are property of the estate, administered almost exclusively by the trustee for the benefit of the estate as a whole rather than for any creditor individually, it is difficult to see how such recoveries can be other than "after-acquired property" within the meaning of section 552(a), rather than proceeds of prepetition collateral under section 552(b)(1). This is true for fraudulent transfers as well as preferences, and no persuasive distinction seems possible along these lines. Prebankruptcy state law preferences exist, and may be asserted postbankruptcy under section 544(b) of the Bankruptcy Code. And the assertion by a trustee of state fraudulent transfer law under section 544(b) allows for an expanded recovery under the rule of *Moore v. Bay*, as well as section 550, underscoring the fact that the recoveries that are property of the estate under section 541(a)(3) are peculiarly postpetition in nature. Indeed, a creditor may not sue to recover a state law fraudulent transfer once a case in bankruptcy is commenced, because this would be taking a chose in action from the estate, thereby violating the automatic stay. On the whole, therefore, the more persuasively reasoned opinions do not permit secured creditors to share in recoveries obtained by bankruptcy trustees or estate representatives pursuant to the avoiding powers, even where such creditors may have independent, traceable rights to those funds.

5 *Collier on Bankruptcy* ¶ 552.02 (16th ed. 2020).

The Court further notes that *Figearo* is contrary to the weight of authority and has not been followed by more recent cases. *See, e.g., Official Committee of Unsecured Creditors v. UMB Bank, NA et al. (In re Residential Capital, LLC)*, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013) (declining to follow *Figearo*; holding that the Trustee's avoidance power claims "must be considered after-acquired property belonging to the estate"; and holding that "because the Debtor does not own the right to pursue a fraudulent transfer action in bankruptcy (since that action belongs to the trustee post-petition under section 554(b)), the Debtor could not have encumbered or assigned that right prepetition").

## 2. The BC Trust's Secured Claim Does Not Attach to Proceeds of the Luce Forward and Greenberg Traurig Settlements

Aggregate proceeds of the Luce Forward and Greenberg Traurig Settlements are $1,250,000.00 (consisting of $750,000.00 from the Luce Forward Settlement and $500,000.00 from the Greenberg Traurig Settlement). Both settlements released the firms from the Trustee's claims for "professional negligence" and "legal malpractice" arising in connection with actions Kirkland took or failed to take with respect to EPD. As such, the proceeds of the settlements qualify as a "commercial tort claim" pursuant to Cal. Com. Code § 9-204. *See* Cal. Com. Code § 9-102 (defining a "commercial tort claim" as "a claim arising in tort," provided that "[t]he claimant is an organization").

Although the Security Agreement giving rise to the BC Trust's secured claim provides for a security interest in "commercial tort claims," the BC Trust's secured claim does not attach to the proceeds of the Luce Forward and Greenberg Traurig Settlements for two reasons. First, a "security interest does not attach under a term constituting an after-acquired property clause to … [a] commercial tort claim." Cal. Com. Code § 9-204(b)(2). The Editors' Note to § 9-204 explains:

> Subsection (b)(2) provides that an after-acquired property clause in a security agreement does not reach future commercial tort claims. In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated.

Editors' Note to Cal. Com. Code § 9-204.

Second, a security interest can attach to a commercial tort claim only if the security agreement adequately describes the claim. "A description only by type of collateral defined in this code is an insufficient description of … [a] commercial tort claim." Cal. Com. Code § 9-108(e)(1). The Editors' Note to § 9-108(e) explains:

> Under Section 9-204, an after-acquired collateral clause in a security agreement will not reach future commercial tort claims. It follows that when an effective security agreement covering a commercial tort claim is entered into the claim already will exist. Subdivision (e) does not require a description to be specific. For example, a description such as ''all tort claims arising out of the explosion of debtor's factory'' would suffice, even if the exact amount of the claim, the theory on which it may be based, and the identity of the tortfeasor(s) are not described. (Indeed, those facts may not be known at the time.)

Editors' Note Cal. Com. Code § 9-108.

Here, the Security Agreement states only that it applies to "commercial tort claims." That description lacks the necessary specificity. Even if a security agreement could attach to after-acquired commercial tort claims (which it cannot), a description such as "all tort claims arising from actions or inactions taken by Kirkland" would be necessary in order for the security interest to attach.[23]

The BC Trust asserts that the Trustee cannot obtain summary judgment that the BC Trust's secured claim does not attach to the proceeds of the Luce Forward and Greenberg Traurig Settlements because the Complaint does not specifically allege that such proceeds are not subject to the BC Trust's claim. The BC Trust is mistaken. The Complaint alleges that the BC Trust's claim is subject to disallowance. Under Civil Rule 8, the Complaint is required to contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," as well as "a demand for the relief sought …." The allegation that the BC Trust's claim is subject to disallowance is sufficient to encompass the Trustee's contention that the claim cannot attach to the proceeds of the law firm settlements. The Trustee was not required to specifically allege in the Complaint that the BC Trust's claim could not attach to the law firm settlements in order to preserve this claim.

The BC Trust also argues that since the jury found that Kirkland acted in good faith, Kirkland cannot also be found to have committed a tort while at Greenberg Traurig or Luce Forward. This argument is unavailing. In determining that the proceeds of the Luce Forward and Greenberg Traurig Settlement qualify as "commercial tort claims," the Court is not finding that Kirkland, Luce Forward, Greenberg Traurig, or anyone else engaged in tortious conduct. Indeed, the Settlement Agreements expressly provide that the law firms do not admit to any wrongdoing. The only finding the Court is making is that for purposes of determining the scope of the BC Trust's secured claim, the subject matter of the settlements is a "commercial tort claim" within the meaning of the California Commercial Code.

Finally, in an effort to escape the California Commercial Code's limitations on the attachment of commercial tort claims, the BC Trust argues that proceeds of the law firm settlements are "general intangibles," rather than "commercial tort claims." The argument lacks merit. Cal. Com. Code § 9-102 defines a "general intangible" as "any personal property, including things in action, *other than* … commercial tort claims …." As discussed above, the Trustee's claims for professional negligence and legal malpractice qualify as commercial tort claims. Therefore, such claims cannot also qualify as general intangibles.

3. The BC Trust's Secured Claim Attaches to the Proceeds of the Settlement with Robert Geringer

The Trustee has collected $3,615,817.85 from a settlement with Robert Geringer (the "Geringer Settlement"). The settlement proceeds represent the amount that Geringer paid Pressman for stock in North Hills Industrial Park, Inc. ("NHIP"). The BC Trust asserts that its secured claim extends to the proceeds of the Geringer Settlement as a result of the Financing Statement. It contends that the UCC-3 recorded on May 5, 2010 that excepted the stock of NHIP from the scope of the Financing Statement is void because it was not authorized by the BC Trust.

---

[23] Although commercial tort claims relating to Greenberg Traurig may have been in existence at the time the Security Agreement was executed, the commercial tort claims relating to Luce Forward were not yet in existence.

The Trustee argues that the UCC-3 is valid. He maintains that the BC Trust can be bound by Kirkland's actions because Kirkland continued to act on behalf of the BC Trust even though Poshow was designated as the sole Trustee; that the UCC-3 was transmitted for filing by Underkoffler, Kirkland's agent; and that consequently the BC Trust is bound by the UCC-3.

The Security Agreement states that its provisions may be modified only by a writing signed by the party against whom the modification is sought:

> Neither this Security Agreement nor any provision hereof may be changed, waived, discharged or terminated orally but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

*Id.* at ¶ 14(a).

Pursuant to Cal. Com. Code § 9-509(d)(1), modifications to a financing statement are valid only if "the secured party of record authorizes the filing." Here, the Security Agreement expressly provides that the secured party can modify the Security Agreement only through a signed writing. No signed writing modifying the Security Agreement has been produced. Therefore, the UCC-3, which purports to modify the scope of the assets secured by the Security Agreement, is invalid.

The absence of a signed writing authorizing the filing of the UCC-3 is dispositive as to the UCC-3's validity. However, even if the Court were to disregard the plain language of the Security Agreement and determine that the scope of the BC Trust's security could be altered by means other than a signed writing (a finding the Court does not make), the Trustee has not provided sufficient evidence in support of his agency theory to defeat summary adjudication. In support of the contention that Underkoffler caused the UCC-3 to be filed at Kirkland's direction, the Trustee relies upon the following testimony from Underkoffler's May 25, 2017 deposition:

> **Question:** Would you have sent UCC statements for filing with National Corporate Research in relation to EPD if John Kirkland hadn't authorized them in advance?
> **Answer:** No.

Underkoffler Depo. at 70:12–15.

Taken in isolation, this testimony appears to suggest that Kirkland must have authorized Underkoffler to file the UCC-3. But at the same deposition, Underkoffler also testified that she did not recall any of the events surrounding the filing of the UCC-3. *See* Section III.E., above. Underkoffler has also clarified that her statement that she would not have sent the UCC-3 absent Kirkland's authorization was based on her general practice as a legal secretary, and that she simply did not remember whether the UCC-3 was authorized by Kirkland or not. *Id.* Taken as a whole, Underkoffler's testimony is that she does not remember what happened with respect to the UCC-3.

//
//
//
//
//
//

Further, to the extent that any conclusions can be drawn from the sparse record, the May 5, 2010 E-mail, which was sent to Underkoffler by Pressman's assistant Katy Werner, suggests that Underkoffler filed the UCC-3 because Pressman wanted the filing done as soon as possible. The May 5, 2010 E-mail, which is addressed directly to Underkoffler, provides in its entirety:

> Hey Lisa,
>
> We're forwarding 2 more UCC 3 filings to be done as soon as possible. Jerry will be faxing them directly to you in the next couple of hours. Let me know if this is a problem.
>
> John, when are you back from China?

May 5, 2010 E-mail [Adv. Doc. No. 432-2, Ex. 38].

Notably, the financing statements in question were not attached to the May 5, 2010 E-mail, so Kirkland could not have been aware of the scope of the UCC-3 even though he was copied on the May 5, 2010 E-mail. Kirkland became aware of the scope of the UCC-3 on May 24, 2010, after he told Underkoffler to run a lien search. *See* Section III.E., above. That Kirkland became aware of the UCC-3 several weeks after it was filed does not support the Trustee's position that Kirkland authorized the filing of the UCC-3 on behalf of the BC Trust.

4. The BC Trust's Secured Claim Attaches to Proceeds from the Trustee's Sale of Stock in Ice Skating Enterprises and Sidecreek Development

The Trustee has collected $54,558.83 from the sale of stock in Ice Skating Enterprises and $50,000.00 from the sale of stock in Sidecreek Development. The Trustee does not dispute that the BC Trust's secured claim attaches to the $104,588.83 in proceeds from these stock sales.

**F. The Court Declines to Enter Final Judgment Pursuant to Civil Rule 54(b)**

Where some but not all claims in an action have been adjudicated, Civil Rule 54(b) permits the Court to enter final judgment as to those claims that have been adjudicated, but "only if the court expressly determines that there is no just reason for delay." The Trustee requests that the Court enter final judgment under Civil 54(b) as to the claims that have been adjudicated. The Court declines to do so. Entering final judgment on only some of the claims would create unnecessary procedural complications with respect to any appeals that may be filed. Further, the District Court has not entered final judgment with respect to the claims against Kirkland. Since the Trustee's claims against the BC Trust are significantly intertwined with his claims against Kirkland, it would not be appropriate for this Court to enter a final judgment before the District Court has done so.

**G. The Matter Shall Be Referred to Mediation**

The Court is aware that prior mediation of this matter before the Hon. Dickran M. Tevrizian (Ret.) did not result in a settlement. Adv. Doc. No. 238 (order appointing mediator). There have been significant developments in the case since the previous mediation. The parties now have the benefit of the jury's findings regarding Kirkland and this Court's findings as to the issues that remain for trial. The narrowing of the issues substantially increases the possibility of successful mediation.

The parties shall meet and confer and select a mediator. No later than **November 13, 2020,** the parties shall submit an order assigning this matter to mediation. The parties shall have completed at least one day of mediation no later than **December 31, 2020**.

To provide the parties sufficient time to engage in mediation, the Court will continue the Pretrial Conference from December 15, 2020 to **February 9, 2021 at 11:00 a.m.**

## VI. Conclusion

Based upon the foregoing, the Cross Motions for Summary Judgment filed by the Chapter 7 Trustee and the BC Trust are **GRANTED IN PART** and **DENIED IN PART**. The Court finds that the facts established by the jury trial, and/or the facts as to which there is no genuine dispute, support entry of the following findings:

1) The BC Trust holds an allowed secured claim in the amount of $1,950,613.41. This finding is without prejudice to the ability of the Trustee and the BC Trust to assert that the claim is subject to the following adjustments:
   a) The BC Trust may assert that the claim should be increased by approximately $75,000, based on the fact that the estate has received approximately $75,000 in proceeds from a Court-approved settlement with Union Bank, and the estate is entitled to only a single satisfaction of avoided transfers under § 550(d).
   b) The Trustee may assert that the claim is subject to being surcharged in the amount of $309,166.70 under § 506(c), based on the fact that the Trustee was required to pay this amount to facilitate a settlement with Robert Geringer.[24]
2) The BC Trust is not entitled to any interest on its claim because the Trustee is entitled to avoid the claim as an actually fraudulent transfer pursuant to § 548(a)(1)(A). Notwithstanding such avoidance, the BC Trust is entitled to a claim of $1,950,613.41 because it has established that it acquired the claim in good faith and for value pursuant to § 548(c).
3) The BC Trust's claim **does not** attach to (a) $3,886,650.83 in proceeds from the Trustee's settlement of avoidance actions or (b) $1,250,000.00 in proceeds from the Trustee's settlements with Luce Forward and Greenberg Traurig. The BC Trust's claim **does** attach to (a) $3,615,817.85 in proceeds from a settlement with Robert Geringer[25] and (b) $104,588.83 in proceeds from the sale of stock in Ice Skating Enterprises and Sidecreek Development.
4) The BC Trust is entitled to summary adjudication in its favor on the Trustee's constructively fraudulent transfer claims.
5) Neither party is entitled to summary adjudication with respect to the Trustee's equitable subordination claim.

---

[24] The issues regarding these potential adjustments to the BC Trust's claim were raised at the hearing and were not sufficiently briefed in the MSJs. The Court declines to rule upon these issues at the present time. These issues will be considered at the trial on the Trustee's equitable subordination claim.

[25] This finding is without prejudice to the Trustee's ability to assert that the BC Trust's claim can attach only to the net proceeds of the Geringer settlement ($3,615,817.85 less $309,166.70 in payments made by the estate to facilitate the settlement). This issue was not sufficiently briefed in the MSJs and will be considered at the trial on the Trustee's equitable subordination claim.

The Court will enter an order consistent with this Memorandum of Decision.

###

Date: October 29, 2020

Ernest M. Robles
United States Bankruptcy Judge